UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
                                              :
STORM LLC,                                    :
                                              :    06-CV-13157 (GEL) (DF)
                        Plaintiff,            :
                                              :
        -against-                             :
                                              :
TELENOR MOBILE COMMUNICATIONS AS,             :
                                              :
                        Defendant.            :
------------------------------------------------------------ x
```

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF THE CASE..................................................................................1

   A.   The Parties .....................................................................................................1

      1.   The 1998 Shareholders Agreement............................................ 2

      2.   Telenor Mobile and Storm Execute a Voting Agreement That Required the Parties to Enter Into the New Shareholders Agreement Three Days After the Consummation of the Omega Transaction............................................................................... 3

      3.   At the Closing Under the Share Purchase Agreement, Telenor Mobile and Storm Exchange Corporate Documents Certifying That They had the Authority to Enter the Shareholders Agreement............... 5

      4.   Alfa Buys Omega Shares And Asks For Changes to the Shareholders Agreement........................................................ 6

      5.   Alfa, Storm, and Telenor Mobile Execute the Shareholders Agreement; Storm Delivers to Telenor Mobile Customary Closing Documents to Confirm that Storm Had the Authority to Enter into the Shareholders Agreement ................................................ 7

      6.   After the Execution of the Shareholders Agreement, Storm Sells Telenor Mobile Kyivstar Shares Under the Option Agreement Signed By Mr. Nilov and Votes to Amend the Charter Consistent With the Shareholders Agreement ........................................ 8

      7.   The Arbitration Commences .................................................... 9

II.   ARGUMENT.................................................................................................9

   A.   THE INTERLOCUTORY ORDER AT ISSUE IS NOT SUBJECT TO REVIEW .................................................................................9

   B.   THE PANEL DID NOT ACT WITH MANIFEST DISREGARD OF THE LAW ................................................................................10

      1.   Storm Initially Conceded the Arbitrators' Jurisdiction          11

      2.   The Panel Did Not Act in Manifest Disregard in Finding That the Alpren Order Had no Effect on the Panel's Order          17

      3.    Storm First Argues That It Lacked Authority to Enter the Shareholders Agreement Until After Telenor Mobile Commences the Arbitration          18

   C.   STORM FAILS TO MEET ANY OF THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION ..................................................22

**TABLE OF CONTENTS**
(continued)

1.    Storm Cannot Satisfy the First Prong of the Standard for Injunctive Relief Because It Will Not Suffer Irreparable Harm if the Arbitration Proceeds ........................................................................... 23

2.    Storm Cannot Satisfy the Second Prong of the Standard for Injunctive Relief Because It Is Not Likely to Succeed on the Merits and Because the Equities Balance in Favor of Telenor ........................ 25

III.    CONCLUSION ............................................................................................27

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*Abram Landau Real Estate and Woodland Reality Co. v. Bevona*
No. 95 Civ. 6424, 1996 U.S. Dist. LEXIS 17714 (S.D.N.Y. 1996) .................................. 12

*Alghanim & Sons, W.L.L., v. Toys "R" Us, Inc.*
126 F.3d 15 (2d Cir. 1997)................................................................................. 12

*American Constr. Machinery & Equipment Corp. v. Mechanised Constr. of Pakistan*
659 F. Supp. 426 (S.D.N.Y. 1987) ..................................................................... 23

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*
402 U.S. 313 (1971)........................................................................................ 24

*Bridgeway Corp. v. Citibank*
201 F.3d 134 (2d Cir. 2000)............................................................................. 24

*Castlewood (US) Inc. v. Nat'l Indemnity Co.*
no. 06-CV-6842 (KMK), 2006 U.S. Dist. LEXIS 77634 (S.D.N.Y. Oct. 24, 2006).... 26, 27

*Cf. Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*
347 F.3d 589 (5th Cir. 2003) ............................................................................ 24

*Choi v. Kim*
50 F.3d 244 (3d Cir. 1995)............................................................................... 25

*Contec Corp. v. Remote Solution Co., Ltd.*
398 F.3d 205 (2d Cir. 2005)............................................................................. 16

*Dean Witter Reynolds, Inc., v. Byrd*
470 U.S. 213 (1985)........................................................................................ 13

*E.B. Michaels v. Mariforum Shipping, S.A.*
624 F.2d 411 (2d Cir. 1980)............................................................................. 11

*Emery Air Freight Corp. v. Local Union 295*
786 F.2d 93 (2d Cir. 1986)............................................................................... 27

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*
596 F.2d 70 (2d Cir. 1979)........................................................................... 25, 28

*Janmort Leasing, Inc. v. Econo-Car Int'l Inc.*
475 F. Supp. 1282 (E.D.N.Y. 1979) ................................................................... 29

*Kamerling v. Massanari*
    295 F.3d 206 (2d Cir. 2002)............................................................................... 26

*Lord v. Veazie*
    49 U.S. 251 (1850)............................................................................................... 21

*Maryland Casualty Co. v. Realty Advisory Board on Labor Relations*
    107 F.3d 979 (2d Cir. 1997)............................................................................... 26

*Mazurek v. Armstrong*
    520 U.S. 968, 138 L. Ed. 2d 162, 117 S. Ct. 1865 (1997).................................. 25

*Merrill Lynch Investment Managers v. Optibase, Ltd.*
    337 F.3d 125 (2d Cir. 2003)............................................................................... 28

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*
    808 F.2d 930 (2d Cir. 1986)........................................................................... 12, 20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*
    473 U.S. 614 (1985)........................................................................................... 14

*Motorola Credit Corp v. Uzan*
    388 F.3d 39 (2d Cir. 2004)....................................................................... 15, 22, 24

*Parklane Hosiery Co., Inc. v. Shore*
    439 U.S. 322 (1979)........................................................................................... 24

*Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co., Inc.*
    698 F. Supp. 504 (S.D.N.Y. 1988) .................................................................... 27

*Renegotiation Board v. Bannercraft Clothing Co.*
    415 U.S. 1 (1974)............................................................................................... 27

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*
    749 F.2d 124 (2d Cir. 1984)............................................................................... 29

*Sea Dragon v. Gebr. Van Weelde Scheepvaartkantoor B.V.*
    574 F. Supp. 367 (S.D.N.Y. 1983) .............................................................. 22, 23

*Shaw Group, Inc. v. Triplefine Intern. Corp.*
    322 F.3d 115 (2d Cir. 2003)........................................................................... 12, 16

*South Spring Hill Gold Mining Co. v. Armador Medean Gold Mining Co.*
    145 U.S. 300 (1892)........................................................................................... 23

*Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*
  263 F.3d 26 (2d Cir. 2001)..................................................................... 15, 17, 18

*Tellium, Inc. v. Corning Inc.*
No. 03-C 2004, U.S. Dist. LEXIS 2289 (S.D.N.Y. Feb. 13, 2004)........................... 26

*The Awosting Reserve LLC v. Conservancy Partners LLC*
  296 F. Supp. 2d 470 (S.D.N.Y. 2003)........................................................... 25

*Top Choice Distrib. Inc. v. United States Postal Service*
  1996 U.S. Dist. LEXIS 16937 (W.D.N.Y. 1996) ............................................... 27

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*
  363 U.S. 574 (1960).............................................................................. 28

*Wilko v. Swan*
  346 U.S. 427 (1953).............................................................................. 12

## STATE CASES

*Congregation Yetev Lev D'Satmar, Inc.* v. *26 Adar N.B. Corp.*
  219 A.D.2d 186, 641 N.Y.S.2d 680 (2d Dep't 1996)..................................... 18, 19

*Gramatan Home Investors Corp.* v. *Lopez*
  46 N.Y.2d 481, 386 N.E.2d 1328 (N.Y. 1979) ................................................ 24

*Indosuez International Finance B.V.,* v. *Nat'l Reserve Bank*
  98 N.Y.2d 238, 746 N.Y.S.2d 631 (2002) .................................................. 15, 19

*Intercontinental Packaging Co.* v. *China Nat'l Cereals, Oils & Foodstuffs Import &*
  *Export Corp.*
  159 A.D.2d 190, 559 N.Y.S.2d 302 (1st Dep't 1990) ........................................ 14

*JSC Surgutneftegaz* v. *President and Fellows of Harvard College*
  2005 WL. 1863676 (S.D.N.Y. Aug. 3, 2005)............................................... 14, 16

*Judson* v. *Flushing Jockey Club*
  14 Misc. 350, 36 N.Y.S. 126 (Com. Pl. N.Y. 1895) ........................................... 21

*Kirkland* v. *New York State Dep't of Correctional Services*
  1988 WL. 108485 (S.D.N.Y. Oct. 12, 1988)................................................... 21

*Mobile Oil Indonesia* v. *Asamera Oil (Indonesia) Ltd.*
  43 N.Y.2d 276, 401 N.Y.S.2d 186 (1977) .................................................... 12

*Quintal* v. *Fidelity & Deposit Co. of Maryland*,
   142 Misc. 657, 255 N.Y.S. 259 (N.Y. Sup. Ct. 1932), *aff'd*, 238 A.D. 820, 262 N.Y.S.
   924 (1st Dep't 1933) ............................................................................................ 18

*Smith Barney Shearson Inc.* v. *Sacharow*,
   91 N.Y.2d 39, 666 N.Y.S.2d 990 (1997) ............................................................ 16

## FEDERAL STATUTES

9 U.S.C.S. § 16(b) ....................................................................................................... 11

9 U.S.C.S. §1 et seq. ............................................................................................... 11, 12

## STATE STATUTES

N.Y. Gen. Oblig. Law § 5-1401 (McKinney 2004) ................................................... 14

This action is the most recent effort by Storm LLC ("Storm") to avoid its contractual obligation to arbitrate disputes under a Shareholders Agreement. After three evidentiary hearings before the arbitrators on Storm's motion to dismiss the arbitration on jurisdictional grounds, the Arbitral Tribunal (the "Panel"), on October 22, 2006, denied Storm's motion to dismiss and stay the proceeding, and directed the parties to proceed to a hearing on the merits on December 7, 2006. Since then, Storm moved for a stay before the arbitrators, and moved to bifurcate the arbitration and limit the scope of the hearing. Both applications were denied. Storm now asks this Court for an injunction to halt the arbitration. Petitioner's latest attempt to derail the arbitration to which it agreed should be rejected.[1]

## I.     STATEMENT OF THE CASE

### A.     The Parties

Defendant Telenor Mobile Communications AS ("Telenor Mobile") is a subsidiary of Telenor ASA ("Telenor"), the largest provider of telecommunications services in Norway. Through its various subsidiaries and affiliates, Telenor has mobile telecommunications operations in 12 countries, with over 50 million subscribers. Telenor is a company organized and existing under the laws of the Kingdom of Norway, with its principal place of business in Fornebu, Norway. Telenor's shares are listed in Norway on the Oslo Stock Exchange, and its American Depositary Shares are listed in the United States on the Nasdaq National Market.

Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar") is the largest mobile telecommunications company in Ukraine, with more than 14 million subscribers and annual

---

[1] Subject matter jurisdiction in this Court is founded on Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §201, et. Seq., and is uncontested.

revenues exceeding US $1 billion.  Telenor Mobile owns approximately 56.5% of the issued and outstanding shares of Kyivstar, while Storm owns approximately 43.5% of the company.[2]

Storm is a limited liability company organized and existing under the laws of the Ukraine.  Storm is an indirect wholly-owned subsidiary of Altimo Holdings & Investment Limited ("Altimo"),[3] a company organized under the laws of the British Virgin Islands.  50.1% of Altimo's interest in Storm is held directly, and the remaining 49.9% is held through Alpren Limited ("Alpren"), a Cyprus corporation and also a wholly-owned subsidiary of Altimo. Storm's sole function is to hold Altimo's shares in Kyivstar.  Both Storm and Altimo are subsidiaries of a Russian business entity known as the Alfa Group Consortium (the "Alfa Group").

### 1.    The 1998 Shareholders Agreement

On March 26, 1998, the then-existing shareholders of Kyivstar, Telenor Mobile, Storm, Sputnik IV L.P., and Sputnik V Holdings Ltd. (collectively "Sputnik"), Omega LLC ("Omega"), and Kyivstar itself, entered into a shareholders agreement concerning the corporate governance and management of Kyivstar (the "1998 Shareholders Agreement").  *See* Exhibits to the Evidentiary Brief in Opposition to Respondent Storm's Motion to Dismiss, ("Evidentiary Brief") Exh. A.  The 1998 Shareholders Agreement soon proved to have many shortcomings in facilitating the growth and development of Kyivstar.  *See* Affidavit of Egil Hansen ("Hansen Aff."), ¶ 6.

Section 8.3 of the 1998 Shareholders Agreement required Telenor Mobile to purchase all of Sputnik's shares in Kyivstar if certain conditions were met.  (the "Sputnik Put Option").  *See*

---

[2] Four wholly-owned subsidiaries of Telenor Mobile, Telenor Ukrainia I AS, Telenor Ukrainia II AS, Telenor Ukrainia III AS and Telenor Ukrainia IV AS, own one share each of Kyivstar.

[3] Altimo was formerly known as Alfa Telecom Limited.

Exh. A.  As it increased its ownership interest in Kyivstar, to ensure that its interests were

sufficiently protected, Telenor Mobile sought to have executed a new shareholders agreement

that would address Kyivstar's financial and governance needs.  Hansen Aff. ¶ 8.  In January

2002, Telenor Mobile approached Storm to negotiate the terms of a new shareholders agreement.

Hansen Aff. ¶ 9.

      In 2002, Altimo expressed its intention to purchase Omega's interest in Kyivstar.

Accordingly, Telenor Mobile, Storm – which was controlled by Altimo – and Altimo directly

negotiated the terms of the new shareholders agreement, beginning in March 2002.

      Although Alfa intended to purchase Omega's shares, it was having difficulty concluding

that transaction.  Accordingly, Telenor Mobile agreed to sell enough Kyivstar shares to Storm to

bring its shareholding over 40% level which gave Storm important minority rights under

Ukrainian corporate law and to re-purchase shares from Storm once the Omega transaction was

concluded.  Following negotiations between Telenor Mobile and Alfa, the order in which

Telenor Mobile and Alfa planned to purchase Sputnik's and Omega's shares in Kyivstar, and

become the company's sole shareholders, was set out in a Letter Agreement between Storm, Alfa

Bank, and Telenor Mobile dated April 29, 2002 (the "April 29 Letter Agreement").  *See*

Evidentiary Brief Exh. B.  The April 29 Letter Agreement provided that "[a]ll shareholders will

be party to a single, new Shareholders Agreement . . . substantially on the terms specified in the

Term Sheet . . . ."  *Id.* at 2.  The Term Sheet in turn sets out, in detail, the terms that would

govern the Shareholders Agreement.  *Id.* at 6-13.

    **2.**    **Telenor Mobile and Storm Execute a Voting Agreement That Required the**
             **Parties to Enter Into the New Shareholders Agreement Three Days After the**
             **Consummation of the Omega Transaction**

      Until Omega ceased to be a shareholder in Kyivstar, the 1998 Shareholders Agreement,

to which Omega was a party, remained in effect.  Accordingly, as a "bridge" to the new

Shareholders Agreement – without which Telenor Mobile would not have allowed Storm to acquire its blocking stake – the parties entered into the Voting Agreement. *See* Evidentiary Brief Exh. I. The Voting Agreement contains essentially the same substantive provisions as the Shareholders Agreement. Clarifying the status of the Voting Agreement as a bridge to the Shareholders Agreement, Section 2.05 of the Voting Agreement provided that:

> The Shareholders agree that within three (3) Business Days after the date on which Storm and/or any of its Affiliates purchases all of the Equity Interests in Omega or all of Omega's Securities, the Shareholders shall enter into and cause the Company to enter into, and Storm shall cause any such Affiliate which has purchased any of the Equity Interests in Omega or any of Omega's Securities to, or to cause Omega to, as applicable, enter into an agreement terminating the [1998] Shareholders Agreement, without the need for any further action by any of the Shareholders or the Company. Within three (3) Business Days after the earlier of (a) the date of termination of the [1998] Shareholders Agreement and (b) Storm and/or any of its Affiliates purchasing all of the Equity Interests in Omega or all of Omega's Securities, *the Shareholders agree to, and to cause the Company to, execute and deliver the New Shareholders Agreement . . ..*

*Id.* (emphasis added).

Telenor, Storm, and Alfa negotiated the Voting Agreement, the Shareholders Agreement, and the Share Purchase Agreement between July 26 and August 15, 2002. *See* Hansen Aff. ¶ 33. On August 15, 2002, Kirill Stein, a Director and the Deputy Head of Corporate Finance at Alfa Bank, sent an e-mail to various parties, stating:

> I can also confirm that neither Alfa nor the Ukrainian shareholders of Storm have any further comments to any of the five documents to be signed at the closing (Shareholders Agreement; Share Purchase Agreement; Voting Agreement; Pledge Agreement; and the Option Agreement). . . . Execution Copies should be prepared.

*Id.*; *see also* Evidentiary Brief Exh. J at 1. Accordingly, on August 30, 2002, final execution copies of the relevant agreements were exchanged between Alfa and Telenor Mobile. On September 2, 2002 the parties exchanged signature pages of the Share Purchase Agreement and

the Voting Agreement.  *See* Evidentiary Brief Exh. K.  A copy of the Shareholders Agreement

that the parties had agreed to execute once the Omega Transaction was concluded was annexed

as Exhibit B to the Voting Agreement.  *See* Evidentiary Brief Exh. I.

    **3.**      **<u>At the Closing Under the Share Purchase Agreement, Telenor Mobile and</u>**
**<u>Storm Exchange Corporate Documents Certifying That They had the</u>**
**<u>Authority to Enter the Shareholders Agreement</u>**

On October 29, 2002, the date of Telenor Mobile's sale of Kyivstar shares to Storm under

the Share Purchase Agreement, the parties exchanged certificates confirming that they had the

requisite authority to enter into all of the relevant agreements, including the Shareholders

Agreement.  Storm delivered a Certificate of Senior Officer of Purchaser, signed by both Mr.

Valeriy Nilov, Storm's General Director, and Mr. Yuri Tumanov, who was then the Chairman of

Storm (the "Storm Certificate").  *See* Evidentiary Brief Exh. L.

Storm also attached to the Storm Certificate a copy of a "true, complete and correct

English translation of a unanimous written consent of the participants of [Storm] approving the

Share Purchase Agreement, the other Transaction Agreements and the transactions contemplated

thereby, dated August 30, 2002...." (the "August 30 Notice") Messrs. Nilov and Tumanov

warranted in the Storm Certificate that:

> such written consent constitutes valid approval under the laws of
> Ukraine of the Purchaser's execution, delivery and performance of
> the Share Purchase Agreement and the other Transaction
> Agreements and any other documents in implementation of the
> Share Purchase Agreement and the other Transaction Agreements
> [which includes the Shareholders Agreement].  Such written
> consent is in full force and effect on the date hereof in the form in
> which it was adopted and no other resolutions have been adopted
> by the General Meeting of Participants of the Purchaser or any
> committee thereof that rescind, modify, amend or contradict such
> written consent.

See *id.*

The resolutions adopted by the August 30 Notice annexed to the Storm certificate expressly gave Mr. Nilov authority to "take or cause to be taken any and all other actions, as are required or desirable" to execute the Voting Agreement and the Shareholders Agreement.[4] *Id.* In particular, the August 30 Notice provided that Mr. Nilov's powers included the following:

> 1. Authorization, approval, ratification and confirmation of: . . .
>
>> (h) the execution, delivery and performance by [Storm] of the *Shareholders Agreement* to be entered into between Telenor and [Storm];
>
>> 2. Authorization of [Storm's General Director], Nilov Valeriy Vladimirovich, *to execute and deliver the above-referenced agreements and to execute, certify, deliver, accept, file and record any and all notices, certificates, instruments and documents, and take or cause to be taken any and all other actions, as are required or desirable in connection with this Resolution and the above referenced agreements.*

*Id.* (emphasis added).  The August 30 Notice further provided that all of the "aforementioned resolutions have been approved by a unanimous vote of the participants of the Company."[5]

### 4.    Alfa Buys Omega Shares And Asks For Changes to the Shareholders Agreement

In November 2003, as Storm's purchase of the Omega shares was finally making progress, Telenor Mobile asked whether Storm was prepared to sign the Shareholders Agreement in the form annexed to the Voting Agreement.  Alexey Khudyakov, an Alfa representative, stated that Alfa did not have any additional comments and was prepared to sign the Shareholders Agreement in that form, subject to some minor technical changes.  *See* Evidentiary Brief Exh. Q. Shortly thereafter, however, Mr. Khudyakov contacted Telenor Mobile in December, requesting

---

[4] Under Part 4 of Article 60 of the Law of Ukraine "On Business Companies" and Section 11.11 of Storm's charter, Storm's participants can decide on all matters within the competence of the meeting of participants by written polling without holding an actual meeting of participants.

[5] The documents furnished by Storm in 2002 confirmed Mr. Nilov's authorization not only by written polling but by an actual meeting of Storm's participants, held on October 7, 2002.  See Evidentiary Brief Exh. N.

two additional changes to the Shareholders Agreement, including a change to the termination provisions of the Agreement. Telenor Mobile eventually agreed to make certain of the changes requested by Alfa. See Evidentiary Brief Exhs. R, T-X.

On December 15, 2003, Storm completed its purchase of Omega, which it intended to liquidate so that it could hold Omega's shares in Kyivstar directly. Because that liquidation could not be completed immediately, on December 17, 2003, Telenor Mobile and Storm entered into a letter agreement in which they jointly waived the requirement in Section 2.05 of the Voting Agreement that the parties terminate the 1998 Shareholders Agreement within three business days following Storm's completion of its purchase of Omega, and Storm agreed that it would enter into the Shareholders Agreement on or prior to January 31, 2004. During the period between January 17 and January 28, 2004, Storm continued to request changes to the Shareholders Agreement. See Evidentiary Brief Exhs. U-W.

### 5. Alfa, Storm, and Telenor Mobile Execute the Shareholders Agreement; Storm Delivers to Telenor Mobile Customary Closing Documents to Confirm that Storm Had the Authority to Enter into the Shareholders Agreement

On January 28, 2004, Telenor Mobile's Ukrainian counsel circulated a final version of the Shareholders Agreement reflecting the additional changes to the Shareholders Agreement. See Evidentiary Brief Exh. W. In an e-mail dated January 29, 2004, Mr. Khudyakov of Alfa agreed to the final text. See Evidentiary Brief Exh. X.

On January 30, 2004, Mr. Valeriy Nilov, the General Director of Storm, Mr. Sigmund Ekhougen, on behalf of Telenor Mobile, and Mr. Igor Lytovchenko, on behalf of Kyivstar, executed the Shareholders Agreement. See Evidentiary Brief Exh. Y. In addition, Storm and Telenor executed and exchanged customary closing certificates to demonstrate that each had possessed full authority to enter into the Shareholders Agreement and had followed appropriate formalities in entering into the Shareholders Agreement. Storm delivered two "Certificates of

Incumbency and Authority of Storm." *See* Evidentiary Brief Exhs. AA and BB.  One of those

certificates was signed by Yuri Tumanov, the then-chairman of Storm, and states as follows:

> I, Yuri G. Tumanov, being the chairman of Storm LLC, a limited
> liability company organized under the laws of Ukraine ("Storm"),
> do hereby certify that Valeriy Vladimirovich Nilov:
>
>> (i) is the duly elected, qualified and
>> acting General Director of Storm; and
>
>> (ii) is duly authorized to sign, on behalf of Storm,
>> individually, (A) all instruments as necessary to terminate
>> the Shareholders Agreement dated March 26, 1998 between
>> and among [Telenor Mobile, Sputnik, Omega, and
>> Kyivstar] . . .and (B) *the Shareholders Agreement dated
>> January 30, 2004 between and among Telenor, Storm and
>> Kyivstar.*

*See* Evidentiary Brief Exh. AA.  An identical certificate was signed by Andrey Kosogov, who

had signed the April 30 and May 7 Letter Agreements on behalf of Alfa.[6]  *See* Evidentiary Brief

Exh. BB.

> **6.**    **After the Execution of the Shareholders Agreement, Storm Sells Telenor
> Mobile Kyivstar Shares Under the Option Agreement Signed By Mr. Nilov
> and Votes to Amend the Charter Consistent With the Shareholders
> Agreement**

In March 2004, Telenor Mobile exercised its rights under the Option Agreement to buy

back 1.163221% of the Kyivstar shares it had previously sold to Storm, thereby ensuring that

Telenor Mobile would have 56.5% of Kyivstar's shares and that Storm would have 43.5% of

Kyivstar's shares.  *See* Evidentiary Brief Exh. M.  Shortly thereafter, on April 27, 2004, at the

annual meeting of Kyivstar's shareholders, Storm voted in favor of the amended and restated

---

[6] Mr. Kosogov, according to the Alfa Group website, is presently Chairman of the Board of Directors of Alfa Asset
Management and Altimo.  Alfa Group Consortium, About the Group, available at
http://www.alfagroup.org/142/18799/About.aspx (last visited Nov. 15, 2006).  The transmittal line at the top of
Storm's certificates of incumbency indicated that they were faxed from Alfa's offices.

charter of Kyivstar, as required by the Shareholders Agreement it had executed.  *See* Evidentiary

Brief Exh. DD.

### 7.     The Arbitration Commences

Although Storm originally complied with its obligations under the Voting Agreement and

the Shareholders Agreement, it began boycotting Shareholders and Board of Directors meetings

in 2005.  Because the Shareholders Agreement obligates Storm to attend those meetings, Telenor

Mobile commenced the underlying arbitration against Storm on February 7, 2006, pursuant to

Section 12.01 of the Shareholders Agreement.[7]  Section 12.01 broadly provides that any disputes

"arising under, relating to or in connection with" the Shareholders Agreement be resolved

through arbitration, held in New York, and governed by the United National Commission on

International Trade Law ("UNCITRAL") Arbitration rules.  On October 22, 2006, the Panel in

this matter concluded not only that it had "jurisdiction to proceed with this Arbitration," but

scheduled a hearing on the merits to begin on December 7, 2006.  *See* Van Tol Evidentiary Brief

Exh. 20.


## II.     ARGUMENT

As set forth below, the Arbitrators' award upholding their own jurisdiction is not

reviewable until there is a final award.  Even if it were, under any standard of review, there is no

basis to vacate the Panel's Order.

### A.     THE INTERLOCUTORY ORDER AT ISSUE IS NOT SUBJECT TO REVIEW

The Panel's "Partial Final Reward Regarding Jurisdiction" is final in name only; it is, in

fact, an interlocutory order denying a motion to dismiss.  The rule in this Circuit is that such

---

[7] In addition, Telenor Mobile's Statement of Claim seeks an order compelling Storm to agree to certain amendments
to the Kyivstar charter necessary to bring it into compliance with the Shareholders Agreement, and appropriate relief
for Storm's violation of the non-competition provisions in the Shareholders Agreement.

orders are not subject to District Court review. As the Court of Appeals held in *E.B. Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411 (2d Cir. 1980):

> Under the Federal Arbitration Act, 9 U.S.C. §1 et seq., a district court does not have the power to review an interlocutory ruling by an arbitration panel. . .
>
> The language of the Act is unambiguous: it is only after an award has been made by the arbitrators that a party can seek to attack any of the arbitrators' determinations in court, by moving either to vacate the award. . . or to modify or correct it. . . . [A] district court is without authority to review the validity of arbitrators' rulings prior to the making of an award. Where, as here, arbitrators make an interim ruling that does not purport to resolve finally the issues submitted to them, judicial review is unavailable.

*Id.* at 414 (Footnote and citations omitted); *Compare* 9 U.S.C.S. § 16(b) ("[A]n appeal may not be taken from an interlocutory order... (2) directing arbitration to proceed under section 4 of this title... [or] (4) refusing to enjoin an arbitration that is subject to this title."). The same rule is followed by New York courts following New York law. See *Mobile Oil Indonesia  v. Asamera Oil (Indonesia) Ltd.*, 43 N.Y.2d 276, 282, 401 N.Y.S.2d 186, 188 (1977).

**B.**    **THE PANEL DID NOT ACT WITH MANIFEST DISREGARD OF THE LAW**

Assuming that review were available, Storm would be required to demonstrate that the arbitrators' decision was a "manifest disregard of the law." *Wilko v. Swan*, 346 U.S. 427, 436-437 (1953); *Alghanim & Sons, W.L.L., v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997). New York Courts follow federal law in reviewing arbitration awards subject to the Federal Arbitration Act. See *Wien & Malkin v. Helmsley-Spear, Inc.*, 12 A.D.3d 65, 70 (1st Dep't 2004) ("the United States Supreme Court has reiterated that Congress's regulation of interstate commerce extends to matters merely affecting interstate commerce; hence where the subject matter of an arbitration does so, the FAA is applicable and the manifest disregard standard applies . . ."). As the Court of Appeals has explained, that standard means that "the arbitrator

10

appreciates the existence of a clearly governing legal principle but decided to ignore or pay no attention to it." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). In fact, even were the arbitrators' decision to be reviewed *de novo*, it would be upheld, because it was correctly decided.

### 1.     Storm Initially Conceded the Arbitrators' Jurisdiction

The Panel correctly found that "the issue of the Tribunal's jurisdiction is arbitrable and that the arbitration clause is severable from any question concerning the validity of the Shareholders Agreement, itself." October 22, 2006 Decision, p. 12. Relying on *Shaw Group, Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115 (2d Cir. 2003) and Article 21 of the UNCITRAL Rules, the Panel found that it had "jurisdiction to proceed with this Arbitration, and that the Arbitration should proceed on December 7 and 8, 2006." October 22, 2006 Decision, p. 12, 16.

During the hearings, Storm was in agreement on this point. Pieter Van Tol, Storm's counsel, repeatedly confirmed that the arbitrators have the right to determine their own jurisdiction in this case. To cite three examples:

- "Just returning to the jurisdictional point quickly, these are great issues to kick around, but I think one way to harmonize the cases is to recognize that *we have never challenged the tribunal's jurisdiction to determine its jurisdiction*." (8/14/2006 Hearing Tr. 257: 10-16) (emphasis added).

- Arbitrator Feinberg: "You have just said on the record that you are not here challenging this tribunal's ability to determine jurisdiction." Mr Van Tol: "Correct." (258: 9-13).

- Arbitrator Jentes: "What, exactly, do you mean, we have jurisdiction? Mr. Van Tol: "It's within your power under the UNCITRAL rules. *You do have the power to determine whether or not his case should go forward. In other words, you have the power to determine whether or not there was a contract.*" (263: 4-12) (emphasis added).

As set forth below, Storm's current repudiation of its prior position is without merit.

a.    **The Arbitration Agreement is Severable from the Shareholders Agreement**

It is firmly established that arbitration agreements are severable from the contracts of which they form a part. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 360 F.2d 315, 317 (2d Cir. 1966) ("In this circuit . . . we have held that an arbitration agreement is separable from the contract within which it is contained.").  Moreover, while it is·generally a court, and not the arbitrators themselves, who rule on the arbitrators' jurisdiction, the parties to an arbitration agreement may vary that practice by contract, under the rule set out in *First Options of Chicago v. Kaplan*, 514 U.S. 938, 943 (1995) (finding that that "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration").  Accordingly, when, as here, parties expressly incorporate rules that empower an arbitrator to decide issues of arbitrability and of the existence of the contract containing the arbitration clause, those rules serve as "clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *See Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (arbitrability question delegated to arbitrator when contract incorporated American Arbitration Association rules); *JSC Surgutneftegaz v. President and Fellows of Harvard College*, 2005 WL 1863676, *6 (S.D.N.Y. Aug. 3, 2005).  The law of New York is to the same effect.  *See Shaw Group, Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 123 (2d Cir. 2003) (arbitrability question delegated to arbitrators when agreement incorporated ICC rules of international arbitration; citing *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 46-47, 666 N.Y.S.2d 990 (1997)).

Because the UNCITRAL Rules are incorporated into the arbitration agreement and provide that the arbitral tribunal has authority to determine the scope of its own jurisdiction, the Panel itself has exclusive authority to determine whether Storm's arbitration agreement is binding.  *See* UNCITRAL Arb. Rules, Art. 21(1) ("The Arbitral tribunal shall have the power to

rule on objections that is has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement.").

Storm repeatedly refers to the Second Circuit's decision in *Sphere Drake v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001) as varying their rule, but that is simply not the case. *Sphere Drake* merely holds that, in a case in which the question of the validity of an arbitration agreement is before a court, the presentation of "some evidence" of invalidity entitles the party opposing arbitration to a trial on the merits of that issue, similar to the practice followed on motions for summary judgment. There is nothing in *Sphere Drake* to suggest that where, as here, the arbitrators are expressly given power to rule on their own jurisdiction under an arbitration agreement, a finding of "some evidence" sends the matter back to court. Such a rule would be entirely illogical, and would fly in the face of the Supreme Court's holding in *First Options*. Storm has had the evidentiary hearing it seeks; the arbitrators have properly upheld their own jurisdiction, and the case should be allowed to proceed on the merits.

While Storm's current argument is that Mr. Nilov lacked actual authority to execute the Shareholders Agreement, it has never argued that he lacked authority, as the General Director of Storm, to enter into a separate arbitration agreement. In fact, Storm's attorney conceded this point before the arbitrators. Because the arbitration clause is, under the UNCITRAL Rules and Federal and New York law, a separate and severable contract, and was concededly executed with authority, the arbitrators' decision to uphold their jurisdiction and allow the hearing on the merits to proceed was clearly correct.

### b.     New York Law Governs the Interpretation of the Shareholders Agreement Which Grants Jurisdiction to the Panel

By express agreement of the parties, New York law, and not Ukrainian law, governs the question of whether the Shareholders Agreement was validly executed. *See* Shareholders

Agreement § 13.05.  Such a choice of law clause is expressly sanctioned by statute in New York.

*See* N.Y. Gen. Oblig. Law § 5-1401 (McKinney 2004) ("The parties to any contract. . . in

consideration of, or relating to any obligation arising out of a transaction covering in the

aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise

covered by subsection one of section 1-105 of the uniform commercial code, may agree that the

law of this state shall govern their rights and duties in whole or in part, whether or not such

contract, agreement or undertaking bears a reasonable relation to this state.").  The same is true

under the UNCITRAL Rules, which the parties specified to govern this proceeding.  *See*

UNICITRAL Arb. Rules, Art. 33(1) ("The arbitral tribunal shall apply the law designated by the

parties as applicable to the substance of the dispute.").[8]

In light of the transnational nature of the underlying dispute, the parties' choice of New

York law controls all issues of contract formation and validity.  As the Second Circuit stated

when applying a contractual choice of New York law to the question of contract validity in

*Motorola Credit Corp v. Uzan,* 388 F.3d 39 (2d Cir. 2004):

> [W]here the parties have chosen the governing body of law,
> honoring their choice is necessary to ensure uniform interpretation
> and enforcement of that agreement and to avoid forum shopping.
> This is especially true of contracts between transnational parties,
> where applying the parties' choice of law is the only way to ensure
> uniform application of arbitration clauses within the numerous
> countries that have signed the New York Convention.

*Id.* at 50-51.  *See Sphere Drake Ins. Ltd.,* 263 F.3d at 31-34 (applying New York choice-of-law

clause to one party's claim that it was not bound by an arbitration agreement that its agent had

---

[8] Similarly, the Geneva Arbitration Convention, to which both Ukraine and Norway are parties, provides in Article VII that "[t]he parties shall be free to determine, by agreement, the law to be applied by the arbitrators to the Substance of the dispute."  Ukrainian statutory law likewise provides, in Article 28(1) of the Law on International Arbitration that "[t]he arbitral tribunal shall decide the dispute in accordance with such rules of law as are chosen by the parties applicable to the substance of the dispute.  Any designation of the law or legal system of a given State shall be construed as directly referring to the substantive law of that State and not to its conflict of law rules."

signed while purportedly acting outside the scope of agency); *see also Indosuez International Finance B.V., v. Nat'l Reserve Bank,* 98 N.Y.2d 238, 746 N.Y.S.2d 631 (2002) (applying New York choice of law clause to question of authority of deputy chairman of Russian bank to bind the bank and rejecting claim that Russian law governed question of authority). Storm's assertions that Ukrainian law governs the validity of the Shareholders Agreement are simply wrong. Storm's efforts to avoid the choice of New York law to which it freely assented should be rejected.

> **(1)    To the Extent that the Validity of the Shareholders Agreement As Opposed to the Arbitration Agreement, is at Issue in this Proceeding, the Record Shows that Storm's General Manager Had either Actual or Apparent Authority to Execute the Shareholders Agreement**

Under New York Law, a senior officer such as Mr. Nilov has at least apparent authority to execute contracts. N.Y. LLC Law § 412 (McKinney 2006) (agency of members or managers). Indeed, Storm went to great lengths to confirm to Telenor Mobile that Mr. Nilov's execution of the Shareholders Agreement was duly authorized. Storm executed and delivered to Telenor Mobile customary closing documents to evidence that Storm possessed full authority to enter into the Shareholders Agreement and had followed appropriate formalities in entering into the Shareholders Agreement. In particular, in connection with its execution of the Shareholders Agreement, Storm delivered two "Certificates of Incumbency and Authority of Storm," signed by the Chairman of Storm and a member of Storm's Board of Directors. Evidentiary Brief Exhs. AA and BB. Moreover, both parties warranted that "the Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and assigns." Shareholders Agreement § 13.05.[9]

---

[9] Whether Mr. Nilov had actual authority under Ukrainian law to execute the Shareholders Agreement was disputed before the arbitrators, but unresolved. Compare the affidavit of Myron Rabij, sworn to August 9, 2006 at ¶¶ 19-29

As a matter of New York law, Storm cannot argue that Storm's alleged failure to follow its own internal procedures before its General Director executed the Shareholders Agreement renders the Shareholders Agreement invalid as against Telenor Mobile. New York follows "[t]he rule that *ultra vires* contracts which have been fully executed on both sides will not be disturbed by the courts . . ." *Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 219 A.D.2d 186, 190, 641 N.Y.S.2d 680, 683 (2d Dep't 1996). A contrary rule would leave parties to contracts in a perpetual "state of uncertainty as to the possibility of being undone on some remote point." *Congregation Yetev Lev D'Satmar, Inc., supra.* Even if such a defense were available, that claim would almost certainly be barred under the doctrine of laches, waiver, or estoppel, particularly given that it was first made over two years after the Shareholders Agreement was executed. *See, e.g., Congregation Yetev Lev D'Satmar*, 219 A.D.2d at 191-92, 641 N.Y.S.2d at 683-84.

The New York Court of Appeals' decision in *Indosuez International Finance B.V. v. National Reserve Bank*, 98 N.Y.2d 238, 746 N.Y.S.2d 631 (2002), is instructive on this point. There, the Court rejected the defendants' claims that Russian law, rather than New York law, determined whether or not a Russian company had entered into a defaulted series of non-deliverable forward contracts with the Geneva branch of a Netherlands corporation. *Id.* Although the relevant contracts specified either New York or English law as their governing law, the Russian defendant claimed that Russian law governed the question of whether one of the executives, acting in Russia, had authority to bind a Russian bank, and that because the confirmations were executed only by the bank's deputy chairman and were not also executed by the defendant's chief accountant general, the contracts were null and void under Russian law.

---

(concluding that Mr. Nilov had actual authority), with affidavit of Vadim Klymenko, sworn to August 9, 2006 at ¶ 8 (arguing that Mr. Nilov lacked actual authority to execute the agreement because of Storm's failure to hold a second "meeting of participants."

The Court of Appeals rejected that argument, holding that by virtue of the "nature of the transactions and the parties' own choices, New York has the paramount interest in the enforceability of the transactions." *Indosuez International Finance B.V.*, 98 N.Y.2d at 245, 746 N.Y.S.2d at 635. Applying New York substantive law to the transaction, the Court of Appeals found that the plaintiff was entitled to rely upon the apparent and implied authority of the deputy chairman of the Russian bank who had executed the relevant contracts.[10] *Indosuez International Finance B.V.*, 98 N.Y.2d at 246, 746 N.Y.S.2d at 636.

### 2.  The Panel Did Not Act in Manifest Disregard in Finding That the Alpren Order Had no Effect on the Panel's Order

Storm contends that the Panel "ignored" the rulings of the Ukrainian courts and thus disregarded New York law on the recognition of foreign judgments by refusing to follow the Ukrainian courts in finding the arbitration clause of the Shareholders Agreement null and void. The Panel's Order, however, was quite clear on this point. October 22, 2006 Decision, p. 15-16. In reaching its decision, the Panel carefully explained and supported the reasoning of its opinion and discussed and distinguished, rather than disregarded the law relied on by Storm.

### a.  The Alpren Order Arises out of Collusive Litigation and Has No Legal Effect on Telenor Mobile

Storm relies principally on the orders generated in Alpren's Ukrainian litigation against Storm to argue that the Arbitrators lack jurisdiction to hear this dispute. However, Storm fails to explain or address how that judgment, which was rendered in a proceeding brought by Storm's own corporate parent, in the Ukrainian courts, without notice to, or participation by, Telenor Mobile or Kyivstar, could have any legal effect on Telenor Mobile or on the arbitration.

---

[10]The Court alternatively found that Defendant ratified the confirmation contracts because, as is the case here, it failed to raise the issue of authority in the course of performance. *Id.*

3.    **Storm First Argues That It Lacked Authority to Enter the Shareholders Agreement Until After Telenor Mobile Commences the Arbitration**

On May 29, 2006, Telenor Mobile for the first time learned through an Alfa press release that Alpren had sued its subsidiary Storm in Ukraine. In Alfa's press release, Altimo Senior Vice President Oleg Malis announced:

> The Voting Agreement between the shareholders of [Kyivstar] dates back to the period when Altimo held 50% of Storm shares. Following the consolidation of Storm, Altimo performed a thorough legal and financial audit of the company's activities and discovered gross violation of the corporate Articles of Association; the General Director did not have the permission of the shareholders' meeting enabling him to sign the above Agreements.[11]

*See* Evidentiary Brief Exh. EE. The *Alpren* case represented the first time Alpren and Storm challenged the validity of the Shareholders Agreement on the grounds that Storm's General Director lacked authority to enter into the Voting Agreement and the Shareholders Agreement, because Storm failed to hold a "meeting of participants."

The Alpren Order is not the product of an adversary proceeding. Rather, without any notice to Telenor Mobile or Kyivstar, Alpren – a wholly-owned subsidiary of Alfa Group and, together with Altimo, the immediate corporate parent of Storm – brought an action against Storm, likewise a wholly-owned subsidiary of Alfa Group, seeking a declaration that the General Director of Storm lacked actual authority to execute the Shareholders Agreement. The apparent basis of that claim is the assertion that appropriate formalities were not followed by Storm before the Shareholders Agreement was executed by its General Director. As the Alpren Order itself recites, Storm, "submitted no statement of defense to the statement of claim." Van Tol Exh. 8, p.

---

[11] In fact, at that time, Altimo held a 50.1% interest in Storm, giving it a formal majority. Moreover, under the Participants Agreement to which it was a party with Storm's other participants, Altimo had, at that time, the right to designate Storm's General Director. Mr. Nilov was, and remains, an employee of the Alfa Group, of which Altimo is a part.

1, and Storm was "represented" by a layman, while Alpren was represented by one of Storm's regular attorneys.

Because the Alpren Order is not the product of a contested litigation, it is entitled to no weight at all. The rule against collusive lawsuits was articulated long ago by the United States Supreme Court in *Lord v. Veazie*, 49 U.S. 251 (1850), as follows:

> The objection in the case before us is, not that the proceedings were amicable, but that there is no real conflict of interest between them; that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons. . . A judgment entered under such circumstances, and for such purposes, is a mere form . . . A judgment in form, thus procured, in the eye of the law is no judgment of the court. It is a nullity . . .

*Id.; see* Charles A. Wright and Arthur R. Miller, 13 Federal Practice and Procedure § 3530 (3rd ed. 2004) (describing as "fundamental" the "rule against suits brought by cooperating interests for the purpose of affecting the interests of nonparties"); *Judson v. Flushing Jockey Club*, 14 Misc. 350, 351, 36 N.Y.S. 126 (Com. Pl. N.Y. 1895) ("Courts of judicature are organized only to decide real controversies between actual litigants. When . . . it appears. . . that a pretended action is not a genuine litigation over a contested right between opposing parties, but is merely the proffer of a simulated issue by a person dominating both sides of the record, the court, from a sense of its own dignity as well as from regard to the public interests, will decline a determination of the fabricated case…."). Accordingly, a court must dismiss a case where the "cooperation of the plaintiff and the defendant might adversely affect the rights of outsiders if the question of law is decided in the manner that both of the parties desire." *Kirkland v. New York State Dep't of Correctional Services*, 1988 WL 108485 (S.D.N.Y. Oct. 12, 1988); Restatement (First) of Judgments §122 (1942) ("Collusion between an agent in charge of an action and the other party to the action has the same effect as the bribery of the court. . . ."). The

19

"clarification" order of November 8, on which Storm places great reliance, only highlights the collusive nature of the Alpren litigation on the face of that order. Storm, the ostensible defendant, approached the Ukrainian court and sought a "clarification" of the judgment against itself, hardly the hallmark of a contested case. [12]

As the authorities cited above makes clear, there is no such rule. In *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004), the Second Circuit affirmed a District Court that declined to give any weight to several injunctions obtained in the Turkish courts purporting to prohibit a transfer of assets, after finding that those orders were the product of collusion between ostensible adversaries. In reaching its decision that the Turkish orders were the product of collusion, the District Court found that:

> the distributors [the Turkish Plaintiffs] enjoyed a very close relationship with the Uzans [the Turkish Defendants]; that the timing of the filings in Turkey suggested that they were intended to thwart the District Court's proceedings just before the Court ruled on the preliminary injunction motion; that the suits in Turkey were nearly identical even though they were purportedly filed by different parties; and that the defendants' responses to the distributors' lawsuits were so pathetic that they actually indicated support for the suits. "Most telling of all," according to the District Court, was defendants' concealment of the Turkish injunctions from the District Court and the Court of Appeals.

*Id.* Here, of course, the parties to the Alpren case are not in "a close relationship" – they are under common ownership and control. The defense was not just "pathetic" – no statement of defense was submitted at all, and Storm did not even engage counsel. However, just as in *Uzan*,

---

[12] The inadequacies and corruption of the Ukrainian Court system are described in The State Department country reports which, under Second Circuit law, are considered "powerful" evidence in a challenge to the adequacy of foreign country's judicial system, are already part of the record. *See* Van Tol Exh. 7, pgs. 215-217; *see also Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) ("There is little doubt that the Country Reports constitute 'factual findings.' . . . . [T]he information in the district court's opinion concerning the functioning of the Liberian courts during the war is drawn (or could easily be drawn) entirely from... the Country Reports... which were clearly admissible.") *See* http://www.state.gov/e/eb/ifd/2005/43044.htm (last visited Nov. 17, 2006).

Storm proceeded before the Ukrainian court without notice to Telenor Mobile. The Alpren case is a transparent sham, and the orders on which Storm relies should be given no weight at all.[13]

Here, the parties expressly chose arbitration in New York to resolve disputes arising under the Shareholders Agreement. Storm attempted to circumvent that agreement by arranging to be sued by Alpren, its corporate parent, in Ukraine. That disregard of the Shareholders Agreement is a further basis for giving no effect to the purported judgment of the Ukrainian court. *See American Constr. Machinery & Equipment Corp. v. Mechanised Constr. of Pakistan*, 659 F. Supp. 426 (S.D.N.Y. 1987) (refusing recognition to Pakistani judgment purporting to invalidate arbitration award where parties had agreed on New York arbitration).

### a. Even If the Alpren Order Was Not the Product of Collusion, Telenor Mobile Is Not Bound By The Judgment in Alpren Because it Was Never a Party to, or Notified of, the Litigation

Even if the Alpren Order were not the product of collusion, it would still have no effect on Telenor Mobile's rights, because Telenor Mobile was not a party to, or even notified of, the litigation.

The applicable rule under New York law is that it is a violation of "due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n.7 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329 (1971); *Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d 481, 486, 386 N.E.2d 1328, 1332

---

[13]Storm cites *Sea Dragon v. Gebr. Van Weelde Scheepvaartkantoor B.V.*, 574 F.Supp. 367 (S.D.N.Y. 1983), as support for the proposition that New York courts may recognize a foreign judgment gained through a collusive litigation. The facts in *Sea Dragon* are dramatically and materially different from those present here. In that case, which involved a prior sequestration order entered by a Dutch Court – an *in rem* proceeding – the District Court expressly held that the plaintiff had been given adequate notice and an appropriate opportunity to respond in the proceeding in the Netherlands. As the Court stated, "respondent's *unopposed position* is that the Dutch Order was obtained in compliance with both Dutch law and American due process standards." *Sea Dragon*, 574 F.Supp. at 372 n.2 (emphasis added). As the extensive record before the Tribunal amply demonstrates, that is far from the case here.

(N.Y. 1979) ("One of the fundamental principles of our system of justice is that every person is entitled a day in court notwithstanding that the same issue of fact may have been previously decided between strangers. Generally, therefore, a person may not be precluded from litigating issues resolved in an action in which that person was not a party"); *Cf. Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 593-97 (5th Cir. 2003) (refusing to recognize Mexican bankruptcy order as failing to afford creditor due process of law when creditor had not been given notice that a motion had been filed which could and did affect its claim); *Choi v. Kim*, 50 F.3d 244, 250 (3d Cir. 1995) (refusing to recognize judgment because party was not notified of entry of order of execution nor given opportunity to challenge its validity). Telenor Mobile, was never notified of, much less made a party to, the *Alpren* action. Consequently, even were the Ukrainian courts a proper forum for contract formation claims, Telenor Mobile never had the opportunity to challenge Alpren and Storm's contentions. Accordingly, both as a matter of New York law and elementary notions of due process, the *Alpren* Order has no legal effect on Telenor Mobile and cannot affect its rights.

## C.  STORM FAILS TO MEET ANY OF THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION

Even assuming the Court does have jurisdiction to hear this case, Storm's motion for a preliminary injunction should be denied.  A preliminary injunction is "'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"  *The Awosting Reserve LLC v. Conservancy Partners LLC*, 296 F. Supp. 2d 470, 472 (S.D.N.Y. 2003) (*quoting Mazurek v. Armstrong* 520 U.S. 968, 972, 138 L.Ed. 2d 162, 117 S. Ct. 1865 (1997) (emphasis in original).  In the Second Circuit, a clear showing is established where a party can demonstrate:  (a) that irreparable harm will occur; and (b) either (1) the likelihood of success on the merits, or (2) sufficiently serious questions going to the

merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.  *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

### 1.    Storm Cannot Satisfy the First Prong of the Standard for Injunctive Relief Because It Will Not Suffer Irreparable Harm if the Arbitration Proceeds

A motion for a preliminary injunction cannot be maintained absent a showing of irreparable injury.  The Second Circuit has found that the irreparable harm prong of the test for injunctive relief "is perhaps the single most important prerequisite for the issuance of a preliminary injunction."  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).  In order to establish irreparable harm, the moving party "must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damage cannot provide adequate compensation." *Id.*  Furthermore, "irreparable harm must be shown to be actual and imminent, not remote or speculative." *Id.*

Storm argues that it "would suffer irreparable harm if it were forced to expend time and resources in an arbitration that it is challenging on the grounds that no agreement to arbitrate exists."  TRO and Injunction Memo, p. 11.  Storm primarily relies on two cases in support of this proposition:  *Castlewood (US) Inc. v. Nat'l Indemnity Co.*, no. 06-CV-6842 (KMK), 2006 U.S. Dist. LEXIS 77634 (S.D.N.Y. Oct. 24, 2006) and *Tellium, Inc. v. Corning Inc.*, No. 03-CV-8487 (NRB), 2004 U.S. Dist. LEXIS 2289 (S.D.N.Y. Feb. 13, 2004).  These cases are readily distinguishable.

In both *Castlewood* and *Tellium*, the parties were not signatories to the arbitration agreements at issue.  New York courts have determined that the expenditure of time and money on arbitrations to which a party is not a signatory is a *per se* irreparable injury.  *Tellium*, 2004 WL 307238 at *8-9; *Castlewood*, 2006 U.S. Dist. LEXIS 2289, at *14.  Similarly, the

expenditure of time and money on non-arbitrable matters can be found to constitute irreparable harm. *Maryland Casualty Co. v. Realty Advisory Board on Labor Relations*, 107 F.3d 979, 984-85 (2d Cir. 1997) ("Maryland would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable....").

In contrast, in this proceeding, the agreement to arbitrate undoubtedly "exists". As discussed above, Storm's contention that the Agreement is voidable does not negate the existence of the arbitration clause or the Tribunal's ability to determine its validity.

In contrast to *Castlewood* and *Tellium*, when a party is a signatory to an arbitration agreement, monetary damages arising from the arbitration do not constitute irreparable harm. *See, e.g.*, *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 24, 94 S. Ct. 1028, 1040 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93, 100 (2d Cir. 1986) ("The monetary cost of arbitration certainly does not impose... legally recognized irreparable harm."); *Top Choice Distrib. Inc. v. United States Postal Service*, 1996 U.S. Dist. LEXIS 16937 (W.D.N.Y. 1996) ("[I]t is well-established that the costs of engaging in administrative actions, arbitration proceedings and other forms of litigation cannot constitute 'irreparable harm.'"); *Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co., Inc.*, 698 F. Supp. 504, 519 (S.D.N.Y. 1988) ("The possible expense incurred in defending an arbitration is not, of course, irreparable harm."). In fact, the *Castlewood* decision explicitly distinguishes the facts before it from the facts in *Pompano*, stating that "in *Pompano*, all of the parties were signatories to the arbitration agreement, and the dispute went solely to the scope of that agreement and the forum in which any arbitration would be held." *Castlewood*, 2006 U.S. Dist. LEXIS 2289, at *15.

Because Storm is a signatory to the arbitration agreement contained in the Shareholders Agreement and has failed to establish any injury other than the potential costs and the time expenditures of arbitration, it has failed to meet its burden of proving irreparable injury. Absent irreparable injury, injunctive relief cannot be granted.

### 2. Storm Cannot Satisfy the Second Prong of the Standard for Injunctive Relief Because It Is Not Likely to Succeed on the Merits and Because the Equities Balance in Favor of Telenor

Even if the Court were to determine that Storm will suffer irreparable injury, which it should not, injunctive relief should not be granted. Under the *Jackson Dairy* standard, in addition to irreparable injury, the movant must establish either a likelihood of success on the merits or a balancing of equities in the movant's favor. Storm can establish neither, and so the injunction should be denied on these grounds as well.

### a. Storm Is Not Likely to Succeed on the Merits

Although a party cannot be required to submit to arbitration any dispute to which the party has not agreed to submit, Storm, as discussed *infra*, fully negotiated, signed, executed, and, by its conduct, ratified the Shareholders Agreement. *Merrill Lynch Investment Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003), quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Storm is bound by its express agreement to arbitrate; it cannot cogently be argued that Storm will have success on the merits of this action. Further, since September, Storm has made no fewer than four attempts to delay the arbitration, all of which have been denied.

### b. The Equities Balance in Favor of Telenor Mobile

In arguing that the balance of equities tips in its favor, Storm reiterates its argument that it would be forced to expend time and resources on arbitration. Even if Storm were able to show that the equities tip in its favor, it would still need to prove that there were "serious questions

going to the merits." *Jackson Dairy*, 596 F.2d 70 at 72. Storm cannot satisfy that more lenient standard. Because Storm did agree to the arbitration provision, having to pay legal fees and costs to present its case in the forum to which it agreed cannot be considered a hardship.

Moreover, with every attempt that Storm has made to delay these proceedings, Telenor suffers further hardship. Telenor is harmed by those delaying tactics because, while the arbitration is pending, Storm continues to boycott meetings of Kyivstar's board of directors and shareholders and, through its shareholdings in competing mobile telecommunications businesses in Ukraine, continues to violate the provisions of the non-compete provisions of the Shareholders Agreement. Without Storm or its nominees on the Kyivstar board present at meetings of Kyivstar's shareholders and board, a quorum cannot be reached, and Kyivstar is unable to conduct ordinary business, such as appointing executives, approving budgets and so forth. These actions are causing financial harm to the company.

Accordingly, because proceeding with the arbitration to which it agreed and in which it has participated since February of this year would work no hardship upon Storm beyond what was contemplated by the parties at the time of their execution of the Shareholders Agreement, and because Storm's endless attempts to delay the arbitration are affecting the management and operations of Kyivstar, the balance of hardships falls on Telenor.

### III.    CONCLUSION

Storm's motion for a preliminary injunction should be denied in its entirety.


Dated:  New York, New York                  By: _Robert L Sills_____
        November 17, 2006                Robert L. Sills (RS 8896)
                                            Jay Musoff (JM 8716)
                                            Karen D. Thompson (KT 4129)
                                            ORRICK, HERRINGTON & SUTCLIFFE LLP
                                            666 Fifth Avenue
                                            New York, New York 10103
                                            Telephone: (212) 506-5000
                                            Facsimile:  (212) 506-5151

                                                  - and -

                                            Peter O'Driscoll (POD 1005)
                                            ORRICK, HERRINGTON & SUTCLIFFE LLP
                                            25 Old Broad Street
                                            London EC2N 1HQ
                                            DX:  557 London/ City
                                            United Kingdom
                                            Telephone:  +44 20 7562 5000
                                          Facsimile:   +44 20 7628 0078


                                          Attorneys for Respondent