Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue, New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Defendant
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

STORM LLC,

                Plaintiff,

           -against-

TELENOR MOBILE COMMUNICATIONS AS,

                Defendant.

--------------------------------------------------------------------- X   06 CV13157 (GEL) (DF)

TELENOR MOBILE COMMUNICATIONS AS,

                Counterclaimant,

          - against-

                                        **DECLARATION OF**
                                        **ROBERT L. SILLS**

STORM LLC,

                Counterclaim-Defendant,

          - and-

**ALTIMO HOLDINGS & INVESTMENTS LIMITED and
ALPREN LIMITED,**

                Relief Defendants.

--------------------------------------------------------------------- X

**ROBERT L. SILLS** declares the following to be true:

         1.  I am a member of the bar of this Court and of the firm of Orrick,

Herrington & Sutcliffe LLP, attorneys for Defendant Telenor Mobile Communications

AS ("Telenor Mobile" or "Defendant"). I make this declaration pursuant to 28 U.S.C. §

1746 upon personal knowledge in support of Telenor Mobile's motion for an anti-suit

injunction and to compel arbitration.

      2.    Defendant is proceeding by Order to Show Cause because

Defendant is seeking, *inter alia,* to enjoin Plaintiff and Relief Defendants from pursuing

litigation against Defendant in Ukraine in violation of the agreement dated January 30,

2004 between and among Plaintiff, Defendant and Closed Joint Stock Company

"Kyivstar G.S.M." ("Kyivstar") that governs Plaintiff's and Defendant's relationship as

shareholders (the "Shareholders Agreement", or the "Agreement") in Kyivstar, a

Ukrainian mobile phone company, pending resolution of the arbitration claim Defendant

submitted in February 2006, and an order to compel Plaintiff to arbitrate the current

dispute between them. As set forth in the accompanying documents, absent the requested

relief, Defendant will be forced to endure additional vexatious litigation initiated by

Plaintiff and Relief Defendants in Ukraine which litigation will frustrate the strong

federal policy in favor of arbitration. Since the Shareholders Agreement was duly

authorized and entered into by both Plaintiff and Defendant, and because the current

dispute between falls within the scope of the arbitration clause in the Agreement,

Defendant's motion to compel arbitration should be granted.

      3.    Telenor Mobile's application is based upon this Declaration and

the exhibits attached thereto and, the accompanying Memorandum of Law.

      4.    Attached hereto as Exhibit A is a true and correct copy of the

Shareholders Agreement dated January 30, 2004 between and among Telenor Mobile,

Storm LLC ("Storm") and Kyivstar.

5. Attached hereto as Exhibit B is a true and correct copy of a December 4, 2006 email sent by Pieter Van Tol, Esq., counsel for Storm.

6. Attached hereto as Exhibit C is a true and correct copy of the Order of the Golosiyiv District Court of the city of Kyiv Goshko O.M., issued December 1, 2006, in Ukrainian, with an English translation provided by Lovells.

7. Attached hereto as Exhibit D is a true and correct copy of an English translation of the Order of the Golosiyiv District Court of the city of Kyiv Goshko O.M., issued December 1, 2006, provided by Oleksiy Didkovskiy, Ukrainian counsel to Telenor Mobile.

8. Attached hereto as Exhibit E is a true and correct copy of the August 9, 2006 Affidavit and Exhibits thereto of Vadim Klymenko, submitted in support of Storm's Motion to Dismiss in the underlying arbitration.

9. Attached hereto as Exhibit F is a true and correct copy of the Transcript of the November 22, 2006 proceedings in front of Hon. Gerard E. Lynch in the Southern District of New York regarding Storm's Motion for Vacatur, and Preliminary and Permanent Injunction.

10. Attached hereto as Exhibit G is a true and correct copy of the Certificate of Incumbency, signed by Andrey Kosogov on January 30, 2004.

11. Attached hereto as Exhibit H is a true and correct copy of the Certificate of Incumbency, signed by Yuri Tumanov on January 30, 2004.

12. Attached hereto as Exhibit I is a true and correct copy of the August 31, 2006 Affidavit of Alexey Khoudyakov, submitted in support of Storm's Motion to Dismiss.

13. Attached hereto as Exhibit J is a true and correct copy of the October 22, 2006 Partial Final Award Regarding Jurisdiction in the Matter of the Arbitration between Telenor Mobile Communications AS and Storm LLC, issued by the Arbitral Panel (the "Panel").

14. No previous application for the same or similar relief has been made, and no other provisional remedy has been sought or secured, before this or any other Court.

15. I declare under penalty of perjury that the foregoing is true and correct.


Dated: December 5, 2006
      New York, New York

                                    Robert L. Sills

EXECUTION COPY

SHAREHOLDERS AGREEMENT

dated January 30, 2004

between and among

TELENOR MOBILE COMMUNICATIONS AS,

and

STORM LLC,

as Shareholders

and

CLOSED JOINT STOCK COMPANY "KYIVSTAR G.S.M.",

as the Company

# TABLE OF CONTENTS

ARTICLE I  DEFINITIONS AND INTERPRETATION......................................................1

1.01   DEFINITIONS ................................................................................................1
1.02   INTERPRETATION ........................................................................................7

ARTICLE II  MANAGEMENT OF THE COMPANY ......................................................8

2.01   BOARD OF DIRECTORS ................................................................................8
2.02   PRESIDENT ...................................................................................................8
2.03   CAPITAL INCREASES; FINANCING; IPO ......................................................11
2.04   DIVIDEND POLICY ......................................................................................11
2.05   IMPLEMENTATION OF AND COMPLIANCE WITH AGREEMENT .....................12

ARTICLE III  REPRESENTATIONS AND WARRANTIES ...........................................13

3.01   REPRESENTATIONS AND WARRANTIES OF THE SHAREHOLDERS ................13
3.02   REPRESENTATIONS AND WARRANTIES OF SUBSEQUENT SHAREHOLDERS ...14

ARTICLE IV  TRANSFER RESTRICTIONS APPLICABLE PRIOR TO THE IPO ............14

4.01   GENERAL ....................................................................................................14
4.02   TRANSFERS AND LIENS ..............................................................................14
4.03   PLEDGE ......................................................................................................15
4.04   TRANSFERS TO PERSONS OTHER THAN PERMITTED TRANSFEREES ............15
4.05   RIGHT OF FIRST REFUSAL ..........................................................................16
4.06   REQUIRED SALE RIGHTS ............................................................................17
4.07   CO-SALE RIGHTS ........................................................................................17
4.08   CLOSING .....................................................................................................17
4.09   EFFECTIVENESS OF TRANSFER ...................................................................18
4.10   IMPROPER TRANSFERS INEFFECTIVE ..........................................................19
4.11   INFORMATION LETTER ...............................................................................19
4.12   PRE-EMPTIVE RIGHTS ................................................................................19

ARTICLE V  TRANSFER RESTRICTIONS APPLICABLE AFTER THE IPO ...................20

5.01   GENERAL ....................................................................................................20
5.02   TRANSFERS OF SPECIFIED PERCENTAGE AFTER THE IPO ...........................20
5.03   EFFECT OF TRANSFERS AFTER THE IPO ......................................................20

ARTICLE VI  CERTAIN CORPORATE MATTERS ......................................................21

6.01   DEBT ACQUISITION ....................................................................................21
6.02   NON-COMPETE ...........................................................................................23
6.03   AMENDMENT OF CHARTER .........................................................................23
6.04   PURCHASE RIGHTS OF TELENOR MOBILE ..................................................24
6.05   DISCLOSURE OF BENEFICIAL OWNERSHIP IN CONNECTION WITH SECURITIES OFFERING...................24
6.06   OTHER ARRANGEMENTS .............................................................................24
6.07   SHAREHOLDER CAPACITY ..........................................................................25

ARTICLE VII  CONFIDENTIALITY ..........................................................................25

ARTICLE VIII  ETHICAL BUSINESS CONSIDERATIONS ..........................................25

8.01   OFFERS TO GOVERNMENT OFFICIALS ..........................................................25
8.02   BOOKS AND RECORDS .................................................................................26
8.03   AGENTS, SUBCONTRACTORS AND CONSULTANTS .........................................26
8.04   TRANSFERS TO THE COMPANY ....................................................................26
8.05   AFFILIATES, DIRECTORS, OFFICERS AND EMPLOYEES ..................................26
8.06   COMPLIANCE POLICIES ...............................................................................27

**8.07**    ACCESS TO CAPITAL MARKETS; IPO.................................................................................27

**ARTICLE IX   COMPANY'S BOOKS AND RECORDS**...................................................27

**9.01**    MAINTENANCE OF COMPANY'S BOOKS AND RECORDS .................................27
**9.02**    RIGHT TO EXAMINE BOOKS AND RECORDS .......................................................27

**ARTICLE X   INDEMNIFICATION**........................................................................................27

**ARTICLE XI   TERM AND TERMINATION** .........................................................................28

**11.01**    TERM AND TERMINATION .......................................................................................28
**11.02**    TERMINATION FOR MATERIAL BREACH ...........................................................28

**ARTICLE XII   DISPUTE RESOLUTION** ..............................................................................30

**12.01**    ARBITRATION; CONSENT TO JURISDICTION ....................................................30
**12.02**    SERVICE OF PROCESS ...............................................................................................31
**12.03**    WAIVER OF SOVEREIGN IMMUNITY .....................................................................32

**ARTICLE XIII   MISCELLANEOUS** .......................................................................................32

**13.01**    NOTICES.........................................................................................................................32
**13.02**    ENTIRE AGREEMENT .................................................................................................33
**13.03**    WAIVER ..........................................................................................................................34
**13.04**    AMENDMENT.................................................................................................................34
**13.05**    NO ASSIGNMENT; BINDING EFFECT;  NO THIRD PARTY BENEFICIARY ...34
**13.06**    GOVERNING LAW .........................................................................................................34
**13.07**    SEVERABILITY .............................................................................................................34
**13.08**    FURTHER ASSURANCES ............................................................................................34
**13.09**    HEADINGS......................................................................................................................35
**13.10**    COUNTERPARTS..........................................................................................................35

Schedules

Schedule 1    Shareholdings
Schedule 2    Procedures for Determination of Fair Market Value
Schedule 3    Approved Bankers
Schedule 4    Investments
Schedule 5    Beneficial Ownership

Exhibits

Exhibit A    Form of Endorsement

SHAREHOLDERS AGREEMENT dated January 30, 2004 between and among TELENOR MOBILE COMMUNICATIONS AS, a company organized under the laws of Norway ("Telenor Mobile"), STORM LLC, a limited liability company organized under the laws of Ukraine ("Storm" and, together with Telenor Mobile and such other holders of shares of Voting Securities (as hereinafter defined) as shall be party hereto from time to time, collectively, the "Shareholders" and each, individually, a "Shareholder"), and CLOSED JOINT STOCK COMPANY "KYIVSTAR G.S.M.", a closed joint stock company organized under the laws of Ukraine (the "Company").

## WITNESSETH

WHEREAS, the Shareholders are the owners, beneficially and of record, of the issued and outstanding shares of Common Stock (as hereinafter defined) described in Schedule 1 hereto opposite their respective names; and

WHEREAS, the Shareholders believe it is in the best interests of the Company that provision be made for the continuity and stability of the business and management of the Company;

NOW, THEREFORE, to implement the foregoing and in consideration of the mutual terms, conditions and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1   DEFINITIONS AND INTERPRETATION

1.01    Definitions

As used herein, the following terms shall have the following meanings:

"Actions or Proceedings" shall mean any action, suit, proceeding or arbitration commenced, brought, conducted or heard by or before any Governmental or Regulatory Authority.

"Affected Shareholder" shall have the meaning specified in Section 2.01(b)(v).

"Affiliate" shall mean, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person, including, if such Person is an individual, any relative or spouse of such Person, or any relative of such spouse of such Person, any one of whom has the same home as such Person, and also including any trust or estate for which any such Person or Persons specified herein, directly or indirectly, serves as a trustee, executor or in a similar capacity (including, without limitation, any protector or settlor of a trust) or in which any such Person or Persons specified herein, directly or indirectly, has a substantial beneficial interest, and any Person who is controlled by any such trust or estate. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of a Person.

"**Agreement**" shall mean this Shareholders Agreement and the Schedules and Exhibits hereto.

"**Alfa**" shall mean Alfa Telecom Limited, a company organized under the laws of the British Virgin Islands.

"**Approved Bankers**" shall mean the investment banks specified in Schedule 3.

"**Assets and Properties**" shall mean, with respect to any Person, all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, used, operated, owned or leased by such Person, including, without limitation, cash, cash equivalents, investments, accounts and notes receivable, chattel paper, documents, instruments, general intangibles, real estate, equipment, inventory, goods and Intellectual Property.

"**Board**" shall mean the Board of Directors of the Company.

"**Breaching Shareholder**" shall have the meaning specified in Section 11.02(a).

"**Business**" shall mean the wireless mobile telecommunications business.

"**Business Day**" shall mean a day other than a Saturday, a Sunday or any day on which banks located in Oslo, Norway, London, England, Kiev, Ukraine or New York, New York are authorized or obliged to close.

"**Charter**" shall mean the most recent version of the charter of the Company, as approved by the GMS on October 30, 2002, with the amendments thereto registered on May 30, 2003, and as it may be further amended or amended and restated from time to time.

"**Common Stock**" shall mean the common stock of the Company, par value fifty (50) Hryvnias per share, as established in Article 6.3 of the Charter.

"**Company**" shall have the meaning specified in the preamble hereto.

"**Consolidated Subsidiary**" shall mean, at any time, a consolidated subsidiary of a Person, as identified in such Person's financial statements for the prior fiscal year audited in accordance with GAAP.

"**Contract**" shall mean any agreement, letter of intent, lease, license, evidence of Debt Obligations, mortgage, indenture, security agreement or other contract or understanding (whether written or oral), in each case, to the extent legally binding.

"**Controlled Affiliate**" shall mean, with respect to any Person, any Affiliate of such Person in which such Person owns or controls, directly or indirectly, more than fifty percent (50%) of the securities having ordinary voting power for the election of directors or other governing body thereof or more than fifty percent (50%) of the partnership or other ownership interests therein (other than as a limited partner).

"**Controlling Interest**" shall mean the ownership or control, direct or indirect, of more than fifty percent (50%) of the securities having ordinary voting power for the election of directors or other

governing body of a Person or more than fifty percent (50%) of the partnership or other ownership interest therein (other than as a limited partner of such Person).

"**Controlling Person**" shall mean, with respect to any Person, any other Person which owns or controls, directly or indirectly, more than fifty percent (50%) of the securities having ordinary voting power for the election of directors or other governing body of such first Person or more than fifty percent (50%) of the partnership or other ownership interests therein (other than as a limited partner of such first Person).

"**Co-Sale Notice**" shall have the meaning specified in Section 4.07(b).

"**Cure Period**" shall have the meaning specified in Section 11.02(a)(i).

"**Damages**" shall have the meaning specified in Article X.

"**Debt Obligations**" shall mean, with respect to any Person, any obligations of such Person (a) for borrowed money; (b) evidenced by notes, bonds, debentures or similar instruments; (c) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business); (d) arising out of any credit facility or financial accommodation; (e) in respect of any liabilities and obligations of third parties (referred to in this definition or otherwise) to the extent that they are guaranteed by such Person or such Person has otherwise assumed or become liable for the payment of such liabilities or obligations or to the extent that they are secured by any Lien upon property owned by such Person, whether or not such Person has assumed or become liable for the payment of such liabilities or obligations; (f) arising under any lease that would be capitalized on the balance sheet of such Person in accordance with GAAP that is otherwise in substance a financing lease; (g) arising in respect of any security, any acceptance or documentary credit or any receivables sold or discounted other than on a non-recourse basis; (h) for trade payables incurred in the ordinary course of business; (i) arising in connection with damages, fines, penalties, compensatory damages and other charges of similar kind or nature that may be assessed, charged or appraised against such Person under any loan agreement, sale-purchase agreement, delivery of goods (works, services) agreement, lease agreement or any other agreement of commercial nature; (j) arising in connection with any other transaction that, in accordance with GAAP, results in such obligation being treated as "indebtedness"; (k) any other monetary obligation of a Person to pay an amount of money in excess of US$1,000,000 to a counter-party either under an agreement or on another basis, including without limitation on the basis of a normative act of a state body (including without limitation payments to state bodies such as taxes, fees or fines) or a judicial decree or Order; and (l) any other obligations or liabilities of a Person (whether absolute, accrued, contingent, fixed or otherwise, and whether due or to become due).

"**Debt Transaction**" means any transaction by which a Standstill Party directly or indirectly makes any loan or extends any credit to any Protected Party (other than a Shareholder Loan) or otherwise becomes an obligee or holds or is a beneficiary of any Debt Obligation of any Protected Party (other than a Shareholder Loan).

"**Debt Transaction Offer Notice**" shall have the meaning specified in Section 6.01(b)(i).

"**Director**" shall mean a member of the Board.

3

"**Endorsement**" shall mean an endorsement to this Agreement, in the form of Exhibit A.

"**Equity Interest**" in a Person shall mean any share of capital stock of such Person.

"**Exchange Act**" shall mean the United States Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Fair Market Value**" shall mean the fair market value of the item to which such term is applied, as determined in accordance with the methodology set forth in Schedule 2.

"**FCPA**" shall have the meaning specified in Section 3.01(e).

"**Foreclosure Action**" shall mean any action by a pledgee to enforce its rights in or to any Securities pledged to such pledgee (including, but not limited to, any enforcement of a pledge of, foreclosure upon, sale of, or acceptance of title to, such Securities).

"**GAAP**" shall mean generally accepted accounting principles in the United States, as in effect from time to time.

"**GMS**" shall mean any general meeting of the shareholders of the Company, as defined in Article 8.1 of the Charter.

"**Governmental or Regulatory Authority**" shall mean any court, tribunal, arbitrator, legislature, government, ministry, committee, inspectorate, authority, agency, commission, prosecutor, district attorney, official or other competent authority of Ukraine, or any other country or any state, as well as any county, city or other political subdivision of any of the foregoing.

"**Government Official**" shall mean any Person holding office with any Governmental or Regulatory Authority (or any member of such Person's immediate family) or any Person employed by, or performing services for, any entity under the administrative control of, or owned by, any Governmental or Regulatory Authority even if such entity conducts commercial activities.

"**Hryvnias**" shall mean the legal currency of Ukraine.

"**Indemnified Person**" shall have the meaning specified in Article X.

"**Information Letter**" shall have the meaning specified in Section 4.11.

"**Intellectual Property**" shall mean patents and patent rights, licenses, inventions, copyrights and copyright rights, know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures), trademarks and trademark rights, service marks and service mark rights, trade names and trade name rights, service names and service name rights, brand names, processes, formulae, trade dress, business and product names, logos, slogans, industrial models, processes, designs, methodologies, software programs (including all source codes) and related documentation, technical information, manufacturing, engineering and technical drawings, and all pending applications for and registrations of patents, trademarks, service marks and copyrights.

**"IPO"** shall mean the initial underwritten public offering of the Common Stock which results in the listing of the Common Stock (or Securities evidencing beneficial ownership interests in the Common Stock) on a national or international stock exchange or securities trading facility.

**"Licenses"** shall mean all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

**"Lien"** shall mean any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, or any conditional sale Contract, title retention Contract or other Contract to grant any of the foregoing.

**"Management"** shall mean the executive body of the Company, having such authority as is set forth in the Charter.

**"Material Breach"** shall have the meaning specified in Section 11.02(a).

**"New Securities"** shall have the meaning specified in Section 2.03(b)(i).

**"Non-Breaching Shareholder"** shall mean, at any time of determination thereof, a Shareholder who is not in Material Breach of this Agreement.

**"Notice of Breach"** shall have the meaning specified in Section 11.02(a)(i).

**"Notice of Termination"** shall have the meaning specified in Section 11.02(a)(iv).

**"Offer"** shall have the meaning specified in Section 4.04.

**"Offer Notice"** shall have the meaning specified in Section 4.05(a).

**"Offered Securities"** shall have the meaning specified in Section 4.04.

**"Option Agreement"** shall mean the Option Agreement dated October 29, 2002 between Telenor Mobile and Storm.

**"Order"** shall mean any writ, judgment, decree, injunction, indictment, complaint or similar order of any Governmental or Regulatory Authority (in each case, whether preliminary or final).

**"Outstanding Voting Securities"** shall mean, collectively, (a) shares of Common Stock that ordinarily, and in the absence of contingencies, entitle their holder to vote at any GMS, and that are, at the time specified in the context in which such term is used, issued and outstanding, and (b) Securities that are, at the time specified in the context in which such term is used, issued and outstanding and convertible into, or exercisable or exchangeable for, any shares of Common Stock described in clause (a).

**"Party"** shall mean (a) each of the Shareholders party hereto on the date hereof, (b) the Company and (c) each Person that acquires Securities in accordance with this Agreement and executes an Endorsement.

**"Permitted Transferee"** shall mean, with respect to any Shareholder, any Controlling Person of such Shareholder, or any Controlled Affiliate of any such Controlling Person or Shareholder.

"**Person**" shall mean any natural person, corporation, general partnership, simple partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority, whether incorporated or unincorporated.

"**Pledge Agreement**" shall mean the Pledge Agreement dated October 29, 2002 between Telenor Mobile and Storm.

"**President**" shall mean the chairman of the Management, whether the title of such officer is "President", "General Director" or otherwise, having the authority described in the Charter and granted by applicable Ukrainian law.

"**Price Notice**" shall have the meaning specified in Section 6.01(b)(ii).

"**Protected Party**" shall mean the Company or any of its Controlled Affiliates.

"**Purchasing Shareholder**" shall have the meaning specified in Section 4.05(b).

"**Registration Rights Agreement**" shall mean the Registration Rights Agreement dated October 29, 2002, between and among the Shareholders and the Company.

"**Required Sale Right**" shall have the meaning specified in Section 4.06.

"**Relevant Obligation**" shall have the meaning specified in Section 6.01(b)(i).

"**SEC**" shall mean the Securities and Exchange Commission of the United States of America, or any successor thereto.

"**Securities**" shall mean shares of Common Stock or other capital stock of the Company, whether or not authorized, or any option, right, subscription, warrant, phantom stock right or other contract right to receive shares of Common Stock or such other capital stock, or any bonds, notes, debentures or other securities of any kind whatsoever, that are, or may become, convertible into or exchangeable or exercisable for, shares of Common Stock.

"**Securities Act**" shall mean the United States Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Selling Shareholder**" shall have the meaning specified in Section 4.04.

"**Shareholder Response Notice**" shall have the meaning specified in Section 4.05(b).

"**Shareholder Loan**" shall mean a loan made to the Company or any of its Consolidated Subsidiaries by Telenor Mobile or any of its Affiliates, or the acquisition of any Debt Obligation of the Company or any of Consolidated Subsidiaries by Telenor Mobile or any of its Affiliates.

"**Shareholder**" and "**Shareholders**" shall have the meaning specified in the preamble hereto.

"**Specified Percentage**" shall mean twenty-five percent (25%) plus one (1) share of the Voting Securities.

6

"**Standstill Parties**" shall mean, with respect to a Shareholder, such Shareholder, its Controlling Persons, its Controlled Affiliates, any Controlled Affiliate of any Controlling Person of such Shareholder and any Person acting on behalf of any of the foregoing, in each case, pursuant to a Contract.

"**Storm**" shall have the meaning specified in the preamble hereto.

"**Storm Participants Agreement**" shall mean the agreement dated June 26, 2002 between and among Alfa and the other participants in Storm.

"**Telenor Mobile**" shall have the meaning specified in the preamble hereto.

"**Third Party Offeror**" shall have the meaning specified in Section 4.05(a).

"**Transfer**" shall mean any direct or indirect sale, exchange, transfer (including, without limitation, any transfer by gift or operation of law, or any transfer of an economic interest in any derivative security of any Security), assignment, distribution or other disposition, or issuance or creation of any option or any voting proxy, voting trust or other voting agreement in respect of any Person or instrument (including, without limitation, any of the Securities), whether in a single transaction or a series of related transactions, including, without limitation, the direct or indirect enforcement or foreclosure of any Lien; provided, that nationalization, expropriation, confiscation, bankruptcy (other than any bankruptcy initiated by the petition of any Shareholder, or any Affiliate of such Shareholder), arrest or any similar Action or Proceeding initiated by any Governmental or Regulatory Authority in respect of any Person or instrument shall not constitute a Transfer.

"**UNCITRAL Rules**" shall have the meaning specified in Section 12.01(a).

"**Voting Agreement**" shall mean the Voting Agreement dated September 2, 2002 between and among the Shareholders.

"**Voting Securities**" shall mean, collectively, shares of Common Stock, shares of preferred stock and any other Securities that ordinarily, and in the absence of contingencies, entitle their holder to vote in any GMS and that are, at the time specified in the context in which such term is used, issued and outstanding.

1.02    <u>Interpretation</u>

Unless the context of this Agreement otherwise requires, the following rules of interpretation shall apply to this Agreement:

     (a)     the singular shall include the plural, and the plural shall include the singular;

     (b)     words of any gender shall include the other gender;

     (c)     the words "hereof", "herein", "hereby", "hereto" and similar words refer to this entire Agreement and not to any particular Section or any other subdivision of this Agreement;

     (d)     a reference to any "Article", "Section", "Schedule" or "Exhibit" is a reference to a

specific Article or Section of, or Schedule or Exhibit to, this Agreement;

(e)     a reference to any law, statute, regulation, notification or statutory provision shall include any amendment, modification or re-enactment thereof, any regulations promulgated thereunder from time to time, and any interpretations thereof from time to time by any regulatory or administrative authority;

(f)     a reference to any agreement, instrument, contract or other document shall include any amendment, amendment and restatement, supplement or other modification thereto;

(g)     a reference to any Person shall include such Person's successors and permitted assigns under any agreement, instrument, contract or other document.

(h)     a reference to any dollar amount shall include its equivalent in another currency; and

(i)     as used herein, "beneficial owner" (and the plural thereof) shall have the same meaning as in Rule 13d-3 under the Exchange Act (17 C.F.R. § 240.13d-3).

## ARTICLE II   MANAGEMENT OF THE COMPANY

2.01   Board of Directors

(a)     General.  Except as limited by, or otherwise provided in, this Agreement or the Charter, the conduct of the overall business, management and affairs of the Company shall be the responsibility of the Board and the President.

(b)     Composition; Election.

(i)     From and after the date hereof, the Board shall consist of nine (9) Directors.

(ii)     Subject to Section 2.01(b)(iii), (iv) and (v):

(A)     Telenor Mobile shall be entitled to designate and nominate five (5) candidates for election to the Board; and

(B)     Storm shall be entitled to designate and nominate four (4) candidates for election to the Board (of which two (2) shall be designated by Alfa pursuant to the terms of the Storm Participants Agreement),

and the Shareholders agree to take all action necessary from time to time (including, without limitation, the voting of their respective Voting Securities, the execution of written consents, the calling of special meetings of the GMS and/or the Board, the waiving of notice and attendance at meetings of the GMS and/or the Board, in each case, to the extent permitted by Ukrainian law) to (1) ensure the election of such candidates and (2) maintain the membership of the Board as specified in this Section 2.01(b)(ii).

(iii)    If after the date hereof through Transfer of any Voting Securities to any Person other than a Permitted Transferee or dilution of its Equity Interest in the Company Telenor Mobile ceases to own, together with any of its Permitted Transferees, at least fifty percent (50%) plus one (1) share of the Voting Securities of the Company, then Telenor Mobile shall use its best efforts to cause such number of Directors nominated by Telenor Mobile to resign or be removed by action of the GMS, such that the aggregate number of remaining Directors nominated by Telenor Mobile is equal to the number of Directors, if any, which Telenor Mobile would be able to elect through the voting of its remaining Voting Securities, if any, in accordance with the terms of the Charter.

(iv)    If after the date hereof through Transfer of any Voting Securities to any Person other than a Permitted Transferee or dilution of its Equity Interest in the Company Storm ceases to own at least forty percent (40%) of the Voting Securities of the Company, then Storm shall use its best efforts to cause such number of Directors nominated by Storm to resign or be removed by action of the GMS, such that the aggregate number of remaining Directors nominated by Storm is equal to the number of Directors, if any, which Storm would be able to elect through the voting of its remaining Voting Securities, if any, in accordance with the terms of the Charter.

(v)    If any Shareholder (an "**Affected Shareholder**") gives notice at any time to the Company and the other Shareholders that any Person nominated by such Affected Shareholder and then serving as a Director is no longer such Affected Shareholder's designee, then such Affected Shareholder, the other Shareholders and the Company shall take all such actions as are necessary to remove the Director so designated.

(vi)    If a Director nominated by a Shareholder dies, resigns or is removed as a Director pursuant to Section 2.01(b)(v), the Company and the other Shareholders shall take such actions as are necessary to elect as a Director any Person who is subsequently designated and nominated by the Shareholder whose nominee has died, resigned or been removed.

(c)    Quorum. The quorum for a meeting of the Board shall be any six (6) Directors; provided that (i) if one or more of the matters on the agenda for such meeting is a decision specified in Section 2.01(d)(i)-(xi) (inclusive), any seven (7) Directors shall be required to be in attendance in order for such matter(s) to be voted on by the Board; (ii) a quorum shall always include at least one (1) Director appointed by Storm; and (iii) if a quorum is not achieved in any two (2) consecutive attempts to convene a meeting of the Board, then the matters on the agenda for such Board meeting shall be determined by the GMS, and, subject to compliance with Ukrainian law and the provisions of the Charter, any Shareholder holding more than ten percent (10%) of the Voting Securities may call for a GMS to determine such matters.

(d)    Voting.  Subject to compliance with Ukrainian law and except as otherwise specified in the Charter, all decisions of the Board (or, if applicable, recommendations from the Board to the GMS) shall be determined by a vote of a simple majority of the Directors other than the following decisions, which shall require an affirmative vote of seven (7) of the nine (9) Directors, including at least one (1) Director appointed by Storm:

(i)    any recommendation to the GMS of any amendment to the Charter (other than any amendment of the Charter required in connection with any increase in the authorized charter capital of the Company contemplated by Section 2.03 and any amendment to the Charter of the type referred to in Section 6.03 which is required by applicable law);

(ii)    except as contemplated by Section 2.03(b), any recommendation to increase the authorized charter capital of the Company and/or to issue any Securities;

(iii)    any individual incurrence by the Company or any of its Consolidated Subsidiaries of any Debt Obligation in an aggregate principal amount in excess of US$50 million;

(iv)    any individual granting or other incurrence of any Lien on any Assets and Properties of the Company and/or any of its Consolidated Subsidiaries having an aggregate value in excess of US$50 million;

(v)    any acquisition by the Company or any of its Consolidated Subsidiaries or entry by the Company or any of its Consolidated Subsidiaries into a joint venture with, any Person the aggregate fair market or pro forma value of which, including any Debt Obligations incurred in connection therewith, exceeds US$50 million;

(vi)    any recommendation to the GMS of any merger or consolidation of the Company or any of its Consolidated Subsidiaries with any Person, the aggregate value of which exceeds US$50 million;

(vii)    the commencement by the Company or any of its Consolidated Subsidiaries of any line of business other than the Business;

(viii)    any transaction between the Company or any of its Consolidated Subsidiaries and any Shareholder or any Affiliate of any Shareholder, including any Debt Transaction (other than any transaction contemplated by Section 2.03 and any Shareholder Loan, except where such Shareholder Loan is subject to Board approval in accordance with item (iii) of this Section 2.01(d));

(ix)    any amendment of any License material to the conduct by the Company or any of its Consolidated Subsidiaries of the Business;

(x)    the appointment of the Company's external auditors; and

(xi)    any recommendation to the GMS in respect of a change from uncertificated, non-documentary Securities to certificated, documentary

Securities.

(e)    Chairman.  Upon the resignation or termination of the current Chairman of the Board, the Board shall elect the Chairman of the Board by a simple majority vote.  The nominees for the position of Chairman of the Board shall be chosen from the Directors nominated by (or pursuant to the instructions of) Telenor Mobile and may be nominated by any one or more of the Directors; provided, however, that Telenor Mobile must obtain the prior approval of Storm to Telenor Mobile's candidate for Chairman of the Board, which approval shall not be unreasonably withheld.  If two (2) of Telenor Mobile's candidates for Chairman of the Board fail to obtain the approval of Storm, Telenor Mobile shall have the right to nominate a third candidate for Chairman of the Board without obtaining the prior approval of Storm.  The Chairman of the Board shall not have any specific powers, other than the authority to arrange the work of the Board and as may be otherwise provided by applicable law and the Charter.  The Chairman of the Board shall not have any casting vote.

2.02    President

Upon the resignation or termination of the current President, the new President shall be appointed by simple majority vote of the Board.  The President shall have the rights and responsibilities granted to chairmen of the management under the laws of Ukraine and Article 10 of the Charter; provided that such rights and responsibilities may be expanded or restricted by a decision of the Board in accordance with the Charter.

2.03    Capital Increases; Financing; IPO

(a)    It is the intention of the Shareholders that the Company undertake an IPO in the United States within two (2) years after the date hereof, subject to the existence of appropriate market conditions, the approval of the Board, and the Company engaging one or more underwriters; provided that, except as otherwise specified in this Section 2.03, neither the Company nor any Shareholder shall have any obligation to undertake or take any action to effectuate such IPO.

(b)    Provided that not less than five (5) Directors so recommend, each Shareholder shall vote its Voting Securities and cause the Directors nominated by it to vote, and take any other action, in favor of approving:

(i)    any increase in the authorized charter capital of the Company which is unrelated to the IPO; provided that (A) the New Securities issued in connection with such increase in the authorized charter capital of the Company ("New Securities") are sold at not less than their par value; and (B) each Shareholder is entitled to purchase such number of such New Securities as is equal to the total number of New Securities then being issued multiplied by a fraction, the numerator of which is the number of Voting Securities owned by such Shareholder immediately prior to such issuance and the denominator of which is the total number of Outstanding Voting Securities (before giving effect to such issuance); provided that Storm shall be entitled to allocate to Alfa or any of its Controlled Affiliates any portion of the New Securities that Storm is entitled to purchase under this Section 2.03(b)(i), as Storm and Alfa or Alfa's relevant

11

Controlled Affiliate may agree between themselves, subject to providing the Company and the other Shareholders with notice of such allocation prior to completion of the subscription for such New Securities; and provided, further, that no Shareholder shall be obligated to vote its Voting Securities in favor of any such issuance of New Securities if, after giving effect to such issuance and the purchase by all Shareholders of such New Securities in an amount sufficient to maintain their respective percentage ownership of Voting Securities, all Shareholders would be required to purchase and pay for, on a cumulative basis, New Securities in an aggregate amount in excess of US$120 million (including, without limitation, the US$40 million of New Securities contemplated by Section 2.04(b) of the Voting Agreement);

(ii)     subject to the limitations specified in Section 2.01(d)(iii) and (iv), any vendor financing, or re-financing of or amendment to any existing vendor financing, any financing provided by the European Bank for Reconstruction and Development or any other Person, or any Eurobond issue undertaken by the Company in accordance with the Company's annual budget and/or financing plan; and

(iii)    subject to the delivery to the Shareholders by an independent investment bank selected by Telenor Mobile from the list of Approved Bankers attached hereto as Schedule 3 of a letter confirming that, in the opinion of such investment bank (A) an IPO on the terms proposed by Telenor Mobile would be achievable, (B) an IPO on the terms proposed by Telenor Mobile would be well received by the market and (C) an IPO on the terms proposed by Telenor Mobile would constitute the most attractive IPO option for the Company in terms of liquidity, value realization and secondary market performance, each Shareholder shall vote its Voting Securities, and shall cause its respective Directors to vote, and take any other action, in favor of approving the IPO (and any increase in the authorized charter capital of the Company, any amendment of the Charter and any change from a closed joint stock company into an open joint stock company in connection therewith) or such other arrangement intended to achieve liquidity in respect of the Securities as shall be proposed by Telenor Mobile.

2.04    Dividend Policy

The Shareholders agree that the dividend policy of the Company shall be determined by the Board and proposed to the GMS, taking into account, among other things, (a) the financial needs of the Company, including its capital expenditure requirements; (b) the shareholders' interest in receiving an appropriate level of dividends consistent with the Company's financial structure and the fulfilment of its development objectives; and (c) the objective of the Shareholders to conduct an IPO in accordance with the terms of this Agreement.

2.05    Implementation of and Compliance with Agreement

(a)      Telenor Mobile undertakes:

(i)      to comply with its obligations under this Agreement;

12

    (ii)    to act in a good faith and constructive manner such as to give effect to the provisions of this Agreement, including, without limitation, through participation in and voting at the GMS and the Board; and

    (iii)    not to take, or permit any of its Affiliates to take, any action permitted by Ukrainian law which would allow Telenor Mobile to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.03(b) as an action for which Telenor Mobile is required to vote its Voting Securities and cause the Directors nominated by it to vote in favor of approving.

  (b)    Storm undertakes:

    (i)    to comply with its obligations under this Agreement;

    (ii)    to act in a good faith and constructive manner such as to give effect to the provisions of this Agreement, including, without limitation, through participation in and voting at the GMS and the Board; and

    (iii)    not to take, or permit any of its Affiliates to take, any action permitted by Ukrainian law which would allow Storm to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.03(b) as an action for which Storm is required to vote its Voting Securities and cause the Directors nominated by it to vote in favor of approving.

## ARTICLE III  REPRESENTATIONS AND WARRANTIES

3.01   <u>Representations and Warranties of the Shareholders</u>

Each Shareholder hereby represents and warrants, in each case, severally and not jointly, as of the date hereof, that:

  (a)    Such Shareholder is the record holder and beneficial owner of the Securities specified opposite its name in Schedule 1;

  (b)    The Securities specified opposite its name in Schedule 1 are the only shares of capital stock of the Company owned of record or beneficially by such Shareholder;

  (c)    Such Shareholder has sole power of disposition and sole voting power with respect to all of such Securities, with no restrictions on such rights, other than such restrictions on Transfer as arise under applicable United States federal securities laws, Ukraine securities laws, the terms and conditions of this Agreement, the Charter, the Option Agreement, the Pledge Agreement, the Storm Participants Agreement and the Registration Rights Agreement;

13

(d)     Such Securities are and will be held free and clear of all Liens, proxies, voting trusts or agreements, understandings or arrangements whatsoever, except for those arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement, the Registration Rights Agreement and the Storm Participants Agreement;

(e)     In connection with the Company or its Business, such Shareholder has not, and none of its Consolidated Subsidiaries or Affiliates, or any director, officer, agent, employee or other Person acting on behalf of such Shareholder or any of its Consolidated Subsidiaries or Affiliates has, in the course of its actions for, or on behalf of such Shareholder (i) provided, or arranged for the provision of, any unlawful contribution, gift, entertainment or other benefit relating to a political party or official thereof or a candidate for public office, (ii) made any payment, directly or indirectly, to any Government Official, (iii) otherwise violated any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), or any anti-corruption laws or regulations of Ukraine or of the jurisdiction of incorporation or principal activities of such Shareholder, or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any customer or other third party;

(f)     The beneficial owners of such Shareholder are set forth in Schedule 5; and

(g)     No asset which such Shareholder has contributed, or otherwise made available, to the Company, and no funds paid or otherwise transferred to any other Shareholder, any other Shareholder's Affiliate or the Company have been acquired by such Shareholder (i) pursuant to a transaction that has involved directly or indirectly an illegal payment to a Government Official or (ii) where such asset represents the proceeds of any illegal activity.

3.02    Representations and Warranties of Subsequent Shareholders

Each Person (other than the Shareholders party hereto as of the date hereof) who subsequently becomes a party hereto after the date hereof shall, upon execution of the Endorsement by such Person, make the representations and warranties set forth in Annex 1 to the Endorsement, which representations and warranties shall be incorporated by reference herein, as though made in this Agreement.

## ARTICLE IV   TRANSFER RESTRICTIONS APPLICABLE PRIOR TO THE IPO

4.01    General

(a)     The provisions of this Article IV shall be applicable to all Securities owned, directly or indirectly, by a Shareholder or hereafter Transferred to a Shareholder in any manner whatsoever, from the date hereof until the date of the IPO. The provisions of this Article IV shall not apply to any Transfer of Securities by a Shareholder in the IPO or after the IPO.

(b)     For the purposes of this Article IV, any fees and expenses incurred in determining the Fair Market Value of any Securities shall be divided pro rata among the Shareholders who are party to the relevant transaction, in proportion to the amount of Securities purchased or sold by such Shareholder, as the case may be.

14

4.02    <u>Transfers and Liens</u>

(a)    Except as provided in this Article IV, no Shareholder may Transfer any or all of its Securities to, or create or permit any Lien on any Securities in favor of, any Person.

(b)    A Shareholder may Transfer any or all of its Securities to any of its Permitted Transferees at any time without compliance with Sections 4.04, 4.05, 4.06 or 4.07; provided that at the time of such Transfer such Permitted Transferee executes an Endorsement in accordance with Section 4.09.

(c)    Storm may Transfer Securities to Telenor Mobile under the Option Agreement, and Securities may be Transferred to Telenor Mobile under the Pledge Agreement, in each case, without compliance with Sections 4.04, 4.05, 4.06 or 4.07.

4.03    <u>Pledge</u>

No Shareholder shall create a security interest in, pledge, assign, mortgage, hypothecate or otherwise permit a Lien on, any of its Securities to or for the benefit of any Person other than:

(a)    Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement, the Storm Participants Agreement or the Registration Rights Agreement;

(b)    with the prior written consent of the other Shareholders, a Lien for the benefit of a Person who, prior to entering into a pledge or other arrangement, executes an Endorsement in accordance with Section 4.09 (such Endorsement to become effective automatically upon the occurrence of any Foreclosure Action, without the need for any further action by the Parties) and undertakes, on terms satisfactory to the other Shareholders, to comply with the provisions of Sections 4.04, 4.05, 4.06, 4.07 and 4.08 in connection with such Foreclosure Action.

4.04    <u>Transfers to Persons Other than Permitted Transferees</u>

Subject to Section 4.02 and Section 4.03, any Shareholder (a "**Selling Shareholder**") may sell, transfer title, assign all rights and interest in or otherwise effect the physical disposition of (but in no event may otherwise Transfer) any or all of such Selling Shareholder's Securities (the "**Offered Securities**") to any Person from whom the Selling Shareholder receives a bona fide offer (whether or not such offer is solicited by the Selling Shareholder) that such Selling Shareholder desires to accept (an "**Offer**"); provided that:

(a)    such Selling Shareholder complies with Sections 4.05, 4.06 and 4.07 prior to effecting any such sale or disposition; and

(b)    the Person from whom the Selling Shareholder received the Offer is a reputable Person (i) whose financial statements are audited by an internationally recognized accounting firm, or (ii) whose shares or other securities are listed on an internationally recognized stock exchange, or (iii) who has long-term indebtedness rated at least investment grade or higher by Moody's Investors Service, Inc. (i.e., Baa or higher) or Standard & Poor's Corporation (i.e., BBB or higher), as determined at the time of the

proposed Transfer.

4.05    Right of First Refusal

(a)    A Selling Shareholder, before accepting any Offer, shall first give sixty (60) days' prior written notice of such Offer (the "Offer Notice") to the other Shareholders. The Offer Notice shall set forth (i) the identity of the Person (including its Controlling Persons) from whom the Selling Shareholders received such Offer (the "Third Party Offeror"), (ii) the number and type of Offered Securities subject to the Offer, (iii) the purchase price per share in cash of the Offer (or, if the Offer consists in whole or in part of non-cash consideration, a description of such non-cash consideration, the Selling Shareholder's proposed good faith determination of the fair market value per share thereof and any valuation by the Third Party Offeror of such non-cash consideration) and (iv) if applicable, notice of the exercise of such Selling Shareholder's Required Sale Right pursuant to Section 4.06.

(b)    Upon receipt of the Offer Notice, the other Shareholders shall each have the first right and option to elect to purchase, for cash, in the aggregate, all (but not less than all) of the Offered Securities (pro rata according to the respective percentage of Voting Securities owned by each of the other Shareholders prior to the giving of the Offer Notice relative to the total number of Outstanding Voting Securities prior to the giving of the Offer Notice, or in such other proportion as such other Shareholders electing to purchase such Offered Securities may agree among themselves) at the purchase price and on the terms and conditions set forth in the Offer Notice, such election to be made by the other Shareholders by written notice delivered to the Selling Shareholder (a "Shareholder Response Notice") within sixty (60) days from the date of the Offer Notice. Failure of any Shareholder to provide a Shareholder Response Notice within such sixty (60) day period shall be deemed an election by such Shareholder not to purchase any of the Offered Securities. If the purchase price set forth in the Offer Notice consists in whole or in part of non-cash consideration, the Shareholder(s) electing to purchase the Offered Securities (the "Purchasing Shareholder(s)") shall pay such portion of the consideration in cash equal to the Fair Market Value thereof.

(c)    In the event of an election by the other Shareholders to purchase in the aggregate all of the Offered Securities, a single closing for the purchase of all of the Offered Securities shall be held at the time and place designated by the Purchasing Shareholder(s), but in any event no later than one hundred eighty (180) days following receipt of the Offer by the Selling Shareholder. At such closing, the Selling Shareholder shall deliver to the Purchasing Shareholder(s), against payment of the purchase price, (i) the Offered Securities, free and clear of all Liens, other than any Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement or the Registration Rights Agreement, and (ii) such documents as are required to transfer title to the Offered Securities.

(d)    In the event that the other Shareholders do not elect to purchase in the aggregate all of the Offered Securities in accordance with Section 4.05(b), the Selling Shareholder (i) shall not be required to sell any of the Offered Securities to any of the other Shareholders and (ii) subject to Section 4.07, may, within one hundred eighty (180) days

16

following receipt of the Offer, Transfer to the Third Party Offeror identified in the Offer Notice all (but not less than all) of the Offered Securities for a purchase price payable in cash (or, if the Offer Notice states that the purchase price consists in whole or in part of non-cash consideration, such non-cash consideration stated therein) equal to or greater than the purchase price specified in the Offer Notice and otherwise on the same terms and conditions specified in the Offer Notice. Such Transfer shall be made in accordance with and subject to Section 4.09. If the Selling Shareholder fails to effect the Transfer of the Offered Securities on such terms and within such time period, then such proposed Transfer or any other proposed Transfer shall again become subject to the provisions of this Section 4.05.

(e)     Other than as provided in this Article IV, without the prior written consent of the Selling Shareholder, the other Shareholders shall not negotiate with, or sell any of their Securities to, the Third Party Offeror identified in the Offer Notice until the earlier of (i) one hundred eighty (180) days following receipt of the Offer by the Selling Shareholder, (ii) the Transfer of the Offered Securities by the Selling Shareholder and (iii) the termination of the Offer by the Selling Shareholder.

(f)     If Telenor Mobile determines to Transfer all or any portion of its Securities to a Third Party Offeror, Storm shall be entitled to assign all or a portion of its right to purchase such Offered Securities to Alfa or any of its Controlled Affiliates, and, upon notice of such assignment, Telenor Mobile shall be obligated to sell the assigned portion of the Offered Securities to Alfa or its designated Controlled Affiliate. For purposes of any such Transfer to Alfa or any of its Controlled Affiliates, Storm hereby waives its right of first refusal under this Article IV.

## 4.06    Required Sale Rights

If, after the second (2nd) anniversary of the date hereof, Telenor Mobile receives an Offer for all of its Securities from a Third Party Offeror (whether or not such Offer was solicited by Telenor Mobile) and the other Shareholders do not elect to purchase in the aggregate all of the Offered Securities pursuant to Section 4.05, then Telenor Mobile shall have the right (the "**Required Sale Right**") to require all, but not less than all, the other Shareholders to sell to such Third Party Offeror all of the Securities owned by such other Shareholders. Telenor Mobile shall exercise its Required Sale Right by making reference thereto in its Offer Notice, which shall state the number of Securities that Telenor Mobile is requiring each of the other Shareholders to sell. Failure by Telenor Mobile to set forth its Required Sale Right in the Offer Notice shall be deemed a waiver by Telenor Mobile of its Required Sale Right with respect to such Offer (but not any subsequent Offer). The sale of Securities by the other Shareholders pursuant to this Section 4.06 shall be on the same terms and conditions as are set forth in the Offer Notice.

## 4.07    Co-Sale Rights

(a)     If (i) the Offer described in Section 4.04 is for a number of Offered Securities such that, as a result of such Transfer, the Third Party Offeror, together with any of its Affiliates, would beneficially hold a Controlling Interest in the Company, (ii) the other Shareholders do not elect to purchase in the aggregate all of the Offered Securities pursuant to Section 4.05 and (iii) Telenor Mobile does not exercise its Required Sale

Right in respect of such Offer, then the Selling Shareholder shall require, as a condition of its acceptance of such Offer, that the Third Party Offeror, within sixty (60) days of delivery by the Selling Shareholder of the Offer Notice, offer to purchase all of such other Shareholders' Securities, free and clear of any Liens other than Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement or the Registration Rights Agreement, and at the same purchase price and on the same terms and conditions as are set forth in the Offer Notice. Such other Shareholders must elect whether to accept such offer by the Third Party Offeror within thirty (30) days of the date of such offer by executing and delivering a written notice to the Selling Shareholder and the Third Party Offeror. Failure of any Shareholder to provide such written notice within such thirty (30) day period shall be deemed an election by such Shareholder not to accept such offer.

(b)     If the Offer described in Section 4.04 is for a number of Offered Securities such that, as a result of such Transfer or a series of related Transfers, the Third Party Offeror, together with any of its Affiliates, will have purchased not less than fifteen percent (15%) of the issued share capital of the Company (and not more than a Controlling Interest in the Company) from the Selling Shareholder, and the other Shareholders do not elect to purchase in the aggregate all of the Offered Securities pursuant to Section 4.05, then each other Shareholder shall have the right, exercisable by executing and delivering a written notice to the Selling Shareholder (a "Co-Sale Notice") within sixty (60) days from delivery by the Selling Shareholder of the Offer Notice, to elect to sell in the proposed Transfer of Offered Securities to such Third Party Offeror, such number of Securities owned by such other Shareholder as is equal to (i) the number of Securities owned by such other Shareholder multiplied by (ii) a fraction, the numerator of which is the number of Securities being Transferred by such Selling Shareholder and the denominator of which is the total number of Securities owned by the Selling Shareholder immediately prior to such proposed Transfer, free and clear of any Liens, other than any Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement or the Registration Rights Agreement.

(c)     The Transfer of Securities by the other Shareholders pursuant to a Co-Sale Notice shall be at the purchase price and on the same terms and conditions as are set forth in the Offer Notice.

(d)     In the event any of the other Shareholders gives a Co-Sale Notice, the Selling Shareholder shall have the option to (i) require, as a condition of acceptance by the Selling Shareholder of the Offer, the Third Party Offeror to purchase both the Offered Securities and the additional Securities to be Transferred by such other Shareholders pursuant to the Co-Sale Notice or (ii) cancel such Transfer to the Third Party Offeror and reject the Offer.

4.08    Closing

The closing of any Transfer of Securities pursuant to Sections 4.05, 4.06 or 4.07 shall be held at the time and place designated by the purchaser(s) and, in any event, unless otherwise agreed by the Parties, within one hundred eighty (180) days after receipt of an Offer by the Selling Shareholder. At the closing of such Transfer, (a) each Shareholder participating in the Transfer

shall deliver to the purchaser(s) the Securities to be Transferred to the purchaser(s), free and clear of any Liens, other than any Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement or the Registration Rights Agreement, together with such documents as are required to transfer title to such Securities, and (b) such purchaser(s) shall pay the purchase price for such Securities and deliver an Endorsement to the Company and the Shareholders.

### 4.09    Effectiveness of Transfer

Securities Transferred in accordance with the terms and conditions of this Article IV shall remain subject to the provisions of this Agreement, and, during the period prior to the IPO, no proposed Transfer of Securities shall be effective, unless and until the proposed transferee, including, without limitation, any Permitted Transferee, agrees in writing to assume and be bound by the provisions of this Agreement by executing and delivering to the Company and each other Shareholder an Endorsement. Following the execution and delivery of such Endorsement and the effectiveness of such Endorsement, the transferee shall be a "Shareholder" for all purposes of this Agreement, and shall be entitled to all rights and subject to all obligations of Shareholders under this Agreement.

### 4.10    Improper Transfers Ineffective

At any time prior to the IPO, any purported Transfer of, creation of any Lien upon, or permitting of any Lien to subsist on, any Securities that is in violation of the provisions of this Agreement shall be void and of no force or effect whatsoever, and the Company shall not treat any purported transferee of such Securities as the owner or pledgee of such Securities for any purpose. Without prejudice to any other rights or remedies of any Shareholder or the Company, if any Shareholder effects a Transfer of any Securities to any Person in violation of this Article IV, then any transferee of such Securities shall receive and hold any and all such Securities so Transferred without any of the rights, but subject to all of the obligations, set forth in this Agreement.

### 4.11    Information Letter

At any and all times prior to the IPO, the Company shall deliver to each Permitted Transferee or other Person who becomes a Shareholder an original information letter on the Company's letterhead and executed on behalf of the Company which shall contain (in addition to the addressee's details) a Russian translation of the following text: "THE SHARES OF THE COMPANY ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER (AND PLEDGE) AS SET FORTH IN THE SHAREHOLDERS AGREEMENT DATED JANUARY 30, 2004, COPIES OF WHICH MAY BE FURNISHED BY THE COMPANY UPON WRITTEN REQUEST AND WITHOUT CHARGE" (an "Information Letter"). The Company shall maintain a list of any written requests to provide copies of this Agreement. Each Shareholder shall be entitled to receive from the Company copies of any such written requests or Information Letters.

### 4.12    Pre-emptive Rights

(a)    Subject to Section 2.03 and Section 6.04, each Shareholder shall have the pre-emptive right to purchase its pro rata portion of any issuance of any New Securities, as is provided on the date hereof by Section 3 of Article 38 of the Law "On Business Associations" of Ukraine and

Section 10 of the Regulations of the Ukrainian Securities Commission "On Procedure for Increase (Decrease) in the Authorized Capital of a Joint Stock Company", exercisable in accordance with Chapter III of such Regulation, or as may be otherwise provided by the laws of Ukraine.

(b)    If at any time Section 3 of Article 38 of the Law "On Business Associations" of Ukraine and Section 10 of the Regulations of the Ukrainian Securities Commission "On Procedure for Increase (Decrease) in the Authorized Capital of a Joint Stock Company" are no longer in effect and have not been replaced by other laws and/or regulations of Ukraine providing the Shareholders with a pre-emptive right to their respective pro rata portions of any issuance of Securities, then, subject to Section 2.03 and Section 6.04, during the period prior to the IPO, each Shareholder shall have a pre-emptive right to purchase its pro rata portion of any issuance of New Securities, on the same terms and conditions as such New Securities are offered to other purchasers thereof.  The Company shall provide the Shareholders with sixty (60) days' prior written notice of any proposed issuance of New Securities which would be subject to the pre-emptive rights provided for in this Section 4.12(b).  The Shareholders desiring to exercise their pre-emptive rights in connection with any such issuance of New Securities must notify the Company in writing on or prior to 5:30 pm on the last day of such sixty (60) day period.  Each Shareholder shall be entitled to purchase its pro rata portion of New Securities based on the number of Voting Securities held by it immediately prior to the issuance of such New Securities. If any Shareholder fails to exercise its pre-emptive right hereunder to purchase any New Securities, the other Shareholders shall, if they have indicated their intention to purchase the maximum possible number of New Securities in their notification to the Company, be entitled to purchase their respective pro rata portion thereof.

## ARTICLE V   TRANSFER RESTRICTIONS APPLICABLE AFTER THE IPO

5.01    General

The provisions of this Article V shall be applicable to all Securities owned, directly or indirectly, by a Shareholder after the date of the IPO.

5.02    Transfers of Specified Percentage after the IPO

If after the IPO any Shareholder proposes to Transfer to any Person, in a single transaction, a number of Voting Securities equal to or greater than the Specified Percentage, such Shareholder shall not Transfer such Voting Securities to such Person, unless such Shareholder has given the other Shareholders thirty (30) days' prior written notice of such proposed Transfer in accordance with Section 13.01.

5.03    Effect of Transfers after the IPO

(a)    At any time after the IPO, in the event of any Transfer of Securities (in one or a series of related transactions, by operation of law or otherwise) from a Shareholder to another Shareholder or a Permitted Transferee, the transferee shall receive and hold any and all Securities so Transferred subject to the terms and conditions of this Agreement and the rights and obligations, if any, of the transferor hereunder, and shall forthwith

execute and deliver to the other Shareholders an Endorsement. Each of the Shareholders hereby undertakes to cause each of their respective Permitted Transferees to which Voting Securities are so Transferred to execute and deliver an Endorsement to each of the other Shareholders.

(b)     In the event of any Transfer following the IPO of Voting Securities in an amount less than the Specified Percentage by a Shareholder or any of its Permitted Transferees to any Person who is not a Shareholder or a Permitted Transferee, such Person shall not be entitled to any rights, nor subject to any obligations, under this Agreement.

(c)     If the Shareholders, or any of them, Transfer, in the aggregate, such number of Voting Securities as is equal to or greater than the Specified Percentage (in one or a series of related transactions) to any Person, other than another Shareholder or a Permitted Transferee, provided such Transfer is made in accordance with this Article V, the transferee shall receive and hold any and all Securities so Transferred subject to the terms and conditions of this Agreement and the rights and obligations, if any, of the transferor hereunder, and shall forthwith execute and deliver to the other Shareholders an Endorsement.

(d)     Following the execution and delivery of an Endorsement and the effectiveness of such Endorsement, a transferee pursuant to Section 5.03(a) or (c) shall be a "Shareholder" for all purposes of this Agreement, and shall be entitled to all of the rights and subject to all of the obligations of a Shareholder under this Agreement.

## ARTICLE VI   CERTAIN CORPORATE MATTERS

6.01   Debt Acquisition

(a)     A Shareholder or any other Standstill Party may enter into any Debt Transactions if and only if such Shareholder and its Standstill Parties comply with the provisions of this Section 6.01.

(b)     Unless otherwise approved by the Board in accordance with Section 2.01(d)(viii), in the event a Shareholder or any of its other Standstill Parties enters into a Debt Transaction, such Shareholder shall, and shall procure that its other Standstill Parties shall:

(i)     Provide written notice thereof to the Protected Party (with a copy to the Company) within ten (10) days of entering into a Debt Transaction, which notice shall constitute an offer to such Protected Party (a "**Debt Transaction Offer Notice**") (which offer shall be legally binding on the Standstill Party upon acceptance by such Protected Party or the Company or the Company's designee on behalf of such Protected Party) to sell to such Protected Party, the Company or the Company's designee, such Debt Obligation (and, if applicable, the underlying obligation to which such Debt Obligation relates, such underlying obligation or Debt Obligation, as applicable, being the "**Relevant Obligation**") at a purchase price equal to the lesser of the Fair Market Value thereof, or one hundred percent (100%) of the aggregate unpaid principal amount of the Relevant Obligation plus any accrued interest and other amounts, if any, owing under the Relevant Obligation up to (but excluding) the purchase date thereof.

21

(ii)    Within ten (10) Business Days from the date of notice of an intention to accept such offer by the Protected Party, the Company or the Company's designee, the Standstill Party shall provide a copy of the document(s) evidencing the outstanding amount of the Relevant Obligation and a calculation of the purchase price thereof showing the amount of unpaid principal, any accrued interest thereon and any other amounts owing thereunder, as well as the basis for determining the Fair Market Value thereof ("**Price Notice**"). Within five (5) Business Days from the date of receipt of the Price Notice, the Protected Party, the Company or the Company's designee shall notify the Standstill Party whether it accepts the offer at such time and, if so, shall purchase such Relevant Obligation at such time. If the Protected Party, the Company or the Company's designee, as applicable, do not accept such offer at such time, the provisions of this Section 6.01(b) shall remain in effect with respect to such Relevant Obligation.

(iii)    The Standstill Party shall not be restricted from selling or otherwise disposing of the Relevant Obligation at any time prior to the acceptance of the Debt Transaction Offer Notice in accordance with the terms hereof; provided, however, that the Standstill Party shall provide written notice to the Protected Party (with a copy to the Company) within ten (10) days of such sale or disposition.

(c)    In the event a Shareholder or any of its other Standstill Parties enters into a Debt Transaction, such Shareholder shall, and shall procure that its other Standstill Parties shall, prior to initiating or participating in any enforcement action or bankruptcy proceeding against any Protected Party with respect to any Debt Obligation, provide at least ninety (90) days prior written notice thereof to the Protected Party (with a copy to the Company) and adhere to the procedures set forth in Section 6.01(b)(i) and 6.01(b)(ii).

(d)    In the event a Shareholder or any of its other Standstill Parties initiates or participates in the initiation of any enforcement action or bankruptcy proceeding against any Protected Party with respect to any Debt Obligation without adhering to the provisions of Section 6.01(c), such Shareholder shall, and shall procure that its other Standstill Parties shall, immediately file all papers necessary to terminate or cause the termination of such action or proceeding within five (5) Business Days of receiving notice from the Protected Party, the Company or any Shareholder that the entity against whom such bankruptcy proceeding was initiated is a Protected Party, and shall thereafter use its best efforts to ensure that such enforcement action or bankruptcy proceeding is terminated, and immediately thereafter or simultaneously with such actions, the relevant Standstill Party shall make an offer to sell to such Protected Party (which offer shall be legally binding on the Standstill Party upon acceptance by such Protected Party or the Company or the Company's designee, as the case may be, on behalf of such Protected Party) and shall sell such Relevant Obligation to the relevant Protected Party or the Company or the Company's designee, as the case may be, pursuant to Section 6.01(b), if such offer is accepted.

(e)    Any breach of Section 6.01(b) shall be deemed cured and no violation of Section 6.01(b) shall be deemed to have occurred or to exist if the terms of Section 6.01(b) are complied with immediately upon the relevant Shareholder becoming aware of it or any of

its Standstill Parties have entered into the Debt Transaction.

(f)     Any breach of Section 6.01(c) shall be deemed cured and no violation of Section 6.01(c) shall be deemed to have occurred or to exist if the Standstill Party complies with Section 6.01(d) and such enforcement action or bankruptcy proceeding is thereafter terminated.

(g)     The Company will, or will cause each Protected Party to, promptly inform each Shareholder if it becomes aware of any violation of the terms of this Section 6.01.

6.02    <u>Non-Compete</u>

(a)     Subject to Section 6.02(b), no Shareholder or any of its Affiliates will, without the prior written consent of the Company and the other Shareholders, (i) engage in the Business in any region in Ukraine, (ii) own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than the Company or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine or (iii) permit any of its Controlled Affiliates (other than the Company or any of its Controlled Affiliates) to engage in the Business in any region in Ukraine or own or control, directly or indirectly, more than five percent (5%) of the voting capital stock in any Person (other than the Company or any of its Controlled Affiliates) engaged in the Business in any region in Ukraine.

(b)     The Shareholders acknowledge that this Section 6.02 shall not in any way limit any Shareholder's or any of its Affiliates' right to:

(i)     maintain, increase the amount of, or otherwise develop, its investments in the Company or any of the Company's Controlled Affiliates; or

(ii)    acquire, maintain, increase the amount of, or otherwise develop, any investment in a Person specified in Schedule 4 or an Affiliate thereof, so long as no officer, director or employee of such Shareholder or any of its Affiliates serves as a member of the board of directors of such Person's Ukrainian Affiliate or otherwise participates in the management of such Person's Ukrainian Affiliate; provided that, for purposes of this Section 6.02(b)(ii), no Person identified in Schedule 4 shall be considered an Affiliate of any Shareholder.

6.03    <u>Amendment of Charter</u>

(a)     In the event of any conflict or inconsistency between this Agreement and the Charter, this Agreement shall prevail. Without limiting the generality of the foregoing, the Shareholders shall take such action as may be necessary to supplement or amend the Charter to reflect, and not conflict or be inconsistent with, the provisions of this Agreement. The Shareholders also agree, to the extent permitted by applicable law, to waive any rights or privileges granted to them (including, but not limited to, redemption rights, rights of first refusal and the like) by applicable law or the Shareholders that conflict or are inconsistent with the terms and conditions of this Agreement.

(b)     To the extent that pursuant to applicable law the legality, validity or enforceability of any provision contained in this Agreement now or at any time hereafter requires that such provision, or a reference to such provision, be contained in the Charter, or requires

any amendment to the Charter, then the Shareholders shall vote their Voting Securities to approve any such amendments and cause the Company to take such action as may be necessary to register such amendments to the Charter as so required with all appropriate Governmental or Regulatory Authorities, and each Shareholder hereby consents to such amendment to the fullest extent permitted by law.

### 6.04    Purchase Rights of Telenor Mobile

For so long as it individually (or, together with its Affiliates, collectively) owns at least 50% plus one share of the Company's Voting Securities, Telenor Mobile shall have the right, but not the obligation, to elect to purchase from the Company at the price offered to investors in the IPO such number of New Securities issued in connection with any increase in the Company's authorized charter capital relating to the IPO as may be required by Telenor Mobile to maintain its individual (or, together with its Affiliates, collective) ownership of 50% plus one share of the Company's Voting Securities. The Company shall provide Telenor Mobile with at least sixty (60) days' prior written notice of the issuance by the Company of any Voting Securities in connection with the IPO.  Such notice shall set forth (a) the approximate number and type of New Securities proposed to be issued and sold by the Company and the material terms thereof and (b) the proposed price or range of prices at which such New Securities are proposed to be sold and the terms of payment.  Telenor Mobile shall have thirty (30) days' following its receipt of such notice to notify the Company of its election to purchase such New Securities.  Failure by Telenor Mobile to notify the Company of such election within such thirty (30) day period shall be deemed an election by Telenor Mobile not to exercise such right.

### 6.05    Disclosure of Beneficial Ownership in connection with Securities Offering

Each Shareholder undertakes and agrees that, within ten (10) days following a written request from the Company or its external legal counsel stating that the Company is preparing to undertake the IPO or any other offering of Securities, such Shareholder shall deliver to the Company and its external legal counsel a true and correct written description of the ultimate (and any intermediate) beneficial owners of such Shareholder and shall use its best efforts to cooperate with the Company and its external legal counsel in responding to questions and providing additional information regarding such beneficial owners.

### 6.06    Other Arrangements

(a)    Except for this Agreement, the Option Agreement, the Pledge Agreement, the Registration Rights Agreement and the Storm Participants Agreement, no Shareholder shall grant any proxy or enter into or agree to be bound by any understanding or any voting trust, voting proxy or other voting agreement with respect to any Securities, nor shall any Shareholder enter into any shareholders agreement or arrangement of any kind (whether written or oral) with any Person with respect to any Securities, including, without limitation, any agreement, understanding or arrangement with respect to the acquisition, ownership, Transfer or other disposition or voting of Securities, nor shall any Shareholder act, for any reason, as a member of a group or in concert with any other Person in connection with the acquisition, transfer or other disposition or voting of Securities in any manner which is inconsistent with any obligation of such Shareholder under this Agreement, provided that each Shareholder shall be permitted to Transfer its

Securities in accordance with the terms of this Agreement.

(b)    Without prejudice to any other rights or remedies of any Shareholder to this Agreement, if any representation and warranty made by any Shareholder in Article III is shown to have been false or misleading when made or confirmed, or if any Shareholder violates the provisions of Article IV, Article V or this Article VI, the rights of such Shareholder under this Agreement and the Registration Rights Agreement shall terminate forthwith, but such Shareholder shall continue to be bound by all of its obligations hereunder and thereunder.

6.07    Shareholder Capacity

No Person executing this Agreement who is, or who becomes during the term hereof, a Director makes any agreement or understanding herein in his or her capacity as such Director, and the agreements set forth herein shall in no way restrict any Director in the exercise of his or her fiduciary duties as a Director. Each Shareholder executes and delivers this Agreement solely in its capacity as the record and beneficial owner of such Shareholder's Voting Securities.

## ARTICLE VII    CONFIDENTIALITY

Each Party will hold, and will use its best efforts to cause its Affiliates, and their respective representatives to hold, in strict confidence from any Person (other than any such Affiliate or representative or a bona fide pledgee in connection with any action contemplated by Article IV), unless (a) compelled to disclose by judicial or administrative process (including, without limitation, as may be required to be disclosed under the Securities Act, the Exchange Act or applicable stock exchange rules) or by other requirements of law or (b) disclosed in an action or proceeding brought by a Party in pursuit of its rights or in the exercise of its remedies hereunder, all documents and information concerning the Company or any other Party or any of its or their Affiliates furnished to the Company or such other Party or their respective representatives to such Party in such capacity, except to the extent that such documents or information can be shown to have been (i) previously known by the Party receiving such documents or information, (ii) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such receiving Party or (iii) later acquired by the receiving Party from another source if the receiving Party is not aware that such source is under an obligation to another Party hereto to keep such documents and information confidential. In the event that this Agreement is terminated, upon the request of another Party, each Party hereto will, and will cause its Affiliates and their respective representatives to, unless otherwise required by law, promptly redeliver or cause to be redelivered all copies of documents and information furnished by the other Parties in connection with this Agreement or the transactions contemplated hereby and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon prepared by the Party which furnished such documents and information or its representatives.

## ARTICLE VIII    ETHICAL BUSINESS CONSIDERATIONS

8.01    Offers to Government Officials

No Party shall (a) pay, promise to pay, or offer any fee, commission, material remuneration or other thing of value to or for the benefit of any Government Official, political party or official

thereof or candidate for political office in order to corruptly influence an act or decision of such Person in his or her official capacity, cause such Person to act or fail to act in violation of his or her lawful duty or cause such Person to influence an act or decision of the government, for the purpose of assisting such Party or any of its Affiliates to obtain or retain business or gain any improper advantage, or (b) shall otherwise violate the FCPA or any Ukrainian or other anti-corruption laws applicable to any Party, its Affiliates or their respective directors, officers, employees, consultants or agents. Nothing in this Agreement, however, shall be construed to prohibit the Company or any Shareholder from offering or making any facilitating or expediting payment the purpose of which is to expedite or to secure the performance of a routine governmental action by a Government Official within the meaning of the FCPA, or any other payment to a Government Official that is permitted under Ukrainian or other laws applicable to such Shareholder.

## 8.02    Books and Records

In connection with this Agreement, all transactions, including, but not limited to, the disposition of assets, the incurrence of liabilities, the recordation of expenses and the documentation of contractual arrangements undertaken by any Party in connection with this Agreement shall be recorded in compliance with applicable law and shall in reasonable detail accurately and fairly reflect the transactions (including the purpose of each transaction and the party with whom it was concluded) in such Party's books and records.

## 8.03    Agents, Subcontractors and Consultants

In connection with this Agreement, no Party shall retain or pay any agent, sub-contractor or consultant if such Party knows that, or has reason to believe that circumstances exist which make it likely that, such agent, subcontractor or consultant will engage in conduct that would violate any provision of Section 8.01 or Section 8.02 if such agent, subcontractor or consultant were a party to this Agreement. Each Party shall take reasonable precautions to require its agents, sub-contractors and consultants to comply with the obligations in Sections 8.01 and 8.02.

## 8.04    Transfers to the Company

No asset which any Shareholder shall contribute, or otherwise make available, to the Company, and no funds to be paid or otherwise transferred to any other Shareholder, any other Shareholder's Affiliate or the Company shall have been acquired by such Shareholder (a) pursuant to a transaction that has involved directly or indirectly an illegal payment to a Government Official or (b) where such asset represents the proceeds of any illegal activity.

## 8.05    Affiliates, Directors, Officers and Employees

In connection with this Agreement, each Party shall require its Affiliates and its and their respective directors, officers and employees to comply with the obligations assumed by such Party in this Article VIII. This effort shall include, but not be limited to, establishing reasonable precautions to prevent such Affiliates, directors, officers and employees from receiving entertainment or gifts, payments, loans, or other things of value from the Company's or any other Shareholder's directors, officers, employees or agents, or Government Officials, or making, promising or offering entertainment or gifts, payments, loans, or other things of value to the Company's or any other Shareholder's directors, officers, employees or agents, or Government

Officials, in violation of applicable law, including, without limitation, anti-corruption laws.

**8.06**   Compliance Policies

The Shareholders agree to cause the Company to enact and maintain appropriate compliance policies to implement the provisions of this Article VIII, including arranging for appropriate training of officers, directors and employees regarding their obligations to adhere to the standards of conduct set forth in such policies.

**8.07**   Access to Capital Markets; IPO

Without prejudice to any other provision of this Article VIII, no Shareholder shall take any action or engage in any conduct, or permit any of its Affiliates or any of its or their respective directors, officers, employees, agents, subcontractors or consultants to take any action or engage in any conduct, the direct or indirect consequence of which would be to prevent the Company from having access to the United States or other international capital markets, or from undertaking an IPO.

## ARTICLE IX   COMPANY'S BOOKS AND RECORDS

**9.01**   Maintenance of Company's Books and Records

The Company shall maintain such corporate books and records as are necessary and appropriate for the conduct of its business. Such books and records, and the minutes of actions and/or meetings of the shareholders and directors of the Company, shall be kept at the principal office of the Company or at such other reasonable place as the Board may determine.

**9.02**   Right to Examine Books and Records

Any Shareholder shall have the right, at such Shareholder's expense, to examine, audit and make copies of the books and records of the Company, in person or by duly authorized agent or attorney, upon reasonable prior notice to the Company and during normal business hours.

## ARTICLE X   INDEMNIFICATION

The Company shall indemnify, defend and hold harmless the Shareholders' respective directors, officers and employees who are acting as a Director or officer of the Company or any of its Controlled Affiliates, and any other directors or officers of the Company or any of its Controlled Affiliates, in such Person's capacity as a Director or officer of the Company or any of its Controlled Affiliates (each and severally, an "**Indemnified Person**" and, collectively, the "**Indemnified Persons**"), from and against any and all liabilities, losses, damages, claims, fines, penalties, costs and expenses, including reasonable fees and expenses of counsel selected by the Indemnified Person (collectively, "**Damages**") to which the Indemnified Person may become subject by reason of, or in connection with, any action taken or omitted to be taken by such Person arising out of such Person's status as a director or officer of the Company or any of its Controlled Affiliates, to the fullest extent permitted by law, except that the Company shall not indemnify any Indemnified Person for any Damages (a) arising from such Indemnified Person's bad faith or willful misconduct, or (b) as to which indemnification is barred under applicable law.  Attorneys' fees and expenses shall be paid by the Company as they are incurred, upon

27

receipt, in each case, of an undertaking by or on behalf of the Indemnified Person to repay such amounts if it is ultimately determined that such Indemnified Person is not entitled to indemnification with respect thereto.

The Company shall procure director and officer liability insurance or similar insurance policy, at its expense, insuring such Indemnified Persons against any of the Damages for which the Company is obligated to indemnify any Indemnified Person pursuant to this Article X. Notwithstanding any other provision of this Article X, the Company shall be obligated to indemnify any Indemnified Person eligible for indemnification hereunder only to the extent payments under such insurance policy are insufficient to hold harmless such Indemnified Person in respect of any such Damages (or actions in respect thereof).

## ARTICLE XI   TERM AND TERMINATION

11.01   <u>Term and Termination</u>

This Agreement shall become effective on the date hereof and remain in effect until the earliest of:

    (a)    the date on which all of the Shareholders and the Company agree in writing to the termination of this Agreement;

    (b)    the date on which this Agreement is terminated in accordance with Section 11.02;

    (c)    the date on which the Shareholders and their Affiliates cease to own at least fifty percent (50%) plus one (1) share of the issued and outstanding capital stock of the Company; and

    (d)    the date on which there is only one (1) Party hereto;

provided that (i) any Shareholder who on the date hereof owns at least ten percent (10%) or more of the Outstanding Voting Securities and thereafter ceases to own at least ten percent (10%) of the Outstanding Voting Securities shall cease to be a party to, or be bound by the terms of, this Agreement from and after the date of the relevant Transfer (or dilution); and (ii) no Transfer or termination shall be deemed to relieve any Party of any obligations of such Party pursuant to this Agreement accruing, or resulting from actions or omissions of such Party occurring, prior to the date of such Transfer or termination.

11.02   <u>Termination for Material Breach</u>

    (a)    Subject to Section 11.02(b) and (c), if any Shareholder (or in the case of a breach or violation of Section 8.01, 8.02, 8.04 or 8.07, any of its Affiliates or any of its or their respective directors, officers, employees, agents, subcontractors or consultants) (in each such case, a "**Breaching Shareholder**") breaches or otherwise violates any of its obligations under Article III, IV or VII or Section 2.05, 6.01, 6.02, 8.01, 8.02, 8.04 or 8.07 and (x) with respect to any breach or violation (or series of breaches or violations) of Article III, IV or VII or Section 2.05, 6.01 or 6.02, in the reasonable opinion of a Non-Breaching Shareholder, such breach or violation (or series of breaches or violations) has resulted or will result in direct loss or damage to the Non-Breaching Shareholder or the

Company in an amount in excess of US$50,000,000 in the aggregate or (y) in the case of any breach or violation of Section 8.01, 8.02, 8.04 or 8.07, such breach or violation has resulted in the issuance of an Order by any Governmental or Regulatory Authority alleging that the Breaching Shareholder, any of its Affiliates, the Company or any of its or their respective directors, officers, employees, agents, subcontractors or consultants has violated applicable law (any such breach(es) or violation(s) meeting the criteria specified in clause (x) or (y) above, a "**Material Breach**"):

(i)      the Non-Breaching Shareholder may provide written notice (a "**Notice of Breach**") to the Breaching Shareholder and the Company of the facts constituting such Material Breach and the Non-Breaching Shareholder's intent to terminate this Agreement if such Material Breach is not cured within thirty (30) days from the date of receipt of the Notice of Breach by the Breaching Shareholder and the Company (the "**Cure Period**");

(ii)      upon receipt of such Notice of Breach, the Breaching Shareholder shall have the right to cure (or cause to be cured) the Material Breach within the Cure Period;

(iii)      a Material Breach shall be deemed cured if (1) in the case of any Material Breach arising from a breach or violation of Article III, IV or VII or Section 2.05, 6.01 or 6.02, prior to the end of the Cure Period the Breaching Shareholder pays to the Company or the Non-Breaching Shareholder, as applicable, an amount equal to the direct loss or damage alleged by the Non-Breaching Shareholder to have arisen from such Material Breach or otherwise remedies such direct loss or damage or (2) in the case of any Material Breach arising from a breach or violation of Section 8.01, 8.02, 8.04 or 8.07 and the issuance of an Order by a Governmental or Regulatory Authority in connection therewith, such Order is revoked or otherwise ceases to be effective (and no new Order is imposed in connection with such breach or violation) prior to the end of the Cure Period;

(iv)      if the Material Breach is not cured within the Cure Period, the Non-Breaching Shareholder shall have the right to terminate this Agreement by delivering to the Breaching Shareholder and the Company not later than fifteen (15) days following the end of the Cure Period written notice of termination (a "**Notice of Termination**");

(v)      the failure of the Non-Breaching Shareholder to provide a Notice of Termination to the Breaching Shareholder and the Company not later than fifteen (15) days following the end of the Cure Period shall constitute a waiver of such Non-Breaching Shareholder's right to terminate this Agreement due to such Material Breach; and

(vi)      if the Non-Breaching Shareholder provides a Notice of Termination to the Breaching Shareholder and the Company not later than fifteen (15) days following the end of the Cure Period, this Agreement shall terminate effective as of the date thirty (30) days after the end of the Cure Period.

(b)    During the period following the Non-Breaching Shareholder having provided a Notice of Breach to the Breaching Shareholder and the Company in accordance with Section 11.02(a)(i) and prior to the date of termination of this Agreement in accordance with this Section 11.02 (including, without limitation, during the period of any arbitration proceeding of the type referred to in Section 11.02(c)), the Parties shall continue to perform their respective obligations under this Agreement in accordance with the terms hereof.

(c)    If a Shareholder disputes whether a Material Breach has occurred or whether it has been cured, such Shareholder may commence an arbitration proceeding in accordance with Section 12.01. If prior to the date of termination of this Agreement in accordance with Section 11.02(a)(vi) a Shareholder commences an arbitration proceeding disputing whether a Material Breach has occurred or has been cured, then, notwithstanding Section 11.02(a), this Agreement shall not be terminated pursuant to Section 11.02 on the basis of such disputed Material Breach or cure until the date on which the panel of arbitrators selected in connection with such proceeding has issued a final, non-appealable award confirming that such disputed Material Breach has occurred and/or has not been cured, as applicable.

## ARTICLE XII  DISPUTE RESOLUTION

12.01  Arbitration: Consent to Jurisdiction

(a)    Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules then in force (the "UNCITRAL Rules") in accordance with the following terms and conditions:

(i)    In the event of any conflict between the UNCITRAL Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail.

(ii)    The place of the arbitration shall be New York, New York, United States of America.

(iii)    Where there is only one claimant party and one respondent party, each shall appoint one arbitrator in accordance with the UNCITRAL Rules, and the two arbitrators so appointed shall appoint the third (and presiding) arbitrator in accordance with the UNCITRAL Rules within thirty (30) days from the appointment of the second arbitrator. In the event of an inability to agree on a third arbitrator, the appointing authority shall be the International Court of Arbitration of the International Chamber of Commerce, acting in accordance with such rules as it may adopt for such purpose. Where there is more than one claimant party, or more than one respondent party, all claimants and/or all respondents shall attempt to agree on their respective appointment(s). In the event that all claimants and all respondents cannot agree upon their respective appointments(s) within thirty (30) Business Days of the date of the notice of arbitration, all appointments shall be made by the International Court of

Arbitration of the International Chamber of Commerce.

(iv)    The English language shall be used as the written and spoken language for the arbitration and all matters connected to the arbitration.

(v)    The arbitrators shall have the power to grant any remedy or relief that they deem just and equitable and that is accordance with the terms of this Agreement, including specific performance, and including, but not limited to injunctive relief, whether interim or final, and any such relief and any interim, provisional or conservatory measure ordered by the arbitrators may be specifically enforced by any court of competent jurisdiction. Each Party retains the right to seek interim, provisional or conservatory measures from judicial authorities and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(vi)    The award of the arbitrators shall be final and binding on the Parties.

(vii)    The award of the arbitrators may be enforced by any court of competent jurisdiction and may be executed against the person and assets of the losing party in any competent jurisdiction.

(b)    Except for arbitration proceedings pursuant to Section 12.01(a), no action, lawsuit or other proceeding (other than the enforcement of an arbitration decision, an action to compel arbitration or an application for interim, provisional or conservatory measures in connection with the arbitration) shall be brought by or between the Parties in connection with any matter arising out of or in connection with this Agreement.

12.02    Service of Process

Each Party irrevocably appoints CT Corporation System, located on the date hereof at 111 Eighth Avenue, 13th Floor, New York, New York 10011, USA, as its true and lawful agent and attorney to accept and acknowledge service of any and all process against it in any judicial action, suit or proceeding permitted by Section 12.01, with the same effect as if such Party were a resident of the State of New York and had been lawfully served with such process in such jurisdiction, and waives all claims of error by reason of such service, provided that the Party effecting such service shall also deliver a copy thereof on the date of such service to the other Parties by facsimile as specified in Section 13.01. Each Party will enter into such agreements with such agent as may be necessary to constitute and continue the appointment of such agent hereunder. In the event that any such agent and attorney resigns or otherwise becomes incapable of acting, the affected Party will appoint a successor agent and attorney in New York reasonably satisfactory to each other Party, with like powers. Each Party hereby irrevocably submits to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York state court sitting in New York City, Borough of Manhattan, in connection with any such action, suit or proceeding, and agrees that any such action, suit or proceeding may be brought in such court, provided, however, that such consent to jurisdiction is solely for the purpose referred to in this Section 12.02 and shall not be deemed to be a general submission to the jurisdiction of said courts of or in the State of New York other than for such purpose. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable law,

any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum. Nothing herein shall affect the right of any Party to serve process in any other manner permitted by applicable law or to commence legal proceedings or otherwise proceed against any other Party in any other jurisdiction in a manner not inconsistent with this Section 12.02.

12.03   Waiver of Sovereign Immunity

Each Party hereby represents and acknowledges that it is acting solely in its commercial capacity in executing and delivering this Agreement and in performing its obligations hereunder, and each Party hereby irrevocably waives with respect to all disputes, claims, controversies and all other matters of any nature whatsoever that may arise under or in connection with this Agreement and any other document or instrument contemplated hereby, all immunity it may otherwise have as a sovereign, quasi-sovereign or state-owned entity (or similar entity) from any and all proceedings (whether legal, equitable, arbitral, administrative or otherwise), attachment of assets, and enforceability of judicial or arbitral awards.

## ARTICLE XIII   MISCELLANEOUS

13.01   Notices

All notices and other communications provided for herein (including, without limitation, any modifications of, or waivers or consents under, this Agreement) shall be given or made by facsimile or by hand in writing and transmitted by facsimile or courier and delivered to the address specified below or at such other address as shall be designated by such Party in a notice to each other Party:

The Shareholders:

If to Telenor Mobile, to:

> Telenor Mobile Communications AS
> Snarøyveien 30
> N-1331 Fornebu
> Norway
>
> Facsimile No: + 47-67-89-48-18
> Attn: Mr. Ragnar Korsæth
>
> with a copy to:
>
> Advokatene i Telenor
> Snarøyveien 30, 1A
> N-1331 Fornebu
>
> Facsimile No.: +47-96-212-216
> Attn: Fredrik Lykke, Esq.

32

If to Storm, to:

    Storm LLC
    1, Narodnogo Opolchennya Street
    Kyiv 03151
    Ukraine
    Fax:    +380-44-235-3905

    Attn: The General Director

    With a copy to:

    OAO "Alfa-Bank"
    12, Prospekt Sakharova, 4th Floor
    107078 Moscow, Russia
    Tel: (7-095) 795-36-42
    Fax: (7-095) 928-86-10

    Attn: Mr. Aleksey Khudyakov

If to the Company, to:

    CJSC "Kyivstar G.S.M."
    51, Chervonozoryany Prospect
    Kyiv 03110
    Ukraine
    Fax:    +380-44-245-72-08

    Attn: The Finance Director

Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given and shall be effective when transmitted by facsimile, personally delivered or, in the case of any notice delivered by courier, upon receipt, in each case, given or addressed as aforesaid.

13.02   <u>Entire Agreement</u>

This Agreement supersedes all prior discussions and agreements among the Parties with respect to the subject matter hereof, including, without limitation, the letter agreement dated April 29, 2002 between and among OAO "Alfa-Bank", Storm and Telenor Mobile and the Voting Agreement, and contains the sole and entire agreement between the Parties with respect to the subject matter hereof.

13.03   Waiver

Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by applicable law or otherwise afforded, will be cumulative and not alternative.

13.04   Amendment

This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party hereto.

13.05   No Assignment; Binding Effect;  No Third Party Beneficiary

Except as expressly provided herein, neither this Agreement nor any right, interest or obligation hereunder may be assigned by any Party without the prior written consent of the other Parties and any attempt to do so will be void.  Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and assigns. The terms and provisions of this Agreement are intended solely for the benefit of each Party and its successors and permitted assigns, and it is not the intention of the Parties to confer third party beneficiary rights upon any other Person other than any Person entitled to indemnity under Article X.

13.06   Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction.

13.07   Severability

If any provision in this Agreement or any other document executed in connection herewith is or shall become invalid, illegal or unenforceable in any jurisdiction, the invalidity, illegality or unenforceability of such provision in such jurisdiction shall not affect or impair the validity, legality or enforceability of (a) any other provision of this Agreement or any such other document in such jurisdiction or (b) such provision or any other provision of this Agreement or any such other document in any other jurisdiction.

13.08   Further Assurances

From time to time, at any Party's reasonable request and without further consideration, each Party shall execute and deliver such additional documents and take all such further action as may be reasonably necessary or desirable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

13.09  <u>Headings</u>

The headings contained in this Agreement are for convenience of reference only, and do not form a part hereof and in no way interpret or construe the provisions hereof.

13.10  <u>Counterparts</u>

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** each of the Parties has caused this Shareholders Agreement to be duly executed by its duly authorized officer as of the day and year first above written.

The Shareholders

TELENOR MOBILE
COMMUNICATIONS AS

By _____
Sigmund Ekhougen
Attorney-in-Fact

STORM LLC

By _____
Valeriy V. Niloy
General Director

The Company

CLOSED JOINT STOCK COMPANY
"KYIVSTAR G.S.M."

By _____
Igor V. Litovchenko
President

36

Schedule 1

Shareholdings

| Name of Shareholder | Number of Securities | Percentage Ownership |
|---|---|---|
| Telenor Mobile Communications AS | 5,915,944 | 55.354437% |
| Storm LLC | 4,771,445 | 44.645563% |
| Total | 10,687,389 | 100% |

Schedule 2

Procedures for Determination of Fair Market Value

1.   **Fair Market Value of Securities Not Listed, Quoted or Traded on a National or International Securities Exchange or Market:**

The parties having an interest in the determination of the Fair Market Value of a security which is not listed, quoted or traded on a national or international securities exchange or market shall use their good faith and reasonable best efforts to mutually agree upon the Fair Market Value of such security as soon as possible.

The following procedure shall be applied assuming that the parties cannot agree on the determination of Fair Market Value within fourteen (14) days (the **"Initial Period"**) of a request by a party for the determination of Fair Market Value of a specific item:

Each party shall select one Appraiser from the list set forth below (the **"Appraiser"**). Within fourteen (14) days of the termination of the Initial Period, each such Appraiser independently shall determine the Fair Market Value of the security having equal access to information. Each such Appraiser shall not be aware of the results of the other one before it has submitted its own final report.   (If a party does not timely choose an Appraiser, or such Appraiser has not completed its valuation within the fourteen (14) day period, then the Appraiser that has been timely selected and which has completed its valuation on time shall be final and binding on the parties and enforceable as a final arbitral award.)

If the higher valuation is not more than 115% of the lower valuation, then the item shall be valued at the average of both valuations and such average shall be final and binding on the parties and enforceable as a final arbitral award.

If the higher valuation is more than 115% of the lower valuation, then the Appraisers selected by the parties shall select a third Appraiser  (which Appraiser shall be selected from the list of Appraisers set forth below) that on its turn shall as soon as reasonably practicable but within fourteen (14) days from its selection determine the Fair Market Value of the item having the same access to information.

Such Appraiser shall not be informed of results of the previous reports before it has submitted its own final report.

Then the lower of the three valuations shall be excluded and the item shall be valued at the average of the two higher valuations.  Such valuation shall be final and binding on the parties and enforceable as a final arbitral award.

For the purposes of this Section 1, the Fair Market Value of a Security shall be determined by one of the following five (5) Appraisers (which entity shall meet the requirements of an Appraiser, as defined in this Agreement, at the time of its selection):

38

ABN AMRO
Deutsche Bank AG
J.P. Morgan Chase & Co.
Schroder Salomon Smith Barney
Morgan Stanley

2.  **Fair Market Value of Securities Listed, Quoted or Traded on a National or International Securities Market or Exchange:**

The Fair Market Value of any securities listed and traded or quoted on a national or international securities market or exchange shall be, as of the date of determination thereof, the average of the Market Prices for such securities for the thirty (30) trading days immediately preceding such date of determination.   As used herein, "Market Price" shall mean the price of one share or unit on the relevant date determined:

(a)    on the basis of the last reported sales price regular way on the principal U.S. securities market or exchange on which the securities are listed or admitted to trading;

(b)    if there is no such reported sale price on such day, on the basis of the average of the reported closing bid and asked prices regular way on the principal U.S. securities market or exchange on which the securities are listed or admitted to trading; or

(c)    or if not so quoted, on the basis of the closing prices on the principal international stock exchange on which the securities are then listed and traded.

3.  **Fair Market Value of Offer Notice Consideration and Relevant Obligations:**

The Fair Market Value of any consideration set forth in an Offer Notice (for purposes of Section 4.04(a)) or a Relevant Obligation (for purposes of Section 6.01) shall be determined by one of the following five (5) Appraisers (which entity shall meet the requirements of an Appraiser, as defined in this Agreement, at the time of its selection) selected by the Parties to the relevant transaction (or Standstill Party, as applicable):

ABN AMRO
Deutsche Bank AG
J.P. Morgan Chase & Co.
Schroder Salomon Smith Barney
Morgan Stanley

The costs incurred in determining such Fair Market Value shall be divided evenly by the parties to the relevant transaction.

39

Schedule 3

Approved Bankers

ABN AMRO
Deutsche Bank AG
J.P. Morgan Chase & Co.
Schroder Salomon Smith Barney
Morgan Stanley

Schedule 4

Investments

Golden Telecom, Inc.

Schedule 5

Beneficial Ownership

**Name of Shareholder:  Telenor Mobile Communications AS**

**Names of Beneficial Owners and Description of Ownership Interests:**

Telenor Mobile Communications AS is a wholly-owned subsidiary (100%) of Telenor Mobile Holding AS.

Telenor Mobile Holding AS is a wholly-owned subsidiary (100%) of Telenor ASA.

The Norwegian state, represented by the Department of Industry and Trade (Nærings og Handels departementet), owns 62.65% of the shares of Telenor ASA. The remainder of the shares of Telenor ASA are held by the public and listed on the Oslo Stock Exchange (OSE) and The New York Stock Exchange (NYSE). Set forth below is a list of Telenor ASA's 20 largest shareholders as of November 28, 2003:

| | | | |
|---|---|---|---|
| DEPT OF TRADE & INDUSTRY (NAERINGS OG HANDELSD) | 1 129 842 400 | NOR | 62.65% |
| STATE STREET BANK | 75 121 572 | USA | 4.17% |
| FOLKETRYGDFONDET | 49 404 000 | NOR | 2.74% |
| TELENOR ASA | 28 103 172 | NOR | 1.56% |
| MORGAN STANLEY AND CLIENTS | 22 040 564 | GBR | 1.22% |
| SKANDINAVISKA ENSKILDA BANKEN | 15 071 681 | SWE | 0.84% |
| JPMORGAN CHASE BANK | 14 005 912 | GBR | 0.78% |
| DEUTSCHE BANK AG | 12 904 859 | ARE | 0.72% |
| MELLON BANK NA | 11 934 234 | USA | 0.66% |
| THE NORTHERN TRUST CO | 11 763 214 | GBR | 0.65% |
| ORKLA ASA | 11 400 000 | NOR | 0.63% |
| JPMORGAN CHASE BANK | 10 813 482 | USA | 0.60% |
| SEB MERCHANT BANKING | 9 259 893 | NOR | 0.51% |

42

| | | | |
|---|---|---|---|
| VITAL FORSIKRING ASA V/DNB ASSET MANAGEMENT | 8 668 950 | NOR | 0.48% |
| MELLON BANK NA | 8 177 180 | USA | 0.45% |
| DEUTSCHE BANK AG | 6 896 114 | DEU | 0.38% |
| THE NORTHERN TRUST CO | 6 805 493 | GBR | 0.38% |
| INVESTORS BANK & TRUST | 6 654 035 | NOR | 0.37% |
| GOLDMAN SACHS INTERNATIONAL | 6 492 368 | GBR | 0.36% |
| STATE STREET BANK | 6 391 327 | USA | 0.35% |

**Name of Shareholder:  Storm LLC**

**Names of Beneficial Owners and Description of Ownership Interests:**

**EC Venture Capital SA,** a Swiss company, owns 5.93945% of the participation interests in Storm. EC Venture Capital SA was incorporated by Mr. Andre Walkowicz, a Swiss citizen resident in Geneva, together with Mr. Francois Payot, a Swiss citizen resident in Geneva and Mr. Benedikt Baumer, a Swiss citizen resident in Nyon. Messrs. Payot and Baumer's sole role was to attend the incorporating meeting with Mr. Walkowicz to fulfil Swiss legal requirements. Each held only one share of the 250 issued shares, and returned them to Mr. Walkowicz after such meeting. The company is registered in the Geneva Trade Register under No. CH-660-1594997-4. Mr. Walkowicz is the sole director of EC Venture Capital SA. The company has no other employees. All decisions are taken by Mr. Walkowicz exclusively.

**Mobile Telecom Finance, L.L.C.,** a Georgia limited liability company, owns 9.00721% of the participation interests in Storm.    Fifty per cent (50%) of the interests in Mobile Telecom Finance, L.L.C. are held by Ms. Susanne Pegard, a Swiss citizen resident in Zurich, and the remaining fifty percent (50%) are held by United Overseas Trading, Ltd., a Bahamas corporation.  One hundred per cent (100%) of the interest in United Overseas Trading, Ltd. is held by Pavatol Invest & Trade, a British Virgin Islands company.

**Euroquest Commerce Ltd.,** a Cyprus company, owns 34.94426% of the participation interests in Storm.  Euroquest Commerce Ltd., is a wholly-owned subsidiary (100%) of Euroquest Commerce Ltd., a British Virgin Islands company ("Euroquest BVI"). Euroquest BVI is owned by Ledra Trustee Services Limited for Franklin Trust (1 share) and Ledra Trustee Services Limited for Liberty Trust (1 share). The trustee of Franklin Trust and Liberty Trust is Olexandr Yaroslavsky, Ukrainian citizen resident in Kharkiv.

43

Alfa Telecom Limited, a British Virgin Islands company, owns 50.1% of the participation interests in Storm. Alfa Telecom Limited is a wholly-owned subsidiary (100%) of Alfa Finance Holdings S.A., a Luxembourg 1929 holding company, which is 75.6628% owned by the following three companies: (i) Cotesmore Holdings Ltd, a Bahamas Corporation beneficially owned by Michael Fridman, (ii) Laketown Services Ltd., an Isle of Man corporation, beneficially owned by Alexey Kuzmichev, and (iii) Bardsley Investment Corp., a British Virgin Islands corporation, beneficially owned by German Khan. The remaining 24.3372% has been distributed to the top managers of OAO "Alfa-Bank" by way of incentives or options.

EXHIBIT A

Form of Endorsement

[date]

The undersigned, a transferee (the "**Transferee**") of shares of Closed Joint Stock Company "Kyivstar G.S.M" (the "**Company**"), hereby agrees to the terms and conditions of the Shareholders Agreement dated January 30, 2004 (the "**Shareholders Agreement**", with terms defined in the Shareholders Agreement used herein as therein defined) between and among the Company, Telenor Mobile Communications AS, Storm LLC and certain other shareholders of the Company that are party thereto from time to time, and (a) agrees to be fully bound by the terms and conditions of the Shareholders Agreement as if the undersigned were an original signatory thereto, (b) makes as of the date hereof [and as of the date of the effectiveness of this Endorsement upon the commencement of any Foreclosure Action], for the benefit of each of the other parties to the Shareholders Agreement, each of the representations and warranties set forth on Annex 1 to this Endorsement, (c) represents that it owns the beneficial interest in the Securities specified below and (d) agrees to deliver to each other party to the Shareholders Agreement, as soon as practicable (and in any event not later than seven (7) days after the date hereof), an original copy of this Endorsement. If the Transferee is a pledgee of shares of the Company, this Endorsement shall automatically become effective upon the commencement of any Foreclosure Action.

[Name of Transferee]

By _____
  Name:
  Title:

Type and Number of Securities:

45

ANNEX 1 TO ENDORSEMENT

## Representations and Warranties

The Transferee hereby represents and warrants as of the date hereof that:

1.  <u>Organization</u>

If not a natural Person, the Transferee is duly organized and validly existing under the laws of its jurisdiction of organization, with corporate power and authority to carry on its business as it is currently being conducted and to own, lease and operate its Assets and Properties.

2.  <u>Authority</u>

    (a)     The Transferee has full power and authority to enter into the Endorsement and the Shareholders Agreement.   The execution and delivery of the Endorsement by the Transferee has been duly and validly authorized and, if the Transferee is not a natural Person, no other corporate action on the part of the Transferee, its board of directors or its shareholders is necessary therefor.

    (b)     The Endorsement and the Shareholders Agreement have been duly and validly authorized, executed and delivered by the Transferee and constitute the legal, valid and binding obligations of the Transferee, enforceable against the Transferee in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights and remedies generally or by general equitable principles (whether applied by a court of law or equity).

    (c)     The Transferee has full power and authority to perform its obligations under the Endorsement and the Shareholders Agreement.

3,  <u>No Conflicts</u>

The execution, delivery and performance by the Transferee of the Endorsement and the Shareholders Agreement, the compliance by the Transferee with all of the provisions hereof and thereof and the consummation by the Transferee of the transactions contemplated hereby and thereby:

    (a)     if the Transferee is not a natural Person, will not conflict with or constitute a breach of any of the terms or provisions of, or a default under, its charter, memorandum of association, articles of association, certificate of incorporation, by-laws or other like constitutive documents, as the case may be;

    (b)     will not conflict with or constitute a breach of any Contract or License to which the Transferee is a party or by which it or any of its Assets and Properties is bound, in each case, as in effect on the date hereof; and

46

(c)    will not violate or conflict with any Orders or laws of any Governmental or Regulatory Authority applicable to the Transferee, in each case, as in effect on the date hereof.

4.    Governmental Approvals and Filings

The execution, delivery and performance by the Transferee of the Endorsement and the Shareholders Agreement, the compliance by the Transferee with all of the provisions hereof and thereof and the consummation by the Transferee of the transactions contemplated hereby and thereby will not require any consent, approval, authorization, other Order or action of, filing with or notice to any Governmental or Regulatory Authority, except for such consents, approvals, authorizations or other Orders as have been obtained and which are in full force and effect on the date hereof.

5.    Legal Proceedings: Liability

(a)    To the knowledge of the Transferee, there are no material Actions or Proceedings pending to which the Transferee is a party or to which any of the Securities it owns or controls, beneficially or otherwise, is subject, which would, or would reasonably be expected to, result in the issuance of an Order which questions the validity of the Endorsement or the Shareholders Agreement or which would, or would reasonably be expected to, result in the issuance of an Order which materially adversely affects the ability of the Transferee to perform its obligations hereunder and thereunder and, to the knowledge of the Transferee, no such proceedings are threatened.

(b)    There are no facts or circumstances known to the Transferee that would reasonably be expected to give rise to any material Action or Proceeding that would be required to be disclosed pursuant to clause (a) above.

6.    Shareholding: Securities Laws

The Transferee hereby represents and warrants as of the date hereof that:

(a)    it is the record holder and beneficial owner of the Securities described opposite its name on its Endorsement;

(b)    the Securities described opposite its name on its Endorsement constitute all of the Securities of capital stock of the Company owned of record or beneficially by the Transferee;

(c)    except for any rights of the Transferee's spouse, if any, arising by operation of law, the Transferee has sole power of disposition and sole voting power with respect to all of the Securities described opposite its name on its Endorsement, as the case may be, with no restrictions on such rights, other than such restrictions on the Transfer as arise under applicable United States federal securities laws, Ukrainian securities laws, this Agreement, the Charter, the Option Agreement, the Pledge Agreement and the

Registration Rights Agreement;

(d)     its Securities are in uncertificated, non-documentary form and, in any event, are now held or will, upon issuance, be held, in each case, free and clear of all Liens, proxies, voting trusts or agreements, understandings or arrangements whatsoever, other than any Liens arising under this Agreement, the Charter, the Option Agreement, the Pledge Agreement or the Registration Rights Agreement;

(e)     it understands that no action has been or will be taken in any jurisdiction by the Company or any other Person that would permit a public offering of the Securities or possession or distribution of any offering or publicity material relating to the Securities, in any country or jurisdiction where action for that purpose may be required; and

(f)     the Securities have not been and will not be registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except in accordance with Regulation S under the Securities Act or pursuant to another exemption from the registration requirements of the Securities Act; and neither the Transferee, its Affiliates nor any Persons acting on its or their behalf have engaged or will engage in any directed selling efforts (within the meaning of Regulation S) with respect to the Securities.

7.     <u>Ethical Conduct</u>

(a)     In connection with the Company or its Business, the Transferee has not, and none of its Consolidated Subsidiaries or Affiliates, or any director, officer, agent, employee or other Person acting on behalf of such Transferee or any of its Consolidated Subsidiaries or Affiliates has, in the course of its actions for, or on behalf of such Transferee (i) provided, or arranged for the provision of, any unlawful contribution, gift, entertainment or other benefit relating to a political party or official thereof or a candidate for public office, (ii) made any payment, directly or indirectly, to any Government Official, (iii) otherwise violated any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or any anti-corruption laws or regulations of Ukraine or of the jurisdiction of incorporation or principal activities of such Transferee, or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any customer or other third party.

(b)     No asset which the Transferee has contributed, or otherwise made available, to the Company, and no funds paid or otherwise transferred to any other Shareholder, any Shareholder's Affiliate or the Company have been acquired by the Transferee (i) pursuant to a transaction that has involved directly or indirectly an illegal payment to a Government Official or (ii) where such asset represents the proceeds of any illegal activity.

8.     <u>Beneficial Ownership</u>

The beneficial owners (as such term is used in Rule 13d-3 under the Exchange Act (17 C.F.R. § 240.13d-3)) of the Transferee are set forth in Annex 2 to the Endorsement.

**REDACTED**

**From:** Van Tol, Pieter [mailto:Pieter.VanTol@LOVELLS.com]
**Sent:** Monday, December 04, 2006 4:55 PM
**To:** Ken Feinberg; Craig, Gregory; adrjentes@rcn.com
**Cc:** Sills, Robert L.; Fried, Lisa; Zeballos, Gonzalo; Chang, Eric
**Subject:** Telenor Mobile v. Storm
**Importance:** High

Confidential

Dear Members of the Tribunal:

I am writing to inform you of another recent development in the Ukrainian courts that we just learned about today. Alpren Limited ("Alpren") has commenced an action in the Golosiyiv District Court of the city of Kyiv Goshko O.M. (the "District Court") regarding the invalidity of actions taken by Vadim Klymenko on behalf of Storm.

On Friday, December 1, 2006, the District Court issued the attached ruling, which we have provided in the original Ukrainian and in an unofficial translation. (We will provide a certified translation very shortly.) In the December 1 ruling, the District Court granted an injunction sought by Alpren that prohibits Mr. Klymenko, Storm <u>and</u> Telenor Mobile (including their representatives) from participating any further in the arbitration that is currently pending before you. It is our understanding that, in keeping with the terms of the ruling, the relevant papers are being (or have been) served on Telenor Mobile, which will have a right of appeal to the Kyiv Appellate Court. The ruling, however, states that an appeal shall not affect the execution of the injunction obtained by Alpren on December 1. We note that the papers call for immediate compliance and that a failure to abide by the ruling is punishable under Ukrainian criminal law.

Under the circumstances, we cannot see how Storm may lawfully appear at the hearing set for December 7 and 8, 2006 and we respectfully request that the Tribunal confirm that the hearing is adjourned until further notice.

We also request a ruling on Storm's pending motion to reconsider, since that would lead to a dismissal of the arbitration and would mean that neither Storm nor Telenor Mobile could be in jeopardy of violating the December 1 ruling.

Respectfully submitted,

Pieter Van Tol
Lovells
590 Madison Avenue
New York, New York  10022
Tel: (212) 909-0661
Fax: (212) 909-0660
pieter.vantol@lovells.com

---

Lovells is an international law firm.

CONFIDENTIALITY. This email and any attachments are confidential and may also be pri

12/5/2006

Ruling

On December 1, 2006, the judge of the Golosiyiv District Court of the city of Kyiv Goshko O.M., having considered the claim of "Alpren Limited" against Klymenko Vadym Viktorovych on invalidation of actions and obligation to take actions,

Has found:

Plaintiff has turned to court with a claim against Klymenko V.V. on invalidation of actions and obligation to take actions. The Plaintiff has also submitted an application for interim protective measures whereby the Plaintiff requests the court as an interim protective measure to enjoin until the judgment in the case is rendered Klymenko V.V. in his capacity of the Director General of "Storm, LLC", or any other persons authorized by him, from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, statements of defense, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York; to enjoin until the judgment in the case is rendered Telenor Mobile Communications AS (a Norwegian legal entity, seated at: Norway, Fornebu Snaroyveien 30 D, 1331) and any persons authorized by it from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting of any explanations, applications, claims, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York.

Under Article 151(1) of the Code of Civil Procedure of Ukraine, the court, upon an application by the parties to the case can take interim protective measures, taking of such measures shall be allowed at any stage of the proceedings if failure to take such measures can complicate or prevent execution of the judgment in the case.

Upon the review of the materials of the case, the court came to the conclusion that failure to take interim protective measures can complicate or prevent execution of the judgment in the case.

Particularly, it is evident from the materials of the case that the Kyiv Commercial Court has applied the consequences of invalidity of a void deed – the Shareholders Agreement dated January 30, 2004 between Storm Limited Liability Company and Telenor Mobile Communications AS. However, execution of this deed hasn't been ceased, some of its participants still are guided by its provisions and thus threaten and violate the rights of the Plaintiff.

With the view to the above, on the basis of Articles 151 (1) and (3), 152 (1) – (3), 153 (1), (5) – (7), (9), (10) of the Code of Civil Procedure of Ukraine, the court,-

Has held:

To enjoin until the judgment on the merits of case is rendered Klymenko V.V. (residing at *01001, city of Kyiv, Gorkogo st., 17-B, apt. 21*) in his capacity of the Director General of "Storm, LLC", or any other persons authorized by him, from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, statements of defense, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R.

Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York;

To enjoin until the judgment on the merits of the case is rendered "Storm LLC" (registered at *01001, city of Kyiv, Narodnoho Opolchennia St., 1*, Legal entity ID #23163325) and any persons authorized by it from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, statements of defense, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York;

To enjoin until the judgment on the merits of the case is rendered "Telenor Mobile Communications AS" (a Norwegian legal entity, seated at: *Norway, Fornebu Snaroyveien 30 D, 1331*) and any persons authorized by it from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, claims, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York.

This Ruling shall be forwarded to the parties of the case, as well as to "Storm LLC" (registered at *01001, city of Kyiv, Narodnoho Opolchennia St., 1*, Legal entity ID #23163325), Telenor Mobile Communications AS" (a Norwegian legal entity, seated at: *Norway, Fornebu Snaroyveien 30 D, 1331*), and respective bodies of the State Enforcement Service.

This Ruling shall be subject to immediate execution.

This Ruling may be appealed to the Kyiv Appellate Court by means of submission within 5 days after the date of this Ruling of the application on subsequent appeal, and submission within 10 days after the date of the application of the appeal complaint. An appeal shall not stop the execution of this Ruling, and it shall not prevent further consideration of the merits of the case.


Judge

                [STAMPED]
                [True Copy
                Judge of the Golosiyiv Ditrict Court
                Of the city of Kyiv
                Goshko O.M. [signed]
                Secretary [signed]]

THE MINISTRY OF JUSTICE OF UKRAINE
**STATE ENFORCEMENT SERVICE**
Golosiyiv District of Kyiv

Lomonosova St., 2/15, Kyiv

December 4, 2006
No. 815/10

        To: Storm LLC
        Gorkogo St., 17B, apt. 21 Kyiv

        CC: Alpren Ltd, 4/12, Chapayev St., Kyiv

        CC: Golosiyiv District Court of Kyiv

    The State Enforcement Service in Golosiyiv District of Kyiv is hereby sending you at your address the **Resolution on Initiation of Enforcement Proceedings**.
    We hereby require informing us on the enforcement of the aforesaid Resolution within 7 days to No._____.

| | | |
|---|---|---|
| Department Head | [signed] | O.I. Grebenyuk |
| State Executive | [signed] | V.A. Ustymenko |

**RESOLUTION No.815/10**
**On Initiation of Enforcement Proceedings**

December 4, 2006                                                                                    Kyiv

I, state enforcement officer V.A. Ustymenko of the State Enforcement Service in Golosiyiv District of the city of Kyiv, have considered the application on compulsory enforcement of the Ruling #2-5613 dated December 1, 2006 of Golosiyiv District Court of City of Kyiv on injunction until the judgment on the merits of case is rendered Klymenko V.V. (residing at *01001, city of Kyiv, Gorkogo st., 17-B, apt. 21*) in his capacity of the Director General of "Storm, LLC", or any other persons authorized by him, from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, statements of defense, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York,
that entered into legal force on December 1, 2006,

Taking into account the foregoing, guided by articles 3, 18, 24, 76, 87 of the Law of Ukraine "On Enforcement Proceedings",

HAVE RULED AS FOLLOWS:

1. To initiate the enforcement proceeding on the Resolution No. 2-5613 dated 1 December 2006 rendered by Golosiyiv District Court of Kyiv on **enjoining until the judgment on the merits of case is rendered the "Storm Limited Liability Company" or any duly authorized persons of the said company from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, statements of defense, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York.**

2. The Debtor shall voluntarily comply with the requirements of the enforcement document by _____.

3. In the event of failure to comply with the decision within the mentioned term, this decision shall be subject to compulsory enforcement. Initiation of compulsory enforcement shall oblige the Debtor to pay a 10 per cent duty and costs related to enforcement execution.

4. The copy of this Resolution shall be forwarded to the parties thereto and to the court.

5. This Resolution may be appealed to the head of the State Enforcement Service of Golosiyiv District of the City of Kyiv or alternatively at court within 10 days of the date of the issuance thereof.

State Enforcement Officer              [signature], [seal]              V.A. [surname: *illegible*]

THE MINISTRY OF JUSTICE OF UKRAINE
**STATE ENFORCEMENT SERVICE**
Golosiyiv District of Kyiv
2/15 Lomonosova St., Kyiv

5 December 2006

To: Storm LLC
Office 21, 17-b Horkoho, Kyiv

Copy: Alpren Limited
4-12, Chapaeva, Kyiv

### DEMAND

The State Enforcement Service of Golosiyiv District of the City of Kyiv is required to enforce the Ruling No.2-5613 of December 1, 2006 issued by Golosiyiv District Court of the City of Kyiv that enjoins until the judgment on the merits of the case is rendered "Storm Limited Liability Company" or any duly authorized persons of the said company from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, statements of defense, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York. This Ruling shall be enforced immediately.

We hereby oblige the debtor to IMMEDIATELY enforce the court ruling and inform the State Enforcement Service thereof.

*Failure to comply with the court decision shall entail issuance of the Ruling on imposing of the penalty on the person guilty of such failure by the state enforcement officer in accordance with Article 87 of the Law of Ukraine "On the Enforcement Procedure".*

*In the event of repeated failure to comply with the lawful requirements of the state enforcement officer, the Ruling shall be issued on imposing of the penalty in a double amount and the motion will be filed with the Prosecutor's Office on imposition of criminal liability on the guilty persons.*

***We hereby remind that pursuant to articles 6, 87, 88 of the Law of Ukraine "On the Enforcement Procedure", failure to comply with the lawful requirements of the state enforcement officer shall entail responsibility contemplated by Law. In the event of failure to comply with the court decision, the state enforcement officer shall file a motion with the court on imposition of criminal liability in accordance with applicable legislation.***

State enforcement officer          [signed] [sealed]          V.A. Ustymenko

THE MINISTRY OF JUSTICE OF UKRAINE
**STATE ENFORCEMENT SERVICE**
Golosiyiv District of Kyiv

Lomonosova St., 2/15, Kyiv

December 4, 2006
No. 815/10

To: V.V. Klimenko
Gorkogo St., 17B, apt. 21 Kyiv

CC: Alpren Ltd, 4/12, Chapayev St., Kyiv

CC: Golosiyiv District Court of Kyiv

    The State Enforcement Service in Golosiyiv District of Kyiv is hereby sending you at your address the **Resolution on Initiation of Enforcement Proceedings**.
    We hereby require informing us on the enforcement of the aforesaid Resolution within 7 days to No._____.

| | | |
|---|---|---|
| Department Head | [signed] | O.I. Grebenyuk |
| State Executive | [signed] | V.A. Ustymenko |

**Resolution No.815/10**
**On Initiation of Enforcement Proceedings**

December 4, 2006                                                    Kyiv

I, state enforcement officer V.A. Ustymenko of the State Enforcement Service in Golosiyiv District of the city of Kyiv, have considered the application on compulsory enforcement of the Ruling #2-5613 dated December 1, 2006 of Golosiyiv District Court of City of Kyiv on injunction until the judgment on the merits of case is rendered Klymenko V.V. (residing at *01001, city of Kyiv, Gorkogo st., 17-B, apt. 21*) in his capacity of the Director General of "Storm, LLC", or any other persons authorized by him, from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, statements of defense, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York, that entered into legal force on December 1, 2006,

Taking into account the foregoing, guided by articles 3, 18, 24, 76, 87 of the Law of Ukraine "On Enforcement Proceedings",

HAVE RULED AS FOLLOWS:

1. To begin enforcement procedure on enforcing the Ruling No. 2-5613 dated December 1, 2006 issued by Golosiyivskiy District Court of the City of Kyiv on **enjoining until the judgment on the merits of case is rendered Klymenko V.V. (residing at *01001, city of Kyiv, Gorkogo st., 17-B, apt. 21*) in his capacity of the Director General of "Storm, LLC", or any other persons authorized by him, from performing any actions aimed at execution of the Shareholders Agreement dated January 30, 2004, and also to enjoin them from signing and submitting on behalf of "Storm LLC" of any explanations, statements, statements of defense, motions, participating in arbitration proceedings, hearings, sittings of the tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) that is being held under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm LLC" in the city of New York.**

2. The Debtor shall voluntarily comply with the requirements of the enforcement document by December 5, 2006.

3. In the event of failure to comply with the decision within the mentioned term, this decision shall be subject to compulsory enforcement. Initiation of compulsory enforcement shall oblige the Debtor to pay a 10 per cent duty and costs related to enforcement execution.

4. The copy of this Resolution shall be forwarded to the parties thereto and to the court.

5. This Resolution  may be appealed to the head of the State Enforcement Service of Golosiyiv District of the City of Kyiv or alternatively at court within 10 days of the date of the issuance thereof.

State Enforcement Officer            [signed], [sealed]            V.A. Ustymenko

THE MINISTRY OF JUSTICE OF UKRAINE
**STATE ENFORCEMENT SERVICE**
Golosiyiv District of Kyiv

Lomonosova St., 2/15, Kyiv

December 5, 2006    No. 815/10

To:    V.V. Klymenko
       17-b, Gorkogo St., apt. 21, Kyiv
Copy: Alpren Limited
       4-12, Chapayeva St., Kyiv

## DEMAND

The State Enforcement Service of Golosiyiv District of the City of Kyiv is required to enforce the Ruling No.2-5613 of December 1, 2006 issued by Golosiyiv District Court of the City of Kyiv that enjoins Vadim Viktorovych Klymenko, General Director of "Storm Limited Liability Company", and any other persons authorized by him from performing any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until the judgment on the merits of the case is rendered, including signing and submitting on behalf of "Storm LLC" of any exmplanations, applications, statements, statements of defense, motions, participating in arbitration proceedings, hearings and sittings (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R.Feinberg) that is taking place under the UNCITRAL Arbitration Rules upon a claim by Telenor Mobile Communications AS against "Storm Limited Liability Company" in the City of New York. This Ruling shall be enforced immediately.

The debtor is hereby obliged to IMMEDIATELY perform the court decision and send the notice informing on the performance to the address of the State Enforcement Service.

*Failure to comply with the court decision shall entail issuance of the Ruling on imposing of the penalty on the person guilty of such failure by the state enforcement officer in accordance with Article 87 of the Law of Ukraine "On the Enforcement Procedure".*

*In the event of repeated failure to comply with the lawful requirements of the state enforcement officer, the Ruling shall be issued on imposing of the penalty in a double amount and the motion will be filed with the Prosecutor's Office on imposition of criminal liability on the guilty persons.*

***We hereby remind that pursuant to articles 6, 87, 88 of the Law of Ukraine "On the Enforcement Procedure", failure to comply with the lawful requirements of the state enforcement officer shall entail responsibility contemplated by Law. In the event of failure to comply with the court decision, the state enforcement officer shall file a motion with the court on imposition of criminal liability in accordance with applicable legislation.***

State enforcement officer         [signed] [sealed]              V.A. Ustymenko

**Decree**

On December 1, 2006, the judge of Golosiyivsky District Court of the City of Kyiv Goshko O.M., having reviewed the materials of claim brought by Alpren Limited against Vadym Viktorovych Klymenko seeking the recognition of actions as unlawful and compulsion to take actions,

**Established that:**

The claimant has brought to the court a claim against V.V. Klymenko on recognizing actions as unlawful and compelling to perform actions. The claimant has also submitted to the court a petition for injunctive relief, whereby the claimant requests the court to apply injunctive relief: to enjoin V.V. Klymenko, as the General Director of Limited Liability Company "Storm", and any persons authorized by him, from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including to enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York; to enjoin Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including to enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York; to enjoin Telenor Mobile Communications AS (a legal entity under the laws of Norway, with its place of business at Snarøyveien 30 D, 1331 Fornebu, Norway) and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including enjoin [them] from filing any explanations, statements, statements of claims, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York.

Under Part 1 of Article 151 of the Code of Civil Procedure of Ukraine, upon a petition of persons participating in the case, the court may apply injunctive relief, injunctive relief is allowed in any stage of the proceedings in a case if non-application of the injunctive relief may complicate the enforcement of a court decision or render it impossible.

Upon reviewing the case files, the court concludes that non-application of injunctive relief will render the enforcement of the court decision regarding the case impossible.

Particularly, it is evident from the materials provided to the court that the Kyiv City Commercial Court has applied the consequences of invalidity of a void transaction – the Shareholders Agreement dated January 30, 2004 between Limited Liability Company "Storm" and Telenor Mobile Communications AS. However, its performance has not been discontinued, some of its parties continue to be guided by its provisions, thereby jeopardizing and violating the rights of the claimant.

Based on the foregoing and pursuant to Parts 1, 3 of Article 151, Parts 1-3 of Article 152, Parts 1, 5, 6, 7, 9, 10 of Article 153 of the Code of Civil Procedure of Ukraine, the court

1

**RULED TO:**

Enjoin Vadym Viktorovych Klymenko (*17-B Gorkogo Str., Apt. 21, 01001, Kyiv*), as the General Director of Limited Liability Company "Storm", and any persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York;

Enjoin Limited Liability Company "Storm" (*1 Narodnogo Opolchennya Str., 01001, Kyiv, identification code of a legal entity 23163325*) and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim bought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York;

Enjoin Telenor Mobile Communications AS (*a legal entity under the laws of Norway, with its place of business at Snarøyveien 30 D, 1331 Fornebu, Norway*) and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including enjoin [them] from filing any explanations, statements, statements of claims, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm LLC" in New York.

Dispatch this Decree to the parties, Limited Liability Company "Storm" (*1 Narodnogo Opolchennya Str., 01001, Kyiv, code in EDRPOU [Unified State Register of Enterprises and Organizations of Ukraine] 23163325*), Telenor Mobile Communications AS (*a legal entity under the laws of Norway*) (*place of business at Snarøyveien 30 D, 1331 Fornebu, Norway*), and to the respective bodies of the State Enforcement Service.

The Decree is subject to immediate enforcement.

The Decree of the court can be appealed to the Kyiv City Court of Appeals by filing a petition on subsequent appeal within 5 days of its announcement and by filing a statement of appeal within 10 days of filing the petition. Filing an appeal against the Decree does not suspend its enforcement and does not prevent further consideration of the case.

Judge:

```
TRUE COPY
The Judge of Golosiyivsky
District Court of the City of Kyiv
Goshko O.M. __[signature]___
Secretary ___[signature]_____
```

2

*[Letterhead of the State Enforcement Service
in Golosiyivsky District of the City of Kyiv]*

December 4, 2006
No. 815/10

<table>
<tr><td>To:</td><td>**LLC "Storm"**<br>17-b Gorkogo Str., Apt. 21, Kyiv</td></tr>
<tr><td>cc:</td><td>Alpren Limited,<br>4-12 Chapayeva Str., Kyiv</td></tr>
<tr><td>cc:</td><td>**Golosiyivsky d/c [District Court] of the City of Kyiv**</td></tr>
</table>

The State Enforcement Service of Golosiyivsky District of the City of Kyiv hereby dispatches to you **the ruling on commencement of enforcement proceedings.**

We hereby require you to inform on the progress of execution of the aforementioned ruling within a 7-day period at No._____.

| /**Head of the Department** | *[signature]* | *O.I. Grebenyuk* |
|---|---|---|
| State Enforcement Officer | *[signature]* | *V.A. Ustymenko* |

*[Round Seal of the State Enforcement
Service of Golosiyivsky District of the City
of Kyiv]*

**RULING No. *815/10***
**on commencement of enforcement proceedings**

*December 4*, 2006                                                                                         City of Kyiv

I, *V.A. Ustymenko*, state enforcement officer of the State Enforcement Service in Golosiyivsky District of the City of Kyiv, have considered the petition on enforcement of decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on enjoining Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York,
that became effective on December 1, 2006,

In consideration of the foregoing, pursuant to Articles 3, 18, 24, 76, 87 of the Law of Ukraine "On Enforcement Proceedings",

IT IS HEREBY RULED TO:

**1.** Commence enforcement proceedings to enforce decree No. 2-5613 issued on December 1, 2006 by the Golosiyivsky District Court of the City of Kyiv on **enjoining Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York.**

**2.** The debtor to execute the enforcement document voluntarily by _____2006.

**3.** In the event of failure to execute the decision within the given term, it will be subject to enforcement. Collect 10% of the enforcement duty and costs related to enforcement proceedings from the debtor for the enforcement of the decision.

4. Send a copy hereof to the parties and the court.

5. The Ruling may be appealed to the Head of the State Enforcement Service in Golosiyivsky District of the City of Kyiv or the court within 10 days from the receipt thereof.

State Enforcement Officer              *[signature]*                    *V.A. Ustymenko*

*[Letterhead of the State Enforcement Service*
*in Golosiyivsky District of the City of Kyiv]*

*December 5, 2006* No. _____

|       |                                               |
|-------|-----------------------------------------------|
| To:   | LLC "Storm"                                   |
|       | 17-b Gorkogo Str., Apt. 21, Kyiv              |
|       |                                               |
| cc:   | Alpren Limited                                |
|       | 4-12 Chapayeva Str., Kyiv                     |

## ORDER

The State Enforcement Service of Golosiyivsky District of the City of Kyiv is carrying out enforcement proceedings regarding decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on enjoining Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York. The decree is subject to immediate enforcement.

The debtor is hereby obliged to IMMEDIATELY perform the court decision and inform the State Enforcement Service of [its] performance.

*Under Article 87 of the Law of Ukraine "On Enforcement Proceedings", for failure to comply with a court decision, a state enforcement officer issues a ruling on imposing a fine on the person guilty of the failure to comply with the court decision.*

*In the event of repeated failure to comply with the lawful requirements of a state enforcement officer, the ruling is issued on imposing a double amount of fine and the motion is filed with the Prosecutor's Office on holding the guilty persons criminally liable.*

**We hereby remind that pursuant to Articles 6, 87, 88 of the Law of Ukraine "On Enforcement Proceedings", failure to comply with the lawful requirements of a state enforcement officer entails liability envisaged by the Law. In the event of failure to comply with a court decision, a state enforcement officer files a motion with the court on criminal liability in accordance with applicable law.**

State Enforcement Officer          *[signature]*                    *V.A. Ustymenko*

*[Round Seal of the State Enforcement*
*Service of Golosiyivsky District of the City*
*of Kyiv]*

*[Letterhead of the State Enforcement Service
in Golosiyivsky District of the City of Kyiv]*

No. *815/10*
*December 4, 2006*

        To:     V.V. Klymenko
                    17-b Gorkogo Str., Apt. 21, Kyiv

        cc:     Alpren Limited,
                    4-12 Chapayeva Str., Kyiv

        cc:     **Golosiyivsky d/c [District Court] of the City of Kyiv**

The State Enforcement Service of Golosiyivsky District of the City of Kyiv hereby dispatches to you **the ruling on commencement of enforcement proceedings**.

We hereby require you to inform on the progress of execution of the aforementioned ruling within a 7-day period at No._____.

**Head of the Department**    [signature]        *O.I. Grebenyuk*
State Enforcement Officer    [signature]        *V.A. Ustymenko*

*[Round Seal of the State Enforcement
Service of Golosiyivsky District of the City
of Kyiv]*

**RULING No. *815/10***
**on commencement of enforcement proceedings**

*December 4*, 2006                                                                           City of Kyiv

    I, V.A. Ustymenko, state enforcement officer of the State Enforcement Service of Golosiyivsky District in the City of Kyiv, have considered the petition on enforcement of decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on enjoining Vadym Viktorovych Klymenko, as the General Director of Limited Liability Company "Storm", and any persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York,

    that became effective on December 1, 2006,

    In consideration of the foregoing, pursuant to Articles 3, 18, 24, 76, 87 of the Law of Ukraine "On Enforcement Proceedings",

IT IS HEREBY RULED TO:

    **1.** Commence enforcement proceedings to enforce decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on **enjoining Vadym Viktorovych Klymenko, as the General Director of Limited Liability Company "Storm", and any other persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York.**

    **2.** The debtor to execute the enforcement document voluntarily by *December 5*, 2006.

    **3.** In the event of failure to execute the decision within the given term, it will be subject to enforcement. Collect 10% of the enforcement duty and costs related to enforcement proceedings from the debtor for the enforcement of the decision.

    4. Send a copy hereof to the parties and the court.

    5. The Ruling may be appealed to the Head of the State Enforcement Service in Golosiyivsky District of the City of Kyiv or the court within 10 days from the receipt thereof.

State Enforcement Officer              *[signature]*                    *V.A. Ustymenko*

*[Letterhead of the State Enforcement Service
in Golosiyivsky District of the City of Kyiv]*

*December 5, 2006* No. *815/10*

To:  V.V. Klymenko
     17-b Gorkogo Str., Apt. 21, Kyiv


cc:  Alpren Limited,
     4-12 Chapayeva Str., Kyiv

**ORDER**

The State Enforcement Service of Golosiyivsky District of the City of Kyiv is carrying out enforcement proceedings regarding decree No. 2-5613 issued on December 1, 2006 by the Golosiyivsky District Court of the City of Kyiv on enjoining Vadym Viktorovych Klymenko, as the General Director of Limited Liability Company "Storm" and any other persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York. The decree is subject to immediate enforcement.

The debtor is hereby obliged to IMMEDIATELY perform the court decision and inform the State Enforcement Service of [its] performance.

*Under Article 87 of the Law of Ukraine "On Enforcement Proceedings", for failure to comply with a court decision, a state enforcement officer issues a ruling on imposing a fine on the person guilty of the failure to comply with the court decision.*

*In the event of repeated failure to comply with the lawful requirements of a state enforcement officer, the ruling is issued on imposing a double amount of fine and the motion is filed with the Prosecutor's Office on holding the guilty persons criminally liable.*

***We hereby remind that pursuant to Articles 6, 87, 88 of the Law of Ukraine "On Enforcement Proceedings", failure to comply with the lawful requirements of a state enforcement officer entails liability envisaged by the Law. In the event of failure to comply with a court decision, a state enforcement officer files a motion with the court on criminal liability in accordance with applicable law.***

State Enforcement Officer      *[signature]*              *V.A. Ustymenko*

*[Round Seal of the State Enforcement
Service of Golosiyivsky District of the City
of Kyiv]*

**IN THE MATTER OF AN ARBITRATION
UNDER THE UNCITRAL ARBITRATION RULES BETWEEN**

---

**TELENOR MOBILE COMMUNICATIONS AS,**

Claimant,

Snarøyveien 30
N-1331 Fornebu
Norway

-and-

**STORM LLC,**

Respondent,

1 Narodnogo Opolchennya Street,
Kyiv 03151
Ukraine

---

**AFFIDAVIT OF VADIM KLYMENKO**

---

- 2 -

I, Vadim Klymenko, declare as follows:

1.     I am and have been Director General of Respondent Storm LLC ("Storm") since February 2006. I joined Storm soon after joining its parent company, Altimo, in November 2005 as a Vice President. Prior to joining Altimo and Storm, I obtained a Master's Degree in International Business Management at Kiev National University of Economics, and worked in investment banking, ultimately as a consultant to a Russian investment bank in the area of telecommunications acquisitions. I was also previously employed at Golden Telecom LLC, a subsidiary of Altimo. Attached hereto as Exhibit A is a true and correct copy of my C.V.

2.     I submit this affidavit in support of Storm's motion to dismiss the claims currently pending before the Tribunal. The specific purpose of this affidavit is to describe Storm's defense against the claims brought against it by Alpren Limited ("Alpren") that culminated in the April 25, 2006 Decision of the Kyiv Commercial Court, as well as the May 25 Ruling of the Kyiv Commercial Court of Appeals that are relevant to Storm's motion (the "April Decision" and "May Ruling").

3.     As a preliminary matter, I wish to point out that Alpren Limited ("Alpren"), a company incorporated under the laws of Cyprus, is one of two shareholders of Storm (the other one being Hardlake Limited, also a company incorporated under the laws of Cyprus). As of February 8, 2006, Alpren's share in Storm is 49.9%, while Hardlake Limited owns 50.1%. Storm itself is incorporated under the laws of Ukraine.

4.     As Director General, I represented Storm before the Kyiv Commercial Court in connection with the proceedings that resulted in the April Decision, as well as the Kyiv Commercial Court of Appeals, which resulted in the May Ruling. Storm's Charter allows the Director General to represent the company in court proceedings.

5.     I first learned of Alpren's lawsuit against Storm in mid-April of 2006, in a notice sent via post by Alpren. At or around the same time, I also received notice from the Kyiv Commercial Court that there would be a hearing set for April 25, 2006. As Director

General, I decided to look over the papers myself, and to deal with the litigation without assistance from outside counsel. I represented Storm myself at the April 2006 Hearing. As indicated on the face of the April Decision, I submitted no statement of defense to Alpren's Statement of Claim, as I understand that I was not required to do so.

6.      At the hearing, I presented what I believed was the strongest argument: that the Shareholders Agreement contained an arbitration clause which covered any dispute "in connection with" the Agreement.   As I understood from Article 62 of the Code of Commercial Procedure of Ukraine, the Kyiv Commercial Court consequently lacked the jurisdiction to hear Alpren's claim.   At the hearing, I also informed the Court of the existence of the New York arbitration proceedings which were already under way.

7.      When the Kyiv Commercial Court ruled in Alpren's favor, I decided to appeal the matter to the Kyiv Commercial Court of Appeals.   I drafted the written submission, and duly filed it to the Court of Appeals.   I did so in my capacity as Director General, as I understood this to be a regular and customary procedure.   I subsequently received notice that the hearing was set for May 25.   At the hearing, I set forward the same jurisdictional argument as I did at the first Hearing.

8.      Since I was not present at the time the Agreement was executed in 2004, prior to the April 2006 Hearing I reviewed Storm's files from that period.   At that time, I searched for, but did not find any evidence of a Meeting of Participants that authorized Mr. Valeriy Nilov to sign the Shareholders Agreement on Storm's behalf.   Moreover, I had not been told by anyone at Storm that there was a Meeting of Participants granting Mr. Nilov the required authority.   As such, I did not rely on this argument at either the April 2006 Hearing, or at the May 2006 Hearing, and instead focused on the jurisdictional argument.

9.      I was once again surprised to see that the Court of Appeals did not follow my argument, but instead confirmed the lower court ruling.   I understand that the Ruling is now binding.   I also wish to point out that during the entire period of

this litigation, nor was I instructed by it as to how I should defend the case.  My only contact with Alpren was through the various notices of the hearings, and during the hearing themselves.  I strongly affirm that no efforts at any sort of collusive actions were made either by me or by Alpren.

I declare, under the penalties of perjury, that the foregoing is true and correct.

Executed on August 9, 2006 at Kiyv, Ukraine.

Vadim Klymenko

# EXHIBIT A

# Vadim    Klymenko

| ✉ | **94 Krasnoarmeyskaya str., apt.88, Kyiv, Ukraine** |
|---|---|
| **Ph:#** | **+ 380 39 491 66 18** |
| **Fax:#** | **+380 44 287 70 58** |
| **@** | Klymenko@Altimo.ru |

## Education

| | |
|---|---|
| 06.97 – 06.98 | **Kiev National University of Economics**<br>**International Economics & Law Department**<br>**Master's Degree in International Business Management** |
| 06.93 – 06.97 | **Kiev National University of Economics**<br>**International Economics & Law Department**<br>**Bachelor's Degree in Economics** |
| 09.83 – 05.93 | **Lyceum of International Affairs**<br>**(Former School #51)** |

## *Professional Experience*

| | |
|---|---|
| **10.05 – till present** | Altimo (former Alfa-Telecom)<br>**Position – *Vice President, General representative in Ukraine, LLC "STORM" – Director General***<br>Work for the largest Russian Telecom holding – Asset management of Kyivstar, Golden Telecom, Vimpelcom. Securing Anti-monopoly resolutions, litigation & arbitration, representation and implementation of shareholders` interests. |
| **05.05 – 09.05** | Freelance M&A Advisor<br>Work for Russian Investment banks as telecom sector M&A advisor. Deal structuring, on-demand research and analysis, arrangement and participation in operational due diligence, operational modeling, arrangement and control over Legal Due Diligence and Financial Due Diligence, preparation of memorandums. |

| 03.04 – 05.05 | Golden Telecom LLC |
|---|---|
| | Position – *Director Mergers & Acquisitions* |
| | **Delivery of multiple pre-sales due diligences, participation in the acquisition projects in Russia and Ukraine, Golden Telecom M&A strategy development. Negotiations with potential acquisition targets throughout the industry, finalizing acquisition deals and integration strategy drafting.** |
| 11.99 – 03.04 | Golden Telecom LLC |
| | Position – *Head of International Carrier Business* |
| | **Management and doubling of the multi-million revenue stream from international voice & data services. Negotiations with International industry leading companies (Cable & Wireless, DT, Telenor, Telia, etc.), NNI agreements establishment, local GSM operators account management, large scale internet and satellite capacity tenders delivery, project management, capacity planning, anti-crisis management, negotiations with regulatory and administrative bodies, company representation at major industry events worldwide, sector and industry consulting.** |
| 11.98 – 11.99 | **<u>Golden Telecom LLC</u>** |
| | *Position – Accounts Receivable/Credit Control Officer* |
| | Management of USD 1 mln AR on a monthly basis, reporting directly to CFO. Debt collection, repayment schedules establishment, debt restructuring, credit aging reporting, communication with the corporate customers. |
| | Head of the Golden Telecom Credit Board. |
| 03.98 – 11.98 | United Financial Group  - Investment Bank |
| | Position – Financial Analyst |
| | Work in Kiev and Moscow offices of the bank as an equity analyst. Initiated range of desknotes on Ukrainian companies wrote number of custom-tailored company and strategy reports, responsible for direct sales to UFG-Ukraine customers. |
| 10.96 – 03.98 | The World Bank , Economic Development Institute |

| | |
|---|---|
| | ***Position – Project Officer***<br>**Work in Kiev & Washington D.C. on the "Sound Bank Management Program" for top-level bankers from FSU countries. Project logistics, interpretation during advanced seminars on Financial Management, Central Bank Policies, Risk Management, Trade Facilities, etc.** |

# Special Training

| | |
|---|---|
| **Sep.03** | **Personnel Management (Phase II)** |
| **May.03** | **Personnel Management (Phase I)** |
| **Nov.01** | **Negotiation skills (Phase II)** |
| **Mar.01** | **Negotiation skills (Phase I)** |
| **Feb.01** | **Efficient communication and negotiation tactics** |
| **Nov.99** | **Project Management** |

| | |
|---|---|
| **Hobbies:** | **Scuba Diving, Traveling, Soccer** |

# In The Matter Of:

*STORM LLC v.*
*TELENOR MOBILE COMMUNICATIONS, AS*

---

*November 22, 2006*

---

*ARGUMENT*

Original File 6BMVSTOC.txt, Pages 1-43

**Word Index included with this Min-U-Script®**

**Page 1**

```
[1]                                    Argument
     UNITED STATES DISTRICT COURT
[2]  SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x
[3]  STORM LLC,
[4]               Plaintiff,
[5]          v.                    06 CV 13157 (GEL)
[6]  TELENOR MOBILE COMMUNICATIONS,
     AS,
[7]
[8]               Defendant.
[9]  ------------------------------x
                                   New York, N.Y.
[10]                               November 22, 2006
                                   10:45 a.m.
[11] Before:
[12]              HON. GERARD E. LYNCH,
[13]                               District Judge
[14]              APPEARANCES
[15] LOVELLS LAW FIRM
          Attorneys for Plaintiff
[16] PIETER VAN TOL
     GONZALO S. ZEBALLOS
[17]
     ORRICK HERRINGTON & SUTCLIFFE
[18]      Attorneys for Defendant
     ROBERT L. SILLS
[19] ALISON SWAP
     KAREN D. THOMPSON
[20] PETER O'DRISCOLL
[21] TELENOR MOBILE COMMUNICATIONS, AS
          Attorneys for Defendant
[22] BJORN HOGSTAD
[23]
[24]
[25]
```

**Page 2**

```
[1]           (In open court; case called)
[2]      THE DEPUTY CLERK:  Matter of Storm LLC v. Telenor
[3]  Mobile Communications.  Counsel, please identified yourselves
[4]  for the record.
[5]      MR. VAN TOL:  Good morning, your Honor.  Pieter
[6]  Van Tol of Lovells for Storm LLC.  I am joined by my colleague
[7]  Gonzalo Zeballos from Lovells.
[8]      THE COURT:  Good morning, gentlemen.
[9]      MR. SILLS:  Good morning, your Honor.  Robert Sills of
[10] Orrick, Herrington & Sutcliffe on behalf of defendant Telenor
[11] Mobile Communications.  With me are my colleagues Peter
[12] O'Driscoll, Karen Thompson, and Alison Swap.
[13]      Also in the courtroom, your Honor, is Bjorn Hogstad,
[14] the region attorney who works at Telenor, observing these
[15] proceedings.
[16]      THE COURT:  Okay.  Good morning to all.  Since we were
[17] here last week, I have carefully read all of the written
[18] submissions of the parties.  And while I can't claim to have
[19] read every word of all of the exhibits submitted in support of
[20] those papers, I have delved fairly deeply into the substantive
[21] record of the case.  So I have, I think, come to a pretty clear
[22] understanding of the issues in the case, and largely prepared
[23] to rule.
[24]      Now, I note two things in that regard.
[25]      Number one, the plaintiffs, as I believe we had
```

**Page 3**

```
[1]  discussed at our last meeting, did not submit reply papers, and
[2]  so I think it's fair to give them an opportunity to make any
[3]  additional points in response to things asserted in the
[4]  defendant's arguments.
[5]      And then secondly, I see that Mr. Van Tol has come
[6]  prepared not only to argue, but with a chart, which I can see
[7]  and have already read as we were waiting to begin today.  And I
[8]  think it actually is a very clear and effective summary of the
[9]  points that I already understand the plaintiffs to be making.
[10]      So while I don't want to foreclose anything the
[11] plaintiffs think is important to say in response, the one thing
[12] that I would be particularly interested to hear, if the
[13] plaintiffs have something to say about it, is the defendant's
[14] argument that I, in effect, don't have jurisdiction to hear the
[15] plaintiff's action and request for an injunction because the
[16] arbitrable tribunal's ruling was interlocutory in nature.
[17]      The points on the merits I think are ones that were
[18] very effectively made in the plaintiff's opening and brief.
[19] And at least reviewing the chart that's before me, it seems to
[20] me that I do understand those points, and I think they were
[21] already made, and there was understandably not extensive or any
[22] attention given to the jurisdictional point in the plaintiff's
[23] initial submission.
[24]      And the defendant's discussion of the point was
[25] notably brief; and, of course, all I can do is evaluate it on
```

**Page 4**

```
[1]  its merits.  The fact that it was brief, it could mean that it
[2]  was so straightforward, simple, and convincing a point that
[3]  there was nothing more to be said; or it could mean the
[4]  defendant was relying more on other arguments and was putting
[5]  that one forward more tentatively.  You can't draw any
[6]  inference from its brevity other than with defendants
[7]  submitting one paragraph effectively and one or two citations,
[8]  and the plaintiffs saying nothing, I'm not as sure that I do
[9]  understand the competing arguments on this front.
[10]      So without foreclosing the plaintiffs from saying
[11] anything that they think is important in rebuttal, I would be
[12] particularly interested in hearing their response to the one
[13] point that, as far as I can see, and maybe I missed something,
[14] they had not yet responded to.
[15]      So, Mr. Van Tol, the floor is yours.
[16]      MR. VAN TOL:  Thank you, your Honor.  And on the
[17] demonstrative, I won't go through point-by-point, I will merely
[18] use it to frame our response to Telenor's arguments.  But I
[19] will, as your Honor suggested, pick up at the jurisdictional
[20] point.
[21]      The case that Telenor cites is the Michaels case.
[22] With just a bit of scrutiny, it becomes clear that Michaels is
[23] inapposite here.  In the Michaels case, the arbitrators decided
[24] five of six counterclaims in their award, but they defer the
[25] other counterclaim, as well as any determination on the ones
```

Page 5

[1] they did decide as far as damages for a later time. So it's
[2] clear in Michaels that the award required further action of the
[3] issues that were decided.
[4]     And the Second Circuit in a case called
[5] Metallgesellschaft, which I'm sure I butchered in German,
[6] speaks to that. So I have a copy for Mr. Sills, and I also
[7] have a copy for your Honor if you would like it.
[8]     **THE COURT:** Why don't you tell me what it says with
[9] respect to the jurisdictional point. And let me be try to be
[10] as focused as I can.
[11]     It seems to me that the Michaels case is potentially
[12] distinguishable, essentially, as you suggest. In that case,
[13] the ruling was a partial resolution of the claims; that is,
[14] there were, as you say, a number of claims: some of them were
[15] decided, some of them remain to be decided. And it certainly
[16] makes a lot of sense to say that we shouldn't address those
[17] issues in court piecemeal, but should wait until there's a
[18] final resolution of all the claims.
[19]     And one might argue that a jurisdictional ruling is
[20] something else; again, that it has a different nature; and that
[21] it might be more important or more efficient or something to
[22] take that up at an earlier stage.
[23]     But if we were talking, for example, about the
[24] jurisdiction of the Court of Appeals over a ruling that I might
[25] make, or of my jurisdiction over appeals from the bankruptcy

Page 6

[1] court, it's clear, is it not, that a ruling denying a motion to
[2] dismiss for lack of jurisdiction in those contexts would be
[3] considered an interlocutory order.
[4]     And so I guess the larger point or the more general
[5] point I'd wonder about is to what extent is that a valid
[6] analogy or are there considerations with respect to arbitration
[7] different, and it's not an appeal, it's a different kind of
[8] animal when you've come to the Court in this context.
[9]     And more specifically, does the Metallgesellschaft
[10] case or anything else specifically address that kind of
[11] distinction? And do you have some precedent where the courts
[12] have accepted an action of this sort where the plaintiff comes
[13] in seeking, in effect, review of a jurisdictional decision of
[14] the arbitrator?
[15]     **MR. VAN TOL:** I'll start with your last question
[16] first, your Honor. I searched high and low, and I'd be happy
[17] if Mr. Sills found one, I did not find a case dealing with
[18] jurisdiction specifically.
[19]     **THE COURT:** Okay. We didn't, either, so that's okay.
[20]     **MR. VAN TOL:** At least I did something right, your
[21] Honor. But I think the Metallgesellschaft case does help,
[22] because it's not quite the situation that your Honor posed
[23] where there's an appeal. Instead, Metallgesellschaft was a
[24] request to confirm an award. And what the Court said, this is
[25] on page 283 of the reported decision, page 3 of the Westlaw

Page 7

[1] printout, it, first of all, distinguished Michaels by saying in
[2] Michaels it didn't finally dispose of the claims, and we
[3] already talked about that. But then it sets forth the
[4] standard, which is important, your Honor, in the next
[5] paragraph.
[6]     It says, An award which finally and definitely
[7] disposes of a separate independent claim may be confirmed,
[8] although it does not dispose of all the claims that were
[9] submitted to the arbitration.
[10]     **THE COURT:** But that's not the case here. We haven't
[11] had a final disposition of any claim; we've only had, again,
[12] what in the context of the courts would be a clearly
[13] interlocutory ruling along the way to resolving the claims.
[14]     **MR. VAN TOL:** The key though, your Honor, is what the
[15] courts look at is, is there anything else that the arbitrators
[16] would have to do on that issue. And here, there isn't.
[17]     **THE COURT:** Well, but "on that issue" is very
[18] different than "on that claim." There's nothing more they have
[19] to do to decide jurisdiction. That much is so. But you could
[20] make that argument with respect to any interlocutory order at
[21] all. If the arbitrable tribunal says, We're going to hear this
[22] evidence; we're not going to exclude it. That's a final ruling
[23] about that issue. They're not going to revisit that later on.
[24] Maybe different kinds of evidentiary rulings. They could say,
[25] We're not going to revisit it. It's done. We're hearing it.

Page 8

[1] That issue is finally and authoritatively resolved. But that's
[2] the very essence of interlocutory rulings.
[3]     **MR. VAN TOL:** In this case, your Honor, and I do have
[4] another argument, and I don't want to be seen as moving too
[5] quickly to it, because I think they intersect.
[6]     The difference here is this isn't just a
[7] jurisdictional ruling or a ruling where we then go forward. We
[8] are also asking here for a permanent injunction, a stay.
[9]     Under the FAA, we are allowed to come into court to
[10] your Honor, even if we're not moving to vacate the award, and
[11] say, your Honor, stop this case in its tracks. This case isn't a
[12] proper signatory to the contract; therefore, we want you to
[13] issue a stay.
[14]     So there is an alternative grounds for your Honor to
[15] hear this case. And I would urge that on you if you were at
[16] all concerned that the award might not be final.
[17]     **THE COURT:** Let me address that. And here, I do think
[18] we might be on slightly different grounds, because I'm not sure
[19] that this is about jurisdiction. It might be about a more
[20] prudential kind of consideration.
[21]     Of course, you could have come to court up-front and
[22] said, We object to this arbitration. We don't want to be in
[23] this arbitration and join this arbitration. They've served us
[24] notice, and this is just not an arbitrable claim.
[25]     And, alternatively, I suppose that there's no waiver

Page 9

[1] if you state your objection to the arbitration panel, lose, and
[2] then go forward and come here at the end and say, Don't confirm
[3] this award; vacate it, because there's no jurisdiction.
[4]     But once you go to the arbitrable panel and make your
[5] arguments to them and lose there, whether or not there's
[6] jurisdiction here, is it sensible for a court to hear piecemeal
[7] that, in effect, appeal from the arbitrator's judgment?
[8] Because what you're doing is taking several preliminary bites
[9] of the apple in a way that very much interferes with the
[10] efficiency of arbitration proceedings.
[11]     It's one thing to say, We don't want to be there.
[12] It's a different thing to say at the end that their decisions
[13] are wrong on any number of issues. But to sort of go halfway
[14] down the path and then interrupt to come to court strikes me as
[15] getting the worst of both worlds.
[16]     And, again, maybe this is a subset of the kind of case
[17] that we already said none of us could find, but is there any
[18] precedent that addresses this sort of in medias res request for
[19] a stay?
[20]     MR. VAN TOL: Not that I've seen, your Honor. This is
[21] an unusual case because of the UNCITRAL rules. And as I said
[22] at our earlier hearing, the reason we went to the tribunal is
[23] because the UNCITRAL rules, which are incorporated in the
[24] agreement, quite clearly say to Storm the tribunal may hear
[25] jurisdictional objections. We agree with that.

Page 10

[1]     Our argument to the tribunal was in hearing our
[2] objection, you must apply this Sphere Drake standard.
[3]     THE COURT: Is there anything in the UNCITRAL rules
[4] that say you can't go to court and raise the issue first?
[5]     MR. VAN TOL: Well, your Honor, I would be afraid that
[6] I would then be in breach of the arbitration agreement. The
[7] principle that the UNCITRAL rules incorporates is an arbitrable
[8] principle called competence-competence, which means that the
[9] arbitration tribunal may rule first, and then the party who
[10] wins or loses may go to the applicable court and say they were
[11] right or they weren't right about whether or not there's
[12] jurisdiction.
[13]     So while there's not a case on it, this happens in the
[14] arbitrable context all the time. And the distinction here is
[15] even if there were no award by the arbitration tribunal, say we
[16] went there, we made our arguments, and they said, We're going
[17] to defer and you go to arbitration, I could come into court
[18] under the FAA, file a motion to stay the arbitration, and argue
[19] to your Honor that Sphere Drake says this needs to be heard by
[20] a judge and not an arbitration tribunal. And that gives us
[21] full jurisdiction; it gives your Honor full power to review our
[22] submission. So we don't need to decide whether the award is
[23] interlocutory or final; we have a freestanding basis to be
[24] here.
[25]     THE COURT: Okay. When you say that happens all the

Page 11

[1] time, but there's no case on it, of course such things -- there
[2] are many such things, they happen all the time, and it's so
[3] obvious that they are allowed to happen. that nobody challenges
[4] them and, therefore, there's no case law.
[5]     But are you representing to me you're saying that
[6] there are many cases in which courts have ruled on
[7] jurisdictional issues after the arbitration panel has either
[8] decided them or deferred them, but while the arbitration is in
[9] process, and enjoined the further proceeding of the
[10] arbitration?
[11]     MR. VAN TOL: Yes, your Honor. I'm aware of foreign
[12] cases. Remember, these UNCITRAL cases are often foreign. And
[13] Mr. Sills, I know, is much more adept at this than I. There is
[14] a French version of competence-competence, a German one. So it
[15] becomes an ongoing debate in the international arbitration
[16] community as to what happens when you go and ask the tribunal
[17] whether they have jurisdiction and they say yea or nay what to
[18] do then.
[19]     And there's a stream of cases that say you may go to
[20] court and get an adjudication, and those are the ones I'm
[21] referring to, your Honor. And that's where we are today,
[22] because we are trying to invoke the Sphere Drake standard.
[23]     I don't need an arbitrable award ignoring Sphere Drake
[24] to come to your Honor and say, Your Honor, we're in the wrong
[25] place. We need to be in court.

Page 12

[1]     THE COURT: Okay. Mr. Sills, maybe I should hear from
[2] you briefly about that issue of jurisdiction. I don't need to
[3] hear more about whether this was or wasn't a final award. I
[4] think it clearly is not. I think it's clearly an interlocutory
[5] ruling. But Mr. Van Tol has now suggested a somewhat different
[6] argument, and I'm not sure the extent to which it's just trying
[7] to say the same thing in different words.
[8]     But it does seem to me that this is not quite the same
[9] thing as taking an appeal within a court system from an
[10] interlocutory ruling. He is coming here seeking an injunction
[11] against an arbitration. And one that I think is clear, maybe
[12] you'll have a different view, but I would have thought it's
[13] clear that he could have come here with exactly this action
[14] before the arbitration started, as soon as they got the notice.
[15] I would have thought it clear that the plaintiff could have
[16] come and brought essentially this same action to this Court.
[17]     So I guess one question is am I right about that? And
[18] then the second is if I am, then why is it different because
[19] the arbitrators have spoken their piece on the same subject
[20] matter?
[21]     MR. SILLS: Well, your Honor, I think the plaintiff
[22] is, to some extent, shifting ground here. And the petition is
[23] framed as a petition to vacate. And I think as to that, the
[24] Michaels case is absolutely clear. I know your Honor reviewed
[25] the case, and I don't want to burden the record by reading from

Page 13

[1] it, but that requires a final determination on claims. And
[2] there, I think the Court of Appeals analogy would be a 54(b)
[3] certificate. It's perfectly possible to decide a separate and
[4] independent claim. And that is, in fact, the language that
[5] appears in the arbitration cases. And this isn't that.
[6]     THE COURT: Right. And that's the language in the
[7] Metallgesellschaft case also.
[8]     MR. SILLS: Precisely, your Honor. And very close
[9] analogy to the way in which interlocutory orders of this Court
[10] are or are not appealable to the Court of Appeals, an almost
[11] identical practice has grown up in terms of seeking
[12] interlocutory review of arbitrable decisions by this Court and
[13] I suppose it's not surprising, given who's devised this set of
[14] rules.
[15]     THE COURT: Okay. So he's shifting ground. And maybe
[16] the form is critical that the action is a petition to vacate.
[17] But I suppose that doesn't really get us very far, because I
[18] guess then you could come back tomorrow, if the problem is he
[19] didn't style it right, he can come back tomorrow with a
[20] different action that's styled a lawsuit to enjoin
[21] arbitration, and then where are we?
[22]     MR. VAN TOL: Your Honor?
[23]     THE COURT: I'm sorry.
[24]     MR. VAN TOL: I am loathed to interrupt, but in the
[25] free declaration, Exhibit A is our petition, and it's styled as

Page 14

[1] a petition for vacatur and injunction where we cite 9 U.S.C.,
[2] Section 4. So that shouldn't be an issue, your Honor.
[3]     MR. SILLS: Your Honor, I don't dispute that. From
[4] the day we filed our demand for arbitration, they could have
[5] come into court seeking to vacate it. The party always has the
[6] right under the Arbitration Act to come in and seek an
[7] injunction against arbitration.
[8]     Now, whether it's seen as jurisdictional or not,
[9] "jurisdiction" has a bit of a funny meaning in this context,
[10] the fact is, as your Honor says, that's not what they did.
[11] They went forward, and as we've documented and as the record
[12] documents very extensively, conceded jurisdiction on the part
[13] of the arbitrator, went ahead and argued this jurisdiction
[14] motion and lost.
[15]     THE COURT: Let me be clear about what we're saying.
[16] They conceded, am I right, that the arbitrators had
[17] jurisdiction to decide the jurisdictional question; they didn't
[18] concede the merits that the -- they are vigorously arguing that
[19] the arbitrators -- that this was not an arbitrable claim.
[20]     MR. SILLS: That's true, your Honor. But it seems to
[21] me, having conceded jurisdiction, and I don't think the record
[22] would be any clearer on that, that you're not allowed to say, I
[23] concede jurisdiction, but only on condition that I went. If
[24] there's a jurisdictional concession, and you're prepared -- and
[25] I don't dispute, your Honor, that at the end of this case,

Page 15

[1] which will hopefully come someday. when there's a final award.
[2] assuming that it grants us the relief we seek, that all of
[3] their claims, including their claim that there was no
[4] jurisdiction in the first instance, are brought up for review,
[5] just as if your Honor denies a motion to dismiss for, say, lack
[6] of personal jurisdiction, and goes ahead and decides the case.
[7] That's preserved for review before the Court of Appeals.
[8]     And so I suppose that in some highly theoretical sense
[9] they're seeking the analogy of an antisuit injunction. And in
[10] the sense in which we use the term "jurisdiction" in court,
[11] there is jurisdiction in the sense that there is judicial power
[12] to exercise equitable jurisdiction and halt the arbitration.
[13] And in that sense, I don't think Michaels is dispositive,
[14] because you always have the right to come to this Court and
[15] seek an injunction, I suppose, against almost anything. And
[16] it's not jurisdictional in the sense now, I think.
[17]     THE COURT: Yes.
[18]     MR. SILLS: I mean there are obvious defenses in terms
[19] of latches and waiver and the underlying merits, but putting
[20] those to one side --
[21]     THE COURT: Well, but this has some consequences for
[22] both sides, if I'm hearing you right. Because one of the --
[23] you just said, and I think it is correct as an abstract
[24] statement, that if I were to say, Get out of here. I don't
[25] have jurisdiction. I shouldn't consider the merits of this for

Page 16

[1] whatever reason, and bar the door at the threshold, then it
[2] certainly would be clear that the plaintiff would have the
[3] ability to raise this jurisdictional objection, for want of a
[4] better word, the objection to the arbitrability of these claims
[5] or the objection to the validity of the arbitration agreement,
[6] in an effort to vacate any award that you ultimately receive.
[7]     But what happens if I say, Gee, Mr. Sills just said
[8] that the Michaels case is not really dispositive; and maybe as
[9] a matter of equitable discretion I shouldn't grant the relief
[10] of the plaintiff's request; but since that's only a prudential
[11] consideration, I think that since the issues have been
[12] presented on the merits to me already, I can go ahead and deny
[13] the plaintiff's arguments on the merits? Would that then be
[14] something that would be res judicata or would otherwise estop
[15] the plaintiffs from making an argument down the road to me or
[16] to somebody else that there was no jurisdiction on the part of
[17] the arbitration tribunal when and if you win in the
[18] arbitration?
[19]     MR. SILLS: The answer, your Honor, I think, is yes.
[20] You get one bite of the apple in court. They could obviously
[21] take an appeal. But I think your Honor --
[22]     THE COURT: Mr. Van Tol, are you sure you want to
[23] proceed with this action here now at this moment before me?
[24]     MR. VAN TOL: Yes, your Honor. The preliminary
[25] injunction rules state that the findings that your Honor makes

Page 17

[1] for preliminary injunction --

[2] **THE COURT:** Is only a preliminary injunction.

[3] **MR. VAN TOL:** Yes, your Honor.

[4] **THE COURT:** Of course, then what happens after the
[5] preliminary injunction gets denied, assuming it gets denied?
[6] What do we do with this action? Your request so far is for a
[7] preliminary injunction. But then after that, there's still an
[8] action pending for a permanent injunction. We could proceed
[9] and deal with that then in due course, as well. I guess that's
[10] just something that we have to decide if, as, and when we see
[11] how the preliminary injunction goes.

[12] **MR. VAN TOL:** Yes, your Honor. And that was my
[13] suggestion. I don't know about timing, but if your Honor were
[14] to deny the preliminary injunction today, I don't think there
[15] would be time for you to really rule on our request to vacate
[16] and for a permanent injunction, which is really why we're here
[17] asking for a PI.

[18] **THE COURT:** That's why it's so important to do this
[19] fast. But if it doesn't succeed, then there may be nothing
[20] left of the action to be ruled on on its ultimate merits,
[21] because absent a preliminary injunction, there wouldn't be much
[22] point in proceeding to address the permanent injunction issue.

[23] **MR. VAN TOL:** Well, your Honor, then I guess if you
[24] deny the preliminary injunction and we go forward on the 7th
[25] and the 8th, and assuming for purposes of argument that we

Page 18

[1] don't prevail, we would come to your Honor and say, Please
[2] vacate whatever you decided on the preliminary injunction was
[3] for those purposes only.

[4] **THE COURT:** Right. So that presumably would not, in
[5] fact, estop you, because it's a preliminary ruling. And the
[6] only thing I have to decide now is whether you meet the
[7] standard for a preliminary injunction, not whether the
[8] arbitration panel does or does not have authority to hear this
[9] as a matter of law. That decision could only be made
[10] authoritatively either in this action, if there were time, or
[11] after the fact.

[12] And I suppose there's no doubt that one way or the
[13] other this comes back before me, because even assuming that
[14] this action, as it currently exists, were to evaporate before
[15] the arbitration under the rules for the division of business,
[16] any subsequent action addressed to the merits of whatever the
[17] arbitration panel decides would come back to me anyway.

[18] **MR. VAN TOL:** And, your Honor, that's why what we're
[19] suggesting is really a way to do this even more efficiently.
[20] In other words, I've said this before, there is no reason,
[21] absent the arbitrator's schedule, and I'm not trying to be too
[22] cavalier about that, but there is no reason to go forward on
[23] December 7th and December 8th and not give your Honor time to
[24] decide our petition for vacatur and injunction. If you put it
[25] off for a short time, Telenor has made no showing whatsoever of

Page 19

[1] any financial harm, they've stated it, and I'll give your Honor
[2] evidence that's not occurring. There is no harm to a couple
[3] weeks' adjournment while your Honor decides these very tough
[4] issues.

[5] This case in many ways is sui generis, and it's hard
[6] to get done. And there's no reason to go forward on December
[7] 7th or 8th that I've heard from Telenor Mobile.

[8] **MR. SILLS:** Your Honor, I can address that, but I
[9] don't think there's any need to.

[10] **THE COURT:** I don't think there's any need to do that
[11] at this point. In fact, I think I'm prepared to rule, because
[12] the jurisdictional issue was the only one that I think I had
[13] not adequate argument on before, and I think this has been very
[14] useful in clarifying that issue.

[15] Petitioner Storm LLC seeks a preliminary injunction
[16] prohibiting the further prosecution of an arbitration between
[17] itself and respondent Telenor Mobile Communications AS, pending
[18] the Court's resolution of Storm's application for an order that
[19] would, one, vacate the arbitration tribunal's October 22nd,
[20] 2006 award; and, two, permanently enjoin the parties from
[21] proceeding with the arbitration. The motion will be denied.

[22] In the first place, the Court agrees with Telenor that
[23] to the extent that plaintiff seeks vacation of the order styled
[24] "Partial Final Reward Regarding Jurisdiction," the order is not
[25] subject to review by this Court because it is an interlocutory

Page 20

[1] order. As the Second Circuit held in Michaels v. Mariforum
[2] Shipping S.A., 624 F.2d 411 (1980):

[3] "Under the Federal Arbitration Act, a district court
[4] does not have the power to review an interlocutory ruling by an
[5] arbitration panel. The language of the act is unambiguous. It
[6] is only after an award has been made by the arbitrators that a
[7] party can seek to attack any of the arbitrators' determinations
[8] in court by moving either to vacate the award or to modify or
[9] correct it. Where, as here, arbitrators make an interim ruling
[10] that does not purport to resolve finally the issues submitted
[11] to them, judicial review is unavailable."

[12] That's 624 F.2d at page 414, citations and footnote
[13] omitted.

[14] Though the Court in Michaels relied on Chapter 1 of
[15] the Federal Arbitration Act in making this statement, that
[16] chapter applies to actions and proceedings brought under
[17] Chapter 2, which enforces the convention on the recognition and
[18] enforcement of foreign arbitrable awards, except where Chapter
[19] 1 conflicts with Chapter 2 or with the convention itself. See
[20] 9 U.S.C., Section 208. There is no conflict here.

[21] Moreover, the policy considerations supporting the bar
[22] on interlocutory appeals apply with equal force to arbitration
[23] under the convention. See Michaels, 624 F.2d at 414, noting
[24] that, "most of the advantages inherent in arbitration are
[25] dissipated by interlocutory appeals to a district court."

**Page 21**

[1] There is no question that the award at issue here was
[2] not final. To be final, an arbitration award "must resolve all
[3] the issues submitted to arbitration; and it must resolve them
[4] definitively enough so that the rights and obligations of the
[5] two parties with respect to the issues submitted do not stand
[6] in need of further adjudication." The quotation is from Rocket
[7] Jewelry Box, Incorporated v. Noble Gift Packaging Incorporated.
[8] 157 F.3d 174 at 176, (2d Cir. 1998).
[9] Here, the tribunal merely denied a motion to dismiss.
[10] It did not resolve all the issues submitted to it. Storm does
[11] not even attempt to argue the contrary, and it would not make
[12] sense to do so, given that Storm's motion to enjoin the
[13] arbitration proceedings from continuing is predicated on the
[14] very fact that those proceedings have not been completed.
[15] Storm relies on the case of Metallgesellschaft, A.G. v.
[16] Merchant Vessel Capitan Constante, 790 F.2d 280 (2d Cir. 1986).
[17] I note that that decision is binding precedent on this
[18] Court, even though Judge Feinberg dissented from it, which, in
[19] this Court's view, raises some questions about whether it was
[20] rightly decided. But that doesn't matter to this case.
[21] Metallgesellschaft is binding authority, but it does
[22] not do what the plaintiffs say it does for this case. What it
[23] points out is that in some situations, an arbitrable tribunal
[24] may finally decide some claims and not others, and a party may
[25] seek judicial review of the claims that were finally decided.

**Page 22**

[1] But here, no claim has been finally decided. We have a classic
[2] interlocutory order simply addressing the question of the
[3] tribunal's jurisdiction.
[4] The tribunal's use of the term "final award" does not
[5] affect this conclusion. Read in context, the more significant
[6] word in what the arbitrators chose as a title is "partial."
[7] The award is only final with respect to the question of
[8] jurisdiction, which makes it not final at all. As noted by the
[9] Seventh Circuit, in any event, the caption is not what matters.
[10] "The content of the decision, not its nomenclature, determines
[11] finality." Publicis Communication v. True North
[12] Communications, Incorporated, 206 F.3d 725, at 728, (7th Cir.
[13] 2000).
[14] Now, today, the plaintiff suggested an alternative
[15] ground jurisdiction, however, which may make this discussion of
[16] the Michaels case somewhat moot. Plaintiff notes that it is
[17] not seeking solely the vacation of the interlocutory award of
[18] the trubinal; that what it is really seeking is an injunction
[19] against the proceeding. And as the defendant concedes, this is
[20] something that the Court does have jurisdiction to hear; that
[21] the Court's equitable powers are being invoked independently as
[22] the plaintiff could have done before the arbitration proceeding
[23] began.
[24] And it appears to me that the fact that the
[25] arbitration proceeding has commenced and the arbitrators have

**Page 23**

[1] expressed certain views about jurisdiction, does not defeat
[2] this Court's jurisdiction to hear such an action. And so the
[3] Court must address the application for a preliminary
[4] injunction, though I note that the same considerations that
[5] preclude a formal action to vacate an award in the nature of an
[6] interlocutory order also militate quite strongly against the
[7] Court exercising equitable powers to intervene in this
[8] situation. There are only so many bites of the apple that are
[9] appropriate.
[10] The plaintiff could have, and I believe could have
[11] without breaching any of its obligations under the UNCITRAL
[12] rules or under the underlying contract, proceeded to court, put
[13] this issue before the Court up-front. The plaintiff will have
[14] the opportunity to put these issues before the Court at the
[15] end. If they are unsuccessful in the arbitration, and if the
[16] defendant here succeeds in obtaining any relief from the
[17] arbitration tribunal, something about which I have no view as
[18] to the likelihood, if that happens, the plaintiff can attack
[19] the award on jurisdictional, among other, grounds.
[20] But to allow the plaintiff to submit the issue of
[21] jurisdiction to the arbitration tribunal, take up the time of
[22] the tribunal to decide the issue, without having come to court
[23] and presented it, and then come in medias res during the
[24] arbitration to attempt to interrupt and disrupt a scheduled
[25] arbitration hearing by, as a matter of substance, attacking the

**Page 24**

[1] interlocutory decision with respect to arbitration, would, as
[2] the Second Circuit said, as I quoted earlier, undermine the
[3] inherent advantages of arbitration, and undermine the orderly
[4] consideration of issues by the Court. There was plenty of time
[5] to put this before a court in a way that would not delay and
[6] undermine the process of the arbitration, and allow the Court
[7] to consider it fully before the arbitration began.
[8] To do it this way wastes the time of the arbitration
[9] tribunal and puts the Court under pressure to decide things too
[10] rapidly for the Court, and too slowly for the arbitration
[11] panel. So the same factors that deny jurisdiction to an
[12] explicit action to vacate the arbitrators' decision suggest
[13] that the Court should be very cautious about granting an
[14] injunction in this situation.
[15] With respect to the merits of the preliminary
[16] injunction application, relying primarily on Sphere Drake v.
[17] Clarendon National Insurance Company, 263 F.3d 26 at 30 (2d
[18] Cir. 2001), Storm argues that where a party challenges the
[19] existence or formation of the contract from which the
[20] obligation to arbitrate derives, a party is entitled to have a
[21] court, rather than an arbitrator, decide the issue of the
[22] contract's existence or validity, provided that the challenging
[23] party, one, presents "some evidence" in support of its claim;
[24] and, two, unequivocally denies that an agreement was made.
[25] However, Sphere Drake's holding that courts, as

[1] opposed to arbitrators, must decide the issue of a contract's
[2] existence in such circumstances does not purport to override
[3] the bar on interlocutory appeals from a nonfinal arbitration
[4] ruling.
[5]     In Sphere Drake, the dispute began in federal court,
[6] when one of the parties, Sphere Drake, brought a declaratory
[7] judgment action seeking to have certain contracts declared
[8] void, and to avoid arbitration.  The other party, Clarendon,
[9] moved in court to dismiss and to compel arbitration.  Neither
[10] party was contesting or appealing the ruling of an arbitrator.
[11]     Here, in contrast, the parties argued the issues first
[12] before the arbitration tribunal.  Storm participated in those
[13] proceedings, and repeatedly conceded before the tribunal that
[14] the tribunal at least have jurisdiction to determine its own
[15] jurisdiction.  See transcript of the hearing of August 14th,
[16] 2006 before the arbitration tribunal at page 258, lines 7 to
[17] 13; 259, lines 8 and 9; 260, lines 15 to 18; and 263, lines 6
[18] to 17.
[19]     This is not to say that Storm has necessarily waived
[20] or abandoned its objections to any aspect of the tribunal's
[21] rulings; however, having submitted to proceedings before the
[22] tribunal, Storm must now wait for a final award before it can
[23] ask this Court to reject the tribunal's rulings.
[24]     In addition to that, the question of whether the
[25] plaintiff has submitted some evidence in support of its claims

[1] raises further significant questions.
[2]     The plaintiff says that it has some evidence because
[3] of a Ukrainian judgment to which it refers.  But in assessing
[4] whether that really is some evidence with respect to the lack
[5] of validity of the arbitration agreement, the Court needs to
[6] look more carefully, as I will in a moment, about the nature of
[7] that litigation, and what it really evidences.
[8]     Because there are certain narrow exceptions to the bar
[9] on interlocutory use, see, for example, Metallgesellschaft,
[10] already cited, and because the Court does have at least
[11] jurisdiction to address the injunctive relief issues, the Court
[12] must, it seems to me, go on to address the question of whether
[13] the plaintiff has made a sufficient showing of likelihood of
[14] success on the merits with respect to its underlying action.
[15]     Even if the Court has jurisdiction, and even
[16] disregarding the various arguments with respect to why the
[17] Court should decline to exercise that authority that I've
[18] already canvassed, it's my belief that Storm would still not be
[19] entitled to relief, because it has failed to demonstrate that
[20] it is likely to succeed in showing a basis for vacating the
[21] tribunal's interlocutory ruling or for enjoining the
[22] arbitration.  Storm has, therefore, failed to demonstrate the
[23] likelihood of success on the merits or even sufficiently
[24] serious questions going to the merits of the case that such
[25] preliminary relief would be warranted.  See Moore v.

[1] Consolidated Edison Company of New York, 409 F.3d 506 at 510
[2] (2d Cir. 2005) in which the Court of Appeals explained that the
[3] party seeking a preliminary injunction must demonstrate, one,
[4] irreparable harm, absent preliminary relief; and, two, either
[5] that the party is likely to succeed on the merits, or that
[6] there are sufficiently serious questions going to the merits to
[7] make them a fair ground for litigation; and that the balance of
[8] hardships tips decidedly in favor of the moving party.
[9]     In arguing that the tribunal's award should be
[10] vacated, Storm argues that the tribunal manifestly disregarded
[11] Ukrainian law, New York law, under recognition of foreign
[12] judgments, and the Second Circuit's decision in Sphere Drake.
[13] Storm also argues that the tribunal's award is contrary to
[14] public policy because it would force Storm to violate the law.
[15] None of these arguments is persuasive.
[16]     A party seeking to vacate an arbitration award on the
[17] basis of manifest disregard of the law must satisfy a
[18] two-pronged test, proving that, "(1) the arbitrator knew of a
[19] governing legal principle, yet refused to apply it or ignored
[20] it altogether; and (2), the law ignored by the arbitrator was
[21] well-defined, explicit, and clearly applicable to the case."
[22] D.H. Blair & Company, Incorporated v. Gottdiener, 462 F.3d 95
[23] at 110-111 (2d Cir. 2006), citation omitted.
[24]     This requires more than just an error or
[25] misunderstanding with respect to the law.  As the Court of

[1] Appeals explained in Wallace v. Buttar, 378 F.3d 182 at 190,
[2] (2d Cir. 2004), "A federal court cannot vacate an arbitral
[3] award merely because it is convinced that the arbitration panel
[4] made the wrong call on the law.  On the contrary, the award
[5] should be enforced, despite a court's disagreement with it on
[6] the merits, if there is a barely colorable justification for
[7] the outcome reached."  Citations and internal quotation marks
[8] omitted.
[9]     With respect to Sphere Drake, Storm cannot meet the
[10] standard.  The tribunal did not ignore or disregard Sphere
[11] Drake; but, rather, distinguished the case, noting that here,
[12] unlike in that case, "both the contract in dispute and the
[13] UNCITRAL rules clearly point to arbitration as the vehicle for
[14] resolving disputed issues."  See the Partial Final Arbitration
[15] Award at 12-13.  Sphere Drake, the tribunal noted, "did not
[16] involve an arbitration clause incorporating rules similar to
[17] the UNCITRAL rules."  Same source at page 13.
[18]     The UNCITRAL rules to which the tribunal referred
[19] provided that the, "arbitral tribunal shall have the power to
[20] rule on the objection that it has no jurisdiction," and "shall
[21] have the power to determine the existence or validity of
[22] the contract of which an arbitration clause forms a part."  Id.
[23] at 12, citing Article 21 of the UNCITRAL rules.
[24]     Storm might believe that this attempt to distinguish
[25] Sphere Drake is inadequate or reflects some misunderstanding of

Page 29

[1] Second Circuit law, but even if Storm were correct, that would
[2] be insufficient to vacate the tribunal's decision under the
[3] "manifest disregard" standard.
[4]     In any event, it is not even clear that the
[5] arbitration tribunal was bound to follow Sphere Drake in the
[6] first place. The Second Circuit rested its decision in that
[7] case on Article II(3) of the Convention on the Recognition and
[8] Enforcement of Foreign Arbitral Awards. See 263 F.3d at 29-30
[9] and note 2.
[10]     The article provides a rule of law for courts to apply
[11] when determining whether to grant a party's request to refer a
[12] matter to arbitration. Specifically, it provides that the
[13] "court of a contracting state, when seized of an action in a
[14] matter in respect to which the parties have made an agreement
[15] within the meaning of this article, shall, at the request of
[16] one of the parties, refer the parties to arbitration, unless it
[17] finds that the said agreement is null and void, inoperative or
[18] incapable of being performed."
[19]     That provision says nothing about what arbitrators
[20] should do when a party to the arbitration challenges an
[21] agreement's validity. Storm does not adequately explain why
[22] the arbitration tribunal here was required to apply a
[23] convention provision specifically directed at courts.
[24]     Storm also challenges the tribunal's conclusion that
[25] it was not bound by the Ukrainian court's decision,

Page 30

[1] invalidating the shareholders agreement. According to Storm,
[2] the tribunal's refusal to defer to the Ukrainian court's
[3] conclusions constituted a manifest disregard of Ukrainian law,
[4] as well as New York and federal law governing the recognition
[5] of foreign judgments.
[6]     According to Storm, the tribunal was "required" to
[7] follow the Ukrainian orders. See Storm's brief at page 18.
[8] Storm concedes, however, that Telenor was not a party to the
[9] dispute in Ukraine, and did not even have notice of it. See
[10] the transcript of the November 15th hearing in this Court at
[11] pages 30-31.
[12]     The Ukrainian judgments regarding the validity of the
[13] shareholders agreement and/or the arbitration agreement,
[14] therefore, can have no binding effect on Telenor in any
[15] subsequent proceeding. It is well-established that "it is a
[16] violation of due process for a judgment to be binding on a
[17] litigant who is not a party or privy and, therefore, never had
[18] an opportunity to be heard." Parklane Hosiery Company v.
[19] Shore, 439 U.S. 322, at page 327, note 7, 1979; see also
[20] Gramatan Home Investors Corporation v. Lopez, 46 N.Y. 2d 481 at
[21] 485-86 in 1979.
[22]     Thus, even if the tribunal could be said to have
[23] disregarded the Ukrainian judgments in some respect, this would
[24] not constitute the disregard of a controlling order or legal
[25] principle clearly applicable to this case, so as to satisfy the

Page 31

[1] "manifest disregard" standard.
[2]     Moreover, there are further reasons why the Ukrainian
[3] court's judgment may not apply to this case.
[4]     For one thing, the parties' agreement expressly
[5] provides that New York law, rather than Ukrainian law, will
[6] control the interpretation of and validity of the parties'
[7] agreement.
[8]     Secondly, the arguments in this case and the arguments
[9] that were made to the Ukrainian court concern primarily the
[10] validity of the shareholders agreement.
[11]     Here, the issue really goes to the validity of the
[12] arbitration clause. And the arguments made with respect to the
[13] validity of the shareholders agreement do not necessarily
[14] directly attack the validity of the arbitration clause. And
[15] absent such an attack, it seems clear under New York and
[16] federal law that the arbitrators do, indeed, have jurisdiction
[17] to address that issue.
[18]     Plaintiffs respond that the Ukrainian courts were
[19] ultimately asked to rule on the severability -- even that's not
[20] quite the right way to put it. The Ukrainian courts were not
[21] actually asked to rule on the severability as such of the
[22] arbitration agreement, but the question was put to them whether
[23] the shareholders agreement was null and void, including the
[24] arbitration clause. And both the trial and appellate courts
[25] apparently ruled that the entire agreement was null and void.

Page 32

[1]     However, the relevance of that finding of invalidity
[2] is further undermined by the substantial evidence that the
[3] Ukrainian orders were the product of collusive litigation. To
[4] be called the litigation collusive is to dignify it.
[5]     The proceedings involved a suit brought against Storm
[6] by its own corporate parent, seeking a declaration that the
[7] general director of Storm lacked actual authority to execute
[8] the shareholders agreement with Kyivstar and Telenor. See Van
[9] Tol affirmation, paragraphs 5 and 6.
[10]     Kyivstar and Telenor, however, as noted already, were
[11] not parties to the litigation. And Storm, the only signatory
[12] of the agreement that was a party to the litigation, submitted
[13] no statement of defense, and was not even represented by an
[14] attorney. Storm concedes that it did not notify Telenor about
[15] the Ukrainian litigation. See the November 15th hearing
[16] transcript at 30-31. Nor did Storm advise the arbitration
[17] tribunal in New York of the existence of the Ukrainian
[18] litigation until after the Ukrainian courts have ruled on the
[19] shareholder agreement's validity, even though the arbitration
[20] proceeding, which pertains to the very same shareholders
[21] agreement that was at issue in Ukraine began before the
[22] Ukrainian litigation was filed. See Partial Final Arbitration
[23] Award at 14.
[24]     No argument, as far as is apparent to this Court, was
[25] ever addressed to the Ukrainian courts with respect to the

[1] severability of the arbitration clause or whether the person
[2] who signed the agreement had authority to enter an arbitration
[3] agreement. The Court was simply presented with a friendly
[4] lawsuit between, essentially, Storm and itself, in which the
[5] only argument presented was an argument for invalidity, and in
[6] which no effort was made to argue any of the issues which would
[7] certainly be apparent to an American court and which would be
[8] controlling under New York and federal law and which, for all I
[9] know, and for all the Ukrainian court's judgment would
[10] evidence, might well be significant under Ukrainian law, as
[11] well. All that was presented to the Court was one side of a
[12] part of the issues that are relevant to this case.
[13]     And I note finally that while this Court has had a
[14] relatively short period of time to address these issues, the
[15] arbitration tribunal, it conducted an exemplary inquiry into
[16] these issues. The arbitration tribunal did not act hastily or
[17] precipitately. It did anything but manifestly disregard the
[18] arguments presented to it with respect to Ukrainian law.
[19]     Rather, it conducted an extensive factual inquiry into
[20] the nature of the Ukrainian litigation, and provided a
[21] thoughtful and reasoned judgment with respect to its reasons
[22] for believing that the arbitration tribunal did have
[23] jurisdiction over this controversy, and should proceed to
[24] address its merits.
[25]     Finally, Storm argues that the tribunal's award should

[1] be vacated because it compels Storm to violate the Ukrainian
[2] decisions, invalidating the shareholder agreement. In making
[3] this argument, Storm relies on a provision of the convention on
[4] the recognition and enforcement of foreign arbitrable awards
[5] that allows a court to refuse enforcement of an award, where to
[6] do so would violate the public policy of the enforcing state.
[7] See Convention Article V(2)(B).
[8]     According to Storm, it would violate public policy to
[9] compel violation of a foreign decree. The Second Circuit has
[10] held, however, that the "public policy exception is to be
[11] construed very narrowly, and should be applied only where
[12] enforcement would violate our most basic notions of morality
[13] and justice." Europcar Italia, S.p.A. v. Maiellano Tours,
[14] Incorporated, 156 F.3d 310 at 315 (2d Cir. 1998) omitting
[15] citations and internal quotation marks.
[16]     In view of Storm's conscious decision not to inform
[17] the other parties to the shareholders agreement that their
[18] agreement's validity was at issue in Ukrainian litigation, it
[19] cannot now rely on "basic notions of morality and justice" to
[20] argue that that litigation binds the uninformed parties. To
[21] the extent Storm faces a dilemma of conflicting obligations,
[22] the dilemma results from Storm's and its parent's own tactical
[23] decisions.
[24]     Moreover, I note that the convention referred to
[25] relates to whether a court to enforce an award that would

[1] violate public policy of the enforcing state.
[2]     There's no issue here, it seems to me, that the public
[3] policy of any state would be violated by requiring the parties
[4] to proceed with respect to the arbitration. There might be
[5] issues at some future point, depending on what Ukrainian law
[6] really is or would really be found to be in a
[7] properly-contested litigation in that country.
[8]     There may be some issue as to whether under Ukrainian
[9] law an award of the arbitration tribunal could be reduced to
[10] judgment and enforced, but that would be a matter for the
[11] Ukrainian courts. I see nothing in American or New York public
[12] policy that would prevent requiring the parties here to proceed
[13] with their arbitration.
[14]     For these reasons, the Court believes, first, that the
[15] plaintiff has definitely not succeeded in showing a likelihood
[16] of success on the merits. And, indeed, it's my belief that
[17] Storm has not shown sufficiently serious questions going to the
[18] merits to make this Court proceed further with applying the
[19] preliminary injunction test.
[20]     However, even if I'm wrong about that, and even if
[21] Storm has shown sufficiently serious questions going to the
[22] merits to make them a fairground for litigation, Storm cannot
[23] show that the balance of hardships tips decidedly in its favor.
[24] And I emphasize the test is decidedly and not slightly.
[25]     Both parties may suffer hardships from a ruling

[1] against them.
[2]     If the Court rules for Telenor, Storm will be forced
[3] to participate in arbitration, in which it claims it has no
[4] obligation to participate, and which, at the end of the day, it
[5] will be entitled to challenge on these jurisdictional grounds
[6] in an action either by it to vacate or by Telenor to enforce an
[7] award, assuming any final award were offered.
[8]     I note, however, that while the courts have indicated
[9] that being forced to participate in an arbitration improperly
[10] constitutes irreparable injury, that's a somewhat theoretical
[11] statement, especially in the context of a case like this one.
[12]     Storm is not a party that has never agreed to proceed
[13] to arbitration, and is somehow being required to do so. Storm
[14] is a party that has explicitly agreed to participate in
[15] arbitration which is challenging the validity of that
[16] agreement.
[17]     As a practical matter, the harm to it of proceeding
[18] with the arbitration is somewhat limited. The arbitration is
[19] scheduled for a rather brief period. The parties have already
[20] expended considerable resources in this matter on two
[21] continents in two court systems and before the arbitration
[22] panel. And the actual harm of going forward at this point with
[23] a hearing on the merits is somewhat limited.
[24]     On the other hand, if the Court rules for Storm, then
[25] Storm will be able to prolong its boycott of the meetings of

Page 37

[1] Telenor's subsidiary, Kyivstar, which makes it apparently
[2] impossible for that company to function, and Storm will be
[3] permitted to continue with its policy of dragging out these
[4] proceedings through various delay tactics. It may be a close
[5] call which hardship, if the Court were in error, is greater,
[6] but it certainly does not seem to me that the balance of
[7] hardships tips decidedly in favor of Storm.
[8]     Indeed, overall, what appears to me to be the case is
[9] that the plaintiff, Storm, and its parent, have attempted, by
[10] means of friendly litigation in the Ukrainian courts, without
[11] notice to the other parties to the dispute in this case, to
[12] make an end run around the very procedure for adjudicating
[13] disputes between the parties that Storm and Telenor
[14] deliberately agreed to when they entered their contract; and
[15] that this effort should not be countenance by this Court.
[16]     Regardless of the ultimate merits of the question of
[17] whether the arbitration panel does have jurisdiction, and
[18] whether the shareholders agreement or the arbitration clause
[19] within it will ultimately be found to be valid by this or other
[20] courts in the United States, the effort by the plaintiffs here
[21] to attack the arbitration tribunal and its jurisdiction on the
[22] basis of the Ukrainian litigation, and again, I say nothing
[23] about whether the Ukrainian court or the arbitration tribunal
[24] may or may not ultimately be right about the validity of any of
[25] these contracts or clauses, but the effort to disrupt the

Page 38

[1] arbitration proceeding on the basis of collusive litigation in
[2] the Ukraine is basically a shabby tactic on the part of the
[3] plaintiffs and should not be condoned.
[4]     In sum, the Court holds that it may not review the
[5] arbitration tribunal's partial final award regarding
[6] jurisdiction, but also that to the extent that the Court has
[7] jurisdiction, either on that theory or as based on the
[8] independent action invoking the equitable powers of the court
[9] to enjoin the arbitration, there is no basis for vacating the
[10] award.
[11]     At a minimum, plaintiffs have not made a showing of
[12] likelihood of success on the merits or serious questions going
[13] to the merits and a balance of hardships in its favor that
[14] would warrant preliminary relief, and the application for a
[15] preliminary injunction is therefore denied.
[16]     Now, at some point I guess we'll decide whether this
[17] action continues to exist in some form or whether it's properly
[18] dismissed without prejudice to some further action with respect
[19] to the validity of any award that the arbitration panel might
[20] or might not come up with, but this is not the day to worry
[21] about that. And I suppose the plaintiff has its avenues of
[22] review of this decision, and will either pursue them or not, as
[23] the case may be.
[24]     But I think that does all the business that brings us
[25] here on the morning before Thanksgiving. Unless there's

Page 39

[1] anything that the parties need me to address further, I think
[2] we can stand adjourned. Mr. Van Tol.
[3]     MR. VAN TOL: Your Honor, I understand that it is on
[4] the eve of Thanksgiving. But if I may have, at most, three
[5] minutes to make an offer of proof on one piece of evidence and
[6] then a couple arguments to make sure any appellate record is
[7] clear that I haven't waived the arguments. I will be brief.
[8]     THE COURT: Okay.
[9]     MR. VAN TOL: The first thing, your Honor, I'd like to
[10] hand up to the Court a copy of the Kyivstar financials. And
[11] I'd ask the Court to take judicial notice of those financials.
[12] They were pulled off the web site for Kyivstar, and they show
[13] that in 2006, things looked better at Kyivstar than they were
[14] in 2004 and 2005. So that any claims of financial harm by
[15] Telenor should not be credited.
[16]     That's all I wanted to say about that, your Honor.
[17]     THE COURT: Right. Well, let me say, I've not
[18] understood this to be a question of direct dollars and cents.
[19] What I understand the argument to be on the part of the
[20] defendant is that its ability to function as a corporation is
[21] inhibited. Now, that may or may not show up in the bottom line
[22] in the short run.
[23]     But it's not been my belief that the defendants have
[24] argued irreparable harm or dollars and cents harm in the short
[25] run as a result of some financial loss; but, rather, that its

Page 40

[1] ability to properly function as a corporation is harmed.
[2]     But I take it, Mr. Sills, you don't deny that these
[3] are the numbers?
[4]     MR. SILLS: Well, your Honor, I don't represent
[5] Kyivstar, but I --
[6]     THE COURT: Oh, okay.
[7]     MR. SILLS: They are what they are. The company is
[8] operating; does, I believe, have an operating profit. I don't
[9] have any reason to doubt these numbers, although I can't vouch
[10] for them either.
[11]     THE COURT: They are what they are. This document can
[12] be marked as Plaintiff's Exhibit 1 of this date, and it's part
[13] of the record.
[14]     MR. VAN TOL: Thank you, your Honor. Just so it's
[15] clear, I'm not trying to waste anyone's time. On page 26 of
[16] Telenor's brief, they do say that Storm's actions are causing
[17] financial harm. That was my sole reason for reading that.
[18]     THE COURT: I don't think it's a waste of time.
[19]     MR. VAN TOL: Quickly, your Honor --
[20]     THE COURT: And, again, financial harm. Financial
[21] harm doesn't necessarily mean a loss. You could be making
[22] money, but you could be making more money. The numbers are
[23] what they are.
[24]     MR. VAN TOL: Thank you, your Honor. And just so the
[25] record is clear on what our arguments are, Mr. Sills, in his

Page 41

[1] brief, raised Parklane Hosiery and some other collateral
[2] estoppel cases. And I noted them in your Honor's ruling.
[3] Just to be clear, Storm is not arguing collateral
[4] estoppel. We didn't below; we're not here. We're relying on
[5] cases like Sea Dragon, which are not collateral estoppel cases,
[6] but say there's a ruling before it needs to be recognized.
[7] And my last point or next-to-last point is on Sea
[8] Dragon, quickly, that case said an allegation of collusion is
[9] not enough. In order for there to be a judgment that's not
[10] recognized, there must be a showing of fraud, and we would
[11] submit that that was not the case here.
[12] Moreover, Sea Dragon was just like this case in that
[13] the party there got notice after the fact, could have
[14] intervened in the Dutch proceedings to do something, and
[15] didn't. We submit that Telenor Mobile is in exactly that
[16] situation.
[17] Last point, your Honor, is on the alleged collusive
[18] nature of the Ukrainian actions, I note that Storm did appeal.
[19] We submitted expert evidence that the defense put on by Storm
[20] was not unusual from a Ukrainian point of view. And in both
[21] the court below and on the appellate level, Storm
[22] representative mentioned and brought up the fact that there was
[23] a New York arbitration going on, asked the Ukrainian court to
[24] defer in favor of arbitration; in other words, the same
[25] argument Telenor Mobile is making here.

Page 42

[1] And thank you, your Honor. That's all I have.
[2] **THE COURT:** Okay. Mr. Sills, I don't think you need
[3] to say anything. If you think you do, I should give you the
[4] chance.
[5] **MR. SILLS:** I don't, your Honor. I think this is all
[6] amply covered in the record.
[7] **THE COURT:** All right. Then I think we're done. I
[8] thank you all for being here, and for a very illuminating
[9] argument.
[10] I must say, finally, perhaps I said it in the ruling
[11] that I already made, that in using rather strong language with
[12] respect to what I think Storm is up to here, I did not for a
[13] moment mean, and I do not mean to cast any aspersion whatever
[14] on the conduct of counsel.
[15] I think that plaintiff's counsel have made legitimate
[16] arguments in this Court with respect to them the best they
[17] could with respect to what their client's interests are. And I
[18] don't believe that counsel has been anything less than
[19] professional and candid with the Court.
[20] But I do believe that the overall strategy here being
[21] pursued by the plaintiff is one that is a strategy of a delay
[22] and evasion of the arbitration proceedings, and it's not
[23] something that I have been persuaded is legitimate or is a
[24] basis for interfering with the arbitration panel at this time.
[25] But I want to make very clear that I have no -- I

Page 43

[1] intend no criticism of counsel. I don't believe any criticism
[2] of counsel would be justified.
[3] All right. Thank you very much.
[4] **MR. VAN TOL:** Thank you, your Honor.
[5] **MR. SILLS:** Thank you, Judge.
[6] * * *

**This Page Intentionally Left Blank**

**1**

**1** 20:14,19;27:18;40:12
**110-111** 27:23
**12** 28:23
**12-13** 28:15
**13** 25:17;28:17
**14** 32:23
**14th** 25:15
**15** 25:17
**156** 34:14
**157** 21:8
**15th** 30:10;32:15
**17** 25:18
**174** 21:8
**176** 21:8
**18** 25:17;30:7
**182** 28:1
**190** 28:1
**1979** 30:19,21
**1980** 20:2
**1986** 21:16
**1998** 21:8;34:14

**2**

**2** 20:17,19;27:20;29:9
**2000** 22:13
**2001** 24:18
**2004** 28:2;39:14
**2005** 27:2;39:14
**2006** 19:20;25:16;27:23;
39:13
**206** 22:12
**208** 20:20
**21** 28:23
**22nd** 19:19
**258** 25:16
**259** 25:17
**26** 24:17;40:15
**260** 25:17
**263** 24:17;25:17;29:8
**280** 21:16
**283** 6:25
**29-30** 29:8
**2d** 21:8,16;24:17;27:2,23;
28:2;30:20;34:14

**3**

**3** 6:25
**30** 24:17
**30-31** 30:11;32:16
**310** 34:14
**315** 34:14
**322** 30:19
**327** 30:19
**378** 28:1

**4**

**4** 14:2

**409** 27:1
**411** 20:2
**414** 20:12,23
**439** 30:19
**46** 30:20
**462** 27:22
**481** 30:20
**485-86** 30:21

**5**

**5** 32:9
**506** 27:1
**510** 27:1
**54b** 13:2

**6**

**6** 25:17;32:9
**624** 20:2,12,23

**7**

**7** 25:16;30:19
**725** 22:12
**728** 22:12
**790** 21:16
**7th** 17:24;18:23;19:7;
22:12

**8**

**8** 25:17
**8th** 17:25;18:23;19:7

**9**

**9** 14:1;20:20;25:17
**95** 27:22

**A**

**abandoned** 25:20
**ability** 16:3;39:20;40:1
**able** 36:25
**absent** 17:21;18:21;27:4;
31:15
**absolutely** 12:24
**abstract** 15:23
**accepted** 6:12
**According** 30:1;6;34:8
**act** 20:5;33:16
**Act** 14:6;20:3,15
**action** 3:15;5:2;6:12;
12:13,16;13:16,20;16:23;
17:6,8,20;18:10,14,16;
23:2,5;24:12;25:7;26:14;
29:13;36:6;38:8,17,18
**actions** 20:16;40:16;
41:18
**actual** 32:7;36:22
**actually** 3:8;31:21
**addition** 25:24

**additional** 3:3
**address** 5:16;6:10;8:17;
17:22;19:8;23:3;26:11,12;
31:17;33:14,24;39:1
**addressed** 18:16;32:25
**addresses** 9:18
**addressing** 22:2
**adept** 11:13
**adequate** 19:13
**adequately** 29:21
**adjourned** 39:2
**adjournment** 19:3
**adjudicating** 37:12
**adjudication** 11:20;21:6
**advantages** 20:24;24:3
**advise** 32:16
**affect** 22:5
**affirmation** 32:9
**afraid** 10:5
**AG** 21:15
**again** 5:20;7:11;9:16;
37:22;40:20
**against** 12:11;14:7;15:15;
22:19;23:6;32:5;36:1
**agree** 9:25
**agreed** 36:12,14;37:14
**agreement** 9:24;10:6;
16:5;24:24;26:5;29:14,17;
30:1,13,13;31:4,7,10,13,
22,23,25;32:8,12,21;33:2,
3;34:2,17;36:16;37:18
**agreement's** 29:21;
32:19;34:18
**agrees** 19:22
**ahead** 14:13;15:6;16:12
**allegation** 41:8
**alleged** 41:17
**allow** 23:20;24:6
**allowed** 8:9;11:3;14:22
**allows** 34:5
**almost** 13:10;15:15
**along** 7:13
**alternative** 8:14;22:14
**alternatively** 8:25
**although** 7:8;40:9
**altogether** 27:20
**always** 14:5;15:14
**American** 33:7;35:11
**among** 23:19
**amply** 42:6
**analogy** 6:6;13:2,9;15:9
**and/or** 30:13
**animal** 6:8
**antisuit** 15:9
**apparent** 32:24;33:7
**apparently** 31:25;37:1
**appeal** 6:7,23;9:7;12:9;
16:21;41:18
**appealable** 13:10
**appealing** 25:10
**appeals** 5:25;20:22,25;
25:3
**Appeals** 5:24;13:2,10;

15:7;27:2;28:1
**appears** 13:5;22:24;37:8
**appellate** 31:24;39:6;
41:21
**apple** 9:9;16:20;23:8
**applicable** 10:10;27:21;
30:25
**application** 19:18;23:3;
24:16;38:14
**applied** 34:11
**applies** 20:16
**apply** 10:2;20:22;27:19;
29:10;22;31:3
**applying** 35:18
**appropriate** 23:9
**arbitrability** 16:4
**arbitrable** 3:16;7:21;8:24;
9:4;10:7,14;11:23;13:12;
14:19;20:18;21:23;34:4
**arbitral** 28:2,19
**Arbitral** 29:8
**arbitrate** 24:20
**arbitration** 6:6;7:9;8:22,
23,23;9:1,10;10:6,9,15,17,
18,20;11:7,8,10,15;12:11,
14;13:5,21;14:4,12;
16:5,17,18;18:8,15,17;
19:16,19,21;20:5,22,24;
21:2,3,13;22:22,25;23:15,
17,21,24,25;24:1,3,6,7,8,
10;25:3,8,9,12,16;26:5,22;
27:16;28:3,13,16,22;29:5,
12,16,20,22;30:19;33:11,12,
14,22,24;32:16,19;33:1,2,
15,16,22;35:4,9,13;36:3,9,
13,15,18,18,21;37:17,18,
21,23;38:1,5,9,19;41:23,
24;42:22,24
**Arbitration** 14:6;20:3,15;
28:14;32:22
**arbitrator** 6:14;14:13;
24:21;25:10;27:18,20
**arbitrators** 4:23;7:15;
12:19;14:16,19;20:6,9;
22:6,25;25:1;29:19;31:16
**arbitrator's** 9:7;18:21
**arbitrators'** 20:7;24:12
**argue** 3:6;5:19;10:18;
21:11;33:6;34:20
**argued** 14:13;25:11;39:24
**argues** 24:18;27:10,13;
33:25
**arguing** 14:18;27:9;41:3
**argument** 3:14;7:20;8:4;
10:1;12:6;16:15;17:25;
19:13;22:24;33:5,5;34:3;
39:19;41:25;42:9
**arguments** 3:4;4:4,9,18;
9:5;10:16;16:13;26:16;
27:15;31:8,8,12;33:18;
39:6,7;40:25;42:16
**around** 37:12
**article** 29:10,15

**Article** 28:23;29:7;34:7
**aspect** 25:20
**aspersion** 42:13
**asserted** 3:3
**assessing** 26:3
**assuming** 15:2;17:5,25;
18:13;36:7
**attack** 20:7;23:18;31:14,
15;37:21
**attacking** 23:25
**attempt** 21:11;23:24;
28:24
**attempted** 37:9
**attention** 3:22
**attorney** 32:14
**August** 25:15
**authoritatively** 8:1;18:10
**authority** 18:8;21:21;
26:17;32:7;33:2
**avenues** 38:21
**avoid** 25:8
**award** 4:24;5:2;6:24;7:6;
8:10,16;9:3;10:15,22;
11:23;12:3;15:1;16:6;
19:20;20:6,8;21:1,2;22:4,7,
17;23:5,19;25:22;27:9,13,
16;28:3,4;33:25;34:5,25;
35:9;36:7;7:38:5,10,19
**Award** 28:15;32:23
**awards** 20:18;34:4
**Awards** 29:8
**aware** 11:11

**B**

**back** 13:18,19;18:13,17
**balance** 27:7;35:23;37:6;
38:13
**bankruptcy** 5:25
**bar** 16:1;20:21;25:3;26:8
**barely** 28:6
**based** 38:7
**basic** 34:12,19
**basically** 38:2
**basis** 10:23;26:20;27:17;
37:22;38:1,9;42:24
**becomes** 4:22;11:15
**began** 22:23;24:7;25:5;
32:21
**begin** 3:7
**belief** 26:18;35:16;39:23
**believes** 35:14
**believing** 33:22
**below** 41:4,21
**best** 42:16
**better** 16:4;39:13
**binding** 21:17,21;30:14,
16
**binds** 34:20
**bit** 4:22;14:9
**bite** 16:20
**bites** 9:8;23:8
**Blair** 27:22

**both** 9:15;15:22;28:12;
31:24;41:20
**Both** 35:25
**bottom** 39:21
**bound** 29:5,25
**Box** 21:7
**boycott** 36:25
**breach** 10:6
**breaching** 23:11
**brevity** 4:6
**brief** 3:18,25;4:1;30:7;
36:19;39:7;40:16;41:1
**briefly** 12:2
**brings** 38:24
**brought** 12:16;15:4;
20:16;25:6;32:5;41:22
**burden** 12:25
**business** 18:15;38:24
**butchered** 5:5
**Buttar** 28:1

**C**

**call** 28:4;37:5
**called** 5:4;10:8;32:4
**can** 3:6,25;4:13;5:10;
13:19;16:12;19:8;20:7;
23:18;25:22;30:14;39:2;
40:11
**candid** 42:19
**canvassed** 26:18
**Capitan** 21:16
**caption** 22:9
**carefully** 26:6
**case** 4:21,21,23;5:4,11,
12;6:10,17,21;7:10;8:3,11,
15;9:16,21;10:13;11:1,4;
12:24,25;13:7;14:25;15:6;
16:8;19:5;21:15,20,22;
22:16;26:24;27:21;28:11,
12;29:7;30:25;31:3,8;
33:12;36:11;37:8,11;38:23;
41:8,11,12
**cases** 11:6,12,12,19;13:5;
41:2,5,5
**cast** 42:13
**causing** 40:16
**cautious** 24:13
**cavalier** 18:22
**cents** 39:18,24
**certain** 23:1;25:7;26:8
**certainly** 5:15;16:2;33:7;
37:6
**certificate** 13:3
**challenge** 36:5
**challenges** 11:3;24:18;
29:20,24
**challenging** 24:22;36:15
**chance** 42:4
**chapter** 20:16
**Chapter** 20:14,17,18,19
**chart** 3:6,19
**chose** 22:6

**Cir** 21:8,16:22;12:24:18;
27:2,23;28:2;34:14
**Circuit** 5:4;20:1;22:9;
24:2;29:1,6;34:9
**Circuit's** 27:12
**circumstances** 25:2
**citation** 27:23
**citations** 4:7;20:12;34:15
**Citations** 28:7
**cite** 14:1
**cited** 26:10
**cites** 4:21
**citing** 28:23
**claim** 7:7,11,18;8:24;13:4;
14:19:15:3;22:1;24:23
**claims** 5:13,14,18;7:2,8,
13:13:1;15:3;16:4;21:24,
25;25:25;36:3;39:14
**Clarendon** 24:17;25:8
**clarifying** 19:14
**classic** 22:1
**clause** 28:16,22;31:12,14,
24:33:1;37:18
**clauses** 37:25
**clear** 3:8;4:22;5:2;6:1;
12:11,13,15,24;14:15;16:2;
29:4;31:15;39:7;40:15,25;
41:3;42:25
**clearer** 14:22
**clearly** 7:12;9:24;12:4,4;
27:21;28:13;30:25
**client's** 42:17
**close** 13:8;37:4
**collateral** 41:1,3,5
**collusion** 41:8
**collusive** 32:3,4;38:1;
41:17
**colorable** 28:6
**coming** 12:10
**commenced** 22:25
**Communication** 22:11
**Communications** 19:17;
22:12
**community** 11:16
**company** 37:2;40:7
**Company** 24:17;27:1,22;
30:18
**compel** 25:9;34:9
**compels** 34:1
**competence-competence**
10:8;11:14
**competing** 4:9
**completed** 21:14
**concede** 14:18,23
**conceded** 14:12,16,21;
25:13
**concedes** 22:19;30:8;
32:14
**concern** 31:9
**concerned** 8:16
**concession** 14:24
**conclusion** 22:5;29:24
**conclusions** 30:3

**condition** 14:23
**condoned** 38:3
**conduct** 42:14
**conducted** 33:15,19
**confirm** 6:24;9:2
**confirmed** 7:7
**conflict** 20:20
**conflicting** 34:21
**conflicts** 20:19
**conscious** 34:16
**consequences** 15:21
**consider** 15:25;24:7
**considerable** 36:20
**consideration** 8:20;
16:11;24:4
**considerations** 6:6;
20:21;23:4
**considered** 6:3
**Consolidated** 27:1
**Constante** 21:16
**constitute** 30:24
**constituted** 30:3
**constitutes** 36:10
**construed** 34:11
**content** 22:10
**contesting** 25:10
**context** 6:8;7:12;10:14;
14:9;22:5;36:11
**contexts** 6:2
**continents** 36:21
**continue** 37:3
**continues** 38:17
**continuing** 21:13
**contract** 8:12;23:12;
24:19;28:12,22;37:14
**contracting** 29:13
**contracts** 25:7;37:25
**contract's** 24:22;25:1
**contrary** 21:11;27:13;
28:4
**contrast** 25:11
**control** 31:6
**controlling** 30:24;33:8
**controversy** 33:23
**convention** 20:17,19,23;
29:23;34:3,24
**Convention** 29:7;34:7
**convinced** 28:3
**convincing** 4:2
**copy** 5:6,7;39:10
**corporate** 32:6
**corporation** 39:20;40:1
**Corporation** 30:20
**counsel** 42:14,15,18;
43:1,2
**countenance** 37:15
**counterclaim** 4:25
**counterclaims** 4:24
**country** 35:7
**couple** 19:2;39:6
**course** 3:25;8:21;11:1;
17:4,9
**court** 5:17;6:1;8:9;21:9:6,

14:10;4,10,17;11:20,25;
12:9;14:5;15:10;16:20;
20:3,8,25;23:12,22;24:5,
21;25:5,9;28:2;29:13:31:9;
33:7;34:5,25;36:21;37:23;
38:8;41:21,23
**Court** 5:24;6:8,24;12:16;
13:2,9,10,12;15:7,14;
19:22,25;20:14;21:18;
22:20;23:3,7,13,14;24:4,6,
9,10,13;25:23;26:5,10,11,
15,17;27:2,25;30:10;32:24;
33:3,11,13;35:14,18;36:2,
24;37:5,15;38:4,6;39:10,
11;42:16,19
**COURT** 5:8;6:19;7:10,17;
8:17;10:3,25;12:1;13:6,15,
23;14:15;15:17,21;16:22;
17:2,4,18;18:4;19:10;39:8,
17;40:6,11,18,20;42:2,7
**courts** 6:11;7:12,15;11:6;
24:25;29:10,23;31:18,20,
24;32:18,25;35:11;36:8;
37:10,20
**court's** 28:5;29:25;30:2;
31:3;33:9
**Court's** 19:18;21:19;
22:21;23:2
**covered** 42:6
**credited** 39:15
**critical** 13:16
**criticism** 43:1,1
**currently** 18:14

**D**

**damages** 5:1
**date** 40:12
**day** 14:4;36:4;38:20
**deal** 17:9
**dealing** 6:17
**debate** 11:15
**December** 18:23,23;19:6
**decide** 5:1;7:19;10:22;
13:3;14:17;17:10;18:6,24;
21:24;23:22;24:9,21;25:1;
38:16
**decided** 4:23;5:3,15,15;
11:8;18:2;21:20,25;22:1
**decidedly** 27:8;35:23,24;
37:7
**decides** 15:6;18:17;19:3
**decision** 6:13,25;18:9;
21:17;22:10;24:1,12;27:12;
29:2,6,25;34:16;38:22
**decisions** 9:12;13:12;
34:2,23
**declaration** 13:25;32:6
**declaratory** 25:6
**declared** 25:7
**decline** 26:17
**decree** 34:9
**defeat** 23:1

**defendant** 4:4;22:19;
23:16;39:20
**defendants** 4:6;39:23
**defendant's** 3:4,13,24
**defense** 32:13;41:19
**defenses** 15:18
**defer** 4:24;10:17;30:2;
41:24
**deferred** 11:8
**definitely** 7:6;35:15
**definitively** 21:4
**delay** 24:5;37:4;42:21
**deliberately** 37:14
**demand** 14:4
**demonstrate** 26:19,22;
27:3
**demonstrative** 4:17
**denied** 17:5,5;19:21;21:9;
38:15
**denies** 15:5;24:24
**deny** 16:12;17:14,24;
24:11;40:2
**denying** 6:1
**depending** 35:5
**derives** 24:20
**despite** 28:5
**determination** 4:25;13:1
**determinations** 20:7
**determine** 25:14;28:21
**determines** 22:10
**determining** 29:11
**devised** 13:13
**DH** 27:22
**difference** 8:6
**different** 5:20;6:7,7,7:18,
24;8:18;9:12;12:5,7,12,18;
13:20
**dignify** 32:4
**dilemma** 34:21,22
**direct** 39:18
**directed** 29:23
**directly** 31:14
**director** 32:7
**disagreement** 28:5
**discretion** 16:9
**discussed** 3:1
**discussion** 3:24;22:15
**dismiss** 6:2;15:5;21:9;
25:9
**dismissed** 38:18
**dispose** 7:2,8
**disposes** 7:7
**disposition** 7:11
**dispositive** 15:13;16:8
**dispute** 14:3,25;25:5;
28:12;30:9;37:11
**disputed** 28:14
**disputes** 37:13
**disregard** 27:17;28:10;
29:3;30:3,24;31:1;33:17
**disregarded** 27:10;30:23
**disregarding** 26:16
**disrupt** 23:24;37:25

dissented 21:18
dissipated 20:25
distinction 6:11;10:14
distinguish 28:24
distinguishable 5:12
distinguished 7:1;28:11
district 20:3,25
division 18:15
document 40:11
documented 14:11
documents 14:12
dollars 39:18,24
done 7:25;19:6;22:22;
42:7
door 16:1
doubt 18:12;40:9
down 9:14;16:15
dragging 37:3
Dragon 41:5,8,12
Drake 10:2,19;11:22,23;
24:16;25:5,6;27:12;28:9,
11,15,25;29:5
Drake's 24:25
draw 4:5
due 17:9;30:16
during 23:23
Dutch 41:14

**E**

earlier 5:22;9:22;24:2
Edison 27:1
effect 3:14;6:13;9:7;30:14
effective 3:8
effectively 3:18;4:7
efficiency 9:10
efficient 5:21
efficiently 18:19
effort 16:6;33:6;37:15,20,
25
either 6:19;11:7;18:10;
20:8;27:4;36:6;38:7,22;
40:10
else 5:20;6:10;7:15;16:16
emphasize 35:24
end 9:2,12;14:25;23:15;
36:4;37:12
enforce 34:25;36:6
enforced 28:5;35:10
enforcement 20:18;34:4,
5,12
Enforcement 29:8
enforces 20:17
enforcing 34:6;35:1
enjoin 13:20;19:20;21:12;
38:9
enjoined 11:9
enjoining 26:21
enough 21:4;41:9
enter 33:2
entered 37:14
entire 31:25
entitled 24:20:26:19;36:5

equal 20:22
equitable 15:12;16:9;
22:21;23:7;38:8
error 27:24;37:5
especially 36:11
essence 8:2
essentially 5:12;12:16;
33:4
estop 16:14;18:5
estoppel 41:2,4,5
Europcar 34:13
evaluate 3:25
evaporate 18:14
evasion 42:22
eve 39:4
even 8:10;10:15;18:13,19;
21:11,18;26:15,23;29:1,4;
30:9,22;31:19;32:13,19;
35:20,20
Even 26:15
event 22:9;29:4
evidence 7:22;19:2;
24:23;25:25;26:2,4;32:2;
33:10;39:5;41:19
evidences 26:7
evidentiary 7:24
exactly 12:13;41:15
example 5:23;26:9
except 20:18
exception 34:10
exceptions 26:8
exclude 7:22
execute 32:7
exemplary 33:15
exercise 15:12;26:17
exercising 23:7
Exhibit 13:25;40:12
exist 38:17
existence 24:19;22;25:2;
28:21;32:17
exists 18:14
expended 36:20
expert 41:19
explain 29:21
explained 27:2;28:1
explicit 24:12;27:21
explicitly 36:14
expressed 23:1
expressly 31:4
extensive 3:21;33:19
extensively 14:12
extent 6:5;12:6,22;19:23;
34:21;38:6

**F**

F2d 20:2,12,23;21:16
F3d 21:8;22:12;24:17;
27:1,22;28:1;29:8;34:14
FAA 8:9;10:18
faces 34:21
fact 4:1;13:4;14:10;18:5,
11;19:11;21:14;22:24;

41:13,22
factors 24:11
factual 13:19
failed 26:19,22
fair 3:2;27:7
fairground 35:22
far 4:13;5:1;13:17;17:6;
32:24
fast 17:19
favor 27:8;35:23;37:7;
38:13;41:24
federal 25:5;28:2;30:4;
31:16;33:8
Federal 20:3,15
Feinberg 21:18
file 10:18
filed 14:4;32:22
final 5:7;11,22;8:16;
10:23;12:3;13:1;15:1;21:2,
2;22:4,7,8;25:22;36:7;38:5
Final 19:24;28:14:32:22
finality 22:11
finally 7:2,6;8:1;20:10;
21:24,25;22:1;33:13;42:10
Finally 33:25
financial 19:1;39:14,25;
40:17,20
Financial 40:20
financials 39:10,11
find 6:17;9:17
finding 32:1
findings 16:25
finds 29:17
first 6:16;7:1;10:4,9;15:4;
19:22;25:11;29:6;35:14;
39:9
five 4:24
floor 4:15
focused 5:10
follow 25:9;30:7
footnote 20:12
force 20:22;27:14
forced 36:2,9
foreclose 3:10
foreclosing 4:10
foreign 11:11,12;20:18;
27:11;30:5;34:4,9
Foreign 29:8
form 13:16;38:17
formal 23:5
formation 24:19
forms 28:22
forth 7:3
forward 4:5;8:7;9:2;
14:11;17:24;18:22;19:6;
36:22
found 6:17;35:6;37:19
frame 4:18
framed 12:23
fraud 41:10
free 13:25
freestanding 10:23
French 11:14

friendly 33:3;37:10
front 4:9
full 10:21,21
fully 24:7
function 37:2;39:20;40:1
funny 14:9
further 5:2;11:9;19:16;
21:6;26:1;31:2;32:2;35:18;
38:18;39:1
future 35:5

**G**

Gee 16:7
general 6:4;32:7
generis 19:5
German 5:5:11:14
gets 17:5,5
Gift 21:7
given 3:22;13:13;21:12
gives 10:20,21
goes 15:6;17:11;31:11
Gottdiener 27:22
governing 27:19;30:4
Gramatan 30:20
grant 16:9;29:11
granting 24:13
grants 15:2
greater 37:5
ground 12:22;13:15;
22:15;27:7
grounds 8:14,18;23:19;
36:5
grown 13:11
guess 6:4;12:17;13:18;
17:9,23;38:16

**H**

halfway 9:13
halt 15:12
hand 36:24;39:10
happen 11:2,3
happens 10:13,25;11:16;
16:7;17:4;23:18
happy 6:16
hard 19:5
hardship 37:5
hardships 27:8;35:23,25;
37:7;38:13
harm 19:1,2;27:4;36:17,
22;39:14,24,24;40:17,20,
21
harmed 40:1
hastily 33:16
hear 13:12,14;7:21;8:15;
9:6,24;12:1,3;18:8:22:20;
23:2
heard 10:19;19:7;30:18
hearing 4:12;7:25;9:22;
10:1;15:22;23:25;25:15;
30:10;32:15;36:23
held 20:1;34:10

help 6:21
high 6:16
highly 15:8
holding 24:25
holds 38:4
Home 30:20
Honor 4:16,19;5:7;6:16,
21,22;7:4,14:8:3,10,11,14;
9:20;10:5,19,22;11:11,21,
24,24;12:21,24;13:8,22;
14:2,3,10,20,25;15:5;
16:19,21,24,25;17:3,12,13,
23:18:1,18,23;19:1,3,8;
39:3,9,16:40:4,14,19,24;
41:17;42:1,5;43:4
Honor's 41:2
hopefully 15:1
Hosiery 30:18;41:1

**I**

ld 28:22
identical 13:11
ignore 28:10
ignored 27:19,20
ignoring 11:23
ll3 29:7
illuminating 42:8
important 3:11;4:11;
5:21;7:4;17:18
impossible 37:2
improperly 36:9
inadequate 28:25
inapposite 4:23
incapable 29:18
including 15:3;31:23
incorporated 9:23
Incorporated 21:7,7;
22:12;27:22;34:14
incorporates 10:7
incorporating 28:16
indeed 31:16;35:16
Indeed 37:8
independent 7:7;13:4;
38:8
independently 22:21
indicated 36:8
inference 4:6
inform 34:16
inherent 20:24;24:3
inhibited 39:21
initial 3:23
injunction 3:15;8:8;
12:10;14:1,7;15:9,15;
16:25;17:1,2,5,7,8,11,14,
16,21,22,24:18:2,7,24;
19:15;22:18;23:4;24:14,16;
27:3;35:19;38:15
injunctive 26:11
injury 36:10
inoperative 29:17
inquiry 33:15,19
instance 15:4

**Instead** 6:23
**insufficient** 29:2
**Insurance** 24:17
**intend** 43:1
**interested** 3:12;4:12
**interests** 42:17
**interferes** 9:9
**interfering** 42:24
**interim** 20:9
**interlocutory** 3:16;6:3:
7:13,20;8:2;10:23;12:4,10;
13:9,12;19:25;20:4.22.25;
22:2.17;23:6;24:1:25:3;
26:9.21
**internal** 28:7;34:15
**international** 11:15
**interpretation** 31:6
**interrupt** 9:14;13:24:
23:24
**intersect** 8:5
**intervene** 23:7
**intervened** 41:14
**into** 8:9;10:17;14:5;33:15,
19
**invalidating** 30:1;34:2
**invalidity** 32:1;33:5
**Investors** 30:20
**invoke** 11:22
**invoked** 22:21
**invoking** 38:8
**involve** 28:16
**involved** 32:5
**irreparable** 27:4;36:10;
39:24
**issue** 7:16,17,23;8:1,13;
10:4;12:2;14:2;17:22;
19:12,14;21:1;23:13,20,22;
24:21;25:1;31:11,17;32:21;
34:18;35:2,8
**issues** 5:3,17;9:13;11:7;
16:11;19:4;20:10;21:3,5,
10;23:14;24:4;25:11;
26:11;28:14;33:6,12,14,16;
35:5
**Italia** 34:13

**J**

**Jewelry** 21:7
**join** 8:23
**judge** 10:20
**Judge** 21:18;43:5
**judgment** 9:7;25:7;26:3;
30:16;31:3;33:9,21;35:10;
41:9
**judgments** 27:12;30:5,
12,23
**judicata** 16:14
**judicial** 15:11;20:11:
21:25;39:11
**jurisdiction** 3:14;5:24,
25;6:2,18;7:19:8:19:9:3,6;
10:12,21;11:17;12:2;14:9,

12,13,17,21,23;15:4,6,10.
11,12,25;16:16;22:3,8,15,
20;23:1,2,21;24:11;25:14,
15;26:11,15;28:20;31:16;
33:23;37:17,21;38:6,7
**Jurisdiction** 19:24
**jurisdictional** 3:22;4:19;
5:9,19;6:13;8:7;9:25;11:7;
14:8,17,24;15:16;16:3;
19:12;23:19;36:5
**justice** 34:13,19
**justification** 28:6
**justified** 43:2

**K**

**key** 7:14
**kind** 6:7,10;8:20;9:16
**kinds** 7:24
**knew** 27:18
**Kyivstar** 32:8,10;37:1;
39:10,12,13;40:5

**L**

**lack** 6:2;15:5;26:4
**lacked** 32:7
**language** 13:4,6;20:5;
42:11
**larger** 6:4
**last** 3:1;6:15;41:7
**Last** 41:17
**latches** 15:19
**later** 5:1;7:23
**law** 11:4;18:9;27:11,11,
14,17,20,25;28:4;29:1,10;
30:3,4;31:5,5,16;33:8,10,
18;35:5,9
**lawsuit** 13:20;33:4
**least** 3:19;6:20;25:14;
26:10
**left** 17:20
**legal** 27:19;30:24
**legitimate** 42:15,23
**less** 42:18
**level** 41:21
**likelihood** 23:18;26:13,
23;35:15;38:12
**likely** 26:20;27:5
**limited** 16:18,23
**line** 39:21
**lines** 25:16,17,17,17
**litigant** 30:17
**litigation** 26:7;27:7;32:3,
4,11,12,15,18,22;33:20;
34:18,20;35:7,22;37:10,22;
38:1
**LLC** 19:15
**loathed** 13:24
**look** 7:15;26:6
**looked** 39:13
**Lopez** 30:20
**lose** 9:1,5

**loses** 10:10
**loss** 39:25;40:21
**lot** 14:14
**lot** 5:16
**low** 6:16

**M**

**Maiellano** 34:13
**makes** 5:16;16:25;22:8;
37:1
**making** 3:9;16:15;20:15;
34:2;40:21,22;41:25
**manifest** 27:17;29:3;
30:3;31:1
**manifestly** 27:10;33:17
**many** 11:2,6;19:5;23:8
**Mariforum** 20:1
**marked** 40:12
**marks** 28:7;34:15
**matter** 12:20;16:9;18:9;
21:20;23:25;29:12,14;
35:10;36:17,20
**matters** 22:9
**may** 7:7;9:24;10:9,10;
11:19;17:19;21:24,24;
22:15;31:3;35:8,25;37:4,
24,24;38:4,23;39:4,21,21
**maybe** 4:13;9:16;12:1,11;
13:15;16:8
**Maybe** 7:24
**mean** 4:1,3;15:18;40:21;
42:13,13
**meaning** 14:9;29:15
**means** 10:8;37:10
**medias** 9:18;23:23
**meet** 18:6;28:9
**meeting** 3:1
**meetings** 36:25
**mentioned** 41:22
**Merchant** 21:16
**merely** 4:17;21:9;28:3
**merits** 3:17;4:1;14:18;
15:19,25;16:12,13;17:20;
18:16;24:15;26:14,23,24;
27:5,6;28:6;33:24;35:16,
18,22;36:23;37:16;38:12,
13
**Metallgesellschaft** 5:5;
6:9,21,23;13:7;21:15,21;
26:9
**Michaels** 4:21,22,23;5:2,
11;7:1,2;12:24;15:13;16:8;
20:1,14,23;22:16
**might** 5:19,21,24;8:16,18,
19;28:24;33:10;35:4;38:19,
20
**militate** 23:6
**minimum** 38:11
**minutes** 39:5
**missed** 4:13
**misunderstanding**
27:25;28:25

**Mobile** 19:7;17;41:15,25
**modify** 20:8
**moment** 16:23;26:6;
42:13
**money** 40:22,22
**Moore** 26:25
**moot** 22:16
**morality** 34:12,19
**more** 4:3,4,5;5:21,21;6:4,
9;7:18;8:19;11:13;12:3;
18:19;22:5;26:6;27:24;
40:22
**Moreover** 20:21;31:2;
34:24;41:12
**morning** 38:25
**most** 20:24;34:12;39:4
**motion** 6:1;10:18;14:14;
15:5;19:21;21:9,12
**moved** 25:9
**moving** 8:4,10;20:8;27:8
**much** 7:19;9:9;11:13;
17:21;43:3
**must** 10:2;21:2,3,23:3;
25:1,22;26:12;27:3,17;
41:10;42:10

**N**

**narrow** 26:8
**narrowly** 34:11
**National** 24:17
**nature** 3:16;5:20;23:5;
26:6;33:20;41:18
**nay** 11:17
**necessarily** 25:19;31:13;
40:21
**need** 10:22;11:23,25;
12:2;19:9,10,21:6;39:1;
42:2
**needs** 10:19;26:5;41:6
**Neither** 25:9
**New** 27:1,11;30:4;31:5,15;
32:17;33:8;35:11;41:23
**next** 7:4
**next-to-last** 41:7
**Noble** 21:7
**nobody** 11:3
**nomenclature** 22:10
**none** 9:17
**None** 27:15
**nonfinal** 25:3
**Nor** 32:16
**North** 22:11
**notably** 3:25
**note** 21:17;23:4;29:9;
30:19;33:13;34:24;36:8;
41:18
**noted** 22:8;28:15;32:10;
41:2
**notes** 22:16
**notice** 8:24;12:14;30:9;
37:11;39:11;41:13
**notify** 32:14

**noting** 20:23;28:11
**notions** 34:12,19
**November** 30:10;32:15
**null** 29:17;31:23,25
**number** 5:14;9:13
**numbers** 40:3.9,22
**NY** 30:20

**O**

**object** 8:22
**objection** 9:1;10:2;16:3.
4,5;28:20
**objections** 9:25;25:20
**obligation** 24:20;36:4
**obligations** 21:4;23:11;
34:21
**obtaining** 23:16
**obvious** 11:3;15:18
**obviously** 16:20
**occurring** 19:2
**October** 19:19
**off** 18:25;39:12
**offer** 39:5
**offered** 36:7
**often** 11:12
**omitted** 20:13;27:23;28:8
**omitting** 34:14
**once** 9:4
**one** 3:11;4:5,7,7,12;5:19;
6:17;9:11;11:14;12:11,17;
15:20,22;16:20;18:12;
19:12,19,24:23;25:6;27:3;
29:16;31:4;33:11;36:11;
39:5;42:21
**ones** 3:17;4:25;11:20
**ongoing** 11:15
**only** 3:6;7:11;14:23;
16:10;17:2;18:3,6,9;19:12;
20:6;22:7;23:8;32:11;33:5;
34:11
**opening** 3:18
**operating** 40:8,8
**opportunity** 3:2;23:14;
30:18
**opposed** 25:1
**order** 6:3;7:20;19:18,23,
24;20:1;22:2;23:6;30:24;
41:9
**orderly** 24:3
**orders** 13:9;30:7;32:3
**others** 21:24
**otherwise** 16:14
**out** 15:24;21:23;37:3
**outcome** 28:7
**over** 5:24,25;33:23
**overall** 37:8;42:20
**override** 25:2
**own** 25:14;32:6;34:22

**P**

**Packaging** 21:7

page 6:25,25;20:12;
25:16;28:17:30:7,19;40:15
pages 30:11
panel 9:1,4;11:7:18:8,17;
20:5;24:11:28:3;36:22;
37:17;38:19;42:24
papers 3:1
paragraph 4:7;7:5
paragraphs 32:9
parent 32:6;37:9
parent's 34:22
Parklane 30:18;41:1
part 14:12;16;16:28:22;
33:12;38:2;39:19;40:12
partial 5:13;22:6;38:5
Partial 19:24;28:14;32:22
participate 36:3,4,9,14
participated 25:12
particularly 3:12;4:12
parties 19:20;21:5;25:6,
11;29:14,16,16;32:11;
34:17,20;35:3,12,25;36:19;
37:11,13;39:1
parties' 31:4,6
party 10:9;14:5;20:7;
21:24;24:18,20,23;25:8,10;
27:3,5,8,16;29:20;30:8,17;
32:12;36:12,14;41:13
party's 29:11
path 9:14
pending 17:8;19:17
perfectly 13:3
performed 29:18
perhaps 42:10
period 33:14;36:19
permanent 8:8;17:8,16,
22
permanently 19:20
permitted 37:3
person 33:1
personal 15:6
persuaded 42:23
persuasive 27:15
pertains 32:20
petition 22:12,23;13:16,
25;14:1;18:24
Petitioner 19:15
PI 17:17
pick 4:19
piece 12:19;39:5
piecemeal 5:17;9:6
place 11:25;19:22;29:6
plaintiff 6:12;12:15,21;
16:2;19:23;22:14,22;23:10,
13,18,20;25:25;26:2,13;
35:15;37:9;38:21;42:21
Plaintiff 22:16
plaintiffs 3:9,11,13:4:8,
10;16:15;21:22;37:20;38:3,
11
plaintiff's 3:15,18,22;
16:10,13;42:15
Plaintiffs 31:18

Plaintiff's 40:12
Please 18:1
plenty 24:4
point 3:22,24;4:2,13,20;
5:9;6:4,5;17:22;19:11;
28:13;35:5;36:22;38:16;
41:7,7,17,20
point-by-point 4:17
points 3:3,9,17,20;21:23
policy 20:21;27:14;34:6,
8,10;35:1,3,12;37:3
posed 6:22
possible 13:3
potentially 5:11
power 10:21;15:11;20:4;
28:19,21
powers 22:21;23:7;38:8
practical 36:17
practice 13:11
precedent 6:11;9:18;
21:17
precipitately 33:17
Precisely 13:8
preclude 23:5
predicated 21:13
prejudice 38:18
preliminary 9:8;16:24;
17:1,2,5,7,11,14,21,24;
18:2,5,7;19:15;23:3;24:15;
26:25;27:3,4;35:19;38:14,
15
prepared 3:6;14:24;19:11
presented 16:12;23:23;
33:3,5,11,18
presents 24:23
preserved 15:7
pressure 24:9
presumably 18:4
prevail 18:1
prevent 35:12
primarily 24:16;31:9
principle 10:7,8;27:19;
30:25
printout 7:1
privy 30:17
problem 13:18
procedure 37:12
proceed 16:23;17:8;
33:23;35:4,12,18;36:12
proceeded 23:12
proceeding 11:9;17:22;
19:21;22:19,22,25;30:15;
32:20;36:17;38:1
proceedings 9:10;20:16;
21:13,14;25:13,21;32:5;
37:4;41:14;42:22
process 11:9;24:6;30:16
product 32:3
professional 42:19
profit 40:8
prohibiting 19:16
prolong 36:25
proof 39:5

proper 8:12
properly 38:17;40:1
properly-contested
35:7
prosecution 19:16
provided 24:22;28:19;
33:20
provides 29:10,12;31:5
proving 27:18
provision 29:19,23;34:3
prudential 8:20;16:10
public 27:14;34:6,8,10;
35:1,2,11
Publicis 22:11
pulled 39:12
purport 20:10;25:2
purposes 17:25;18:3
pursue 38:22
pursued 42:21
put 18:24;23:12,14;24:5;
31:20,22;41:19
puts 24:9
putting 4:4;15:19

Q

quickly 8:5;41:8
Quickly 40:19
quite 6:22;9:24;12:8;23:6;
31:20
quotation 21:6;28:7;
34:15
quoted 24:2

R

raise 10:4;16:3
raised 41:1
raises 21:19;26:1
rapidly 24:10
rather 24:21;28:11;31:5;
36:19;39:25;42:11
Rather 33:19
reached 28:7
read 3:7
Read 22:5
reading 12:25;40:17
really 13:17;16:8;17:15,
16;18:19;22:18;26:4,7;
31:11;35:6,6
reason 9:22;16:1;18:20,
22;19:6;40:9,17
reasoned 33:21
reasons 31:2;33:21;35:14
rebuttal 4:11
receive 16:6
recognition 20:17;27:11;
30:4;34:4
Recognition 29:7
recognized 41:6,10
record 12:25;14:11,21;
39:6;40:13,25;42:6
reduced 35:9

refer 29:11,16
referred 28:18;34:24
referring 11:21
refers 26:3
reflects 28:25
refusal 30:2
refuse 34:5
refused 27:19
regarding 30:12;38:5
Regarding 19:24
Regardless 37:16
reject 25:23
relates 34:25
relatively 33:14
relevance 32:1
relevant 33:12
relied 20:14
relief 15:2;16:9;23:16;
26:11,19,25;27:4;38:14
relies 21:15;34:3
rely 34:19
relying 4:4;24:16;41:4
remain 5:15
Remember 11:12
repeatedly 25:13
reply 3:1
reported 6:25
represent 40:4
representative 41:22
represented 32:13
representing 11:5
request 3:15;6:24;9:18;
16:10;17:6,15;29:11,15
required 5:2;29:22;30:6;
36:13
requires 13:1;17:24
requiring 35:3,12
res 9:18;16:14;23:23
resolution 5:13,18;19:18
resolve 20:10;21:2,3,10
resolved 8:1
resolving 7:13;28:14
resources 30:7
respect 5:9;6:6;7:20;
21:5;22:7;24:1,15;26:4,14,
16;27:25;28:9;29:14;
30:23;31:12;32:25;33:18,
21;35:4;38:18;42:12,16,17
respond 31:18
responded 4:14
respondent 19:17
response 3:3,11;4:12,18
rested 29:6
result 39:25
results 34:22
review 6:13;10:21;13:12;
15:4,7;19:25;20:4,11;
21:25;38:4,22
reviewed 12:24
reviewing 3:19
revisit 7:23,25
Reward 19:24
right 6:20;10:11,11;12:17;

13:19;14:6,16:15:14,22;
31:20;37:24:42:7;43:3
Right 16:8;18:4;39:17
rightly 21:20
rights 21:4
road 16:15
Rocket 21:6
rule 10:9;17:15;19:11;
28:20;29:10;31:19,21
ruled 11:6;17:20;31:25;
32:18
rules 9:21,23;10:3,7;
13:14;16:25;18:15;23:12;
28:13,16,17,18,23;36:2,24
ruling 3:16;5:13,19,24;
6:1;7:13,22;8:7,7;10:13,10;
18:5;20:4,9;25:4,10;26:21;
35:25;41:2,6,42:10
rulings 7:24;8:2;25:21,23
run 37:12;39:22,25

S

SA 20:2
same 12:7,8,16,19:23:4;
24:11;32:20:41:24
Same 28:17
satisfy 27:17;30:25
saying 4:8,10;7:1;11:5;
14:15
schedule 18:21
scheduled 23:24;36:19
scrutiny 4:22
Sea 41:5,7,12
searched 6:16
second 22:18
Second 5:4;20:1;24:2;
27:12;29:1,6;34:9
secondly 3:5
Secondly 31:8
Section 14:2;20:20
seek 14:6;15:2,15;20:7;
21:25
seeking 6:13;12:10;
13:11;14:5;15:9;22:17,18;
25:7;27:3,16;34:20
seeks 19:15,23
seem 12:8;37:6
seems 3:19;5:1;14:20;
26:12;31:15;35:2
seized 29:13
sense 5:16:15:8,10,11,13,
16;21:12
sensible 9:6
separate 7:7;13:3
serious 24:20,27:6;35:17,
21:38:12
served 8:23
set 13:13
sets 7:3
Seventh 22:9
severability 31:19,21;
33:1

**several** 9:8
**shabby** 38:2
**shall** 28:19,20;29:15
**shareholder** 32:19;34:2
**shareholders** 30:1,13;
31:10,13,23;32:8,20;34:17;
37:18
**shifting** 12:22;13:15
**Shipping** 20:2
**Shore** 30:19
**short** 18:25;33:14;39:22.
24
**show** 35:23;39:12,21
**showing** 18:25;26:13,20:
35:15;38:11;41:10
**shown** 35:17,21
**side** 15:20;33:11
**sides** 15:22
**signatory** 8:12;32:11
**signed** 33:2
**significant** 22:5;26:1;
33:10
**Sills** 5:6;6:17;11:13;12:1;
16:7;40:2,25;42:2
**SILLS** 12:21;13:8;14:3,
20;15:18;16:19;19:8;40:4.
7:42:5;43:5
**similar** 28:16
**simple** 4:2
**simply** 22:2;33:3
**site** 39:12
**situation** 6:22;23:8;
24:14;41:16
**situations** 21:23
**six** 4:24
**slightly** 8:18;35:24
**slowly** 24:10
**sole** 40:17
**solely** 22:17
**somebody** 16:16
**someday** 15:1
**somehow** 36:13
**somewhat** 12:5;22:16;
36:10,18,23
**soon** 12:14
**sorry** 13:23
**sort** 6:12;9:13,18
**source** 28:17
**SpA** 34:13
**speaks** 5:6
**specifically** 6:9,10,18;
29:23
**Specifically** 29:12
**Sphere** 10:2,19;11:22,23;
24:16,25;25:5,6;27:12;
28:9,10,15,25;29:5
**spoken** 12:19
**stage** 5:22
**stand** 21:5;39:2
**standard** 7:4;10:2;11:22;
18:7;28:10;29:3;31:1
**start** 6:15
**started** 12:14

**state** 9:1;16:25;29:13;
34:6;35:1,3
**stated** 19:1
**statement** 15:24;20:15;
32:13;36:11
**States** 37:20
**stay** 8:8,13;9:19;10:18
**still** 17:7;26:18
**stop** 8:11
**Storm** 9:24;19:15;21:10.
15:24;18:25;12,19,22;
26:18,22;27:10,13,14;28:9,
24;29:1,21,24;30:1,6,8;
32:5,7,11,14,16;33:4,25;
34:1,3,8,21;35:17,21,22;
36:2,12,13,24,25;37:2,7,9,
13;41:3,18,19,21;42:12
**Storm's** 19:18;21:12;
30:7;34:16,22;40:16
**straightforward** 4:2
**strategy** 42:20,21
**stream** 11:19
**strikes** 9:14
**strong** 42:11
**strongly** 23:6
**style** 13:19
**styled** 13:20,25;19:23
**subject** 12:19;19:25
**submission** 3:23;10:22
**submit** 3:1;23:20;41:11,
15
**submitted** 7:9;20:10;
21:3,5,10;25:21,25;32:12;
41:19
**submitting** 4:7
**subsequent** 18:16;30:15
**subset** 9:16
**subsidiary** 37:1
**substance** 23:25
**substantial** 32:2
**succeed** 17:19;26:20;
27:5
**succeeded** 35:15
**succeeds** 33:16
**success** 26:14,23;35:16;
38:12
**suffer** 35:25
**sufficient** 26:13
**sufficiently** 26:23;27:6;
35:17,21
**suggest** 5:12;24:12
**suggested** 4:19;12:5;
22:14
**suggesting** 18:19
**suggestion** 17:13
**sui** 19:5
**suit** 32:5
**sum** 38:4
**summary** 3:8
**support** 24:23;25:25
**supporting** 20:21
**suppose** 8:25;13:13,17;
15:8,15;18:12;38:21

**sure** 4:8;5:5;8:18;12:6;
16:22;39:6
**surprising** 13:13
**system** 12:9
**systems** 36:21

**T**

**tactic** 38:2
**tactical** 34:22
**tactics** 37:4
**talked** 7:3
**talking** 5:23
**Telenor** 4:21;18:25;19:7,
17,22;30:8,14;32:8,10,14;
36:2,6;37:13;39:15;41:15,
25
**Telenor's** 4:18;37:1;
40:16
**tentatively** 4:5
**term** 15:10;22:4
**terms** 13:11;15:18
**test** 27:18;35:19,24
**Thanksgiving** 38:25;
39:4
**theoretical** 15:8;36:10
**theory** 38:7
**therefore** 8:12;11:4;
26:22;30:14,17;38:15
**though** 7:14;21:18;23:4;
32:19
**Though** 20:14
**thought** 12:12,15
**thoughtful** 33:21
**three** 39:4
**threshold** 16:1
**Thus** 30:22
**timing** 17:13
**tips** 27:8;35:23;37:7
**title** 22:6
**today** 3:7;11:21;17:14;
22:14
**Tol** 3:5;4:15;12:5;16:22;
32:9;39:2
**TOL** 4:16;6:15,20;7:14;
8:3;9:20;10:5;11:11;13:22,
24;16:24;17:3,12,23;18:18;
39:3,9;40:14,19,24;43:4
**tomorrow** 13:18,19
**tough** 19:3
**Tours** 34:13
**tracks** 8:11
**transcript** 25:15;30:10;
32:16
**trial** 31:24
**tribunal** 7:21;9:22,24;
10:1,9,15,20;11:16;16:17;
21:9,23;23:17,21,22;24:9;
25:12,13,14,16,22;27:10;
28:10,15,18,19;29:5,22;
30:6,22;32:17;33:15,16,22;
35:9;37:21,23
**tribunal's** 3:16;19:19;

22:3,4:25:20,23;26:21;
27:9,13;29:2,24;30:2;
33:25;38:5
**trubinal** 22:18
**true** 14:20
**True** 22:11
**try** 5:9
**trying** 11:22;12:6;18:21;
40:15
**two** 4:7;19:20;21:5;24:24;
27:4;36:20,21
**two-pronged** 27:18

**U**

**Ukraine** 30:9;32:21;38:2
**Ukrainian** 26:3;27:11;
29:25;30:2,3,7,12,23;31:2,
5,9,18,20;32:3,15,17,18,
22,25;33:9,10,18,20;34:1,
18;35:5,8,11;37:10,22,23;
41:18,20,23
**ultimate** 17:20;37:16
**ultimately** 16:6;31:19;
37:19,24
**unambiguous** 20:5
**unavailable** 20:11
**UNCITRAL** 9:21,23;10:3,
7;11:12;23:11;28:13,17,18,
23
**under** 10:18;14:6;18:15;
20:16,23;23:11,12;24:9;
27:11;29:2;31:15;33:8,10;
35:8
**Under** 8:9;20:3
**underlying** 15:19;23:12;
26:14
**undermine** 24:2,3,6
**undermined** 32:2
**understandably** 3:21
**understood** 39:18
**unequivocally** 24:24
**uninformed** 34:20
**United** 37:20
**unless** 29:16
**Unless** 38:25
**unlike** 28:12
**unsuccessful** 23:15
**unusual** 9:21;41:20
**up** 4:19;5:22;13:11;15:4;
23:21;38:20;39:10,21;
41:22;42:12
**up-front** 8:21;23:13
**urge** 8:15
**USC** 14:1;20:20
**use** 4:18;15:10;22:4;26:9
**useful** 19:14
**using** 42:11

**V**

**V2B** 34:7
**vacate** 8:10;9:3;12:23;

13:16;14:5;16:6;17:15;
21:2;19:19;20:8;23:5;
24:12;27:16;28:2;29:2;
36:6
**vacated** 27:10;34:1
**vacating** 26:20;39:9
**vacation** 19:23;22:17
**vacatur** 14:1;18:24
**valid** 6:5;37:19
**validity** 16:5;24:22;26:5;
28:21;29:21;30:12;31:6,10.
11,13,14;32:19;34:18;
36:15;37:24;38:19
**Van** 3:5;4:15;12:5;16:22;
32:8;39:2
**VAN** 4:16;6:15,20;7:14;
8:3;9:20;10:5;11:11;13:22,
24;16:24;17:3,12,23;18:18;
39:3,9;40:14,19,24;43:4
**various** 26:16;37:4
**vehicle** 28:13
**version** 11:14
**Vessel** 21:16
**view** 12:12;21:19;23:17;
34:16;41:20
**views** 23:1
**vigorously** 14:18
**violate** 27:14;34:1,6,8,12;
35:1
**violated** 35:3
**violation** 30:16;34:9
**void** 25:8;29:17;31:23,25
**vouch** 40:9

**W**

**wait** 5:17;25:22
**waiting** 3:7
**waived** 25:19;39:7
**waiver** 8:25;15:19
**Wallace** 28:1
**warrant** 38:14
**warranted** 26:25
**waste** 40:15,18
**wastes** 24:8
**way** 7:13;9:9;13:9;18:12,
19;24:5,8;31:20
**ways** 19:5
**web** 39:12
**weeks'** 19:3
**well-defined** 27:21
**well-established** 30:15
**weren't** 10:11
**Westlaw** 6:25
**whatsoever** 18:25
**who's** 13:13
**win** 16:17
**wins** 10:10
**within** 12:9;29:15;37:19
**without** 4:10;23:11,22;
37:10;38:18
**wonder** 6:5
**word** 16:4;22:6

**words** 12:7:18:20:41:24
**worlds** 9:15
**worry** 38:20
**worst** 9:15
**wrong** 9:13;11:24;28:4;
35:20

**Y**

**yea** 11:17
**York** 27:1,11:30:4;31:5,
15;32:17:33:8;35:11;41:23

**Certificate of Incumbency and Authority of Storm**

January 30, 2004

Telenor Mobile Communications AS
Snarøyveien 30
N-1331 Fornebu
Norway

Omega LLC
66, Karl Marx Prospect
49000 Dnipropetrovsk
Ukraine

Closed Joint Stock Company "Kyivstar G.S.M."
51, Chervonozoryany Prospect
Kyiv 03110
Ukraine

Gentlemen:

I, Andrey N. Kosogov, on behalf of Storm LLC, a limited liability company organized under the laws of Ukraine ("Storm"), do hereby certify that Valeriy Vladimirovich Nilov:

(i) is the duly elected, qualified and acting General Director of Storm; and

(ii) is duly authorised to sign, on behalf of Storm, individually, (A) all instruments as necessary to terminate the Shareholders Agreement dated March 26, 1998 between and among Telenor Mobile Communications AS (formerly known as Telenor Invest AS, "Telenor"), Sputnik IV, L.P., Sputnik V Holdings Ltd., Storm, Omega LLC ("Omega") and Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar"), including the letter agreement dated January 30, 2004 between and among Telenor, Storm, Omega and Kyivstar; and (B) the Shareholders Agreement dated January 30, 2004 between and among Telenor, Storm and Kyivstar.

Yours sincerely,

STORM LLC

By _____
Andrey N. Kosogov

# STORM

## LIMITED LIABILITY COMPANY

1, Narodnogo Opolchennia Street, Kyiv, Ukraine

### Certificate of Incumbency and Authority of Storm

January 30, 2004

Telenor Mobile Communications AS
Snarøyveien 30
N-1331 Fornebu
Norway

Omega LLC
66, Karl Marx Prospect
49000 Dnipropetrovsk
Ukraine

Closed Joint Stock Company "Kyivstar G.S.M."
51, Chervonozoryany Prospect
Kyiv 03110
Ukraine

Gentlemen:

I, Yuri G. Tumanov, being the Chairman of Storm LLC, a limited liability company organized under the laws of Ukraine ("Storm"), do hereby certify on behalf of Storm that Valeriy Vladimirovich Nilov:

(i)    is the duly elected, qualified and acting General Director of Storm; and

(ii)    is duly authorised to sign, on behalf of Storm, individually, (A) all instruments as necessary to terminate the Shareholders Agreement dated March 26, 1998 between and among Telenor Mobile Communications AS (formerly known as Telenor Invest AS, "Telenor"), Sputnik IV, L.P., Sputnik V Holdings Ltd., Storm, Omega LLC ("Omega") and Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar"), including the letter agreement dated January 30, 2004 between and among Telenor, Storm, Omega and Kyivstar; and (B) the Shareholders Agreement dated January 30, 2004 between and among Telenor, Storm and Kyivstar.

Yours sincerely,

STORM LLC

By _____
Yuri G. Tumanov

IN THE MATTER OF AN ARBITRATION
UNDER THE UNCITRAL ARBITRATION RULES BETWEEN

———————————

**TELENOR MOBILE COMMUNICATIONS AS,**

Claimant,

Snarøyveien 30
N-1331 Fornebu
Norway

-and-

**STORM LLC,**

Respondent,

1 Narodnogo Opolchennya Street,
Kyiv 03151
Ukraine

———————————

**AFFIDAVIT OF ALEXEY KHOUDYAKOV**

———————————

- 2 -

Alexey Khoudyakov declares under penalty of perjury as follows:

1.      I am the Vice President of Altimo, the private equity group within the Alfa Group which invests in telecommunications. I joined Altimo in May 2004 from Alfa bank, where I was Vice President and managed the Alfa Group's investments in Golden Telecom, Inc. ("Golden Telecom") and Open Joint-Stock Company Kyivstar G.S.M. ("Kyivstar"). Prior to this, from 1998 to 2002, I was employed at the Moscow office of McKinsey & Co. as a management consultant. I hold a Masters Degree in Business Administration awarded in 1998 from INSEAD, and a Masters in Applied Mathematics and Physics from Moscow Institute of Physics and Technology awarded in 1994.

2.      I submit this affidavit in support of Storm's motion to dismiss the claims currently pending before the Tribunal. I have been asked to comment on my involvement in the negotiation and eventual signing of the Shareholders Agreement dated January 30, 2004 (the "Shareholders Agreement"), between Telenor Mobile Communications A.S. ("Telenor Mobile"), Storm LLC ("Storm"), and Kyivstar.

3.      As a general matter, I was not directly involved in the 2002 negotiations surrounding the Shareholders Agreement between Storm and Telenor Mobile. I left McKinsey & Co. in July 2002, and joined Alfa Bank in December 2002; as such, my involvement with Storm and Kyivstar began only in December 2002.

4.      As Vice President of Alfa Bank, I was responsible for the management of Kyivstar, and as a result I was involved in the negotiation of the amendments to the draft Shareholders Agreement in November/December 2003 and January 2004. I worked closely with Messrs. Andrey Kosogov and Yuri Tumanov at Storm in order to conclude Storm's buyout of Omega LLC's ("Omega") shares in Kyivstar, and to conclude the new Shareholders Agreement between Storm and Telenor Mobile in 2004. I have read and am familiar with the factual statements made in Telenor Mobile's Evidentiary Brief of August 9, 2006. I have several comments to make concerning Telenor Mobile's portrayal of the events.

5.      During late 2003 / beginning of 2004, Altimo was the ultimate owner of 50.1% of Storm's shares.    Mr. Andrey Kosogov represented the Altimo half of the shareholding interests in Storm.    The other 49.9% of Storm's shares were owned by various Ukrainian shareholders, who were largely represented by Mr. Yuri Tumanov.    Upon the completion of the Omega transaction, Mr. Tumanov had on several occasions asked me to represent the Ukrainian partners in Storm.    There were several reasons behind this request.    First, the Ukrainian shareholders of Storm (rather than Altimo) wanted to push for several amendments to the draft Shareholders Agreement.    However, these shareholders, who had been involved with Kyivstar from the very beginning, had difficult relations with Telenor Mobile.    Since at that time, I (and Altimo as a whole) had a good working relationship with Telenor Mobile, it was felt that I could successfully push Storm's overall interests and, more specifically, the amendments, forward.    Moreover, it was a preference of Telenor Mobile to deal with Altimo representative rather then with Ukrainian partners in Storm.

6.      It is my understanding that Telenor Mobile puts great weight on the fact that in November 2003, I informed Telenor Mobile that Storm was ready to sign the Shareholders Agreement "as is", but that despite this, by December 2003, I had requested additional amendments to the Agreement.[1]    From my perspective as the representative of Storm, however, I do not see how this could present any problems.    None of the parties including Telenor Mobile expected the 2002 draft Shareholders Agreement to be signed in its exact state.    My requests for amendments to the Agreement in December 2003 (at the behest of the Ukrainian shareholders of Storm) were entirely legitimate, and Storm was perfectly within its rights to further negotiate the terms of the draft Agreement.    It is true that I made the request fairly late in December 2003; however, this was unavoidable, as closing the Omega transaction was my consuming priority (as everyone else's) until that point.    Only after the closing did Altimo and the Ukrainian shareholders in Storm turn their attention to the draft

---

[1]      I have reviewed and am familiar with Exhibits Q and R to Telenor Mobile's Evidentiary Brief.

- 4 -

Shareholders Agreement in detail. It was at that time that we determined that the section on material breach needed to be revised.

7.     I further understand Telenor Mobile's position to be that the amendments which were made between 2003 and 2004 were technical in nature, and were not material or substantial. This is incorrect. The amendments were substantial, material, and important for Storm. At the behest of Storm's Ukrainian shareholders, I advanced several proposed amendments at or around the December 11, 2003 meeting which followed a Kyivstar Board Meeting. These included the renegotiation of Telenor Mobile's right to appoint the President, a renegotiation of the material limits on the company's CEO to make decisions (beyond which the decisions would be taken by the board), and of course the material breach section. The material breach section was crucial for the Ukrainian shareholders of Storm, due to their increasingly difficult relations with Telenor Mobile. It was important for these shareholders in Storm to protect themselves from potential misdealings by Telenor Mobile, whom they no longer fully trusted.

8.     Telenor Mobile is correct when it states that it flatly rejected my requests to amend the draft Shareholders Agreement; this is reflected in Mr. Sigmund Ekhougen's e-mail to Mr. Kosogov on December 16, 2003, which I was copied in on (at Exhibit R of Telenor Mobile's Evidentiary Brief). Indeed, most of the proposed amendments were firmly rejected by Telenor Mobile. However, as I have already stated, the material breach section was important for Storm's Ukrainian shareholders, so I pushed for negotiations on this issue. Thus, Messrs. Tumanov and Kosogov wrote to Telenor Mobile on December 18, 2003, in order to urge the latter to reconsider its refusal to negotiate (Exhibit T to Telenor Mobile's Evidentiary Brief).

9.     Following a meeting the Kyivstar board meeting held between Telenor Mobile, Storm and Kyivstar on January 20, 2004, Telenor Mobile changed its position, and agreed to negotiate the issue of material breach. A flurry of activity followed between early January and the date of the signing on January 30, 2004. A large majority of the negotiations took

place between myself and Oleksiy Didkovskiy, Ukrainian counsel for Telenor Mobile. Mr. Vladimir Jmak, counsel for Kyivstar, also participated in the negotiations.

10.     Around this time (mid-January 2004), and parallel to my negotiations with Telenor Mobile, I also contacted David Wack, an American lawyer and outside counsel who regularly represented Alfa's interests in transactional matters, to review the draft terms as negotiated between the parties. I asked Mr. Wack to review the new draft sections on material breach because he had been intimately involved in the drafting of the original 2002 version of the Shareholders Agreement. The material breach section was an important issue, and I felt that Mr. Wack would provide a valuable, independent viewpoint on the new draft version. However, I only requested his advice on the limited issue of the material breach draft section. I did not rely on Mr. Wack to provide Ukrainian law advice on the overall negotiations which lead to the signing of the 2004 Shareholders Agreement.

11.     In my opinion, the back-and-forth negotiations between Storm and Telenor Mobile demonstrate the importance of the amendments. Obviously, the issue of material breach was important for Storm, or else it would have not initiated and insisted on the negotiations. As for Telenor Mobile, I believe that the provisions on material breach were also important for it, since it also negotiated very hard on particular details. For example, on January 26, 2004, I proposed lowering the amount of the direct breach from US $50 million to US $5 million (a breach causing the defined amount in damages would allow the damaged party to terminate the Shareholders Agreement). In an e-mail sent to me the following day, Mr. Didkovskiy held firm on the US $50 million amount. I negotiated the amount down to US $30 million in an e-mail reply on January 28, 2004 (Exhibit V to Telenor Mobile's Evidentiary Brief). In the end, Telenor Mobile won on this point, and the final Shareholders Agreement kept the US $50 million amount. By January 29, 2004, the parties largely agreed on the terms, and the Shareholders Agreement was signed two days later (Exhibit X to Telenor Mobile's Evidentiary Brief). The negotiation of this particular point is important, because it illustrates that Telenor Mobile thought that it was substantial and material enough

to fight for. If it had been merely a "technical" issue, Telenor Mobile would certainly not have negotiated so hard.

12.    Finally, I have recently been informed that these material changes required new authorization by Storm's Meeting of Participants. I again confirm that at the time I did not ask for Mr. Wack's advice on this point. However, Telenor Mobile's lawyer, Mr. Didkovskiy, did not raise the issue either, nor did anyone else at Telenor Mobile.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2006 Moscow, Russia.

Maxim Khrapunov

IN THE MATTER OF AN ARBITRATION UNDER
THE UNCITRAL ARBITRATION RULES BETWEEN:

**TELENOR MOBILE COMMUNICATIONS AS,**
Claimant,

-and-

**STORM LLC,**
Respondent

## PARTIAL FINAL AWARD REGARDING JURISDICTION

We, the undersigned Arbitrators, having been designated in accordance with

the January 30, 2004 arbitration agreement between the above-named Parties,

having been duly sworn, and having heard the allegations, arguments and proofs of

the Parties regarding Respondent Storm LLC's Motion to Dismiss on the ground

that this Tribunal does not have jurisdiction to hear and decide this Arbitration, do

hereby make this Partial Final Award.  We conclude that this Tribunal does have

jurisdiction to hear the above-captioned Arbitration.

## A.    The Parties and the Background of This Arbitration

This Arbitration involves disputes between the majority and minority

shareholders of CJSC "Kyivstar G.S.M." ("Kyivstar"), a Ukrainian closed joint stock

company and the largest mobile telecommunications company in Ukraine, over the

governance and operation of that company.  Claimant Telenor Mobile

Communications AS ("Telenor") is a Norwegian corporation headquartered in

Fornebu, Norway.  It is a subsidiary of Telenor ASA, the largest provider of

telecommunications services in Norway and the provider of such services in 12 other countries.  Claimant owns approximately 56.5 % of the issued and outstanding stock of Kyivstar.

Respondent Storm LLC ("Storm") is a Ukrainian limited liability company headquartered in Kyiv, Ukraine. Storm owns the remaining approximately 43.5 % of Kyivstar shares.  At the times relevant to this Arbitration, Storm was, in turn, owned 50.1% by Altimo Holdings & Investment Limited ("Altimo"), and 49.9% by Altimo's subsidiary, Alpren Limited ("Alpren").  Storm, Altimo and Alpren are all part of a large Russian financial-industrial conglomerate known as the Alfa Group Consortium ("Alfa").

The interest of Telenor and Storm in Kyivstar dates back to 1998 when Storm held a much smaller minority interest in Kyivstar.  At that time Telenor, Storm and Kyivstar, along with three other minority shareholders in Kyivstar, entered into a March 26, 1998 Shareholders Agreement concerning the corporate governance and management of Kyivstar.  In 2002, Telenor and Storm worked out an arrangement whereby Storm would take over the position of the other minority shareholders and increase its percentage holdings to its present 43.5 %.  As part of this arrangement, the parties agreed that a new form of Shareholders Agreement would replace the 1998 agreement.  Between March 2002 and August 25, 2002, the parties negotiated the terms of the new Shareholders Agreement.

When it appeared that it would not be possible for Storm immediately to purchase the shares from one of the other minority owners, the parties agreed to

enter into a Voting Agreement that would govern their relationship until the purchase could take place. The Voting Agreement provided that, following Storm's purchase of the shares, the parties would enter into the new Shareholders Agreement. The text of that agreement was annexed to the Voting Agreement. The parties signed the Voting Agreement on September 2, 2002. Due to delays in Storm's ability to acquire the shares of the minority shareholder, the parties did not sign the new Shareholders Agreement until January 30, 2004.

As signed, the text of the January 30, 2004 Shareholders Agreement differed in only one respect from the form of new Shareholders Agreement that had been attached to the Voting Agreement. The January 2004 Agreement contained a modification – requested by Storm – in the section of the September 2002 form Agreement that dealt with the definition of a material breach. Otherwise, the January 30, 2004 Shareholders Agreement remained identical in all respects to the 2002 form Agreement. Of particular importance, the arbitration provision in the January 30, 2004 Shareholders Agreement was precisely the same as the arbitration provision in the earlier form Agreement that had been fully approved as an annex to the September 2, 2002 Voting Agreement. The arbitration provision, contained in Section 12.01 of the January 20, 2004 Shareholders Agreement, states in pertinent part:

12.01 <u>Arbitration: Consent to Jurisdiction</u>

(a)     Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a Panel of three (3) arbitrators under the United Nations Commission on International

Trade Law (UNCITRAL) Arbitration Rules then in force (the "UNCITRAL Rules") in accordance with the following terms and conditions:

> (i)      In the event of any conflict between the UNCITRAL Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail.

> (ii)      The place of the arbitration shall be New York, New York, United States of America.

Telenor and Storm performed their respective obligations under the January 30, 2004 Shareholders Agreement for over a year. At the annual meeting of Kyivstar shareholders on April 27, 2004, for example, the two parties voted in favor of an amended Kyivstar charter that brought Kyivstar's charter into compliance with the January 2004 Shareholders Agreement. This charter was duly registered with the appropriate Ukrainian authorities. During 2005, however, increasing friction developed between the parties. In March 2005, Storm and its designated representatives stopped attending Kyivstar shareholder and general board meetings. Thereafter, Storm and other affiliates in the Alfa consortium commenced several lawsuits in the Ukrainian courts challenging the Telenor relationship.

**B.      The Commencement of This Arbitration and Storm's Motion to Dismiss**

On February 7, 2006, Telenor commenced this Arbitration against Storm pursuant to Section 12.01 of the January 30, 2004 Shareholders Agreement. In brief, Telenor's Notice of Arbitration and its Statement of Claim seek a declaration that Storm is in breach of the January 2004 Shareholders Agreement by reason of: (a) its failure to attend annual and extraordinary shareholder meetings, its failure

-4-

to appoint candidates for election to the Kyivstar board, and its failure to attend board meetings and participate in the management of Kyivstar, (b) its ownership of more than 5 % in a competitive telecommunications company, and (c) its violation of the dispute resolution procedures. Telenor also seeks an order requiring Storm to comply with the Shareholders Agreement in the future and to make certain amendments to the Kyivstar charter. Finally, Telenor seeks an award of damages for Storm's violations of the Agreement, plus attorney's fees and costs.

Telenor selected William R. Jentes as its arbitrator to serve on the Tribunal, and Storm selected Gregory B. Craig. On March 31, 2006, the two party-appointed arbitrators selected Kenneth R. Feinberg to serve as Chair. All of the arbitrators agreed that they would serve as neutral members of the Tribunal. The Tribunal's first order of business was to ask the parties to supply names of all affiliates, parents and subsidiaries related to the parties, along with the names of all officers and executives who were likely to be mentioned in the proceeding, to be certain there would be no disabling relationships with the Tribunal members. Both parties complied with that request, the Tribunal disclosed no conflicts, and its members were accepted.

On April 14, 2006, the Tribunal held its initial pre-hearing conference with the parties to consider the parties' views on the schedule and to discuss what pre-hearing procedures would be followed. During the conference, Storm notified the Tribunal that it intended to file a motion to dismiss asserting that the Shareholders Agreement was invalid, and that the Tribunal accordingly lacked jurisdiction to

decide Telenor's claim.  The parties agreed to a schedule, which was approved by the Tribunal, for briefing and hearing Storm's motion.  Storm was given until June 5, 2006 to file its motion, along with any material it wanted to submit in support.

On May 30, 2006, Storm filed a Statement of Defense to Telenor's claim, which included as "an alternative ground" that the Kyiv Commercial Court had declared on April 25, 2006 that "the entire Shareholders Agreement is invalid because it was entered into without the requisite authority and fails to comply with the registration and execution requirements of Ukrainian law."  Storm Statement of Defense at p. 3.  Storm also pointed out that, "An appellate court recently upheld the April 25 Order."  *Id.* at p. 6.  This was the first notice given to the Tribunal that Storm had been in litigation in Ukraine challenging the validity of the underlying Shareholders Agreement.

On June 7, 2006, Storm filed  its Motion to Dismiss in which it  amplified on its Statement of Defense, contending that the Tribunal had "no authority to decide the merits of Telenor's claim because the Ukrainian courts had ruled, among other things, that the January 30, 2004 Shareholders Agreement was 'null and void in full, including the arbitration clause.'"  Decision of Kyiv Commercial Court, April 25, 2006 (translation, p. 3); aff'd Kyiv Appellate Commercial Court, May 25, 2006 (translation, p. 3).  Storm filed English translations of the two decisions as attachments to its Motion and argued that the arbitration should be dismissed in its entirety for lack of jurisdiction.

Telenor filed its Opposition to Storm's Motion on June 23, 2006, with exhibits, in which it contended that the Ukrainian litigation was "collusive", having been brought against Storm by one of its own affiliates, Alpren; that Telenor was not notified of, or made a party to, the Ukrainian litigation; and, therefore, that Telenor was not bound by the Ukrainian decisions.   Telenor asserted that it first learned of the Alpren litigation from a press report *after* the Kyiv Appellate Commerial Court had already issued its decision.  Telenor further argued that New York law, not Ukrainian law, governed the issue of whether the Shareholders Agreement was valid.

On June 29, 2006, the Tribunal held the first of three hearings on Storm's Motion to Dismiss.  The first hearing consisted largely of oral argument by the parties' counsel with reference to the two Ukrainian decisions and the background of the Voting Agreement of September 2, 2002, the attached form of Shareholders Agreement and the January 30, 2004 Shareholders Agreement.  At the conclusion of the argument, it was clear to the Tribunal that it needed the parties to make further evidentiary submissions regarding both the background of the January 30, 2004 Shareholders Agreement and what evidence and arguments had been presented to the Ukrainian courts concerning its validity, including the arbitration provision.  Accordingly, the Tribunal ordered such submissions and scheduled a second hearing for August 14, 2006.  At the conclusion of the August 14 hearing, the Tribunal held a third hearing on September 5, 2006, in response to Storm's concerns about the unavailability of certain of its witnesses for the August 14 hearing.

In the course of the three separate hearings, the Tribunal received extensive evidence regarding the background, negotiation, approval and execution of the July 30, 2006 Shareholders Agreement and its predecessors, and about what of this evidence was presented to the Ukrainian courts. The evidence presented to the Tribunal consisted of live testimony and declarations from Telenor and Storm officials and counsel, documents relating to the negotiation, approval and signing of the relevant corporate documents, including emails and letters exchanged between the parties and their representatives, and the official court records from the Ukrainian courts and English translations of those records. The evidence also included affidavits and supporting documents submitted by Ukrainian legal experts.

With regard to the proceedings in the Ukrainian courts, the evidence submitted to this Tribunal established that on April 17, 2006, Alpren brought suit against Storm in the Kyiv Commercial Court, claiming among other things that Storm's January 30, 2004 Shareholders Agreement with Telenor had not been executed by a duly authorized representative and was accordingly invalid. As previously noted, Alpren owned 49.9% of Storm, with the rest owned by Alpren's parent, both of which were affiliates of Storm and under the overall control of the Alfa Group. It was undisputed that Telenor received no notice of this proceeding or of the subsequent appeal until after the Commercial Appellate Court had rendered its decision.

On April 21, 2006, the Kyiv Commercial Court held a hearing at which Storm submitted no statement of defense. Its representative did advise the Court of the arbitration clause and of the existence of this arbitration, but made no argument that the arbitration clause submits "any and all disputes" to the arbitral tribunal for resolution and that the governing UNCITRAL Rules provide for the severability of the arbitration clause from the Shareholders Agreement. Storm's representative also made no attempt to present to the Ukrainian court the extensive evidence received by this Tribunal regarding the background, approval and affirmation of the July 30, 2004 Shareholders Agreement, including its arbitration provision.

On April 25, 2006, the Kyiv Commercial Court rendered its decision in which it concluded that Storm's participating shareholders had not properly approved the January 30, 2004 Shareholders Agreement; that Storm's Director General, Mr. Nilov, had "acted unlawfully and in excess of [his] powers"; and that the Shareholders Agreement and the arbitration clause were null and void.

Telenor filed an appeal, repeating that the dispute was currently in arbitration in New York and was not "examinable" by the Kyiv Commercial Court. Oral argument before the Kyiv Appellate Commercial Court took place on May 25, 2006, and that court issued its decision the same day. The Appellate Commercial Court agreed with the lower court that Storm's General Director had "acted unlawfully" and "in excess of his authority" in signing the January 30, 2004 Shareholders Agreement, and that the Agreement, including its arbitration provision, was null and void. The Court further ruled that the lower court had

jurisdiction to proceed because any arbitration agreement was not between Alpren and Storm.

As Storm had failed to do during the initial court proceeding, it made no effort to present to the Ukrainian Appellate Commercial Court any of the extensive evidence presented to this Tribunal concerning the background, negotiation and execution of the July 30, 2006 Shareholder Agreement, nor regarding the affirmation by Storm officials on repeated occasions of the authority of Storm's General Director to sign the Agreement on its behalf.  Storm also made no argument regarding the severability of the arbitration clause, nor did it supply the evidence heard by this Tribunal of Storm's clear intent to submit any and all disputes with Telenor to arbitration.

## C.    <u>The Tribunal's Jurisdiction To Hear This Arbitration</u>

In light of the evidence and argument presented to the Tribunal, it is apparent that Storm's Motion to Dismiss presents two issues for resolution by the Tribunal:  <u>First</u>, does the Tribunal have jurisdiction to decide the question of whether it has jurisdiction to hear this Arbitration, or is that a decision for a court?  <u>Second</u>, assuming the Tribunal has jurisdiction to decide this first issue, does it, in fact, have authority to proceed to hear the issues raised by Claimant's Amended Notice of Arbitration and Statement of Claim?  For the following reasons, the Tribunal unanimously answers both questions in the affirmative.

As to the first question, it should be emphasized that the Respondent, itself, has repeatedly conceded that this Tribunal does, in fact, have authority to decide the issue of its own jurisdiction. As Respondent's counsel stated at the June 29, 2006 Hearing:

> Now, [Claimant] spend[s] a lot of time saying that this panel has the jurisdiction to determine whether it has jurisdiction, or has the power to determine whether it has jurisdiction. Storm does not disagree with that proposition . . . . We believe that you do have the power to decide whether you have jurisdiction. That's why we made the motion to you and are here today. Hearing on 6/29/06; Tr. at p. 23, 13-23.

Respondent repeatedly confirmed this position in appearing before the Tribunal, expressly asserting that the Tribunal has "the authority under the UNCITRAL rules to decide your jurisdiction." Hearing on 9/5/06; Tr. at p. 62, 2-9; see, also, other similar references at Hearing on 8/14/06; Tr. at p. 257, 10-16; Tr. at p. 263, 4-12; Tr. at pp. 266-267, 1-3, 24-25.

Respondent's concession is consistent with the law. The Tribunal points in particular to *Shaw Group, Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 123 (2d Cir. 2003), which stands for the proposition that where, as here, the question of jurisdiction to arbitrate is delegated in clear and unmistakable language to the Tribunal, it is the Tribunal – not a court – that has the authority to decide its jurisdiction to proceed. In this matter, Section 12.01 of the Shareholders Agreement clearly and unmistakably states that "any and all disputes and controversies arising under, relating to or in connection with this Agreement shall

be settled by arbitration." Equally pertinent is Article 21 of the UNCITRAL Rules,

which Section 12.01 expressly adopts and which provides:

> 1.  The arbitral tribunal shall have the power to rule on
>     objections that it has no jurisdiction, including any
>     objections with respect to the existence or validity of
>     the arbitration clause or of the separate arbitration
>     agreement.
>
> 2.  The arbitral tribunal shall have the power to
>     determine the existence or the validity of the contract
>     of which an arbitration clause forms a part. For the
>     purposes of Article 21, an arbitration clause which
>     forms part of a contract and which provides for
>     arbitration under these Rules shall be treated as an
>     agreement independent of the other terms of the
>     contract. A decision by the arbitral tribunal that the
>     contract is null and void shall not entail ipso jure the
>     invalidity of the arbitration clause.

Thus, this matter precisely parallels *Shaw* in that there is an express

agreement to arbitrate "any and all disputes" in the Shareholders Agreement; and

Article 21 of the UNCITRAL Rules makes clear both that the issue of the Tribunal's

jurisdiction is arbitrable and that the arbitration clause is severable from any

question concerning the validity of the Shareholders Agreement, itself.

Accordingly, the clear language of Section 12.01 of the Shareholders Agreement and

Article 21 of the UNCITRAL rules, coupled with the repeated concessions on the

issue by Respondent, lead to the unanimous conclusion of the Tribunal that it has

jurisdiction to decide its jurisdiction to proceed with this Arbitration.

Nothing in *Sphere Drake Ins. v. Clarendon National Ins.*, 263 F.3d 26 (2d Cir.

2001), compels a different conclusion. That case did not deal with the situation we

have here, where both the contract in dispute and the UNCITRAL Rules clearly

point to arbitration as the vehicle for resolving disputed issues, including jurisdiction. *Sphere Drake* did not involve an arbitration clause incorporating rules similar to the UNCITRAL Rules, which expressly confer power on the Tribunal to decide questions concerning its own jurisdiction. Accordingly, the present matter is not one where the issue of jurisdiction must be referred to a court for resolution, as the concessions of Respondent recognize.

The Tribunal, having concluded it has jurisdiction to decide its own jurisdiction, further unanimously decides that it does have jurisdiction to proceed with this Arbitration. It does so notwithstanding the decisions of the Ukrainian courts declaring the Shareholders Agreement to be "null and void". Our principal reason for doing so is that the Ukrainian courts never addressed the severability of the arbitration clause from the rest of the Shareholders Agreement. In fact, those courts never referenced Article 21 of the UNCITRAL Rules at all. That Article expressly provides for the severability of the arbitration clause and further provides that a decision that the underlying Shareholders Agreement is invalid "shall not entail ipso jure the invalidity of the arbitration clause".

As a result, the Ukrainian courts never addressed whether Mr. Nilov, for Storm, had authority to agree to the arbitration clause and the UNCITRAL Rules quite apart from his authority to agree to the Shareholders Agreement. Having heard a full record on this point, this Tribunal expressly finds that Storm and Telenor had a clear intent to have their disputes resolved through arbitration; that Mr. Nilov confirmed that intention by executing agreements that contained a broad

arbitration clause incorporating the UNCITRAL Rules; and that none of the reasons assigned by the Ukrainian courts for invalidating the Shareholders Agreement applies to the arbitration clause. Indeed, there is nothing in those decisions to suggest that the General Director of a Ukrainian company could not enter into a binding agreement to arbitrate.

It is understandable that the Ukrainian courts never addressed the severability issue or considered that the parties' agreement to refer disputes to arbitration – embodied in Section 12.01 – might be something separate and apart from the Shareholders Agreement. Neither Alpren nor Storm presented these issues to those courts. Telenor had no ability to do so because it was never notified of, or made a party to, the Ukrainian proceedings. In some respects, this is not surprising since, as already indicated, the parties clearly intended that any and all disputes should be resolved through arbitration.

In the latter regard, the Tribunal finds it significant that this arbitration was initiated in February 2006, two months before Alpren commenced its Ukrainian litigation. The Tribunal was fully constituted by the end of March and held its first pre-hearing conference prior to the initiation of the Ukrainian litigation. It is noteworthy that, despite the existence of this Tribunal and the nature of this proceeding – which involved *Storm's* challenge to the validity of the underlying Shareholders Agreement – Storm never notified this Tribunal about the Ukrainian litigation until after both Ukrainian courts had ruled that the Shareholders Agreement was invalid. It is beyond dispute that Storm was aware of the Alpren

challenge to the validity of the Shareholders Agreement on or before April 17, 2006 when Alpren filed it is claim in the Kyiv Commercial Court.  Storm did not inform the Tribunal about that litigation, however, until it submitted its Statement of Defense on May 30, 2006 six weeks later.  To repeat, this was after both the initial Ukrainian proceeding and the appeal in the Ukraine had been completed.  The Tribunal also finds it significant that neither during the course of the Ukrainian litigation nor since has Storm made any attempt to seek an order from any court staying this Arbitration.  Instead, Storm has been steadfast in its effort to secure from this Tribunal a ruling on its Motion to Dismiss.

The Tribunal emphasizes that it is not deciding at this point whether the Shareholders Agreement, as opposed to the arbitration clause, is valid or not.  That decision must await the arbitration hearing scheduled in New York City on December 7 and 8, 2006.  Respondent will continue to have every opportunity to present additional evidence on that issue at that time.  While Storm has recently sought to continue the December hearing, the Tribunal believes that it should go forward as scheduled.  The parties will have had three months to prepare since the September 5 hearing, and over a month remains for them to complete any remaining discovery they require.

Finally, the Tribunal's present Partial Final Award does not ignore in any respect the decisions of the Ukrainian courts.  Nor does it impugn in any way the integrity of those courts or their decisions.  To the contrary, the Tribunal finds no evidence of any impropriety or violations of any Ukrainian procedures.  The

Tribunal rests its decision on the fact that the Ukraine courts lacked the full record presented to this Tribunal on the issues of arbitrability and the validity of the arbitration clause.  Unlike the court proceedings in Ukraine, both the Claimant and Respondent in this Arbitration have been afforded a full and complete opportunity to present their evidence and arguments on those issues.  Indeed, Claimant and Respondent have expressly stated that there is no further evidence or legal argument they wish to present to the Tribunal on those issues.

In sum, the Tribunal has considered all decisions of the Ukrainian courts, but has unanimously concluded that the Ukrainian courts lacked the full record before this Tribunal.  It is this full record that leads us to conclude that this Tribunal does have jurisdiction to proceed with this Arbitration, and that the Arbitration should proceed on December 7 and 8, 2006.

## D.    <u>Conclusions and Partial Final Award</u>

A unanimous Tribunal in the above-captioned matter hereby issues the following Partial Final Award:

1.    Respondent Storm LLC's Motion to Dismiss on the ground that this Tribunal does not have jurisdiction to hear and decide this Arbitration is denied.

2.    The Tribunal does have jurisdiction to proceed with the resolution of the claims raised by Claimant's Amended Notice of Arbitration and Statement of Claim.

3.    Respondent's request for a continuance is denied, and this Arbitration shall proceed as scheduled on December 7 and 8, 2006 in New York, New York.

4.    The Tribunal directs the Parties to meet and confer on a proposed Order covering any remaining pre-hearing matters.

SO ORDERED this 22nd day of October, 2006.


_____signed _____                _____signed_____
Gregory B. Craig                       William R. Jentes

                   _____signed_____
                   Kenneth R. Feinberg, Chair