UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
:
**STORM LLC,**                                                       :
:
                Plaintiff,                 :
:
          -against-                            :
:
**TELENOR MOBILE COMMUNICATIONS AS**            :
:
             Defendant.                    :
:
---------------------------------------------------------------------X   06-CV 13157 (GEL) (DF)
**TELENOR MOBILE COMMUNICATIONS AS**            :
:
            Counterclaimant,                :
:
          -against-                            :
:
**STORM LLC,**                                                       :
:
            Counterclaim-Defendant           :
:
          -and-                                :
:
**ALTIMO HOLDINGS & INVESTMENTS LIMITED**       :
**and ALPREN LIMITED**                          :
:
            Relief Defendants                :
---------------------------------------------------------------------X

**STORM LLC'S MEMORANDUM OF LAW IN OPPOSITION TO TELENOR
MOBILE'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF
COMPELLING ARBITRATION AND GRANTING ANTI-SUIT INJUNCTION**

## Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................1

FACTUAL BACKGROUND.....................................................................3

ARGUMENT.......................................................................................16

I.     The Court Should Determine the Motion to Compel Under the Standard for Summary Judgment and Should Order a Jury Trial................................16

II.    The Motion for a Preliminary Injunction Compelling Arbitration Should be Denied Because the Entire Shareholders Agreement Is Invalid and Unenforceable as a Matter of Ukrainian Law, Which Is the Law Applicable to This Dispute.................................................................................... 17

    A.   Storm's Signatory to the Shareholders Agreement Lacked Actual Authority to Bind Storm to That Agreement .........................................17

    B.   Mr. Nilov Lacked Apparent Authority to Bind Storm to the Shareholders Agreement...................................................................................20

        1. Storm is Estopped From Raising an *Ultra Vires* Defense and Has Not, Through Its Actions, Ratified the Shareholders Agreement... ...........25

III.   Telenor Mobile's Request for an Anti-suit Injunction Should Be Denied Because It Does Not Meet the Standards for an Anti-suit Injunction............... 27

    A.   Telenor Mobile Has Not Satisfied the Threshold Factors for the Issuance of an Anti-Suit Injunction.................................................................27

    B.   Telenor Mobile Has Not Satisfied the Remaining Five Factors for the Issuance of an Anti-Suit Injunction.........................................................29

CONCLUSION....................................................................................33

**Table of Authorities**

| Cases | Page |
|---|---|

*36 Convent Ave. HDFC v. Fishman*, No. 03 Civ. 3998 (JGK), 2004 WL 1048213 (S.D.N.Y. May 7, 2001) ............................................................................................... 26

*Adams v. Morton*, 581 F.2d 1314, 1319 (9th Cir. 1978) ..................................................... 29

*Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625 (2d Cir. 1945) ............................ 16

*Benckiser Consumer Prods., Inc. v. Kasday*, No. 97 Civ. 5389, 1998 WL 677631 (S.D.N.Y. Sept. 30, 1998) ............................................................................................ 16

*Bensadoun v. Jobe-Riat*, 316 F.3d 171 (2d Cir. 2003); .................................................... 16

*Business Incentives Co. v. Sony Corp. of Am.*, 397 F. Supp 63 (S.D.N.Y. 1975) ................................................................................ 21

*Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51 (2d Cir. 1991) ...................................................................................... 21

*China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987) .............. 27

*FDIC v. Providence College*, 115 F.3d 136 (2d Cir 1997) ............................................... 24

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines*, 230 F.3d 549 (2d Cir. 2000) ...................................................................................... 21

*Indosuez v. National Reserve Bank*, 98 N.Y.2d 238 (N.Y. 2002) ..................................... 24

*INS v. Chadha*, 103 S.Ct. 2764 (1983) ............................................................................. 29

*Int'l Sales Co. v. Potter & Brumfield*, 410 F. Supp. 1339 (S.D.N.Y. 1976) ......................................................................... 22

*LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194 (2d Cir. 2004) ................................... 27

*Lehman Bros., Inc. v. Tutelar*, No. 85 CIV, 3772 (DLC), 1997 WL 403463 (S.D.N.Y. July 17, 1997) ................. 17, 18

*North American Bank, Ltd. v. Schulman*,
    474 N.Y.S.2d 383 (N.Y. Co. Ct. 1984)........................................................................ 22

*Paramedics Electromedicina Comercial Ltda. v. GE Medical Systems Information*
    *Technologes*, 369 F.3d 645 (2d Cir. 2004) ................................................................ 27

*S. Leo Harmonay Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014 (S.D.N.Y. 1984)................ 20

*SG Avipro Fin. Ltd. v. Cameroon Airlines*, No. 05 Civ. 655 (LTS)(DFE), 2005 WL
    1353955 (S.D.N.Y. June 8, 2005).............................................................................. 30

*SG Cowen Sec. Corp. v. Messih*,
    No. 00 Civ. 3228, 2000 WL 633434 (S.D.N.Y. May 17, 2000).................................. 22

*Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001)............. 16

*Triad Fin. Establishment v. Trumpane Co.*,
    611 F. Supp. 157 (N.D.N.Y. 1985)....................................................................... 21, 22

*Trs. of the Am. Fed'n. of Musicians and Employers' Pension Fund v. Steven Scott*
    *Enters., Inc.*,
    40 F. Supp. 2d 508 (S.D.N.Y. 1999) ......................................................................... 25

**Treatises**

Restatement (Second) Conflict of Laws, § 187 (1971)....................................................... 21

Wright, Miller & Cooper, 13 Federal Practice and Procedure: Jurisdiction 2d §3530 at
    319. .......................................................................................................................... 29

Respondent Storm LLC ("Storm") respectfully submits this memorandum of law in opposition to the motion by Telenor Mobile Communications AS ("Telenor Mobile") for an order compelling arbitration and for an anti-suit injunction.

## PRELIMINARY STATEMENT

This dispute arises out of a shareholders agreement allegedly agreed to among each of Storm, Telenor Mobile and Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar"), dated as of January 30, 2004 (the "Shareholders Agreement" or "Agreement"). The key issue before this Court is whether Storm's General Director, Mr. Valeriy Nilov, had actual or apparent authority to bind Storm to the Shareholders Agreement. Ukrainian law, which is the law applicable to this dispute (though the result is the same under New York law), directs us to Storm's corporate charter on the question of actual authority. Storm's charter states that in order for the General Director to have authority to bind Storm, such authority must be granted by a special shareholders meeting. That meeting never took place. There is no other basis under Ukrainian law under which Mr. Nilov could have obtained actual authority to bind Storm, so the inquiry ends there.

Turning to the question of apparent authority, which, under either the choice of law analysis mandated by New York law or even the application of New York law itself directs us again to Ukrainian law, during the relevant time period Ukrainian law did not recognize the concept of apparent authority. Again, if New York law on apparent authority did apply here, the result would be the same. Telenor Mobile argues that there was no way it could have known that Mr. Nilov lacked authority to bind Storm. This is simply not the case. In its prior dealings with Storm – dealings that predated Alfa's investment in Storm – specifically, the negotiation and execution of a 2002 voter

agreement, Telenor Mobile asked for – and received - evidence of Mr. Nilov's authority. If, as Telenor Mobile asserts, the Shareholders Agreement was of such dire importance, it should have done as much due diligence for this agreement as it did for the one in 2002. The issue was right in front of them, and they got it right once. That they overlooked the question of certifying Mr. Nilov's authority the second time is their own fault. That Storm may have made the same mistake in failing to recognize Mr. Nilov's lack of authority until early 2005 is of no import to this dispute – if Storm rather than Telenor was seeking to benefit from the Shareholders Agreement they would be in the same boat as Telenor Mobile is now. But that is not the case here. If their dispute is that there was a violation of a representation and warranty, then Telenor Mobile has brought the wrong suit. This is simply a case of *caveat venditor*: Telenor Mobile failed to properly conduct its due diligence in the underlying transaction and therefore has no one to blame but itself.

Telenor Mobile also seeks relief from this court from an anti-suit injunction issued by the Ukrainian courts prohibiting the parties to the arbitration from going forward with that proceeding. Notwithstanding the fact that Telenor Mobile seeks to restrain Storm and the other parties to the Ukrainian action from executing a self-executing order, basic principles of comity militate in favor of letting the Ukrainian proceeding go forward where, by contrast to this forum, all the parties transact business and engage in activities in which Ukrainian authorities have a paramount interest. Finally, if these were not reasons enough to deny Telenor Mobile's motion for an anti-suit injunction, its pleadings fall woefully short of the requisite legal standard for obtaining such extraordinary relief.

## FACTUAL BACKGROUND

**The Parties**

Telenor Mobile is a corporation duly organized and existing under the laws of the Kingdom of Norway, with its principal place of business in Fornebu, Norway. Telenor Mobile is a subsidiary of Telenor ASA. *See* Statement of Defense at ¶ 1, attached to Van Tol Declaration as Exhibit A. Storm is a limited liability company organized and existing under the laws of Ukraine, with its principal address at 1, Narodnogo Opolchennya Street, Kyiv 03151, Ukraine. *See id.* at ¶ 2. Storm is wholly owned by Alfa Telecom, a company organized under the laws of the British Virgin Islands that currently uses the trade name "Altimo." Storm and Alfa Telecom are associated with the Alfa Group, one of Russia's largest privately owned financial-industrial conglomerates. *See id.* at ¶ 3.

Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar") is the largest mobile telecommunications company in Ukraine. Telenor Mobile and Storm are the only two shareholders of Kyivstar. Telenor Mobile owns approximately 56.5% of the issued and outstanding shares of Kyivstar, and Storm owns approximately 43.5% of the shares of the company. *See id.* at ¶ 4.

**The Shareholders Agreement and Its Predecessors**

Telenor Mobile, Kyivstar and Storm are signatories to the Shareholders Agreement. *See* Amended Statement of Claim at ¶ 1, attached to Van Tol Declaration as Exhibit B. The Shareholders Agreement was one of several documents related to the corporate governance and management of Kyivstar executed by the parties and other entities beginning in 1998. *See generally* Telenor Mobile Evidentiary Br., attached to

3

Van Tol Declaration as Exhibit C. On March 26, 1998, the then-existing shareholders of Kyivstar — Telenor Mobile, Storm, Sputnik IV L.P. and Sputnik V. Holdings Ltd. (collectively, "Sputnik"), Omega LLC ("Omega") and Kyivstar itself — entered into a shareholders agreement concerning the corporate governance and management of Kyivstar (the "1998 Shareholders Agreement"). *See id.* at 5. Pursuant to a put option in the 1998 Shareholders Agreement, Telenor Mobile in early 2002 agreed that it would purchase all of Sputnik's shares in Kyivstar. *See id.* In anticipation of that purchase, Telenor Mobile sought to have a new shareholders agreement executed and approached Storm in January 2002 to begin the process for negotiating such an agreement. *See id.*

**Negotiations Relating to the 2002 Transactions**

Beginning in March 2002, Telenor Mobile, Storm and Storm parent Alfa Telecom or related entities (collectively, "Alfa") began negotiating the documents relating to the contemplated transactions. *See id.* At approximately the same time, it became clear that Alfa, by itself or through Storm, sought to purchase Omega's shares in Kyivstar. *See id.* at 6. Storm's contemplated purchase of Omega's shares would render it a holder of 40% or more of the shares of Kyivstar. In the absence of a shareholders agreement, the holder of 40% or more of the shares in a Ukrainian company can block decisions on various matters. Accordingly, a term sheet negotiated by the parties required that they enter into a new shareholders agreement in connection with the purchase of the Omega shares. *See id.* at 6-7 and exhibit B thereto.

By May 2002, Telenor Mobile's acquisition of Sputnik's interest in Kyivstar was proceeding as planned, but it became clear that Storm's purchase of the Omega shares would likely not take place before the closing of the transaction between Alfa, Storm and Telenor Mobile. *See id.* at 7.) During this time, Storm expressed concern that the failure

4

to complete the purchase of Omega's shares would leave Storm with less than a 40% interest in Kyivstar. *See id.* Storm expressed an interest in acquiring a 7.8% interest in Kyivstar from Sputnik, which would permit Storm to reach 40% ownership. Storm proposed that when and if the Omega transaction took place, Storm would sell back to Telenor Mobile the number of Kyivstar shares necessary to achieve the shareholder structure to which the parties originally had agreed: Telenor Mobile, 56.5%; Storm, 43.5%. *See id.* at 7-8.

The parties continued to negotiate, and in July 2002 Telenor Mobile agreed to waive the requirement that Alfa complete its acquisition of the Omega shares prior to Telenor Mobile's purchase of Sputnik's shares. *See id.* at 8. On July 9, 2002, Telenor Mobile purchased 16.5% of Kyivstar's shares from Sputnik. *See Id.* Having received notice of the purchase, Alfa notified Telenor Mobile that Alfa viewed the consummation of the transaction to be a violation of the parties' previous agreement and demanded that Telenor Mobile sell Alfa or one of its affiliates a portion of the Kyivstar shares purchased from Sputnik. *See id.* Following additional negotiations, Telenor Mobile agreed to enter into a share purchase agreement (the "Share Purchase Agreement") with Storm, under which Telenor Mobile would agree to sell Storm 7.7% of the issued and outstanding shares of Kyivstar, which would bring Storm over the 40% ownership threshold. *See id.* at 9. Alfa's acquisition of Omega's Kyivstar shares had yet to occur, and, until Omega ceased to be a shareholder in Kyivstar, the 1998 Shareholders Agreement, to which Omega was a party, would remain in effect. *See id.* at 9.

During July and August 2002, Telenor Mobile, Alfa and Storm negotiated a voting agreement (the "2002 Voting Agreement"), which was intended to act as a

5

"bridge" between the 1998 Shareholders Agreement and a new agreement to be entered into *after* Storm completed its acquisition of Omega's Kyivstar shares. *See id.* at 9. The new agreement, which was ultimately the Shareholders Agreement, was entirely dependent on the acquisition of the Omega shares by Storm. *See* Testimony of Sigmund Ekhougen, 8/14 Tr., attached to Van Tol Declaration as Exhibit D, at 101:20-102:18; Affidavit of David Wack dated August 31, 2006, attached to Van Tol Declaration as Exhibit E, at ¶ 6. On August 30, 2002, final execution copies of the Share Purchase Agreement and 2002 Voting Agreement were exchanged between Alfa and Telenor Mobile. On September 2, 2002, the parties exchanged signature pages of the Share Purchase Agreement and the 2002 Voting Agreement. *See* Exhibit C at 10. A form (in draft) of the new shareholders agreement the parties contemplated entering into once the Omega transaction was concluded was annexed as Exhibit B to the 2002 Voting Agreement. *See id.* Telenor Mobile's representative, Mr. Ekhougen, has testified that Telenor Mobile never argued that the draft shareholders agreement attached to the 2002 Voting Agreement was an enforceable contract in and of itself. *See* Exhibit D at 109:4-110:17.

On October 29, 2002, the date of Telenor Mobile's sale of a 7.7% interest in Kyivstar to Storm under the Share Purchase Agreement, the parties exchanged certificates confirming that they possessed the requisite authority to enter into the relevant agreements. *See* Exhibit C at 10. Of particular relevance to the instant proceeding, Storm attached to its certificate (the "Storm Certificate") a copy of its charter, founding documents, and registration certificate. *See id.* at 11, exhibit L thereto;

Affidavit of Egil Hansen dated August 8, 2006, attached to Van Tol Declaration as Exhibit F at ¶ 37.

Storm also attached to the Storm Certificate a copy of a "true, complete and correct English translation of a unanimous written consent of the participants of [Storm] approving the Share Purchase Agreement, the other Transaction Agreements and the transactions contemplated thereby, dated August 30, 2002" and a document entitled "Minutes No. 19 of the Extraordinary General Meeting of Participants" of Storm dated October 7, 2002, which confirmed approval of the resolutions adopted by written polling on August 30, 2002 (the "2002 Written Polling"). Exhibit C at exhibits L and N thereto. Although the foregoing documents refer to the draft form of a new shareholders agreement to be entered into between the parties after the Omega transaction had been completed, they do not grant Mr. Nilov the authority to sign the shareholders agreement "as is" nor do they purport to authorize Mr. Nilov to execute versions of the new shareholders agreement that are materially different from the draft form.

The attorney who advised Storm in connection with the above-described 2002 transactions, David Wack, has testified that it was generally understood by the parties at the time that the Shareholders Agreement was still in draft form and that several conditions had to be satisfied before the Agreement could be signed; most notably, Storm needed to purchase Omega's shares in Kyivstar. *See* Exhibit E. at ¶ 6. Because there was no guarantee that the Omega transaction would occur, the form of shareholders agreement attached to the 2002 Voting Agreement was not in and of itself an enforceable contract.

**Alfa and Storm Close the Omega Transaction and Request Significant and Material Changes to the Shareholders Agreement**

7

Shortly before the closing of the Omega share purchase transaction, Alexey Khudyakov, Vice President of Altimo, requested certain changes to the draft shareholders agreement (including amendments to the material breach section and to other sections involving the appointment and powers of Kyivstar officials). Mr. Khudyakov requested those changes at the insistence of Storm's Ukrainian partners, on whose behalf he acted, and he testified that the Ukrainian partners sought the amendments to the draft agreement because they did not fully trust Telenor Mobile. *See* Affidavit of Alexey Khudyakov dated August 31, 2006, attached to Van Tol Declaration as Exhibit G at ¶¶ 6-7.

Although Telenor Mobile's representative, Mr. Ekhougen, initially refused to make any changes, he noted that his refusal to incorporate Mr. Khudyakov's amendments "does not mean that Telenor is unwilling to consider any possible amendments that Kyivstar's shareholders may bring forward at a later stage." (Exhibit C at exhibit R thereto; *see also* Exhibit D, at 110:7-17.) It is significant that Telenor Mobile, in response to the requested changes, did not insist on signing the draft shareholders agreement "as is" and did not argue that the form language attached to the 2002 Voting Agreement constituted an enforceable contract.

On December 15, 2003, Storm finalized the terms of its purchase of the Omega shares. Because the officers and directors of Omega would remain in their respective positions for several weeks until Omega was liquidated, Telenor Mobile and Storm entered into a letter agreement, dated December 17, 2003, jointly waiving the requirement in Section 2.05 of the 2002 Voting Agreement that the parties terminate the 1998 Shareholders Agreement and enter into the new shareholders agreement within three business days of completion of the Omega transaction. Instead, under the letter

8

agreement, Storm agreed to enter into the new shareholders agreement on or before January 31, 2004. *See* Exhibit C at 15, exhibit S thereto.

On December 18, 2003, Storm again wrote to representatives of Telenor Mobile to urge Telenor Mobile to consider Storm's proposed changes to the draft shareholders agreement. *See id.* at 15, exhibit T thereto. As originally contemplated, these changes included the renegotiation of Telenor Mobile's right to appoint the President, a renegotiation of the material limits on the company's CEO to make decisions, and the material breach section. Notably, the material breach section was deemed particularly crucial for the Ukrainian shareholders of Storm, due to their increasingly difficult relations with Telenor Mobile. *See* Exhibit G at ¶¶ 6-7. Telenor Mobile rejected two of the proposed amendments, but agreed to negotiate the material breach provisions. *See id.* at ¶¶ 8-9.

Between January 22, 2004 and January 28, 2004, several drafts of the new termination provision for material breaches of the agreement were exchanged among Alfa, Storm and Telenor Mobile. *See* Exhibit C at 15, exhibits U, V and W thereto; Exhibit G at ¶ 9. Mr. Ekhougen conceded at the August 14, 2006 hearing that the changes proposed by Storm would have implications for various "important" provisions of the shareholders agreement. *See* Exhibit D, at 115:16-117:18. At the time, Mr. Khudyakov referred to the comments Alfa had to the draft agreement as "substantive." *See* Exhibit C at exhibit U thereto. In his affidavit submitted in these proceedings, Mr. Khudyakov similarly characterized the amendments in the final executed agreement as substantial, material and important to Storm. *See* Exhibit G at ¶ 7. Mr. Khudyakov recalled in particular that the parties negotiated the amount of direct breach specified in

the agreement; though Storm proposed lowering the figure from $50 million to $5 million, Telenor Mobile refused and ultimately prevailed. *See id.* at ¶ 11. Mr. Khudyakov noted that Telenor Mobile would not have taken such a firm stance on the issue had it believed the issue to be merely "technical." *See id.*

By contrast to the 2002 transactions, which involved lawyers for both Telenor Mobile and Storm, Storm's negotiations culminating in the Shareholders Agreement were primarily led by a non-lawyer, Mr. Khudyakov. Telenor Mobile was represented in these negotiations by its Ukrainian counsel, Oleksiy Didkovskiy. *See* Exhibit G at ¶ 9; Exhibit D, at 111:3-6. Although Mr. Wack (who was involved extensively in the 2002 transactions) did not participate actively in the negotiations surrounding the Shareholders Agreement, he did briefly review the material breach amendments after having been contacted by Mr. Khudyakov on January 22, 2004. *See* Exhibit G at ¶ 10; Exhibit E at ¶ 8 and exhibit A thereto. Mr. Wack did not provide any other advice to Storm with regard to the Shareholders Agreement, and Mr. Khudyakov did not rely on Mr. Wack (who is not a Ukrainian lawyer) for any advice on Ukrainian law in that transaction. *See* Exhibit G at ¶ 10.

On January 30, 2004, Mr. Nilov, on behalf of Storm; Mr. Ekhougen, on behalf of Telenor Mobile; and Mr. Igor V. Lytovchenko, on behalf of Kyivstar; executed the Shareholders Agreement. *See* Exhibit C at 16, exhibit Y thereto. In connection with the execution of the Shareholders Agreement, Storm delivered "Certificates of Incumbency and Authority of Storm" dated January 30, 2004. *See* Exhibit C at exhibits AA and BB thereto. The documents purported to certify that Mr. Nilov was authorized to sign the Shareholders Agreement. *Id.* One of the certificates was signed by Andrey Kosogov, a

10

member of the Alfa Group Supervising Board of Directors and chairman of Altimo. Unlike the documents provided for the 2002 transactions, the 2004 certificates do not anywhere indicate (or provide any evidence) that a Meeting of Participants had been held or that Mr. Nilov had been given authority to execute the Shareholders Agreement. *Compare* exhibits AA and BB of Exhibit C with exhibit L of Exhibit C.  Storm's expert, Mr. Maydanyk, has testified that the 2004 certificates have no effect under Ukrainian law absent such a Meeting of Participants.  *See* Legal Opinion of Roman Maydanyk dated August 31, 2005, attached to Van Tol Declaration at Exhibit H at ¶¶ 26-29.

Mr. Kosogov also testified that he signed one of the certificates at Telenor Mobile's request and he mistakenly believed that Mr. Nilov had general authority under Ukrainian law to execute the Shareholders Agreement.  *See* Affidavit of Andrei Kosogov dated August 31, 2006, attached to Van Tol Declaration as Exhibit I at ¶¶ 5-6.  Mr. Kosogov did not consult the provisions of Storm's Charter, and he did not seek legal advice before signing the certificate. *See id.* at ¶ 6.  Mr. Kosogov further testified that he did not intend to represent that there had been a Meeting of Participants authorizing the execution of the Shareholders Agreement and he does not recall any such meeting.  *See id.* at ¶¶ 4, 6.

## V.   Alpren Proceedings Against Storm In Ukraine

In 2005, after completing the purchase of the Ukrainian partners' shares in Storm, Alfa discovered that Mr. Nilov lacked authority to enter into the Shareholders Agreement.  *See* Telenor Mobile's Memorandum of Law in Opposition to Respondent Storm's Motion to Dismiss, dated June 23, 2006, attached to Van Tol Declaration as Exhibit J, at exhibit C thereto; *see also* September 5, 2006 Hearing Transcript, attached to Van Tol Declaration as Exhibit K, at 9:17-10:17.  At the time, Storm had already begun

11

to raise issues relating to Kyivstar's corporate governance through litigation in Ukraine. *See* Exhibit A at ¶¶ 10-13. Specifically, Storm commenced an action in the Ukrainian courts which was directly related to the corporate governance provisions in Kyivstar's Charter and the Shareholders Agreement. In that litigation (the "December 22, 2005 litigation"), Storm took the position that its representatives were not required to follow the provisions relating to Kyivstar's board member nominations because they are invalid under Ukrainian law. *See id.*; *see also* Second Affidavit of Alexey Khudyakov dated November 22, 2006, attached to Van Tol Declaration as Exhibit L, at ¶ 5; Affidavit of Pavel Kulikov dated November 22, 2006, attached to Van Tol Declaration as Exhibit M, at 4-5.[1]

The litigation commenced by Alpren Limited ("Alpren"), an Alfa subsidiary, in April 2006 is consistent with the actions brought by Storm in Ukraine because it too challenged the Shareholders Agreement. The Alpren litigation culminated in the April Order, which was confirmed on appeal by the May Order. The Ukrainian courts found that Mr. Nilov lacked authority under Storm's Charter and Ukrainian law to enter into the Shareholders Agreement. The courts noted that Section 2.03(b)(1) of the Shareholders Agreement bound Storm to purchase shares of Kyivstar. As a result, the courts held, Section 12.4(ii) of Storm's Charter required approval for the Agreement from a Meeting of Participants. The courts found that there was no evidence that such a Meeting ever

---

[1]    Mr. Kulikov has alSo testified in his Affidavit that Altimo's position at the time was that the Article 6.02, the non-exempt clause which is cited by Telenor Mobile in its claim against Storm, could not possibly affect Altimo nor any of its subsidiaries other than Storm. *See* Exhibit M at ¶ 15. This will be discussed in greater detail below.

took place. *See* Affidavit of Anna-Marta Khomyak, dated August 8, 2006, attached to Van Tol Declaration as Exhibit N at exhibits 23 and 29 thereto.[2]

Storm was represented in those proceedings by its current General Director (and Mr. Nilov's successor), Vadim Klymenko. *See* Affidavit of Vadim Klymenko dated August 9, 2006, attached to Van Tol Declaration as Exhibit O, at ¶ 4. Mr. Klymenko was unable to argue, both at trial and on appeal, that there was in fact a Meeting of Participants granting Mr. Nilov the authority to enter into the Shareholders Agreement, because Mr. Klymenko had not seen any evidence of such a meeting. Exhibit O at ¶ 8. Mr. Klymenko informed the Ukrainian courts of these ongoing arbitration proceedings. *See id.* at ¶¶ 6-7. The courts, however, ruled that they had jurisdiction over the dispute. *See* Exhibit N at exhibits 23 and 29 thereto.

Telenor Mobile did not attempt to intervene in the Ukrainian proceedings, even though it had the right to do so. *See* Storm's Evidentiary Brief dated August 9, 2006, attached to Van Tol Declaration as Exhibit P at 3; Legal Opinion of Lyubov Logush dated July 28, 2006, attached to Van Tol Declaration as Exhibit Q, at ¶¶ 16-19. Telenor Mobile, however, did invoke the Ukrainian legal system in the December 22, 2005 litigation, fully participated in that proceeding, and in fact obtained a reversal of the December 22 Order on July 5, 2006, based on a procedure in which it introduced newly

---

[2]     The trial court also held that the Shareholders Agreement was not registered with the proper authorities in the Ukrainian language, which is a requirement for documents that affect a company's foundational documents. Because the Shareholders Agreement and the 2002 Voting Agreement call for changes in Storm's Charter under certain circumstances, the trial court ruled that both agreements were invalid for failure to comply with the Ukrainian registration requirements. *See* Exhibit N at exhibit 23 thereto at 3.

admitted evidence.[3]  *See* Exhibit P at 3.  The reversal of the December 22 Order was itself reversed by the Ukrainian Supreme Court on October 3, 2006 (the "October 3 Ruling"), thus permanently reinstating the original December 22 Order, which remains binding law to this day.  *See* October 3 Ruling, attached to Van Tol Declaration as Exhibit S.

**The Clarification Order of the Kyiv Appellate Commercial Court**

The Tribunal rendered its Partial Final Award on Jurisdiction on October 22, 2006 (the "October 22 Award" or the "Award").  *See* Partial Final Award on Jurisdiction, dated October 22, 2006, attached to Van Tol Declaration as Exhibit T.  The main premise behind the Award was the Tribunal's belief that Ukrainian orders did no address the severability of the arbitration clause because none of the parties presented that issue to the court.  *See id.* at 13-14.  However, Storm's representative at both the trial and appellate levels argued that the Ukrainian actions should be dismissed in favor of the arbitration.  *See* Exhibit O at ¶ 3.  In addition, the arbitration clause in the Shareholders Agreement plainly refers to Article 21 of the UNCITRAL rules, which in turn states that the invalidity of the contract does not necessarily mean, absent a further finding by the court or arbitration tribunal, that the arbitration clause is also void.  The record therefore shows that the Ukrainian courts were well aware of the Arbitration and the potential argument that it should continue (based on severability) even if the rest of the Shareholders Agreement was voided.  In addition, both the trial and appellate courts stated that the Shareholders Agreement was "null and void in full, <u>including the</u>

_____

[3]      It is significant that Telenor Mobile initiated this proceeding *ex parte*, in direct violation of Ukrainian civil procedure rules which required notice.  *See* 6/29 Tr., attached to Van Tol Declaration as Exhibit R at 33:7-13.

arbitration clause, from the time of its execution." *See* April 2006 Order, a true and correct copy of which is attached to the Van Tol Declaration as Exhibit U, at 3 (emphasis added); May 2006 Order, a true and correct copy of which is attached to the Van Tol Declaration as Exhibit V, at 2-3. In light of the reasoning contained in the Award, Storm filed an application to the Kyiv Appellate Commercial Court on October 30, 2006 requesting that it clarify certain aspects of the Ukrainian Orders.

On November 8, 2006, the Kyiv Appellate Commercial Court issued a Clarification Order. The Clarification Order states in no uncertain terms that, "the Shareholders Agreement violated the public order of Ukraine and … the representative of one of the parties to the agreement – Storm LLC – was not authorized to execute the said Shareholders Agreement and the arbitration clause contained therein as its integral part." *See* Clarification Order at 1, attached to Van Tol Declaration as Exhibit W. The appellate court further noted that the invalidation of the Shareholders Agreement arose under Article 216, which provides that "an invalid deed does not entail any legal consequences except for those related to its invalidity." Accordingly, the court stated that the entire agreement was void *ab initio*, and that "the parties had no grounds whatsoever to perform any acts on the basis of such agreement, including to resort to arbitration in connection therewith." *Id.* at 2.

## ARGUMENT

I.   **The Court Should Determine the Motion to Compel Under the Standard for Summary Judgment and Should Order a Jury Trial**

In deciding motions to compel, the courts have used a summary judgment standard. They will grant a motion to compel only where the moving party shows that there are no issues of material fact and it is entitled to a finding, as a matter of law, that the contract at issue is a valid an enforceable contract. *See, e.g., Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *Benckiser Consumer Prods., Inc. v. Kasday*, No. 97 Civ. 5389, 1998 WL 677631, at *2 (S.D.N.Y. Sept. 30, 1998). Here, by meeting the "some evidence" standard of *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001), Storm has shown that Telenor Mobile cannot satisfy the summary judgment standard.

In *Sphere Drake*, the Second Circuit also held that a party who comes forward with "some evidence" regarding the existence or validity of a contract purportedly giving rise to an arbitration is entitled to a jury trial. *Id.* at 30. *See also, Almacenes Fernandez, S.A. v. Golodetz*, 1148 F.2d 625, 628 (2d Cir. 1945) ("to make a genuine issue entitling the plaintiff to a trial by jury, an unequivocal denial that the agreement had been made is needed, and some evidence should have been produced to substantiate the denial.") Accordingly, Storm is entitled to a jury trial and an opportunity to take discovery as well as prepare for trial. Instead, this Court has set this matter down for what it described as a trial on the merits on little more than one business day's notice. This has caused, and will cause, substantial prejudice to Storm. Therefore, Storm's appearance before the Court on December 11, 2006 is under a reservation of rights.

16

II.    **The Motion for a Preliminary Injunction Compelling Arbitration Should be Denied Because the Entire Shareholders Agreement Is Invalid and Unenforceable as a Matter of Ukrainian Law, Which Is the Law Applicable to This Dispute**

Telenor Mobile assumes that New York law should apply to this dispute because the Shareholders Agreement contains a New York choice of law clause. That is not the case. The applicable New York case law and New York conflicts of laws rules clearly mandate the application of Ukrainian law to this dispute. Under that analysis, there is no question that the Shareholders Agreement, in its entirety, is unenforceable as to Storm because: (a) Storm's signatory to the Shareholders Agreement lacked actual authority to bind Storm to the Agreement; and (b) Storm's signatory to the Shareholders Agreement lacked apparent authority to bind Storm to the Agreement.

A.    **Storm's Signatory to the Shareholders Agreement Lacked Actual Authority to Bind Storm to That Agreement**

(1)    **Choice of Law**

With regard to the question of whether Storm's signatory to the Shareholder's Agreement, Mr. Valeriy Nilov, had actual authority to bind Storm to the Shareholders Agreement, the applicable case law clearly directs New York courts to the law of the place of incorporation. *See, e.g., Lehman Bros., Inc. v. Tutelar, CIA Financiera, S.A.*, No. 95 CIV, 3772 (DLC), 1997 WL 403463, at *3 n.4 (S.D.N.Y. July 17, 1997) (applying law of place of incorporation (Argentina) to issue of actual authority). Applying Ukrainian law, there is no question that Mr. Nilov, lacked the proper legal authority to bind Storm to the terms of that agreement.[4]

---

[4]    *See* Exhibit H (Legal Opinion of Roman Maydanyk) at ¶¶ 8-13 (stating that Ukrainian law is applicable to the question of Mr. Nilov's authority to enter into the Shareholders Agreement.)

*Tutelar* is in accord with Ukrainian statutory law that mandates the application of Ukrainian law to issues relating to the status and operation of a Ukrainian company. *See* Legal opinion of Peter Magnus dated November 22, 2006, attached to Van Tol Declaration as Exhibit X, at ¶ 18. As such, the application of New York law to matters of corporate governance would constitute a violation of Ukrainian positive law. The mandatory nature of the Ukrainian laws applicable to domestic corporate governance evinces a strong public policy favoring the application of Ukrainian law to disputes arising under such circumstances. This is particularly so in light of the fact that the entities here affected by the application of Ukrainian corporate law, namely, Kyivstar and Storm, are each Ukrainian companies doing business exclusively within Ukrainian territory and in a highly regulated national market.

### (2)    Application of Ukrainian Law Here

Storm's corporate charter (the "Storm Charter") expressly limits the power of its General Director to enter into agreements such as the Shareholders Agreement.[5] *See* Exhibit H at ¶¶ 14-18. Under Article 12 of the Storm Charter, before Storm's general director can bind the company, he requires specific authorization to do so, which authorization may be conferred only by the affirmative vote of a special shareholders meeting. *See* Exhibit W at ¶ 10; Exhibit M at ¶ 6; Exhibit L at ¶ 6. No such meeting ever

---

[5]    Storm's Charter states that the approval of a Meeting of Participants is required where, among other things, the General Director will be entering into an agreement providing for "the disposal of or encumbrance upon the Kyivstar Shares or any other assets of the Company." Exhibit N at Section 12.3(ii) of exhibit 11 thereto. The August 30, 2002 Notice of Written Polling notes that the new shareholders agreement would involve the "voting and disposal of shares in Kyivstar" (*see* Exhibit C at exhibit L thereto) and the Shareholders Agreement clearly contemplates such a disposition. *See* Exhibit C, at section 2.03(b) of exhibit Y thereto. One of Storm's legal experts, Mr. Maydanyk, reviewed this evidence and concluded that "that [Storm's Charter] expressly limits the power of the General Director to enter into the Shareholders Agreement precisely because it entails the disposal of Kyivstar shares." Exhibit H at ¶ 14. Telenor Mobile, through its representative, Mr. Ekhougen, admitted that the Shareholders Agreement involves the disposition of Kyivstar shares. *See* Exhibit D at 98:10-15.

18

took place prior to Mr. Nilov's execution of the Shareholders Agreement. Accordingly, when Mr. Nilov signed that agreement, he acted unlawfully and without authority. *See* Exhibit X at ¶¶ 9-12.

Because authority to bind the corporation can derive only via the mechanisms set forth in the Storm Charter, both under the terms of the Storm Charter and § 145 of the Ukrainian Civil Code, which provides that the corporate charter shall determine all issues pertaining to corporate governance and that the charter shall be amended only by a vote at the general shareholders meeting, there is no other legal way under which Mr. Nilov could have obtained authority to bind Storm. *See* Exhibit X at ¶ 11. As such, absent the granting of special authority at a special shareholders meeting, Mr. Nilov could not, as a matter of law, have bound Storm to the Shareholders Agreement.

Telenor Mobile has argued that the authorizations prepared in connection with the 2002 Voting Agreement may be considered proper authority for the execution of the Shareholders Agreement. *See* Affidavit of Myron B. Rabij dated August 9, 2006, attached to Van Tol Declaration as Exhibit Y, at ¶¶ 11-18 Those authorizations, however, were limited to the 2002 Voting Agreement. Although they refer to the draft form for the new shareholders agreement and allow Mr. Nilov to take steps to enter into that new shareholders agreement, the authorizations cannot be stretched to apply to a materially different agreement entered into more than a year later. Telenor Mobile's own witness, Mr. Ekhougen, admitted that the Shareholders Agreement contained new material breach provisions that affected important clauses in the Agreement and that those changes were the subject of negotiations. *See* Exhibit D at 115:16 – 117:18. At the time of negotiations, Storm's representative, Mr. Khudyakov, referred to the new

provisions as "substantive." *See* Exhibit C at exhibits U. This was confirmed by Mr.

Khudyakov. *Id. See also* Exhibit E. at ¶ 9. Storm's expert, Professor Maydanyk, has

also testified that the differences between the draft shareholders agreement attached to the

2002 Voting Agreement and the 2004 Shareholders Agreement meant that a new and

separate authorization was required before Mr. Nilov could execute the letter. *See*

Exhibit H at ¶¶ 23-25. Telenor Mobile has not presented any case law or other authority

in which a board resolution or power of attorney was construed so broadly.

**B.    Mr. Nilov Lacked Apparent Authority to Bind Storm to the Shareholders Agreement**

**(1)    Choice of Law**

The determination of the applicable law to the issue of apparent authority is

somewhat more complicated, but it still leads to the conclusion that Ukrainian law

applies. Assuming a choice-of-law analysis is required, New York choice of law

principles mandate the application of Ukrainian law to this issue, notwithstanding the

existence of a New York choice-of-law clause in the Shareholders Agreement. Although

some U.S. "jurisdictions give determinative effect to a choice-of-law clause and thereby

follow the so-called 'autonomy rule,' . . . New York is not one of them." *S. Leo

Harmonay Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014, 1024 (S.D.N.Y. 1984) (internal

citations omitted) *aff'd mem.* 762 F.2d 990 (2d Cir. 1985). It is well-settled law in the

State of New York that the existence of a contractual choice of law clause is not binding

on the New York courts. Rather, New York courts will only enforce a contractual choice

of law provision where:

> [the state whose law is] selected has sufficient contacts with the
> transaction in question and the application of that state's law would not be
> contrary to any fundamental policy of a state which has a materially
> greater interest than the chosen state in the determination of the particular

20

issue at bar, and which would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Business Incentives Co. v. Sony Corp. of Am.*, 397 F. Supp. 63, 67 (S.D.N.Y. 1975),

(*citing* Restatement (Second) Conflict of Laws, § 187 (1971)). *See also Hartford Fire*

*Ins. Co. v. Orient Overseas Containers Lines*, 230 F.3d 549, 556 (2d Cir. 2000) ("New

York law is clear [that] in cases involving a contract with an express choice-of-law

provision . . . a court is to apply the law selected in the contract *as long as* the state

selected has sufficient contacts with the transaction.") (emphasis added); *Cargill, Inc. v.*

*Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) (holding that New York

courts may disregard an express choice-of-law provision where the most significant

contacts with the subject matter of the dispute are in another state); *Triad Fin.*

*Establishment v. Trumpane Co.*, 611 F. Supp. 157, 162-63 (N.D.N.Y. 1985) (holding that

"New York courts do not consider themselves bound by a forum selection clause if its

application would override the policies of a state with a materially greater interest in the

controversy"). Thus, applying New York conflict of laws principles to this case, the

choice-of-law clause contained in the Shareholders Agreement should be enforced if and

only if: (1) New York has sufficient contacts with the transaction in question to justify its

application to the Shareholders Agreement; (2) the application of New York law is not

contrary to any fundamental policy of the state (Ukraine) which has a materially greater

interest than New York; *and* (3) the state with the materially greater interest would have

been the state of the applicable law in the absence of an effective choice by the parties.

Here, as is set forth in greater detail below, there is no question that all of these elements

mandate the application of Ukrainian law.

21

New York courts have not hesitated to invalidate a choice-of-law provision where the chosen law does not bear a substantial relationship to the parties or the underlying transaction and/or the state whose law is chosen has little or no interest in the outcome of the dispute. *See, e.g. SG Cowen Sec. Corp. v. Messih*, No. 00 Civ. 3228 (HB), 2000 WL 633434, at *4 (S.D.N.Y. May 17, 2000) (denying effect of New York law selection where California had greater interest in the transaction) *aff'd* 224 F.3d 79 (2d Cir. 2000); *Int'l Sales Co. v. Potter & Brumfield*, 410 F. Supp. 1339, 1341 (S.D.N.Y. 1976) (applying the law of Puerto Rico even though the contract had an Indiana choice of law provision where Puerto Rico had a more significant relationship to the controversy); *Triad Fin. Establishment*, 611 F. Supp. at 162 (N.D.N.Y. 1985) (denying enforcement of choice of law provision due to insufficient connection with chosen state and because application would override policies of forum with materially greater interest in the controversy); *North American Bank, Ltd. v. Schulman*, 123 Misc. 2d 516, 521, (N.Y. Co. Ct. 1984) (denying choice of Israeli law due to insufficient connection to Israel and conflict with New York's law against usury).

Neither the Shareholders Agreement, nor the transactions contemplated therein, nor the parties to that agreement, have any connection whatsoever to New York. The documents and testimony instead show a clear nexus with Ukraine, which is the only other jurisdiction cited by the parties. The parties to the Shareholders Agreement are Ukrainian and Norwegian. The obligations set forth in the Shareholders Agreement are to be performed exclusively in Ukraine. Every aspect of the Shareholders Agreement relates to the operations of Kyivstar, a Ukrainian company, whose business engagements consist of activity in a highly regulated national market in Ukraine. Telenor Mobile's

22

chief negotiator and counsel were located in Ukraine at the time of the transaction. *See* Exhibit D at 30:23-31:7, 111:3-112-2. It is therefore indisputable that the state with the most substantial relationship to the parties and the transaction is Ukraine, and that therefore, Ukrainian law must apply to the question of Mr. Nilov's apparent authority.[6]

The *Tutelar* case supports an application of Ukrainian law as well, because it states that the issue of apparent authority is governed by the law where Telenor Mobile "relied upon" such authority. *See, e.g., Tutelar*, 1997 WL 403463, at *3 n.4. As shown above, that analysis compels the application of Ukrainian law because there is no evidence that any of the negotiations surrounding the 2004 transaction took place in New York. The only place where Telenor Mobile could have "relied upon" Mr. Nilov's apparent authority is Ukraine. Even Telenor Mobile's expert, Mr. Rabij, concedes that Telenor Mobile was relying on Mr. Nilov's apparent authority under Ukrainian law. *See* Exhibit Y at ¶ 30.

Ukrainian law does not recognize the concept of apparent authority except for Article 92(3) of the New Ukrainian Civil Code, which applies the concept of apparent authority only when a person has exceeded his or her legal authority, not when there is an allegation that the person lacked any authority whatsoever. *See* Exhibit H at ¶¶ 31-32. Even if, *arguendo*, Article 92(3) were apposite under these facts, it is inapplicable here

---

[6]       This choice-of-law analysis is, in fact, applicable to *all* aspects of this dispute. Even the case Telenor Mobile has cited repeatedly in support of its proposition that New York law applies to this dispute, *Indosuez v. National Reserve Bank*, actually supports the opposite result, stating, "New York choice of law principles require a court to apply the law of the state with the most significant relationship with the particular issue in the conflict." The court in *Indosuez* conducted this analysis even though the contract at issue had a New York/England choice of law clause. And while it's true that in *Indosuez* the court upheld the choice of law clause at issue, it did so not because it was inviolate but because New York had the most significant interest in the outcome of the litigation. *Indosuez* involved a series of payments to be made in New York dollars at a New York bank, and the court found that New York had a "paramount interest, as an international clearing house and market place for a plethora of international transaction s denominated in

because the Ukrainian New Civil Code (containing the new Article 2(3) came into effect only as of January 1, 2004.[7] Therefore, because Article 92(3), cannot apply to the facts of this case and the Ukrainian Civil Code contains no other provisions relating to the doctrine of apparent authority (*see* Exhibit H at 37), Telenor Mobile may not therefore assert that Mr. Nilov had apparent authority to enter into the Shareholders Agreement.

Moreover, even if the Ukrainian concept of apparent authority were relevant -- and indeed, even if New York law on apparent authority were applicable -- Telenor Mobile knew or should have known that there were limitations on Mr. Nilov's authority. *See e.g., FDIC v. Providence College*, 115 F.3d 136, 141 (2d Cir 1997) (stating that in the apparent authority context a duty of inquiry arises, *inter alia*, "where (1) the facts and circumstances are such as to put the third party on inquiry"). *See also, Tutelar*, 1997 WL 403463 at *4 (same). Telenor Mobile has acknowledged both in its submissions and in the testimony of its witnesses, that it received a copy of Storm's Charter well in advance of the parties' execution of the Shareholders Agreement. *See, e.g.*, Exhibit C at 11; Exhibit D at 91:11-96:13; 97:5-10. Telenor Mobile also knew, from the 2002 transactions, that approval conferred by a special meeting of Storm's shareholders was required for transactions involving the disposition of Kyivstar shares. Prof. Maydanyk has presented testimony (once again, unrebutted by Telenor Mobile) that even if Article 92(3) of the Ukrainian Civil Code 2004 were applicable, Telenor Mobile would not be able to rely on the principle of apparent authority, because it knew or should have known

---

United States dollars in ensuring orderly dollar currency transactions." *Indosuez v. National Reserve Bank*, 98 N.Y.2d 238, 244 (N.Y. 2002)

[7]     The Legal Opinion of Prof. Maydanyk presents unrebutted testimony that because the New Civil Code came into force in January 2004, *i.e.*, after the 2002 Written Polling, Telenor Mobile may not rely on its provisons. *See* Exhibit H at ¶¶ 35-38.

of the limitations on Mr. Nilov's authority. *See* Exhibit H at ¶¶ 33-34. Under the present circumstances, Telenor Mobile clearly had a duty to inquire since it had knowledge of the requirement of a special shareholders meeting. As a result, Telenor Mobile cannot show, as a matter of either New York or Ukrainian law, that Mr. Nilov had apparent authority.

> 1.    **Storm Is Not Estopped From Raising an *Ultra Vires* Defense and Has Not, Through Its Actions, Ratified the Shareholders Agreement**

Telenor Mobile has also maintained that Storm is estopped from denying Mr. Nilov's authority to bind Storm to the Shareholders Agreement through actions that allegedly ratified the Shareholders Agreement. A principal is estopped under New York law from denying an agent's authority if, among other things, the principal's intentional or negligent acts or omissions "created an appearance of authority in the agent" on which the third party "*reasonably* and *in good faith relied*" to its detriment. *See, e.g., Trs. of the Am. Fed'n. of Musicians and Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503, 508 (S.D.N.Y. 1999) (cited by Telenor Mobile) (emphasis added). Notwithstanding that, as noted above, New York law cannot be applied to the merits of this dispute, Telenor Mobile cannot be said to have reasonably relied on any alleged act or omission on Storm's part, because it was undeniably aware that Mr. Nilov had limitations on his authority to enter into the Shareholders Agreement.[8] There was no "appearance of authority" and any reliance that Telenor Mobile claims to have placed on

Mr. Nilov's authority could not have been reasonable. Accordingly, Telenor Mobile cannot rely on the doctrine of estoppel.

Telenor Mobile's ratification theory fails as well. Alfa did not learn of Mr. Nilov's lack of authority until 2005 and by that time it had begun to raise issues relating to Kyivstar's corporate governance. These challenges continued thereafter and included the April 2006 lawsuit brought by Alfa's subsidiary, Alpren, regarding Mr. Nilov's lack of authority. Without prejudice to that fact the New York law does not apply, the main case cited by Telenor Mobile, *36 Convent Ave. HDFC v. Fishman*, No. 03 Civ. 3998 (JGK), 2004 WL 1048213 (S.D.N.Y. May 7, 2004), states that ratification "only occurs where the principal has full knowledge of all material facts and takes some action to affirm the agent's actions." *Id.* at \*5 (quoting *Trs. of the Am. Fed'n.* 40 F. Supp. 2d at 511). Here, after Alfa learned the facts, there was no action to affirm Mr. Nilov's execution of the Shareholders Agreement. *36 Convent Avenue* also notes that the court may find there is ratification if the principal fails to timely repudiate after learning the material facts and the opposing party relies on the principal's silence. *See id.* That is not the case here because, as noted above, Alfa has been challenging the Kyivstar corporate governance provisions since 2005. *See* Exhibit L at ¶ 5; *See also* Exhibit A at ¶¶ 10-13.

---

[8]    Indeed, Telenor Mobile's reliance on *Steven Scott* is misplaced, because that case is highly distinguishable from the present facts. In that case, the court held that the relying party reasonably relied on the agent's apparent authority in part because it had not been mailed a copy of a trust agreement which described the agent's inability to enter into the relevant settlement agreement. Here, however, Telenor Mobile knew since 2002 that a Meeting of Participants was necessary for Mr. Nilov to sign the Shareholders Agreement, because it did in fact receive a copy of Storm's Charter, and had previously signed the Voting Agreement and knew of the requirement for a Meeting of Participants for that agreement.

### III. Telenor Mobile's Request for an Anti-suit Injunction Should Be Denied Because It Does Not Meet the Standards for an Anti-suit Injunction

The Second Circuit has emphasized that "principles of comity counsel that injunctions restraining foreign litigation be used sparingly and [should be] granted only with care and great restraint." *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 199 (2d Cir. 2004) (citations and internal quotations omitted). "That is because an anti-suit injunction, though directed at litigants, effectively restricts the jurisdiction of the court of a foreign sovereign." *Id.*; *see also Paramedics Electromedicina Comercial Ltda. v. GE Medical Systems Information Technologes*, 369 F.3d 645, 652 (2d Cir. 2004).

The Second Circuit, in *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987), has also warned that:

> Concurrent jurisdiction in two courts does not necessarily result in a conflict. When two sovereigns have concurrent *in personam* jurisdiction one court will ordinarily not interfere with or try to restrain proceedings before the other. Parallel proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as *res judicata* in the other. Since parallel proceedings are ordinarily tolerable, the initiation before a foreign court of a suit concerning the same parties and issues as a suit already pending in the United States does not, without more, justify enjoining a party from proceeding in a foreign forum.

*Id.* at 36. Here, as discussed below, the parties are not the same in the two proceedings, but the resolution of the issues in the Ukrainian action will lend further support to Storm's claim in the arbitration that the Shareholders Agreement is null and void in its entirety under Ukrainian law. Accordingly, the Court should allow the Ukrainian action to continue.

### A. Telenor Mobile Has Not Satisfied The Threshold Factors For The Issuance Of An Anti-Suit Injunction

27

In keeping with the restraint that must be exercised in issuing anti-suit injunction relating to foreign actions, the Second Circuit has set forth a multi-factor test consisting of two threshold factors followed by five other factors. "An anti-suit injunction against parallel litigation may be imposed only if: (A) the parties are the same in both matters; and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." *Paramedics*, 369 F.3d at 652 (citing *China Trade*, 837 F.2d at 37). Here, the "matter" referred to in the first prong is the arbitration. The arbitration proceeding is between Storm and Telenor Mobile. The parties in the action in Ukraine that Telenor Mobile seeks to enjoin involves Alpren and Storm, and it is focused on whether Mr. Klymenko has the right to act on behalf of Storm in light of the clear invalidity of the Shareholders Agreement under Ukrainian law. Thus, the two matters involve different parties. Even more starkly, with respect to the second prong of the *China Trade* standard, the resolution of the arbitration will not in any way dispose of the Ukrainian action. The Ukrainian courts have already determined several times that the Shareholders Agreement violates Ukrainian law and that the arbitral tribunal erred in its interpretation of the Ukrainian courts' orders. Nothing that the arbitral tribunal determines is going to change that.

It is telling that Telenor Mobile makes no effort to satisfy the second prong and provides no evidence or specific allegations in support of the first prong. Telenor Mobile nowhere discusses how the arbitration will resolve the issues in the Ukrainian action and, as demonstrated above, it cannot make that showing. With regard to the first prong, Telenor Mobile claims that the Alpren is "in privity" with Storm and then it alleges that Alpren and Storm have colluded in the Ukrainian litigation. *See* Telenor Mobile

28

Memorandum of Law in Support of Motion to Compel Arbitration and for and Anti-Suit Injunction (hereinafter, "Telenor Mobil Br." at 11-12.)  Telenor Mobile even goes so far as to assert that "Storm … arranged for its General Director [Mr. Klymenko] to be sued by its corporate parent [Alpren]."  *Id.* at 12.  Telenor Mobile provides no evidentiary support for this accusation and there is nothing in the record showing that anything of the sort took place.  Telenor Mobile's speculation that the Ukrainian action is "collusive" (*see id.* at 12) is no substitute for evidence that Alpren and Storm are "in privity" or are the same.  There is no dispute that Alpren and Storm, though affiliated, are separate legal entities and Telenor Mobile has not made any attempt to show that the corporate veil between the two should be pierced.[9]

Because Telenor Mobile has not satisfied the two-pronged threshold for anti-suit injunctions, the Court should deny the motion on that basis alone.

**B.    Telenor Mobile Has Not Satisfied The Remaining Five Factors For The Issuance Of An Anti-Suit Injunction**

Even assuming that Telenor Mobile has met the threshold factors, it still must satisfy the following five other factors set forth by the Second Circuit in *China Trade* for the issuance of an anti-suit injunction: (1) frustration of a policy in the enjoining forum; (2) the foreign action would be vexatious; (3) a threat to the issuing court's *in rem* or *quasi in rem* jurisdiction (4) the proceedings in the other forum prejudice other equitable considerations; or (5) adjudication of the same issues in separate actions would result in

---

[9]    Even assuming, arguendo, that the Alpren antisuit injunction could be described as a collusive litigation where both parties affirmatively desire the same result, the fact that Telenor Mobile is a relief defendant to that injunction means that there is a genuine adversary in the litigation.  "A case conceived in cooperation may be saved by intervention of a genuine adversary who represents the rights that might otherwise be adversely affected."  Wright, Miller & Cooper, 13 Federal Practice and Procedure: Jurisdiction 2d §3530 at 319.  Thus, the intervention of a third party will create a concrete controversy and allow the litigation to go forward.  *See Adams v. Morton*, 581 F.2d 1314, 1319 (9th Cir. 1978); *INS v. Chadha*, 103 S.Ct. 2764, 2774 n.6, 2778 (1983).

delay, inconvenience, expense, inconsistency, or a race to judgment. *China Trade,* 837 F.2d at 35. None of the *China Trade* factors, which are discussed below in relevant part, favors the issuance of an anti-suit injunction here.

Telenor Mobile contends that anti-suit injunction would protect the important federal policies regarding the enforcement of arbitration agreements. *See* Telenor Mobile Br. at 12. But in all the cases cited by Telenor Mobile, the existence and validity of the arbitration agreement was not in doubt. Indeed, in all but one of the cases, *SG Avipro Fin. Ltd. v. Cameroon Airlines*, No. 05 Civ. 655 (LTS)(DFE), 2005 WL 1353955 (S.D.N.Y. June 8, 2005), the existence and validity of the arbitration agreement was not even an issue. In *SG Avipro*, the court granted a motion to compel and issued an anti-suit injunction, but it did so only after there was evidence submitted allowing the court to rule — as a matter of law — that a valid contract existed. Here, there is no evidence allowing for the entry of an order finding that a valid contract existed under Ukrainian law; to the contrary, the Ukrainian courts have reached the opposite conclusion on several occasions. Thus, allowing the Ukrainian action to continue would not frustrate an important federal policy.

Moreover, enjoining the Ukrainian action would violate international comity and would interfere with the Ukrainian court's interest in the outcome of the action before it. As discussed above, the place with the greatest interest in the outcome of this litigation is Ukraine. The Shareholders Agreement binds a Ukrainian company (Storm) and a Norwegian company with respect to the operations of a second Ukrainian company (Kyivstar) in the highly regulated Ukrainian market for mobile telephony. The performance of the Shareholders Agreement was to be entirely in Ukraine, which was

also where that Agreement was negotiated and executed. Without a doubt the forum with the greatest interest in this dispute is Ukraine. The Shareholders Agreement, consisting in large part of rules relating to the corporate governance of a Ukrainian company, violates Ukrainian law and several of its provisions have been invalidated in a Ukrainian court order dated December 22, 2005 (which Telenor Mobile admits is a binding order). And the Shareholders Agreement, in its entirety, has been found to be null and void as matter of Ukrainian law. Although the Court has stated (or implied) that those decisions are not binding upon it, they are, at the very least, evidence of the Ukrainian law applicable to this dispute and the manner in which a Ukrainian court would apply that law. This Court should not, by enjoining the Ukrainian action, interfere with the Ukrainian courts' regulation of their internal matters.

Telenor Mobile also argues that Storm is using the Ukrainian courts as part of a "vexatious scheme" to avoid arbitration. First of all, Storm is not the party who brought the litigation in Ukraine and we have already shown that there is no evidence of collusion between Storm and the plaintiff in that case, Alpren. In addition, there is no effort by Storm here to sidestep arbitration. As Storm has informed the Court and the arbitration tribunal, it is faced with a dilemma. The Ukrainian courts have already found that the Shareholders Agreement, including the arbitration clause, is null and void, but Telenor Mobile is seeking a determination by the arbitration tribunal on the very same issue. In fact, the arbitration tribunal still has not ruled on whether or not it will dismiss the arbitration on the basis of the Ukrainian courts' decisions regarding the validity of the Shareholders Agreement and the arbitration clause. It was Storm's position, even prior to the December 1, 2006 ruling from another Ukrainian court, that the arbitration tribunal

31

has to rule on the jurisdictional issue now and follow the Ukrainian courts' decisions. In the absence of such a ruling, Storm is concerned (and Ukrainian authority supports this view) that any ruling from the arbitration tribunal, including a ruling in Storm's favor, would be unenforceable under Ukrainian law. It is not that Storm does not want a decision on the merits from the arbitration tribunal; it is that such a decision cannot be validly issued in light of the Ukrainian courts' decisions. The December 1, 2006 ruling simply reinforces Storm's view.

The easiest resolution to these issues is one that Telenor Mobile steadfastly ignores. It should go to the Ukrainian courts and obtain a ruling on any matters where it feels it has been aggrieved. If Telenor Mobile were able to obtain a ruling from those courts allowing the arbitration to proceed, Storm would look forward to a hearing on the merits before the arbitration tribunal. But Telenor Mobile has refused to take that obvious step and, having done so, it cannot seek to use this Court's equitable powers to overturn decisions that Telenor Mobile should be addressing in the Ukrainian courts.

Finally, the parallel adjudication of the Ukrainian action would not lead to the inconsistent results, confusion or delay that Telenor Mobile alleges. The Ukrainian courts have already ruled on the issue of whether the Shareholders Agreement and arbitration clause are valid under Ukrainian law. The arbitration tribunal has no basis to reach another result, even if it finds that the Ukrainian decisions are not binding on it under applicable New York law. At a minimum (and there is no dispute about this), the Ukrainian court decisions accurately sets forth the Ukrainian law on whether or not Mr. Nilov had authority to enter into the Shareholders Agreement. Telenor Mobile did not intervene to challenge that finding, as it had the right to do, nor did seek to put additional

information before the Ukrainian courts, as it has done in other matters in Ukraine. There is no reason to think that the arbitration tribunal will do anything other than follow the decisions of the Ukrainian courts on this issue. In fact, the arbitration tribunal expressly stated that it found no fault with the Ukrainian court procedures and, in the October 22 Award, it did not contradict the Ukrainian courts' findings (even thought Telenor Mobile vociferously argued that it should).

In sum, a consideration of the *China Trade* additional five factors compel the conclusion that the Court should deny Telenor Mobile's request for an anti-suit injunction.

## CONCLUSION

For the foregoing reasons, Storm respectfully requests that this Court deny in its entirety Telenor Mobile's request for an order compelling arbitration and for an anti-suit injunction.

LOVELLS

By: _Pieter Van Tol_

Pieter Van Tol (PVT-2455)
Gonzalo S. Zeballos (GZ-5994)

590 Madison Avenue
New York, New York 10022
Telephone: (212) 909-0600
Facsimile: (212) 909-0660

Attorneys for Respondent

33