Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue, New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

**STORM LLC,**

                       Plaintiff,

            -against-

**TELENOR MOBILE COMMUNICATIONS AS,**

                       Defendant.

-------------------------------------------------------------------- X   06 CV13157 (GEL) (DF)

**TELENOR MOBILE COMMUNICATIONS AS,**

                       Counterclaimant,

            - against-                          **DECLARATION OF**
                                                    **ROBERT L. SILLS**

**STORM LLC,**

                       Counterclaim-Defendant,

            - and-

**ALTIMO HOLDINGS & INVESTMENTS LIMITED and**
**ALPREN LIMITED,**

                       Relief Defendants.

-------------------------------------------------------------------- X

     **ROBERT L. SILLS** declares the following to be true:

             1.      I am a member of the bar of this Court and of the firm of Orrick,

Herrington & Sutcliffe LLP, attorneys for Counterclaimant Telenor Mobile

Communications AS ("Telenor Mobile" or "Counterclaimant").  I make this declaration pursuant to 28 U.S.C. § 1746 in support of Telenor Mobile's motion for an anti-suit injunction.

2.     Attached hereto as Exhibit A are copies of the "screen shots" of the Abacus Limited website.

3.     Attached hereto as Exhibit B are copies of the "screen shots" of the Altimo website.

4.     Attached hereto as Exhibit C is a copy of an article from Cellular News entitled "Telenor Rejects Storm's Offer of Equal Kyivstar Board Votes," dated December 12, 2006.

5.     Attached hereto as Exhibit D is a copy of Storm's Amended and Restated Charter dated February 20, 2006 in English.

6.     Attached hereto as Exhibit E is a copy of an article from CNews.ru's Telecom Business, entitled "Altimo Vice-President Told to Stay Away from US Court," dated December 12, 2006, in English and Russian.

7.     Attached hereto as Exhibit F is a certified English translation of the December 1, 2006 decree of the judge of Golosiyivsky District Court of the City of Kyiv Goshko O.M. in the Alpren litigation.

8.     Attached hereto as Exhibit G is a certified English translation of the November 8, 2006 clarification of the Kyiv Commercial Court of Appeals in the Alpren litigation.

9.     Attached hereto as Exhibit H is a certified English translation of the May 25, 2006 ruling of the Kyiv Commercial Court of Appeals in the Alpren

litigation.

        10.    Attached hereto as Exhibit I is a certified English translation of the April 25, 2006 decision of the Kyiv City Commercial Court in the Alpren litigation.

        11.    Attached hereto as Exhibit J is a copy of an Altimo press release dated October 3, 2006.

        I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 14, 2006 at New York, New York.

Robert L. Sills



## Abacus

> In the last 30 years, Cyprus has developed into a reputable international business and financial centre.

Businesses from all over the world have taken advantage of the unique infrastructure and the very favourable tax regime that the island offers and have either set up operations here or have included Cyprus entities in their international group structures.

**Abacus** is a professional firm that provides company administration and other related services to international businesses operating out of Cyprus.

Nicosia
March 2004



Abacus Limited© 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd



# Cyprus

Cyprus is the third largest island of the Mediterranean Sea with an area of 9 250 sq km. climate is warm with about 340 sunny days a year and a light rainy season between November and March. The population is estimated at 700000 and the capital is Nicosia.

The official language is Greek but English is widely spoken.
The country is served by two international airports, the main one in Larnaka and the se in Pafos. About 3 million tourists visit Cyprus every year.

Cyprus enjoys a low crime environment and a European standard of living with per capi income at around US$15.000. The legal system has been structured essentially on Engli law with recent amendments to incorporate European Union directives.

Despite its small size, Cyprus has developed into an important international financial ce due to its geographic location at the crossroads of Europe, Africa and Asia, an extensive network of double tax treaties with more than 30 countries and advantageous tax incentives.

On 1 May 2004, Cyprus is joining the European Union as a full member,
a development which is expected to give a further boost to the economy.

The new tax law of 2002, introduced to align Cyprus with European Union directives, abolished all distinctions between international and local companies
as from 1 January 2003 whilst maintaining a favourable tax regime for the
international investor through the following main provisions:

❯ Corporate profits taxed at 10%

❯ Investment income from dividends and profit on sale of securities is exempt from tax

❯ Repatriation of profits from Cyprus companies to non-residents is free from any withholding tax

❯ No time restriction on carrying forward of tax losses

❯ Group relief provisions

Cyprus offers a unique combination of socio-economic and tax planning advantages to t international investor looking for a cost effective, stable and credible base for structurin his investments

 | Abacus Limited© 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd

**History...**

# Establishment of Abacus in Cyprus

The introduction of auditor independence regulations by the Securities and Exchange Commission in the USA early in 2001, affecting audit firms with clients listed or seeking listing on US Stock Exchanges, made it no longer possible for audit firms to provide such clients with certain non-audit services that might be considered as compromising the auditor's independence.

The services that became prohibited mainly included accounting, corporate administration payroll and work of a fiduciary nature such as provision of corporate officers and trust services.

These changes had a significant impact on PricewaterhouseCoopers Cyprus (PwC), the biggest audit firm on the island and the leader in the provision of fiduciary and corporate administration services to International Business Companies registered in Cyprus. The f along with all other audit firms, was required to comply with the new independence rule terminating all prohibited work for clients falling under the new regulations.

In the best interests of clients, on 31 March 2001, three partners retired from PwC Cypr and set up Abacus as an independent organisation, for the purpose of providing to the companies affected all the non-audit services that could no longer be provided by PwC. the same time, 22 staff from the International Business Department of PwC joined Abac thus ensuring the uninterrupted provision of high quality services.

The growth of Abacus has been substantial and in July 2003 the decision was taken to c an office in Limassol, to compliment the main office which is based in Nicosia. Another partner from PwC was invited to join Abacus and head the Limassol office whilst on 1 January 2004, a Senior Manager became the fifth partner of the firm.

Abacus currently employs about 50 people and its client portfolio includes over 750 international companies and trusts. As trustees, bank signatories and directors of client companies, Abacus has responsibility for over US$25 billion worth of assets on behalf of clients from Western, Central and Eastern Europe and North America and it is one of the leading accountancy and corporate administration service providers in Cyprus.

The operations of Abacus are carried out through Abacus Limited and a number of fully owned subsidiaries.

 | Abacus Limited© 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd



Company formation, in Cyprus and other locations

Corporate administration, including invoicing, opening and maintenance of bank accounts with local and international banks, handling of correspondence with third parties and local regulatory authorities

Bookkeeping and maintenance of corporate records, including monthly bank reconciliations and preparation of annual statutory financial statements in accordance w International Accounting Standards

Management reporting

Corporate secretarial work, including maintenance of statutory registers, preparation board and shareholders' meetings, maintenance of all minutes and generally compliance with statutory requirements

Payroll

Registration of ships and administration of shipping companies

Provision of nominee shareholders

Provision of directors and company secretary

Registered office, mail forwarding, telephone, fax, e-mail facilities

Provision of archive storage facilities

Provision of conference room facilities

Trust formation and trustee services

Abacus does not provide audit, tax advisory or legal services.

Our fees for services rendered are charged on a time basis and our hourly rates are very competitive compared to similar organisations in Cyprus, Western Europe or Eastern Europe.

| Abacus Limited© 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd



# Our Work approach

Abacus applies strict criteria for accepting new clients. As part of our client acceptance procedure, all new clients need to submit to us two references from an internationally recognised bank and a professional accounting, law or consulting firm. The credibility and legitimacy of the client's proposed business will also need to be established.

Once a client is accepted, Abacus and the client enter into an engagement agreement whereby the terms of engagement, the services to be provided and the authorisation procedures to be followed are clearly set out.

Our work approach revolves around three key themes which form the basis of our firm's culture and staff training:

### Quality
We apply the highest professional standards to all aspects of our work. We employ and train people with the necessary academic and professional background as well as credibility of character to achieve the high standards of performance set. We appoint and specialise dedicated teams to handle the affairs of each client to ensure familiarity, continuity and promptness of service at all times.

### Reliability
We apply an extremely strict system of internal controls covering all partners and staff to ensure absolute protection and security of all assets entrusted to us by our clients. All actions regarding a client's business or assets are taken only in accordance with the authorisation procedures agreed in advance between Abacus and the client. No single person within the firm has power to take any unauthorised action and all work is supervised directly by the Abacus partners at all times. The operation of clients' bank accounts is done through a sophisticated test key code procedure.

### Confidentiality
All information in our possession regarding a client and its business is treated as absolutely confidential and under no circumstances is released to any third party unless so instructed by the client or through court order.

Overall, our business objective is to serve the best interests of our clients and to add value to their business by contributing actively to their growth, success and credibility.

 Abacus Limited© 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd



## Our clients

Our clients are predominantly corporate groups originating in Western and Eastern Europe and North America, whose shares are listed or potentially targeting a listing in a US or European Stock Exchange. They are a mixture of public and privately owned groups of companies covering all industry sectors but mainly financial services, energy and manufacturing.

The main rationale for our clients using Cyprus as a base for their investments is to benefit from the advantageous tax provisions and the extensive network of double tax treaties between Cyprus and about 30 other countries. Cyprus is particularly attractive as a base for inward investments into Central and Eastern Europe and the Russian Federation and several of our clients use it for this purpose.

As part of our full range services to our corporate client groups we normally set up and administer not just Cyprus-based companies but other companies belonging to our client located in various tax planning jurisdictions such as the BVI and the Caymans.

Our client portfolio also includes international trusts set up and administered for high net worth individuals as well as international shipping companies using our specialised service in this sector.



Abacus Limited© 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd

> partners
> personnel

# Partners





### Nicos Nicolaides, Managing Partner

Studied Economics at the London School of Economics and Political Science and qualified as Chartered Accountant with Coopers & Lybrand in the UK in 1978.
Joined the Management Consulting Services department of Coopers & Lybrand Cyprus in 19: where he became partner in July 1984. Until April 2001, when he moved to Abacus, he was Senior Partner in charge of the Management Consulting Services department of PricewaterhouseCoopers.He holds various appointments in business organisations in Cyprus and has served on the Board of the Cyprus Securities and Exchange Commission.

### Costas Hadjicosti, Partner

After obtaining a Business Studies degree from the Middlesex University, in London, he qual as a Chartered Accountant in 1982. In 1986 he returned to Cyprus where he joined Coopers Lybrand and was appointed an audit partner in 1990.
He subsequently moved to the International Business Services Division of PricewaterhouseCoopers, being in charge of a portfolio of international clients until 30 June 2003, when he joined Abacus to head the Limassol office.



### George Trachonitis, Partner

A London School of Economics and Political Science graduate with a degree in Accounting ar Finance. He qualified as a Chartered Accountant with KPMG in the UK in 1985. Joined the Au department of Coopers & Lybrand Cyprus in 1985 and moved to the International Business Services department in 1993 where he became partner in 1994. He was in charge of a portf of international clients until moving to Abacus in April 2001.



### Michael Georghiou, Partner

Holder of an Economics and Accounting degree from Leeds University and a qualified Charte Accountant since 1991 after training with Ernst & Young in the UK. Joined the Management Consulting Services department of Coopers & Lybrand Cyprus in 1992, moved to the Audit department in 1994 and then to the International Business Services department in 1996 wh he became partner in 1998. He was in charge of a portfolio of international clients until mov to Abacus in April 2001.



### Petros Demetriou, Partner

A graduate of the University of New South Wales, Sydney, Australia with a degree of Bachel of Commerce with major in Business, Finance and Systems. Qualified in 1989 as member of CPA Australia. In 1998 he joined the International Business Services Division of PricewaterhouseCoopers Cyprus, handling as senior manager a portfolio of international clie until moving to Abacus in April 2001. He was appointed a partner in January 2004.

| Abacus Limited© 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd

## Senior Personnel

**Pambos Michaelides**, Principal Manager
Head of Trust & Shipping Company Services

Studied Accounting and Business Studies at Hammersmith & West London College and quali
as a Chartered Accountant in 1983 with Saunders & Co in the UK. In 1985 he joined the
International Business Services department of Coopers & Lybrand Cyprus where he became
principal manager specialising in the formation and administration of Cyprus international tr
until April 2001 when he moved to Abacus as head of the Trust & Shipping Company Servic

**Akis Koupepides**, Principal Manager
Head of Fiduciary Services

After studying accounting in London, he returned to Cyprus in 1980 where he joined the au
department of Coopers & Lybrand, rising though the ranks to the position of Principal Mana
In 1994, he joined a major retail organisation as its Financial Controller and in 2004 was
recruited by Abacus to head the firm's Fiduciary Services department.

**Stella Raouna**, Senior Manager
Company Administration Services

Graduated from the Economics University in Athens
with a degree in Business Administration. In 1983 joined the accountancy firm of Moore
Stephens International in Greece until 1990 when she joined the International Business
Services department of Coopers & Lybrand Nicosia, handling international clients and rising
the position of senior manager in 2000. She moved to Abacus in April 2001.

**Sophia Ioannou**, Manager
Head of Corporate Secretarial Services

Joined the Corporate Secretarial Services department of Coopers
& Lybrand Nicosia in 1986 where she specialised in the formation of companies and provisio
corporate secretarial services to International Business Companies until she moved to Abac
April 2001 as head of the Corporate Secretarial Services department of this firm.

 | Abacus Limited© 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd



# Our contact details

Our partners will be happy to provide additional information or to discuss relevant busin
opportunities.

You may contact any of the following partners
in Nicosia:

◼ Nicos Nicolaides

◼ George Trachonitis

◼ Michael Georghiou

◼ Petros Demetriou

The contact details of the **Nicosia** office are:

Abacus Limited
Elenion Building
5 Themistocles Dervis Street, 2nd Floor
CY-1066 Nicosia
P.O.Box 25549
CY-1310 Nicosia, Cyprus

Telephone:+357-22555800
Facsimile: .+357-22555801
e-mail: abacus@abacus.com.cy

The contact details of the **Limassol** office are:

◼ Costas Hadjicosti, Partner

Nora Court, 1st Floor
Flat 101
86 Athinon Street
CY-3040 Limassol
P O Box 56183
CY-3305 Limassol, Cyprus

From July 2004 the Limassol office will move to:
City House, 3rd Floor
6 Karaiskakis street
CY-3032 Limassol
P O Box 56183
CY-3305 Limassol, Cyprus

Telephone:+357-25555800
Facsimile: .+357-25555801

www.abacus.com.cy



| Abacus Limited © 2004. All Rights reserved

Designed by: Philos Business Solutions (Cyprus) Ltd





About ALTIMO

Media Centre

Altimo's Talent

Our Assets

# Unparalleled expertise and experience

ABOUT ALTIMO

\ About ALTIMO

About Altimo

Altimo was created in 2005 from Alfa Telecom, which itself was established in 2004 to hold the telecoms investments of the Alfa Group Consortium. Those assets are in Russia , the CIS and other promising emerging markets.

Alfa Group was founded in 1989. It is one of Russia 's largest and most respected privately-owned business groups which, as well as telecommunications has interests in oil production, financial services and retail. Alfa Group's joint venture with BP to create a major Russian, vertically integrated oil company, TNK-BP, reflects this leading position.

The companies in which Altimo is invested have a footprint which covers a total population of 334 million people and have over 120 million subscribers.

Growth levels in the Russian telecommunications market are impressive, increasing by over 50% in recent years. Similar growth levels are predicted for the CIS and other Eurasian emerging markets.

Altimo already has a proven track record of enhancing the performance of the companies in which it invests, reflected in the performance of Vimplecom which has risen by eight times in value since the company first made its investment in 2001.

Altimo is an example of the emergence of Russia 's "new multinationals": more western-focused, open and transparent, with sound corporate governance and effective corporate management. Little wonder then, that VimpelCom, was the first Russian company to be listed on the New York Stock Exchange.

Vision & Mission

From the CEO

Altimo Brand

Subscribe and receive our news releases directly to your mailbox

11 Savvinskaya nab., Moscow 119435, Russia. Tel. +7 495 981 4488 E-mail: info@altimo.ru

Alfa Group

© 2006 ALTIMO. All rights reserved.





■ Русский     ✛ Site map     ☎ Contact Us     [Enter a Search Te]

About ALTIMO

Media Centre

Altimo's Talent

Our Assets

# Leading telecoms investment

INVESTOR RELATIONS

\          \          \ Our Major Assets

Our Major Assets

**Our Major Assets**

⌐ Subscribe and receive our news releases directly to your mailbox

The market capitalisation of Altimo's assets exceed $8 bn. This includes significant holdings in Russia 's leading mobile operators VimpelCom and MegaFon, together with stakes in Kyivstar, the largest Ukrainian operator, and Turkcell, the Turkish leading mobile company. Our operators have a total of over 100 million subscribers in Russia, the CIS, and Turkey.



Founded in 1992, VimpelCom is one of the largest wireless telecommunications service companies in Russia . It operates under the "Beeline" family of brand names, which are among the most recognised brands in Russia . In 1996, VimpelCom became the first Russian company to be listed on the NYSE. The company is now aggressively expanding into other promising emerging markets; it is a leading mobile operator in Kazakhstan, Tadjikistan, Uzbekistan and Ukraine. Currently, VimpelCom serves over 45 million subscribers.

Altimo owns 32.9% of VimpelCom/Beeline.



MegaFon is the third largest provider of wireless telecommunications services in Russia with nearly 18 million subscribers and 18% of market share in Russia. Its license portfolio covers 145 million people, or 100% of the population of Russia.

Altimo owns 25.1% of Megafon.



Kyivstar is the leading provider of wireless telecommunications services in Ukraine with over 10 million subscribers. The company is also licensed to operate city, long-distance, and international phone networks. Additionally, Kyivstar holds licenses to build and maintain its own fixed-line networks and to organise data transmission networks.

Altimo owns 43.5% of Kyivstar.



Founded in 1989, Golden Telecom is the leading fixed-line provider of integrated telecommunications and Internet services to businesses and other high-usage customers and telecommunications operators in major population centres throughout Russia and other countries of the CIS. The company is listed on NASDAQ.

Altimo owns 29.9% of Golden Telecom.

## TURKCELL

Turkcell introduced mobile communication in Turkey with its GSM services in 1994. Now it is the leading GSM operator in Turkey with over 27 million customers and a 65% market share. The company also owns assets in Ukraine. Turkcell is the first Turkish company to be listed on the New York Stock Exchange (NYSE) where its shares have been traded since July 11, 2000 along with trading on the Istanbul Stock Exchange (IMKB).

Altimo owns 13,22% of Turkcell

Sky Mobile is № 1 GSM operator in Kyrgyzstan andwhich has GSM licence allover the country. Nearly 900.000 customers enjoys quality connection provided by Sky Mobile. The operator is a member of international GSM Association.

11 Savvinskaya nab., Moscow 119435, Russia. Tel. +7 495 981 4488 E-mail: info@altimo.ru

Alfa Group                    © 2006 ALTIMO. All rights reserved.



## Telenor rejects Storm's offer of equal Kyivstar board votes

MOSCOW, Dec 5 (Prime-Tass) -- Norwegian telecommunications company Telenor has rejected a proposal by Storm, a subsidiary of Russia's Altimo, that would have given each company three seats on the board of directors of Ukraine's largest mobile operator Kyivstar, the Norwegian company said in a press release Tuesday.

Altimo's proposal would have amended the company's charter to give each company equal seats on the board while reserving three seats for independent directors.

Currently Telenor has five representatives on the board, while Storm has four representatives.

Telenor holds a 56.5% stake in Kyivstar, while Storm controls the remaining 43.5% stake.

Telenor said that Storm's proposal did not comply with Ukraine's laws and was targeted at impeding Telenor's reestablishment of corporate governance in Kyivstar.

Earlier Telenor came up with its own proposal to change Kyivstar's charter that would have left the board's current composition intact.

Storm has waged a legal battle for over a year to get parity with Telenor on Kyivstar's board. Storm had been also unhappy with the appointment of Kyivstar's president, who was nominated by Telenor.

In October, Ukraine's Supreme Court ruled that Kyivstar should amend its charter by changing procedures for the appointment and election of the company's general director and board of directors.

End

*Posted on 05-12-2006*

Read this article on the web at: www.cellular-news.com/story/20790.php

All rights reserved.
Reproduction of this website, in whole or in part, in any form or medium without express written permission from cellular-news is prohibited.

APPROVED
By Meeting of the Equity Holders
Minutes dated February 15, 2006

*[seals of the state registering bodies]*
*[date of state registration – 17.02.2006]*

**COPY**

# CHARTER

## OF THE LIMITED LIABILITY COMPANY

## "STORM"

USREOU Code – 23163325

(new edition)

*[state tax inspection of Ukraine in Solomyanskyi district of Kyiv; department of taxpayers registration, 20.02.2006}*

Kyiv - 2006

*[TRUE COPY]*

*2*

Limited Liability Company "STORM" ("Company") incorporated under the laws of Ukraine in effect and the Foundational Agreement of the Company dated April 20, 1995.

The Company is registered on June 23, 1995 in the State Administration of Solomyanskyi District in Kyiv under number 10731200000000003.

## ARTICLE 1
## DEFINITIONS

"**Affiliated person**" – is a Person that directly or indirectly through one or more intermediaries controls, is controlled or is jointly controlled together with another person (for the purposes of this Charter, "control" shall mean authority to influence or assure influence on management and policies by means of owning securities that entitle to vote, through the contract or by any other means). "**Person**" shall mean any natural person, corporation, company, limited liability company, association, joint-stock venture, trust or the trustee, incorporated association or joint venture, court or state body, or any agency or its division or any other legal entity. "**Statutory Fund**" shall mean the statutory fund of the Company as determined in Section 7.1 of this Charter. "**Company**" shall mean Limited Liability Company "STORM". "**Equity Holders**" shall mean as determined in Section 4.1 of this Charter. Other terms used in this Statute, including "**Meeting of the Equity Holders**", "**General Meeting**", "**Extraordinary Meeting**", "**Director General**", "**Board of Auditors**", "**Annual Reports**", "**Reserve Fund**", "**Agenda**", "**Creditor Report**" and "**Liquidation Commission**" are used in the same meaning as determined by the legislation of Ukraine, unless the opposite meaning is specifically introduced or the context suggests to the opposite.

## ARTICLE 2
## NAME OF THE COMPANY AND ITS SEAT

2.1.    Name of the Company. The Company shall have the following name:

2.1.1.  In Ukrainian:

full name: Товариство з обмеженою відповідальністю "СТОРМ";
reduced name: ТОВ "СТОРМ".

2.1.2.  In English:

full name: Limited Liability Company "STORM";
reduced name: LLC "Storm".

2.2.    Seat of the Company. Seat of the Company shall be:

Ukraine, Kyiv, 1 Narodnogo Opolchennya Street.

## ARTICLE 3
## TERM AND LEGAL STATUS OF THE COMPANY

3.1.    Term of Existence. The Company has an indefinite term of existence and shall be considered to exist until liquidated as laid down in this Charter.

3.2.    Legal Status. The Company is a legal entity in the form of a limited liability company, incorporated under the laws of Ukraine.

*[TRUE COPY]*

3.3.     Enterprise with foreign investments. The Company is an enterprise with foreign investments. The Company may establish local and foreign subsidiaries, affiliated persons and divisions, participate in commercial relations, as well as may use rights and privileges, provided for enterprises with foreign investments by the laws of Ukraine.

3.4.     Limitation of liability. The Company shall be liable before its creditors by all of its property and assets. However, liability of the Equity Holders of the Company shall be limited to the value of their contributions into the Statutory Fund, as provided for in Section 7.3 of this Charter. The Equity Holders of the Company shall not be liable for the debts and obligations of the Company.

## ARTICLE 4
## THE EQUITY HOLDERS OF THE COMPANY

The Equity Holders of the Company shall be:

"**Alpren Limited**", legal entity incorporated under the laws of Cyprus, having its registered number 143441 and registered office at: Themistocles Dervis Street, 3 Julia House, 1st floor, P.C. 1066, Nicosia, Cyprus ("**Alpren Limited**"), and

"**Hardlake Limited**", legal entity incorporated under the laws of Cyprus, having its registered number 163009 and registered office at: 5 Themistocles Dervis Street, Elenion Building, 2nd Floor, CY- 1066, Nicosia, Cyprus ("**Hardlake Limited**"),

Referred to separately as "the Equity Holder" and collectively as "the Equity Holders".

## ARTICLE 5
## PURPOSE OF THE COMPANY

The purpose of the Company is gainful commercial activity as set forth in this Charter. The Company's commercial activity shall mean ownership of shares of the Closed Joint Stock Company "Kyivstar G.S.M.", USREOU code 21673832, registered by the State Administration of Zaliznychny District in Kyiv on September 3, 1997, under registered № 5959, or its legal successor (hereinafter – "Kyivstar"), and all the rights and obligations connected with ownership of the mentioned shares. All the shares that were issued by Kyivstar and are in possession of the Company on the date of this Charter or at any other time in the future shall be hereinafter referred to as "Kyivstar Shares"

## ARTICLE 6
## SUBSTANCE OF THE COMPANY'S ACTIVITY

The primary substance of the Company's activity is possession of Kyivstar Shares, as well as exercise of any and all rights and obligations connected to possession of Kyivstar Shares. The Company shall not be engaged in any other type of commercial activity unless the Meeting of the Equity Holders decides to the contrary.

## ARTICLE 7
## STATUTORY FUND OF THE COMPANY

7.1.     Statutory Fund. The Statutory Fund of the Company (hereinafter "**Statutory Fund**") shall amount to 349,923,179.58 hryvnas (three hundred and forty nine million nine hundred and twenty three thousand one hundred and seventy nine hryvnas, fifty eight kopiykas).

*[TRUE COPY]*

4

7.2. _Formation._ The Statutory Fund is formed with monetary and/or property contributions of the Equity Holders.

7.3. _Shares and contributions of the Equity Holders._

7.3.1. Share of Alpren Limited in the Statutory Fund of the Company amounts to 49,9 %.

Contribution of Alpren Limited to the Statutory Fund of the Company amounts to 174,611,666.61 hryvnas (one hundred and seventy four million six hundred and eleven thousand six hundred and sixty six hryvnas, sixty one kopiykas), which equals to 34,209,133.71 US Dollars (thirty four million two hundred and nine thousand one hundred and thirty three US dollars, seventy one cents).

7.3.2. Share of Hardlake Limited in the Statutory Fund of the Company amounts to 51.1%.

Contribution of Hardlake Limited to the Statutory Fund of the Company amounts to 175,311,512.97 hryvnas (one hundred and seventy five million three hundred and eleven thousand five hundred and twelve hryvnas, ninety seven kopiykas), which equals to 34,346,244.25 UD Dollars (thirty four million three hundred and forty six thousand two hundred and forty four US dollars, twenty five cents).

7.4. _Certification of complete contribution for share in the Company._ Following timely and complete contribution of the share into the Statutory Fund, each Equity Holder receives a certificate of the Company certifying that the respective Equity Holder has made complete contribution in exchange for its respective share in the Company.

7.5. _Amendments to the Statutory Fund._ The General Meeting of the Equity Holders may decide to increase or decrease the Statutory Fund of the Company through introduction of amendments and addenda into the Foundational Agreement and the Charter of the Company according to requirements of the laws of Ukraine in effect as well as of registration of such amendments and addenda with the respective public authorities.

7.6. _Priority right to purchase; decrease share._ If the Statutory Fund of the Company is increased, each Equity Holder has a priority right to purchase additional share, which is proportional to the share of property of such Equity Holder at the moment when the Statutory Fund is increased. If any of the Equity Holders decided not to purchase additional share of property in maximum amount, to which it is entitled by such priority right, all the other Equity Holders, which decided to purchase, are entitled to purchase such additional share, which is proportional to their shares of property at the moment when the Statutory Fund is increased. Such decision may be taken prior to the moment when the entire additional share, in the amount of which the Statutory Fund is increased, is purchased by one or several Equity Holders, or prior to the moment when neither of the Equity Holders decides to purchase any additional share. If the Equity Holder is unable to duly purchase or pay for the additional share of property, which is proportional to its share and to which it is entitled by virtue of increase of the Statutory Fund, the share of property of such Equity Holder in the Statutory Fund shall be subject to respective decrease.

7.7. _Notice about payment of dividends._ During reasonable period of time following the end of each financial year of the Company, the General Meeting of the Equity Holders shall be obliged to approve the yearly report (including verified financial reports) for the respective financial year as well as to consider payment of dividends to the Equity Holders in proportion to their respective shares in the Statutory Fund of the Company.

_[TRUE COPY]_

5

# ARTICLE 8
## CONCESSION OF THE SHARE (ITS PORTION) IN THE STATUTORY FUND OF THE COMPANY

8.1.    _Agreement to concession of share (its portion)._ Except for (a) transfer of share of property by virtue of the Equity Holder's exercise of its Priority right to refuse under Section 8.2 of this Charter or (b) Privileged Transfer (this term is defined in Section 8.2 below), the Equity Holder of the Company may not sell, transfer, concede or otherwise alienate either entire or any portion of its share in the Company to another Equity Holder of the Company or third persons without clear written agreement to this of all the other Equity Holders.

8.2.    _Right to first refusal._ Within the limits of the Ukrainian legislation, each Equity Holder is free to sell or otherwise transfer either entire, or portion of its share according to this Section 8.1 and Rights to first refusal of other Equity Holders pursuant to Section 8.2.

If an Equity Holder (hereinafter "Offeror") wishes to sell, transfer, concede or otherwise alienate either portion or its entire share of property in the Company to any Person, including another Equity Holder (hereinafter referred "the Offer Addressee") by any means other than the Privileged Transfer (this term is defined below), the Offeror prior to concluding the binding contract with the Offer Addressee, shall offer its share to other Equity Holders (Equity Holders Non Offerors) by means of timely written notice (Transfer Notice) about his wish to transfer such share. This Transfer Notice shall contain information about the offered amount of the share of property to be transferred (Offered Share), offered sale price and other substantial terms and conditions of transfer; if any conditions connected with determination of certain time limits are not regarded substantial for the Equity Holder Non Offerors, and Section 8.2 is applied to the time limits.

Every Transfer Notice shall be an irrevocable proposal of the Offeror about the sale of the entire Offered Share to any or all Equity Holders Non Offerors with price and on conditions mentioned in the Transfer Notice. Equity Holders Non Offerors shall have the right and a well-founded ability to analyze (i) the grounds for the offered price and other substantial conditions of the offered transfer, and (ii) confirmation of the honesty of this offer from the Offer Addressee or contract with it. Each of the Equity Holders Non Offerors shall have the Priority right to purchase the Offered Share for the price and on the conditions as set forth in the Transfer Notice (Right of First Refusal).

An Equity Holder Non Offeror shall exercise its Right of first refusal for purchase of the entire Offered Share by means of giving a written notice to the Offeror on acceptance of the offer mentioned in the Transfer Notice (Acceptance Notice) within 60 (sixty) days after the receipt of the Transfer Notice by the Equity Holder Non Offeror (Term of Right Exercise). Transfer Notice and Acceptance Notice, together with the provisions of this Section 8.2, shall constitute a single and a binding contract on purchase of the Offered Share, and the Offeror shall sell to such an Equity Holder Non Offeror that sends the Acceptance Notice (Acceptor Equity Holder), and the Acceptor Equity Holder(s) shall purchase from the Offeror the entire Offered Share for the mentioned price and on the mentioned conditions within 90 (ninety) days after the date of the Acceptance Notice. If any part of the purchase price mentioned in the Transfer Notice is expressed in the non-monetary form, the Accepting Equity Holder(s) shall be entitled to pay in the monetary form a fair market price for the part of the share, expressed in the non-monetary form, if agreed by the parties, or, failing such agreement, as determined by an internationally recognized investment bank choseb by the Accepting Equity Holder(s).

Closing of the contract shall take place as determined by the Accepting Equity Holder(s), or, if it is not determined, in the office of the Company no later than 10 (ten) days after registration of the share to the name of the Accepting Equity Holder(s). Full purchase price shall be paid in the monetary form by means of the bank transfer of immediately available funds, and such payment

_[TRUE COPY]_

shall be made against transfer of the certified copies of the amendments and addenda to this Charter and the Foundational Agreement, reflecting transfer of the share of property, free from any encumbrances, to the Accepting Equity Holder.

6

The Equity Holders shall take all measures necessary to the transfer of the share of property to the Accepting Equity Holder in accordance with the provisions of this Section 8.2, including, *inter alia*, participation in the Meeting of the Equity Holders and due approval of the amendments and addenda to this Charter and the Foundational Agreement, and such amendments and addenda shall remain in force and be absolutely effective at the date of closing.

If a valid Accepting Notice is given by more than one Equity Holder Non Offeror, the Offered Share shall be purchased by such Equity Holders in proportion to their shares of property in the Statutory Fund of the Company (excluding the Offeror's ownership share).

If no Accepting Notices are received during the Term of Right Exercise, the Offeror shall be entitled to offer the Offered Share to the Offer Addressee for the price and on conditions mentioned in the Transfer Notice, provided that after the lapse of the 60-day period from the end of the Term of Right Exercise such a transfer may not be performed. After this, the Offeror may transfer the share only after he has resubmitted the Transfer Notice to the Equity Holders Non Offerors, and these Equity Holders shall have all the same rights, privileges and options as provided in this Section 8.2.

For the purposes of this Charter, the term "Privileged transfer" shall mean (i) sale, transfer or concession by any Equity Holder of its share of property or its portion to the Affiliated Person of such Equity Holder, (ii) sale of any share of property in accordance with sections 8.3 or 8.4 of this Charter, (iii) sale of any share of property in accordance with Article 17 of the Foundational Agreement, and (iv) any other sale that is not the object of the Right to first refusal under the terms of the Foundational Agreement or otherwise as agreed by the Equity Holders. As regards the Privileged Transfer under subsection (i) if the Affiliated Person of the Equity Holder at any time possesses any share of property, and this Affiliated Person ceases to be an Affiliated Person of the Equity Holder, during the term before the event, after which the Affiliated Person ceases to be an Affiliated Person of the Equity Holder, takes place, other Equity Holders shall have the right and possibility to purchase the entire share of property owned by such Affiliated Person in accordance with the provisions of Section 6.4 of this Charter as if the mentioned share of property is subject to compulsory transfer, except when the share of property is returned to the original Equity Holder prior to such event.

8.3.    <u>Rights to compulsory sale</u>. If, after conditions set forth in Section 8.2 are executed (except Compulsory Transfer), none of the Equity Holder Non Offerors decides to acquire the entire Offered Share under the provisions of Section 8.2, the Offeror shall have the rights (hereinafter "The Right to compulsory sale") to demand that all Equity Holders Non Offerors sell to the named Offer Addressee the entire share of property that belongs to such Equity Holders Non Offerors. The Offeror exercises his Right to compulsory sale by including the reference about existence of such right in the Transfer Notice, where the amount of the share of property is mentioned that all the Equity Holders Non Offerors must sell on the Offeror's demand. If no such reference is made in the Transfer Notice, Offeror shall be deemed to have waived the Right to compulsory sale under this Offer (this waiver is, however, not extended to any subsequent Transfer). The sale by the Equity Holders Non Offerors of their shares of property under this Section 8.3 is performed on the conditions similar to those, set forth in the Transfer Notice.

8.4.    <u>Compulsory Transfer</u>. If any share of property must be sold, transferred, concede or alienated in the result of (i) bankruptcy or insolvency proceedings initiated against an Equity Holder, voluntarily or compulsory, or (ii) it attachment or other compulsory transfer, the Equity Holder whose share is subject to compulsory transfer ("Offeror") shall notify the other Equity Holders ("Other Equity Holders") accordingly immediately after the grounds, underlying such

*[TRUE COPY]*

offered transfer, emerged, mentioning the conditions of such offered transfer and the identity of the Offer Addressee.                                                                                                7

Having received such notice or, if it is not received – after every Other Equity Holder obtains reliable information from other sources about such transfer, such Other Equity Holder shall have the right and possibility to purchase this entire share of property. This right may be exercised by such Other Equity Holder's directing the written notice to the Offeror within 60 (sixty) days after the receipt by the Other Equity Holder of this notice, or if it is not received – after every Other Equity Holder obtains reliable information from other sources about such transfer. If such notice is sent by more than one Other Equity Holder, the share of property is purchased by such Other Equity Holders in proportion to amount of their shares of property in the Statutory Fund of the Company (excluding the Offeror's ownership share).

Price paid by Other Equity Holders for the share of property under the provisions of this Section 8.4, shall correspond to the fair market price of this share of property that is determined by an internationally recognized investment bank chosen by the Other Equity Holder(s) that exercise their rights under Section 8.4.

Closing of the contract shall take place as determined by the Other Equity Holder(s) or, and if it is not determined, in the office of the Company no later than 10 (ten) days after registration of the share to the name of the Other Equity Holder(s). Full purchase price shall be paid in the monetary form by means of the bank transfer of immediately available funds, and such payment shall be made against transfer of the certified copies of the amendments and addenda to this Charter and the Foundational Agreement, reflecting transfer of the share of property, free from any encumbrances, to the Other Equity Holder.

The Equity Holders shall take all measures necessary to the transfer of the share of property to the Other Equity Holder in accordance with the provisions of this Section 8.2, including, *inter alia*, participation in the Meeting of the Equity Holders and due approval of the amendments and addenda to this Charter and the Foundational Agreement, and such amendments and addenda shall remain in force and be absolutely effective at the date of closing.

8.5.     Transfer of share (its portion) to third persons. Transfer of share (its portion) to third persons shall be possible if Sections 8.1, 8.2, 8.3 and 8.4 of this Charter are adhered and only following the full contribution by the Equity Holder transferring the share is made. Any third person acquiring the share, shall become bound by all provisions of this Charter and the Foundational Agreement. Any Equity Holder transferring the share (its portion) in the Company to a third person, shall include in the contract on transfer of such share of property (its portion) the clause providing for application of the provisions of the Charter and the Foundational Agreement to the transfer of the share and to the person acquiring it, as well as the clause committing the person acquiring the share to sign the written amendments and addenda to this Charter and the Foundational Agreement confirming such transfer.

8.6.     Purchase of share by the Company. A share of an Equity Holder of the Company, if its contribution is fully made, may be acquired by the Company if such purchase is approved by the General Meeting according to the Charter or upon exit or exclusion of the Equity Holder of the Company according to the Charter. In this case, no later than one year, the Company shall transfer the share to the other Equity Holders or to third persons. During this period the distribution of income, as well as voting and defining quorum at the Meeting of the Company or during the decision-making by the Equity Holders via questioning, according to Article 11 of this Charter, are made without consideration of the share acquired by the Company.

8.7.     Negative pledge. Regardless of any provisions to the contrary an Equity Holder may not transfer its share into pledge or mortgage or take other actions that may encumber its share, except when there is a written consent of all the Equity Holders.

*[TRUE COPY]*

8

**8.8.** <u>Prohibition to transfer encumbered Share.</u> Regardless of any provision of this Charter to the contrary, no Equity Holder may sell, transfer or otherwise alienate, or commit itself to sell, transfer or otherwise alienate (as a principal debtor or as a guarantor, pledger or in any other capacity for direct obligation or for conditional obligation or otherwise) his share of the statutory capital or corporate rights (or any portion thereof) in the Company if and while any pledge or other encumbrance created by such Equity Holder in regard of such share or corporate rights to secure any debt of the Equity Holder before the bank or financial institution is finally and unconditionally settled in accordance with the legislation in force in relation to the settlement of such debt under the written permission of such bank or financial institution.

**8.9.** <u>Transfer and pledge contrary to the Charter.</u> Any sale, transfer, concession, pledge or other alienation of share or any plans to sell, transfer, concede, pledge or otherwise alienate an Equity Holder's share, contrary to the other provisions of this Article 8, shall be considered invalid and have no legal force, and the person, for which such transfer is destined, shall not have rights in the Company, regarding it or regarding any such share of property.

## ARTICLE 9
## RESERVE FUND AND OTHER FUNDS OF THE COMPANY

**9.1.** <u>Establishment of separate funds.</u> Apart from the Statutory Fund, the Company shall establish and maintain the following funds:

**9.1.1.** The Reserve Fund; and

**9.1.2.** Other funds in accordance with the requirements of the law of Ukraine or under the decision of the Meeting of the Equity Holders of the Company.

**9.2.** <u>The Reserve Fund.</u> With the view to reimbursement of possible damages of the Company, the Reserve Fund shall be created at the rate of 25% (twenty five per cent) of the Statutory Fund. Annual allocations to the Reserve Fund of the Company shall amount to at least 5% (five per cent) of the net profit of the Company, but only until and while the Reserve Fund is lower than 25% (twenty five per cent) of the Statutory Fund.

**9.3.** <u>Other funds.</u> The Company may establish and maintain other funds that may be necessary for the activity of the Company; such funds shall be established under the laws of Ukraine in force.

**9.4.** <u>Use of funds.</u> Any losses occurred in the course of the Company's activity shall, first of all, be reimbursed from the Reserve Fund. If the Reserve Fund may not reimburse such losses, the Company, upon respective recommendations from the Director General, as well as upon agreement of the Meeting of the Equity Holders, shall use other possibilities to reimburse the losses.

## ARTICLE 10
## MANAGING BODIES OF THE COMPANY

Managing bodies of the Company shall be:

(i)     the Meeting of the Equity Holders;

(ii)    the Director General;

(iii)   the Board of Auditors.

*[TRUE COPY]*

## ARTICLE 11
## THE MEETING OF THE EQUITY HOLDERS

11.1.    Senior body. The Meeting of the Equity Holders, which may be General or Extraordinary, is the senior decision-making body of the Company. Within the limits, set forth by law of Ukraine and this Charter, the Meeting of the Equity Holders shall exercise all rights and powers, which are not entrusted upon other managing bodies of the Company.

11.2.    Head of the Company. The Meeting of the Company shall elect the Head of the Company. The Head of the Company may be elected as the Head of the Meeting of the Company when the Meeting of the Equity Holders is held. The Head of the Company shall be competent to convene the Meeting of the Equity Holders according to Section 11.3.2 below, as well as make for written questioning to enable the Equity Holders of the Company to decide without the Meeting of the Equity Holders.

11.3.    General and Extraordinary Meeting.

11.3.1. General Meeting. The General Meeting of the Equity Holders (hereinafter "the General Meeting") shall be held at least one (1) time per year. The Equity Holders also may make decisions by means of written interviews as set forth in Section 11.11 of this Charter.

11.3.2. Extraordinary Meeting. The Extraordinary Meeting of the Equity Holders shall be held in case of insolvency of the Company, upon request of the Head of the Company and/or the Board of Auditors and/or the Director General, in any case, if the interests of the Company so require, as well as upon request of the Equity Holders of the Company that in aggregate own more than 20 (twenty) per cent of the votes. If after the lapse of 25 (twenty five) days from the day of receipt of such request of the Equity Holders of the Company the Head of the Company does not convene the Extraordinary Meeting, these Equity Holders shall be entitled to convene the Extraordinary Meeting themselves.

11.4.    Competence of the Meeting of the Equity Holders. According to the legislation of Ukraine, any General or Extraordinary Meeting of the Equity Holders shall be competent to consider the following matters:

   a)    determination of the basic activities of the Company, approving of its plans and reports on their implementation;

   b)    amending the Charter of the Company, including, but not limited to, amending the Statutory Fund of the Company;

   c)    exclusion of an Equity Holder from the Company;

   d)    exclusion and recalling of the Head of the Company and members of the Board of Auditors;

   e)    approval of annual results of the Company's activity, including that of its subsidiaries, approval of reports and opinions of the Board of Auditors, procedure of the profit division, term and procedure of payment of the shares of profit (dividends), determination of the losses reimbursement procedure;

*[TRUE COPY]*

f) incorporation, reorganization and liquidation of the wholly-owned subsidiaries, branches and representative offices, approval of their charters and regulations;

g) deciding upon liability of the Company's officials for their misconducts against the Company;

h) approval of procedural rules and other internal documents of the Company, determination of the organizational structure of the Company;

i) determination of salary of the Director General and the Company's officials;

j) determination of amounts, forms and procedure of additional contributions of the Equity Holders;

k) approval of decision on reorganization, liquidation and cessation of the Company's activity, appointment of the liquidation commission, approval of the liquidation balance;

l) approval of decision on the Company's acquisition of the Equity Holder's share;

m) deciding to sign, conclude or perform any deed, transaction or agreement, which may result in total commitments of the Company (*i.e.* all its liabilities with exception of the own capital) exceeding 490,000,000 US Dollars (four hundred and ninety million US Dollars) or the equivalent in another currency (according to the official exchange rate or cross-rate, determined with the reference to the official exchange rate of the National Bank of Ukraine valid for at least any of the following dates: for the date when the matter to conclude such deed, transaction or agreement is decided or for the date when such deed, transaction or agreement is signed, concluded or performed, hereinafter "Official NBU Exchange Rate");

n) deciding to sign, conclude or perform any deed, transaction or agreement (or series of deeds, transactions or agreements with the same person or with one or more related persons), which stipulates for:

   (i) obligation of the Company (either direct or conditional, as a principal pledgee or as a pledger or otherwise) to pay funds (including, but not limited to, grant a loan or deposit) or sell or otherwise transfer or dispose of any property or other assets in the amount that, or value of which, exceeds 10,000 US Dollars (ten thousand US Dollars) or the equivalent in another currency (according to the Official NBU Exchange Rate);

   (ii) any sale, transfer, another disposal or making for any pledge or another encumbrance or liability (either current, or future, conditional or otherwise, as a principal debtor or a pledger or otherwise) regarding the Kyivstar Shares or any of their portion;

   (iii) making for any pledge, mortgage or another encumbrance regarding any Company's assets;

   (iv) subscription for, purchase or another Company's acquiring (either direct, or conditional) of any shares, other securities, shares in statutory funds and/or corporate rights; and/or

[TRUE COPY]

11

     (v)    Company's establishment of any account (in monetary form or securities) in any bank, securities registrar, depository system or custodian in Ukraine or abroad;

o)    deciding for the Company to perform any acts (including, but not limited to, exercise of any voting rights at the general meeting of shareholders or in another managing body of Kyivstar) with the view to introducing any amendments to the Kyivstar Charter, including (but not limited to) any increase or decrease of Kyivstar's statutory fund;

p)    deciding for the Company to refuse from any priority rights to purchase any shares of Kyivstar either owned by any shareholders of Kyivstar, or new ones, issued by Kyivstar.

Decision on the abovementioned issues (a), (b) and (c) shall be deemed adopted, if it casts votes of the Equity Holders that in aggregate own more than 50 per cent of the votes of the Equity Holders (except for subsection (c) where more than 50% (fifty per cent) of the votes, not including votes of the Equity Holders to be excluded, shall be required). If this Charter does not set forth to the contrary, other decisions shall be adopted by simple majority of the Equity Holders' votes present at the Meeting.

11.5.    Notice. Notice about either General, or Extraordinary meeting (hereinafter "Meeting") shall contain the following information:

    (i)    name and address of the Company;

    (ii)    date, place and time of the Meeting;

    (iii)    matters to be considered at the Meeting (hereinafter "Agenda"); and

    (iv)    reference to the form of the Meeting: General or Extraordinary.

The Notice shall be sent via post or delivered by courier to the Equity Holders no later than 30 (thirty) days prior to the Meeting of the Equity Holders to their addresses, mentioned in the Foundational Agreement of the Company. If address of an Equity Holder is changed, such Equity Holder shall be obliged to inform immediately the Company and the Equity Holders about that. If such obligation is not observed, the Equity Holder may not invoke non-delivery of the notice about the Meeting of the Equity Holders to the new address.

11.6.    Agenda. Any Equity Holder is entitled to request consideration of a matter at the Meeting of the Equity Holders if it is submitted no later than 25 days prior to the Meeting.

Matters, not included into the Agenda, may be considered only upon respective agreement of all the Equity Holders present at the Meeting.

No later than 7 (seven) days prior to the Meeting the Equity Holders shall be given possibility to examine the documents included in the Agenda of the Meeting. These documents may be examined and copied in the office of the Company except when their copies are sent along with notices about the Meeting.

11.7.    Quorum. Presence, either personal, or through authorized representatives, of the Equity Holders that own in aggregate more than 60 (sixty) per cent of votes shall make quorum at any Meeting of the Equity Holders.

*[TRUE COPY]*

12

If there is no quorum on the set date, in the set time and in the set place of the Meeting of the Equity Holders, the Meeting of the Equity Holders shall be convened again but only if the Equity Holders are informed about this no later than 30 (thirty) days prior to such repeated Meeting of the Equity Holders. Quorum requirements, set forth in the first sentence of this Section 11.7 shall be applied unaltered to any and all repeated Meetings of the Equity Holders.

11.8.    Representatives (trusted persons) of the Equity Holders. An Equity Holder may be represented by an authorized representative (a trusted person) at any Meeting of the Equity Holders if such representatives are appointed as required by the law of Ukraine in force.

11.9.    Minutes. The Head shall be in charge of the Meeting and appoint a secretary (not obviously from among the Equity Holders) to keep minutes. Such minutes shall be kept in the journal of the minutes. The Head and the secretary of the Meeting of the Equity Holders shall confirm that minutes fully and correctly reflect the substance of matters submitted to consideration at the Meeting of the Equity Holders.

11.10.    Voting. The Equity Holders shall have number of votes in proportion to amount of their shares in the Statutory Fund. All decisions are adopted by simple majority of votes of the Equity Holders present at the Meeting, except when under Section 11.4 of this Charter more votes are required for a decision to be adopted.

11.11.    Form of the Meeting; Actions without the Meeting of the Equity Holders. Within 10 (ten) days after receipt of a written notice about decision or voting on a respective matter from all the Equity Holders, the Head of the Meeting (elected at the previous Meeting of the Equity Holders or upon the decision of the Equity Holders adopted through interviews) shall inform all the Equity Holders about the decision adopted through such interviews.

Within 10 (ten) days since the last notice from the participants in voting is received, all the Equity Holders shall be informed about the adopted decision by the Director General.

Decisions adopted without the Meeting of the Equity Holders shall, together with information about such decision, be recorded in the respective journal of the minutes and read at the following Meeting of the Equity Holders.

## ARTICLE 12
## THE DIRECTOR GENERAL OF THE COMPANY

12.1.    Executive body. The Director General shall exercise powers of the executive body of the Company. The Director General shall decide upon all issues of the Company's activity except those within the competence of the Meeting of the Equity Holders if decisions of the Meeting of the Equity Holders and this Charter do not provide to the contrary. The Director General shall not be entitled to adopt decisions to bind the Equity Holders of the Company.

12.2.    Appointment and Term of Office. The Director General shall be appointed as set forth in Section 11.3 of this Charter. The Director General shall be appointed for 3 (three) years and may be reelected unlimited number of times.

12.3.    Obligations. The Director's General competence extends to the following issues:

[TRUE COPY]

(i)    control over day-to-day activities of the Company and conducting the Company's affairs;

(ii)    deciding upon any and all issues relating to the day-to-day activities of the Company except issues within the competence of another body of the Company according to the laws of Ukraine, this Charter or decision of the Meeting of the Equity Holders;

(iii)    drafting annual reports, business-plans and annual budget;

(iv)    management and administration of business-plans implementation, reporting for the results before the Meeting of the Equity Holders;

(v)    representing the Company's interests and acting on its behalf without a power of attorney in relation to any Company's activity according to the Foundational Agreement and this Charter, as well as limitations imposed by Section 12.4 of this Charter;

(vi)    signing and making for fulfillment of all contracts, agreements and documents relating to the Company's activity according to the limitations imposed by Section 12.4 of this Charter;

(vii)    determination of the staff selection criteria; hiring; determination of the employees' functions and obligations; control and supervision over their work; stimulation, imposition of disciplinary penalties and firing;

(viii)    making for implementation of all rules and regulations in the sphere of administration and operation of the Company;

(ix)    representation of the Company before public courts and courts of arbitration;

(x)    representing the Company's interests at the general meeting of shareholders of Kyivstar or of other legal entities, shares of which are owned by the Company, and voting by the shares of property of such legal entities, possessed by the Company according to the limitations imposed by Section 12.4 of this Charter;

(xi)    other powers and additional functions that may be imposed upon him by a decision of the Meeting of the Equity Holders, as well as his basic obligations according to the instructions of the Meeting of the Equity Holders.

12.4.    <u>Limitations of the Director's General competence to conclude deeds</u>. Regardless of any provision of this Charter to the contrary, the Director General may not, without clear and special preliminary approval of the Equity Holders through a written decision, sign, conclude or perform any deed, transaction or agreement (or series of deeds, transactions or agreements with the same person or with one or more related persons), or perform another act set forth in subsections (m) to (p) inclusive of Article 11.4 of this Charter. Any deed, transaction or agreement, concluded, signed or performed, or any action performed by the Director General with any violation of requirements of this Article 12.4 shall entail no obligation or responsibility for the Company. The Director General shall be obliged to inform any natural or legal person, with which the Director General is discussing or negotiating as regards any deeds, transactions, agreements or acts, defined in this Article, about all limitations, contained in this Article 12.4.

*[TRUE COPY]*

*14*

12.5.    <u>Signing on behalf of the Company.</u> Under Section 12.4 of this Charter, provided there are no other decisions of the Meeting of the Equity Holders, the Director General, acting individually, or another person, appointed by the Director General in written form, shall be entitled to sign documents on behalf of the Company.

12.6.    <u>No other office requirement</u>. The Director General of the Company shall not be a member of the Board of Auditors and/or the Head of the Meeting of the Equity Holders of the Company.

## ARTICLE 13
## BOARD OF AUDITORS

13.1.    <u>Composition.</u> The Company shall have the Board of Auditors composed of at least 3 (three) persons appointed (and may be dismissed) by the Meeting of the Equity Holders.

13.2.    <u>Obligations</u>. The Board of Auditors shall certify the annual accounting and financial reports, balances and reports on income and losses, as well as tax declarations and submissions (hereinafter "the Annual reports"), and, also, assist the Director General and other officers on the tax and financial management of the Company. The Board of Auditors shall also verify legitimacy of the Director's General activity, other officers and employees of the Company. The Board of Auditors may request convention of the Meeting of the Equity Holders if it considers the vital interests of the Company to be threatened or identifies the facts of the abuse of the property of the Company by the Company's employees.

13.4.    <u>Reporting</u>. Within 3 (three) months after the end of each financial year the Board of Auditors shall certify and submit the Annual Audit Report along with the detailed analysis and comments of the Annual Reports of the Company for the consideration of the Director General and the Meeting of the Equity Holders. On the request of the Meeting of the Equity Holders the Board of Auditors shall submit other reports.

## ARTICLE 14
## FINANCIAL DOCUMENTATION, ACCOUNTING REPORTS AND AUDIT REVIEWS

14.1.    <u>Financial year</u>. The financial year of the Company shall start on January 1 and ends on December 31. The principles of the accounting and audit reviews of the Company shall comply with the requirements of this Charter, decisions of the Meeting of the Equity Holders and the legislation of Ukraine in force.

14.2.    <u>Financial reports</u>. The Company shall keep complete and precise financial and accounting record according to the main principles, set by the Director General and adopted by the Meeting of the Equity Holders. Such record shall reflect accurately all the income, losses, profits, expenditures, assets and liabilities of the Company. Apart from the auditing documentation, kept according to the Ukrainian legislation on the accounting activities, the balance, income and losses report, costs investment report and other financial documents shall be prepared quarterly and annually, according to the international accounting standards, and disseminated among the Equity Holders. The financial reports of the Company shall be drafted and signed by the Director General along with the Chief Accountant and certified annually by the Board of Auditors. As requested by the Equity Holders, they shall be given access to all financial and accounting documentation of the Company.

*[TRUE COPY]*

14.3.    <u>Independent auditors.</u> Apart form the audit reviews that may be conducted by the Ukrainian audit organizations according to the requirements of the Ukrainian legislation, the Company shall be entitled, on its own costs, appoint the independent auditors from any country, for the conduction of annual or other periodic audits of the company according to the international accounting standards.

## ARTICLE 15
## EXIT FROM THE COMPANY

Under the provisions of this Charter and the laws of Ukraine in force, an Equity Holder may, at any time, exit from the Company by sale of its share in the Company to the other Equity Holders or to third persons and/or to the Company, if such Equity Holder has made his contribution in full.

## ARTICLE 16
## EXCLUSION OF AN EQUITY HOLDER FROM THE COMPANY

Regardless of the provisions of Article 17 of the Foundational Agreement, the Equity Holder that systematically refrains from or inappropriately fulfills its obligations or by its actions impedes achievement of the Company's objectives, may be excluded from the Company by decision of the Meeting of the Equity Holders, adopted by the Equity Holders, aggregate vote of which exceeds 50 (fifty) per cent of total votes of the Company's Equity Holders. In this case such Equity Holder (its representative) shall not participate in the voting.

## ARTICLE 17
## TERMINATION OF THE ACTIVITY (REORGANIZATION) AND LIQUIDATION OF THE COMPANY

17.1.    <u>General provisions.</u> Termination of the Company's activity takes place in case of its reorganization (merger, accession, division, separation, transformation) or liquidation. In case of reorganization, all the rights and obligations of the Company are transferred to the legal successors.

17.2.    <u>Grounds for liquidation.</u> The Company may be liquidated in the following cases:

(i)    upon decision of the Meeting of the Equity Holders according to subsection k) of Section 11.4 of this Charter; or

(ii)    by decision of a public court or a court of arbitration according to the legislation of Ukraine.

17.4.    <u>Management, carried out by the Liquidation Commission.</u> Starting from the date on which the Liquidation Commission is appointed, all the powers on management of the Company shall be transferred to it. Within the time limits, required or permitted by the legislation of Ukraine, the Liquidation Commission shall publish information on the liquidation of the Company in official (national and local) press, define the deadlines for the claims submission and inform the creditors about them, assess the actual property (assets and liabilities) of the Company, publish the lists of debtors and creditors of the Company, as well as make settlement with them, make for the clearance of the Company's debts before the employees, third persons and the Equity Holders, draft the liquidation balance and submit it for consideration of the Meeting of the Equity Holders, and perform other functions, as provided by the legislation of Ukraine.

*[TRUE COPY]*

16

17.5.    Liquidation balance. The liquidation Commission shall prepare, no later than the proposed date of liquidation, the financial report (hereinafter "Liquidation Balance") showing all the assets remaining after the settlement of the unpaid obligations, including, in particular, the taxes and fees, debts before the banks and suppliers with the payment date before or after the date of the liquidation of the Company. The Liquidation Commission shall submit the Liquidation Balance for consideration of the Meeting of the Equity Holders together with the current report on the liquidation process and proposals on settlement of any remaining obligations as well as regarding the use of the remaining assets of the Company.

17.6.    Division of assets/incomes from the liquidation of the Company After the liquidation balance is approved by the Meeting of the Equity Holders, the Liquidation Commission shall commence the liquidation of the Company. After the Company's activity is terminated the Liquidation Commission, upon decision of the Meeting of the Equity Holders, shall sell all the assets of the Company to raise funds to cover expenditures, connected with the liquidation of the Company, to settle all other claims and to distribute remaining (if any) funds among the Equity Holders in proportion to their correspondent shares in the Company. Nevertheless, if the monetary and other assets of the Company are sufficient to settle unfulfilled obligations, and the shares of Kyivstar have not been sold prior to the adoption of the decision on the liquidation of the Company, the Liquidation Commission shall not sell the shares of Kyivstar, but distribute them among the Equity Holders in proportion to their shares in the Statutory Fund in accordance with the requirements of the foundational documents of Kyivstar and any other relevant agreement between the shareholders.

17.7.    Termination of the Company's activity. The Liquidation Commission

(i)    shall make for safe storage of all accounting and record documentation within the term as laid down by law; and

(ii)    shall take measures to withdrawal of the Company from the respective company register.

Liquidation of the Company shall be deemed finalized and the Company shall be deemed to have terminated its activity after the moment when respective record is made in the respective state register.

## ARTICLE 18
## NOTICES

Any notice or other information to be provided under this Charter shall be in written form. Such information or notice shall be deemed duly provided, if delivered in the manner directly determined by this Charter. If a manner is not determined in this Charter, the notice shall be deemed duly made, if delivered personally, by air mail, sent by telex or fax to the Equity Holder, to which it must or may be provided, to the address of such Equity Holder stated below or to another address, notified by the Equity Holder to the other Equity Holders and the Company. Such notices or any other information shall be sent to the Equity Holders to their addresses and faxes, mentioned in the Foundational Agreement of the Company.

**EQUITY HOLDERS of "STORM" Limited Liability Company:**

**Company "Alpren Limited" (Cyprus),**
Represented by Oleksandra Serhiyivna Maltseva,
acting by proxy of January 5, 2006,
certified by the private notary of the Kyiv notary district

*[TRUE COPY]*

17

Levchenko V.M. on January 5, 2006 under № 33                    *[signature]*

**Company "Hardlake Limited" (Cyprus),**
Represented by Kateryna Serhiyivna Kokot,
acting by proxy issued on November 11, 2005, and
certified by the Regional Commissioner of Nicosia
*[Name]* on November 18, 2005 under № 142140/05          *[signature]*

*[TRUE COPY]*

*18*

Kyiv on February 15, 2006, I, Yakymenko V.O., Private Notary of Kyiv notary district, certify the authenticity of the signatures of **Kokot Kateryna Serhiyivna,** acting by proxy of Company "Hardlake Limited" **Maltseva Oleksandra Serhiyivna,** acting by proxy of Company "Alpren Limited", done in my presence. The identity of Kokot K.S. and Maltseva O.S. who have signed the document is confirmed, the authority of the representatives is verified.

Registered in the Register under the № *523, 524*

The payment charged – according to Article 31 of the Law of Ukraine "On Notariate".

Private Notary

*[Signature and the round seal of Private Notary V.O. Yakymenko]*

[signed and stamped by the round stamp of the private Notary V.O. Yakymenko]

[Kyiv, 20.02.2005.
I, Levytskyi R.V., Private Notary of Kyiv notary district, certify that this is the true copy of the document, in which I have reveled no strike-outs, corrections and other unapproved changes or other peculiarities.
Registered with № *1228*
Payment charged – as per agreement

**[Signature and the round seal of Private Notary R.V. Levytskyi]**

*[Seal]*
Stitched, numbered and sealed.
20 (twenty) pages
*[Signature]*

*[Seal]*
Numbered, stitched, signed and sealed 18 (eighteen) pages
*[Signature]*

*[Signature and the round seal of Private Notary V.O. Yakymenko]*

*[TRUE COPY]*

**Altimo Vice-President Told to Stay Away from US Court**
Telecom Business, 12.12.2006

Altimo Vice-President Vadim Klimenko, keeping it secret from his own holding company, has been coming to a US court to uphold the company's interests in a lawsuit filed by Norway's Telenor. Upon hearing about it Altimo has used a Ukrainian court to stop its own senior executive from going to the US court.

It transpired last Tuesday that on December 1 the Russian telecommunications holding company Altimo had filed a lawsuit against its own Vice-President Vadim Klimenko with Kiev's Golosievsky District Court. The lawsuit was filed on behalf of Altimo's subsidiary, the Cyprus-based offshore entity Alpren that owns 43.5% of the Ukraine's leading cellular operator Kyivstar through the Ukrainian company Storm. Mr. Klimenko is also the CEO of Storm and, until now, has also appeared as a defendant in a lawsuit filed by Norway's Telenor (the principal owner of Kyivstar) with the New York Arbitration Court. However, by way of trial precautionary measures, the Golosievsky court has instructed Mr. Klimenko to discontinue such practices.

"Upon learning about Mr. Klimenko's activities, Alpren was forced to take him to court and to bring in Storm and Telenor as third parties," *CNews* was told by Mikhail Ilyashev, head of the law firm Ilyashev and Partners that represents Altimo in the Ukraine. "The thing is that as far back as last April the Kiev Business Court granted Alpren's suit seeking to invalidate the Shareholder Agreement between Telenor and Storm. Subsequently, the court explained that from then on the parties were required to act in a way as if the agreement had never existed. That means that the arbitration clause whereby all disputes between Kyivstar shareholders must be reviewed in a US court is no longer valid and neither Telenor, nor Storm are entitled to continue to be in court there."

Telenor has been enraged by Altimo taking the matter to a Kiev district court. "We did not learn about that suit until December 4 although it directly affects our interests," Telenor's press-release says. "Under the court ruling, we and our representatives are banned from participating in further court proceedings in New York and, should we violate that injunction, penal sanctions will apply to us." In response, Telenor petitioned the US court to stop representatives of Storm, Alpren, and Altimo from complying with the Kiev court's ruling. The petition was granted on December 7.

However, where the Ukrainian court's injunction has given Telenor a reason to worry Altimo assures that the "mirror" injunction by the New York court is nothing to fear as far as they are concerned. "American arbiters have no authority to review disputes involving Kyivstar, let alone issue any injunctions regarding the Cyprus company Alpren," said Mr. Ilyashev. "In addition, for the first time in my legal career I saw a court judgment in which the judge made corrections between the lines and, after he ran out of space, he started writing vertically on the margins."
**

This is to confirm that I, Yuri Somov, fully fluent in both Russian and English, certify that the above is a true and accurate translation of the original story appearing in *CNews* on 12.12.2006

*December 13, 2006*

# CNews | НОВОСТИ





## Вице-президенту Altimo запрещено появляться в суде США

Телеком Бизнес
12.12.06, Вт, 21:22, Мск

Версия для КПК

**В тайне от холдинга Altimo его вице-президент Вадим Клименко посещал американский суд для отстаивания интересов компании по иску, поданному норвежским Telenor. Узнав об этом, Altimo через украинский суд запретил своему топ-менеджеру продолжать этим заниматься.**

Как стало известно в минувший вторник, 1 декабря российский телекоммуникационный холдинг Altimo подал в Голосиевский районный суд Киева иск против своего вице-президента **Вадима Клименко**. Иск подан от лица «дочки» Altimo — кипрского офшора Alpren, — которая через украинскую компанию «Сторм» владеет 43,5% акций лидирующего на Украине сотового оператора «Киевстар». Г-н Клименко также является гендиректором «Сторма» и до сих пор он выступал в качестве ответчика по иску, поданному в Арбитражный суд Нью-Йорка норвежским Telenor (основным владельцем «Киевстара»). Но, в качестве обеспечительных мер,

**Читайте также:**

Кремль отбросил Telenor на Украину

«Киевстару» не дают независимости

Менеджер Microsoft помирил россиян со шведами

Российские связисты добрались до Вьетнама и Индонезии



Время отклика
2 мс GTG

BenQ
Enjoyment Matters

Голосиевский суд запретил ему продолжать подобного рода практику.

«Узнав о действиях г-на Клименко, Alpren была вынуждена подать на него в суд, а в качестве третьих лиц привлечь „Сторм" и Telenor, — пояснил CNews глава юридической компании „Ильяшев и партнеры", представляющей интересы Altimo на Украине, **Михаил Ильяшев.** — Дело в том, что еще в апреле Хозяйственный суд Киева удовлетворил иск Alpren о признании незаконным акционерного соглашения между Telenor и „Стормом". Позднее суд дал разъяснение, что отныне стороны должны действовать так, как если бы данного соглашения не существовало. Это означает, что арбитражная оговорка, предусматривающая рассмотрение всех споров акционеров „Киевстара" в американском суде, более не действительна, и ни Telenor, ни „Сторм" не имеют право продолжать там судиться».

В Telenor оказались возмущены обращением Altimo в районный суд Киева. «Мы узнали об этом иске только 4 декабря, хотя он непосредственным образом затрагивает наши интересы, — говорится в пресс-релизе норвежской компании. — Ведь по решению суда нам и нашим представителям запрещено участвовать в дальнейших судебных разбирательствах в Нью-Йорке, а в случае нарушения запрета против нас будут применены уголовные санкции». В ответ Telenor подал ходатайство в американский суд о запрете представителям „Сторма", Alpren и Altimo исполнять решения киевского суда. 7 декабря ходатайство было удовлетворено.

Однако, если запрет украинского суда вызывает беспокойство у Telenor, то в Altimo уверяют, что «зеркальный» запрет Нью-Йоркского суда для них не страшен. «У американских арбитров нет никаких полномочий рассматривать споры вокруг „Киевстара" и, тем более, выносить какие-либо запреты в отношении кипрской компании Alpren, — говорит г-н Ильяшев. — К тому же, впервые в своей юридической практике я увидел решение суда, в которое судья ручкой вносил правки

между строк, а потом, когда место закончилось, стал писать вертикально на полях».

В портфель    Обсудить    Распечатать    Переслать новость

■ ZOOM: Лучшие цифровые подарки к Новому Году!

## Новости РБК и наших партнеров

**RBC.RU**
- Дж.Бушу потребуются еще 100 млрд долл. на Ирак и Афганистан
- Правительство Украины: В.Ющенко дестабилизирует ситуацию в стране
- Внук А.Пиночета уволен из армии за речь на похоронах деда

**REGNUM.RU**
- Хакеры нацелились на блоги, ICQ и "мобильники"
- Осторожно! Новые пирамиды
- Сайты в зоне .SU будут уничтожены

**ИноСМИ.RU**
- Не поднимайте лапки перед Путиным ("Los Angeles Times")
- Чудище из Московии ("The American Spectator")

**RIAN.RU**
- "Мста-С": российское орудие, которое произвело фурор

**IZVESTIA.RU**
- "В России такой бардак, что за деньги черта с рогами продадут". М.Соколов о лондонских интригах и радиофобии

**REDTRAM.COM**
- Грузия вооружается быстрее всех в мире
- Начальник Генштаба РФ назвал заявление Ольмерта о ядерном оружии "безответственным"

**GAZETA.RU**
- Доллар падает быстрее веры в него

**MK.RU**
- Президент приказал копать

NG.RU

- **Доллар рухнет**

Новости    Бизнес    Безопасность    Телеком    Интеграция

- Министра уволили по SMS
- Российскому Columbus IT не с кем поделиться акциями
- "ТВ-Новости" получит в аренду спутник "Интелсат 904"
- Основатель Wikipedia предлагает бесплатный хостинг
- Завершена локализация сайта SoftKey в Израиле
- Влияние З.фрейда на развитие психоанализа в России обсудят на конференции

- "МТУ-Интел" переименован в "Комстар-Директ"
- Google: Россия №1 в Европе
- HP представил две новые системы хранения начального уровня
- Продолжается подготовка к запуску космического телескопа COROT
- Решение IBM ускорило работу службы 911 округа Колумбия
- Microsoft выпустила декабрьское обновление безопасности

все новости

Интернет    Наука



Лучшие цифровые подарки к Новому Году. Конкурсы, призы!

Статьи    Профили    Проекты    Точки    Обзоры



Россия топчется у Рубикона: итоги круглого стола

Телекомы устраняют нелояльных клиентов

SSL: Защита с гарантией в 1 млн. долларов

Элдар Разроев: "Евросеть" не занимается агрессивными поглощениями

Компания Motorola продолжает набор профессионалов для разработки программного обеспечения инфраструктуры сетей WiMAX!



9000 новых и подержанных авто

## Новости партнеров

- Орбакайте навсегда уехала в Америку
- Орбакайте выходит замуж и навсегда уезжает в США
- Участницы "Танцев со звездами" показали стриптиз. ФОТО
- "Танцы со звездами": девушки обнажились на паркете. ФОТО
- Солистка "Фабрики" обнажилась до ...

## Обучение



**Скрытые ресурсы сети. Способы увеличения сбыта**
18 декабря

**Разработка системы оплаты труда для ИТ–компаний**
21 - 22 декабря

список всех курсов



**Продажи ИТ - услуг.**
Базовый курс
19 - 20 декабря



**Результативное управление сотрудниками.**
Базовый курс
21 - 22 декабря

## RBC DAILY / AutoNews

- «Газпром» отдаст деньги потом
- Дубль ВЗБ
- Украина перестанет светить Белоруссии
- ВВП стало больше

## Biztorg.RU / Потребрынок

- Самые красивые автомобили 2006 года
- Автомагистрали над железными дорогами разгрузят пол-Москвы
- До конца года в России продадут миллион иномарок

Case No. 2- 5613/06

## Decree

On December 1, 2006, the judge of Golosiyivsky District Court of the City of Kyiv Goshko O.M ., having reviewed the materials of claim brought by Alpren Limited against Vadym Viktorovych Klymenko seeking the recognition of actions as unlawful and compulsion to take actions,

## Established that:

The claimant has brought to the court a claim against V.V. Klymenko on recognizing actions as unlawful and compelling to perform actions. The claimant has also submitted to the court a petition for injunctive relief, whereby the claimant requests the court to apply injunctive relief: to enjoin V.V. Klymenko, as the General Director of Limited Liability Company "Storm", and any persons authorized by him, from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including to enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York; to enjoin Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including to enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York; to enjoin Telenor Mobile Communications AS (a legal entity under the laws of Norway, with its place of business at Snarøyveien 30 D, 1331 Fornebu, Norway) and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including enjoin [them] from filing any explanations, statements, statements of claims, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York.

Under Part 1 of Article 151 of the Code of Civil Procedure of Ukraine, upon a petition of persons participating in the case, the court may apply injunctive relief, injunctive relief is allowed in any stage of the proceedings in a case if non-application of the injunctive relief may complicate the enforcement of a court decision or render it impossible.

Upon reviewing the case files, the court concludes that non-application of injunctive relief will render the enforcement of the court decision regarding the case impossible.

Particularly, it is evident from the materials provided to the court that the Kyiv City Commercial Court has applied the consequences of invalidity of a void transaction – the Shareholders Agreement dated January 30, 2004 between Limited Liability Company "Storm" and Telenor Mobile Communications AS. However, its performance has not been discontinued, some of its parties continue to be guided by its provisions, thereby jeopardizing and violating the rights of the claimant.

Based on the foregoing and pursuant to Parts 1, 3 of Article 151, Parts 1-3 of Article 152, Parts 1, 5, 6, 7, 9, 10 of Article 153 of the Code of Civil Procedure of Ukraine, the court

**RULED TO:**

Enjoin Vadym Viktorovych Klymenko (*17-B Gorkogo Str., Apt. 21, 01001, Kyiv*), as the General Director of Limited Liability Company "Storm", and any persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York;

Enjoin Limited Liability Company "Storm" (*1 Narodnogo Opolchennya Str., 01001, Kyiv, identification code of a legal entity 23163325*) and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim bought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York;

Enjoin Telenor Mobile Communications AS (*a legal entity under the laws of Norway, with its place of business at Snarøyveien 30 D, 1331 Fornebu, Norway*) and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of this case *per se*, including enjoin [them] from filing any explanations, statements, statements of claims, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, Presiding Arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm LLC" in New York.

Dispatch this Decree to the parties, Limited Liability Company "Storm" (*1 Narodnogo Opolchennya Str., 01001, Kyiv, code in EDRPOU [Unified State Register of Enterprises and Organizations of Ukraine] 23163325*), Telenor Mobile Communications AS (*a legal entity under the laws of Norway*) (*place of business at Snarøyveien 30 D, 1331 Fornebu, Norway*), and to the respective bodies of the State Enforcement Service.

The Decree is subject to immediate enforcement.

The Decree of the court can be appealed to the Kyiv City Court of Appeals by filing a petition on subsequent appeal within 5 days of its announcement and by filing a statement of appeal within 10 days of filing the petition. Filing an appeal against the Decree does not suspend its enforcement and does not prevent further consideration of the case.

Judge:

> TRUE COPY
> The Judge of Golosiyivsky
> District Court of the City of Kyiv
> Goshko O.M. ___[*signature*]___
> Secretary ___[*signature*]___

*[Letterhead of the State Enforcement Service
in Golosiyivsky District of the City of Kyiv]*

December 4, 2006
No. 815/10

        To:  **LLC "Storm"**
               17-b Gorkogo Str., Apt. 21, Kyiv


        cc:  Alpren Limited,
               4-12 Chapayeva Str., Kyiv


        cc:  **Golosiyivsky d/c [District Court] of the City of Kyiv**


        The State Enforcement Service of Golosiyivsky District of the City of Kyiv hereby dispatches to you **the ruling on commencement of enforcement proceedings.**
        We hereby require you to inform on the progress of execution of the aforementioned ruling within a 7-day period at No._____.


**/Head of the Department**    *[signature]*        *O.I. Grebenyuk*
State Enforcement Officer    *[signature]*        *V.A. Ustymenko*

        *[Round Seal of the State Enforcement
Service of Golosiyivsky District of the City
of Kyiv]*

**RULING No. *815/10***
**on commencement of enforcement proceedings**

*December 4,* 2006                                                                                    City of Kyiv

I, *V.A. Ustymenko*, state enforcement officer of the State Enforcement Service in Golosiyivsky District of the City of Kyiv, have considered the petition on enforcement of decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on enjoining Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York,
that became effective on December 1, 2006,

In consideration of the foregoing, pursuant to Articles 3, 18, 24, 76, 87 of the Law of Ukraine "On Enforcement Proceedings",

IT IS HEREBY RULED TO:

**1.** Commence enforcement proceedings to enforce decree No. 2-5613 issued on December 1, 2006 by the Golosiyivsky District Court of the City of Kyiv on **enjoining Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York.**

**2.** The debtor to execute the enforcement document voluntarily by _____2006.

**3.** In the event of failure to execute the decision within the given term, it will be subject to enforcement. Collect 10% of the enforcement duty and costs related to enforcement proceedings from the debtor for the enforcement of the decision.

4. Send a copy hereof to the parties and the court.

5. The Ruling may be appealed to the Head of the State Enforcement Service in Golosiyivsky District of the City of Kyiv or the court within 10 days from the receipt thereof.


State Enforcement Officer               *[signature]*                    *V.A. Ustymenko*

*[Letterhead of the State Enforcement Service*
*in Golosiyivsky District of the City of Kyiv]*

*December 5, 2006* No. _____

|  |  |  |
|---|---|---|
| To: | LLC "Storm" | |
| | 17-b Gorkogo Str., Apt. 21, Kyiv | |
| cc: | Alpren Limited | |
| | 4-12 Chapayeva Str., Kyiv | |

## ORDER

The State Enforcement Service of Golosiyivsky District of the City of Kyiv is carrying out enforcement proceedings regarding decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on enjoining Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York. The decree is subject to immediate enforcement.

The debtor is hereby obliged to IMMEDIATELY perform the court decision and inform the State Enforcement Service of [its] performance.

*Under Article 87 of the Law of Ukraine "On Enforcement Proceedings", for failure to comply with a court decision, a state enforcement officer issues a ruling on imposing a fine on the person guilty of the failure to comply with the court decision.*

*In the event of repeated failure to comply with the lawful requirements of a state enforcement officer, the ruling is issued on imposing a double amount of fine and the motion is filed with the Prosecutor's Office on holding the guilty persons criminally liable.*

***We hereby remind that pursuant to Articles 6, 87, 88 of the Law of Ukraine "On Enforcement Proceedings", failure to comply with the lawful requirements of a state enforcement officer entails liability envisaged by the Law. In the event of failure to comply with a court decision, a state enforcement officer files a motion with the court on criminal liability in accordance with applicable law.***

State Enforcement Officer          *[signature]*                    *V.A. Ustymenko*

*[Round Seal of the State Enforcement*
*Service of Golosiyivsky District of the City*
*of Kyiv]*

*[Letterhead of the State Enforcement Service
in Golosiyivsky District of the City of Kyiv]*

No. *815/10*
*December 4, 2006*

To:     V.V. Klymenko
        17-b Gorkogo Str., Apt. 21, Kyiv


cc:     Alpren Limited,
        4-12 Chapayeva Str., Kyiv

cc:     **Golosiyivsky d/c [District Court] of the City of Kyiv**


The State Enforcement Service of Golosiyivsky District of the City of Kyiv hereby dispatches to you **the ruling on commencement of enforcement proceedings**.

We hereby require you to inform on the progress of execution of the aforementioned ruling within a 7-day period at No._____.



**Head of the Department**         [signature]          *O.I. Grebenyuk*
State Enforcement Officer          [signature]          *V.A. Ustymenko*


*[Round Seal of the State Enforcement
Service of Golosiyivsky District of the City
of Kyiv]*

## RULING No. *815/10*
### on commencement of enforcement proceedings

*December 4,* 2006                                                    City of Kyiv

      I, V.A. Ustymenko, state enforcement officer of the State Enforcement Service of Golosiyivsky District in the City of Kyiv, have considered the petition on enforcement of decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on enjoining Vadym Viktorovych Klymenko, as the General Director of Limited Liability Company "Storm", and any persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York,
      that became effective on December 1, 2006,

      In consideration of the foregoing, pursuant to Articles 3, 18, 24, 76, 87 of the Law of Ukraine "On Enforcement Proceedings",

### IT IS HEREBY RULED TO:

      **1.** Commence enforcement proceedings to enforce decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on **enjoining Vadym Viktorovych Klymenko, as the General Director of Limited Liability Company "Storm", and any other persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York.**

      **2.** The debtor to execute the enforcement document voluntarily by *December 5*, 2006.

      **3.** In the event of failure to execute the decision within the given term, it will be subject to enforcement. Collect 10% of the enforcement duty and costs related to enforcement proceedings from the debtor for the enforcement of the decision.

      4. Send a copy hereof to the parties and the court.

      5. The Ruling may be appealed to the Head of the State Enforcement Service in Golosiyivsky District of the City of Kyiv or the court within 10 days from the receipt thereof.

State Enforcement Officer          [*signature*]                *V.A. Ustymenko*

*[Letterhead of the State Enforcement Service
in Golosiyivsky District of the City of Kyiv]*

*December 5, 2006* No. *815/10*

|     |     |
| --- | --- |
| To: | V.V. Klymenko |
|     | 17-b Gorkogo Str., Apt. 21, Kyiv |
|     |     |
| cc: | Alpren Limited, |
|     | 4-12 Chapayeva Str., Kyiv |

### ORDER

The State Enforcement Service of Golosiyivsky District of the City of Kyiv is carrying out enforcement proceedings regarding decree No. 2-5613 issued on December 1, 2006 by the Golosiyivsky District Court of the City of Kyiv on enjoining Vadym Viktorovych Klymenko, as the General Director of Limited Liability Company "Storm" and any other persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York. The decree is subject to immediate enforcement.

The debtor is hereby obliged to IMMEDIATELY perform the court decision and inform the State Enforcement Service of [its] performance.

*Under Article 87 of the Law of Ukraine "On Enforcement Proceedings", for failure to comply with a court decision, a state enforcement officer issues a ruling on imposing a fine on the person guilty of the failure to comply with the court decision.*

*In the event of repeated failure to comply with the lawful requirements of a state enforcement officer, the ruling is issued on imposing a double amount of fine and the motion is filed with the Prosecutor's Office on holding the guilty persons criminally liable.*

***We hereby remind that pursuant to Articles 6, 87, 88 of the Law of Ukraine "On Enforcement Proceedings", failure to comply with the lawful requirements of a state enforcement officer entails liability envisaged by the Law. In the event of failure to comply with a court decision, a state enforcement officer files a motion with the court on criminal liability in accordance with applicable law.***

|     |     |     |
| --- | --- | --- |
| State Enforcement Officer | *[signature]* | *V.A. Ustymenko* |
|     | *[Round Seal of the State Enforcement Service of Golosiyivsky District of the City of Kyiv]* |     |

I, Oksana Kharchenko, hereby certify that I have knowledge of English and Russian/Ukrainian languages and that I am competent to translate to and from the said languages. I declare that the above translation was done by me and is true, accurate and correct translation of the Decree of the Golosiyivsky District Court of the City of Kyiv dated December 1, 2006 in case No. 2- 5613/06, the letter of the State Enforcement Service of Golosiyivsky District of the City of Kyiv to LLC "Storm" dated December 4, 2006, Ruling No. 815/10 on commencement of enforcement proceedings dated December 4, 2006, Order of the State Enforcement Service of Golosiyivsky District of the City of Kyiv to LLC "Storm" dated December 5, 2006, the letter of the State Enforcement Service of Golosiyivsky District of the City of Kyiv V.V. Klymenko dated December 4, 2006, Ruling No. 815/10 on commencement of enforcement proceedings dated December 4, 2006, Order of the State Enforcement Service of Golosiyivsky District of the City of Kyiv to V.V. Klymenko dated December 5, 2006, of which I have seen a copy of the original.

December 11, 2006, I, Narinskii F.M., director of Translation Agency "Eridan – 2002", certify the authenticity of signature which is made by translator Oksana Kharchenko.

[Seal]

*[On the letterhead of the Kyiv Commercial Court of Appeals]*

## DECREE

No. 40/242                                                    November 8, 2006

**The Kyiv Commercial Court of Appeals** as consisting of the panel of judges:

The Presiding Judge – V.O. Zelenin

Judges: N.V. Kapatsyn, O.F. Synytsya

**With participation of the parties' representatives**: not summoned.

**Having considered the petition** filed by Limited Liability Company (LLC) "Storm" on clarification of the ruling of the Kyiv Commercial Court of Appeals issued on May 25, 2006 in case No. 40/242

**upon the claim** filed by Alpren Limited, a legal entity under the laws of the Republic of Cyprus,

**against** LLC "Storm"

**on** recognition of certain actions as unlawful and termination of certain actions.

## ESTABLISHED THAT:

On April 25, 2006, the Kyiv City Commercial Court issued the decision whereby it allowed the claim of Alpren Limited against LLC "Storm".

By its ruling of May 25, 2006, the Kyiv Commercial Court of Appeals affirmed the decision issued by the Kyiv City Commercial Court on April 25, 2005 in case No. 40/242.

On October 30, 2006, the Kyiv Commercial Court of Appeals received a petition filed by LLC "Storm" on clarifying the ruling of the Kyiv Commercial Court of Appeals issued on May 25, 2006 in case No. 40/242 where it concerns the validity of the arbitration clause and the consequences of invalidating the Shareholders Agreement.

Being governed by Articles 86, 89 and 99 of the Code of Commercial Procedure of Ukraine, [the court] –

## RULED TO:

Clarify the ruling of the Kyiv Commercial Court of Appeals issued on May 25, 2006 in case No. 40/242 for Limited Liability Company "Storm".

The court recognized the Shareholders Agreement as void in its entirety, including the arbitration agreement set forth in the form of an arbitration clause in the Shareholders Agreement. Therewith, the court took into account both the international treaties ratified by Ukraine and other regulatory enactments, in particular, the Law of Ukraine "On International Commercial Arbitration". The court established that since the Shareholders Agreement violated the public policy of Ukraine and, in addition, the representative of LLC "Storm", one of the parties to the agreement, was not authorized to enter into the said Shareholders Agreement and the arbitration clause, an integral part thereof in this case, the arbitration agreement set forth in

1

the form of an arbitration clause in the Shareholders Agreement is also void / invalid.

As regards the consequences of invalidity of a void transaction, Article 216 of the Civil Code of Ukraine provides that an invalid transaction does not create any legal consequences, except for those relating to its invalidity. Therefore, the Shareholders Agreement as a void transaction has not created any legal consequences for its parties since the time of its execution, that is, never. Under such circumstances, as the invalidity of a void transaction does not require obtaining a respective court decision (a decision regarding this would be a mere statement of fact), it [such a transaction] is invalid in view of its nullity, the parties had no grounds whatsoever to perform any actions on its basis, including to resort to arbitration in accordance therewith. The parties have to adjust their conduct so that they would act if there were no Shareholders Agreement, and any continuation of actions on the basis of the Shareholders Agreement, including its arbitration clause, in particular, the referral of a dispute for arbitration by three arbitrators under the applicable UNCITRAL Rules in accordance with it, will be deemed to be a violation of Section 4 of Article 216 of the Civil Code of Ukraine. As under Section 4 of Article 216 of the Civil Code of Ukraine, the parties cannot change the legal consequences of the invalidity of a void transaction, and any agreements between the parties in this respect shall not have any legal effect.

Should the parties and the arbitration designated in the Shareholders Agreement ignore this and should it [the arbitration] render an award on the dispute, this will constitute a violation of the court decision being clarified.

As regards the binding nature of a court decision, under Article 124 of the Constitution of Ukraine and Article 11 of the Law of Ukraine "On the Judicial System of Ukraine", court decisions that have become effective shall be binding on legal entities, citizens, state authorities, local government authorities, their officers, citizen associations and other organizations. Therefore, a court decision is effective and binding also on the persons that have not been the parties to a proceeding.

| | | |
|---|---|---|
| **Chairman of the panel, judge** | [stamp: TRUE COPY | **V.O. Zelenin** |
| | POSITION [*handwritten:* Assistant Judge] | |
| **Judges:** | SIGNATURE [*signature*]] | **N.V. Kapatsyn** |
| | | **O.F. Synytsya** |

I, Oksana Kharchenko, hereby certify that I have knowledge of English and Russian/Ukrainian languages and that I am competent to translate to and from the said languages. I declare that the above translation was done by me and is true, accurate and correct translation of the Decree of the Kyiv Commercial Court of Appeals No. 40/242 dated November 8, 2006, of which I have seen a copy of the original.

December ___, 2006, I, Narinskii F.M., director of Translation Agency "Eridan – 2002", certify the authenticity of signature which is made by translator Oksana Kharchenko.

[Seal]

2

*[Letterhead of the Kyiv Commercial Court of Appeals]*

## RULING
## IN THE NAME OF UKRAINE

**No. 40/242**                                                          **May 25, 2006**

**The Kyiv Commercial Court of Appeals** as consisting of the panel of judges:
Presiding judge – V.O. Zelenin
Judges: L.O. Repina, S.O. Aldanova

**With the participation of representatives of the parties**:
Of the claimant – M.I. Illyashev – by proxy.
Of the respondent – V.V. Klymenko – General Director.

**Upon review of the statement of appeal**      of Limited Liability Company (LLC) "Storm" against the decision issued by the Kyiv City Commercial Court on April 25, 2006 **regarding case No. 40/242** (judge L.G. Smirnova)
**upon the claim** of Alpren Limited, a legal entity under the laws of the Republic of Cyprus **against** LLC "Storm"
**on** recognition of certain actions as unlawful and their termination.

### ESTABLISHED THAT:

By its decision of April 25, 2006 regarding case No. 40/242, the Kyiv City Commercial Court allowed the claim of Alpren Limited, a legal entity under the laws of the Republic of Cyprus, against LLC "Storm" on recognition of actions as unlawful and their termination.

Disagreeing with the issued decision, the respondent has brought a statement of appeal and requests [the court] to reverse it as it [the respondent] believes that it [the decision] was issued in violation of procedural rules of law. According to the respondent, the Kyiv City Commercial Court was to reject the statement of claim based on Article 62 of the Code of Commercial Procedure of Ukraine as it was out of the jurisdiction of commercial courts of Ukraine.

By its decree of May 19, 2006, the Kyiv Commercial Court of Appeals commenced the appeal proceedings in case No. 40/242, the court hearing was scheduled for May 25, 2006.

Having examined the case files, reviewed the statement of appeal and heard the arguments of the attending representatives of the parties, the Kyiv Commercial Court of Appeals established the following.

The claimant is one of the Respondent's participants holding 49.9 percent of votes. The Claimant, as a Respondent's participant, is entitled to participate in the management of the Respondent.

The Respondent is a limited liability company operating on the basis of the laws of Ukraine and its Charter.

The Respondent's operations have been and are managed by its bodies. The powers of each governing body are determined by the laws of Ukraine and the Charter.

Pursuant to the Charter the Respondent's day-to-day operations are managed by the General Director, whose powers are specified in Article 12 of the Respondent's Charter.

*[Seal of the Secretariat of the Kyiv Commercial Court of Appeals]*                    1

As appears from the case files, on September 2, 2002 the Respondent, as represented by its General Director, executed the Voting Agreement between Telenor Mobile Communications AS and Limited Liability Company "Storm".

The abovementioned Agreement (Clause 2.04, b) established an obligation of the Respondent to purchase shares of "Kyivstar G.S.M." under certain conditions. Pursuant to the Respondent's Charter (Article 12), as in effect at the time of execution of the Voting Agreement, the Respondent's General Director was authorized to sign the said Agreement only after approval by the Meeting of Participants, unless otherwise agreed between the participants.

The court of first instance established that the Respondent's Meeting of Participants did not approve the said Agreement, that there existed no other arrangements between the Respondent's participants other than those stipulated in its constituent documents, and that there was no evidence of its subsequent approval by the Respondent.

The panel concurs with the conclusion made by the court of first instance to the effect that, signing the Voting Agreement, the Respondent's General Director was actually trying to administer the Respondent's funds and acted unlawfully, in excess of his powers, in violation of requirements of the laws of Ukraine, in particular, Article 145 of the Civil Code of Ukraine, and the Respondent's Charter.

Therefore, also substantiated is the conclusion of the local commercial court to the effect that as the Voting Agreement, dated September 2, 2002, between Telenor Mobile Communications AS and Limited Liability Company "Storm" is aimed at misappropriation of the Respondent's funds, it is a void transaction pursuant to Article 228 of the Civil Code of Ukraine as a transaction which violates public policy in its entirety, including the arbitration clause, from the time of its conclusion.

On January 30, 2004 the Respondent, as represented by its General Director, executed the Shareholders Agreement between Telenor Mobile Communications AS, Limited Liability Company "Storm" and Closed Joint Stock Company "Kyivstar G.S.M.". The said agreement (Clause 2.03, b. i) established an obligation of the Respondent to purchase shares of CJSC "Kyivstar G.S.M." under certain conditions.

Pursuant to the Respondent's Charter (Article 12), as in effect at the time of execution of the Shareholders Agreement, the General Director was authorized to sign the said agreement only after approval by the Meeting of Participants, unless otherwise agreed between the participants.

The court of first instance established that the Respondent's Meeting of Participants did not approve the abovementioned agreement, that there existed no other arrangements between the Respondent's participants other than those stipulated in its constituent documents, and that there was no evidence of its subsequent approval by the Respondent.

The panel concurs with the conclusion made by the court of the first instance to the effect that, signing the said Shareholders Agreement, the General Director was actually trying to administer the Respondent's funds and acted unlawfully, in excess of his powers, in violation of requirements of the laws of Ukraine, in particular, Article 145 of the Civil Code of Ukraine, and the Respondent's Charter.

Therefore, also substantiated is the conclusion of the local commercial court to the effect that as the Shareholders Agreement, dated January 30, 2004, is aimed at misappropriation of the Respondent's funds, it is a void transaction pursuant to Article 228 of the Civil Code of Ukraine as a transaction which violates public policy in its entirety, including the arbitration clause, from the time of its conclusion.

The panel agrees with the conclusion of the local commercial court to the effect that there are no legal grounds for the Respondent to take actions to perform the Voting Agreement, dated September 2, 2002, between Telenor Mobile Communications AS and Limited Liability Company "Storm", and the Shareholders Agreement, dated January 30, 2004, between Telenor

*[Seal of the Secretariat*    2
*of the Kyiv Commercial*

Mobile Communications AS, Limited Liability Company "Storm" and Closed Joint Stock Company "Kyivstar G.S.M.", and that such actions need to be discontinued.

As for the appellant's statement that the Kyiv City Commercial Court was to reject the statement of claim based on Article 62 of the Code of Commercial Procedure of Ukraine as it was out of the jurisdiction of commercial courts of Ukraine, the panel considers it necessary to point out the following.

Pursuant to Article 12 of the Code of Commercial Procedure of Ukraine, commercial courts have jurisdiction over cases regarding disputes arising in connection with execution, amendment, termination or performance of commercial contracts or on other grounds, unless the parties have referred the dispute for settlement to a court of arbitration (arbitration tribunal). The dispute in question has not been referred for settlement to a court of arbitration (arbitration tribunal), therefore, it is within the jurisdiction of the commercial courts of Ukraine. In addition, pursuant to Article 124 of the Constitution of Ukraine, the jurisdiction of the courts extends to all legal relations that arise in the state.

Considering the foregoing, the court panel deems that the decision of the Kyiv Commercial Court dated April 25, 2006 regarding case No. 40/242 corresponds to the case files and applicable law and, therefore, there are no grounds to amend or reverse it.

Being governed by Articles 99, 101, 103, 105 of the Code of Commercial Procedure of Ukraine, the Kyiv Commercial Court of Appeals, –

## RULED TO:

1. Dismiss the statement of appeal filed by Limited Liability Company "Storm" against the decision of the Kyiv City Commercial Court dated April 25, 2006 regarding case No. 40/242.

2. Affirm the decision of the Kyiv City Commercial Court dated April 25, 2006 regarding case No. 40/242.

3. Return the case No. 40/242 files to the Kyiv City Commercial Court.

| | | |
|---|---|---|
| **Chairman of the panel, judge** | [stamp: TRUE COPY POSITION [*handwritten:* secretary] SIGNATURE [*signature*]] | **V.O. Zelenin** |
| **Judges:** | | **S.O. Aldanova** |
| | [*Seal of the Secretariat of the Kyiv Commercial Court of Appeals*] | **L.O. Repina** |

I, Oksana Kharchenko, hereby certify that I have knowledge of English and Russian/Ukrainian languages and that I am competent to translate to and from the said languages. I declare that the above translation was done by me and is true, accurate and correct translation of the Ruling of the Kyiv Commercial Court of Appeals No. 40/242 dated May 25, 2006, of which I have seen a copy of the original.

December 11, 20[...], [...]inskii F.M., director of Translation Agency "Eridan – 2002", certify the authenticity of signature which is made by translator Oksana Kharchenko.

[Seal]

3

[Letterhead of the Kyiv City Commercial Court]

## DECISION
## IN THE NAME OF UKRAINE

**No. 40/242**                                                                          **April 25, 2006**

**Upon the claim of:** Alpren Limited, Legal entity under the laws of Cyprus Republic

**against:**          Limited Liability Company "Storm"
**RE:**              recognition of certain actions as unlawful and their termination

**The Judge: Smirnova L.G.**

**Representatives:**
Of the plaintiff: Marchenko R.V., representative acting on the basis of the Power of
            Attorney (unnumbered), dated April 5, 2006
Of the defendant: Klimenko V.V., Director General [acting on the basis of] the Minutes,
            dated February 8, 2006

### FACTUAL BACKGROUND:

The Plaintiff filed a claim to recognize as unlawful the actions related to the execution and to discontinue the actions related to performance by the Defendant of the Shareholders Agreement, dated January 30, 2004. During the case hearing, the Plaintiff has extended the demanded relief and asks to recognize as unlawful the actions related to execution and to discontinue the actions related to performance by the Defendant of the Shareholders Agreement, dated January 30, 2004, and the Voting Agreement, dated September 2, 2002.

By its Ruling, dated April 14, 2006, the Kyiv City Commercial Court initiated court proceedings in the case, and the court hearing was scheduled for April 21, 2006.

At the court sitting of April 21, 2006 the case hearing was adjourned until April 25, 2006. The Defendant submitted no statement of defense to the statement of claim.

The Plaintiff's representative, present at the court sitting, sustained the demanded relief and asked [the court] to allow the claim in full.

The Defendant's representative objected against the claim and asked [the court] to disallow it.

[round seal of the Clerk's Office No. 1 of the Kyiv          [stamp: A TRUE COPY]
            City Commercial Court]

Having studied the case papers and having heard the arguments of the parties' representatives, the Kyiv City Commercial Court, -

## DETERMINED THAT:

Pursuant to Article 124 of the Constitution of Ukraine, the jurisdiction of the courts extends to all legal relations that arise in the state. Pursuant to Article 12 of the Commercial Procedural Code of Ukraine, commercial courts have jurisdiction over cases regarding disputes arising in connection with execution, amendment, termination or performance of commercial agreements or on other grounds, unless the parties have referred the dispute for settlement to a court of arbitration (arbitration tribunal). It appears from the case papers that the dispute in question has not been referred for settlement to a court of arbitration (arbitration tribunal) and, therefore, it is within the jurisdiction of the commercial courts of Ukraine.

The Defendant is a limited liability company operating on the basis of the laws of Ukraine and its Charter.

The Plaintiff is one of the Defendant's participants holding 49.9 percent of votes. The Plaintiff, as the Defendant's participant, is entitled to participate in the management of the Defendant.

The Defendant's operations have been and are managed by its bodies, the powers of which are determined in the Charter and by the laws of Ukraine. [Its] day-to-day operations are managed by [its] executive body - the Director General. Pursuant to Article 145 of the Civil Code of Ukraine, powers of the Defendant's Director General and limitations of his powers are defined in Article 12 of the Defendant's Charter.

On September 2, 2002 the Defendant, as represented by its Director General, executed the Voting Agreement between Telenor Mobile Communications AS and Storm Limited Liability Company. The said agreement established an obligation of the Defendant to purchase shares of Closed Joint Stock Company "Kyivstar G.S.M." under certain conditions (Clause 2.04, b). Pursuant to the Defendant's Charter (Article 12), as in effect at the time of execution of the Voting Agreement, the Director General had the right to sign the said agreement only after approval by the Meeting of Participants, unless otherwise agreed between the participants. The court established that the Defendant's Meeting of Participants did not approve the said agreement, that there existed no other arrangements between the Defendant's participants other than those stipulated in its constituent documents, and that there was no evidence of its subsequent approval by the Defendant.

Therefore, signing the said Voting Agreement and actually trying to administer the Defendant's funds, the Defendant's Director General acted unlawfully and in excess of his powers, in violation of requirements of the laws of Ukraine, in particular, Article 145 of the Civil Code of Ukraine, and the Defendant's Charter.

On January 30, 2004 the Defendant, as represented by its Director General, executed the Shareholders Agreement between Telenor Mobile Communications AS, Storm Limited Liability Company, and "Kyivstar G.S.M." Closed Joint Stock Company. The said agreement established an obligation of the Defendant to purchase shares of "Kyivstar G.S.M." CJSC under certain conditions (Clause 2.03, b. i). Pursuant to the Defendant's Charter (Article 12), as in effect at the time of execution of the Shareholders Agreement, the Director General had the right to sign the said agreement only after approval by the Meeting of Participants, unless otherwise agreed between

[round seal of the Clerk's Office No.l of the Kyiv                    [stamp: A TRUE COPY]
City Commercial Court]

the participants. The court established that the Defendant's Meeting of Participants did not approve the said agreement, that there existed no other arrangements between the Defendant's participants other than those stipulated in the constituent documents, and that there was no evidence of its subsequent approval by the Defendant.

Therefore, signing the said Shareholders Agreement and actually trying to administer the Defendant's funds, the Defendant's Director General acted unlawfully and in excess of his powers, in violation of requirements of the laws of Ukraine, in particular, Article 145 of the Civil Code of Ukraine, and the Defendant's Charter.

Pursuant to Article 228 of the Civil Code of Ukraine, a transaction is considered as such that violates public policy, in particular, if it is aimed at misappropriation of property of a legal entity. As the Voting Agreement, dated September 2, 2002, and the Shareholders Agreement, dated January 30, 2004, are aimed at misappropriation of the Defendant's funds, the court concludes that the Voting Agreement, dated September 2, 2002, between Telenor Mobile Communications AS and Storm Limited Liability Company is a void transaction, as well as the Shareholders Agreement, dated January 30, 2004, between Telenor Mobile Communications AS, Storm Limited Liability Company, and "Kyivstar G.S.M." Closed Joint Stock Company is a void transaction pursuant to Articles 215 and 228 of the Civil Code of Ukraine in [their] entirety, including the arbitration clause, from the time of their conclusion.

Pursuant to Article 216 of the Civil Code of Ukraine, an invalid transaction does not create legal consequences, except for those related to its invalidity. Any interested person has the right to demand application of the consequences of invalidity of a void transaction.

Therefore, the court concludes that there are no legal grounds for the Defendant to take any actions to perform the Voting Agreement, dated September 2, 2002, between Telenor Mobile Communications AS and Storm Limited Liability Company, and the Shareholders Agreement, dated January 30, 2004, between Telenor Mobile Communications AS, Storm Limited Liability Company, and "Kyivstar G.S.M." Closed Joint Stock Company, and that such actions need to be discontinued.

The court also takes into account the fact that the Voting Agreement and the Shareholders Agreement, being actually in part amendments and supplements to the Charter of "Kyivstar G.S.M." CJSC, are not duly registered and are set forth in English, contrary to the requirements of the rule of the public law as to the state language contained in Article 10 of the Constitution of Ukraine, and therefore, inconsistent with the requirements of Article 203 of the Civil Code of Ukraine, [these facts alone] are sufficient grounds to recognize them as null and void.

In view of the foregoing and being governed by Articles 49, 82 - 85 of the Commercial Procedural Code of Ukraine, the court, -

RESOLVED:

1. To allow the claim in its entirety.

2. To recognize as unlawful the actions of the "Storm" Limited Liability Company related to the execution of the Voting Agreement, dated September 2, 2002, between Telenor Mobile Communications AS and "Storm" Limited Liability Company.

3. To recognize as unlawful the actions of the "Storm" Limited Liability Company related to the execution of the Shareholders Agreement, dated January 30, 2004, between Telenor

[round seal of the Clerk's Office No. l of the Kyiv City Commercial Court]                    [stamp: A TRUE COPY]

Mobile Communications AS, Storm Limited Liability Company, and "Kyivstar G.S.M." Closed Joint Stock Company.

4. To apply the consequences of invalidity of the void transaction - the Voting Agreement, dated September 2, 2002, between Telenor Mobile Communications AS and Storm Limited Liability Company - and discontinue the actions of the "Storm" Limited Liability Company towards performance of the Voting Agreement, dated September 2, 2002, between Telenor Mobile Communications AS and "Storm" Limited Liability Company.

5. To apply the consequences of invalidity of the void transaction - the Shareholders Agreement, dated January 30, 2004, between Telenor Mobile Communications AS, Storm Limited Liability Company, and "Kyivstar G.S.M." Closed Joint Stock Company – and discontinue the actions of the "Storm" Limited Liability Company towards performance of the Shareholders Agreement, dated January 30, 2004, between Telenor Mobile Communications AS, "Storm" Limited Liability Company, and "Kyivstar G.S.M." Closed Joint Stock Company.

6. To collect from "Storm" Limited Liability Company (1 Narodnogo Opolchennya Street, Kyiv 01001, c/a 26000100675001 opened with Alfa-Bank CJSC, USREOU[1] Code 23163325, MFO 300346) for the benefit of Alpren Limited, Legal entity under the laws of Cyprus Republic, UAH 85.00 (eighty five) of the state duty and UAH 118.00 (one hundred eighteen) of the costs of services related to the technical and information support of the court proceedings.

7. To issue an appropriate order.

This decision shall come into legal force ten days after its adoption.

**The Judge**                                              **Smirnova L.G.**

*[handwritten:* Secretary [signature]]

---

[1] the Unified State Register of Enterprises and Organizations of Ukraine
[round seal of the Clerk's Office No. 1 of the Kyiv            [stamp: A TRUE COPY]
City Commercial Court]

I, Oksana Kharchenko, hereby certify that I have knowledge of English and Russian/Ukrainian languages and that I am competent to translate to and from the said languages. I declare that the above translation was done by me and is true, accurate and correct translation of the Decision of the Kyiv City Commercial Court No. 40/242 dated April 25, 2006, of which I have seen a copy of the original.

December 11, 2006, I, Narinskii F.M., director of Translation Agency "Eridan – 2002", certify the authenticity of signature which is made by translator Oksana Kharchenko.

[Seal]



■ Русский     ✛ Site map     ☎ Contact Us     Enter a





About ALTIMO

Media Centre

Altimo's Talent

Our Assets

Unparalleled exper
and experience

MEDIA CENTRE

Home \ Media Centre \ SUPREME COURT OF UKRAINE UPHOLDS RULING

**Supreme Court of Ukraine upholds ruling on incompliance of Kyivstar's charter**

**03.10.2006**

Having considered the appeal lodged by Storm, a 100-percent subsidiary of Altimo, the Supreme Court of Ukraine cancelled the ruling issued by the Highest Commercial Court of Ukraine on June 27, 2006.

In this way the ruling by the Highest Commercial Court of December 22, 2005 has been restored that orders Kyivstar's shareholders to make amendments to the company's Charter of Association.

The decision of The Supreme Court of Ukraine has eventually upheld Altimo's claim that ZAO Kyivstar's Articles of Association do not comply with Ukrainian legislation and restored the rights of Altimo as Kyivstar's significant shareholder.

Altimo Vice President Kirill Babaev said: "Currently Altimo is consulting with auditors regarding proportional consolidation by the Altimo of its share in Kyivstar after the amendments to the Charter have been made and a new Board of Directors elected."

The issue of further consolidation of Kyivstar's financial results by Telenor remains open. Altimo has earlier received a report from a major international audit company according to which the ruling by the Highest Commercial Court of December 22, 2005 prohibits Telenor to consolidate Kyivstar's financial statements. Altimo sent a letter to Telenor's Board of Directors and the Audit Committee; however, there was no response.

The Highest Commercial Court of Ukraine has restored the law violated by the ruling of the Highest Commercial Court of June 27. This ruling was in conflict with Ukrainian and international law and instigated a controversial response in Ukraine. As a result, MP's of Ukrainian Rada lodged a request with the General Prosecutor's Office and Supreme Council of Justice that the circumstances under which the ruling was issued should be investigated.

Back to Media Centre Press Releases >>

Media Contact Information
Press Release Archives
Press Pack
Altimo Corporate Video
Recent Press
Subscribe
Altimo presentation in Vietr

Subscribe and receive o
releases directly to your