UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :

STORM LLC,                                :

                        Petitioner,    :

                                       :

           -v-                      :

                                       :

TELENOR MOBILE COMMUNICATIONS AS,   :          06 Civ. 13157 (GEL)

                                     :

                      Respondent,    :         **OPINION AND ORDER**

                                     :

              and                 :

                                     :

ALTIMO HOLDINGS & INVESTMENTS LTD.  :
and ALPREN LTD.,                  :

                                     :

                    Relief Defendants.  :

                                     :
------------------------------------------------------------x

Peter Van Tol and Gonzalo S. Zeballos, Lovells Law
Firm, New York, NY, for petitioner.

Robert L. Sills, Jay K. Musoff and Peter O'Driscoll,
Orrick, Herrington & Sutcliffe LLP, New York, NY,
for respondent.

Ronald S. Rolfe, Cravath, Swaine & Moore, New
York, NY, for relief defendants.

GERARD E. LYNCH, District Judge:

      Telenor Mobile Communications AS ("Telenor"), a Norwegian telecommunications

company, and Storm LLC ("Storm"), a company organized under the laws of Ukraine, jointly

own Kyivstar G.S.M. ("Kyivstar"), a Ukrainian telecommunications venture.  Telenor and Storm

are engaged in a dispute over, inter alia, the validity and effect of a 2004 shareholders'

agreement (the "Shareholders Agreement" or "Agreement") related to the corporate governance

and managment of Kyivstar.  To resolve the dispute, Telenor invoked the arbitration provision of

the Shareholders Agreement.  Storm duly responded to the notice, appointed one of the three

arbitrators as provided for in the Agreement, and appeared before the arbitrators ("the

arbitrators" or "the Tribunal"), although its opening move was to challenge the arbitrators'

jurisdiction, claiming that the Shareholders Agreement was invalid because Storm's general

director, who signed it, lacked authority to bind the company.  (See id. Ex. J. at 5-6.)  The case is

before this Court on (1) Storm's petition to vacate the arbitrators' decision on the jurisdictional

issues, which rejected Storm's position and found the issues before them to be arbitrable, and (2)

Telenor's cross-petition to compel arbitration.  The issue now pending before the Court is

Telenor's motion for relief in the form of a preliminary anti-suit injunction prohibiting Storm

and its parent companies from further litigation in Ukraine in relation to the dispute.

The matter is of considerable urgency.  Telenor's counter-petition was served on

December 6, 2006; the arbitrators have scheduled hearings for Monday, December 18.  Having

heard evidence and argument in sessions on November 15, November 22,  December 7,

December 11 and December 15, as well as having reviewed an extensive record submitted in

connection with Telenor's motion and Storm's earlier motion to vacate, the Court is prepared to

rule.  Telenor's motion will be granted.

## BACKGROUND

The 2004 Agreement is the product of a series of negotiations and transactions among

Telenor, Storm, and several other companies, some of which were formerly shareholders of

Kyivstar.  The details of these transactions, which date back at least to 1998, need not be recited

in full here.  It suffices to note that the negotiations arose from the desire of Alpha

Telecommunications, a predecessor company of the "relief defendant" Altimo Holdings & Investment Limited ("Altimo"), to obtain a significant share of Kyivstar.  Storm was the vehicle through which the acquisition was made.  Because Storm obtained over 40% of the Kyivstar shares — which under Ukrainian law gave it substantial rights in corporate governance — Telenor negotiated an agreement obligating Storm not to exercise its rights in certain ways. (See, e.g., 11/15/06 Tr. at 14:6 to 15:2.)  Wary of the Ukrainian legal system, Telenor also negotiated an arbitration clause ("the Arbitration Agreement"), which provided that "[a]ny and all disputes and controversies arising under, relating to or in connection" with the Shareholders Agreement would be resolved by a tribunal of three arbitrators in New York in accordance with the Arbitration Agreement and the UNCITRAL rules.  (12/5/06 Sills Dec. Ex. A at 30.)

Though the Agreement is nominally between Storm and Telenor, Storm is merely a holding company with no business other than holding the shares of Kyivstar for its ultimate corporate parent Altimo, which owns 50.1% of Storm through Hardlake, a Cyprus entity that is 100% owned by Altimo, and the remaining 49.9% through Alpren Limited, which is also 100% owned by Altimo.  (See 12/11/06 Sills Dec. Ex J at 2, Ex. D at 3; 12/11/06 Tr. at 21:3-5.)

In entering the Shareholders Agreement on January 30, 2004, Storm provided documents warranting that its general director, Valeriy Vladimirovich Nilov, who signed the agreement on its behalf, was legally authorized to do so.  (See 12/11/06 Tr. at 59; 8/9/06 Evidentiary Brief in Opp. to Storm Mot. to Dismiss at 16; 12/8/06 Storm Mem. in Opp. to Mot. for Prelim. Injun. Relief at 10.)  Storm now argues, however, that Nilov had not received any such authorization. (See id. at 17.)  Although a resolution passed by unanimous consent of Storm's shareholders specifically authorized the general director to enter the Shareholders Agreement on behalf of

Storm, Storm argues that the authorization referred only to a 2002 agreement, which was slightly but materially different from the 2004 Agreement. (See, e.g., 12/11/06 Tr. at 83:16 to 84:16.) In testimony that is part of the record before this Court, Telenor's key witness acknowledged that the differences are material (see 12/8/06 Van Tol Dec. Ex. D. at 115:16 to 117:18); Storm, however, does not dispute Telenor's contention that the differences in essence favored Storm, and were the result of concessions extracted by Storm during a final period of negotiations. (See 12/11/06 Tr. at 82:14 to 83:15.)

After an initial honeymoon, Telenor and Storm developed differences, and Telenor now accuses Storm of violating the Shareholders Agreement in ways that effectively paralyze Kyivstar. Specifically, Telenor claims that Storm has violated the Shareholders Agreement by failing (1) to attend shareholder meetings, (2) to appoint candidates for election to the Kyivstar board, and (3) to attend board meetings and to participate in the management of Kyivstar. (12/5/06 Sills Dec. Ex. J at 4-5.) Telenor also claims that Storm's five percent ownership of a competitive company violates the Agreement. (Id.) On February 7, 2006, Telenor sought redress for these alleged violations by invoking the arbitration clause.

As noted above, Storm responded to the arbitration demand by appointing an arbitrator and participating in proceedings before the arbitrators. Even as this process was developing, however, legal proceedings were instituted in Ukraine. In the Ukrainian proceedings, Alpren, the 49.9% owner of Storm, sought a declaration of the invalidity of the Shareholders Agreement. (See 12/5/06 Sills Dec. Ex. J. at 8; see also 11/15/06 Tr. 9:10-18.) Telenor was not named as a defendant in the suit, and indeed neither Telenor nor the arbitrators were advised of its pendency. Storm did not retain counsel or file written opposition to the action. (See id.) Instead, its current

general director, Vadim Klymenko, appeared in person and registered oral opposition to
Alpren's demands, a method of proceeding that Storm contends is permissible, and not unusual,
in Ukraine.  (See 12/5/06 Sills Dec. Ex. E at 2; see also id. Ex. J. at 9-10.)

      Whether or not unusual under Ukrainian custom, the proceeding had a number of curious
features.  Although Klymenko, who acted for Storm in the matter, is not a lawyer, a resume
submitted by him in connection with the arbitration notes that he is a Vice President of Altimo,
the ultimate parent both of Storm and of Alpren, and that his responsibilities in that role include
the management of "litigation[,] arbitration, representation and implementation of shareholders'
interests."  (12/5/06 Sills Dec. E. at 6.)  The initial Ukrainian proceeding appears to have lasted
all of ten minutes (12/11/06 Tr. at 55:2-6), suggesting that Klymenko's oral opposition was
somewhat perfunctory.  It resulted in a judgment declaring the Shareholders Agreement invalid.
Storm appealed the result, again without submitting any substantial defense of its position.[1]  An
appellate court not only affirmed the lower court's decision against Storm, but broadened it by
finding specifically that the Arbitration Agreement was invalid.

      The arbitrators, however, did not accept the Ukrainian courts' conclusions as binding on
them.  In a well-reasoned decision, the arbitrators entered a "Partial Final Award" rejecting
Storm's jurisdictional argument.  (12/5/6 Sills Dec. Ex. J.)  Though reserving to later hearings
the questions regarding the validity of the Shareholders Agreement, the arbitrators declared that
whether or not Nilov had authority to enter into the Agreement itself, he at least had the authority
to enter an arbitration agreement.  (Id. Ex. J at 13-14.)  Accordingly, the Tribunal denied Storm's

---

    [1]  Telenor argues that Storm appealed because an "appeal gives a special enforceable
status, at least as a formal matter of Ukrainian law, to the judgment."  (12/11/06 Tr. at 61:7-9.)

motion to dismiss and held that it had jurisdiction to hear Telenor's claims.

After losing its motion to dismiss before the Tribunal, Storm obtained a "clarification" form the Ukrainian courts that broadened the scope of their initial rulings by specifically stating that the arbitration clause of the Shareholders Agreement was invalid, apparently in response to the arbitrators' suggestion that the Ukrainian courts had not considered the possible severability of the Arbitration Agreement. (See 12/5/06 Tr. at 61:25 to 62:10.) Storm then quickly filed a petition in state court to enjoin the arbitration from continuing. Telenor removed the action to this Court, asserting subject matter jurisdiction under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention" or "Convention"). See 9 U.S.C. §§ 203, 205. This Court denied preliminary relief, holding that the Court could not review an interlocutory order of an arbitral panel, and that to the extent Storm relied on the general equitable power of the Court, it was insufficiently likely to prevail on the merits, given the likely correctness of the arbitrators' ruling, the apparently collusive nature of the Ukrainian litigation, and the lack of conflict between the arbitrators' decision and the Ukrainian judgment, given that Storm had not been ordered by the Ukrainian court not to participate in the arbitration. (See 11/22/06 Tr. at 19:15 to 38:15.)

Following this decision, the Ukrainian parties returned to court. This time, Alpren sued not Storm but Klymenko himself as general director of Storm, and obtained in equally short order a ruling that not only barred Klymenko from participating in the arbitration, but that also purported to bar Storm and Telenor from proceeding with the arbitration — notwithstanding that Telenor had again not been notified of the action nor named as a party to it. (12/5/06 Sills Dec.

6

Ex. C; see also 12/7/06 Tr. at 23:19-24.)   Telenor has still not been served in Ukraine with any order of the Ukrainian court; it obtained a copy of the judgment only via New York counsel for Storm in connection with the arbitration proceedings and this litigation.

After this ruling, Telenor sought relief from this Court, counterpetitioning to compel arbitration, and simultaneously seeking an anti-suit injunction against Storm, Alpren and Altimo to prevent further litigation in the Ukraine.  On December 7, 2006, the Court granted a temporary restraining order, and held an evidentiary hearing on Telenor's motion for a preliminary anti-suit injunction.  Alpren and Altimo moved to dismiss any claims against them for lack of in personam jurisdiction, and Storm contested Telenor's motion on the merits.  Storm and Telenor agreed to the admission of the evidentiary record compiled during the arbitration proceeding with respect to jurisdiction, supplemented by additional testimony taken before this Court.[2]  In a further hearing today, Alpren and Altimo also agreed that the Court could consider all of the evidence in the record in addressing the motion for an injunction against them.

## DISCUSSION

I.    Legal Standards

The standard for issuing a preliminary injunction is well established.  To obtain a preliminary injunction, the party seeking relief must demonstrate (1) that it will suffer irreparable harm absent injunctive relief, and (2) either (a) that it is likely to succeed on the merits, or (b)

---

[2]   After the December 11 evidentiary hearing, Telenor received documents from an attorney for Alpren that on their face would appear to be a complaint in yet another suit in the Ukraine, this time naming Telenor itself as a defendant, attacking the validity of the Shareholders Agreement, as well as the arbitration.  At a conference held on December 15, 2006, counsel for Alpren represented to the Court that the documents had been sent in error, and that no further litigation had in fact been filed.

"that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." <u>Moore v. Consol. Edison Co.</u>, 409 F.3d 506, 510 (2d Cir. 2005) (citation and internal quotation marks omitted).

A federal court may enjoin a party from pursuing litigation in a foreign forum. <u>China Trade and Development Corp. v. M.V. Choong Yong</u>, 837 F.2d 33, 35 (2d Cir. 1987). "But principles of comity counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with care and great restraint.'" <u>Paramedics Electromedicina Comercial, Ltda. V. GE Med. Sys. Info. Techs., Inc.</u>, 360 F.3d 645, 653 (2d Cir. 2004), quoting <u>China Trade</u>, 837 F.2d at 36. Two threshold requirements must be met before an anti-suit injunction is appropriate: (1) the parties must be the same in both matters; and (2) resolution of the case before the enjoining court must be dispositive of the action to be enjoined. <u>See Paramedics</u>, 360 F.3d at 652-53. If those requirements are satisfied, a court must then consider such factors as (1) the potential frustration of a policy in the enjoining forum; (2) the vexatiousness of the foreign litigation; (3) a threat to the issuing court's jurisdiction; (4) any prejudice caused by the foreign litigation to other equitable considerations; and (5) any delay, inconvenience, expense, inconsistency or unseemly race to judgment created by adjudication of the same issues in separate actions. <u>See Ibeto Petrochemical Indus., Ltd. v. M/T "Beffen"</u>, 412 F. Supp. 2d 285, 29 (S.D.N.Y. 2005); <u>Am. Home Assurance Corp. v. Ins. Corp. of Ireland, Ltd.</u>, 603 F. Supp. 636, 643 (S.D.N.Y. 1984), <u>cited with approval in China Trade</u>, 837 F.2d at 35-36.

II.     <u>The Standards Applied</u>

    A.     <u>Threshold Requirements</u>

1.    The same parties

At the outset, there is some question in this case as to whether the threshold requirements are met. This is not a typical arbitration anti-suit scenario, such as <u>Paramedics</u>, in which A seeks to compel arbitration against B in one jurisdiction while B seeks relief in the same dispute against A in a foreign court. In that situation, the parties will typically be the same in both proceedings, satisfying the first threshold requirement for an anti-suit injunction.

Here, in contrast, Telenor has demanded arbitration against Storm in New York, pursuant to the Shareholders Agreement. Unlike the typical anti-suit scenario, Storm did not refuse arbitration and seek converse relief against Telenor in the courts of Ukraine. Rather, Storm appointed an arbitrator, and appeared before the arbitration panel. Although the first issue presented to the arbitrators by Storm was a challenge to their jurisdiction, Storm has taken the position before this Court that it is ready and willing to proceed to the merits before the arbitrators – indeed, that it is eager for its "day in court" to vindicate its position on the merits – but for the fact that it has been placed in an untenable position by a lawsuit brought not by but *against* it in Ukraine. Telenor seeks to enjoin that litigation, which on its face is not a suit involving the same parties (Telenor and Storm) who are before the arbitrators here, but a suit between a third party, Alpren, and Storm. Thus, Storm argues, the first threshold requirement is not met, because the parties to the litigation in Ukraine are not the same as the parties here. Put another way, Storm argues that there is no basis for enjoining it from bringing litigation in Ukraine, because it has not brought any such litigation; rather, litigation has been brought against it there.

Telenor argues, however, that Storm's view of the litigation in Ukraine is at best

formalistic, and at worst deceptive. According to Telenor, Alpren and Storm are mere alter egos of one another, and more importantly, they are both alter egos of their shared corporate parent, Altimo. And, Storm posits, even if the present record is insufficient to demonstrate that these various companies are alter egos of one another, the litigation between them is nevertheless collusive; it is, in effect, a friendly suit between Storm and its parent, in which the interests of the parties are aligned rather than adverse. In Telenor's view, Storm is in effect the plaintiff, having stimulated an action against itself in order to produce an order that serves its interests in the New York arbitration. And while Telenor is not formally a party to the Ukrainian lawsuit – indeed, it was deliberately left out of both actions in Ukraine, and given notice of neither until a judgment was obtained – its absence has not prevented the Ukrainian courts from entering an injunction that purports to bind Telenor. Thus, according to Telenor, the real parties in interest in the Ukrainian litigation are Storm (and its parents) on one side and Telenor on the other, the same parties as the New York arbitration.

Paramedics itself illustrates that although the threshold requirement is usually formulated as requiring that the parties be "the same," the rule is not so strict in practice. In Paramedics, the Second Circuit held that the fact that a different party was present in the foreign proceedings did not defeat the "same parties" requirement, because the purportedly distinct party was a close affiliate of one of the parties in the New York action, and was involved only because of its affiliation. Thus, the Court ruled, "[t]he district court did not abuse its discretion in ruling that the parties to the two actions are thus *sufficiently similar* to satisfy the first threshold requirement of China Trade." 369 F.3d at 652 (emphasis added). See also Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp.2d 552, 562 (S.D.N.Y. 2006) ("Where parties to

10

the two actions are affiliated or substantially similar, such that their interests are represented by one another, courts have found the first requirement is met."); Motorola Credit Corp. v. Uzan, 02 Civ. 666 (JSR), 2003 WL 56998, at *2 (S.D.N.Y. Jan. 7, 2003) (finding sufficient similarity between parties, even though not all parties to the two actions were identical, because "the real parties in interest are the same in both matters"), cited in Paramedics, 369 F.3d at 652; MasterCard Int'l, Inc. v, Argencard S.A., 01 Civ. 3027 (JGK), 2002 WL 432379, at *10 (S.D.N.Y. Mar. 20, 2002) (finding "sufficient[] similar[ity]" between parties despite intervention in foreign action by one party's controlling shareholder, which was "not a necessary party to that action"), cited in Paramedics, 369 F.3d at 652-53.

      As explained below, see Part III, the Court agrees that Telenor will likely succeed in establishing that Storm, Alpren and Altimo are alter egos of one another, at least to the extent necessary to warrant the relief Telenor seeks against them.   Even if they are not, however, the parties in the two actions are sufficiently similar to satisfy the threshold requirement for a preliminary anti-suit injunction.  The litigation in Ukraine, while nominally between Alpren and Storm, seeks to influence the arbitration proceedings and has resulted in orders that are directed at Telenor.  Although Alpren is a participant in the Ukrainian litigation, Alpren is not merely a shareholder of Storm but is part of a family of affiliated corporations that collectively owns the entirety of Storm.  The real parties in interest in the Ukrainian lawsuit are essentially the same entities that are involved in the arbitration here.

      Of course, if Telenor is ultimately unable to show that the Altimo-controlled companies are alter egos of one another, this case would differ from Paramedics in at least one significant respect.  In Paramedics, the party to be enjoined had sued an additional affiliate of the plaintiff.

11

See Paramedics, 369 F.3d at 652.  Here, the party to be enjoined is ostensibly the *defendant* in litigation brought by a third party abroad.  Nevertheless, the Court has no trouble concluding that the parties here and in the Ukraine are "sufficiently similar" for purposes of an antisuit injunction.  The question of whether an injunction can or should issue against a nominal defendant in a foreign action presents a distinct and more difficult issue, which is best deferred to a later stage of the analysis.

2.    Dispositive litigation

The second threshold question is whether the present litigation will be dispositive of the issues being litigated in the foreign forum.  As is frequently the case where arbitration is in issue, the litigation between Storm and Telenor in this Court does not in itself concern the merits of the issues that divide them, or that have been put in issue in Ukraine.  Rather, this case concerns only the *arbitrability* of those issues.  Nevertheless, courts have recognized that in this situation, the district court's judgment disposes of the foreign action by determining the arbitrability of the issues.  See Paramedics, 369 F.3d at 653.  See also Affymax, Inc. v. Johnson & Johnson, 420 F. Supp. 2d 876, 885 (N.D. Ill. 2006) (finding second threshold requirement met where "resolution of the arbitration will be dispositive of the [foreign] action"); Ibeto Petrochemical Indus., 412 F. Supp. 2d at 292 (finding second threshold requirement met where "resolution of [the] case (through arbitration) will be dispositive of the [foreign] matter").

Here, the issue pending before this Court is the arbitrability of the very issues put before the Ukrainian court: Storm brought this action seeking to enjoin the arbitration, and Telenor counterpetitions to compel it.  If the present action results in a judgment for Telenor and against Storm, then the issues before the Ukrainian courts will be, "by virtue of [that] judgment, . . .

reserved to arbitration," Paramedics, 369 F.3d at 653, and the threshold requirement for an anti-suit injunction will be met.[3]

One further problem arises, however. The arbitration will finally dispose of all pending issues between Telenor and Storm. It is separate question, however, whether it will have any effect on the status of those issues between Storm and Alpren, who are the parties to the Ukrainian litigation. If the Ukrainian court had confined itself to adjudicating matters between the parties before it, this might be a significant obstacle to an anti-suit injunction. Whoever was responsible for bringing the Ukrainian action, that action is between Alpren and Storm (and Klymenko as Storm's agent). The relationship of those entities is not governed by a contract with an arbitration clause, and whatever rights might be at stake as between them are not at issue in the arbitration, which concerns only Storm's obligations to Telenor.

This concern evaporates, however, once Telenor demonstrates — as it likely will be able to do — that Altimo, Alpren and Storm are, for purposes of the present dispute, the same entity. See Part III, infra. In any event, even if Telenor's alter-ego argument does not succeed in the end, the fact remains that the parties in Ukraine have obtained orders purporting to bind Telenor, and to prohibit both Telenor and Storm from going forward with the arbitration. At least with respect to such orders, the arbitration, and any decision in this Court regarding arbitrability, will be dispositive. By attempting to bind Telenor to the results of litigation between them to which Telenor is not a party, Alpren and Storm have created the prerequisite conditions for an anti-suit

---

[3] At this time, of course, the case has not progressed to a final judgment, and the question is not whether a final injunction should issue, but whether preliminary relief should be granted. The point, however, is that this is the kind of action that satisfies the threshold requirement for an anti-suit injunction, because it will be dispositive of the issues raised in the foreign litigation if those issues are found arbitrable.

injunction.

Accordingly, although the issue is not free from doubt given the convoluted factual situation, the Court concludes that Telenor is likely to succeed in demonstrating that the prerequisite conditions for an anti-suit injunction have been met on the facts of this case.

      B.      <u>Factors Bearing on Injunctive Relief</u>

The Court thus turns to the factors bearing on whether an injunction should issue. As noted above, the usual factors applied in this context are (1) the potential frustration of a policy in the enjoining forum; (2) the vexatiousness of the foreign litigation; (3) a threat to the issuing court's jurisdiction; (4) any prejudice caused by the foreign litigation to other equitable considerations; and (5) any delay, inconvenience, expense, inconsistency or unseemly race to judgment created by adjudication of the same issues in separate actions. <u>See</u> <u>Ibeto Petrochemical Indus.</u>, 412 F. Supp. 2d at 290. If Storm had directly sued Telenor in the Ukrainian courts, balancing the factors involved here would be relatively easy, since several of the factors weigh heavily in favor of an injunction in this case.

With respect to the first factor, federal policy strongly favors the enforcement of arbitration agreements. <u>Arciniaga v. General Motors Corp.</u>, 460 F.3d 231, 234 (2d Cir. 2006) ("[I]t is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied." (citation and internal quotation marks omitted)). This policy "applies with particular force in international disputes." <u>Paramedics</u>, 369 F.3d at 654, citing <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u> 473 U.S. 614, 638-40 (1985). To the extent that the litigation in Ukraine threatens to disrupt the arbitration process, it would have the effect of frustrating that policy. And there is no doubt that that litigation has been

14

designed to, and has had the effect of, interfering in the arbitration process.  The judgments

issued in that litigation have been the basis for objections to the arbitrators' jurisdiction, appeals

to this Court to enjoin the arbitration, and concerns on the part of Telenor that it or even the

arbitrators themselves may be subject to penalties in Ukraine if the arbitration goes forward.

This factor thus strongly favors an injunction.

Storm argues that this factor is not significant here because the entire Shareholders

Agreement, including the arbitration agreement, is invalid.  The federal policy favoring

arbitration, Storm contends, cannot apply where there is no agreement to arbitrate in the first

place.  Telenor, however, has satisfied its burden of demonstrating a likelihood of success on the

merits on that issue, and that is all that is required at this stage.  In light of the urgency of the

preliminary injunction issue, the Court will not discuss the matter in depth.  It suffices to note

that the Court agrees in substantial part with Telenor's argument that Nilov, Storm's general

director, had at least apparent authority to sign the Shareholders Agreement and to thereby bind

Storm to the Agreement's arbitration clause.  (Telenor Mem. 6-10; 12/11/06 Tr. at 50:22 to

59:20.)[4]  While the Court has expressed some doubt as to whether Telenor is entitled to an order

---

[4]  This is not to say that the Court necessarily accepts Telenor's argument on the choice-of-law question.  Telenor argues that New York law applies to the question of whether Storm agreed to arbitrate, whereas Storm argues that Ukrainian law applies to that issue.  Both parties have acknowledged, however, that this case falls under the New York Convention.  (11/15/06 Tr. 3:1 to 4:20.)  The weight of the authority suggests that in such cases, *federal* law governs the issue of whether the parties have agreed to arbitrate.  See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 96 (2d Cir. 1999) (explaining that with respect to questions regarding the making of an agreement to arbitrate in a case falling under the Convention, "compelling reasons [exist] to apply federal law . . . to the question of whether an agreement to arbitrate is enforceable."); Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 845 (2d Cir. 1987) ("In enacting the federal Arbitration Act, Congress created national substantive law governing questions of the validity and the enforceability of arbitration agreements under its coverage.  Hence whether Genesco is bound by the arbitration clause of the sales confirmation

compelling arbitration, the reason for that doubt has nothing to do with the validity of the arbitration clause.  Rather, the Court's reservations regarding the motion to compel were based on the concern that an order compelling arbitration may not be procedurally appropriate where both parties have already submitted to arbitration.  (See 12/11/06 Tr. at 3:5 to 9:6.)  Moreover, because Telenor is likely to succeed in demonstrating that Storm, Alpren and Altimo are alter egos of one another, the federal policy favoring arbitration also weighs strongly in favor of issuing an antisuit injunction against Alpren and Altimo.

Attempts to interfere with arbitration of international disputes are so powerfully disapproved that the Second Circuit has suggested, albeit not decided, that "an attempt to sidestep arbitration" might be "sufficient to support a foreign anti-suit injunction." Paramedics, 369 F.3d at 654.  Where this factor is present, little else is required to authorize an injunction.  But here there is much else.  The foreign litigation here has been conducted in the most vexatious way possible.  Telenor has found its interests undermined by litigation to which it has not been made a party, and of which it has not even received notice until after orders have been

---

forms is determined under federal law, which comprises generally accepted principles of contract law." (citations omitted)); Stony Brook Marine Transp. Corp. v. Wilton, 94 Civ. 5880 (JS), 1996 WL 913180, at *3 (E.D.N.Y. May 1, 1996) ("[T]he vast majority of the cases in this Circuit hold that under the Federal Arbitration Act, federal law applies to contract formation issues when the question of an agreement to arbitrate is at issue."); 21 Williston on Contracts § 57:56 (4th ed. 2006) (noting that under the Convention, "[g]eneral federal law, rather than the state law of the forum and its conflict of laws rules, governs the question whether an agreement to arbitrate was made"); see also Republic of Ecuador v. ChevronTexaco Corp., 376 F.Supp.2d 334, 352-56 (S.D.N.Y. 2005) (analyzing, and attempting to reconcile, inconsistencies in Second Circuit case law on this issue).

However, even if federal law, as opposed to New York or Ukrainian law, applies, this does not undermine the substance of Telenor's argument, because federal law and New York State law are consistent with respect to apparent authority in agency relationships.  See 36 Convent Ave. HDFC v. Fishman, 03 Civ. 3998 (JGK), 2004 WL 1048213, at *3 (S.D.N.Y. May 7, 2004).

entered.  The Ukrainian orders have been used against Telenor in court and before the arbitrators

here in New York, and have exposed it to potential criminal liability in Ukraine.  As late as this

very day, Telenor was receiving what appeared to be service of process in yet another lawsuit,

only to be advised by Alpren's New York attorney during oral argument that there was no such

lawsuit, and that the papers were a "mistake" of no legal significance.  If a federal court may

enjoin foreign litigation that straightforwardly seeks to adjudicate the rights of a party to

litigation, a fortiori it should be able to enjoin litigation being conducted by a kind of stealth

attack.  These facts also support a finding that the fourth factor favors an injunction: to the extent

that the litigation in Ukraine purports to bind Telenor without notice or opportunity to be heard,

it manifestly prejudices any equitable concern for fair play.

    In addition, the foreign litigation threatens the jurisdiction of this Court.  This case is

here, at Storm's original instance, by virtue of the pending arbitration.  Storm lost in its effort to

derail that arbitration by a preliminary injunction.  The Ukrainian litigation seeks to "sidestep"

not merely the arbitration, but this Court's ruling.  It further threatens the very existence of the

arbitration, by threatening serious sanctions against Telenor if it proceeds with the arbitration.  If

Telenor were forced to yield to that pressure, this Court's jurisdiction would be at an end.

    Moreover, continued litigation in Ukraine raises the distinct specter of delay,

inconvenience, expense, inconsistency and an unseemly race to judgment.  Arbitration is

intended to be an expeditious and efficient means of resolving commercial disputes.  Being

forced to litigate in both American and Ukrainian courts not merely to enforce an arbitration

agreement but to defend the existence of an arbitration already under way, has already created

extensive delays in the arbitration proceeding and added considerable expense to the

proceedings. The risk of inconsistent adjudications is acute, particularly because Alpren and Storm apparently insist on conducting their Ukrainian litigation without even notifying Telenor, such that Telenor's position has not even been heard.[5]  A proceeding in which Storm and Telenor vigorously contest the issues is highly likely to reach different conclusions than one in which the only participating parties share a common interest and the same analysis of the issues.

As for an "unseemly race to judgment," "unseemly" and "race" do not begin to describe the situation here.  After every setback in the arbitration or in this Court, parties associated with Storm have proceeded to the Ukrainian courts, seeking and obtaining broad rulings without any meaningful opposition.  Telenor seeks to arbitrate the dispute in a neutral forum; Storm and its parents seek to coopt that process by resorting to a forum in which their home-court advantage is magnified by their willingness to play the game without letting the other team show up.

The factors relevant to an award of anti-suit relief thus strongly favor Telenor.  And strongly favor Telenor they must, for as the courts have emphasized, even though "such an injunction in terms is leveled against the party bringing the suit, it nonetheless 'effectively restricts the jurisdiction of the court of a foreign sovereign.'"  Paramedics, 369 F.3d at 655, quoting China Trade, 837 F.2d at 35.  Considerations of comity thus always weigh against an anti-suit injunction.[6]

---

[5]  Storm's blithe suggestion that Telenor could intervene on appeal after judgment has already been reached against it is hardly an adequate opportunity to be heard.

[6]  Telenor contends that comity is a lesser concern here because the courts of Ukraine are entitled to less deference than might otherwise be the case.  Telenor relies on reports from the State Department, which has found that the Ukrainian judiciary suffers from "corruption and inefficiency."  See United States Department of State, Country Report on Human Rights Practices in the Ukraine (2006), available at http://www.state.gov/g/drl/rls/ hrrpt/2005/ 61682.htm.  This Court rejects the view that it can simply dismiss the usual comity due to a

18

Accordingly, to the extent that Storm can be held responsible for the Ukrainian litigation, the issue is clear-cut: Telenor is extremely likely to succeed in establishing that virtually all of the factors considered by courts in granting anti-suit injunctions favor its cause. Nevertheless, the entry of an anti-suit injunction against the *defendant* in foreign litigation is both unconventional, and, so far as the parties' or the Court's research can determine, unprecedented. The Court thus turns to consideration of that issue.

      C.    <u>May an Anti-Suit Injunction Issue Against Storm?</u>

Telenor persistently refers to the Ukrainian litigation between Storm and Alpren as "collusive," and indeed this Court too has so found it, at least to the limited degree necessary to make preliminary findings with respect to Storm's request for preliminary relief. Telenor also claims that an injunction against Storm is appropriate because Storm is acting as the alter ego of its corporate parents Altimo and Alpren.

Having weighed the parties' arguments and evidence, the Court finds that Telenor is at a minimum likely to prove that the Ukrainian action has been brought with the collusion of Storm. First, the position that Alpren seeks to vindicate in the Ukrainian courts is exactly the position that Storm has asserted before the arbitrators and in this Court, namely, that the arbitration agreement is invalid because it is part of a Shareholders Agreement that the then general director of Storm was not authorized to sign. Although Storm argues that Klymenko formally opposed the relief sought by Alpren, it does not contend that Klymenko or Storm objected on the merits

---

foreign sovereign on the basis of such criticism. However, it must be noted that the departure from due process involved in entering orders against absent, unserved parties without prior notice lessens the degree of comity due, not to the Ukrainian courts at large, but to the particular orders at issue in this case.

to the legal position taken by Alpren. Rather, it argues that Storm urged the Ukrainian court to defer to the on-going arbitration. (See, e.g., 12/5/06 Sills Dec. Ex. E at 3.) Given that Storm has taken the exact opposite position here and has actively supported in this litigation the position taken by its supposed adversary abroad, it is reasonable to infer that its true position in the Ukrainian is identical to Alpren's.[7]

Indeed, Storm has explicitly conceded before this Court that it wishes the Ukrainian action to continue *precisely because it hopes and expects that the Ukrainian courts will rule against Storm*. In its most recent memorandum to the Court, Storm argues that this "Court should allow the Ukrainian action to continue" because that action "will lend further support to Storm's claim in the arbitration that the Shareholders Agreement is null and void in its entirety under Ukrainian law." (Storm Mem. in Opposition to Telenor Mot. for Prelim. Injunc. Relief at 27.) In view of this blatant acknowledgment that Storm's opposition to Telenor's request for an antisuit injunction is rooted in a desire to protect the ruling in favor of Alpren, Storm's claim that it has opposed Alpren's lawsuit is simply implausible.

Klymenko, moreover, neither retained counsel nor submitted written legal or factual arguments in the Ukrainian court. Storm offers expert testimony that, contrary to federal practice here, it is both permissible and not uncommon in Ukraine for corporations to appear in court pro se through their chief executive officer, and that oral presentation of arguments and evidence is also common practice. But the point is not whether such practices are permissible or even whether they are common. The issue is whether a party that seriously opposed an action

---

[7] At the December 11, 2006, hearing, Storm acknowledged that the argument it presented to the Ukrainian courts was the "same argument" that it opposes here. (12/11/06 Tr. at 73:5-8.)

would proceed in that manner.  There can be little doubt, for example, that if such an action had been brought against Telenor, it would have retained counsel and sought a sufficient adjournment to make a substantive, serious presentation to the Court.  Storm, however, presented its defense in the most perfunctory manner, and did not even bother to notify Telenor of the proceedings.  Alpren, in contrast, was represented by counsel throughout the proceedings.  Indeed, it appears that it was represented by a law firm that had previously represented Storm.

Alpren relies heavily on the affidavit of Klymenko, who claims to have presented a defense in the Ukrainian actions.  Klymenko, however, has never been present in this Court or in the arbitration to be cross-examined, and his affidavit — which Storm submitted to the arbitrators — relates only to the first stage of the first litigation.  His affidavit does not address how Storm managed, by seeking a "clarification" of the "adverse" judgment in the first case, to succeed only in broadening the order in such a way as to better conform to the position it was taking in the United States, and it does not speak to the action later brought against Klymenko personally.

It is worth emphasizing that Klymenko is not merely the general director of Storm, but also an executive of Altimo (12/11/06 Tr. at 22:19-23, 47:9-15; 12/11/06 Sills Dec. Ex. A), and there is evidence that as an Altimo executive, he has responsibility for, among other things, litigation.  (See 12/5/06 Sills Dec. Ex. E at 6.)  There is also evidence in the record that in his dealings with Telenor, Klymenko held himself out indiscriminately as representing either company, and that there was no real distinction between his duties as an Altimo executive and his duties as director of Storm.  (See, e.g., 12/11/06 Tr. at 47:9 to 48:18; 12/5/06 Sills Dec. Ex. E. at 6.)  It is difficult to believe that Alpren undertook to sue Storm without the knowledge

either of Storm or of the litigation manager of Altimo.

Finally, all of the facts described above must be considered in light of the corporate structure of the supposedly adverse parties. As noted above, Storm is 50.1% owned by Altimo through one intermediary, and Alpren, which owns the other 49.9% of Storm, is 100% owned by Altimo. Neither Storm nor Alpren conduct any real business activities; Alpren exists to hold Altimo's shares in Storm, and Storm's sole activity is its possession of the shares in Kyivstar. Storm's general director, Klymenko, is an executive of Altimo, and Klymenko's own description of his responsibilities suggests no meaningful distinction between his activities for Storm and his activities for Altimo. (12/5/06 Sills Dec. Ex. E at 2, 6.)

Weighing all these matters, the Court is persuaded that Telenor is likely to succeed in establishing, at a minimum, that the litigation in Ukraine has been collusive, and not truly adversarial. The Ukrainian litigation was brought in Storm's as well as Alpren's interests, sought relief that Storm had every reason to desire, and was not meaningfully resisted by Storm or its general director. Storm has effectively conceded before this Court that it wants to preserve the Ukrainian judgment "against" it. Accordingly, it is a fair inference, and one that on this limited record the Court finds more likely true than not, that Storm colluded in the bringing of this litigation against itself. It can therefore be enjoined from continuing with such actions.

D.    Futility

A court of equity will not undertake futile acts. See Foster v. Mansfield, C. & L. M. R. Co., 146 U.S. 88, 101-02 (1892); Spectacular Venture, L.P. v. World Star Int'l, Inc., 927 F.Supp. 683, 686 (S.D.N.Y. 1996). In arguing that the actions here will not be dispositive, Storm contends that whatever this Court or the arbitrators do, "[t]he Ukrainian courts have already

22

determined several times that the Shareholders Agreement violates Ukrainian law [and] [n]othing that the arbitral tribunal determines is going to change that." (12/8/06 Storm Mem. in Opp. to Mot. for Prelim. Injun. Relief at 27.)

It may well be questioned whether Telenor in the end can secure any benefit from an arbitration award in its favor, even if such an award is confirmed and embodied in a judgment of this Court. But it cannot simply be assumed that this Court's judgments will be disregarded by foreign courts. The "determin[ations]" of the Ukrainian courts to which Storm refers were reached in apparently non-adversarial proceedings between friendly parties with no incentive to raise serious issues about the correctness of their joint position. Such determinations may not be adhered to in genuine judicial proceedings. Moreover, the record in this case contains no information about what assets Storm may have outside Ukraine that could be reached by either a judgment on the merits or a contempt adjudication. The views of the Ukrainian courts may not be shared by those of other countries.

E.    Irreparable Injury

The Court need not dwell on the issue of irreparable injury, for there is no question that the action to be enjoined places Telenor under threat of imminent and irreparable harm. To the extent the Ukrainian litigation interferes with the arbitration, Storm will be able to prolong its boycott of Kyivstar meetings, thereby making it impossible for that company — in which Telenor has a majority stake — to function. (See 11/22/06 Tr. at 36:24 to 37:4.) More importantly, however, the Ukrainian proceedings place Telenor under threat of criminal sanctions if it proceeds with the arbitration. Not only does Storm concede that this possibility exists, but it has exploited the possibility in its attempt to derail the arbitration. (12/5/06 Sills

Dec. Ex. B.)

III.    <u>Altimo and Alpren</u>

Telenor seeks a preliminary anti-suit injunction not only against Storm, but also against Altimo and Alpren.  Those corporations have entered a limited appearance to contest the in personam jurisdiction of the Court.

Altimo and Alpren argue that neither of them transacts any business within New York.  This claim is something of a red herring, however.  It is undisputed that neither Altimo nor Alpren — nor Storm, for that matter — has any ordinary business in New York or would be subject to general jurisdiction here.

The Arbitration Agreement, however, expressly provides for arbitration in New York, and in that same agreement Storm expressly consents to the jurisdiction of this Court.  Counsel for Altimo and Alpren conceded at a December 15 hearing before this Court that if they were found to be alter egos of Storm, the Court could properly exercise personal jurisdiction over them on a theory of consent.

The question, therefore, is whether Telenor has succeeded in demonstrating, for personal jurisdiction purposes, that Altimo, Alpren and Storm are alter egos of one another.  To determine whether a company is an alter ego of another company (or a "mere department" of another company), the Court must evaluate four factors: "(1) common ownership, which is essential; (2) financial dependency of the subsidiary on the parent; (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's personnel and fails to observe corporate formalities; and (4) the degree of control that the parent exercises over the subsidiary's marketing and operational policies."  <u>Sodepac, S.A. v. Choyang Park in rem</u>, 02 Civ. 3927

24

(SAS), 2002 WL 31296341, at *4 (S.D.N.Y. Oct. 10, 2002).[8]

These factors clearly weigh in favor of Telenor's motion here. The common ownership of Alpren and Storm by Altimo is undisputed. Alpren and Storm, moreover, are essentially shell companies that exist solely for the purpose of holding shares for Altimo — Alpren holds shares in Storm, and Storm holds shares in Kyivstar. The Court is unaware of any evidence in the voluminous record that these shell companies are financially independent, or that they have more than a few employees. Indeed, Alpren and Altimo's counsel conceded at the December 15 hearing that he knew of no evidence in the record that Storm had employees other than its general director. In a submission to the arbitration panel, Storm conceded that it had no board of directors and that its senior management consisted only of Klymenko. (12/15/06 Sills Letter Ex. A.) There is also evidence in the record that Altimo has the right to select Storm's general director. (See, e.g., Telenor Evidentiary Brief Ex. P.) To the extent Storm and Alpren have any employees, there is evidence that they share the employees of Altimo. Klymenko, for example, is both an Altimo executive and the general director of Storm. Alpren, moreover, is a Cypriot company that is 100% owned by Altimo, whose directors are provided by another Cypriot company, Abacus, that exists merely to provide corporate services to some 700 clients. Alpren has no known employees other than those provided by Abacus. It passes credulity that these Cypriot officials independently decided to bring this action, without consultation with Abacus's client Altimo. Indeed, it is apparent that they made no such decision; the lawsuit was filed by

---

[8] Establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability. See Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981); Quebecor World (USA), Inc. v. Harsha Assocs., L.L.C., --- F.Supp.2d ----, 06 Civ. 6002, 2006 WL 2918797, at *7 (W.D.N.Y. Oct. 11, 2006).

Ukrainian counsel for Altimo, who acted pursuant to a general power of attorney by Alpren's Cypriot directors. Finally, the question of whether Storm controls Alpren and Storm's "marketing and operational policies" is answered by the fact that Alpren and Storm likely do not engage in any marketing; nor do they have significant "operations" other than their possession of shares.

The same alter-ego theory that provides for jurisdiction over Altimo and Alpren also leads the Court to conclude that Telenor is likely to succeed in establishing that Altimo and Alpren are bound by the Arbitration Agreement. Thus, the policy favoring arbitration applies to them as well, and they are appropriately subject to an antisuit injunction.

It is undisputed that Altimo played a significant role in the negotiations leading to the Arbitration Agreement. Alpren and Altimo make much of the fact that at time the Agreement was negotiated, Storm was not a mere shell company and was not wholly owned by Altimo or its subsidiaries. Telenor responds, however, that at that time, the negotiating parties had already determined that Storm would become what it is now — a shell company existing solely for the purpose of holding shares. The Court finds that Telenor is likely to succeed in proving that that was the case.

There is no real dispute that Altimo negotiated the entire transaction that gives rise to this dispute, agreed to the arbitration clause demanded by Telenor as part of that bargain, negotiated the Shareholders Agreement by which its vehicle Storm would operate in voting the shares it held for Altimo, and provided Telenor with assurances that the general director of Storm — Altimo's own employee — was properly authorized to sign the Shareholders Agreement, including the Arbitration Agreement. Altimo now seeks to frsutate the Arbitration Agreement

by litigating the same issues in the very Ukrainian courts the parties agreed to bypass in favor of arbitration. It cannot be permitted to do this.

In sum, because Telenor has made a sufficient showing that Altimo, Alpren and Storm are mere alter egos of one another, they are subject to this Court's jurisdiction and, more importantly, to the Court's order granting a preliminary antisuit injunction.

## CONCLUSION

For the foregoing reasons, the motion for a preliminary anti-suit injunction is granted. Storm, Altimo and Alpren are enjoined from bringing or attempting to cause the enforcement of any legal action in the Ukraine that would disrupt, delay or hinder in any way the arbitration proceedings between Telenor and Storm in New York.[9]

SO ORDERED.

Dated: New York, New York
December 15, 2006

_____
GERARD E. LYNCH
United States District Judge

_____

[9] Telenor also moves for an injunction directing Storm and its corporate parents to take steps to withdraw the Ukrainian litigation. Telenor does not ask for a *preliminary* injunction of this sort, however. The Court expresses no view at this time as to whether such an order would be appropriate.