Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

STORM LLC,

                      Plaintiff,

             -against-

**TELENOR MOBILE COMMUNICATIONS AS,**

                   Defendant.

------------------------------------------------------------------------ X   06 CV 13157(GEL) (DF)

**TELENOR MOBILE COMMUNICATIONS AS,**

                 Counterclaimant,

          - against-

**STORM LLC,**

                Counterclaim-Defendant,

         - and-

**ALTIMO HOLDINGS & INVESTMENTS LIMITED and
ALPREN LIMITED**,

             Relief Defendants.

------------------------------------------------------------------------ X

**MEMORANDUM IN SUPPORT OF COUNTERCLAIMANT'S MOTION TO HOLD
COUNTERCLAIM-DEFENDANT AND RELIEF DEFENDANTS IN CONTEMPT**

# INTRODUCTION

Counterclaimant Telenor Mobile Communications AS ("Telenor Mobile") respectfully submits this memorandum in support of its motion to have Relief Defendants Altimo Holdings & Investments ("Altimo") and Alpren Limited ("Alpren") and Counterclaim-Defendant Storm LLC ("Storm" and, together with Altimo and Alpren, collectively, the "Altimo Entities") held in contempt of this Court's December 18, 2006 preliminary injunction (the "Preliminary Injunction"). In the Preliminary Injunction, this Court preliminarily enjoined Altimo, Alpren and Storm from "(a) commencing, prosecuting, enforcing, causing the enforcement, attempting to enforce or cause the enforcement; or (b) allowing or failing to take steps to prevent, any other person, official or entity from enforcing or attempting to enforce" any Ukrainian order "that would disrupt, delay or hinder in any manner whatsoever, the arbitration proceedings between Telenor Mobile and Storm." Exh. 1. As set forth below, the Altimo Entities have taken affirmative steps to cause a Ukrainian order to be enforced against Telenor Mobile, and have failed to take any steps to prevent the enforcement of the Ukrainian order that seeks to disrupt the New York arbitration proceeding. Moreover, following the issuance of the Preliminary Injunction, Storm and Alpren commenced additional actions in Ukraine that violate the Preliminary Injunction because they sought, and obtained, relief on a substantive issue pending before the arbitrators in the New York arbitration proceeding.

# FACTS

On December 5, 2006, Telenor Mobile sought an anti-suit injunction against Storm, Alpren and Altimo based on the collusive litigation in Ukraine. This Court granted a temporary restraining order on December 7, 2006. Following an evidentiary hearing on December 15, 2006, this Court held that Telenor Mobile was "extremely likely" to succeed in

establishing that "virtually all" of the factors for an injunction weighed in its favor.  Exh. 2. at

18-19.  Noting that Telenor Mobile would "likely succeed" in showing that the Altimo Entities

are alter egos of each other (Id. at 11), this Court found that:

> [t]here is no real dispute that Altimo negotiated the entire
> transaction that gives rise to this dispute, agreed to the
> arbitration clause demanded by Telenor as part of that
> bargain, negotiated the Shareholders Agreement by which
> its vehicle Storm would operate . . . and provided Telenor
> with assurances that the general director of Storm –
> Altimo's own employee – was properly authorized to sign
> the Shareholders Agreement, including the Arbitration
> Agreement.  Altimo now seeks to frustrate the Arbitration
> Agreement by litigating the same issues in the very
> Ukrainian courts the parties agreed to bypass in favor of
> arbitration.  It cannot be permitted to do this.

Id. at 26-27.

On December 15, 2006, this Court issued its opinion and order preliminarily

enjoining "Storm, Altimo and Alpren . . . from bringing or attempting to cause the enforcement

of any legal action in the Ukraine that would disrupt, delay or hinder in any way the arbitration

proceedings between Telenor and Storm in New York."  Id.  On December 18, 2006, this Court

entered a further order, over the opposition of Altimo and Alpren,  setting out the precise terms

of the anti-suit injunction.  Exh. 1.  In the Preliminary Injunction, this Court preliminarily

enjoined Altimo, Alpren and Storm from "(a) commencing, prosecuting, enforcing, causing the

enforcement, attempting to enforce or cause the enforcement; or (b) allowing or failing to take

steps to prevent, any other person, official or entity from enforcing or attempting to enforce" any

Ukrainian order "that would disrupt, delay or hinder in any manner whatsoever, the arbitration

proceedings between Telenor Mobile and Storm."  Id.

**A.**    **Alpren Causes the December 1 Injunction to be Enforced**

As set forth in the Declaration of Oleksiy Didkovskiy, dated March 12, 2007, ("Didkovskiy Decl. I") concerning the enforcement of the injunction issued by the Golosiyiv District Court of the City of Kyiv on December 1, 2006 in the case brought by Alpren against Storm's General Director, Vadym Klymenko, purporting to enjoin Mr. Klymenko, Storm and Telenor Mobile from participating in the New York arbitration proceeding (the "Second Alpren Case"), injunctions in Ukraine are not self-enforcing. Didkovskiy Decl. I ¶ 11. Rather, the party seeking to enforce the injunction (or its authorized representative) must submit a request to the State Enforcement Service, which in turn will examine the request and, in response to the request, commence an enforcement proceeding. Id. It is simply unknown for the State Enforcement Service of its own volition to commence enforcement proceedings against a party. Id. Here, the events of the past several weeks show that the Altimo Entities have taken steps to cause enforcement proceedings to be commenced and prosecuted in Ukraine in an attempt to disrupt, delay and hinder the New York arbitration proceeding.

First, on February 7, 2007, Telenor Mobile was served in Kyiv with a "ruling on imposing a fine" issued by the State Enforcement Officer and approved by the Head of the State Enforcement Service in the Golosiyivsky District of the City of Kyiv (the "Fine Ruling"). Didkovskiy Decl. I, Exh. A. The Fine Ruling, dated January 25, 2007, imposes a fine of 510 Ukrainian Hryvnia[1] upon Telenor Mobile, having "established" that Telenor Mobile "fails to comply with the decision of the Golosiyivsky Court . . . dated December 1, 2006." The imposition of a fine under such circumstances generally is made only upon the petition of the party seeking enforcement of the relevant injunction, in this case, Alpren. See Didkovskiy Decl.

---

[1] 510 Ukrainian Hryvnia, or approximately US$100, while trivial in amount, is the maximum fine allowed by statute in these circumstances against a legal entity in Ukraine. See Didkovskiy Decl. I ¶ 3.

I ¶ 11. More importantly, the imposition of a fine, however small, carries with it the threat of more drastic sanctions, particularly the arrest of individuals working for the alleged contemnor.

Next, on February 12, 2007, shortly after the panel in the New York arbitration proceeding (the "Panel") ordered Telenor Mobile and Storm to undertake further briefing on certain issues before the Panel, the three members of the Panel—Messrs. Kenneth Feinberg, William Jentes and Gregory Craig—received from the State Enforcement Service in the Golosiyivsky District of the City of Kyiv a letter in Ukrainian, dated December 20, 2006, notifying them that the State Enforcement Service was "carrying out enforcement proceedings" regarding the December 1 Injunction. Declaration of Robert L. Sills, dated March 12, 2007 ("Sills Decl.") ¶ 7. This may be the first time that the State Enforcement Service has notified arbitrators who are not party to an underlying action or the subject of an injunction or court order of its intent to carry out enforcement proceedings. See Didkovskiy Decl. I ¶ 9. No apparent purpose is served by the State Enforcement Service notifying the arbitrators that it "is carrying out enforcement proceedings", other than as part of an effort to disrupt the New York arbitration proceeding. Moreover, such notification most likely would not have been delivered to the arbitrators in the United States other than pursuant to Alpren's express request. Id. at ¶ 11.

Next, on February 19, 2007, the Representative Office of Telenor Mobile in Ukraine was served with Ruling No. 815/10 on the Commencement of Enforcement Proceeding dated December 4, 2006 (the "Enforcement Ruling") from the State Enforcement Service in the Golosiyivsky District of the City of Kyiv, and an undated demand issued by the State Enforcement Officer of the Ministry of Justice of Ukraine (the "Demand"). The Demand from the State Enforcement Officer states that he has "examined application for the enforcement" of the December 1 Injunction. An order such as the Enforcement Ruling would not be issued in Ukraine other than pursuant to the application of the beneficiary of the relevant injunction. Id.

4

Nor would such a ruling have been served on Telenor Mobile – particularly more than two months after it was supposedly issued – in the absence of a request by the beneficiary of the injunction. Id.

Although the Enforcement Ruling plainly states that the State Enforcement Officer examined an "application" for enforcement, no such application was found in the enforcement file when it was inspected on February 20, 2007. Didkovskiy Decl. I at ¶¶ 5 and 6 Indeed, an examination of the file concerning the enforcement proceedings of the December 1 Injunction revealed several irregularities. First, the file contained applications by Alpren to enforce the December 1 Injunction against Storm and Mr. Klymenko. Exh. 3. However, there was no corresponding application to enforce the December 1 Injunction against Telenor Mobile, despite the fact that the Enforcement Ruling would not have been served or even issued other than pursuant to a request from Alpren. Didkovskiy Decl. I ¶ 11. Second, although the files of enforcement proceedings typically, and unsurprisingly, contain an index, the index associated with the enforcement of the December 1 Injunction was missing from the file. Id. at ¶ 6.

**B.** **Storm and Alpren Commence Three Separate Litigation Proceedings Against Kyivstar's Auditors and Others In an Effort to Interfere with the Arbitration Proceeding**

On December 29, 2006, Judge L. G. Smirnova of the Kyiv City Commercial Court – the same judge who rendered the April 25, 2006 decision in the case brought by Relief Defendant Alpren against Counterclaim-Defendant Storm addressed in this Court's decision of December 15, 2006 – issued an injunction in response to a claim filed by Storm against Kyivstar requesting, among other things, that agreements between Kyivstar and Limited Liability Company "Ernst & Young Audit Services" and Limited Liability Company "Ernst & Young" (collectively, "E&Y"), Kyivstar's outside auditors, be declared "null and void". The injunction

issued by the Kyiv City Commercial Court purported to prohibit "any of [Kyivstar and E&Y's] authorized persons, officers and shareholders of [Kyivstar]" from taking any actions that would result in the provision of audit services to Kyivstar.[2]  See Declaration of Oleksiy Didkovskiy, dated March 12, 2007, concerning the actions commenced against E&Y and others by Storm and Alpren in relation to the auditing of Kyivstar's financial results ("Didkovskiy Decl. II"), ¶¶ 2-6; Declaration of Thor Asbjørn Halvorsen, dated March 12, 2007 ("Halvorson Decl."), ¶ 3.  That injunction was soon followed by a series of enforcement proceedings against Kyivstar and E&Y.[3]  Didkovskiy Decl. II ¶ 6.  Although the injunction in the case before Judge Smirnova (the "First E&Y Case") was subsequently vacated on her own motion by Judge Smirnova on January 19, 2007, the case remains active.  Didkovskiy Decl. II ¶ 8.

        In response, on January 16, 2007, Telenor Mobile wrote to the Panel regarding the First E&Y Case (the "January 16 Letter").  The January 16 Letter explains how the First E&Y Case violates Sections 2.05 and 8.07 of the Shareholders Agreement dated January 30, 2004 between and among Telenor Mobile, Storm and Kyivstar (the "Shareholders Agreement"), and expressly seeks the following relief:

> (a)    a declaration that Storm is in breach of the Shareholders Agreement for seeking the December 29, 2006 Injunction and the Enforcement Order;
>
> (b)    an injunction against Storm, its affiliates and anyone acting in concert with Storm or its affiliates from seeking to enforce the December 29, 2006 Injunction or the Enforcement Order; and

---

[2] The purported basis for the requested injunction was an allegation that contracts between Kyivstar and E&Y were not validly approved by the Kyivstar Board of Directors.  As this Court will recall from the earlier proceedings in this matter, the reason that the Kyivstar Board has not met for the past two years is that Storm's nominees have boycotted meetings of the Kyivstar Board, in violation of Storm's obligations under the Shareholders Agreement. That boycott is one of the principal issues before the Panel.

[3] In each of those cases, written requests were made to the State Enforcement Service seeking enforcement of the rulings.

     (c)     a requirement that Storm take all actions necessary to cause
the December 29, 2006 Injunction and the Enforcement
Order to be withdrawn in their entirety.

Sills Decl., Exh. C.

On January 26, 2007, Storm responded by letter, opposing the relief sought by

Telenor Mobile.[4] In Telenor Mobile's proposed Findings of Fact and Conclusions of Law,

submitted to the arbitrators on January 19, 2007, Telenor Mobile requested substantially the

same relief sought in the January 16 Letter.[5] The arbitrators have yet to rule on the substance of

any of Telenor Mobile's claims, including those regarding the First E&Y Case. However, it

seems clear that those claims are within the scope of the arbitration agreement. The rule is that

arbitration is required "unless it can be said with positive assurance that the arbitration clause is

not susceptible of an interpretation that covers the asserted dispute." McMahon Securities Co. v.

Forum Capital Markets L.P., 35 F.3d 82, 88 (2d Cir. 1994). Under that test, any claims that

"touch matters" covered by the arbitration agreement – here, a classic "broad" clause – must be

arbitrated. See David L. Threlkeld & Co. v. Mettalgesellschaft Ltd., 923 F.2d 245, 251 (2d Cir.

1991).

On January 31, 2007, shortly after the injunction in the First E&Y Case was

vacated, Alpren filed a claim in the Krasnolutsky District Court of Lugansk Region[6] on grounds

similar to the claims in the First E&Y Case against E&Y, Kyivstar, Storm's General Director,

---

[4] Storm's letter claimed that the arbitrators "should not take any action that would intrude on the jurisdiction of the Ukjrainian courts as they determine the issues," and that the arbitrators should not "attempt to interfere with the Ukraininan court proceedings" in light of Storm's claims that the Shareholders Agreement was not validly executed.

[5] At the hearing on the merits held before the Panel on December 18, 2006, Storm again moved to dismiss or stay the arbitration, based on the same collusive Ukrainian litigations that were the subject of the proceedings before this Court. After the Panel denied Storm's motion, Storm and its attorneys stated that they would not participate further in the proceedings, and left the hearing. Storm also declined to submit to the Panel any proposed findings of fact and conclusions of law.

[6] Lugansk is located near the border of Ukraine and Russia, approximately 540 miles southeast of Kyiv. The ostensible basis for venue in that case is that Mr. Klymenko supposedly lives there, although the record before this Court shows that he actually lives and works in Kyiv.

Vadym Klymenko, and Trond Moe, the current head of Telenor Mobile's country office in

Ukraine and the former Vice President and Chief Financial Officer of Kyivstar, seeking, among

other things, to have the court declare the relevant E&Y contracts null and void. See Didkovskiy

Decl. II ¶ 9. In response to a petition from Alpren, on January 31, 2007, the Krasnolutsky

District Court of Lugansk Region immediately issued an injunction similar in scope to the one

issued by the Kyiv City Commercial Court in the First E&Y Case and enforcement proceedings

were commenced against E&Y and Kyivstar. Didkovskiy Decl. II ¶¶ 10 and 11. Although

Telenor Mobile has filed an appeal with the Lugansk Region Court of Appeals requesting the

court to reverse on procedural grounds the injunction issued by the Krasnolutsky District Court

of Lugansk Region, the injunction remains in place and, to the best of Telenor Mobile's

knowledge, the underlying case (the "Second E&Y Case") remains active. Didkovskiy Decl. II

¶¶ 13 and 14.

On February 16, 2007, Alpren filed a claim with the Kyiv City Commercial Court

that was almost identical to the claim it filed in the Second E&Y Case. See Didkovskiy Decl. II

¶ 15. On February 21, 2007, Judge I.O. Domnicheva of that Court issued an injunction

purporting to enjoin (a) Kyivstar and E&Y and "any other individuals or legal entities" "from

taking any actions aimed at performance of any contracts . . ., the subject matter of which is to

provide (obtain) audit services to/by [Kyivstar], including [to] enjoin from providing and

receiving any information, reports or data on financial and business activity" of Kyivstar, (b)

Kyivstar "from entering into any transactions (contracts, agreements), the subject matter of

which is to provide (obtain) audit services" and (c) Kyivstar and E&Y and "any other individuals

or legal entities, which have received information on [Kyivstar], specifically, financial and other

reports of [Kyivstar] not approved by authorized bodies of [Kyivstar], from making such

information available to any persons in any way whatsoever, including by making it public using

any media, specifically, printed and/or electronic mass media, from placing such information in the Internet, from disseminating (distributing), using in any manner whatsoever and for any purpose any information on [Kyivstar], including financial or other reports of [Kyivstar] not approved by authorized bodies of [Kyivstar], <u>as well as enjoin from using the said information in their consolidated financial statements</u>." Didkovskiy Decl. II ¶ 16 (emphasis added).

On February 28, 2007, the State Enforcement Service in the Pechersky District of Kyiv City issued an order addressed to Kyivstar and E&Y notifying them of the commencement of enforcement proceedings in the case before Judge Domniclieva in the Kyiv Commercial Court (the "Third E&Y Case" and together with the First E&Y Case and the Second E&Y Case, collectively, the "E&Y Cases") instructing them to "notify us of the implementation status within 7 days hereof." This order was accompanied by an Imperative Demand dated February 28, 2007 from the State Enforcement Service demanding that Kyivstar and E&Y "execute the decision of the court and report the execution [to] the Enforcement Service" and stating that "[t]he repeated failure to comply with lawful requirements of the state enforcement officer will result in a ruling to impose a double penalty and a motion to the Prosecutor's Office to hold the failing persons criminally liable." Didkovskiy Decl. II ¶ 19. The Third E&Y Case remains active. Didkovskiy Decl. II ¶ 20. As a result, Kyivstar's financial statements for 2006 have not been audited, and, as a practical matter, Kyivstar does not now have an outside auditor. Halvorsen Decl. ¶ 4.

## ARGUMENT

### I.   THE ALTIMO ENTITIES' ACTIONS CONSTITUTE CONTEMPT OF THIS COURT'S PRELIMINARY INJUNCTION

Courts have the inherent power to hold a party in [civil] contempt in order to enforce compliance with their orders. <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 44 (1991); <u>see</u>

also People by Abrams v. Terry, 45 F.3d 17, 23 (2d Cir. 1995). Such power ensures that

"disobedience to the orders of the [j]udiciary" does not go unremarked. Chambers, 501 U.S. at

44. (citations omitted). "[T]he distinguishing characteristic of civil contempt is that it is

designed to coerce a non-compliant actor into obeying court decrees." Experience Hendrix, LLC

v. Chalpin, No. 06 Civ. 9926, 2007 WL 541620, *2 (S.D.N.Y., Feb. 15, 2007); see also Nye v.

United States, 313 U.S. 33, 41-43 (1941).

> A court may invoke its contempt power when (1) the order the party allegedly

failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and

convincing, and (3) the violating party has not reasonably and diligently attempted to comply

with the order. See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs.,

369 F.3d 645, 655 (2d Cir. 2004); New York State Nat. Organization for Women v. Terry, 886

F.2d 1339, 1351 (2d Cir. 1989); A.V. By Versace, Inc. v. Gianni Versace, 446 F.Supp.2d 252,

257 (S.D.N.Y. 2006); see also Yash Raj Films (USA), Inc. v. Bobby Music Co. & Sporting

Goods, Inc., No. 01 CV 8378, 2006 WL 2792756, *6 (E.D.N.Y., Sept. 27, 2006) (collecting

cases). It need not be established that the violation was willful. Donovan v. Sovereign Sec. Ltd.,

726 F.2d 55, 59 (2d Cir. 1984).

### A.    This Court's Order was Clear and Unambiguous

> To satisfy the first requirement for a contempt finding, "[t]he party enjoined must

be able to ascertain from the four corners of the order precisely what acts are forbidden."

Drywall Tapers & Pointers of Greater N.Y., Local 1974 of I.B.P.A.T. AFL-CIO v. Local 530 of

Operative Plasterers & Cement Masons Int'l Ass'n, 889 F.2d 389, 395 (2d. Cir. 1989). Rule

65(d) of the Federal Rules of Civil Procedure requires that injunctive orders be "specific in

terms" and "describe in reasonable detail . . . the act or acts sought to be restrained." An

injunction must "be specific and definite enough to apprise those within its scope of the conduct

10

that is being proscribed." In re Baldwin-United Corp., 770 F.2d 328, 339 (2d Cir. 1985).  The

Preliminary Injunction easily satisfies this standard.

> The Preliminary Injunction preliminarily enjoins Altimo, Alpren and Storm from:
>
> (a) commencing, prosecuting, enforcing, causing the enforcement, attempting to enforce or cause the enforcement; or
>
> (b) allowing, or failing to take steps to prevent, any other person, official or entity from enforcing or attempting to enforce,
>
> any [Ukrainian] order . . . that would disrupt, delay or hinder in any way whatsoever, the arbitration proceedings between Telenor Mobile and Storm arising out of or relating to the Shareholders Agreement among Storm, Telenor Mobile, and Kyivstar, dated as of January 30, 2004.

Exh. 1.

The Preliminary Injunction is clear and unambiguous.  It preliminarily enjoins the

Altimo Entities from commencing enforcement of any Ukrainian court order that could disrupt,

delay or hinder the New York arbitration proceeding.  It also preliminarily enjoins the Altimo

Entities from taking steps to commence enforcement of any Ukrainian order, or failing to take

steps to prevent others from commencing enforcement of any Ukrainian order.

**B.    The Proof of the Altimo Entities' Non-Compliance With the Preliminary Injunction is Clear and Convincing**

The Altimo Entities have failed to comply with the terms of the Preliminary

Injunction.  First, the Altimo Entities have failed to take any steps to prevent the commencement

of the enforcement proceedings in relation to the December 1 Injunction by the Ukrainian State

Enforcement Service.  The simplest step that Alpren and its corporate parent Altimo could have

taken – but chose not to – would have been to withdraw the Second Alpren Case.  See

Didkovskiy Decl. I ¶¶ 10 and 11.  Short of that, Altimo and Alpren could have withdrawn (or

never filed) Alpren's requests to the State Enforcement Service seeking enforcement of the

December 1 Injunction against Telenor Mobile, Storm and Klymenko. Id. Neither Altimo nor

Alpren took any such steps. Nor, upon information and belief, has Altimo or Alpren taken any

step to "prevent any other person, official or entity from enforcing or attempting to enforce" the

December 1 Injunction.

Instead, the Altimo Entities have taken steps to enforce the December 1

Injunction. As described above, enforcement proceedings in Ukraine are not self-executing.

Telenor Mobile has presented a strong case demonstrating that Alpren submitted a request to the

State Enforcement Service seeking the commencement of enforcement proceedings in respect of

the December 1 Injunction. That such an application – specifically referred to by the State

Enforcement Service in the Enforcement Ruling – no longer exists in the case file for the

enforcement proceeding should make no difference, especially given that the other applications

submitted by Alpren exist, and the index to the file is missing. See Exh. 3; Didkovskiy Decl. I ¶¶

5-7. It also appears that Alpren petitioned the State Enforcement Service to fine Telenor

Mobile, and that Alpren caused the State Enforcement Service to undertake the highly unusual

step of notifying the Panel members in the New York arbitration proceeding that the State

Enforcement Service was commencing enforcement proceedings.

Third, Storm and Alpren have commenced three new actions in Ukraine (again,

without notice to Telenor Mobile) in order to further interfere with the New York arbitration

proceeding. See Didkovskiy Decl. II ¶¶ 2, 15 and 19; Halvorsen Decl. ¶ 3. Telenor Mobile

brought the first of these new litigations to the attention of the Panel in the January 16 Letter,

detailing the new violations of the Shareholders Agreement by Storm and addressed such

violations in its Proposed Findings of Fact and Conclusions of Law submitted to the Panel on

January 19, 2007. See Sills Decl. ¶¶ 4 and 6. Storm took issue with Telenor Mobile's arguments

in a letter to the Panel dated January 26, 2007, a full month after the hearing on the merits, ten

days after Telenor Mobile's January 16 Letter was circulated to the Panel and one week after

Telenor Mobile's Proposed Findings of Fact and Conclusions of Law – which sought

substantially the same relief as in the January 16 Letter – was submitted to the Panel.[7] See Id. at

¶ 5.

Any one of the steps taken by the Altimo Entities is a violation of the Preliminary

Injunction; taken together, they demonstrate a consistent pattern of actions designed to disrupt,

delay and hinder the New York arbitration proceeding.

The Alpren Entities are all acting in concert, under the ultimate direction of

Altimo.  As this Court found in its opinion granting the Preliminary Injunction, Alpren and

Storm are shell companies that exist only to hold Altimo's interest in Kyivstar.  Accordingly,

despite the formal status of Alpren and Storm in the various Ukrainian lawsuits at issue here, all

three Defendants are acting together, as part of a common plan, to defeat the New York

arbitration proceeding to which they agreed.

C.     **The Altimo Entities Have Made No Attempt to Comply With the Preliminary
       Injunction**

There is no evidence suggesting that the Altimo Entities have reasonably and

diligently attempted to comply with the Preliminary Injunction.  On the contrary, the evidence

available to Counterclaimant Telenor Mobile strongly indicates that the Altimo Entities have

affirmatively taken steps to cause enforcement proceedings to be commenced in connection with

the December 1 Injunction and have commenced the three E&Y Cases in a deliberate effort to

delay the New York arbitration proceeding.  The Altimo Entities have taken such actions as part

of their overarching campaign to disrupt, delay and hinder the New York arbitration proceeding.

---

[7] As noted above, Telenor Mobile's request for relief regarding the First E&Y Case remains pending.

## II.    THE ALTIMO ENTITIES SHOULD RECEIVE THE MAXIMUM PENALTIES FOR CIVIL CONTEMPT

### A.    Sanctions Are the Only Appropriate Remedy

Civil contempt sanctions may be either coercive or compensatory.  Should a coercive sanction be appropriate, the court has "broad discretion to design a remedy that will bring about compliance." Perfect Fit Indus. v. Acme Quilting Co., 673 F.2d 53, 57 (2d Cir. 1982).  Where a compensatory sanction is awarded, "some proof of loss must be present to justify its compensatory aspects." National Organization for Women, 886 F.2d at 1353. Sanctions may also be awarded to serve both coercive and compensatory ends.  See Paramedics, 369 F.3d at 657 ("The imposition of civil contempt sanctions may serve dual purposes:  to secure future compliance with court orders and to compensate the party that has been wronged.").  In fashioning an appropriate remedy, whether coercive and/or compensatory, the court must consider several factors, including  "the character and magnitude of the harm threatened by continued contumacy," the "probable effectiveness of any suggested sanction in bringing about [compliance]," and the contemnor's ability to pay.  Paramedics, 369 F.3d at 657-658; Perfect Fit, 673 F.2d at 57.

### 1.    The Character of the Harm of the Altimo Entities' Actions

Despite this Court's entry of the Preliminary Injunction, the Altimo Entities continue their efforts to frustrate the New York arbitration proceeding through abusive litigation in the Ukrainian courts.  Their ongoing attempts to intimidate both the Panel and Telenor Mobile through fines and warnings of enforcement arising out of collusive Ukrainian litigations are specifically intended to halt or delay the New York arbitration proceeding and thereby  prevent Telenor Mobile from addressing Storm's repeated violations of the Shareholders Agreement. Indeed, the recent actions taken by the Altimo Entities in the E&Y Cases clearly demonstrate

14

that the Altimo Entities intend to continue to violate the Shareholders Agreement. Alpren, which exists only to hold Altimo's interest in Storm, which in turn exists only to hold Altimo's interest in Kyivstar, has no conceivable, legitimate business interest in preventing Kyivstar's financial records from being audited. Rather, the three E&Y Cases are simply part of the Altimo Entities' ongoing campaign of litigation in the Ukrainian court, in violation of the parties' arbitration agreement and the Preliminary Injunction. Those actions only create delay and expense, interfere with Telenor Mobile's contractual rights and, in the case of the E&Y Cases, have created substantial financial harm to Telenor Mobile and its parent, Telenor ASA. Halvorsen Decl. ¶ 4.

## 2.    <u>The Effectiveness of Sanctions in Bringing the Altimo Entities Into Compliance with the Preliminary Injunction</u>

The Altimo Entities are clearly concerned with this Court's orders. On Telenor Mobile's application for a preliminary injunction, two different prominent law firms appeared in opposition. After the Preliminary Injunction was granted, Altimo and Alpren appealed. There is no basis to assume that a finding of contempt would be ignored.

Moreover, Altimo has substantial assets in this jurisdiction and elsewhere, including a substantial shareholding in Open Joint Stock Company "Vimpel-Communications", some of which is held in the form of ADRs in New York. Any fine could be enforced against those assets.[8] A finding of contempt will likely bring the Defendants into compliance with the Preliminary Injunction.

---

[8] Altimo is evidently interested in expansion into Western markets. The reputational risk of continued defiance of this Court's order in the face of a finding of contempt is a further basis for confidence that sanctions will be effective here.

### 3.    The Altimo Entities' Ability to Pay

The Alfa Group Consortium and its telecom arm, the Altimo Entities, are one of the most profitable businesses in Eastern Europe.  Altimo claims the market capitalization of its assets exceeds US$14 billion.[9]  No sanction imposed by this Court will pose any hardship on the Altimo Entities.

### B.    By Acting in Contempt of the Preliminary Injunction, the Altimo Entities' Actions Threaten the Jurisdiction of this Court

The Altimo Entities' actions threaten more than Telenor Mobile's ability to arbitrate.  "It is not a new observation that the ability of a society to order its affairs through the rule of law depends on sound enforcement of the law and respect for the role courts play in this process.  Repeated and unexcused failure to abide by judicial orders . . . strikes at the heart of this equation."  Versace, 446 F.Supp.2d at 275.  As this Court has itself noted, the Ukrainian litigations, and the subsequent attempts to enforce those decisions, "threaten . . . the very existence of the arbitration", as well as "the jurisdiction of this Court."  See Exh. 2 at 17.  The Altimo Entities' repeated and unexcused failure to abide by this Court's Order should not be allowed to continue.  This Court should exercise its inherent power to punish for contempt, and should fashion an appropriate remedy.

---

[9] See "Altimo – Investor Relations – Our Major Assets", http://www.altimo.org/sub.cfm?artID=14 (last checked Mar. 11, 2007).

# CONCLUSION

For the foregoing reasons, it is respectfully requested that Counterclaimant Telenor Mobile's motion to declare Storm, Altimo and Alpren in civil contempt be granted in its entirety, that Counterclaim-Defendant and Relief Defendants be held in civil contempt of court and that the maximum penalties be assessed, including Counterclaimant's reasonable attorneys' fees.

Dated: New York, New York
       March  12, 2007

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

By Robert L. Sills

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
666 Fifth Avenue
New York, New York 101013
Telephone: 212 506 5000
Facsimile:  212 506 5151

-and-

Peter O'Driscoll
ORRICK, HERRINGTON & SUTCLIFFE LLP
25 Old Broad Street
London EC2N 1HQ
United Kingdom
Telephone:  011-44 20 7562 5000
Facsimile:  011-44 20 7628 0078

Attorneys for Counterclaimant-Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

STORM LLC,                                              :

                                Petitioner,             :

                    -against-                           :

TELENOR MOBILE COMMUNICATIONS AS,                       :

                                Respondent,             :        06 Civ. 13157 (GEL) (DF)

                    - and-                              :

ALTIMO HOLDINGS & INVESTMENTS LIMITED                   :
and ALPREN LIMITED,                                     :

                                Relief Defendants.      :
------------------------------------------------------------------X

      Upon consideration of the motion filed December 6, 2006 of

Respondent/Counter-Petitioner Telenor Mobile Communications AS ("Telenor Mobile" or

"Respondent") for a preliminary injunction prohibiting Storm LLC ("Storm"), Altimo

Holdings & Investments Limited ("Altimo") and Alpren Limited ("Alpren") from further

initiating or pursuing any legal action or proceeding in Ukraine intended to interfere with

the ongoing arbitration between Telenor Mobile and Storm in New York regarding closed

joint stock company "Kyivstar G.S.M." ("Kyivstar"); Altimo and Alpren's memorandum

in opposition to Telenor Mobile's motion for a preliminary anti-suit injunction dated

December 8, 2006; the evidence and arguments before the Court on November 15, 2006,

November 22, 2006, December 7, 2006, December 11, 2006, and December 15, 2006; the

record submitted in connection with Telenor Mobile's motion for a preliminary injunction;

the record submitted before the arbitrators; Storm's motion to vacate, dated November 13, 2006; and upon all pleadings and proceedings heretofore had herein;

AND the Court having rendered its Opinion and Order, dated December 15, 2006, granting Telenor Mobile's motion, it is hereby:

ORDERED, that Respondent Telenor Mobile's motion for a preliminary injunction against Petitioner Storm and Relief Defendants Altimo and Alpren is GRANTED; and it is further

ORDERED, that Petitioner Storm, and Relief Defendants Altimo and Alpren, together with their officers, agents, servants, employees and attorneys, and all persons in active concert of participation with them who receive actual notice of this order, by personal service or otherwise, are PRELIMINARILY RESTRAINED and ENJOINED, pending the final disposition of this action, from:

    (a) commencing, prosecuting, enforcing, causing the enforcement, attempting to enforce or cause the enforcement; or

    (b) allowing, or failing to take steps to prevent, any other person, official or entity from enforcing or attempting to enforce,

any such order, in any manner whatsoever, direct or indirect, of any legal action, suit, or proceeding before any court or tribunal in Ukraine that would disrupt, delay or hinder, in any manner whatsoever, the arbitration proceedings between Telenor Mobile and Storm arising out of or relating to the Shareholders Agreement among Storm, Telenor Mobile, and Kyivstar, dated as of January 30, 2004.

Dated: New York, New York
      December _12_, 2006

                                      Gerard E. Lynch
                                      United States District Judge

Slip Copy                                                                                                      Page 1
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

C

Briefs and Other Related Documents
**Storm** LLC v. **Telenor** Mobile Communications
ASS.D.N.Y.,2006.Only the Westlaw citation is
currently available.
United States District Court,S.D. New York.
STORM LLC, Petitioner,
v.
TELENOR MOBILE COMMUNICATIONS AS,
Respondent,
andAltimo Holdings & Investments Ltd. and Alpren
Ltd., Relief Defendants.
**No. 06 Civ. 13157(GEL).**

Dec. 15, 2006.

Peter Van Tol and Gonzalo S. Zeballos, Lovells Law
Firm, New York, NY, for petitioner.
Robert L. Sills, Jay K. Musoff and Peter O'Driscoll,
Orrick, Herrington & Sutcliffe LLP, New York, NY,
for respondent.
Ronald S. Rolfe, Cravath, Swaine & Moore, New
York, NY, for relief defendants.

**OPINION AND ORDER**
GERARD E. LYNCH, District Judge.
**\*1** Telenor Mobile Communications AS ("Telenor"),
a Norwegian telecommunications company, and
Storm LLC ("Storm"), a company organized under
the laws of Ukraine, jointly own Kyivstar G.S.M.
("Kyivstar"), a Ukrainian telecommunications
venture. **Telenor** and **Storm** are engaged in a dispute
over, inter alia, the validity and effect of a 2004
shareholders' agreement (the "Shareholders
Agreement" or "Agreement") related to the corporate
governance and managment of Kyivstar. To resolve
the dispute, Telenor invoked the arbitration provision
of the Shareholders Agreement. Storm duly
responded to the notice, appointed one of the three
arbitrators as provided for in the Agreement, and
appeared before the arbitrators ("the arbitrators" or
"the Tribunal"), although its opening move was to
challenge the arbitrators' jurisdiction, claiming that
the Shareholders Agreement was invalid because
Storm's general director, who signed it, lacked
authority to bind the company. (See id. Ex. J. at 5-6.)
The case is before this Court on (1) Storm's petition
to vacate the arbitrators' decision on the jurisdictional
issues, which rejected Storm's position and found the
issues before them to be arbitrable, and (2) Telenor's
cross-petition to compel arbitration. The issue now
pending before the Court is Telenor's motion for
relief in the form of a preliminary anti-suit injunction
prohibiting Storm and its parent companies from

further litigation in Ukraine in relation to the dispute.

**\*1** The matter is of considerable urgency. Telenor's
counter-petition was served on December 6, 2006;
the arbitrators have scheduled hearings for Monday,
December 18. Having heard evidence and argument
in sessions on November 15, November 22,
December 7, December 11 and December 15, as well
as having reviewed an extensive record submitted in
connection with **Telenor's** motion and **Storm's**
earlier motion to vacate, the Court is prepared to rule.
Telenor's motion will be granted.

**BACKGROUND**

**\*1** The 2004 Agreement is the product of a series of
negotiations and transactions among **Telenor**, **Storm**,
and several other companies, some of which were
formerly shareholders of Kyivstar. The details of
these transactions, which date back at least to 1998,
need not be recited in full here. It suffices to note that
the negotiations arose from the desire of Alpha
Telecommunications, a predecessor company of the
"relief defendant" Altimo Holdings & Investment
Limited ("Altimo"), to obtain a significant share of
Kyivstar. Storm was the vehicle through which the
acquisition was made. Because Storm obtained over
40% of the Kyivstar shares-which under Ukrainian
law gave it substantial rights in corporate
governance-**Telenor** negotiated an agreement
obligating **Storm** not to exercise its rights in certain
ways. (See, e.g., 11/15/06 Tr. at 14:6 to 15:2.) Wary
of the Ukrainian legal system, Telenor also
negotiated an arbitration clause ("the Arbitration
Agreement"), which provided that "[a]ny and all
disputes and controversies arising under, relating to
or in connection" with the Shareholders Agreement
would be resolved by a tribunal of three arbitrators in
New York in accordance with the Arbitration
Agreement and the UNCITRAL rules. (12/5/06 Sills
Dec. Ex. A at 30.)

**\*2** Though the Agreement is nominally between
**Storm** and **Telenor**, **Storm** is merely a holding
company with no business other than holding the
shares of Kyivstar for its ultimate corporate parent
Altimo, which owns 50.1% of Storm through
Hardlake, a Cyprus entity that is 100% owned by
Altimo, and the remaining 49.9% through Alpren
Limited, which is also 100% owned by Altimo. (See
12/11/06 Sills Dec. Ex J at 2, Ex. D at 3; 12/11/06 Tr.
at 21:3-5.)

**\*2** In entering the Shareholders Agreement on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

January 30, 2004, Storm provided documents warranting that its general director, Valeriy Vladimirovich Nilov, who signed the agreement on its behalf, was legally authorized to do so. (*See* 12/11/06 Tr. at 59; 8/9/06 Evidentiary Brief in Opp. to Storm Mot. to Dismiss at 16; 12/8/06 Storm Mem. in Opp. to Mot. for Prelim. Injun. Relief at 10.) Storm now argues, however, that Nilov had not received any such authorization. (*See id.* at 17.) Although a resolution passed by unanimous consent of Storm's shareholders specifically authorized the general director to enter the Shareholders Agreement on behalf of Storm, Storm argues that the authorization referred only to a 2002 agreement, which was slightly but materially different from the 2004 Agreement. (*See, e.g.,* 12/11/06 Tr. at 83:16 to 84:16.) In testimony that is part of the record before this Court, Telenor's key witness acknowledged that the differences are material (*see* 12/8/06 Van Tol Dec. Ex. D. at 115:16 to 117:18); **Storm**, however, does not dispute **Telenor's** contention that the differences in essence favored Storm, and were the result of concessions extracted by Storm during a final period of negotiations. (*See* 12/11/06 Tr. at 82:14 to 83:15.)

**\*2** After an initial honeymoon, **Telenor** and **Storm** developed differences, and **Telenor** now accuses **Storm** of violating the Shareholders Agreement in ways that effectively paralyze Kyivstar. Specifically, **Telenor** claims that **Storm** has violated the Shareholders Agreement by failing (1) to attend shareholder meetings, (2) to appoint candidates for election to the Kyivstar board, and (3) to attend board meetings and to participate in the management of Kyivstar. (12/5/06 Sills Dec. Ex. J at 4-5.) **Telenor** also claims that **Storm's** five percent ownership of a competitive company violates the Agreement. (*Id.*) On February 7, 2006, Telenor sought redress for these alleged violations by invoking the arbitration clause.

**\*2** As noted above, Storm responded to the arbitration demand by appointing an arbitrator and participating in proceedings before the arbitrators. Even as this process was developing, however, legal proceedings were instituted in Ukraine. In the Ukrainian proceedings, Alpren, the 49.9% owner of Storm, sought a declaration of the invalidity of the Shareholders Agreement. (*See* 12/5/06 Sills Dec. Ex. J. at 8; *see also* 11/15/06 Tr. 9:10-18.) Telenor was not named as a defendant in the suit, and indeed neither Telenor nor the arbitrators were advised of its pendency. Storm did not retain counsel or file written opposition to the action. (*See id.*) Instead, its current general director, Vadim Klymenko, appeared in

person and registered oral opposition to Alpren's demands, a method of proceeding that Storm contends is permissible, and not unusual, in Ukraine. (*See* 12/5/06 Sills Dec. Ex. E at 2; *see also id.* Ex. J. at 9-10.)

**\*3** Whether or not unusual under Ukrainian custom, the proceeding had a number of curious features. Although Klymenko, who acted for Storm in the matter, is not a lawyer, a resume submitted by him in connection with the arbitration notes that he is a Vice President of Altimo, the ultimate parent both of Storm and of Alpren, and that his responsibilities in that role include the management of "litigation[,] arbitration, representation and implementation of shareholders' interests." (12/5/06 Sills Dec. E. at 6.) The initial Ukrainian proceeding appears to have lasted all of ten minutes (12/11/06 Tr. at 55:2-6), suggesting that Klymenko's oral opposition was somewhat perfunctory. It resulted in a judgment declaring the Shareholders Agreement invalid. Storm appealed the result, again without submitting any substantial defense of its position.[FN1] An appellate court not only affirmed the lower court's decision against Storm, but broadened it by finding specifically that the Arbitration Agreement was invalid.

> [FN1.] **Telenor** argues that **Storm** appealed because an "appeal gives a special enforceable status, at least as a formal matter of Ukrainian law, to the judgment." (12/11/06 Tr. at 61:7-9.)

**\*3** The arbitrators, however, did not accept the Ukrainian courts' conclusions as binding on them. In a well-reasoned decision, the arbitrators entered a "Partial Final Award" rejecting Storm's jurisdictional argument. (12/5/06 Sills Dec. Ex. J.) Though reserving to later hearings the questions regarding the validity of the Shareholders Agreement, the arbitrators declared that whether or not Nilov had authority to enter into the Agreement itself, he at least had the authority to enter an arbitration agreement. (*Id.* Ex. J at 13-14.) Accordingly, the Tribunal denied Storm's motion to dismiss and held that it had jurisdiction to hear Telenor's claims.

**\*3** After losing its motion to dismiss before the Tribunal, Storm obtained a "clarification" form the Ukrainian courts that broadened the scope of their initial rulings by specifically stating that the arbitration clause of the Shareholders Agreement was invalid, apparently in response to the arbitrators'

Slip Copy                                                                                    Page 3
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

suggestion that the Ukrainian courts had not considered the possible severability of the Arbitration Agreement. (*See* 12/5/06 Tr. at 61:25 to 62:10.) Storm then quickly filed a petition in state court to enjoin the arbitration from continuing. Telenor removed the action to this Court, asserting subject matter jurisdiction under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention" or "Convention"). *See* 9 U.S.C. § § 203, 205. This Court denied preliminary relief, holding that the Court could not review an interlocutory order of an arbitral panel, and that to the extent Storm relied on the general equitable power of the Court, it was insufficiently likely to prevail on the merits, given the likely correctness of the arbitrators' ruling, the apparently collusive nature of the Ukrainian litigation, and the lack of conflict between the arbitrators' decision and the Ukrainian judgment, given that Storm had not been ordered by the Ukrainian court not to participate in the arbitration. (*See* 11/22/06 Tr. at 19:15 to 38:15.)

**\*4** Following this decision, the Ukrainian parties returned to court. This time, Alpren sued not Storm but Klymenko himself as general director of Storm, and obtained in equally short order a ruling that not only barred Klymenko from participating in the arbitration, but that also purported to bar **Storm** and **Telenor** from proceeding with the arbitration-notwithstanding that Telenor had again not been notified of the action nor named as a party to it. (12/5/06 Sills Dec. Ex. C; *see also* 12/7/06 Tr. at 23:19-24.) Telenor has still not been served in Ukraine with any order of the Ukrainian court; it obtained a copy of the judgment only via New York counsel for Storm in connection with the arbitration proceedings and this litigation.

**\*4** After this ruling, Telenor sought relief from this Court, counterpetitioning to compel arbitration, and simultaneously seeking an anti-suit injunction against Storm, Alpren and Altimo to prevent further litigation in the Ukraine. On December 7, 2006, the Court granted a temporary restraining order, and held an evidentiary hearing on Telenor's motion for a preliminary anti-suit injunction. Alpren and Altimo moved to dismiss any claims against them for lack of in personam jurisdiction, and **Storm** contested **Telenor's** motion on the merits. **Storm** and **Telenor** agreed to the admission of the evidentiary record compiled during the arbitration proceeding with respect to jurisdiction, supplemented by additional testimony taken before this Court.[FN2] In a further

hearing today, Alpren and Altimo also agreed that the Court could consider all of the evidence in the record in addressing the motion for an injunction against them.

> FN2. After the December 11 evidentiary hearing, Telenor received documents from an attorney for Alpren that on their face would appear to be a complaint in yet another suit in the Ukraine, this time naming Telenor itself as a defendant, attacking the validity of the Shareholders Agreement, as well as the arbitration. At a conference held on December 15, 2006, counsel for Alpren represented to the Court that the documents had been sent in error, and that no further litigation had in fact been filed.

### DISCUSSION

#### I. Legal Standards

**\*4** The standard for issuing a preliminary injunction is well established. To obtain a preliminary injunction, the party seeking relief must demonstrate (1) that it will suffer irreparable harm absent injunctive relief, and (2) either (a) that it is likely to succeed on the merits, or (b) "that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Moore v. Consol. Edison Co.,* 409 F .3d 506, 510 (2d Cir.2005) (citation and internal quotation marks omitted).

**\*4** A federal court may enjoin a party from pursuing litigation in a foreign forum. *China Trade and Development Corp. v. M.V. Choong Yong,* 837 F.2d 33, 35 (2d Cir.1987). "But principles of comity counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with care and great restraint.' " *Paramedics Electromedicina Comercial, Ltda. V. GE Med. Sys. Info. Techs., Inc.,* 360 F.3d 645, 653 (2d Cir.2004), quoting *China Trade,* 837 F.2d at 36. Two threshold requirements must be met before an anti-suit injunction is appropriate: (1) the parties must be the same in both matters; and (2) resolution of the case before the enjoining court must be dispositive of the action to be enjoined. *See Paramedics,* 360 F.3d at 652-53. If those requirements are satisfied, a court must then consider such factors as (1) the potential frustration of a policy in the enjoining forum; (2) the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

vexatiousness of the foreign litigation; (3) a threat to the issuing court's jurisdiction; (4) any prejudice caused by the foreign litigation to other equitable considerations; and (5) any delay, inconvenience, expense, inconsistency or unseemly race to judgment created by adjudication of the same issues in separate actions. *See Ibeto Petrochemical Indus., Ltd. v. M/T "Beffen", 412 F.Supp.2d 285, 29 (S.D.N.Y.2005); Am. Home Assurance Corp. v. Ins. Corp. of Ireland, Ltd., 603 F.Supp. 636, 643 (S.D.N.Y.1984), cited with approval in China Trade, 837 F.2d at 35-36.*

II. *The Standards Applied*

A. *Threshold Requirements*

1. The same parties

**\*5** At the outset, there is some question in this case as to whether the threshold requirements are met. This is not a typical arbitration anti-suit scenario, such as *Paramedics,* in which A seeks to compel arbitration against B in one jurisdiction while B seeks relief in the same dispute against A in a foreign court. In that situation, the parties will typically be the same in both proceedings, satisfying the first threshold requirement for an anti-suit injunction.

**\*5** Here, in contrast, **Telenor** has demanded arbitration against **Storm** in New York, pursuant to the Shareholders Agreement. Unlike the typical anti-suit scenario, Storm did not refuse arbitration and seek converse relief against Telenor in the courts of Ukraine. Rather, Storm appointed an arbitrator, and appeared before the arbitration panel. Although the first issue presented to the arbitrators by Storm was a challenge to their jurisdiction, Storm has taken the position before this Court that it is ready and willing to proceed to the merits before the arbitrators-indeed, that it is eager for its "day in court" to vindicate its position on the merits-but for the fact that it has been placed in an untenable position by a lawsuit brought not by but *against* it in Ukraine. Telenor seeks to enjoin that litigation, which on its face is not a suit involving the same parties (**Telenor** and **Storm**) who are before the arbitrators here, but a suit between a third party, Alpren, and Storm. Thus, Storm argues, the first threshold requirement is not met, because the parties to the litigation in Ukraine are not the same as the parties here. Put another way, Storm argues that there is no basis for enjoining it from bringing litigation in Ukraine, because it has not brought any

such litigation; rather, litigation has been brought against it there.

**\*5** **Telenor** argues, however, that **Storm's** view of the litigation in Ukraine is at best formalistic, and at worst deceptive. According to **Telenor**, Alpren and **Storm** are mere alter egos of one another, and more importantly, they are both alter egos of their shared corporate parent, Altimo. And, Storm posits, even if the present record is insufficient to demonstrate that these various companies are alter egos of one another, the litigation between them is nevertheless collusive; it is, in effect, a friendly suit between Storm and its parent, in which the interests of the parties are aligned rather than adverse. In **Telenor's** view, **Storm** is in effect the plaintiff, having stimulated an action against itself in order to produce an order that serves its interests in the New York arbitration. And while Telenor is not formally a party to the Ukrainian lawsuit-indeed, it was deliberately left out of both actions in Ukraine, and given notice of neither until a judgment was obtained-its absence has not prevented the Ukrainian courts from entering an injunction that purports to bind Telenor. Thus, according to Telenor, the real parties in interest in the Ukrainian litigation are Storm (and its parents) on one side and Telenor on the other, the same parties as the New York arbitration.

**\*6** *Paramedics* itself illustrates that although the threshold requirement is usually formulated as requiring that the parties be "the same," the rule is not so strict in practice. In *Paramedics,* the Second Circuit held that the fact that a different party was present in the foreign proceedings did not defeat the "same parties" requirement, because the purportedly distinct party was a close affiliate of one of the parties in the New York action, and was involved only because of its affiliation. Thus, the Court ruled, "[t]he district court did not abuse its discretion in ruling that the parties to the two actions are thus *sufficiently similar* to satisfy the first threshold requirement of *China Trade."* 369 F.3d at 652 (emphasis added). *See also Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd., 441 F.Supp.2d 552, 562 (S.D.N.Y.2006)* ("Where parties to the two actions are affiliated or substantially similar, such that their interests are represented by one another, courts have found the first requirement is met."); *Motorola Credit Corp. v. Uzan,* 02 Civ. 666(JSR), 2003 WL 56998, at \*2 (S.D.N.Y. Jan. 7, 2003) (finding sufficient similarity between parties, even though not all parties to the two actions were identical, because "the real parties in interest are the same in both matters"), *cited in Paramedics,* 369

Slip Copy                                                                                                    Page 5
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

F.3d at 652; *MasterCard Int'l, Inc. v, Argencard S.A., 01 Civ. 3027(JGK), 2002 WL 432379, at \*10 (S.D.N.Y. Mar. 20, 2002)* (finding "sufficient[ ] similar[ity]" between parties despite intervention in foreign action by one party's controlling shareholder, which was "not a necessary party to that action"), *cited in Paramedics,* 369 F.3d at 652-53.

**\*6** As explained below, *see* Part III, the Court agrees that Telenor will likely succeed in establishing that Storm, Alpren and Altimo are alter egos of one another, at least to the extent necessary to warrant the relief Telenor seeks against them. Even if they are not, however, the parties in the two actions are sufficiently similar to satisfy the threshold requirement for a preliminary anti-suit injunction. The litigation in Ukraine, while nominally between Alpren and Storm, seeks to influence the arbitration proceedings and has resulted in orders that are directed at Telenor. Although Alpren is a participant in the Ukrainian litigation, Alpren is not merely a shareholder of Storm but is part of a family of affiliated corporations that collectively owns the entirety of Storm. The real parties in interest in the Ukrainian lawsuit are essentially the same entities that are involved in the arbitration here.

**\*6** Of course, if Telenor is ultimately unable to show that the Altimo-controlled companies are alter egos of one another, this case would differ from *Paramedics* in at least one significant respect. In *Paramedics,* the party to be enjoined had sued an additional affiliate of the plaintiff. *See Paramedics,* 369 F.3d at 652. Here, the party to be enjoined is ostensibly the *defendant* in litigation brought by a third party abroad. Nevertheless, the Court has no trouble concluding that the parties here and in the Ukraine are "sufficiently similar" for purposes of an antisuit injunction. The question of whether an injunction can or should issue against a nominal defendant in a foreign action presents a distinct and more difficult issue, which is best deferred to a later stage of the analysis.

### 2. Dispositive litigation

**\*7** The second threshold question is whether the present litigation will be dispositive of the issues being litigated in the foreign forum. As is frequently the case where arbitration is in issue, the litigation between **Storm** and **Telenor** in this Court does not in itself concern the merits of the issues that divide them, or that have been put in issue in Ukraine. Rather, this case concerns only the *arbitrability* of

those issues. Nevertheless, courts have recognized that in this situation, the district court's judgment disposes of the foreign action by determining the arbitrability of the issues. *See Paramedics,* 369 F.3d at 653. *See also Affymax, Inc. v. Johnson & Johnson, 420 F.Supp.2d 876, 885 (N.D.Ill.2006)* (finding second threshold requirement met where "resolution of the arbitration will be dispositive of the [foreign] action"); *Ibeto Petrochemical Indus., 412 F.Supp.2d at 292* (finding second threshold requirement met where "resolution of [the] case (through arbitration) will be dispositive of the [foreign] matter").

**\*7** Here, the issue pending before this Court is the arbitrability of the very issues put before the Ukrainian court: Storm brought this action seeking to enjoin the arbitration, and Telenor counterpetitions to compel it. If the present action results in a judgment for **Telenor** and against **Storm**, then the issues before the Ukrainian courts will be, "by virtue of [that] judgment, ... reserved to arbitration," *Paramedics,* 369 F.3d at 653, and the threshold requirement for an anti-suit injunction will be met.[FN3]

> [FN3.] At this time, of course, the case has not progressed to a final judgment, and the question is not whether a final injunction should issue, but whether preliminary relief should be granted. The point, however, is that this is the kind of action that satisfies the threshold requirement for an anti-suit injunction, because it will be dispositive of the issues raised in the foreign litigation if those issues are found arbitrable.

**\*7** One further problem arises, however. The arbitration will finally dispose of all pending issues between **Telenor** and **Storm**. It is separate question, however, whether it will have any effect on the status of those issues between Storm and Alpren, who are the parties to the Ukrainian litigation. If the Ukrainian court had confined itself to adjudicating matters between the parties before it, this might be a significant obstacle to an anti-suit injunction. Whoever was responsible for bringing the Ukrainian action, that action is between Alpren and Storm (and Klymenko as Storm's agent). The relationship of those entities is not governed by a contract with an arbitration clause, and whatever rights might be at stake as between them are not at issue in the arbitration, which concerns only **Storm's** obligations to **Telenor**.

**\*7** This concern evaporates, however, once Telenor

demonstrates-as it likely will be able to do-that Altimo, Alpren and Storm are, for purposes of the present dispute, the same entity. *See* Part III, *infra*. In any event, even if Telenor's alter-ego argument does not succeed in the end, the fact remains that the parties in Ukraine have obtained orders purporting to bind Telenor, and to prohibit both **Telenor** and **Storm** from going forward with the arbitration. At least with respect to such orders, the arbitration, and any decision in this Court regarding arbitrability, will be dispositive. By attempting to bind Telenor to the results of litigation between them to which Telenor is not a party, Alpren and Storm have created the prerequisite conditions for an anti-suit injunction.

**\*8** Accordingly, although the issue is not free from doubt given the convoluted factual situation, the Court concludes that Telenor is likely to succeed in demonstrating that the prerequisite conditions for an anti-suit injunction have been met on the facts of this case.

### B. *Factors Bearing on Injunctive Relief*

**\*8** The Court thus turns to the factors bearing on whether an injunction should issue. As noted above, the usual factors applied in this context are (1) the potential frustration of a policy in the enjoining forum; (2) the vexatiousness of the foreign litigation; (3) a threat to the issuing court's jurisdiction; (4) any prejudice caused by the foreign litigation to other equitable considerations; and (5) any delay, inconvenience, expense, inconsistency or unseemly race to judgment created by adjudication of the same issues in separate actions. *See Ibeto Petrochemical Indus., 412 F.Supp.2d at 290.* If **Storm** had directly sued **Telenor** in the Ukrainian courts, balancing the factors involved here would be relatively easy, since several of the factors weigh heavily in favor of an injunction in this case.

**\*8** With respect to the first factor, federal policy strongly favors the enforcement of arbitration agreements. *Arciniaga v. General Motors Corp., 460 F.3d 231, 234 (2d Cir.2006)* ("[I]t is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied." (citation and internal quotation marks omitted)). This policy "applies with particular force in international disputes." *Paramedics,* 369 F.3d at 654, citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc. 473 U.S. 614, 638-40 (1985).* To the extent the litigation in Ukraine threatens to disrupt the

arbitration process, it would have the effect of frustrating that policy. And there is no doubt that that litigation has been designed to, and has had the effect of, interfering in the arbitration process. The judgments issued in that litigation have been the basis for objections to the arbitrators' jurisdiction, appeals to this Court to enjoin the arbitration, and concerns on the part of Telenor that it or even the arbitrators themselves may be subject to penalties in Ukraine if the arbitration goes forward. This factor thus strongly favors an injunction.

**\*8** Storm argues that this factor is not significant here because the entire Shareholders Agreement, including the arbitration agreement, is invalid. The federal policy favoring arbitration, Storm contends, cannot apply where there is no agreement to arbitrate in the first place. Telenor, however, has satisfied its burden of demonstrating a likelihood of success on the merits on that issue, and that is all that is required at this stage. In light of the urgency of the preliminary injunction issue, the Court will not discuss the matter in depth. It suffices to note that the Court agrees in substantial part with **Telenor's** argument that Nilov, **Storm's** general director, had at least apparent authority to sign the Shareholders Agreement and to thereby bind Storm to the Agreement's arbitration clause. (Telenor Mem. 6-10; 12/11/06 Tr. at 50:22 to 59:20.) [FN4] While the Court has expressed some doubt as to whether Telenor is entitled to an order compelling arbitration, the reason for that doubt has nothing to do with the validity of the arbitration clause. Rather, the Court's reservations regarding the motion to compel were based on the concern that an order compelling arbitration may not be procedurally appropriate where both parties have already submitted to arbitration. (*See* 12/11/06 Tr. at 3:5 to 9:6.) Moreover, because Telenor is likely to succeed in demonstrating that Storm, Alpren and Altimo are alter egos of one another, the federal policy favoring arbitration also weighs strongly in favor of issuing an antisuit injunction against Alpren and Altimo.

[FN4.] This is not to say that the Court necessarily accepts Telenor's argument on the choiceof-law question. Telenor argues that New York law applies to the question of whether Storm agreed to arbitrate, whereas Storm argues that Ukrainian law applies to that issue. Both parties have acknowledged, however, that this case falls under the New York Convention. (11/15/06 Tr. 3:1 to 4:20.) The weight of the authority suggests

Slip Copy                                         Page 7
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

that in such cases, *federal* law governs the issue of whether the parties have agreed to arbitrate. *See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 96 (2d Cir.1999)* (explaining that with respect to questions regarding the making of an agreement to arbitrate in a case falling under the Convention, "compelling reasons [exist] to apply federal law ... to the question of whether an agreement to arbitrate is enforceable."); *Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 845 (2d Cir.1987)* ("In enacting the federal Arbitration Act, Congress created national substantive law governing questions of the validity and the enforceability of arbitration agreements under its coverage. Hence whether Genesco is bound by the arbitration clause of the sales confirmation forms is determined under federal law, which comprises generally accepted principles of contract law." (citations omitted)); *Stony Brook Marine Transp. Corp. v. Wilton, 94 Civ. 5880(JS), 1996 WL 913180, at *3 (E.D.N.Y. May 1, 1996)* ("[T]he vast majority of the cases in this Circuit hold that under the Federal Arbitration Act, federal law applies to contract formation issues when the question of an agreement to arbitrate is at issue."); *21 Williston on Contracts § 57:56 (4th ed.2006)* (noting that under the Convention, "[g]eneral federal law, rather than the state law of the forum and its conflict of laws rules, governs the question whether an agreement to arbitrate was made"); *see also Republic of Ecuador v. ChevronTexaco Corp., 376 F.Supp.2d 334, 352-56 (S.D.N.Y.2005)* (analyzing, and attempting to reconcile, inconsistencies in Second Circuit case law on this issue). However, even if federal law, as opposed to New York or Ukrainian law, applies, this does not undermine the substance of Telenor's argument, because federal law and New York State law are consistent with respect to apparent authority in agency relationships. *See 36 Convent Ave. HDFC v. Fishman, 03 Civ. 3998(JGK), 2004 WL 1048213, at *3 (S.D.N.Y. May 7, 2004).*

**\*9** Attempts to interfere with arbitration of international disputes are so powerfully disapproved that the Second Circuit has suggested, albeit not decided, that "an attempt to sidestep arbitration" might be "sufficient to support a foreign anti-suit

injunction." *Paramedics,* 369 F.3d at 654. Where this factor is present, little else is required to authorize an injunction. But here there is much else. The foreign litigation here has been conducted in the most vexatious way possible. Telenor has found its interests undermined by litigation to which it has not been made a party, and of which it has not even received notice until after orders have been entered. The Ukrainian orders have been used against Telenor in court and before the arbitrators here in New York, and have exposed it to potential criminal liability in Ukraine. As late as this very day, Telenor was receiving what appeared to be service of process in yet another lawsuit, only to be advised by Alpren's New York attorney during oral argument that there was no such lawsuit, and that the papers were a "mistake" of no legal significance. If a federal court may enjoin foreign litigation that straightforwardly seeks to adjudicate the rights of a party to litigation, a fortiori it should be able to enjoin litigation being conducted by a kind of stealth attack. These facts also support a finding that the fourth factor favors an injunction: to the extent that the litigation in Ukraine purports to bind Telenor without notice or opportunity to be heard, it manifestly prejudices any equitable concern for fair play.

**\*9** In addition, the foreign litigation threatens the jurisdiction of this Court. This case is here, at Storm's original instance, by virtue of the pending arbitration. Storm lost in its effort to derail that arbitration by a preliminary injunction. The Ukrainian litigation seeks to "sidestep" not merely the arbitration, but this Court's ruling. It further threatens the very existence of the arbitration, by threatening serious sanctions against Telenor if it proceeds with the arbitration. If Telenor were forced to yield to that pressure, this Court's jurisdiction would be at an end.

**\*9** Moreover, continued litigation in Ukraine raises the distinct specter of delay, inconvenience, expense, inconsistency and an unseemly race to judgment. Arbitration is intended to be an expeditious and efficient means of resolving commercial disputes. Being forced to litigate in both American and Ukrainian courts not merely to enforce an arbitration agreement but to defend the existence of an arbitration already under way, has already created extensive delays in the arbitration proceeding and added considerable expense to the proceedings. The risk of inconsistent adjudications is acute, particularly because Alpren and Storm apparently insist on conducting their Ukrainian litigation without even notifying Telenor, such that Telenor's position has not even been heard.[FN5] A proceeding in which

Slip Copy                                                                                    Page 8
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**Storm** and **Telenor** vigorously contest the issues is highly likely to reach different conclusions than one in which the only participating parties share a common interest and the same analysis of the issues.

> FN5. **Storm's** blithe suggestion that **Telenor** could intervene on appeal after judgment has already been reached against it is hardly an adequate opportunity to be heard.

**\*10** As for an "unseemly race to judgment," "unseemly" and "race" do not begin to describe the situation here. After every setback in the arbitration or in this Court, parties associated with Storm have proceeded to the Ukrainian courts, seeking and obtaining broad rulings without any meaningful opposition. Telenor seeks to arbitrate the dispute in a neutral forum; Storm and its parents seek to coopt that process by resorting to a forum in which their home-court advantage is magnified by their willingness to play the game without letting the other team show up.

**\*10** The factors relevant to an award of anti-suit relief thus strongly favor Telenor. And strongly favor Telenor they must, for as the courts have emphasized, even though "such an injunction in terms is leveled against the party bringing the suit, it nonetheless 'effectively restricts the jurisdiction of the court of a foreign sovereign.' " *Paramedics,* 369 F.3d at 655, quoting *China Trade,* 837 F.2d at 35. Considerations of comity thus always weigh against an anti-suit injunction.[FN6]

> FN6. Telenor contends that comity is a lesser concern here because the courts of Ukraine are entitled to less deference than might otherwise be the case. Telenor relies on reports from the State Department, which has found that the Ukrainian judiciary suffers from "corruption and inefficiency." *See* United States Department of State, Country Report on Human Rights Practices in the Ukraine (2006), *available at* http://www.state.gov/g/drl/rls/      hrrpt/2005/61682.htm. This Court rejects the view that it can simply dismiss the usual comity due to a foreign sovereign on the basis of such criticism. However, it must be noted that the departure from due process involved in entering orders against absent, unserved parties without prior notice lessens the degree of comity due, not to the Ukrainian

courts at large, but to the particular orders at issue in this case.

**\*10** Accordingly, to the extent that Storm can be held responsible for the Ukrainian litigation, the issue is clear-cut: Telenor is extremely likely to succeed in establishing that virtually all of the factors considered by courts in granting anti-suit injunctions favor its cause. Nevertheless, the entry of an anti-suit injunction against the *defendant* in foreign litigation is both unconventional, and, so far as the parties' or the Court's research can determine, unprecedented. The Court thus turns to consideration of that issue.

C. *May an Anti-Suit Injunction Issue Against* **Storm***?*

**\*10 Telenor** persistently refers to the Ukrainian litigation between Storm and Alpren as "collusive," and indeed this Court too has so found it, at least to the limited degree necessary to make preliminary findings with respect to Storm's request for preliminary relief. Telenor also claims that an injunction against Storm is appropriate because Storm is acting as the alter ego of its corporate parents Altimo and Alpren.

**\*10** Having weighed the parties' arguments and evidence, the Court finds that Telenor is at a minimum likely to prove that the Ukrainian action has been brought with the collusion of Storm. First, the position that Alpren seeks to vindicate in the Ukrainian courts is exactly the position that Storm has asserted before the arbitrators and in this Court, namely, that the arbitration agreement is invalid because it is part of a Shareholders Agreement that the then general director of Storm was not authorized to sign. Although Storm argues that Klymenko formally opposed the relief sought by Alpren, it does not contend that Klymenko or Storm objected on the merits to the legal position taken by Alpren. Rather, it argues that Storm urged the Ukrainian court to defer to the on-going arbitration. (*See, e.g.,* 12/5/06 Sills Dec. Ex. E at 3.) Given that Storm has taken the exact opposite position here and has actively supported in this litigation the position taken by its supposed adversary abroad, it is reasonable to infer that its true position in the Ukrainian is identical to Alpren's.[FN7]

> FN7. At the December 11, 2006, hearing, Storm acknowledged that the argument it presented to the Ukrainian courts was the "same argument" that it opposes here.

Slip Copy                                                                                                    Page 9
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

(12/11/06 Tr. at 73:5-8.)

**\*11** Indeed, Storm has explicitly conceded before this Court that it wishes the Ukrainian action to continue *precisely because it hopes and expects that the Ukrainian courts will rule against Storm.* In its most recent memorandum to the Court, Storm argues that this "Court should allow the Ukrainian action to continue" because that action "will lend further support to Storm's claim in the arbitration that the Shareholders Agreement is null and void in its entirety under Ukrainian law." (**Storm** Mem. in Opposition to **Telenor** Mot. for Prelim. Injunc. Relief at 27.) In view of this blatant acknowledgment that **Storm's** opposition to **Telenor's** request for an antisuit injunction is rooted in a desire to protect the ruling in favor of Alpren, Storm's claim that it has opposed Alpren's lawsuit is simply implausible.

**\*11** Klymenko, moreover, neither retained counsel nor submitted written legal or factual arguments in the Ukrainian court. Storm offers expert testimony that, contrary to federal practice here, it is both permissible and not uncommon in Ukraine for corporations to appear in court pro se through their chief executive officer, and that oral presentation of arguments and evidence is also common practice. But the point is not whether such practices are permissible or even whether they are common. The issue is whether a party that seriously opposed an action would proceed in that manner. There can be little doubt, for example, that if such an action had been brought against Telenor, it would have retained counsel and sought a sufficient adjournment to make a substantive, serious presentation to the Court. Storm, however, presented its defense in the most perfunctory manner, and did not even bother to notify Telenor of the proceedings. Alpren, in contrast, was represented by counsel throughout the proceedings. Indeed, it appears that it was represented by a law firm that had previously represented Storm.

**\*11** Alpren relies heavily on the affidavit of Klymenko, who claims to have presented a defense in the Ukrainian actions. Klymenko, however, has never been present in this Court or in the arbitration to be cross-examined, and his affidavit-which Storm submitted to the arbitrators-relates only to the first stage of the first litigation. His affidavit does not address how Storm managed, by seeking a "clarification" of the "adverse" judgment in the first case, to succeed only in broadening the order in such a way as to better conform to the position it was taking in the United States, and it does not speak to the action later brought against Klymenko personally.

**\*11** It is worth emphasizing that Klymenko is not merely the general director of Storm, but also an executive of Altimo (12/11/06 Tr. at 22:19-23, 47:9-15; 12/11/06 Sills Dec. Ex. A), and there is evidence that as an Altimo executive, he has responsibility for, among other things, litigation. (*See* 12/5/06 Sills Dec. Ex. E at 6.) There is also evidence in the record that in his dealings with Telenor, Klymenko held himself out indiscriminately as representing either company, and that there was no real distinction between his duties as an Altimo executive and his duties as director of Storm. (*See, e.g.,* 12/11/06 Tr. at 47:9 to 48:18; 12/5/06 Sills Dec. Ex. E. at 6.) It is difficult to believe that Alpren undertook to sue Storm without the knowledge either of Storm or of the litigation manager of Altimo.

**\*12** Finally, all of the facts described above must be considered in light of the corporate structure of the supposedly adverse parties. As noted above, Storm is 50.1% owned by Altimo through one intermediary, and Alpren, which owns the other 49.9% of Storm, is 100% owned by Altimo. Neither Storm nor Alpren conduct any real business activities; Alpren exists to hold Altimo's shares in Storm, and Storm's sole activity is its possession of the shares in Kyivstar. Storm's general director, Klymenko, is an executive of Altimo, and Klymenko's own description of his responsibilities suggests no meaningful distinction between his activities for Storm and his activities for Altimo. (12/5/06 Sills Dec. Ex. E at 2, 6.)

**\*12** Weighing all these matters, the Court is persuaded that Telenor is likely to succeed in establishing, at a minimum, that the litigation in Ukraine has been collusive, and not truly adversarial. The Ukrainian litigation was brought in Storm's as well as Alpren's interests, sought relief that Storm had every reason to desire, and was not meaningfully resisted by Storm or its general director. Storm has effectively conceded before this Court that it wants to preserve the Ukrainian judgment "against" it. Accordingly, it is a fair inference, and one that on this limited record the Court finds more likely true than not, that Storm colluded in the bringing of this litigation against itself. It can therefore be enjoined from continuing with such actions.

### D. *Futility*

**\*12** A court of equity will not undertake futile acts. *See* Foster v. Mansfield, C. & L.M.R. Co., 146 U.S. 88, 101-02 (1892); *Spectacular Venture, L.P. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 10
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

*World Star Int'l, Inc.,* 927 F.Supp. 683, 686 (S.D.N.Y.1996). In arguing that the actions here will not be dispositive, Storm contends that whatever this Court or the arbitrators do, "[t]he Ukrainian courts have already determined several times that the Shareholders Agreement violates Ukrainian law [and] [n]othing that the arbitral tribunal determines is going to change that." (12/8/06 Storm Mem. in Opp. to Mot. for Prelim. Injun. Relief at 27.)

**\*12** It may well be questioned whether Telenor in the end can secure any benefit from an arbitration award in its favor, even if such an award is confirmed and embodied in a judgment of this Court. But it cannot simply be assumed that this Court's judgments will be disregarded by foreign courts. The "determin[ations]" of the Ukrainian courts to which Storm refers were reached in apparently non-adversarial proceedings between friendly parties with no incentive to raise serious issues about the correctness of their joint position. Such determinations may not be adhered to in genuine judicial proceedings. Moreover, the record in this case contains no information about what assets Storm may have outside Ukraine that could be reached by either a judgment on the merits or a contempt adjudication. The views of the Ukrainian courts may not be shared by those of other countries.

### E. *Irreparable Injury*

**\*13** The Court need not dwell on the issue of irreparable injury, for there is no question that the action to be enjoined places Telenor under threat of imminent and irreparable harm. To the extent the Ukrainian litigation interferes with the arbitration, Storm will be able to prolong its boycott of Kyivstar meetings, thereby making it impossible for that company-in which Telenor has a majority stake-to function. (*See* 11/22/06 Tr. at 36:24 to 37:4.) More importantly, however, the Ukrainian proceedings place Telenor under threat of criminal sanctions if it proceeds with the arbitration. Not only does Storm concede that this possibility exists, but it has exploited the possibility in its attempt to derail the arbitration. (12/5/06 Sills Dec. Ex. B.)

### III. *Altimo and Alpren*

**\*13** Telenor seeks a preliminary anti-suit injunction not only against Storm, but also against Altimo and Alpren. Those corporations have entered a limited appearance to contest the in personam jurisdiction of the Court.

**\*13** Altimo and Alpren argue that neither of them transacts any business within New York. This claim is something of a red herring, however. It is undisputed that neither Altimo nor Alpren-nor Storm, for that matter-has any ordinary business in New York or would be subject to general jurisdiction here.

**\*13** The Arbitration Agreement, however, expressly provides for arbitration in New York, and in that same agreement Storm expressly consents to the jurisdiction of this Court. Counsel for Altimo and Alpren conceded at a December 15 hearing before this Court that if they were found to be alter egos of Storm, the Court could properly exercise personal jurisdiction over them on a theory of consent.

**\*13** The question, therefore, is whether Telenor has succeeded in demonstrating, for personal jurisdiction purposes, that Altimo, Alpren and Storm are alter egos of one another. To determine whether a company is an alter ego of another company (or a "mere department" of another company), the Court must evaluate four factors: "(1) common ownership, which is essential; (2) financial dependency of the subsidiary on the parent; (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's personnel and fails to observe corporate formalities; and (4) the degree of control that the parent exercises over the subsidiary's marketing and operational policies." *Sodepac, S.A. v. Choyang Park in rem,* 02 Civ. 3927(SAS), 2002 WL 31296341, at \*4 (S.D.N.Y. Oct. 10, 2002).[FN8]

> FN8. Establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability. *See Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *Quebecor World (USA), Inc. v. Harsha Assocs., L.L.C.,* ---F.Supp.2d ----, 06 Civ. 6002, 2006 WL 2918797, at \*7 (W.D.N.Y. Oct. 11, 2006).

**\*13** These factors clearly weigh in favor of Telenor's motion here. The common ownership of Alpren and Storm by Altimo is undisputed. Alpren and Storm, moreover, are essentially shell companies that exist solely for the purpose of holding shares for Altimo-Alpren holds shares in Storm, and Storm holds shares in Kyivstar. The Court is unaware of any evidence in the voluminous record that these shell companies are financially independent, or that they have more than a

few employees. Indeed, Alpren and Altimo's counsel conceded at the December 15 hearing that he knew of no evidence in the record that Storm had employees other than its general director. In a submission to the arbitration panel, Storm conceded that it had no board of directors and that its senior management consisted only of Klymenko. (12/15/06 Sills Letter Ex. A.) There is also evidence in the record that Altimo has the right to select Storm's general director. (*See, e.g.,* Telenor Evidentiary Brief Ex. P.) To the extent Storm and Alpren have any employees, there is evidence that they share the employees of Altimo. Klymenko, for example, is both an Altimo executive and the general director of Storm. Alpren, moreover, is a Cypriot company that is 100% owned by Altimo, whose directors are provided by another Cypriot company, Abacus, that exists merely to provide corporate services to some 700 clients. Alpren has no known employees other than those provided by Abacus. It passes credulity that these Cypriot officials independently decided to bring this action, without consultation with Abacus's client Altimo. Indeed, it is apparent that they made no such decision; the lawsuit was filed by Ukrainian counsel for Altimo, who acted pursuant to a general power of attorney by Alpren's Cypriot directors. Finally, the question of whether Storm controls Alpren and Storm's "marketing and operational policies" is answered by the fact that Alpren and Storm likely do not engage in any marketing; nor do they have significant "operations" other than their possession of shares.

**\*14** The same alter-ego theory that provides for jurisdiction over Altimo and Alpren also leads the Court to conclude that Telenor is likely to succeed in establishing that Altimo and Alpren are bound by the Arbitration Agreement. Thus, the policy favoring arbitration applies to them as well, and they are appropriately subject to an antisuit injunction.

**\*14** It is undisputed that Altimo played a significant role in the negotiations leading to the Arbitration Agreement. Alpren and Altimo make much of the fact that at time the Agreement was negotiated, Storm was not a mere shell company and was not wholly owned by Altimo or its subsidiaries. Telenor responds, however, that at that time, the negotiating parties had already determined that Storm would become what it is now---a shell company existing solely for the purpose of holding shares. The Court finds that Telenor is likely to succeed in proving that that was the case.

**\*14** There is no real dispute that Altimo negotiated

the entire transaction that gives rise to this dispute, agreed to the arbitration clause demanded by Telenor as part of that bargain, negotiated the Shareholders Agreement by which its vehicle Storm would operate in voting the shares it held for Altimo, and provided Telenor with assurances that the general director of Storm-Altimo's own employee-was properly authorized to sign the Shareholders Agreement, including the Arbitration Agreement. Altimo now seeks to frustrate the Arbitration Agreement by litigating the same issues in the very Ukrainian courts the parties agreed to bypass in favor of arbitration. It cannot be permitted to do this.

**\*14** In sum, because Telenor has made a sufficient showing that Altimo, Alpren and Storm are mere alter egos of one another, they are subject to this Court's jurisdiction and, more importantly, to the Court's order granting a preliminary antisuit injunction.

### CONCLUSION

**\*14** For the foregoing reasons, the motion for a preliminary anti-suit injunction is granted. Storm, Altimo and Alpren are enjoined from bringing or attempting to cause the enforcement of any legal action in the Ukraine that would disrupt, delay or hinder in any way the arbitration proceedings between **Telenor** and **Storm** in New York.[FN9]

> FN9. Telenor also moves for an injunction directing Storm and its corporate parents to take steps to withdraw the Ukrainian litigation. Telenor does not ask for a *preliminary* injunction of this sort, however. The Court expresses no view at this time as to whether such an order would be appropriate.

**\*14** SO ORDERED.

S.D.N.Y.,2006.
Storm LLC v. Telenor Mobile Communications AS
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 4049448 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Motion of Relief Defendants Altimo Holdings & Investments Limited and Alpren Limited to Dismiss for Lack of Personal Jurisdiction (Dec. 14, 2006)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 12
Slip Copy, 2006 WL 3735657 (S.D.N.Y.)
**(Cite as: Slip Copy)**

• 2006 WL 4049447 (Trial Motion, Memorandum and Affidavit) Opposition Memorandum of Altimo Holdings & Investments Limited and Alpren Limited to Telenor Mobile's Motion for an Anti-Suit Injunction (Dec. 8, 2006)

• 2006 WL 4049446 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Telenor Mobile's Motion to Compel Arbitration and for an Anti-Suit Injunction (Dec. 6, 2006)

• 2006 WL 4009054 () Legal Opinion of Peter Magnus (Nov. 23, 2006)

• 1:06cv13157 (Docket) (Nov. 14, 2006)

• 2006 WL 4009052 () Legal Opinion of Roman Maydanyk (Aug. 31, 2006)

• 2006 WL 4058504 () Affidavit of Alexey Khoudyakov (Aug. 31, 2006)

• 2006 WL 4009053 () Legal Opinion by Lyubov Logush (Jul. 28, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[handwriting and signature illegible]

The State Enforcement Service in
the Golosiyivsky District of the City of Kyiv

Debtor:     LLC "Storm"
            Apt. 21, 17-B Gorkogo Street, Kyiv

Recoverer:  Alpren Limited

**Mailing address: 01030, 4 Chapayeva Str., Office 12, Law Firm "Ilyashev & Partners"**

## APPLICATION
## FOR THE COMMENCEMENT OF ENFORCEMENT PROCEEDING

By virtue of Decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on enjoining Limited Liability Company "Storm" and any persons authorized by it from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from filing any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York, I hereby require to commence the enforcement proceedings and to take all actions necessary for the execution of the court decision.

Attachments: - Decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv (original);
        -   Power of Attorney (copy).

Authorized representative of the Recoverer        *[signature]*        I. Mishanina

> The State Enforcement Service in
> the Golosiyivsky District of the City of Kyiv
> Incoming No. *14558*
> *December 4, 2006*

I, Oksana Kharchenko, hereby certify that I have knowledge of English and Russian/Ukrainian languages and that I am competent to translate to and from the said languages. I declare that the above translation was done by me and is true, accurate and correct translation of the Application for the Commencement of Enforcement Proceeding, registered by the State Enforcement Service in Golosiyivsky District of the City of Kyiv under No. 14558 on December 4, 2006, of which I have seen a copy of the original.

February 23, 2007, I, Narinskii F.M., director of Translation Agency "Eridan – 2002", certify the authenticity of signature which is made by translator Oksana Kharchenko.

[Seal]

Державна виконавча служба
Голосіївського   району  м.Києва

Боржник:      ТОВ «Сторм»,
              м. Київ, вул. Горького, 17-б, кв.21

Стягувач:     «Альпрен Лімітед»

**Адреса для кореспонденції: 01030, м.Київ, вул.Чапаєва,4 оф.12**
**ЮФ "Ілляшев та Партнери"**

### З А Я В А
### ПРО ВІДКРИТТЯ ВИКОНАВЧОГО ПРОВАДЖЕННЯ

        На підставі   ухвали № 2- 5613 від 01.12.2006 року Голосіївського районного суду м. Києва про   заборону до вирішення справи по суті Товариству з обмеженою відповідальністю «Сторм» та  будь-яким уповноваженим ним особам вчиняти будь-які дії по виконанню Акціонерної угоди, датованої 30.01.2004 р., в тому числі   заборонити подавати  будь-які пояснення, заяви, відзиви на позовні заяви, клопотання, приймати участь у арбітражному процесі, слуханнях, засіданнях арбітражу (арбітри Григорі Бі. Крейг (Gregory B. Craig), Вільям Р. Дженетс (William R. Jentes), головуючий Кеннет Р. Фейнберг ( Kenneth R. Feinberg), який відбувається згідно з  арбітражними правилами UNCITRAL, за позовом Теленор мобайл ком''юнікейшнз АС (Telenor Mobile Communications AS) до Товариства з обмеженою відповідальністю «Сторм» в місті Нью-Йорк   прошу   відкрити виконавче провадження та провести всі необхідні дії для виконання рішення суду.

Додатки:  - ухвала № 2- 5613 від 01.12.2006 року Голосіївського районного суду м. Києва (оригінал);
              - довіреність (копія).

Довірена особа стягувача                                              І.Мішаніна

[handwriting and signature illegible]

The State Enforcement Service in
the Golosiyivsky District of the City of Kyiv

Debtor:       V.V. Klymenko
                Apt. 21, 17-B Gorkogo Street, Kyiv

Recoverer:    Alpren Limited

**Mailing address: 01030, 4 Chapayeva Str., Office 12, Law Firm "Ilyashev & Partners"**

## APPLICATION
## FOR THE COMMENCEMENT OF ENFORCEMENT PROCEEDING

By virtue of Decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv on enjoining Vadym Viktorovych Klymenko, as the General Director of Limited Liability Company "Storm", and any other persons authorized by him from taking any actions aimed at performance of the Shareholders Agreement dated January 30, 2004 until resolution of the case *per se*, including enjoin [them] from signing and filing on behalf of LLC "Storm" any explanations, statements, respondent's statements, motions, participating in the arbitration proceedings, hearings, sessions of the arbitration tribunal (arbitrators Gregory B. Craig, William R. Jentes, presiding arbitrator Kenneth R. Feinberg) being held under the UNCITRAL Arbitration Rules upon a claim brought by Telenor Mobile Communications AS against Limited Liability Company "Storm" in New York, I hereby require to commence the enforcement proceedings and to take all actions necessary for the execution of the court decision.

Attachments: - Decree No. 2-5613 issued on December 1, 2006, by the Golosiyivsky District Court of the City of Kyiv (original);
          - Power of Attorney (copy).

Authorized representative of the Recoverer    *[signature]*    I. Mishanina

> The State Enforcement Service in the
> Golosiyivsky District of the City of Kyiv
> Incoming No. *14557*
> *December 4, 2006*

I, Oksana Kharchenko, hereby certify that I have knowledge of English and Russian/Ukrainian languages and that I am competent to translate to and from the said languages. I declare that the above translation was done by me and is true, accurate and correct translation of the Application for the Commencement of Enforcement Proceeding, registered by the State Enforcement Service in Golosiyivsky District of the City of Kyiv under No. 14557 on December 4, 2006, of which I have seen a copy of the original.

February 23, 2007, I, Narinskii F.M., director of Translation Agency "Eridan – 2002", certify the authenticity of signature which is made by translator Oksana Kharchenko.

[Seal]



Державна виконавча служба
Голосіївського району м.Києва

Боржник:    Клименко В.В.
            м. Київ, вул. Горького, 17-б, кв.21

Стягувач:   «Альпрен Лімітед»

**Адреса для кореспонденції: 01030, м.Київ, вул.Чапаєва,4 оф.12
ЮФ "Ілляшев та Партнери"**

### З А Я В А
### ПРО ВІДКРИТТЯ ВИКОНАВЧОГО ПРОВАДЖЕННЯ

На підставі ухвали № 2- 5613 від 01.12.2006 року Голосіївського районного суду м. Києва про заборону до вирішення справи по суті Клименку Вадиму Вікторовичу, як генеральному директору Товариства з обмеженою відповідальністю «Сторм» та будь-яким уповноваженим ним особам вчиняти будь-які дії по виконанню Акціонерної угоди, датованої 30.01.2004 р., в тому числі заборонити підписувати та подавати від імені ТОВ «Сторм» будь-які пояснення, заяви, відзиви на позовні заяви, клопотання, приймати участь у арбітражному процесі, слуханнях, засіданнях арбітражу (арбітри Григорі Бі. Крейг (Gregory B. Craig), Вільям Р. Дженетс (William R. Jentes), головуючий Кеннет Р. Фейнберг ( Kenneth R. Feinberg), який відбувається згідно з арбітражними правилами UNCITRAL, за позовом Теленор мобайл ком''юнікейшнз АС (Telenor Mobile Communications AS) до Товариства з обмеженою відповідальністю «Сторм» в місті Нью-Йорк прошу відкрити виконавче провадження та провести всі необхідні дії для виконання рішення суду.

Додатки: - ухвала № 2- 5613 від 01.12.2006 року Голосіївського районного суду м. Києва (оригінал);
         - довіреність (копія).

Довірена особа стягувача                                          І.Мішаніна