# APPENDIX OF AUTHORITIES PART 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

**STORM LLC,**                                          :
                                                        :
                          Plaintiff,                    :
                                                        :
            -against-                                   :
                                                        :
**TELENOR MOBILE COMMUNICATIONS AS,**                   :
                                                        :
                          Defendant.                    :
------------------------------------------------------------------X  06-CV 13157 (GEL) (DF)

**TELENOR MOBILE COMMUNICATIONS AS,**                   :
                                                        :
                          Counterclaimant,              :
                                                        :
            -against-                                   :
                                                        :
**STORM LLC,**                                          :
                                                        :
                          Counterclaim-Defendant,       :
                                                        :
            -and-                                        :
                                                        :
**ALTIMO HOLDINGS & INVESTMENTS LIMITED** :
**and ALPREN LIMITED**                                  :
                                                        :
                          Relief Defendants.            :
------------------------------------------------------------------X

**APPENDIX OF AUTHORITIES TO
STORM LLC'S MEMORANDUM OF LAW IN OPPOSITION TO TELENOR
MOBILE'S MOTION FOR AN ORDER HOLDING COUNTERCLAIM-DEFENDANT
AND RELIEF DEFENDANTS IN CIVIL CONTEMPT**

LOVELLS

590 Madison Avenue
New York, New York 10022
Telephone: (212) 909-0600
Facsimile: (212) 909-0660

Attorneys for Storm LLC

## INDEX OF AUTHORITIES

**Tab   Cases**

1. *A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281 (S.D.N.Y. 2000)

2. *Bristol—Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033 (2d Cir. 1992)

3. *Levin v. Tiber Holding Corp.*, 277 F.3d 243 (2d Cir. 2002)

4. *RxUSA Wholesale, Inc. v. Dep't of Health and Human Serv.*, 467 F. Supp. 2d 285 (E.D.N.Y. 2006)

5. *United States v. Local 1804-1 Int'l Longshoreman's Ass'n*, 44 F.3d 1091 (2d Cir. 1995)

6. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)

.

# TAB 1

Westlaw.

87 F.Supp.2d 281
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
(Cite as: 87 F.Supp.2d 281)

Page 1

▷

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
A.V. BY VERSACE, INC., Plaintiff,
v.
GIANNI VERSACE, S.p.A. and Alfredo Versace,
Defendants.
and
Gianni Versace, S.p.A., Third-Party Plaintiff,
v.
Anthony J. Pellegrino, Patrick Marano, and John
Does 1-10, Third-Party
Defendants.
Gianni Versace, S.p.A., Plaintiff,
v.
Alfredo Versace and Foldom International (U.S.A.),
Inc., Defendants.
**Nos. 96Civ.9721(PKL)(THK),
98Civ.0123(PKL)(THK).**

March 6, 2000.

Trademark infringement plaintiff moved to find defendant in civil contempt for violation of court's preliminary injunction. The District Court, Leisure, J., held that: (1) defendant's allegedly foreign licensing of infringing marks from his New York office did not violate preliminary injunction, which did not clearly prohibit overseas activity; (2) defendant's online sales and advertisements of allegedly infringing products violated preliminary injunction; and (3) sanctions were warranted.

Motion granted.

West Headnotes

**[1] Contempt** ⚖70**20**
93k20 Most Cited Cases

**[1] Contempt** ⚖70**60(3)**
93k60(3) Most Cited Cases
Party may not be held in civil contempt for violation of court order unless violated order is clear and unambiguous, proof of non-compliance is clear and convincing, and party was not reasonably diligent in attempting to comply.

**[2] Contempt** ⚖70**70**
93k70 Most Cited Cases
Judicial sanctions in civil contempt proceedings may be employed for either or both of two purposes: to coerce defendant into compliance with court's order, and to compensate complainant for losses sustained.

**[3] Trademarks** ⚖70**1722**
382Tk1722 Most Cited Cases
(Formerly 382k654.1)
Evidence was insufficient to establish that third party was alter ego of trademark infringement defendant, and thus third party would not be sanctioned for defendant's alleged violations of preliminary injunction.

**[4] Trademarks** ⚖70**1722**
382Tk1722 Most Cited Cases
(Formerly 382k655)
Trademark infringement defendant's alleged foreign licensing of infringing marks from his New York office did not violate preliminary injunction, which did not clearly prohibit overseas activity; injunction, prohibiting "defendant ... in the United States . . . from . . . licensing" marks, was ambiguous.

**[5] Trademarks** ⚖70**1723**
382Tk1723 Most Cited Cases
(Formerly 382k656)
Trademark infringement defendant would not be held in contempt for violation of preliminary injunction, absent clear and convincing evidence that alleged violations post-dated injunction.

**[6] Trademarks** ⚖70**1722**
382Tk1722 Most Cited Cases
(Formerly 382k656)
Trademark infringement defendant's online sales and advertisements of allegedly infringing products violated preliminary injunction, warranting contempt sanctions; even if defendant's Internet sites operated from servers in foreign countries, they were accessible by any web browser in United States.

**[7] Contempt** ⚖70**70**
93k70 Most Cited Cases
In civil contempt proceeding, court has broad discretion to fashion appropriate coercive remedy based on nature of harm and probable effect of alternative sanctions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 F.Supp.2d 281
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
**(Cite as: 87 F.Supp.2d 281)**

Page 2

**[8] Contempt** ☜70
93k70 Most Cited Cases
In determining whether sanctions are appropriate for civil contempt, court must consider whether ends justify means.

**[9] Trademarks** ☜1724
382Tk1724 Most Cited Cases
(Formerly 382k657)

**[9] Trademarks** ☜1751
382Tk1751 Most Cited Cases
(Formerly 382k657)

**[9] Trademarks** ☜1755
382Tk1755 Most Cited Cases
(Formerly 382k657)
Trademark infringement defendant's violation of preliminary injunction through Internet sales and advertisements warranted, as contempt sanction, order to delete infringing references from websites in question, payment of compensatory fine to plaintiff in amount of profits from post-injunction online sales, and payment of one-third of plaintiff's attorney fees and costs associated with enforcing injunction.

**[10] Federal Civil Procedure** ☜824
170Ak824 Most Cited Cases

**[10] Federal Civil Procedure** ☜834
170Ak834 Most Cited Cases

**[10] Federal Civil Procedure** ☜851
170Ak851 Most Cited Cases
Motion to amend complaint may be denied due to undue delay, if it would cause undue prejudice to opposing party, or where proposed amendment would be futile. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[11] Federal Civil Procedure** ☜851
170Ak851 Most Cited Cases
Proposed amendment of trademark infringement complaint so as to add additional corporate defendants would not be denied on ground of futility; evidence suggested that additional defendants played significant role in named defendant's operations and that plaintiff might be able to pierce corporate veil. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[12] Federal Civil Procedure** ☜834
170Ak834 Most Cited Cases

Amendment of trademark infringement complaint so as to add additional corporate defendants would not unduly prejudice defendants; no trial date had yet been set, discovery had not been completed, and claims against additional defendants did not raise factual claims unrelated to events original complaint. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.
*282 Walsh & Walsh, Hackensack, NJ (John Walsh, of counsel), for A.V. By Versace, Inc.

Quirk and Bakalor, P.C., New York, NY (H. Nicholas Goodman, James M. Andriola, of counsel), for A.V. By Versace, Inc.

Phillips, Nizer, Benjamin, Krim & Ballon LLP, New York, NY (Theodore C. Max, David E. Jacoby, of counsel), for Gianni Versace, S.p.A.

Tunick, Kupferman & Creadore, P.C., New York, NY (Theodore R. Kupferman, of counsel), for Alfredo Versace and Foldom International (U.S.A.), Inc.

*OPINION AND ORDER*

LEISURE, District Judge.

Gianni Versace, S.p.A. seeks an order, pursuant to Federal Rule of Civil Procedure 70, Local Civil Rule 83.9, and this Court's inherent power, finding defendants Alfredo Versace and Foldom International (U.S.A.), Inc. in civil contempt for violating a preliminary injunction entered by the Honorable Sidney H. Stein, United States District Judge, in Civil Action No. 98- 0123(SHS) (the *"Foldom* Action"). In addition, Gianni moves this Court for leave to amend its answer, counterclaim, and third-party complaint in Civil Action No. 96-9721(PKL) (the *"A.V.* Action"). For the *283 following reasons, Gianni's application for contempt sanctions is granted with respect to Alfredo Versace and denied with respect to Foldom International (U.S.A.), Inc., and its motion for leave to amend its pleadings is granted.

**BACKGROUND**
Gianni Versace, S.p.A. ("Gianni") is a world-famous design house founded in the 1970s by the late Italian designer, Mr. Gianni Versace. Gianni owns a number of famous trademarks incorporating the name "Versace," as well as its signature "Medusa" trademarks. A.V. By Versace, Inc. ("A.V.") is a manufacturer of clothing and athletic shoes bearing the trademarks "A.V. By Versace" and "Alfredo Versace," pursuant to an alleged license with Alfredo Versace ("Mr.Versace"), an Italian citizen and United

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 F.Supp.2d 281                                                                                                    Page 3
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
(Cite as: 87 F.Supp.2d 281)

States resident. Mr. Versace has also been accused of marketing jeans and other items of clothing, as well as cigarettes, in conjunction with codefendant Foldom International (U.S.A.), Inc. ("Foldom"), through the use of various marks confusingly similar to trademarks registered by Gianni in the United States. The parties filed separate lawsuits in December 1996 and January 1998, which were later consolidated by this Court. See *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* No. 96 Civ. 9721, 1998 WL 832692 (S.D.N.Y.1998), at *1.

### I. The *A.V.* Action

The facts underlying the *A.V.* Action have been set forth in greater detail in this Court's January 28, 1997 Memorandum Order, *A.V. by Versace v. Gianni Versace, S.p.A.,* 1997 WL 31247, at *1 (S.D.N.Y. Jan. 28, 1997), familiarity with which the Court assumes. In December 1996, A.V. commenced the *A.V.* Action after its customer, Kinney Shoe Corporation ("Kinney"), received a cease and desist letter from Gianni's attorneys alleging that Kinney's sales of "A.V. By Versace" and "Alfredo Versace" clothing and shoes infringed various Gianni trademarks. As to Gianni, A.V. sought (1) declaratory relief, declaring that its products do not infringe Gianni's registered trademarks; (2) injunctive relief, enjoining Gianni from sending further "cease and desist" letters to A.V.'s customers; and (3) damages, under theories of unfair competition and tortious interference with contract. See *id.* Against Mr. Versace, A.V. requested (1) declaratory relief, ruling that (a) it has the sole right to use the mark "Alfredo Versace," and (b) if the mark is registered in the United States, it must be assigned the registration; and (2) compensatory and punitive damages. See *id.*

On January 28, 1997, this Court denied A.V.'s request for a preliminary injunction against the two defendants that would have prohibited both from using the mark "Alfredo Versace," based on A.V.'s failure to demonstrate a likelihood of irreparable harm. See *id.* at *2-3. Gianni subsequently filed counterclaims, a cross-claim, and third-party claims of trademark infringement and unfair competition against A.V. and third-party defendants Anthony J. Pelligrino ("Pelligrino") and Patrick Marano ("Marano") (collectively, the "third-party defendants"). [FN1] See *A.V., 1998 WL 832692, at *1.*

> FN1. Gianni also filed a third-party claim against Kinney, which in turn

counterclaimed. However, pursuant to a settlement agreement executed on July 19, 1999, those claims were dismissed with prejudice. See Stipulation and Order, dated Aug. 16, 1999.

### II. The *Foldom* Action and Judge Stein's Preliminary Injunction

On January 8, 1998, after sending another "cease and desist" letter to Mr. Versace's counsel and to Foldom, Gianni filed a separate lawsuit against Mr. Versace and Foldom, alleging trademark infringement, unfair competition, and trademark dilution in violation of the Lanham Act, 15 U.S.C. § § 1114(1), 1125(a), and 1125(c); trademark dilution, pursuant to N.Y. Gen. Bus. Law § 360-*l*; and trademark infringement and unfair competition under New York *284 common law. See *Foldom* Compl. ¶ 1. In short, Gianni claimed that Mr. Versace and Foldom were manufacturing and selling products that infringed Gianni's registered trademarks, or licensing or franchising such infringing products. See *id.* ¶ 17. These products allegedly included men's and women's suits, jeans, tee-shirts, sweaters, active wear, handbags, leather goods, and packaging bearing the names "AV Versace," "Versace by A.V.," or "Alfredo Versace." *Id.* ¶ 18. Of specific displeasure to Gianni was an advertisement that appeared in the November 12, 1997 issue of *Women's Wear Daily,* soliciting persons to license or franchise trademarks from "AV Versace." *Id.* ¶ 18. By its complaint, Gianni sought a preliminary injunction enjoining Mr. Versace and Foldom from using "its trademarks or trade dress or any designation so similar as likely to cause confusion, mistake or deception," including among others, "Alfredo Versace," "A.V. by Versace," "Versace by A.V." and "A. Versace," *id.* ¶ A, as well as compensatory and punitive damages, *id.* ¶ ¶ C, E-G. The case was initially assigned to the Honorable Sidney H. Stein, United States District Judge.

On February 4, 1998, Judge Stein granted Gianni's request for a preliminary injunction, issuing his decision from the bench. See Max Aff. ¶ 8; Prelim. Inj. at 1; see also Order to Show Cause, dated Jan. 12, 1998. During that hearing, defense counsel raised the issue of the injunction's extraterritorial application:
THE COURT: ... [Defendants' attorney] Mr. Feldman has raised separate issues in the papers in regard to my ability to adjudicate these issues in regard to Pakistan and Austria, so forth.
MR. MAX: So long as he is here and licensing it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there.

THE COURT: If the license is entered into here, I do have authority.

MR. MAX: If he is an actor here, if he wants to move to Austria and do licensing there, I certainly would agree with your Honor that we have no jurisdiction over him. But as I believe the letter that Mr. Feldman passed up at the last hearing indicates, which dealt with correspondence between Mr. Versace [in] New York and someone in Italy, clearly the spider at the middle of the web is here in New York, so long as he is licensing and franchising his trademark from New York.

THE COURT: It is a jurisdictional matter. I think you are right. I will let that be. I will let Mr. Feldman convince me otherwise. To the extent that he is directing things be done, I guess that is a pretty basic contract matter, I have jurisdiction to stop him from doing things.

Feb. 4, 1998 Conf. Tr. at 20-21. Yet, Judge Stein declined to rule definitively on the question, and instead asked the parties to provide him with case law, which he expected would clarify the legal principles involved. *See id.* at 24. He did, however, state that "[i]n the absence of [a clear holding from the Second Circuit], the proposed preliminary injunction should cover licensing in the States. For licenses to be entered abroad, let's see what the cases say." *Id.*

Between February 4 and February 9, 1998, both sides submitted letter brief; and proposed orders arguing their respective positions on the issue of the Court's power to reach activities directed from within the United States that take place outside the country. *See* Max Aff. ¶ 14-17 & Exhs. B-D. On February 6, 1998, the attorneys for Foldom and Mr. Versace proposed a change to paragraph 11 of the proposed order (concerning publicity), which would have added the phrase "within the United States." *See* Proposed Prelim. Inj. at 7 (Max Aff., Exh. D). Counsel contended that his proposal was meant "to clarify the issue that this order is not preventing our client from conducting businesses in foreign countries which may allow him to use his name or a variation *285 thereof as a trademark." Letter from John F. Kaley, Esq. to the Court, dated Feb. 6, 1998, at 2 (Max Aff., Exh. D). Later that day, counsel for Gianni wrote a letter to the Court, objecting to the proposed change, *see id.* at 2-4, to which counsel for defendants replied three days later, *see* Letter from Stephen E. Feldman, Esq. to the Court, dated Feb. 9, 1998, at 2-3 (Max Aff., Exh. D), and which in turn provoked a surreply from Gianni, *see* Letter from Max to the Court, dated Feb. 10, 1998, at 2-3 (Max

Aff., Exh. D).

Six days after issuing its oral decision, on February 10, 1998, the Court entered a preliminary injunction, which ordered, *inter alia,* that

[d]efendants, their officers, agents, servants, employees, representatives, licensees, and attorneys, and all persons in active concert or participation or privity with any of them who receive actual notice of this Order, are hereby enjoined, *pendente lite,* in the United States of America _[FN2]_ from registering, attempting to register, using, advertising, marketing, licensing, franchising, promoting or authorizing the use of any of the Versace Trademarks, Versace Trade Dress, or the Medusa Designs, _[FN3]_ as or as part of a trademark, service mark, business name, or trade name for any product, service, or business, or in such a manner as to create the impression that such name, logo or symbol is the trade name or business name of any designed, manufacturer, distributor, retailer or other business or trademark or service mark for any product or service....

FN2. The phrase, "in the United States of America," was originally included in Gianni's proposed paragraph 8, which appears to have been adopted verbatim by the Court. *See* Proposed Prelim. Inj. ¶ 8 (Max Aff., Exh. D). The phrase was proposed by counsel for Gianni before Alfredo Versace's lawyers suggested a similar addition to paragraph 11, *see supra* note 1, and would appear to be completely unrelated to the paragraph 11 proposal.

FN3. "Versace Trademarks" and "Medusa Designs" are defined in paragraph 2 of the preliminary injunction, while paragraph 3 defines "Versace Trade Dress." *See* Prelim. Inj. ¶¶ 2-3.

Prelim. Inj., dated Feb. 10, 1998 ("Prelim.Inj.") ¶ 8 (Max Aff., Exh. E); *see also id.* ¶ ¶ 9, 10 (prohibiting Mr. Versace from using his name as a trademark and restricting the use of his name, other than to identify him as the designer of goods he actually designed); *id.* ¶ 12 (prohibiting defendants from attempting to register various marks and requiring that any pending application be withdrawn or abandoned); *id.* ¶ 13 (prohibiting Mr. Versace from delegating or licensing rights or obligations under the preliminary injunction, subject to limited exceptions); *id.* ¶ 15 (ordering defendants to provide a copy of the Order to "all present and former

# APPENDIX OF AUTHORITIES

# PART I-A

licensees, franchisees, customers and distributors"). With the exception of paragraph 8, however, no other provision in the Order--including paragraph 11--includes any geographic limitation. *See id.;* Max Aff. ¶ 18.

Subsequently, in a letter dated March 25, 1998, counsel for the two defendants requested a conference with Judge Stein to clarify the scope of the preliminary injunction with regard to its extraterritorial application. Letter from Kaley to the Court, dated Mar. 25, 1998, at 1-3 (Max.Aff., Exh. F). Counsel inquired specifically:

> Under the [preliminary injunction], may Alfredo Versace sign a license agreement while present in his office in New York licensing a foreign entity or concern (*e.g.,* a Japanese or Korean company) to distribute goods bearing the trademark AV Versace or Alfredo Versace outside the United States, in, for example, a country where Alfredo Versace has rights to manufacture and distribute goods bearing either of those trademarks?

*Id.* at 2. Evidently, however, Judge Stein felt there was no need for such a conference, as, on April 10, 1998, by Memorandum Endorsement, he denied Mr. Versace's "*286 request for 'clarification.' " *Id.* at 1. Gianni now insists that counsel's letter "posed a question that the Court had definitively answered at both the February 4, 1998 hearing and in the February 10, 1998 order." Max. Aff. ¶ 19. Naturally, Mr. Versace disputes Gianni's characterization of its efforts to seek clarification as an attempt to "create ambiguity where none existed." Kupferman Aff. ¶ 14.

On July 30, 1998 Judge Stein stayed the *Foldom* Action, pending the resolution of the *A.V.* Action. In that Order, Judge Stein relied on his determination that Gianni's cross-claim in the *A.V.* Action was " 'broad enough to encompass the basic allegations of trademark infringement that are alleged in [the *Foldom* A]ction.' " *A.V.,* 1998 WL 832692, at *1 (quoting Order of July 30, 1998, *Gianni Versace, S.p.A. v. Versace,* 98 Civ. 0123(SHS)).

### III. Consolidation and the Motions Before the Court

Upon Gianni's motion, on December 1, 1998, this Court consolidated the *A.V.* Action with the *Foldom* Action, concluding that "[m]any common questions of both law and fact exists between the [two actions]." *A.V.,* 1998 WL 832692, at * 2. The Court further recognized that "[t]he complaint filed by [Gianni] in the *Foldom* Action seeks similar relief [to

that of its cross-claim in the *A.V.* Action], overlapping substantially with the cross-claim." *Id.* In addition, the Court lifted the stay on the *Foldom* Action and granted Mr. Versace and Foldom twenty days to answer the *Foldom* complaint. [FN4] *See id.* at *3.

> FN4. The stay did not affect the preliminary injunction. *See* Order dated July 30, 1998 (citing *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1204 (2d Cir.1970)).

On November 30, 1998, Gianni brought a motion, by Order to Show Cause, seeking an order adjudging Foldom and Mr. Versace to be in civil contempt of the preliminary injunction. Gianni contends that the defendants have been violating the terms of Judge Stein's Order since its issuance on February 10, 1998. Specifically, Gianni has accused Mr. Versace and Foldom of engaging in a worldwide campaign of licensing infringements, resulting in the proliferation of infringing goods and advertisements in Korea, Italy, Russia, and beyond. *See* Pl. Mem. at 1.

Discovery in both cases continued under the supervision of the Honorable Naomi Reice Buchwald, United States Magistrate Judge, [FN5] while Gianni's application for contempt sanctions in the *Foldom* Action was pending. In light of information learned during discovery, in April 1999, Gianni sought leave to amend its answer, counterclaim, and third-party complaint in the *A.V.* Action to assert third-party claims against Transportation Services, Inc. ("TSI"), a Texas corporation, and TSI Equipment, Inc. ("TSIE"), a Delaware corporation, based on evidence that the two had been active participants in A.V.'s infringement scheme. *See* Jacoby Aff. ¶ 2. At a May 7, 1999 hearing, Judge Buchwald granted Gianni leave to file the aforementioned motion. After numerous delays and extensions, Gianni served its motion to amend on July 30, 1999. [FN6]

> FN5. Judge Buchwald has since been confirmed as a United States District Judge for the Southern District of New York. The case has since been reassigned to the Honorable Judge Theodore H. Katz, Chief United States Magistrate Judge.

> FN6. A copy of the proposed amended pleading is annexed to the Affidavit of David Jacoby, sworn to on July 30, 1999, as its Exhibit A. *See* Jacoby Aff., Exh. A.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 F.Supp.2d 281
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
(Cite as: 87 F.Supp.2d 281)

## DISCUSSION
### I. Motion for Civil Contempt

It is Gianni's contention that, despite the preliminary injunction, Mr. Versace has continued to direct infringing licensing activity abroad from his center of operations in New York. *See id.* at 2. In particular, it asserts that, pursuant to master license with Universal Licensing, Mr. Versace approved sublicenses permitting various Korean **\*287** entities to manufacture and market products using the name "Alfredo Versace," *see* Max Aff. ¶¶ 23, 26, 35; Max Rep. Aff. ¶ 14; Lee Decl. ¶¶ 9-18 & Exh. A, and attempted to register the "Alfredo Versace" trademark in Korea as recently as July 1998, [FN7] *see* Max Aff. ¶¶ 25, 27, 31, 37; Max Rep. Aff. ¶ 7. In addition, Gianni complains that an Italian company, Diesse s.r.l. ("Diesse"), has been manufacturing "Alfredo Versace" jeans in Italy, under the authority of a license supposedly granted by Mr. Versace. *See* Max Aff. ¶¶ 42-44; Max Rep. Aff. ¶ 16; de Martinis Decl. ¶¶ 5-15 & Exhs. A, C. [FN8] Finally, Mr. Versace is said to have employed a German firm, Reemtsma International, to manufacture "V Gold A.V. Versace" cigarettes for sale in Russia, as well as Honnex Tobaccos Limited, to distribute "AV Versace" cigarettes in Hong Kong. [FN9] *See* Max Aff. ¶¶ 48- 59 & Exh. FF; Max Rep. Aff. ¶¶ 18-19; Loo Decl. ¶¶ 4-5 & Exhs. A & B; *see also* Versace Aff. ¶¶ 17-18 (admitting that prior to the Court's order, in 1997, he granted a license to a different German firm to sell cigarettes, pursuant to which two trial loads of cigarettes were sold in Russia and Macau).

> FN7. Since filing the motion for contempt sanctions, counsel for Gianni claims to have discovered evidence of additional trademark filings in Korea, Japan, Macau, and the Bahamas. *See* Max Rep. Aff. ¶ 7 & Exh. C.

> FN8. Gianni also states that on September 5, 1998, an Italian import/export firm known as Pepete s.r.l. placed an advertisement for "Alfredo Versace Jeans" in *Il Giorno,* an Italian newspaper in Milan, "as an accommodation to Alfredo Versace, with whom it had previously done business." Max Aff. ¶ 45; *see also id.* Exh. CC. The request allegedly came from Mr. Versace himself in New York. *See id.* ¶ 45.

Furthermore, Gianni complains that Mr. Versace "has continued to prosecute registrations or extensions of registrations in Italy. *See id.* ¶ 46. Specifically, upon information and belief, counsel for Gianni submits that Italian authorities issued a trademark for "V. GOLD A.V. VERSACE" on February 20, 1998, and extended it "international trademark" status on April 20, 1998. *See id.* Finally, counsel also states that on July 16, 1998, Italian authorities issued Mr. Versace a trademark on the phrase "Designated by Alfredo Versace," and granted it "international trademark" status on November 12, 1998.

> FN9. Further complicating matters, one of Gianni's lawyers in Hong Kong has averred that he has been informed by at least one retailing executive that "Honnex has been telling would-be customers that Alfredo Versace is the late Gianni Versace's brother." Loo Decl. ¶ 5.

In their reply papers, filed on March 19, 1999, Gianni's attorneys cited further alleged violations of the preliminary injunction. For example, there is evidence that Mr. Versace registered "Versace Boutique, Inc." as a corporate name for a Bahamian shell corporation and subsequently applied for Bahamian trademarks, listing his company's location as 57 West 38th Street in New York City. *See* Max Rep. Aff. ¶¶ 8-9; Blair Decl. ¶¶ 1-6 & Exh. A-B. In addition, Gianni offers a letter from Samed Ud Bin Ahmad, marketing director for Time Concepts, P.L., dated August 17, 1998, that implies that "Alfredo Versace" watches were being marketed in the United States, Japan, Korea, Singapore, and Malaysia. *See* Max Rep. Aff. ¶ 17; de Martinis Decl. Exh. D. Gianni further alleges that Mr. Versace has failed to provide notice of the preliminary injunction to all of its present and former licensees, franchisees, customers, and distributors, as it is required to do under paragraph 15 of the preliminary injunction. *See* Max Rep. Aff. ¶ 12.; Iovane Aff. ¶¶ 9, 13 & Exhs. C, E; de Martinis Decl. ¶ 16; Loo Decl. ¶ 5 & Exh. B.

Finally, it appears that various Internet sites have been featuring many of the marks covered by the preliminary injunction. As a consequence, Gianni's attorneys maintain, Mr. Versace's "tidal wave of publicity for the infringing [goods] has reached the United States via the Internet." Max Rep. Aff. ¶ 21. Specifically, a web site managed by Hawksburn Distilleries, which claimed to be "the appointed exclusive distributors for all AV Versace Cigarettes in over twenty-five countries **\*288** world-wide,"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 F.Supp.2d 281
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
**(Cite as: 87 F.Supp.2d 281)**

invited customers to place orders, without any geographic limitation on distribution, from anywhere around the globe. *Id.;* Iovane Aff. ¶¶ 13-15 & Exh. E. Another site offered "A.V. designed by Alfredo Versace Sports-wear Line Clothing," evidently made in Italy and produced and distributed by Gruppo Manifatture Italiane s.r.l. [FN10] *See id.* ¶¶ 9-11 & Exh. C. Furthermore, Diesse's web site advertises Mr. Versace's jeans, complete with a certificate of authenticity that closely mimics that which accompanies genuine Gianni products. *See id.* ¶ 12 & Exh. D. These sites were reachable via popular Internet search engines, [FN11] such as *Lycos* and *Altavista*, through a simply query of the name "Versace." *See* Iovane ¶¶ 9, 12-13 & Exhs. C-D.

> FN10. The site, which listed its business address as 10 West 33rd Street, New York, New York, *see id.* ¶ 10, allowed users to e-mail, fax, or telephone for information concerning these products, *see id.* ¶ 11. Gianni charges that the site violated the preliminary injunction in several respects. For example, the name "ALFREDO VERSACE" was featured in the same size type as "A. V.," in violation of ¶ 10(e); the phrase "designed by" appeared in a different type size and style from "ALFREDO VERSACE," as required by ¶ 10(d); and there is no disclaimer disassociating Mr. Versace from Gianni, in violation of ¶¶ 9(b) and 10(f). *See* Iovane Aff. ¶ 11 & Exh. C.

> FN11. The Second Circuit has explained that "[a] search engine will find all web pages on the Internet with a particular word or phrase. Given the current state of search engine technology, that search will often produce a list of hundreds of web sites through which the user must sort in order to find what he or she is looking for." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202 F.3d 489, 493 (2d Cir.2000).

Defendants Mr. Versace and Foldom oppose Gianni's motion and urge that sanctions are unwarranted. They argue that (1) Judge Stein's preliminary injunction granted Gianni unnecessarily broad protection of its trademarks and trade dress, *see* Def. Opp. Mem. at 2-3; (2) there is no "clear and convincing" evidence of violations of the order or a failure to reasonably attempt to comply with its requirements, *see id.* at 3-4; and (3) that the injunction cannot be applied to actions undertaken

outside the United States, *see id.* at 4-7. Mr. Versace himself avers that none of the allegedly-infringing goods are currently being manufactured or sold in the United States. *See* Versace Aff. ¶ 2.

Moreover, Mr. Versace's counsel attests that, in fact, his client has purposefully refrained from entering into any further foreign licenses and registrations from the United States "out of an abundance of caution." Kupferman Aff. ¶ 16. Nothing in the Order, he maintains, required Mr. Versace to forfeit his existing foreign trademark rights. *See id.* ¶ 17; Versace Aff. ¶¶ 2-3, 10, 16, 20. Finally, he disputes each of Gianni's allegations as either unsupported by the evidence, *see* Kupferman Aff. ¶¶ 21-25, unrelated to his clients' post-February 4, 1998 activities, *see id.* ¶¶ 18-20, 28, 33-34, 37-38, or outside the scope of the injunction, *see id.* ¶¶ 19, 26, 30-32, 35- 36, 40.

### A. Standard For a Finding of Civil Contempt

[1] Although it is axiomatic that "courts have inherent power to enforce compliance with their lawful orders through civil contempt," *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), this Court's authority to hold a party in contempt is significantly circumscribed. The Supreme Court has warned against sanctioning a party for contempt "where there is a fair ground of doubt as to the wrongfulness of the [party's] conduct." *California Artificial Stone Paving Co. v. Molitor,* 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885). Thus, "a contempt holding will fail unless the order violated by the contemnor is 'clear and unambiguous,' the proof of non-compliance is 'clear and convincing,' and the contemnor was not reasonably diligent in attempting to comply." *United States v. Local 1804- 1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995).

*\*289 [2] Only if these three conditions are met may the Court impose contempt sanctions against a party. Even then, constitutional considerations limit the Court's ability to award sanctions that may be deemed punitive in nature. "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.,* 330 U.S. 258, 303-04, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Accordingly, an award may not be arbitrary; rather, it must be reasonably related to the facts. *See Perfect Fit Indus. v. Acme Quilting Co.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 F.Supp.2d 281
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
(Cite as: 87 F.Supp.2d 281)

673 F.2d 53, 57 (2d Cir.1982).

### B. Allegations Against Foldom

[3] In its defense, Foldom protests that it was but a mere bystander to any violations by its co-defendant, having had "nothing to do with the violations alleged by plaintiff." Def. Opp. Mem. at 1. As a result, it argues, it "should be released from any consideration of contumacy." *Id.* In an attempt to counter Foldom's assertions, Gianni identifies two facsimile transmissions, apparently sent from Foldom's fax machine, as evidence of Foldom's support of Mr. Versace's ongoing activities in Korea and Russia. *See* Max Aff. ¶¶ 32-33, 49 & Exhs. N, FF. Yet, Foldom's managing director, Paul Law, avers that Foldom had no involvement whatsoever in the transmittal of the two faxes. *See* Law Aff. ¶ 6. Rather, he explains, Mr. Versace had been renting space in Foldom's West 38th Street office, and was therefore afforded unsupervised use of the facsimile machine in Foldom's office. [FN12] *See id.* Mr. Law further states that he has asked Mr. Versace to vacate Foldom's office, on account of his "hav[ing] been subjected by [Gianni] to needless anxiety and expenses simply because I had a tenant whom I allowed access to my fax machine." *Id.* ¶ 9.

> FN12. In addition, Foldom notes that one of the faxes was sent on December 18, 1997, almost two months prior to the issuance of the preliminary injunction. *See* Law Aff. ¶ 7 & Exh. FF.

Gianni's reply notes that (1) Foldom held out Tom Conrad, who had earlier been identified as Mr. Versace's assistant or "right hand," as its sales director, *see* Pl. Rep. Mem. at 8; Max Rep. Aff. ¶ 32 & Exh. J; and (2) a business directory listed a "Paul Low" as the "owner" of Alfredo Versace, Inc.; *see* Pl. Rep. Mem. at 8; Max Rep. Aff. ¶ 35 & Exh. K. [FN13] Simply put, it is Gianni's contention that Foldom was one of Mr. Versace's many alter egos.

> FN13. The Court also observes that Foldom's address "appears on virtually all [of] Alfredo Versace's post-Order licenses and trademark applications." Pl. Rep. Mem. at 8 (citing Max Rep. Aff. ¶ 14 & Exhs. C, K). Of course, this can be logically explained, as Mr. Versace had apparently been sharing office space with Foldom. *See* Law Aff. ¶¶ 6-7. The shared address does not come close to establishing that Foldom was somehow in league with

Mr. Versace with respect to his allegedly contumacious activities.

The Court finds, in exercising its wide discretion to determine whether to hold a party in contempt, that the evidence against Foldom is insufficient to warrant contempt sanctions. *See Dunn v. New York State Dep't of Labor,* 47 F.3d 485, 490 (2d Cir.1995). A finding of civil contempt requires "clear and convincing proof of noncompliance with the injunction," and the party seeking contempt charges bears the burden of demonstrating noncompliance. *Donovan v. Sovereign Sec., Ltd.,* 726 F.2d 55, 59 (2d Cir.1984). Aside from a business card and a facsimile signature, Gianni has offered no evidence suggesting that Mr. Versace and Foldom are in fact one and the same. Though the two co-defendants may have previously shared a business relationship, *see, e.g.,* Max Rep. Aff. ¶ 36, there is no proof of contumacious behavior on the part of Foldom. On the present record, it appears that any violation of Judge Stein's Order by Foldom was "inadvertent" and "promptly cured" by the *290 apparent eviction of Mr. Versace. *See Fiber-Shield Indus., Inc. v. N.Y. Fire-Shield, Inc.,* 189 F.3d 460, 1999 WL 709351, at *2 (2d Cir. Sept. 1, 1999); *see also NLRB v. New Pines, Inc.,* 468 F.2d 427, 430 (2d Cir.1972) ("The violation, if any, was de minimis...."). Therefore, the Court will not hold Foldom in contempt.

### C. Allegations Against Mr. Versace

While the Court finds insufficient evidence to support the imposition of contempt sanctions against Foldom, the evidence submitted by Gianni predominantly implicates Mr. Versace. Having considered the voluminous evidence, it is apparent that Mr. Versace has violated the terms of the preliminary injunction, though not to the extent Gianni suggests. As to the numerous allegations that Mr. Versace has been directing an ongoing overseas campaign of infringement from his center of operations in New York, the Court finds that Judge Stein's Order was not sufficiently "clear and unambiguous" to justify holding Mr. Versace in civil contempt. Likewise, there is no "clear and convincing" evidence of sales or marketing having occurred directly in the United States. On the other hand, however, with regard to advertisements and customer solicitations that reached the United States via the Internet, the Court finds that contempt sanctions are indeed warranted. For the reasons that follow, therefore, the Court will enter an order adjudging Mr. Versace to be in civil contempt.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**1. Overseas Activities Directed From the United States**

[4] Gianni's primary contention is that Mr. Versace has continued to mastermind an international campaign of infringing licensing activity from his New York office. Thus, it argues, because Mr. Versace was located within the jurisdiction of the United States courts, Judge Stein properly exercised his power to enjoin Mr. Versace from directing these operations, so long as Mr. Versace remained in this country.

Accordingly, Gianni submits that the preliminary injunction, embodied both in the Court's oral guidance of February 4, 1998 and the February 10, 1998 Order, was clear and unambiguous with respect to activities undertaken within the United States. Though not directly contesting this issue in his opposition brief, [FN14] Mr. Versace suggests by counsel that if his conduct violated the injunction, "any such violation was inadvertent and the result of ambiguity in the Order as it related to the foreign trademark issues presented by [Gianni's] application." Kupferman Aff. ¶ 42.

> FN14. Gianni's reply memorandum correctly notes that Mr. Versace did not formally contest the liability prong of the contempt test in his memorandum in opposition to Gianni's motion. See Pl. Rep. Mem. at 23. However, Mr. Versace's argument regarding the Lanham Act's irrelevance to activities conducted overseas effectively challenges Gianni's interpretation of the Order with respect to its extraterritorial reach. See Def. Opp. Mem. at 4-7. Moreover, the affidavit of Theodore R. Kupferman, Esq. clearly disputes plaintiff's reading of the Order, thus raising the issue of ambiguity. See, e.g., Kupferman Aff. ¶ 3 ("That is not what the Order provides and is not ... what Judge Stein intended."); id. ¶ 14 ("As a result of the language of the Order, there was still an ambiguity as to precisely what was permitted and prohibited by the Order....").

The Second Circuit has defined a "clear and unambiguous order" as "one that leaves 'no uncertainty in the minds of those to whom it is addressed,' who 'must be able to ascertain from the four corners of the order precisely what acts are forbidden.' " *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir.1995) (quoting, respectively, *Hess v. New Jersey Transit Rail Operations, Inc.,* 846

F.2d 114, 116 (2d Cir.1988), and *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers and Cement Masons Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir.1989)). In other words, an injunction must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *In re Baldwin-United Corp.,* 770 F.2d 328, 339 (2d Cir.1985). A district court may **\*291** not impose obligations on a party that are not unambiguously mandated by the decree itself. *See King,* 65 F.3d at 1058 (citing *United States v. Armour & Co.,* 402 U.S. 673, 681-82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)). Consequently, "[t]he longstanding, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt.' " *Drywall Tapers,* 889 F.2d at 400 (Mahoney, J., concurring in part and dissenting in part) (quoting *Ford v. Kammerer,* 450 F.2d 279, 280 (3d Cir.1971)) (alteration in original).

Reading Judge Stein's Order as a whole, and considering the circumstances surrounding its formation, the Court cannot interpret the injunction to "clearly and unambiguously" cover overseas activities, even those that may have been coordinated from the United States. Although the parties explicitly raised the question of the scope of the Order before Judge Stein and briefed the issue several times for his consideration, *see supra* at 284-85, the resulting preliminary injunction contains "no language within [its] four corners" that conclusively prohibits such overseas activity. *United States v. O'Rourke,* 943 F.2d 180, 189 (2d Cir.1991).

Specifically, counsel for Mr. Versace points to paragraph 8 of the Order, which "enjoined" the "[d]efendants," as well as their agents, employees, and licensees, *"in the United States of America"* from registering, attempting to register, using, advertising, marketing, licensing, franchising, promoting or authorizing the use of any of the Versace Trademarks." Prelim. Inj. ¶ 8 (emphasis added). It is unclear, however, whether the phrase "in the United States of America" modifies "enjoined" or whether it modifies "registering, attempting to register, using, advertising, marketing, licensing, franchising, promoting or authorizing." If the former, such activities as alleged by Gianni would likely fall within the scope of the Order. Yet, if the latter, so long as the particular use, registration, or licensing took place outside the borders of the United States, there would not appear to be a violation. Still, the bare text does not definitively answer this question.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nor do the circumstances surrounding the Court's adoption of the parties' proposed orders shed much light on Judge Stein's true intent. It is appropriate for the Court to consider extrinsic evidence as an aid to interpretation of a particular order or judgment if a certain term is ambiguous on its face. [FN15] *See King,* 65 F.3d at 1059; *O'Rourke,* 943 F.2d at 187. However, the events that precipitated Gianni's application for contempt sanctions do not clarify, but rather further cloud the issue of the injunction's geographic scope. Although the parties discussed the Order's extraterritorial application during the February 4, 1998 hearing, Judge Stein never explicitly ruled on the issue. *See* Feb. 4, 1998 Conf. Tr. at 24; *supra* at 284. Each side thereafter submitted letter briefs offering their respective interpretations of Second Circuit case law; yet, again, the subsequent injunction did not definitively adopt either side's argument.

> FN15. "[S]ince [an] order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the 'four corners' rule...." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (footnote omitted).

In particular, although Gianni disagrees, the fact that Judge Stein did not include the proposed amendment advanced by Mr. Versace's attorneys, *see supra* at 284-85, is, in the absence of an express ruling rejecting the proposal, inconclusive. If anything, the Court must construe any possible ambiguity in the preliminary injunction against Gianni, as it was the one that "drew the order, chose the language, and presented it to the judge for approval." *292 *Gluck v. Camden Fire Ins. Ass'n,* 204 F.2d 183, 185 (2d Cir.1953). Under the general rule that a writing should be construed against its drafter, had Gianni truly wanted such activity prohibited, it could easily have proposed and drafted an order that explicitly forbid it. *See id.*

Finally, Judge Stein's refusal to "clarify" the scope of the preliminary injunction apparently left the parties without an adequate understanding as to the scope of the Order. That Mr. Versace's lawyers had to ask the Court for clarification evidences the Order's ambiguity. *See Town of Islip v. Eastern Air Lines, Inc.,* 793 F.2d 79, 83 (2d Cir.1986) (vacating judgment of contempt where oral and written orders "failed to give the airline a clear understanding of what it was legally required to do, and because Eastern made reasonable efforts to seek clarification of the ambiguous order"); *cf. Drywall Tapers,* 889 F.2d at 395 (finding contempt where the party alleging ambiguity had previously complained that the same order was too harsh to comply with).

Gianni's attorneys argue that, because Judge Stein decided the issue in its favor, the Court should ignore Mr. Versace's protestations that the Order did not apply to activities abroad, since "a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *United States v. Rylander,* 460 U.S. 752, 756, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) (internal quotes omitted). This Court, however, is in no position to determine the veracity of either party's understanding as to the scope of the injunction, due to the lack of clarity in the Order itself. *See Islip,* 793 F.2d at 83; *Tenen v. Winter,* No. 94-934S, 1996 WL 947560, at *16 (W.D.N.Y. July 23, 1996). Fed.R.Civ.P. 65(d), which requires, *inter alia,* that an injunction be "specific in terms" and "describe in reasonable detail ... the act or acts sought to be restrained," exists so as to "prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." [FN16] *Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.; see also Perfect Fit,* 646 F.2d at 809 ("[V]ague or general injunctions cannot be easily obeyed or effectively and fairly enforced."). Here, neither the "four corners" of Judge Stein's Order, nor the circumstances surrounding its issuance, definitively establish whether the actions attributed to Mr. Versace were prohibited.

> FN16. "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to

require and what it means to forbid."
*International Longshoremen's Ass'n v.
Philadelphia Marine Trade Ass'n, 389 U.S.
64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967).*

In sum, though the Court would probably side with
Gianni were it forced to choose among the two
competing interpretations, neither the written Order
of February 10, 1998 nor the Court's pronouncements
at the February 4, 1998 conference settled the debate
over the preliminary injunction's application to
activities abroad.      Accordingly, with respect to
allegations of overseas infringement directed from
the United States, Gianni's motion for a finding of
contempt must be denied.

**2. Activities Within the United States**

[5] In a supplemental affidavit sworn to on April 16,
1999, Gianni's attorney contends that Mr. Versace's
April    12,    1999    responses    to    interrogatories
"demonstrate further infringing conduct undertaken
within the state of New York which violates the
preliminary injunction." Max *293 Supp. Aff. ¶ 2.
Specifically,    counsel    cites    Mr.    Versace's
supplemental response to Gianni's Interrogatory
Number 28, in which Mr. Versace identified as
materials using the name "Alfredo Versace" or the
"Alfredo Versace" mark: (1) an invoice from
Minuteman Press, located at 885 Hempstead
Turnpike, in Franklin Square, New York, dated
February 19, 1999, for the printing of "prospective
labels/hang tags and business cards;" [FN17] (2) six
enlarged color sketches or prospective labels/hang
tags; and (3) a copy of his new business card. *See
id.* ¶ 5 & Exh. A. Both the invoice and the sketches
were apparently signed and approved by Mr. Versace
personally. *See id.* ¶ 7 & Exh. B. It is Gianni's
contention that these documents prove that Foldom
and Mr. Versace are "actively violating this Court's
injunction" by producing infringing materials in the
United States, since the sketches appear to lack the
disclaimer required under the preliminary injunction,
as well as--with one exception--the necessary phrase
"Designed by Alfredo Versace." *Id.* ¶ 8.

>  FN17. The invoice also includes a "P.O.
>  Date" of February 10, 1999, which suggests
>  that the materials were ordered on February
>  10, 1999.     The invoice is addressed to
>  Alfredo Versace, 57 West 38th Street, New
>  York, New York, and marked "Attn:
>  Alfredo."

Yet, the connection between the allegedly infringing

sketches and the February 19, 1999 invoice is
tenuous at best.   Counsel for Mr. Versace has since
clarified that the sketches were in fact produced (i)
prior to the issuance of the Order, (ii) in Japan, and
(iii) were intended for use in Japan, *see* Letter from
Kupferman to the Court, dated Apr. 19, 1999, at 2.
Rather, he explains, the invoice refers to
noninfringing hang tags previously provided to
Gianni's counsel in earlier discovery.       *See id.;*
Letter from Max to the Court, dated Apr. 23, 1999,
Exh. B;  Letter from Kupferman to the Court, dated
Apr. 23, 1999, at 2-3. [FN18]  Gianni offers no
evidence to the contrary.

>  FN18.  Gianni reads too much into Mr.
>  Versace's business cards, having suggested
>  that his recent order of 2,000 business cards
>  refutes Paul Law's assertion regarding Mr.
>  Versace's imminent eviction from Foldom's
>  offices. *See* Max. Supp. Aff. ¶ 9. The cards
>  incorporate Mr. Versace's new trademark,
>  and, as his attorney suggests, "it is
>  understandable that he would want to issue
>  his new business card to as many people as
>  possible as quickly as possible in order to
>  publicize his new trademark." Letter from
>  Kupferman to the Court, dated Apr. 19,
>  1999, at 2. The size of the order is also
>  unilluminating, as it may have been more
>  cost effective for Mr. Versace order in bulk.
>  *See id.*

Regardless of whether Gianni's suppositions about
the true origin of these sketches are correct or
confused, it has certainly not met the standard
necessary to establish contempt.     A party may be
held in contempt only if it is demonstrated by "clear
and convincing" evidence that the party violated a
"clear and unambiguous" order of the court.      *See
City of New York v. Local 28, Sheet Metal Workers'
Int'l Ass'n, 170 F.3d 279, 282 (2d Cir.1999); see also
EEOC v. Local 638, 81 F.3d 1162, 1174 (2d
Cir.1996)* (requiring proof by "clear and convincing
evidence, not just by a preponderance of the
evidence").    Gianni's contention that the sketches
supplied by Mr. Versace were in some manner "used"
in the United States, in contravention of paragraphs 8
and 10 of the preliminary injunction, finds little, if
any factual support. Rather, its evidence merely
shows that (1) Mr. Versace purchased certain "tags"
and business cards from a New York printer, but not
that these materials were in any way infringing; and
(2) various sketches were designed that do not
comply with the requirements of the Order, but not
that the sketches were used in the United States or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 F.Supp.2d 281                                                                                                          Page 12
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
(Cite as: 87 F.Supp.2d 281)

even printed subsequent to the date of the injunction. Moreover, as concerns materials printed for use in the United States, there is no evidence that Mr. Versace has not been reasonably diligent in attempting to comply with Judge Stein's Order. Therefore, given the absence of supporting proof, Gianni's "mere assertion" of a violation fails to **294** "meet the 'clear and convincing' standard required to support a finding of contempt." *Tap Publications, Inc. v. Chinese Yellow Pages, Inc.,* No. 95 Civ. 5043, 1996 WL 509718, at *2 (S.D.N.Y. Sept. 9, 1996).

### 3. Internet Sales and Advertising

[6] While there is insufficient evidence to support a finding of contempt with respect to the bulk of Gianni's allegations, the Court is more disturbed by recent evidence of online sales and advertisements of "Alfredo Versace" products. Although these Internet sites presumably operate from servers in foreign countries, they are accessible by any web browser in the United States. The Court thus finds that Mr. Versace has marketed various products featuring the infringing marks on the World Wide Web since entry of the preliminary injunction. *See supra* at 287-88. Furthermore, there is little doubt that such efforts persist to this date. [FN19]

> FN19. *See, e.g., Diesse Abbigliamento Alfredo Versace Pantaloni Griffe Oggettistica Vestiti Camicia Giacca* <http:// www.genesi.it/diesse/VERSACE.HTM> (last visited Feb. 29, 2000).

Despite originating overseas, under federal trademark law, this type of online infringement is deemed to have occurred in the United States, and therefore is plainly covered by the preliminary injunction. In fact, Judge Shira A. Scheindlin faced an analogous situation in *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 939 F.Supp. 1032, 1036-40, 1044-45 (S.D.N.Y.1996). In that case, Playboy accused an Italian company of operating an Internet site in Italy using the label "PLAYMEN," in violation of a fifteen year-old order enjoining it from employing the word "in connection with the sale, offering for sale or distributing in the United States, importing into or exporting from the United States, English language publications and related products." *Id.* at 1034. After rejecting the defendant's analogy of its customers "boarding a plane, landing in Italy, and purchasing a copy of PLAYMEN magazine," Judge Scheindlin held that "merely posting pictorial images on a computer server in Italy" could constitute active solicitation of American customers

and distribution within the United States. *Id.* at 1039. [FN20] Although the Court allowed the defendant to continue operating its web site from abroad, it ordered the company to deny access to users in the United States. *See id.* at 1040, 1044-45.

> FN20. *See also Hard Rock Cafe Int'l (USA) Inc. v. Morton,* No. 97 Civ. 9483, 1999 WL 717995, at *26 (S.D.N.Y. Sept. 9, 1999) (ruling that "advertis[ing] and offer[ing] CDs for sale to a global audience" over the Internet violated a licensing agreement that limited defendant's rights to use plaintiff's trademarks to a number of identified states and regions); *Planned Parenthood Fed'n of Am. v. Bucci,* No. 97 Civ. 0629, 1997 WL 133313, at *3 n. 7 (S.D.N.Y. Mar. 24, 1997) ("[The defendant's] activities over the Internet occur everywhere that Internet users may access his web site."), *aff'd,* 152 F.3d 920 (2d Cir.), *cert. denied,* 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998); *Comedy III Prods., Inc. v. Class Publications, Inc.,* No. 95 Civ. 5552, 1996 WL 219636, at *2-*3 (S.D.N.Y. May 1, 1996) (finding defendant in contempt where his company violated an order preliminarily the advertising or selling of "merchandise bearing the names, likenesses and trademarks of the Three Stooges" by advertising clothing on the Internet).

Mr. Versace's international e-commerce clearly falls within the three-part test required for a finding of contempt. First, Judge Stein's Order clearly proscribes this activity. Paragraph 8 of the preliminary injunction enjoined Mr. Versace from using any mark "confusingly similar" to the Versace Trademarks. The appearance of the "Alfredo Versace" name in cyberspace is certainly likely to confuse Internet users, particularly in light of Mr. Versace's failure to adhere to the conditions for the use of his name prescribed by paragraphs 9(a) and (b) and 10(b), (d), (e), and (f), *see supra* note 10. Although the text of paragraph 8 limits its geographical scope to actions undertaken "in the United States," because these Internet sites were capable of being accessed from within the U.S. borders, this condition is satisfied. **295***See Playboy,* 939 F.Supp. at 1039. [FN21] Similarly, paragraph 12 prohibits Mr. Versace from using or permitting others to use any of the so-called Infringing Marks (including "Alfredo Versace," "AV Versace," "Versace," and "A. Versace Jeans"), and paragraph 13 bars him from assigning his rights or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX OF AUTHORITIES PART 2

obligations under the Order to any other person. Thus, whether Mr. Versace himself authorized these web sites, or merely licensed his name to others, its use for these particular products is precisely the type of infringement the Order sought to prevent. [FN22]

> FN21. Moreover, it should be noted that the Order's failure to refer to the Internet specifically does not limit its applicability to this new medium. *See Playboy,* 939 F.Supp. at 1037.

> FN22. It should also be noted the fact that web sites advertising Alfredo Versace products could be reached via popular search engines imposed an affirmative obligation on Mr. Versace to purge all infringing references to "Alfredo Versace" from the search engines themselves. Because the search engines continued to direct users towards web sites that were in violation of Judge Stein's Order, the appearance of the "Alfredo Versace" name on the search engines was itself a violation, as it constitutes "using, advertising, marketing, [and] promoting" of a Versace Trademark, on the Internet, in violation of paragraph 8 of the preliminary injunction. *Cf. Nettis Environ. Ltd. v. IWI, Inc.,* 46 F.Supp.2d 722, 727-28 (N.D.Ohio 1999) (finding defendant in civil contempt for failing to take affirmative action to "undo" its associations with various search engines). Clearly, then, Mr. Versace was not sufficiently "diligent and energetic in attempting to accomplish what was ordered." *Local 530,* 889 F.2d at 396.

Furthermore, the evidence of Mr. Versace's contumacious online activity is "clear and convincing," as he has not denied responsibility for licensing these marks for continued use overseas. Likewise, his repeated use of the "Alfredo Versace" name without the disclaimers required by paragraphs 9 and 10, coupled with his failure to ensure that web sites operated from overseas could not be accessed in the United States, reveals his lack of diligence in complying with the injunction. [FN23] As such, the three-part test for a finding of civil contempt is satisfied.

> FN23. That Mr. Versace's conduct may not have been willful does not preclude an award of contempt sanctions, "since 'sanctions for civil contempt can be imposed

without a finding of wilfulness.' " *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 5 (2d Cir.1989) (quoting *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.,* 869 F.2d 34, 39 (2d Cir.1989)). "The fact that the prohibited act was done inadvertently or in good faith ... does not preclude a citation for civil contempt, for the sanction is remedial in nature." *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 128 n. 2 (2d Cir.1979).

As Judge Scheindlein warned in *Playboy,* "[c]yberspace is not a 'safe haven' from which [Mr. Versace] may flout the Court's injunction." *Id.* at 1040. Allowing Mr. Versace to contravene the clear intent of the preliminary injunction by permitting the sale and advertisement of goods in the United States through the use of a foreign server would emasculate Judge Stein's Order. *See id.* at 1037. He must be held accountable for Internet transmissions that have the capability of reaching the United States. Therefore, the Court concludes that Mr. Versace has violated paragraphs 8, 9(a) and (b), 10(b), (d), (e), and (f), 12, and 13 of the preliminary injunction by using offshore Internet sites to advertise and distribute his products in the United States. As such, as concerns these particular allegations, contempt sanctions are warranted.

**D. Remedy**

[7][8] In a civil contempt proceeding, the Court has "broad discretion to fashion an appropriate coercive remedy ... based on the nature of the harm and the probable effect of alternative sanctions." *N.A. Sales Co. v. Chapman Indus. Corp.,* 736 F.2d 854, 857 (2d Cir.1984); *see also Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985). The Court may either order sanctions which are necessary to coerce compliance with its previous orders or fashion remedies that "compensate the complainant for losses sustained." *296United Mine Workers,* 330 U.S. at 303-04, 67 S.Ct. 677; *see also Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979) ( "Generally, the sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance."). In determining whether sanctions are appropriate, the Court must consider whether the ends justify the means. Specifically, the Second Circuit has instructed district courts to weigh "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness

87 F.Supp.2d 281
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
**(Cite as: 87 F.Supp.2d 281)**

of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." _Dole Fresh Fruit Co. v. United Banana Co., 821 F.2d 106, 110 (2d Cir.1987)._

[9] Unlike the situation in _Playboy,_ there is no evidence before the Court concerning the feasibility of limiting access to online "Alfredo Versace" sales and advertisements to persons outside the United States. _Compare Hard Rock Cafe, 1999 WL 717995, at *27_ (recognizing lack of evidence of feasibility of limiting access by region), _with Playboy, 939 F.Supp. at 1044-45_ (ordering defendant who violated the Court's injunction to either shut down its web site or prohibit access to users from the United States). As it does not appear that there is any practical alternative other than to require Mr. Versace to purge all references to the Infringing Marks throughout cyberspace, Mr. Versace must ensure that all references to "Alfredo Versace" that do not comply with Judge Stein's Order are removed from the Internet. Therefore, Mr. Versace is hereby ordered, within thirty days of the date of this Order, to take all reasonable steps to disable every Internet site that in any way employs any of the Versace Trademarks, Versace Trade Dress, or the Medusa Designs, or any mark or design confusingly similar thereto, or any of the Infringing Marks identified in paragraph 6 of the preliminary injunction, in such a manner that would violate the terms of the Judge Stein's Order, consistent with the findings in this Order. Within thirty days, Mr. Versace shall file an affidavit describing his efforts to delete any infringing references and noting any references he was unable to remove. _See Nettis, 46 F.Supp.2d at 729._

In addition, Mr. Versace shall also pay a compensatory fine to Gianni, equal to any and all profits earned from the sale of products advertised on any Internet site, unless he can demonstrate that the advertisement or sale was in undertaken compliance with Judge Stein's Order. The Second Circuit has approved the use of compensatory sanctions based on the defendant's profits, without requiring proof of actual injury to the plaintiff, under a theory of unjust enrichment. _See Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd., 885 F.2d 1, 6 (2d Cir.1989)._ Thus, within thirty days of the date of this Order, Mr. Versace shall file a sworn statement detailing (i) all net profits derived from licensing and sales over the Internet throughout the world from February 4, 1998 to date; (ii) all outstanding agreements concerning

the use of any trademark on the Internet, subject to the preliminary injunction; (iii) all business activity since February 4, 1998 as to such trademarks; and (iv) all monies received through the licensing and use of the trademarks at issue.

Finally, the Court finds that these online violations were wilful, as Mr. Versace should have "had sufficient cause to doubt the[ir] legality." _Playboy, 939 F.Supp. at 1041, 1045._ Therefore, Mr. Versace shall remit to Gianni the sum of one-third (_i.e.,_ 33.3%) of its costs and attorneys' fees incurred in making the instant application. _See Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir.1996); N.A. Sales, 736 F.2d at 858; Vuitton, 592 F.2d at 130-31._ Within thirty days of the date of this Order, Gianni shall serve and file a memorandum and affidavits in support thereof itemizing its total *297 attorneys' fees and costs associated with this application.

If any of these conditions has not been met within the stated thirty day period, Mr. Versace shall pay to Gianni a fine of $1,000 each day thereafter until it fully complies with this Order. _See Playboy, 939 F.Supp. at 1041._ In addition, Gianni may seek any further sanctions if it feels it has not been adequately compensated for any losses it actually sustained.

**II. Motion for Leave to Amend**

For reasons apparently unrelated to its motion for contempt sanctions, Gianni moves the Court for leave to amend its answer, counterclaim, and third-party complaint in the _A.V._ Action, so as to assert third-party claims against TSI and TSIE. Gianni asserts that it has learned through discovery that TSI and TSIE were active participants in the alleged infringement. _See_ Jacoby Aff. ¶ 2. In particular, according to counsel for Gianni, TSI and TSIE are entities controlled by third-party defendant Pelligrino. _See id._ ¶¶ 4-6; Jacoby Rep. Aff. ¶ 7. Consequently, A.V. shared a close relationship with TSI, such that TSI employees allegedly (1) incorporated A.V., _see_ Jacoby Aff. ¶ 8; and (2) installed A.V.'s computer systems, _see id._ ¶¶ 12-13; (3) signed A.V.'s quarterly federal tax withholding forms and insurance claims, _see id._ ¶ 14; and (4) acted as A.V.'s general counsel, _see id._ ¶¶ 15-16; and (5) authorized payments from TSI on A.V.'s loans. Furthermore, Gianni contends that TSI itself (6) bought and financed the manufacture of "Alfredo Versace" shoes in Korea, _see id._ ¶¶ 9, 20-21 & Exhs. Q-R, Jacoby Rep. Aff. ¶ 8; (7) handled A.V.'s shipping, _see_ Jacoby Aff. ¶ 11; (8) paid A.V.'s bills, _see id._ ¶ 11; and (9) along with TSIE, played a "vital

87 F.Supp.2d 281
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
(Cite as: 87 F.Supp.2d 281)

Page 15

role" in financing A.V.'s operations by securing more than $500,000 in A.V.'s debt, *see id.* ¶¶ 18-19, 22 & Exhs. P-S. As it is doubtful that A.V. has retained assets sufficient to satisfy a judgment against it, Gianni seeks to add TSI and TSIE as third-party defendants, to the extent either hold assets used to facilitate infringement by A.V. *See id.* ¶ 25.

A.V., the plaintiff and counterclaim-defendant, opposes the motion, as do third-party defendants Pelligrino and Marano (collectively, the "motion opponents"). They maintain that TSI and TSIE had no role in A.V.'s operations or financing--as A.V. had its own independent and proper corporate structure--and thus any responsibility on their part for alleged infringing activities was at most tangential. *See* A.V. Opp. Mem. at 1, 5-6; Third-Party Defendants' Opp. Mem. ("TPD Opp. Mem.") at 4, 8-9, 11-12; Buonconti Aff. ¶¶ 19, 23, 25; Walsh Aff. ¶¶ 2-3, 5-15, 17-20, 24 & Exhs. A-P. Rather, according to the motion opponents, TSI and TSIE merely served as guarantors, not purchasers of merchandise. *See* Walsh Aff. ¶¶ 17-20, 24.

Furthermore, the motion opponents charge that Gianni is effectively attempting to pierce A.V.'s corporate veil in order to reach completely separate business entities, and thereby interjecting a new legal theory that will require additional pleading and discovery, to the prejudice of A.V. and the third-party defendants. *See* A.V. Opp. Mem. at 5, 6; TPD Opp. Mem. at 12-13; Buonconti Aff. ¶ 26. Finally, they also protest that the introduction of additional third-party defendants at this stage of the litigation will unduly prolong the *A.V.* Action and unnecessarily extend discovery. *See* A.V. Opp. Mem. at 4; TPD Opp. Mem. at 13; Buonconti Aff. ¶¶ 3, 5, 14, 17; Walsh Aff. ¶ 21.

### A. Standard for Granting Leave to Amend

[10] Federal Rule of Civil Procedure 15(a) permits a party to amend a pleading "by leave of the court." The Rule provides that leave to amend "shall be freely given when justice so requires." *Id.* "Nonetheless, a motion to amend may be denied due to undue delay or if it would cause undue prejudice to the opposing party." **\*298***Ashjari v. NYNEX Corp.,* 82 F.3d 898, 1999 WL 464977, at \*1 (2nd Cir. June 22, 1999). In addition, the Court has discretion to deny leave to amend where the proposed amendment would be futile. *See Marchi v. Board of Coop. Educ. Servs.,* 173 F.3d 469, 477 (2d Cir.1999); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ( "In the absence of any apparent

or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be 'freely given.' ").

### B. Futility

[11] Although there is a general presumption in favor of permitting amendment, this Court has broad discretion in deciding whether to allow Gianni to amend its pleadings. Leave to amend may be denied where it appears that the proposed amendments are "unlikely to be productive." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see also Kaster v. Modification Sys., Inc.,* 731 F.2d 1014, 1018 (2d Cir.1984) ("That the amendments would not serve any purpose is a valid ground to deny a motion for leave to amend."). Thus, if the proposed amended complaint would be subject to "immediate dismissal" for failure to state a claim or on some other ground, the Court will not permit the amendment. *Jones v. New York State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999). By contrast, " 'if [Gianni] has at least colorable grounds for relief, justice does so require' " that its motion be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 783 (2d Cir.1984) (quoting *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Housing Dev. Fund Co.,* 608 F.2d 28, 41 (2d Cir.1979)).

The motion opponents have endeavored to explain the somewhat suspicious relationship between TSI, TSIE, and A.V. They have not, however, demonstrated Gianni's inability to state a claim for relief against TSI and TSIE. The motion opponents maintain that Gianni's amended third-party complaint does not allege that either TSI or TSIE ever "engaged in the manufacturing, marketing or sale of the allegedly infringing items." Opp. Mem. at 6. Furthermore, they argue that Gianni cannot establish that it lost sales as a result of the alleged infringement.

While Gianni may not yet be able to show the existence of triable issues of material fact, the standard for granting leave to amend is far more liberal than the showing required to survive summary judgment. Gianni has pleaded its claims with substantial specificity and has adduced several facts suggesting that TSI and TSIE did play a significant role in A.V.'s operations. The owner of a trademark

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 F.Supp.2d 281
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
(Cite as: 87 F.Supp.2d 281)

"is entitled to protection against all who knowingly play a significant part in accomplishing the unlawful purpose." *Stix Prods. Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 500 (S.D.N.Y.1968) (Weinfeld, J.) (citing *Cuervo v. Jacob Henkell Co.*, 50 F. 471, 472 (C.C.S.D.N.Y.1892) ("Complainant is clearly entitled to an injunction against all who knowingly combine together to accomplish that purpose.")).  [FN24]  It certainly "lies within the realm of possibility" that, upon further *299 discovery, Gianni might be able to prove that TSI and TSIE knowingly played an indispensable role in A.V.'s infringing activities. *Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir.1999).  Moreover, as the parties vigorously dispute the legitimacy of A.V.'s corporate formalities, the Court cannot at this point say that Gianni will be unable to demonstrate an adequate basis for disregarding A.V.'s corporate structure and "piercing the corporate veil."

> FN24. Contrary to the motion opponents' implication, Judge Weinfeld's opinion in *Stix Products* is directly on point.  Not unlike A.V. and its apparent relationship with TSI and TSIE, "Stix was launched upon its career with the affirmative aid of Firestone." *Stix Prods.*, 295 F.Supp. at 500. Moreover, as the Court noted, "[e]ver since Stix's entry into the self-adhesive decorative plastic field, Firestone has played an active and essential role in Stix's affairs with respect to the products in question, providing Stix with extensive financial and technical assistance." *Id.* Firestone also supplied Stix with materials necessary to manufacture its products, and provided legal counsel to guide Stix in its infringing activities.  *See id.*  In turn, Stix kept Firestone informed of its policies and activities.  The two worked hand-in-hand, just as Gianni alleges TSI and TSIE assisted A.V.

As such, the amendments have not been shown to be futile.  Any deficiencies in the pleadings can best be considered in the context of a motion for summary judgment.  *See WIXT Television, Inc. v. Meredith Corp.*, 506 F.Supp. 1003, 1010 (S.D.N.Y.1980). [FN25]

> FN25. The motion opponents also argue that efforts to obtain injunctive relief against TSI and TSIE will be futile, on account of a Stipulation and Order entered into by the parties and adopted by this Court on June

19, 1997.   In that Stipulation, Gianni accepted on the representations of A.V. and the third-party defendants and agreed to "refrain[ ] from seeking preliminary injunctive relief" against them. Stipulation & Order, dated June 19, 1997, at ¶ 3 (Jacoby Rep. Aff., Exh. F); *see also* TPD Opp. Mem. at 6. Yet, the motion opponents' argument is unavailing.    First, the injunction to which A.V., Marano, and Pelligrino consented is merely an injunction *pendente lite*.  Gianni never waived its right to pursue permanent injunctive relief against the motion opponents upon the completion of the litigation.   Second, Gianni never agreed not to seek preliminary injunctive relief against other persons or entities who were not parties to the agreement, such as TSI and TSIE.

### C. Undue Prejudice

[12]  The motion opponents also contend that allowing the amendments will prejudice their case. However, prejudice alone is insufficient to justify a denial of leave to amend;  rather, the necessary showing is *"undue* prejudice to the opposing party." *Foman*, 371 U.S. at 182, 83 S.Ct. 227 (emphasis added); *see also MacDraw, Inc. v. CIT Group Equip. Financing, Inc.*, 157 F.3d 956, 962 (2d Cir.1998).  " 'Mere delay, ... absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.' " *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993) (quoting *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981)).    In determining whether a party's interests have been unduly prejudiced, the Second Circuit has instructed district courts to consider "whether the assertion of the new claim would:  (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial;  (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350.

None of these factors are implicated by the instant motion.   No trial date has yet been set, nor has discovery been completed.   Although the proposed amendments would implead additional parties, Gianni's claims against TSI and TSIE do not raise factual claims unrelated to the events its original third-party complaint. *Cf. Clark v. World Cable Communications, Inc.*, 166 F.3d 1199, 1998 WL 907904, at *3 (2d Cir. Dec. 23, 1998).   In fact, there

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 F.Supp.2d 281                                                                                      Page 17
87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660
**(Cite as: 87 F.Supp.2d 281)**

is no indication--and, furthermore, no showing by the
motion opponents--that the addition of TSI and TSIE
would in any way materially affect the duration or
scope of discovery.    Regardless, even if discovery
were prolonged, "the adverse party's burden of
undertaking discovery, standing alone, does not
suffice to warrant denial of a motion to amend a
pleading." _United States v. Continental Ill. Nat'l_
_Bank & Trust Co.,_ 889 F.2d 1248, 1255 (2d
Cir.1989) (citing _S.S. Silberblatt,_ 608 F.2d 28 at 43).
Allegations that an amendment will require the
expenditure of additional time, effort, or money do
not constitute "undue prejudice." _Block,_ 988 F.2d at
351.    Therefore, the motion opponents have offered
nothing to suggest that leave to amend should not be
"freely granted." Fed.R.Civ.P. 15(a).

### CONCLUSION

For the foregoing reasons, Gianni's motion for a
finding of civil contempt is **\*300** HEREBY DENIED
with respect to Foldom, and HEREBY GRANTED
with respect to Alfredo Versace.    Moreover, Gianni's
motion for leave to amend its pleadings in the _A.V._
_Action_ is HEREBY GRANTED.    Gianni shall serve
and file its amended pleadings within fourteen days
of the date of this Order.

**SO ORDERED.**

87 F.Supp.2d 281, 46 Fed.R.Serv.3d 660

**Motions, Pleadings and Filings _(Back to top)_**

• 1:98cv00123 (Docket) (Jan. 09, 1998)

• 1:96cv09721 (Docket) (Dec. 27, 1996)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

973 F.2d 1033                                                                    Page 1
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Second Circuit.
BRISTOL-MYERS SQUIBB COMPANY, Plaintiff-
Appellee, Cross-Appellant,
v.
McNEIL-P.P.C., INC., Defendant-Appellant, Cross-
Appellee.
**Nos. 1387, 1492, Docket 92-7212, 92-7260.**

Argued April 30, 1992.
Decided Aug. 21, 1992.

Manufacturer of "Excedrin PM" brought action for
trademark and trade dress infringement by competitor
that manufactured "Tylenol PM." The United States
District Court for the Eastern District of New York,
Arthur D. Spatt, J., 786 F.Supp. 182, entered
preliminary injunction against competitor and denied
manufacturer's claim for preliminary injunction with
respect to "PM."   Appeal and cross appeal were
taken.  The Court of Appeals, Meskill, Chief Judge,
held that:   (1) initial classification of mark to
determine eligibility for protection is question of fact
left to determination of District Court;  (2) "PM"
designator was descriptive mark and was not entitled
to  trademark  protection  without  showing  of
secondary  meaning;   and  (3)  no  likelihood  of
confusion existed between the two products.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Federal Courts** ☜═815
170Bk815 Most Cited Cases
Decision whether to issue preliminary injunction is
reviewed only for abuse of discretion. 28 U.S.C.A. §
1292(a)(1).

**[2] Federal Courts** ☜═862
170Bk862 Most Cited Cases
If Court of Appeals is left with definite and firm
conviction that mistake has been committed, it will
reverse grant or denial of preliminary injunction. 28
U.S.C.A. § 1292(a)(1).

**[3] Trademarks** ☜═1421
382Tk1421 Most Cited Cases
     (Formerly 382k334.1, 382k334)

**[3] Trademarks** ☜═1436
382Tk1436 Most Cited Cases
     (Formerly 382k334.1, 382k334)
Before Court of Appeals will address whether
allegedly infringing mark is likely to cause consumer
confusion, plaintiff must show that trademark or
trade dress is of type that deserves protection.
Lanham Trade-Mark Act, §  43(a), as amended, 15
U.S.C.A. § 1125(a).

**[4] Trademarks** ☜═1689
382Tk1689 Most Cited Cases
     (Formerly 382k704)
Initial classification of mark to determine its
eligibility for protection is question of fact left to
determination of district court.  Lanham Trade-Mark
Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[5] Trademarks** ☜═1037
382Tk1037 Most Cited Cases
     (Formerly 382k15)

**[5] Trademarks** ☜═1038
382Tk1038 Most Cited Cases
     (Formerly 382k15)
Tradename of analgesic using letters "PM" could be
found  to  be  "descriptive  mark,"  rather  than
"suggestive mark," and, therefore, was entitled to
trademark protection only if it acquired secondary
meaning.   Lanham Trade-Mark Act, §  43(a), as
amended, 15 U.S.C.A. § 1125(a).

**[6] Trademarks** ☜═1036
382Tk1036 Most Cited Cases
     (Formerly 382k13)
"Descriptive mark" is one that forthwith conveys
immediate  idea  of  ingredients,  qualities,  or
characteristics of the goods.  Lanham Trade-Mark
Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[7] Trademarks** ☜═1038
382Tk1038 Most Cited Cases
     (Formerly 382k25)
Term is suggestive if it requires imagination, thought,
and perception to reach conclusion as to nature of
goods.  Lanham Trade-Mark Act, §   43(a), as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX OF AUTHORITIES

## PART 2-A

973 F.2d 1033                                                                 Page 2
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
(Cite as: 973 F.2d 1033)

amended, 15 U.S.C.A. § 1125(a).

**[8] Trademarks** ☞1037
382Tk1037 Most Cited Cases
(Formerly 382k11)
Descriptive term is subject to protection only if, in addition to ordinary, common meaning of word or words, term has acquired secondary meaning in particular market--that consuming public primarily associates term with particular source. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[9] Trademarks** ☞1038
382Tk1038 Most Cited Cases
(Formerly 382k25)
If mark is suggestive, plaintiff need not prove secondary meaning in order to qualify for trademark protection. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[10] Trademarks** ☞1033
382Tk1033 Most Cited Cases
(Formerly 382k9)
Focus in categorizing mark is on how words are used in context, rather than meaning in the abstract. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[11] Trademarks** ☞1707(6)
382Tk1707(6) Most Cited Cases
(Formerly 382k584.1, 382k584)
Manufacturer failed in proceeding for preliminary injunction to establish that "PM" following tradename of its analgesic acquired secondary meaning entitling the descriptive mark to protection, even though competitor had imitative intent, and even though "PM" was on each tablet. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[12] Federal Courts** ☞860
170Bk860 Most Cited Cases
(Formerly 382k726)
Court of Appeals will reverse district court's determination that term has not acquired secondary meaning only if determination is clearly erroneous. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[13] Trademarks** ☞1032
382Tk1032 Most Cited Cases
(Formerly 382k333)
Although imitative intent can help support finding of

secondary meaning, it does not necessarily mandate one. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[14] Trademarks** ☞1062
382Tk1062 Most Cited Cases
(Formerly 382k43)
Focus in examining trade dress is on entire look of product or packaging; individual aspects of trade dress may be eligible for trademark protection in their own right, but in action for trade dress infringement, each aspect should be viewed in relation to the entire trade dress. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[15] Trademarks** ☞1436
382Tk1436 Most Cited Cases
(Formerly 382k349)
In trade dress infringement case inquiry is whether trade dress of junior user--one who has adopted its mark or dress later than senior user--is likely to cause consumer confusion as to source of product. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[16] Trademarks** ☞1063
382Tk1063 Most Cited Cases
(Formerly 382k43)

**[16] Trademarks** ☞1436
382Tk1436 Most Cited Cases
(Formerly 382k43)
If trade dress acquires secondary meaning, it is eligible for protection under statutory prohibition against use of any word, term, name, symbol, or device, or combination thereof likely to cause confusion. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[17] Trademarks** ☞1063
382Tk1063 Most Cited Cases
(Formerly 382k43)
Secondary meaning inquiry is same for trade dress as it is for trademark.

**[18] Trademarks** ☞1065(2)
382Tk1065(2) Most Cited Cases
(Formerly 382k43)
To establish secondary meaning in trade dress, manufacturer was required to show that primary significance of its "Excedrin PM" trade dress was to identify source of product, rather than product itself. Lanham Trade-Mark Act, § 43(a), as amended, 15

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033                                                                                                Page 3
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

U.S.C.A. § 1125(a).

**[19] Trademarks** 🔑1707(6)
382Tk1707(6) Most Cited Cases
          (Formerly 382k584.1, 382k584)
Evidence in proceeding for preliminary injunction
supported finding of secondary meaning in trade
dress for "Excedrin PM"; permanent display of name
on box strongly supported determination that
consumers associated trade dress, taken as a whole,
with particular producer. Lanham Trade-Mark Act, §
43(a), as amended, 15 U.S.C.A. § 1125(a).

**[20] Federal Courts** 🔑860
170Bk860 Most Cited Cases
          (Formerly 382k726)
Findings of fact as to likelihood of confusion from
trade dress could not be set aside unless clearly
erroneous. Lanham Trade-Mark Act, § 43(a), as
amended, 15 U.S.C.A. § 1125(a); Fed.Rules
Civ.Proc.Rules 52, 52(a), 52 note, 28 U.S.C.A.

**[21] Trademarks** 🔑1033
382Tk1033 Most Cited Cases
          (Formerly 382k10)

**[21] Trademarks** 🔑1063
382Tk1063 Most Cited Cases
          (Formerly 382k10)
Strength of particular mark or dress is measured by
its distinctiveness or degree to which it indicates
source or origin of product. Lanham Trade-Mark
Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[22] Trademarks** 🔑1033
382Tk1033 Most Cited Cases
          (Formerly 382k10)

**[22] Trademarks** 🔑1063
382Tk1063 Most Cited Cases
          (Formerly 382k10)
Strength of mark should be examined in its
commercial context. Lanham Trade-Mark Act, §
43(a), as amended, 15 U.S.C.A. § 1125(a).

**[23] Trademarks** 🔑1065(2)
382Tk1065(2) Most Cited Cases
          (Formerly 382k43)

**[23] Trademarks** 🔑1119
382Tk1119 Most Cited Cases
          (Formerly 382k43)
"Excedrin PM" trade dress, taken as a whole, strongly
indicated source of product and supported claim of

likelihood of confusion with "Tylenol PM." Lanham
Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. §
1125(a).

**[24] Trademarks** 🔑1631
382Tk1631 Most Cited Cases
          (Formerly 382k589)
Evidence in proceeding for preliminary injunction in
trade dress infringement case supported conclusion
that competitor did not exercise good faith in
adopting its trade dress for "Tylenol PM"; every
choice made by competitor brought it closer to
"Excedrin PM" trade dress, although there were many
proposed trade dresses that did not incorporate
substantial aspects of the existing trade dress.
Lanham Trade-Mark Act, § 43(a), as amended, 15
U.S.C.A. § 1125(a).

**[25] United States Magistrates** 🔑31
394k31 Most Cited Cases
Reversing district court's findings on ground that
district court rejected credibility findings of
magistrate judge without calling witnesses and
hearing and observing them itself would be
inappropriate, where no objection was raised on those
grounds before district court. 28 U.S.C.A. §
636(b)(1), (b)(1)(B).

**[26] Trademarks** 🔑1118
382Tk1118 Most Cited Cases
          (Formerly 382k349)
Presence and prominence of markings tending to
dispel confusion as to origin, sponsorship, or
approval of goods in question is highly relevant to
inquiry concerning similarity of trade dresses.
Lanham Trade-Mark Act, § 43(a), as amended, 15
U.S.C.A. § 1125(a).

**[27] Trademarks** 🔑1112
382Tk1112 Most Cited Cases
          (Formerly 382k336)

**[27] Trademarks** 🔑1118
382Tk1118 Most Cited Cases
          (Formerly 382k336)
Generally, the more sophisticated and careful the
average consumer of product is, the less likely it is
that similarities in trade dress or trademarks will
result in confusion concerning source or sponsorship
of product. Lanham Trade-Mark Act, § 43(a), as
amended, 15 U.S.C.A. § 1125(a).

**[28] Trademarks** 🔑1119
382Tk1119 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
(Cite as: 973 F.2d 1033)

(Formerly 382k334.1, 382k334)
Under New York and federal laws, no likelihood of confusion arose from similarity of trade dress for "Tylenol PM" to that for "Excedrin PM," even though competitor exercised bad faith in adopting many elements of "Excedrin PM" trade dress and even though the purchases entailed low involvement of consumer; "Excedrin" was emblazoned over almost half the package, and trade name was most prominent and distinctive feature of the trade dresses. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[29] Antitrust and Trade Regulation** 🔑43
29Tk43 Most Cited Cases
         (Formerly 382k421, 382k476 Trade Regulation)
New York law of misappropriation required some confusion as to source, sponsorship, or permission.

**[30] Trademarks** 🔑1420
382Tk1420 Most Cited Cases
         (Formerly 382k478)
Absence of secondary meaning in descriptive mark does not necessarily result in defeat for owner under New York law of unfair competition.

**[31] Trademarks** 🔑1468
382Tk1468 Most Cited Cases
         (Formerly 382k462)

**[31] Trademarks** 🔑1472
382Tk1472 Most Cited Cases
         (Formerly 382k462)
Designator "PM" appended to analgesic trade name and aspects of trade dress common to "Excedrin PM" and "Tylenol PM" were not "extremely strong marks" and, therefore, were not protected by New York's anti-dilution statute. N.Y.McKinney's General Business Law § 368-d.

**[32] Federal Courts** 🔑933
170Bk933 Most Cited Cases
         (Formerly 382k727)
Dismissing claims for trade dress and trademark infringement would be inappropriate following reversal of preliminary injunction; although there was no likelihood of confusion between the two products, there remained possibility that manufacturer would present at trial numerous incidents of actual confusion. Lanham Trade-Mark Act, § 43(a), as amended, 15 U.S.C.A. § 1125(a).

**[33] Federal Courts** 🔑862

170Bk862 Most Cited Cases
Findings of fact at preliminary injunction stage are not binding at trial on merits.

**Trademarks** 🔑1800
382Tk1800 Most Cited Cases
         (Formerly 382k736)
PM.
   *1036 Gregory L. Diskant, New York City (Stephen P. Younger, Lisa C. Cohen, Mary E. Mulligan, Patterson, Belknap, Webb & Tyler, of counsel), for appellant.

Lawrence I. Weinstein, New York City (Alfred T. Lee, Samuel D. Rosen, Brendan J. O'Rourke, Milgrim Thomajan & Lee, of counsel), for appellee.

Before: MESKILL, Chief Judge, NEWMAN, Circuit Judge, and ZAMPANO, [FN*] District Judge.

         FN* Honorable Robert C. Zampano, United States District Judge for the District of Connecticut, sitting by designation.

MESKILL, Chief Judge:

   This is an appeal from a preliminary injunction entered in the United States District Court for the Eastern District of New York, Spatt, J., in an action brought under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and various state unfair competition laws. The preliminary injunction prevents the appellant, McNeil-P.P.C., Inc. (McNeil) from marketing its product, "Tylenol PM," in the trade dress that it had been using prior to the injunction. Also before us is a cross-appeal by Bristol-Myers Squibb Company (Bristol) from the denial of preliminary injunctive relief preventing McNeil from using the term "PM" in connection with a combination analgesic/sleep aid.

   As in any case under section 43(a) of the Lanham Act, the ultimate question here is whether, because of the challenged markings, consumers are likely to be confused as to the origin or sponsorship of goods. Because we believe that the district court erred in finding that the "Tylenol PM" trade dress was likely to cause confusion among purchasers due to its similarity to Bristol's "Excedrin PM" trade dress, we reverse the preliminary injunction. Because we agree with the district court's denial of Bristol's request preliminarily to enjoin McNeil's use of the term "PM," we affirm as to the cross-appeal.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033                                                                                                      Page 5
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

Affirmed in part and reversed in part.

## BACKGROUND

Bristol is a major pharmaceutical company that produces and markets "Excedrin," *1037 a nationally known over-the-counter analgesic pain reliever. Since 1968 Bristol has manufactured and distributed "Excedrin PM," a product that combines an analgesic with a sleep aid.

Although there have been some alterations over the years, the packaging of "Excedrin PM" has remained fairly constant. That packaging consists of an outer carton with a solid deep blue background, white lettering for the name "Excedrin PM," which appears on a single line, with "Excedrin" in lower case lettering except for the initial "E" and "PM," which are in capital letters. In the lower right portion of the face of the box is a depiction of two light blue tablets, each marked "PM." In 1988, Bristol introduced a caplet form of "Excedrin PM." The trade dress for this caplet form is similar to that of the tablet form except that the background is a solid dark green and there is a depiction of two caplets each displaying the full name "Excedrin PM." On both packages the word "Excedrin" occupies approximately one-third of the total face of the package.

McNeil is also a major pharmaceutical company. Among McNeil's products is "Tylenol," which, like "Excedrin," is a nationally famous over-the-counter analgesic. In 1991 McNeil introduced "Tylenol PM," which, like "Excedrin PM," is a combination analgesic/sleep aid. Although there are slight differences in the composition of the two products, it is undisputed that those differences are not material and that the two products are functionally interchangeable. Like "Excedrin PM," "Tylenol PM" comes in two forms: tablet and caplet.

The packaging for the tablet form of "Tylenol PM" consists of a box with a green background that shifts from dark green at the top of the box to light green at the bottom and the name "Tylenol" in white capital letters with "PM" in yellow capital letters on the same line. In addition, the package depicts two tablets on the lower right face of the package, one of which is imprinted with the word "Tylenol" and the other of which is marked "PM." The trade dress for the caplet form of "Tylenol PM" resembles that of the tablet form except that the background fades from dark to light blue rather than green and two caplets, each of which reads "Tylenol PM," are depicted instead of the tablets. On both forms of the "Tylenol PM" trade dress, the word "Tylenol" occupies

approximately one-third of the total area of the face of the package.

Shortly after "Tylenol PM" was introduced, Bristol filed this action before Judge Spatt in the United States District Court for the Eastern District of New York, seeking relief under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and on various state law grounds. Bristol moved for a preliminary injunction to prevent McNeil from using the term "PM" in connection with a combination analgesic/sleep aid and to prevent McNeil from marketing an analgesic/sleep aid in the "Tylenol PM" packaging described above.

Judge Spatt referred the matter to Magistrate Judge Orenstein pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge heard evidence and examined exhibits and the results of discovery. The magistrate judge filed a report in the district court in which he made certain findings of fact and ultimately recommended that the preliminary injunction be denied. Both parties made timely objections to various portions of the magistrate judge's report and the district court addressed the matter *de novo* pursuant to 28 U.S.C. § 636(b)(1).

The district court denied Bristol's request for an injunction preventing McNeil from using the term "PM" in connection with an analgesic/sleep aid, finding that "PM" in this context did not qualify for protection under section 43(a) of the Lanham Act. The district court granted, however, Bristol's request for an injunction with regard to the "Tylenol PM" trade dress because it found that Bristol had demonstrated that the similarities between the two packages were likely to cause consumer confusion 786 F.Supp. 182. Both parties appealed and a panel of this Court stayed the preliminary injunction pending appeal.

## *1038 DISCUSSION
## I. PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction, the moving party must demonstrate both (1) irreparable harm in the absence of the requested relief, and (2) either (a) a likelihood that it will succeed on the merits of the action, or (b) a sufficiently serious question going to the merits combined with a balance of hardships tipping decidedly in favor of the moving party. *See Jackson Dairy v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). In the context of a Lanham Act claim both the likelihood of success on the merits and the potential for irreparable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033                                                                                                Page 6
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

harm in the absence of preliminary relief may be demonstrated by a showing that a significant number of consumers are likely to be misled or confused as to the source of the products in question. _Western Publishing Co. v. Rose Art Industries_, 910 F.2d 57, 59 (2d Cir.1990).

[1][2] We have jurisdiction to review the grant or denial of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1). We review a district court's decision whether to issue a preliminary injunction only for an abuse of discretion. _Doran v. Salem Inn_, 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-68, 45 L.Ed.2d 648 (1975). "Applying legal standards incorrectly or relying upon clearly erroneous findings of fact may constitute an abuse of discretion." _Haitian Centers Council v. McNary_, 969 F.2d 1326, 1338 (2d Cir.1992) (citation omitted). We are not, however, limited to "reversing only when the lower court's action exceeds any reasonable bounds and to rubber-stamping with the imprimatur of an affirmance when it does not." _Coca-Cola Co. v. Tropicana Products_, 690 F.2d 312, 315 (2d Cir.1982) (citation omitted). Although our scope of review is limited, if we are left with " 'the definite and firm conviction that a mistake has been committed' " we will reverse the grant or denial of a preliminary injunction. _See Standard & Poor's Corp. v. Commodity Exchange_, 683 F.2d 704, 708 (2d Cir.1982) (quoting _United States v. United States Gypsum Co._, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). With these principles in mind, we turn to the parties' specific claims.

II. THE LANHAM ACT CLAIMS

Neither the "PM" designator nor the "Excedrin PM" trade dress is a registered trademark. Bristol, therefore, relies on that part of the Lanham Act that addresses unregistered marks. Section 43(a) of the Lanham Act prohibits any person from using

in connection with any goods ... or any container for goods, ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person.

15 U.S.C. § 1125(a). [FN1] "[I]t is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." _Two Pesos, Inc. v. Taco Cabana, Inc._, 505 U.S. 763, ----, 112 S.Ct. 2753, 2757, 120

L.Ed.2d 615 (1992) (citations omitted). As the words of the statute indicate, the central inquiry is whether the use of a marking is likely to cause consumer confusion.

> FN1. This language was added in 1988 by P.L. 100-667, Title I, § 132, and replaced the original section 43(a) which had been enacted in 1946. The Senate Report accompanying the amendment indicates that the intent of the new language was "to codify the interpretation [section 43(a)] has been given by the courts." Senate Report No. 100-515, _reprinted in_ 1988 U.S.Code Cong. & Admin.News 5577, 5603; _see Two Pesos, Inc. v. Taco Cabana, Inc._, 505 U.S. 763, ----, n. 18, 112 S.Ct. 2753, 2765 n. 18, 120 L.Ed.2d 615 (1992) (Stevens, _J._, concurring). Thus our precedents predating the new language remain in force.

Bristol makes two related claims under section 43(a). First, Bristol claims that the use by McNeil of the term "PM" in connection with its combination analgesic/sleep aid is likely to cause confusion as to the source, sponsorship or approval of "Tylenol *1039 PM." Second, Bristol claims that the overall look of the "Tylenol PM" packaging, its trade dress, is so similar to the trade dress of Bristol's "Excedrin PM" that consumers will confuse the two.

[3] Before we will address whether an allegedly infringing mark is likely to cause consumer confusion, the plaintiff must show that its trademark or trade dress is of the type that deserves protection under section 43(a). _See Thompson Medical Co. v. Pfizer, Inc._, 753 F.2d 208, 213 (2d Cir.1985). The plaintiff then must demonstrate that the use by the defendant of a mark or dress is likely to cause consumer confusion because of the similarity between the defendant's mark or dress and the mark or dress of the plaintiff. _See id._

A. _Trademark Infringement: The "PM" Designator_

To facilitate our analysis, we will deal first with the cross-appeal. Bristol appeals from the district court's refusal to grant preliminary injunctive relief preventing McNeil from using the term "PM" appended to its "Tylenol" trade name to designate its combination analgesic/sleep aid. Under the terms of the preliminary injunction, McNeil remains free to market "Tylenol PM" in a trade dress that does not resemble the "Excedrin PM" trade dress. The district court agreed with the magistrate judge that the term

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"PM" as used by Bristol did not warrant protection under section 43(a).

In making the preliminary inquiry into whether a particular mark is eligible for protection under section 43(a), we have established several categories into which we classify various marks. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World,* 537 F.2d 4, 9 (2d Cir.1976). Suggestive, arbitrary and fanciful marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos,* 505 U.S. 763, 112 S.Ct. at 2757. Generic marks are never entitled to protection, while a descriptive mark is eligible for protection "if it 'has become distinctive of the [producer's] goods in commerce.'" This acquired distinctiveness is generally called 'secondary meaning.'" *Id,* 505 U.S. at ----, 112 S.Ct. at 2757 (citations omitted).

[4] Although we have not expressly articulated the standard of review appropriately applied to a district court's classification of a mark, other courts of appeals have found that classification to be a factual question, review of which is limited to whether the district court was clearly erroneous in its determination. *See, e.g., Ford Motor Co. v. Summit Motor Products,* 930 F.2d 277, 292 n. 18 (3d Cir.) ("The characterization of a mark is a factual issue.") (citations omitted), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *G. Heileman Brewing Co. v. Anheuser-Busch,* 873 F.2d 985, 992 (7th Cir.1989) ("[T]he district court's classification of a term on the trademark spectrum is a factual determination subject to the 'clearly erroneous' standard of review."); *Wiley v. American Greetings Corp.,* 762 F.2d 139, 141 (1st Cir.1985) ("Whether a design is 'inherently distinctive,' *i.e.,* whether it is arbitrary or merely descriptive, is ordinarily a question of fact.") (citation omitted); *Anheuser-Busch v. Stroh Brewery Co.,* 750 F.2d 631, 635 (8th Cir.1984) ("[T]he categorization of a term for which trademark protection is claimed is considered to be a factual issue and thus is to be reviewed under the clearly erroneous standard of Fed.R.Civ.P. 52(a).") (citations omitted); *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1183 n. 12 (5th Cir.1980) ("Any given term's correct categorization is a factual issue.") (citations omitted), *cert. denied,* 450 U.S. 981 (1981); *cf. In re Northland Aluminum Products,* 777

F.2d 1556, 1559 (Fed.Cir.1985) ("Whether a term is a common descriptive name is a question of fact" in context of trademark registration.) (citation omitted). We agree with these courts that the initial classification of a mark to determine its eligibility for protection *1040 is a question of fact left to the determination of the district court. We will substitute our own judgment on the matter for that of the district court only if the district court's determination is clearly erroneous. Fed.R.Civ.P. 52(a).

[5] The district court classified the "PM" mark as descriptive. Bristol argues that the mark is suggestive. Neither party claims that the mark is generic, arbitrary or fanciful. The question in this case, therefore, is whether "PM," when affixed to an analgesic trade name, is descriptive or suggestive of the product, a combination analgesic/sleep aid.

[6][7] A descriptive mark is one that "'forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.'" *Abercrombie & Fitch,* 537 F.2d at 11 (citation omitted). "[A] term can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product." *20th Century Wear v. Sanmark-Stardust,* 747 F.2d 81, 88 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). A term is suggestive "'if it requires imagination, thought and perception to reach a conclusion as to the nature of goods.'" *Abercrombie & Fitch,* 537 F.2d at 11 (citation omitted).

[8][9] Although the line between descriptive and suggestive may be difficult to discern, *see id.* at 10-11, the consequence of the classification is important. A descriptive term is subject to protection under section 43(a) only if the proponent of protection demonstrates that, in addition to the ordinary common meaning of the word or words, the term has acquired a secondary meaning in its particular market--that the consuming public primarily associates the term with a particular source. *See Centaur Communications, Ltd. v. A/S/M Communications,* 830 F.2d 1217, 1221 (2d Cir.1987); *Thompson Medical,* 753 F.2d at 212-13. The public presumably will not be confused by a descriptive term, but if the proponent of protection can show that the descriptive term is primarily associated with a single producer, a sufficient question is raised to justify further inquiry into the likelihood of confusion. In contrast, if its mark is suggestive a plaintiff need not prove such secondary meaning in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033                                                                                                    Page 8
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

order to qualify for trademark protection. *Id.* at 213.

In this case, the "PM" acts as a modifier to the analgesic brand name. Both "Tylenol" and "Excedrin" are well known brand names for analgesics; the "PM" modifies each to show that they are a particular type of analgesic. "PM," usually abbreviated "p.m." or "P.M." (for "post meridiem"), is a common term that refers to the period of time between noon and midnight. It is often associated with the time when most people go to sleep.

As used here, "PM" does not literally describe the presence of a sleep aid in the product. The "PM" refers to the purpose or utility of the product--it is an analgesic that should be used at night. The issue, therefore, is whether the connection between "PM" and a nighttime sleep aid is direct enough that the term may be categorized as descriptive or whether the connection is more indirect, requiring categorization as suggestive.

Bristol argues that "PM" is suggestive because a consumer must engage in a multi-step analysis before coming to the conclusion that it denotes the presence of a sleep aid in the analgesic. Bristol asserts that the consumer first must eliminate possible alternate meanings for "PM"--*e.g.*, "Pre-Menstrual" or "Pain Medication"--before arriving at "Post Meridiem." Next, Bristol argues, the consumer must make a leap from all the post meridiem hours to those at night, and a further intellectual leap from nighttime to sleeping.

The magistrate judge found that several other over-the-counter products are designated as nighttime products by the use of some close variant of "PM." The magistrate judge held in that context that "[t]he direct connotation of 'PM' is nighttime. There is *no* 'multi-stage reasoning process' that a consumer must indulge in to associate the term 'PM' with a nighttime product."

[10] **\*1041** We cannot say that the district court's adoption of this finding was clearly erroneous. The focus in categorizing a mark is on how the words are used in context rather than their meaning in the abstract. *See Abercrombie & Fitch,* 537 F.2d at 12. One of the leading commentators has offered the following example to demonstrate the context-dependent nature of the classification: "[T]he word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple-A-Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and

generic when used on apples." 1 J.T. McCarthy, Trademarks and Unfair Competition § 11:22, at 498-99 (2d ed. 1984). There was sufficient evidence before the magistrate judge to support the finding that several nighttime products were sold using some variant of "PM." Given that context, the conclusion that "PM" describes rather than suggests a nighttime product was not clearly erroneous. Once the consumer arrives at an awareness that the product is useful at nighttime, the "purpose or utility" of the product has been conveyed, even though the consumer is not aware of why the product is useful at night. *See Thompson Medical,* 753 F.2d at 216 & n. 15 ("Sportscreme" descriptive of cream useful in sports even though inadequately descriptive as to significance of product). Therefore, the consumer need not conclude that the analgesic contains a sleep aid.

Given the deferential standard of review, and the fact that this matter is before us at the preliminary injunction stage, we will not disturb the district court's finding that "PM" is descriptive.

[11] Because "PM" is a descriptive term it is not entitled to trademark protection unless Bristol demonstrates secondary meaning. The district court found that Bristol had not established that the "PM" designator had acquired secondary meaning. We agree with the district court.

[12] "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (citation omitted). Secondary meaning is an essentially factual determination, proof of which " 'entails vigorous evidentiary requirements.' " *Thompson Medical,* 753 F.2d at 217 (citation omitted); *see Coach Leatherware v. AnnTaylor, Inc.,* 933 F.2d 162, 169 (2d Cir.1991). We will reverse the district court's determination that a term has not acquired secondary meaning only if that determination is clearly erroneous. *See Murphy v. Provident Mut. Life Ins.,* 923 F.2d 923, 928 (2d Cir.1990), *cert. denied,* 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991); *815 Tonawanda Street Corp. v. Fay's Drug Co.,* 842 F.2d 643, 647 (2d Cir.1988).

Among the factors that we have found relevant to this inquiry in the past are advertising expenditures, consumer studies, sales success, unsolicited media

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

coverage, attempts to plagiarize and length and exclusivity of use. *Thompson Medical,* 753 F.2d at 217. There are undoubtedly other types of evidence that would also be relevant to a claim of secondary meaning. The fundamental question, however, is whether " 'the *primary* significance of the term in the minds of the consuming public is not the product but the producer.' " *Centaur Communications,* 830 F.2d at 1221 (citations omitted).

"The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation." *PaperCutter, Inc. v. Fay's Drug Co.,* 900 F.2d 558, 564 (2d Cir.1990) (citation omitted). The district court found that Bristol had not presented sufficient evidence that consumers recognized the source of "Excedrin PM" by the "PM" designator and that there was no evidence that Bristol had ever marketed the product as "PM."

[13] Bristol suggests two grounds in support of its contention that the district court's finding that the "PM" mark had not acquired secondary meaning was clearly **\*1042** erroneous. First, Bristol argues that McNeil's intentional copying of its mark is indicative of secondary meaning. Although imitative intent can help support a finding of secondary meaning, *see Centaur Communications,* 830 F.2d at 1224, it does not necessarily mandate one, *see American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir.1979) ("[N]o single factor is determinative."), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Therefore, we believe that, even assuming McNeil's imitative intent, the district court was not bound to find that the "PM" designator had acquired secondary meaning.

Second, Bristol argues that the fact that each "Excedrin PM" tablet is imprinted with "PM" shows that the consuming public must associate "PM" with Bristol. However, "[a]lthough the mark owner strives to create a secondary meaning for its product, it is the consuming public which, in effect, determines whether that effort has succeeded." *Centaur Communications,* 830 F.2d at 1221 (citations omitted). The mere fact that Bristol places the name "PM" on its tablets does not persuade us that the consuming public associates that term with Bristol. Moreover, on the larger caplet version of the product, Bristol placed the entire "Excedrin PM" mark.

The district court was not clearly erroneous in classifying "PM" as a descriptive term in these circumstances. Because "PM" had not become primarily associated with a single producer in these circumstances, "PM" as used by Bristol is not by itself subject to protection under the Lanham Act. The district court therefore properly declined to enjoin McNeil from using the "PM" designator in connection with its combination analgesic/sleep aid.

**B.** *Trade Dress Infringement*

[14][15] McNeil appeals from the entry of a preliminary injunction preventing it from marketing "Tylenol PM" in the packaging that the district court found to have infringed on Bristol's trade dress. The "trade dress" of a product " involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics.' " *LeSportsac, Inc. v. K mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985) (citation omitted). In examining trade dress the focus is on the *entire* look of the product or packaging. Individual aspects of a trade dress may be eligible for trademark protection in their own right, but in an action for trade dress infringement each aspect should be viewed in relation to the entire trade dress. The inquiry is whether the trade dress of a *"junior user"*--one who has adopted its mark or dress later than the "senior user"--is likely to cause consumer confusion as to the source of the product. As in the trademark arena, we must first determine whether a particular trade dress is eligible for protection under the Lanham Act.

The district court proceeded on the assumption, formerly the law in this Circuit, that, unlike trademarks, a trade dress was always ineligible for protection under section 43(a) in the absence of proof of secondary meaning. *See, e.g., LeSportsac,* 754 F.2d at 75. The Supreme Court, however, recently rejected this distinction between trademarks and trade dress. *Two Pesos,* 505 U.S. at ----, 112 S.Ct. at 2760 ("We see no basis for requiring secondary meaning for inherently distinctive trade dress protection under § 43(a) but not for other distinctive words, symbols, or devices capable of identifying a producer's product.").

[16] The district court made no finding as to whether the "Excedrin PM" trade dress was "inherently distinctive." However, if the district court was correct in determining that the trade dress had acquired secondary meaning, that dress is eligible for protection under section 43(a).

### 1. Secondary Meaning

[17][18] The secondary meaning inquiry is the same for trade dress as it is for a trademark. Bristol must

# APPENDIX OF AUTHORITIES PART 3

973 F.2d 1033                                                                                    Page 10
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

show that the primary significance of its "Excedrin PM" trade dress is to identify the source of the product rather than the product itself. *See Inwood Laboratories, 456 U.S. at 850-51* n. **\*1043** 11, *102 S.Ct. at 2187* n. 11. The question whether a mark or dress has acquired secondary meaning is a factual one that we will not reverse unless it is clearly erroneous. *See Murphy, 923 F.2d at 928; 815 Tonawanda Street Corp., 842 F.2d at 647.* The district court properly examined the *Thompson Medical* factors and concluded that Bristol's "Excedrin PM" trade dress had acquired secondary meaning. *See Thompson Medical, 753 F.2d at 217.*

[19] The district court found that Bristol's advertising expenditures in connection with "Excedrin PM" and its sales success weighed in favor of a finding of secondary meaning for the trade dress. It further held that consumer survey evidence introduced by Bristol, "though problematic in terms of some of its methodology," supported Bristol's claim of secondary meaning. The district court finally found that McNeil intentionally copied the "Excedrin PM" trade dress.

Given the deferential standard of review, we cannot say that the district court clearly erred in determining that the overall trade dress of "Excedrin PM" had acquired secondary meaning. This conclusion is strengthened by the well known trade name "Excedrin" prominently displayed on the "Excedrin PM" box as an integral part of the whole trade dress. That name strongly supports the district court's determination that consumers associate the trade dress, taken as a whole, with a particular producer.

2. Likelihood of Confusion

Having determined that the district court did not err in finding that the "Excedrin PM" trade dress is eligible for protection under section 43(a), we turn to the central question in this case: Whether McNeil's use of the "Tylenol PM" trade dress is likely to cause confusion as to the "origin, sponsorship, or approval" of "Tylenol PM" with "Excedrin PM." *See 15 U.S.C. § 1125(a)(1).*

Whether the public is likely to confuse two products is a question that is not easily answered. Our cases, however, have established an analytical framework designed to add structure to this nebulous inquiry and to guide judicial decisions toward some degree of predictability and uniformity.

In *Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 7*

*L.Ed.2d 25 (1961),* we examined similar marks used for dissimilar products. We set forth the following nonexclusive list of factors relevant to success on a Lanham Act claim:

> the strength of [the prior owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap [between the two products], actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495. We have subsequently held that these factors are appropriately considered when examining the likelihood of confusion between two competing products. *See, e.g., Thompson Medical, 753 F.2d at 213-14.*

[20] The standard of appellate review of a district court's conclusion regarding the likelihood of confusion between two products has split the courts of appeals. *See Euroquilt, Inc. v. Scandia Down Corp., 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986)* (White, *J.,* dissenting from the denial of *certiorari* to resolve whether the determination of likelihood of confusion under section 43(a) is subject to *de novo* review as a conclusion of law or "clearly erroneous" review as a question of fact). In this Circuit, a district court's determination of the individual *Polaroid* factors are subject to review as findings of fact, subject to reversal only if clearly erroneous, while the ultimate balancing of all the *Polaroid* factors to determine the likelihood of confusion in any given case is done *de novo* by this Court. *See Murphy, 923 F.2d at 928; Western Publishing, 910 F.2d at 61.*

Some earlier cases in this Circuit have held that to the extent that the *Polaroid* factors rest on a comparison of the marks **\*1044** themselves we are in as good a position to evaluate them as the district court and thus will evaluate those factors *de novo.* *See, e.g., McGregor-Doniger v. Drizzle, 599 F.2d 1126, 1133 (2d Cir.1979).* However, Rule 52(a) of the Federal Rules of Civil Procedure was amended in 1985 to require that "[f]indings of fact, whether based on oral or documentary evidence, ... not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a). The Notes of the Advisory Committee on Rules accompanying that amendment emphasize that even where the appellate court is in as good a position as the trial court to make a given factual determination, the factfinding function should be left to the district courts because of "the public interest in ... stability and judicial economy." Notes of Advisory Committee

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033                                                                                                      Page 11
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

on Rules, 1985 Amendment.    Thus, each of the *Polaroid* factors should be reviewed under Rule 52(a). *Cf. Johnson & Johnson v. GAC International, 862 F.2d 975, 979 (2d Cir.1988)* (finding of falsity in advertisement, formerly reviewed *de novo,* reviewed under amended Rule 52).

The only case that applies a *de novo* review to any *Polaroid* factor since the amendment to Rule 52(a) is *Centaur Communications, 830 F.2d at 1226* ("Unlike the other factors, this finding [with regard to similarity of the marks] is reviewed *de novo* because an appellate court is in as good a position to evaluate this factor as is a trial court.") (citations omitted).    In that case, the Court did not examine the amendment to Rule 52, and its statement that we review similarity of the marks *de novo* was not necessary to its holding.    Therefore, we do not find that statement controlling.

Despite the existence and importance of the *Polaroid* factors, we must remember that they are merely tools "designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue," and that "the ultimate conclusion as to whether a likelihood of confusion exists is not to be determined in accordance with some rigid formula." *Lois Sportswear v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir.1986)* (citation omitted).

We now turn to an examination of the *Polaroid* factors.    In the case of competing products, one of the *Polaroid* factors, proximity of the products in the marketplace, is necessarily answered in favor of the senior user, and another factor, the likelihood of bridging the gap, is not a relevant inquiry.    Where, as here, the competitive products are of nearly identical quality, a comparison of the quality of the products is not particularly helpful in determining the likelihood of confusion.    The remaining factors, however, require additional discussion.

a. Strength of the "Excedrin PM" Trade Dress
[21][22] The strength of a particular mark or dress is measured by its distinctiveness or the degree to which it indicates the source or origin of the product. *McGregor-Doniger, 599 F.2d at 1131; Banff, Ltd. v. Federated Dep't Stores, 841 F.2d 486, 491 (2d Cir.1988).*    The strength of a mark should be examined in its commercial context. *Centaur Communications, 830 F.2d at 1226.*

[23] We agree with the district court that the "Excedrin PM" trade dress, taken as a whole, strongly indicates the source of the product.    The presence of

the "Excedrin" trade name prominently displayed as an integral part of the trade dress demonstrates beyond question that the entire trade dress indicates the origin of the product.

b. McNeil's Good Faith
[24] Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products. *Charles of the Ritz Group v. Quality King Distrib., 832 F.2d 1317, 1322 (2d Cir.1987).* "Although this factor alone is not dispositive, it bolsters a finding of consumer confusion." *Id.*

The district court here found that McNeil intentionally copied elements of Bristol's trade dress.    There is evidence in the record to support that finding.    McNeil concededly was aware of Bristol's trade dress.    There was evidence that the target **\*1045** market for "Tylenol PM" was the "Excedrin PM" user.    Evidence also existed tending to show that the similarities in the trade dresses were raised by McNeil employees during the design process.    There were many proposed trade dresses that did not incorporate substantial aspects of the "Excedrin PM" trade dress yet, as the district court noted, "every choice [McNeil] made brought it closer to the EXCEDRIN PM trade dress."    An internal memorandum regarding the text to be placed on the package stated that it should appear "as in Excedrin PM."    Based on this and other evidence in the record, the district court was not clearly erroneous in finding that McNeil had not exercised good faith in adopting its trade dress.

[25] Although there was sufficient evidence in the record to support the district court's finding with regard to McNeil's good faith, McNeil argues that the district court erred in rejecting, without receiving additional evidence, the findings of the magistrate judge, who had found that McNeil acted in good faith.    District courts may designate a magistrate judge to conduct hearings and to submit to the district court proposed findings of fact and dispositions.    28 U.S.C. § 636(b)(1)(B).    If a party files objections to those findings, as both parties did in this case, the district court is to

make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The district court] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.    The judge may also receive further evidence.

*Id.* at 636(b)(1).    McNeil argues that before a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

district court may reject credibility findings of a magistrate judge it must recall witnesses and hear and observe them itself. We disagree.

McNeil's reliance on dicta from _United States v. Raddatz, 447 U.S. 667, 681 n. 7, 100 S.Ct. 2406, 2415 n. 7, 65 L.Ed.2d 424 (1980),_ is unavailing. In that case, a criminal prosecution, the Court expressed skepticism as to whether a district court could reject dispositive findings of credibility without seeing and hearing the witnesses. Arguably, the rejection of the magistrate judge's conclusion by the district court was not based on witness credibility in this case. Moreover, we have indicated that the _Raddatz_ dicta may be inapplicable outside the criminal context, _see Moore v. Ross, 687 F.2d 604, 609 n. 5 (2d Cir.1982), cert. denied, 459 U.S. 1115, 103 S.Ct. 750, 74 L.Ed.2d 969 (1983),_ and where, as here, the civil party has raised no objection on those grounds before the trial court we will not reverse the district court's findings on that ground.

### c. Evidence of Actual Confusion

Before the magistrate judge, Bristol presented evidence of actual confusion that included two different types of consumer surveys, the results of McNeil's own television advertisement survey and questions from McNeil's employees regarding the similarity in the two trade dresses. The magistrate judge reviewed all of the evidence presented and found that Bristol had not demonstrated any actual confusion between the two products.

The district court addressed only the consumer surveys and found that they did not demonstrate any meaningful actual confusion between the products. The district court had before it evidence critical of the manner in which the surveys were conducted. Bristol has not demonstrated to us on appeal that the district court was clearly erroneous in placing little credence in those surveys. Nor has Bristol given us any reason to supplant the finding of the magistrate judge with regard to the other evidence of actual confusion. Therefore, Bristol has not demonstrated any meaningful instances of actual confusion resulting from the "Tylenol PM" trade dress.

### d. The Similarity of the Trade Dresses

The district court found that the two trade dresses were strongly similar. After examining the two trade dresses, we conclude that, although they share many similar elements, the prominence of the trade **\*1046** names on the two packages weighs heavily against a finding of consumer confusion resulting from the overall look of the packaging. Therefore, we find

that the district court's finding on this issue was clearly erroneous.

Undeniably, the "Tylenol PM" trade dress shares many attributes with the "Excedrin PM" trade dress. The color scheme used by the two products is similar. Both products have the "PM" designator on the same line as the trade name. The text on the packaging is also similar. However, in a trade dress infringement case the question is not how many points of similarity exist between the two packages but rather whether the two trade dresses "create the same general overall impression." _RJR Foods v. White Rock Corp., 603 F.2d 1058, 1060 (2d Cir.1979)._ The issue is whether the similarity between the two trade dresses will contribute to consumer confusion as to the origin of the product. _See Western Publishing, 910 F.2d at 61_ (" 'Ultimately, the crucial question is whether the similarity is likely to create confusion.' ") (citations omitted); _McGregor-Doniger, 599 F.2d at 1133_ (" 'Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question.' ") (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 82.1(a), at 601-02 (3d ed.1969)).

[26] The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses. When prominently displayed it can go far towards eliminating any possible confusion, _see, e.g., American Rolex Watch Corp. v. Ricoh Time Corp., 491 F.2d 877, 879 (2d Cir.1974)_ ("Rolex's reliance upon [section 43(a) ] appears to be misplaced in view of the prominent display of 'Ricoh' on the challenged watch."); _Bose Corp. v. Linear Design Labs, 467 F.2d 304, 310 (2d Cir.1972)_ ("[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.") (footnote omitted), even though the appearance of the junior user's name does not in all cases eliminate the possibility of consumer confusion, _see Banff, 841 F.2d at 492_ ("Bloomingdale's attachment of its company name below its standard typestyle 'B Wear' mark does not offset the marks' similarity because the name is in very small letters and may actually increase the misappropriation by linking defendant's name to plaintiff's goodwill.") (citation omitted).

In this case, by far the most prominent feature of the "Excedrin PM" trade dress is the trade name "Excedrin." At least as prominent on the "Tylenol PM" packaging is the trade name "Tylenol." These

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trade names are the major features of otherwise
ordinary boxes.     The "Tylenol" trade name is
displayed in the same typeface used on other
"Tylenol" products.    In fact, except for the color of
the box and the presence of "PM," the "Tylenol PM"
trade dress is extremely similar to the trade dress of
the other "Tylenol" analgesic products.           The
differences between the two trade dresses are
therefore significant.

Despite the similarity between certain aspects of the
two trade dresses, when taken as a whole, including
the prominently displayed names, they are not similar
in any manner that is likely to cause consumer
confusion; in fact, the prominent presence of well
known trade names goes far toward countering any
suggestion of consumer confusion arising from any
of the other *Polaroid* factors.

### e. Sophistication of the Purchasers

[27] Generally, the more sophisticated and careful
the average consumer of a product is, the less likely it
is that similarities in trade dress or trade marks will
result in confusion concerning the source or
sponsorship of the product.       *See Centaur
Communications, 830 F.2d at 1228.*    The district
court found that consumers of non-prescription
analgesic/sleep aids were not typically careful or
sophisticated in making their purchases.    Given the
expert testimony available to the district court that
over-the-counter analgesics were "low involvement"
purchases, and given the fact **\*1047** that these
products are relatively inexpensive, we cannot say
that the district court was clearly erroneous in this
regard.    Thus, consumer sophistication in making a
purchase of these products militates toward a
likelihood of confusion.

### f. Ultimate Likelihood of Confusion

[28] Having reviewed the district court's findings
with regard to the *Polaroid* factors, we now engage
in a *de novo* balancing of those factors in order to
determine whether McNeil's use of the "Tylenol PM"
trade dress is likely to cause confusion among
consumers because of its similarity to the "Excedrin
PM" trade dress.    *See Murphy, 923 F.2d at 928.*

Although the overall trade dress of "Excedrin PM"
strongly identifies the product with a particular
source, it does so largely because the word
"Excedrin" is emblazoned over almost half the
package.    The "Tylenol PM" trade dress differs
significantly from the "Excedrin PM" trade dress in
that it does not include the word "Excedrin."    The
absence of the name "Excedrin" from McNeil's

product is a significant difference.    Additionally, that
absence is replaced by a different prominent name.
The origin-indicating name "Tylenol" appears at least
as prominently on the "Tylenol PM" trade dress as
does "Excedrin" on the "Excedrin PM" trade dress.
McNeil did not appropriate the aspect of the
"Excedrin PM" trade dress that most strongly
indicates the origin of the product and McNeil
supplied the "Tylenol PM" trade dress with a marking
that strongly indicated that the product emanated
from a *different* source.

Even McNeil's bad faith in adopting many elements
of the "Excedrin PM" trade dress does not alter that
conclusion.    Absence of good faith, like the other
*Polaroid* factors, is not by itself dispositive in any
given case.    *See Centaur Communications, 830 F.2d
at 1228* (" '[I]f comparison of the [marks] reveals no
fair ... issue concerning the likelihood of confusion,
then intent to copy, even if found from the proffered
evidence, would not establish a Lanham Act
violation.' ") (quoting *Warner Brothers v. American
Broadcasting Co., 720 F.2d 231, 247 (2d Cir.1983)*).
The prominent placement of the "Tylenol" name goes
far toward countering any suggestion that McNeil
intended to confuse its customers as to the source of
its product.    We believe that even "low involvement"
consumers will have a hard time missing the famous
names that form the most prominent feature of the
trade dress in each case.    It is thus not surprising that
Bristol was unable to present any meaningful
evidence of actual confusion between the two
products.

We do not mean to intimate that the distinctive
elements of any trade dress may be freely
appropriated as long as the junior user clearly
identifies the source of the goods.    In many cases,
the distinctive elements of a trade dress may
themselves be eligible for trademark protection.    In
other cases the trade name may be a less dominant
feature of the entire trade dress and thus have less
force in countering other similarities between two
trade dresses.    Also, the junior user's trade name may
less strongly identify a particular source than the
"Tylenol" name at issue here.

In this case, however, the trade name is the most
prominent and distinctive feature in each of the two
trade dresses.    The fact that they each are nationally
prominent names and are different on the respective
packages outweighs the evidence that tends to
demonstrate a likelihood of confusion.

Because there is no likelihood of confusion between

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

these two products resulting from any similarities in their overall trade dress, we are left with a " 'definite and firm conviction,' " *see Standard & Poor's, 683 F.2d at 708,* that the district court erred in preliminarily enjoining McNeil from marketing "Tylenol PM" in the proposed trade dress. Thus we reverse the decision to grant preliminary relief on the Lanham Act claim.

**\*1048  III.  STATE UNFAIR COMPETITION CLAIMS**

The district court also enjoined McNeil's use of its trade dress on the basis of New York and Florida common law of unfair competition.   In order to prevail under New York law, a plaintiff must demonstrate a likelihood of confusion between the two products.  *See Coach Leatherware, 933 F.2d at 169.* Similarly, likelihood of confusion is a necessary element of an unfair competition claim under Florida law.   *See American Bank of Merritt Island v. First American Bank and Trust, 455 So.2d 443, 445-46 (Fla. Dist. Ct.App.), review denied, 461 So.2d 114 (Fla.1984).*   As we have determined with regard to the Lanham Act claim, there is no likelihood of consumer confusion arising from McNeil's use of the "Tylenol PM" trade dress.   Therefore, Bristol is not entitled to relief under its common law unfair competition theory.

[29] Bristol also claims on appeal that it is entitled to a preliminary injunction, notwithstanding absence of confusion, under New York state common law under a theory of "misappropriation."  Bristol seizes on our language in *Flexitized, Inc. v. National Flexitized Corporation, 335 F.2d 774, 781-82 (2d Cir.1964), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965),* to the effect that New York law will prevent a party from misappropriating " 'the results of the skill, expenditures and labors of a competitor.' " *Id.* at 781 (citations omitted).  Bristol claims that the district court's finding of bad faith, without more, entitles it to relief under this theory.

We disagree.   In *Flexitized,* we were faced with one party that had appropriated the name of another. Relief was unavailable under the Lanham Act because the name "Flexitized" was deemed descriptive and had not acquired secondary meaning. Because the appropriating party had exhibited bad faith and because the name had acquired some familiarity among the consuming public, we held that use of the name constituted unfair competition.   We later clarified that this "misappropriation" theory still requires some confusion, if not as to source at least as

to sponsorship or permission.   *See American Footwear Corp., 609 F.2d at 662.*   That type of confusion has not been demonstrated here.

[30] More troubling is the application of New York law to Bristol's request to enjoin use of the "PM" mark.   New York law, unlike federal law, does not conclusively presume that there is no likelihood of confusion if a descriptive mark has not acquired secondary meaning.   *See Coach Leatherware, 933 F.2d at 169.*   Although it may be very difficult to show a likelihood of confusion where the senior mark is not associated in the public mind with a particular producer, under New York law it is not impossible. The district court did not analyze the *Polaroid* factors with regard to the use of the "PM" designator and thus we can make no determination to that effect. We note only that, under New York law, an absence of secondary meaning in a descriptive mark does not necessarily result in defeat for the owner.   The district court should consider this issue in the first instance.

**IV.  THE NEW YORK ANTI-DILUTION STATUTE CLAIM**

[31] Bristol also appeals from the refusal of the district court to enter an injunction against McNeil on the basis of New York's "Anti-Dilution" statute, New York Gen.Bus.Law § 368-d.  That statute states:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

New York Gen.Bus.Law § 368-d.   As the plain language of the statute indicates, relief is available under section 368-d even when there is no likelihood of confusion as **\*1049** to the source of the product. *See Sally Gee, Inc. v. Myra Hogan, Inc., 699 F.2d 621, 624 (2d Cir.1983); Allied Maintenance v. Allied Mechanical Trades, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977).*

The district court denied relief under section 368-d because Bristol and McNeil are direct competitors and the district court determined that section 368-d applied only to non-competing goods.   Whether section 368-d applies to products in direct competition is a question that has split the district courts in this Circuit.   *See E.P. Lehmann Co. v. Polk's Modelcraft Hobbies, 770 F.Supp. 202, 206*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 F.2d 1033
973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161
**(Cite as: 973 F.2d 1033)**

Page 15

(S.D.N.Y.1991) (collecting and discussing cases). New York courts have not directly addressed this issue.

We need not resolve this conflict over New York law because, even assuming *arguendo* that the statute applies to competitors, under the appropriate legal standard Bristol cannot prevail on its claim under section 368-d. "[O]nly those trade names which are truly of *distinctive* quality or which have acquired a secondary meaning in the mind of the public should be entitled to protection under the anti-dilution statute." *Allied Maintenance,* 42 N.Y.2d at 546, 399 N.Y.S.2d at 633, 369 N.E.2d at 1166. In interpreting this New York statute, we have held that it "protects only extremely strong marks." *Sally Gee, Inc.,* 699 F.2d at 625. The "PM" designator appended to the analgesic trade name does not qualify as an "extremely strong mark." Nor do the aspects of the "Excedrin PM" trade dress that are common to both products constitute "extremely strong marks." Thus, Bristol is not entitled to protection under section 368-d.

V. DISMISSAL OF THE ACTION

[32] Although this is an interlocutory appeal from a preliminary injunction, McNeil argues that we should dismiss Bristol's action in its entirety. The Supreme Court has cautioned that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) (citations omitted). Although in the past we have dismissed Lanham Act cases on appeal from the grant or denial of a preliminary injunction, *see, e.g., American Cyanamid v. Connaught Laboratories,* 800 F.2d 306, 307 (2d Cir.1986), we do not believe that this case appropriately lends itself to such extraordinary summary disposition.

[33] On this record, the balancing of the *Polaroid* factors does not convince us that Bristol is likely to succeed in its claim. However, findings of fact at the preliminary injunction stage are not binding at a trial on the merits. *See Camenisch,* 451 U.S. at 395, 101 S.Ct. at 1834. There remains the possibility, albeit slight, that Bristol will present evidence at trial-- numerous instances of actual confusion between the two products by actual customers for example--that might lead to a change in the ultimate conclusion regarding the likelihood of consumer confusion. We therefore decline to dismiss Bristol's action in its entirety.

CONCLUSION

For the reasons stated above, the district court erred in preliminarily enjoining McNeil from marketing its combination analgesic/sleep aid in the "Tylenol PM" trade dress. The injunction is therefore vacated and the matter is remanded to the district court.

973 F.2d 1033, 61 USLW 2160, 24 U.S.P.Q.2d 1161

**Briefs and Other Related Documents (Back to top)**

• 1992 WL 12013063 (Appellate Brief) Reply Brief of Plaintiff-Appellee-Cross-Appellant Bristol-Myers Squibb Company (Apr. 24, 1992)Original Image of this Document (PDF)

• 1992 WL 12013064 (Appellate Brief) Reply Brief of Plaintiff-Appellee-Cross-Appellant Bristol-Myers Squibb Company (Apr. 06, 1992)Original Image of this Document (PDF)

• 1992 WL 12013062 (Appellate Brief) Reply and Response Brief for Defendant-Appellant-Cross-Appellee (Mar. 30, 1992)Original Image of this Document (PDF)

• 1992 WL 12013059 (Appellate Brief) Brief for Defendant-Appellant-Cross-Appellee (Mar. 09, 1992)Original Image of this Document (PDF)

• 1992 WL 12013060 (Appellate Brief) Brief for Defendant-Appellant (Mar. 05, 1992)Original Image of this Document (PDF)

• 1992 WL 12013061 (Appellate Brief) Answering Brief and Brief on Cross-Appeal of Plaintiff-Appellee-Cross-Appellant Bristol-Myers Squibb Company (Jan. 01, 1992)Original Image of this Document (PDF)

END OF DOCUMENT

# APPENDIX OF AUTHORITIES

# PART 3-A

# TAB 3

Westlaw.

277 F.3d 243                                                                Page 1
277 F.3d 243
**(Cite as: 277 F.3d 243)**

▷

**Briefs and Other Related Documents**


United States Court of Appeals,
Second Circuit.
Neil D. LEVIN, Superintendent of Insurance of the
State of New York, as
Liquidator of Nassau Insurance Company, in
Liquidation, Plaintiff-Appellee-
Cross-Appellant,
v.
TIBER HOLDING CORPORATION, Defendant-
Appellant-Cross-Appellee.
**Docket No. 00-9579.**

Argued Sept. 19, 2001.
Decided Jan. 11, 2002.

State insurance superintendent brought suit in state
court seeking to have corporation that had previously
owned insurer which was in liquidation found in
contempt of consent order entered in connection with
liquidation, which barred dissipation of domestic
assets of insurer's subsidiary. After action was
removed, the United States District Court for the
Southern District of New York, Sidney H. Stein, J.,
found corporation liable for contempt. Corporation
appealed. The Court of Appeals, Jacobs, Circuit
Judge, held that: (1) finding that payments made by
corporation to subsidiary were made in connection
with agreement for sale of subsidiary was not clearly
erroneous; but (2) after sale of subsidiary,
corporation was not a direct party to consent order,
and thus could only be found in contempt as an aider
and abettor; and (3) lack of sufficient finding that
subsidiary acted in contempt precluded corporation
from being found to have aided and abetted
contempt.

Vacated and remanded.

West Headnotes

**[1] Federal Courts** ⬤➔776
170Bk776 Most Cited Cases

**[1] Federal Courts** ⬤➔850.1
170Bk850.1 Most Cited Cases
Court of Appeals reviews a district court's findings of

fact for clear error, and its holdings of law de novo.

**[2] Federal Civil Procedure** ⬤➔2397.6
170Ak2397.6 Most Cited Cases
District court did not commit clear error in
determining that payments made by corporation
which had formerly owned insurer that was in
liquidation to insurer's subsidiary, in accordance with
its obligations under agreement for sale of subsidiary
which required it to maintain subsidiary's capital and
surplus at a specified level and pay subsidiary's legal
fees and expenses in existing litigation, rather than in
fulfillment of preexisting inter-corporate obligations,
and thus could constitute a breach of consent order
entered in connection with liquidation, which barred
transfer of subsidiary's assets.

**[3] Contracts** ⬤➔187(1)
95k187(1) Most Cited Cases
Under New York law, insurer's subsidiary was an
intended third party beneficiary of agreement for sale
of subsidiary, which required insurer's corporate
owner to maintain subsidiary's capital and surplus at
a specified level and pay subsidiary's legal fees and
expenses in existing litigation; agreement specifically
included subsidiary as direct beneficiary of promise,
corporate owner rendered performance of its
obligations directly to subsidiary, and right of
rescission that was retained by successor was never
exercised. Restatement (Second) of Contracts § 302.

**[4] Contracts** ⬤➔187(1)
95k187(1) Most Cited Cases
Under New York law, a third party is an intended
beneficiary of a contract, as opposed to an incidental
beneficiary, if recognition of a right to performance
in the beneficiary is appropriate to effectuate the
intention of the parties, and either (1) the
performance of the promise will satisfy an obligation
of the promisee to pay money to the beneficiary, or
(2) the circumstances indicate that the promisee
intends to give the beneficiary the benefit of the
promised performance. Restatement (Second) of
Contracts § 302.

**[5] Federal Civil Procedure** ⬤➔2397.5
170Ak2397.5 Most Cited Cases
Obligations owed by corporate owner of insurer to
insurer's subsidiary as third-party beneficiary of
contract for sale of subsidiary, which required
corporate owner to maintain subsidiary's capital and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

277 F.3d 243
277 F.3d 243
**(Cite as: 277 F.3d 243)**

surplus at a specified level and pay subsidiary's legal fees and expenses in existing litigation, constituted intangible property of the successor located within the United States, for purposes of consent order entered in connection with insurer's liquidation which barred dissipation of such assets.

**[6] Federal Civil Procedure** ☜2397.6
170Ak2397.6 Most Cited Cases
Corporate owner of insurer which was in liquidation, and which had sold insurer's subsidiary, was no longer directly bound by consent order entered in connection with liquidation that barred dissipation of subsidiary's domestic assets, and thus could only be found in contempt of consent order as an aider or abettor, where unambiguous text of consent order made clear that it applied only to subsidiary's officers, directors, shareholders, and assigns; after sale, corporate owner no longer held status of shareholder of subsidiary.

**[7] Contempt** ☜20
93k20 Most Cited Cases
Under New York law, all ambiguity in a judicial mandate will be construed strictly to the benefit of the party facing allegations of contempt.

**[8] Contempt** ☜29
93k29 Most Cited Cases
Before a party can be found guilty of aiding and abetting civil contempt, the court must find (1) that the party subject to the court's mandate committed contempt, and (2) that another party assisted the enjoined party.

**[9] Contempt** ☜60(3)
93k60(3) Most Cited Cases
Party seeking to hold another in civil contempt bears the burden of proof to establish the offense by clear and convincing evidence.

**[10] Contempt** ☜60(3)
93k60(3) Most Cited Cases
In the context of civil contempt, the clear and convincing standard of proof requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred.

**[11] Federal Civil Procedure** ☜2397.6
170Ak2397.6 Most Cited Cases
Evidence was insufficient to establish that former subsidiary of insurer that was in liquidation had acted in contempt of consent order entered in connection with liquidation, which barred transfers of

subsidiary's domestic assets, and thus, actions of insurer's corporate owner in fulfilling its obligations under contract for sale of subsidiary by making payments to subsidiary in Bermuda to maintain subsidiary's capital and surplus at a specified level, and pay subsidiary's legal fees and expenses in existing litigation, could not provide basis to find that owner had aided and abetted civil contempt; while payments were suspect, nothing indicated that subsidiary had actively dissipated its assets.

**[12] Bills and Notes** ☜63
56k63 Most Cited Cases
Under New York law, a check has no valid inception until delivery.

**[13] Judgment** ☜668(1)
228k668(1) Most Cited Cases

**[13] Judgment** ☜678(1)
228k678(1) Most Cited Cases
To be bound by a prior judgment, a party in the subsequent litigation must have been a party to, or represented by a privy in, the prior action.

**[14] Insurance** ☜3557
217k3557 Most Cited Cases
Under New York law, insurer which was in liquidation, and its former subsidiary, were not bound under doctrine of collateral estoppel by determination made in prior litigation between insurer's principal, and liquidator, to which insurer and subsidiary were not parties, where neither insurer nor its subsidiary was represented in the prior suit, and their interests also were not represented, so that no privity existed.

**[15] Federal Courts** ☜382.1
170Bk382.1 Most Cited Cases

**[15] Federal Courts** ☜383
170Bk383 Most Cited Cases
Federal court sitting in diversity must follow the holdings of a state's highest court, and must reject inconsistent rulings from its lower courts.
**\*245** Thomas E. Zemaitis, (Matthew J. Borger, on the brief), Philadelphia, PA, for Defendant-Appellant-Cross-Appellee.

William F. Costigan, New York, NY, for Plaintiff-Appellee-Cross-Appellant.

Before: MESKILL, JACOBS, and CABRANES, Circuit Judges.

277 F.3d 243
277 F.3d 243
**(Cite as: 277 F.3d 243)**

Page 3

JACOBS, Circuit Judge.

Appellant Tiber Holding Corporation ("Tiber") appeals from an order of the United States District Court for the Southern District of New York (Stein, J.), imposing sanctions for contempt of a 1985 consent order. The underlying controversy and the present appeal arise out of transactions between and among entities controlled by Richard A. DiLoreto or his family, either directly or through Tiber, a domestic corporation headed by DiLoreto.

Tiber was (but is no longer) the indirect owner of both: (A) Nassau Insurance Company, an insurer now in liquidation under the supervision of the Superintendent of Insurance of the State of New York (the "Liquidator"), and (B) one of Nassau's reinsurers, Ardra Insurance *246 Company, Ltd., a Bermuda Corporation. In the course of an action initiated by the Liquidator in New York state court, Ardra entered into a consent order that decreed in relevant part that "Ardra ... its officers, directors, shareholders and assigns ... shall ... not ... remove, transfer or convert in any manner whatsoever any assets whatsoever of defendant Ardra located anywhere in the United States." Joint Appendix at 168, *Levin v. Tiber Holding Corp.* (2d Cir.2001) (00-9579) [hereinafter J.A.].

In December 1990, Tiber contracted to sell Ardra to an entity called Corporate Holding Corporation ("Corporate Holding"), of which Mr. DiLoreto was the sole shareholder, sole director, and sole officer. Pursuant to the Tiber/Corporate Holding agreement, Tiber promised
  • to maintain Ardra's capital and surplus at no less than $125,000 over a five-year period during which Corporate Holding was to make payment on the acquisition, and
  • to pay Ardra's legal fees and expenses in its existing litigation.

The District Court: (1) found that Ardra was the third party beneficiary of the Tiber/Corporate Holding agreement; (2) held that seventeen Tiber payments made between December 1990 and December 1995, ostensibly pursuant to Tiber's obligations (under the Tiber/Corporate Holding agreement) to maintain Ardra's capital and surplus and to fund its legal fees, were United States-based assets of Ardra that were diverted from the Liquidator by payment to Ardra in Bermuda; and (3) ruled that this diversion constituted aiding and abetting of contempt of the 1985 consent order. At issue are seventeen payments, one of which was a

$50,000 check sent directly to Ardra, and sixteen of which were channeled payments sent indirectly to Ardra through a series of Tiber-controlled companies in the United States and abroad.

The district court rejected the Liquidator's argument that Tiber was in contempt *as a shareholder of Ardra* bound directly by consent order, reasoning that by the time Tiber made the payments, it had sold its shares to Corporate Holding. However, the district court accepted the Liquidator's alternative argument that Tiber was in contempt as an aider and abetter, on the theory summarized above. Finally, the district court rejected the Liquidator's claim that four other checks, delivered directly from Tiber to Ardra before or after the expiration of the Tiber/Corporate Holding agreement (i.e., before and after the period December 1990 to December 1995), qualified as assets of Ardra located in the United States because they were drafted in the United States notwithstanding their delivery abroad.

For reasons stated in this opinion, we agree (*l* ) that Tiber, no longer a shareholder, was not directly bound by the consent order after December 1990 and could be held in contempt if at all only as an aider and abetter; and (2) that Tiber was a third party beneficiary of the Tiber/Corporate holding agreement. We also conclude that the Liquidator's cross-appeal is without merit. However, because, on the record before us, there is no sufficient finding that Ardra itself violated the consent order, we vacate the judgment and remand the cause to the District Court for proceedings not inconsistent with this opinion.

**I.**

From 1988 until present, Richard A. DiLoreto has served as principal officer of Tiber, a corporation domiciled in the United States. **[A 146]**. Through a subsidiary, Tiber owned Nassau Insurance Company. *247 Some or all of Nassau's risks were reinsured by Ardra, a Tiber-owned, DiLoreto-led corporation, formed in Bermuda for the specific purpose of serving Nassau's reinsurance needs.

In 1984, Nassau was ordered into liquidation. **[A 147]**. The Liquidator, as a judgment creditor of Ardra, initiated a New York state action against Ardra, and on June 28, 1985, entered into a consent order with Ardra, which decreed:
  Ardra ... its officers, directors, shareholders, and assigns ... shall, for so long as this action is pending, not ... expend, obligate, promise, assign, pay, remove, transfer or convert in any matter whatsoever any assets whatsoever of defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

277 F.3d 243
277 F.3d 243
**(Cite as: 277 F.3d 243)**

Page 4

Ardra located anywhere in the United States....
J.A. at 168.

In addition to his active role in these corporations, DiLoreto also was the sole officer, director, and shareholder of Corporate Holding. **[A 147].** On December 3, 1990, Tiber entered into an agreement to sell Ardra to Corporate Holding Corporation. **[A 147].** Tiber agreed to sell its outstanding Ardra shares to Corporate Holding for $50,000 (paid over five years) plus the value of Ardra's "shareholder net equity" as of December 3, 1995.    J.A. at 174. Additionally, Tiber promised both to maintain Ardra's capital and surplus at no less than $125,000 and to pay Ardra's legal fees and expenses in Ardra's existing litigation until December 3, 1995. **[A 148].** Finally, Corporate Holding had the right (which it did not exercise) to rescind the transaction "at any time during the next five years," on condition that it "forfeit all money paid to the Seller under the agreement." J.A. at 148.

Between 1989 and 1996 Tiber made five separate payments to Ardra in Bermuda by checks signed in the United States.    However, only one of those payments ($50,000 on April 9, 1991) was made during the five-year existence of the Tiber/Corporate Holding Agreement (three were made beforehand, one was made afterward). **[A 148].**

Additionally, over several years Ardra received a number of other payments routed from Tiber to Ardra through a chain of Tiber-owned subsidiaries: Tiber would first deliver these payments to Sondam Investments N.V. ("Sondam"), a Netherlands Antilles subsidiary of Tiber which only does business with other companies associated with DiLoreto; Sondam then would pass the money on to Nara Insurance Co. ("Nara"), a Bahamas Corporation established by DiLoreto; **[A 148-49]** Nara, in turn, would send the funds to Ardra.    Generally, the payments would course along the chain in a matter of days, and the amount Tiber initially paid Sondam would equal or closely approximate the amount Ardra ultimately received from Nara. **[A 150-51; Blue 35].**    During the five-year existence of the Tiber/Corporate Holding agreement, Tiber channeled sixteen payments to Ardra.

On November 11, 1998, the Liquidator filed a contempt petition against Tiber in New York Supreme Court.    The Liquidator argued that Tiber's payments to Ardra effectively dissipated Ardra's domestic assets and thereby violated the 1985 consent order.    Tiber removed the case to the

Southern District of New York, and, after a one-day bench trial, the district court held that Ardra, as a third party beneficiary of the Tiber/Corporate Holding agreement, had a possessory interest *only* in the direct and indirect payments made during the existence of the agreement, and therefore these seventeen payments (and only these seventeen) constituted domestic assets of Ardra prior to transfer from the United States by Tiber.    According to the district court, by transferring these seventeen *248 payments to Ardra in Bermuda (either directly or through the chain) Tiber aided and abetted contempt.

On appeal, Tiber argues that the seventeen payments were not transferred pursuant to the Tiber/Corporate Holding agreement.    Rather, Tiber maintains that it made these payments in fulfillment of long preexisting,    inter-corporate    obligations. Specifically,    Tiber maintains that Ardra was compelled by Bermuda law in the early 1980s to divest itself of shares of its parent, Tiber, and transfer them to Nara in consideration for a loss-portfolio transfer of some millions of dollars in reinsurance. Nara transferred the bulk of those Tiber shares to Sondam in exchange for some millions of dollars in interest-bearing 30-year bonds;    and Sondam transferred the Tiber shares it thus acquired to Tiber in exchange for a 30-year bond in an equal amount bearing 1% more interest.

It is Tiber's premise, which the district court rejected, that the disputed payments from Tiber to Ardra that fulfilled (or obviated) Tiber's obligation to maintain Ardra's capital surplus were periodic payments on the bonds from Tiber to Sondam and from Sondam to Nara and that Ardra ultimately received those funds as reinsurance payments from Nara.

**II.**

[1] We review a district court's findings of fact for clear error and its holdings of law *de novo. White v. White Rose Food,* 237 F.3d 174, 178 (2d Cir.2001).

[2] As an initial matter, the district court did not clearly err when it found that Tiber's payments to Ardra were made in accordance with Tiber's obligations under the Tiber/Corporate Holding agreement.    Tiber's attempt to rationalize the circuitous transfers as intercorporate reinsurance and bond payments fails by DiLoreto's own admissions. In a 1998 deposition, DiLoreto acknowledged that "[d]uring the period December 3, 1990 to December 3, 1995, ... Tiber transferred funds from its United States bank account to Ardra for payment of legal fees and expenses and to maintain the capital and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

277 F.3d 243
277 F.3d 243
**(Cite as: 277 F.3d 243)**

Page 5

surplus account of Ardra at no less than $125,000."
J.A. at 197. Additionally, DiLoreto admitted, under
cross-examination, that he was unaware whether
anyone was "keeping track of the bonds ... [,] whether
they were being paid ... [or] whether they were real."
J.A. at 150. Finally, there is no written record
indicating the existence of the supposed loss-
portfolio transfer between Ardra and Nara. **[A 149]**.

Having determined that Tiber made the payments
pursuant to the Tiber/Corporate Holding agreement,
the district court held: (1) that Ardra was a third
party beneficiary under the contract and that its third
party rights constitute intangible property located in
the United States; and (2) that this property
constituted domestic Ardra assets subject to the
consent order.

[3][4] As to the first ruling, the district court
properly held Ardra to be a third party beneficiary of
the Tiber/Corporate Holding agreement. Under New
York law, a third party is an intended (as opposed to
incidental) beneficiary of a contract
>   if recognition of a right to performance in the
>   beneficiary is appropriate to effectuate the
>   intention of the parties and either (a) the
>   performance of the promise will satisfy an
>   obligation of the promisee to pay money to the
>   beneficiary; or (b) the circumstances indicate that
>   the promisee intends to give the beneficiary the
>   benefit of the promised performance.
Restatement (Second) Contracts § 302; *see also*
*249*Fourth Ocean Putnam Corp. v. Interstate
Wrecking Co., 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485
N.E.2d 208, 211-12 (N.Y.1985).

The Tiber/Corporate Holding agreement specifically
included Ardra as a direct beneficiary of Tiber's
promise. *Cf. Trans-Orient Marine Corp. v. Star*
*Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d
Cir.1991) ("An intended third party beneficiary will
be found when it is appropriate to recognize a right to
performance in the third party and the circumstances
indicate that the promisee intends to give the third
party the benefit of the promised performance.");
*Cauff, Lippman & Co. v. Apogee Finance Group*, 807
F.Supp. 1007, 1020 (S.D.N.Y.1992) ("Although the
parties' intention to benefit the third party must be
gleaned from the face of the contract, .... the
defendant's obligation to the third-party beneficiary
need not be explicitly stated in the contract itself."
(internal citations omitted)). Additionally, Tiber
rendered performance of its obligations directly to
Ardra. *See Flickinger v. Harold C. Brown & Co.*,
947 F.2d 595, 600 (2d Cir.1991) (holding that a third

party will be deemed an intended beneficiary where
performance is rendered directly to it under the terms
of the contract); 22 N.Y.Jur.2d Contracts § 304
("Where the terms of the contract necessarily require
the promisor to confer a benefit upon a third person,
then the contract contemplates a benefit to that third
person, and this is ordinarily sufficient to justify
third-party-beneficiary enforcement of the contract,
even though the contract also works to the advantage
of the immediate parties thereto.").

It is inconsequential that Corporate Holding retained
a right of rescission, because Corporate Holding's
right of rescission was never exercised. Ardra at all
times retained its right as beneficiary to demand that
Tiber fulfill its contractual obligations. *See Brewster*
*v. Kable News Co.*, 289 N.Y. 246, 45 N.E.2d 426,
427 (1942) (holding that a third party beneficiary
contract that will terminate upon the happening of a
contingency will remain in force until such
contingency occurs).

[5] Because Ardra was a third party beneficiary of
the Tiber/Corporate Holding Agreement, the district
court properly held that Tiber's obligations to Ardra
under the agreement constituted "intangible [Ardra]
property" located in the United States. *See ABKCO*
*Industries, Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670,
385 N.Y.S.2d 511, 350 N.E.2d 899, 901-02 (1976),
(holding that contractual interests constitute
"intangible property" which has its situs in the place
where the party from whom "performance is required
by the terms of the contract" is located).

The district court's second ruling is more
problematic. While an encumbered payment made
for a specific contractual purpose (e.g., maintaining
Ardra's capital or paying its legal bills) does
constitute intangible property, it may not qualify as
"any asset" as that term is used in the consent order.
The district court held that Ardra's limited contract
rights were subject to the consent order. However,
some (if not all) of the payments under the
Tiber/Corporate Holding agreement were slated
exclusively for satisfaction of Ardra's legal fees.
The district court's ruling therefore would sanction
the Liquidator's effort to deny Ardra funds that
conceivably would be used by Ardra to defend itself
against the Liquidator's claims. Nevertheless, we are
not prepared to hold the ruling in error. *See Beers v.*
*Shannon*, 73 N.Y. 292, 299 (1878) (defining an asset
to include "every ... species of personal property"
(internal quotations omitted)); Black's Law
Dictionary 112 (7th Ed.1996) (defining an asset as
"[a]ll the property of a person ... available for paying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

debts.").

**\*250 III.**

[6]  Even if payments to Ardra under the Tiber/Corporate holding agreement constitute domestic Ardra assets subject to the consent order, Tiber itself was not *directly* bound by the consent order.  **[A 153].**  The consent order, according to its unambiguous text, applied only to Ardra's "officers, directors, *shareholders,* and assigns" (emphasis added)--a status Tiber no longer held after it agreed to sell its shares in Ardra to Corporate Holding on December 3, 1990.  Consequently, the district court properly held that Tiber, as a former shareholder, could commit contempt only as an aider or abettor.  *See Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 832-33 (2d Cir.1930) ("[N]o court can make a decree which will bind any one but a party;  ... it cannot lawfully enjoin the world at large, no matter how broadly it words its decree....  Thus, the only occasion when a person not a party may be punished, is when he has helped to bring about ... what [the decree] has power to forbid....");  *McCormick v. Axelrod,* 59 N.Y.2d 574, 466 N.Y.S.2d 279, 453 N.E.2d 508, 513 (N.Y.1983) (per curiam) (holding that a party not included in a court order may be held in contempt of that order if that party assists an included party's violation).

[7]  The Liquidator's cross-appeal asks us to credit the argument that "[a]nyone fitting th[e] description" of shareholder at the time the Consent Order was issued "became subject to the Consent Order so long as it remained in effect," regardless of whether her status subsequently changed.  Appellee's Brief at 11, *Levin v. Tiber Holding Corp.* (2d Cir.2001) (00-9579).  However, under New York law, all ambiguity in a judicial mandate will be construed strictly to the benefit of the party facing allegations of contempt.  *Mahopac Teachers Ass'n v. Board of Education of the Mahopac Central School Dist.,* 143 A.D.2d 888, 533 N.Y.S.2d 520, 521 (2d Dept.1988).  We would therefore resolve all ambiguity in Tiber's favor.  Accordingly, we reject the Liquidator's argument and hold that liability will only lie if Tiber aided and abetted contempt.

**IV.**

[8][9][10]  Before a party can be found guilty of aiding and abetting civil contempt, the court must find:  (1) that the party subject to the court's mandate committed contempt;  and (2) that another party assisted the enjoined party.  *See Alemite,* 42 F.2d at 833.  "[T]he party seeking to hold another in civil contempt bears the burden of proof" to establish the

offense by clear and convincing evidence.  *Beverina v. West,* 257 A.D.2d 957, 684 N.Y.S.2d 363, 363 (3d Dept.1999);  *see also Powers v. Powers,* 86 N.Y.2d 63, 629 N.Y.S.2d 984, 653 N.E.2d 1154, 1157 (1995);  *Stringfellow v. Haines,* 309 F.2d 910, 912 (2d Cir.1962) ("[I]n civil contempt ... [p]roof of violation must be clear and convincing.");  *Yalkowsky v. Yalkowsky,* 93 A.D.2d 834, 461 N.Y.S.2d 54, 55 (2d Dept.1983) ("The party making the application for a civil contempt ... has the overall burden of proof to establish, by clear and convincing evidence, that the court order ... has been violated.").  In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a "reasonable certainty" that a violation occurred.  *Callanan Indus., Inc. v. White,* 123 A.D.2d 56, 510 N.Y.S.2d 230, 231 (3d Dept.1986).

[11]  The district court erroneously held that Tiber aided and abetted a violation of the court order without reaching the predicate question of whether Ardra itself committed contempt.  *See Alemite,* 42 F.2d at 833 ("[T]he [defendant] must either abet the [principal], or must be legally\*251 identified with him....  [I]f the [principal] is not involved in the contempt, the [defendant] cannot be;  the decree has not been disobeyed ....");  *see also United States v. Paccione,* 964 F.2d 1269, 1274 (2d Cir.1992) ("[A] person who knowingly *assists a defendant in violating an injunction* subjects himself to civil as well as criminal proceedings for contempt." (quoting *Alemite,* 42 F.2d at 832) (emphasis added));  *Cf. United States v. Karen Bags, Inc.,* 602 F.Supp. 1052, 1064 (S.D.N.Y.1985) ("The elements necessary to prove aiding and abetting [criminal contempt] are '*the commission of the underlying offense* by someone, a voluntary act or omission, and a specific intent that such act or omission promote the success of the underlying criminal offense.' " (quoting *United States v. Perry,* 643 F.2d 38, 46 (2d Cir.1981)) (emphasis added)), *aff'd sub nom.  United States v. Klaymine,* 780 F.2d 179 (2d Cir.1985), *rev'd on other grounds, sub nom.  Young v. United States,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987);  *United States v. Samaria,* 239 F.3d 228, 235 (2d Cir.2001) ("To convict a defendant on a theory of aiding and abetting [credit card fraud], *the government must prove that the underlying crime was committed by a person other than the defendant* and that the defendant acted ... with the specific purpose of bringing about the underlying crime." (internal quotation omitted) (emphasis added)).

The district court specifies no underlying contempt on the part of Ardra, and the Liquidator does not

# APPENDIX OF AUTHORITIES PART 4

277 F.3d 243
277 F.3d 243
**(Cite as: 277 F.3d 243)**

Page 7

allege any. To satisfy the underlying elements of contempt, the Liquidator would have had to demonstrate that Ardra "had knowledge of and disobeyed a clear, explicit and lawful order of the court and that the offending conduct prejudiced the right of the opposing party." *Sager Spuck Statewide Supply Co. Inc. v. Meyer,* 282 A.D.2d 971, 723 N.Y.S.2d 732, 733 (3d Dept.2001) (internal quotations omitted); *see also Sacco v. Burke,* 764 F.Supp. 918, 921 (S.D.N.Y.1991) ("The only defenses to civil contempt are (1) that the order claimed to be violated is vague and indefinite as to whether particular action is required or ...; (2) that the disobedient party lacked actual knowledge of the terms of the order; or (3) that proof of the party's noncompliance is not clear and convincing." (internal citation omitted)).

The Liquidator presented no evidence that Ardra directed Tiber to make its payments in a specific manner or to a particular place, or that Ardra even knew that the money was due it under the Tiber/Corporate Holding agreement.

No doubt there is much that seems irregular about Mr. DiLoreto, his roles in these various entities, and their doings with each other. However, rather than holding the Liquidator to its clear and convincing burden, the district court simply posited a violation, holding: "*Tiber has not presented* credible evidence that the payments were routed from Sondam through Nara to Ardra for any purpose other than to evade the consent order." *Levin v. Tiber Holding Corp.,* No. 98 Civ. 8643, at 12 (S.D.N.Y. Aug. 14, 2000), 2000 WL 33911225 (emphasis added).

Tiber challenges this burden shift and we are inclined to agree. While it was not clear error to find DiLoreto's payments suspect, that, by itself, does not sufficiently demonstrate Tiber's complicity in contempt, or Ardra's commission of the underlying violation. Mr. DiLoreto may be up to something, but whether it is illegal is not Tiber's burden to explain.

The only finding by the district court that bears upon any wrongdoing on the part of Ardra is the (conditional) observation that "[i]nsofar as Tiber was aiding Ardra in dissipating assets held in the United States ... Tiber was aiding and **\*252** abetting Ardra in disregarding the order and can be held in contempt." *Id.* at 9. But that observation merely presumes its own premise, and does not demonstrate or explain how Ardra actively dissipated its assets or to what extent Tiber aided the drain.

Nor do we see any way, based on the findings of the district court on the record before us, for the district court to find Ardra liable of violating the consent order as a principal. The various transfers from or to any DiLoreto company do not amount to clear and convincing evidence of wrongdoing on the part of Ardra, even under the Liquidator's theory of events. All Ardra has done, apparently, is receive payment of certain funds, as a third party beneficiary, in its primary place of business (Bermuda), and without more, we cannot conclude that Ardra itself was in contempt.

We therefore conclude that the district court's finding that Tiber aided and abetted contempt fails for lack of proof of an underlying malfeasance by Ardra or any other party directly bound by the consent order at the time the challenged transactions occurred.

### V.

The Liquidator's cross-appeal argues that the district court erroneously failed to adopt two alternative theories of liability. The first such claim, which we rejected *supra,* is that Tiber was directly bound by the consent order as a former shareholder. As we discussed, the consent order binds only existing shareholders.

The remaining argument is that four checks drawn by Tiber (payable to Ardra) outside the period of the Tiber/Corporate Holding agreement constituted domestic Ardra assets in the hands of Tiber in the United States. Under the theory, subsequent delivery abroad effected a proscribed transfer.

This argument, even if sound as a legal proposition, does not assist the Liquidator. It would establish only that the checks constituted a United States asset prior to transfer, not that the party that made the transfer was bound by the consent order or that any party that was bound wrongfully directed the payment in a way that would expose the transferor to liability as an aider and abettor.

[12] Moreover, the proposition is at best weak under New York law, which (the parties agree) controls the controversy. "[A] check has no valid inception until delivery." *New York v. Barclays Bank,* 76 N.Y.2d 533, 561 N.Y.S.2d 697, 563 N.E.2d 11, 12 (1990) (holding that a payee has no interest in a check prior to attaining actual or constructive possession); *see also Grubb v. Gen. Contract Purchase Corp.,* 94 F.2d 70,73 (2d Cir.1938) ("[N]o cheque is valid before delivery.").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

277 F.3d 243
277 F.3d 243
**(Cite as: 277 F.3d 243)**

Page 8

[13][14] The Liquidator does not challenge this precedent. Rather, the Liquidator invokes affirmative collateral estoppel, citing a ruling favorable to it in a prior action between DiLoreto and the Liquidator involving a different set of checks, none of which involved Tiber funds. However, "[t]o be bound by a prior judgement, a party in the subsequent litigation must have been a party to, or represented by a privy in, the prior action." *Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1350, 1355 (2d Cir.1992) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 & n. 7, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)), *rev'd on other grounds, sub nom. Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). Tiber was not represented in the prior suit; nor was Ardra, for that matter, nor were the interests of either company. Without more, there is insufficient evidence **\*253** of privity in the record. *See* 18 Wright, Miller & Cooper, *Federal Practice and Procedure,* § 4460 at 533 ("Corporations are treated as entities separate from their officers, directors, and shareholders for purposes of preclusion....").

[15] In any event, this Court, sitting in diversity, must follow the holdings of the New York Court of Appeals and must reject inconsistent rulings from its lower courts. *First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 165 (2d Cir.1998). In other and more compelling circumstances, we might pursue the estoppel inquiry further, but on this pure question of law, we will follow the applicable rule announced by the New York Court of Appeals in *Barclays Bank. See Haitian Centers Council,* 969 F.2d at 1356 ("Especially where pure questions of law are presented, courts and commentators both have recognized that the interests of finality and judicial economy may be outweighed by other substantive policies....").

### Conclusion
For these reasons the contempt order is vacated and the matter is remanded for any further proceedings.

277 F.3d 243

**Briefs and Other Related Documents (Back to top)**

• 2001 WL 34113499 (Appellate Brief) Reply Brief of Appellant Tiber holding Corporation (May. 21, 2001)Original Image of this Document (PDF)

• 2001 WL 34113497 (Appellate Brief) Brief for Plaintiff-Appellee-cross-Appellant (May. 04,

2001)Original Image of this Document (PDF)

• 2001 WL 34113498 (Appellate Brief) Brief of Appellant Tiber holding Corporation (Apr. 05, 2001)Original Image of this Document (PDF)

• 00-9579 (Docket) (Dec. 21, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

467 F.Supp.2d 285                                                                 Page 1
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

**Motions, Pleadings and Filings**

United States District Court,
E.D. New York.
RxUSA WHOLESALE, INC., Alden Surgical, Co.,
Inc., Atlantic Biologicals, Inc.,
Bell Medical Services, Inc., C.O. Truxton, Inc.,
Hygen Pharmaceuticals, Inc.,
Medex Medical, Inc., Medsource Direct, Inc., Mika
Pharmaceuticals, Inc., and
Stat Pharmaceuticals, Inc., Plaintiffs,
v.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, U.S. Food and Drug Administration,
Defendants.
No. 06-CV-5086 (JS)(AKT).

Dec. 11, 2006.

**Background:** Pharmaceutical companies brought
action against Food and Drug Administration (FDA),
challenging implementation of regulation governing
wholesale distribution of prescription drugs.
Companies moved for preliminary injunction.

**Holdings:** The District Court, Seybert, J., held that:
(1) preliminary injunction would serve public
interest; and adopted in part report and
recommendation of A. Kathleen Tomlinson, United
States Magistrate Judge, which held that:
(2) companies established irreparable injury;
(3) companies established likelihood of success on
merits of claim; and
(4) injunction was not barred by laches.
Motion granted.

West Headnotes

[1] Constitutional Law ⌖208(1)
92k208(1) Most Cited Cases

[1] Constitutional Law ⌖208(3)
92k208(3) Most Cited Cases
Court cannot overturn statute unless varying
treatment of different groups or persons is so
unrelated to achievement of any combination of
legitimate purposes that it can only conclude that
government's actions were irrational.

[2] Injunction ⌖158
212k158 Most Cited Cases
Findings of fact made by court granting preliminary
injunction are not binding at trial on merits, since
preliminary injunction is customarily granted on
basis of procedures that are less formal and evidence
that is less complete than in trial on merits.

[3] Injunction ⌖24
212k24 Most Cited Cases
When preliminary injunction implicates public
interests, court should consider balance of such
interests in deciding if plaintiff's irreparable injury
and probability of success on merits warrants
injunctive relief.

[4] Health ⌖328
198Hk328 Most Cited Cases
Preliminary injunction sought by pharmaceutical
companies that sued Food and Drug Administration
(FDA), challenging implementation of regulation
governing wholesale distribution of prescription
drugs, would serve public interest; injunction would
maintain status quo by requiring both authorized and
unauthorized wholesale distributors to provide
pedigree information about their transactions, while
allowing rule would have prevented smaller entities
from distributing drugs to their customers. Federal
Food, Drug, and Cosmetic Act, § 503(e)(1)(A)(b),
21 U.S.C.A. § 353(e)(1)(A)(b); 21 C.F.R. §
203.50(a).

[5] Injunction ⌖138.46
212k138.46 Most Cited Cases
Where moving party seeks to stay, by means of a
preliminary injunction, a governmental action taken
in public interest pursuant to statutory or regulatory
scheme, moving party must show irreparable injury
and likelihood of success on merits, not just
sufficiently serious questions going to merits of
action.

[6] Injunction ⌖138.6
212k138.6 Most Cited Cases
Irreparable harm, for purposes of preliminary
injunction, may be found where moving party makes
strong showing that economic loss would
significantly damage its business above and beyond
simple diminution in profits.

[7] Injunction ⌖138.6

467 F.Supp.2d 285                                                                                          Page 2
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

212k138.6 Most Cited Cases
Loss of business constitutes "irreparable harm" for purposes of preliminary injunction; thus, where injunction will prevent damage to business as whole, irreparable harm can be established.

**[8] Health** ☞328
198Hk328 Most Cited Cases
Pharmaceutical companies that sued Food and Drug Administration (FDA), challenging implementation of regulation governing wholesale distribution of prescription drugs, established irreparable injury for purposes of preliminary injunction; under regulation, companies would have been virtually unable to obtain authorized distributor status from major pharmaceutical manufacturers, and companies would have been unable to return inventory to manufacturers. Federal Food, Drug, and Cosmetic Act, § 503(e)(1)(A)(b), 21 U.S.C.A. § 353(e)(1)(A)(b); 21 C.F.R. § 203.50(a).

**[9] Health** ☞328
198Hk328 Most Cited Cases
Pharmaceutical companies that sued Food and Drug Administration (FDA), challenging implementation of regulation governing wholesale distribution of prescription drugs, established likelihood of success on merits of claim that regulation's application would violate their equal protection rights, as required to obtain preliminary injunction; regulation's exemption of authorized pharmaceutical distributors from Prescription Drug Marketing Act (PDMA) pedigree requirement was not rationally related to purposes of PDMA. U.S.C.A. Const.Amend. 14; Federal Food, Drug, and Cosmetic Act, § 503(e)(1)(A)(b), 21 U.S.C.A. § 353(e)(1)(A)(b); 21 C.F.R. § 203.50(a).

**[10] Constitutional Law** ☞213.1(1)
92k213.1(1) Most Cited Cases

**[10] Constitutional Law** ☞213.1(2)
92k213.1(2) Most Cited Cases
If distinctions drawn within statute have some basis in practical experience, or if any state of facts reasonably may be conceived to justify them, and they are not drawn on basis of criteria wholly unrelated to objective of statute, then statute will withstand equal protection challenge. U.S.C.A. Const.Amend. 14.

**[11] Injunction** ☞113
212k113 Most Cited Cases
Doctrine of "laches" is equitable defense which bars injunctive relief where plaintiff unreasonably delays

in commencing action.

**[12] Equity** ☞72(1)
150k72(1) Most Cited Cases
Party asserting laches defense must show that plaintiff has inexcusably slept on its rights so as to make decree against defendant unfair.

**[13] Equity** ☞71(1)
150k71(1) Most Cited Cases

**[13] Equity** ☞72(1)
150k72(1) Most Cited Cases
As equitable doctrine, laches may not be based on delay alone; thus, in order to establish defense and bar grant of injunctive relief, defendant must also prove that it has been prejudiced by plaintiff's unreasonable delay in bringing action.

**[14] Equity** ☞72(1)
150k72(1) Most Cited Cases
Prejudice ensues, for purposes of laches defense, when defendant has changed his position in way that would not have occurred if plaintiff had not delayed.

**[15] Equity** ☞84
150k84 Most Cited Cases
Due to equitable nature of laches, any resolution must be based on circumstances peculiar to each case; thus, inquiry is factual one.

**[16] Equity** ☞84
150k84 Most Cited Cases
Determination whether laches bars plaintiff from equitable relief is entirely within discretion of trial court.

**[17] Health** ☞328
198Hk328 Most Cited Cases
Preliminary injunction sought by pharmaceutical companies that sued Food and Drug Administration (FDA), challenging implementation of regulation governing wholesale distribution of prescription drugs, was not barred by laches; no prejudice from companies' purported delay in bringing action would have ensued, since enjoining effective date of regulation would have maintained status quo as to distribution process. Federal Food, Drug, and Cosmetic Act, § 503(e)(1)(A)(b), 21 U.S.C.A. § 353(e)(1)(A)(b); 21 C.F.R. § 203.50(a).
                         West Codenotes
Validity Called into Doubt

21 C.F.R. § 203.50(a)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 285                                                                                    Page 3
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

**\*287** Michael L. Levine, The Law Firm of Michael Levine, P.C., Scarsdale, NY, for Plaintiffs.

Vincent Lipari, United States Attorneys Office, Eastern District of New York, Central Islip, NY, for Defendants.

*ORDER ADOPTING REPORT AND RECOMMENDATION*

SEYBERT, District Judge.

### INTRODUCTION

Before this Court is Magistrate Judge A. Kathleen Tomlinson's Report and Recommendation, dated November 30, 2006, regarding Plaintiffs' motion for a preliminary injunction. The Magistrate recommended that this Court preliminarily enjoin the Defendants from implementing certain regulations that were to take effect on Friday, December 1, 2006. Pursuant to Fed.R.Civ.P. 72(b), the Defendants objected to certain parts of the Report and Recommendation, and Plaintiffs responded. Pursuant to 28 U.S.C. § 636(b)(1), this Court reviews *de novo* those portions of the Report and Recommendation to which Defendants object. Such *de novo* review does not entirely replace the Magistrate's efforts.

**\*288** After carefully reviewing Defendants' objections and hearing oral argument on December 4, 2006, this Court adopts in part and modifies in part the Report and Recommendation and grants Plaintiffs' request for a preliminary injunction. For purposes of this Order, familiarity with the facts of the case is presumed. The Court refers the parties to the facts as stated in the Report and Recommendation.

### DISCUSSION

Defendants have objected to several parts of the Magistrate's Report and Recommendation. Defendants have challenged the Magistrate's conclusion that Plaintiffs will suffer irreparable harm and have a likelihood of success on the merits. Defendants also raise issue with the Magistrate's factual findings. The Court turns to each of Defendants' objections.

I. *Defendants Do Not Deny Plaintiffs Will Be Irreparably Harmed Without An Injunction.*

For this Court to issue a preliminary injunction against "government action taken in the public interest pursuant to a statutory or regulatory scheme,"

the Plaintiffs must show "(i) irreparable harm absent the injunction and (ii) a likelihood of success on the merits." *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir.2005) (citations omitted). A plaintiff satisfies the irreparable harm requirement when it shows that absent a preliminary injunction, it "will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.' " *Id.* (citations omitted). Because irreparable harm is "the single most important prerequisite" before a preliminary injunction will issue, Plaintiffs must show first that the injury is "likely" before showing any other requirements. *Id.*

Defendants attempt to challenge Plaintiffs' claim that they will suffer irreparable harm. However, the Court rejects this argument at the outset because Defendants' argument is circuitous. First, Defendants do not directly address Plaintiffs' claims that they will suffer irreparable harm. Instead, Defendants claim that staying the FDA regulation will not save Plaintiffs from any irreparable harm because the statute--which the FDA regulation "mirrors"-- still requires pedigree information back to the manufacturer. Thus, Defendants have essentially acknowledged that Plaintiffs will suffer irreparable harm--it is just a matter of the source of the harm: the PDMA or the FDA regulation.

Accordingly, the Court finds that Plaintiffs have met their burden regarding the irreparable harm prong of a preliminary injunction. Defendants do not deny Plaintiffs will be irreparably harmed. It simply challenges the source of the harm, which does not change that such harm is bound to occur without a preliminary injunction. The Court adopts that portion of the Report and Recommendation finding that Plaintiffs will suffer irreparable harm.

II. *Plaintiffs Have Shown A Likelihood Of Success On The Merits.*

The second prong that Plaintiffs must meet for this Court to issue a preliminary injunction is a likelihood of success on the merits. *See Freedom Holdings, Inc.,* 408 F.3d at 114. For purposes of a preliminary injunction, however, this Court need not find with "absolute certainty" that Plaintiffs will succeed on the merits of their claims. *Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1984) ("A movant ... need not show that success is an absolute certainty. He need only make a showing **\*289** that the probability of his prevailing is better than fifty percent. There may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 285
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

remain considerable room for doubt.") Thus, a finding that a plaintiff has more than a fifty-fifty chance of succeeding on the merits of their claims would warrant a finding of a likelihood of success on the merits.

*A. Defendants' Arguments*

First, Defendants object to the Magistrate's conclusion that the classification fails rational basis review because authorized distributors purchase a significant volume of drugs from unauthorized distributors and then resell those drugs without a pedigree. (Def.'s Mem. of Law 5.) Second, Defendants also claim the Magistrate erred when she found that it was not rational to believe that Congress intended to create a situation where it was impossible for four thousand unauthorized distributors to comply with the law. (*Id.* at 6.) Defendants specifically claim that this is a disputed factual issue.

Third, Defendants claim the Magistrate erred when she relied on certain statements made after the Prescription Drug Marketing Act ("PDMA") was passed. (*Id.* at 8-9.) Specifically, Defendants argue that the Magistrate should have looked solely to facts as they were when Congress enacted the PDMA.

*B. The Rational Basis Test & Review Of Administrative Actions*

[1] Defendants do not object to the Magistrate's conclusion that a statute must be rationally related to its stated purpose to be Constitutional. A court cannot overturn a statute "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational." *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). The Court must inquire whether a statute is "rationally related to legitimate [governmental] interest." *Vance,* 440 U.S. at 97, 99 S.Ct. 939 (quoting *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)).

Defendants also do not object to the Magistrate's conclusion that the FDA's administrative actions are subject to review by the Court under the Administrative Procedure Act ("APA"). (Report at 20.) The FDA's actions may be disturbed only "if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C.

§ 706(2)(A). "When a court reviews an agency's construction of a statute it administers," a court must determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "[I]f the statute is silent or ambiguous with respect to the specific issue," a court must determine whether such regulation is "a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

However, in *Bldg. and Const. Trades Dep't v. Donovan,* 543 F.Supp. 1282, 1290 (D.C.1982), the court preliminarily enjoined an agency from enforcing regulations issued to implement the Davis-Bacon Act. The *Donovan* court analyzed the new administrative actions with "more exacting vigilance" because the agency was changing a "longstanding administrative position" that had originally been taken contemporaneously with or shortly after the legislation. *Id.* 1290.

At the outset, the Court notes that Congress had a rational basis when it required unauthorized distributors to provide pedigree *290 information for the drugs it distributed. The Magistrate, this Court, and both parties agree on this. The PDMA's pedigree requirement is important and necessary in light of Congress's findings that "most of the drugs that were counterfeit, stolen, expired, or obtained through fraud were handled by secondary wholesalers, who were not authorized to distribute that manufacturer's product." H.R.Rep. No. 100-76, at 17 (1987). PDMA's purpose "is to protect American consumers from mislabeled, subpotent, adulterated, expired, or counterfeit pharmaceuticals, which are being dispensed under existing law and practice, and to restore competitive balance in the marketplace." *Id.* at 6. Accordingly, the Court rejects that portion of the Report and Recommendation that finds the PDMA had no rational basis.

The issue, however, is whether the regulatory scheme created to enforce the PDMA is arbitrary and capricious in light of the FDA's position for the last sixteen years and its findings stated in its various reports to Congress. Defendants do not dispute the Magistrate's finding that both manufacturers and authorized distributors are exempt from the pedigree requirement. (Report at 12.) When the PDMA was first enacted in 1988, the statute read as follows:
> Each person who is engaged in the wholesale distribution of the drugs ... and who is not an authorized distributor of record of such drugs shall provide to each wholesale distributor of such drugs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX OF AUTHORITIES PART 4-A

a statement identifying each sale of the drug (including the date of sale) before the sale to such wholesale distributor.
(Drucker Aff. Ex. 1.)

The FDA interpreted this statute as requiring unauthorized distributors to provide pedigree information back to either the manufacturer or the authorized distributor, depending upon from whom the unauthorized distributor purchased the drugs. (Drucker Aff. ¶ ¶ 14-15; Ex. 6 at 27.) The FDA thus considered the statutory exemptions for manufacturers and authorized distributors from the pedigree requirement when issuing its guidance letter in 1988. The FDA "believed that this [interpretation] was consistent with the legislative history of PDMA, which indicated that Congress intended that the drug pedigree be a written certification fully identifying the source and place *from which the drugs were obtained*." (Drucker Aff. Ex. 6 at 27 (emphasis added)).

In 1992, Congress amended the PDMA to require unauthorized wholesale distributors to provide pedigree information "identifying each prior sale, purchase, or trade of such drug (including the date of the transaction and the names and addresses of all parties to the transaction)." 21 U.S.C. § 353(e)(1)(A)(b). Neither the statute--as originally written or as amended-- specifically or expressly required unauthorized distributors to provide pedigree information *all the way back to the manufacturer*. But in 1994, the FDA proposed a new rule requiring the unauthorized wholesale distributors to provide pedigree information for sales all the way back to the manufacturer. *See* Drucker Aff., Ex. 6 at 27; 21 C.F.R. § 203.50(a) (hereinafter referred to as the "Rule"). In this regard, the Court departs from the Magistrate's finding that the regulation "closely mirrors" what the statute requires. (Report at 21.)

The FDA, however, delayed implementation of the Rule for twelve years. The FDA had reported to Congress that the PDMA pedigree exemption for authorized distributors allowed a "large volume of prescription drugs [to] move through the system without pedigrees, or with incomplete pedigrees, because they [had] passed through an authorized distributor at least *291 once before reaching their retail destination." (Drucker Aff. Ex. 17, DEP'T OF HEALTH AND HUMAN SERVS. U.S. FOOD AND DRUG ADMIN., PRESCRIPTION DRUG MARKETING ACT REPORT TO CONGRESS 9 (2001).) The FDA further found that the exemption "undermines the purpose of the pedigree by allowing

for potential gaps in the distribution history." *Id.*

If the Rule were to go into effect while the exemption for authorized distributors existed, the result would completely defeat the purpose of the PDMA. Pedigree information would not be available for any drugs moving through commerce. Any drugs passing through an authorized distributor would contain no pedigree information due to the statute's exemption. Unauthorized distributors would be unable to comply with the Rule. They would be unable to provide complete pedigree information for all prior sales up to the manufacturer because--as the FDA has found--most drugs pass at least once through authorized distributors who do not provide pedigree information. And according to Plaintiffs, manufacturers refuse to sell products directly to Plaintiffs so they have no choice but to purchase from authorized distributors. (Report at 2.)

This entire regulatory scheme and the anomalous result that would occur if the Rule went into effect appears arbitrary in light of the FDA's previous position and interpretation of the PDMA. The PDMA's purpose is to protect the American consumer from tainted pharmaceuticals. The pedigree requirement was created to show where wholesale distributors were obtaining their drugs. But the Rule would essentially wipe out all the unauthorized distributors, leaving only authorized distributors who are exempt from the pedigree requirement. So none of the drugs ultimately going to the American consumer would contain pedigree information because the drugs would be provided solely through authorized distributors who are exempt from the pedigree requirement. Accordingly, the Court rejects Defendants' objections to the Magistrate's findings regarding Plaintiffs' likelihood of success on the merits.

[2] To the extent that Defendants object to the Magistrate's supposed factual findings, Defendants prematurely raise this objection. None of the Magistrate's findings of fact nor this Order's recitation of facts are conclusive. "[F]indings of fact ... made by a court granting a preliminary injunction are not binding at trial on the merits [because] ... a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 806, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). "The purpose of a preliminary

467 F.Supp.2d 285                                                                                                    Page 6
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

injunction is ... to preserve the relative positions of the parties until a trial on the merits can be held.... A party is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex., 451 U.S. at 395, 101 S.Ct. 1830.* The Magistrate simply cited to affidavits and exhibits presented to her at the hearing, none of which suffice for conclusive factual findings. Accordingly, the Court rejects Defendants' objections to the extent they relate to the Magistrate's factual findings or reliance on facts stated in the parties' affidavits or exhibits.

### III. *The Preliminary Injunction Serves The Public Interest.*

[3][4] Lastly, the Court raises one final issue not discussed in the Report. When a preliminary injunction implicates public interests, a court should consider the balance **\*292** of such interests in deciding if "a plaintiff's irreparable injury and probability of success on the merits warrants injunctive relief." *Brody v. Vill. of Port Chester, 261 F.3d 288, 290 (2d Cir.2001).* This Court believes a preliminary injunction in this instance benefits the public interest.

Since passage of the PDMA in 1988, both authorized and unauthorized wholesale distributors have been complying with the PDMA by providing pedigree information back to the authorized distributors from whom the drugs were purchased. (Report at 16.) By granting Plaintiffs' motion for the preliminary injunction, this Court simply maintains the status quo and the current practice in the industry. The Court enjoins the Defendants from implementing the Rule that would require unauthorized distributors to provide pedigree information about the transactions of their drugs all the way back to the manufacturer. This maintains the positions of the parties that have been in effect for the last eighteen years since passage of the PDMA.

To allow the Rule to go into effect may "prevent over 4,000 smaller, unauthorized distributors from distributing drugs to their customers and may put them out of business ...." Drucker Aff. Ex. 8 at 25640. This in turn may ultimately lead to "underserved" markets and consumers for prescription drugs. *Id.* Because of these concerns regarding the four thousand unauthorized distributors and potentially underserved markets and consumers, the FDA continued to delay implementation of the Rule. *Id.* at 25641. Specifically, the "Commissioner of Food and Drugs [found] that this delay of [the Rule's] effective date is in the public interest." *Id.*

And of course, while the pedigree requirement is not perfect with its current exemptions, at least some information is provided as to where some drugs have been obtained. This somewhat comforts the American public that the purpose of the PDMA--to protect American consumers from counterfeit, expired or mislabeled drugs--is being met by tracking where some drugs are obtained. Without this, only authorized distributors would provide drugs to the public and these distributors would not need to provide any information as to where they obtained their drugs.

The Court agrees that maintaining the status quo and enjoining the FDA from implementing the Rule is in the public interest. This Rule may drastically change how prescription drugs are distributed in this country and ultimately affect the cost to the consumer in terms of insurance premiums and prescription drugs. If the statute and Rule are found to be Constitutional, no prejudice results to Defendants in waiting a little bit longer to implement the Rule, especially in light of the fact that Defendants have delayed enforcement for the last twelve years.

### CONCLUSION

Based on the reasons above, the Court adopts in part and modifies in part Magistrate Judge A. Kathleen Tomlinson's Report and Recommendation. The Court preliminarily enjoins Defendants from implementing 21 C.F.R. § 203.50(a) on December 1, 2006.

SO ORDERED.

### REPORT AND RECOMMENDATION

TOMLINSON, United States Magistrate Judge.

Before the Court is the Motion for a Preliminary Injunction brought by Plaintiffs RxUSA Wholesale, Inc., Alden Surgical Co., Inc., Atlantic Biologicals, Inc., Bell Medical Services, Inc., Co. Truxton, Inc., Hygen Pharmaceuticals, Inc. and Stat **\*293** Pharmaceuticals, Inc. (collectively "Plaintiffs") which has been referred to me by District Judge Seybert for a Report and Recommendation. Plaintiffs seek preliminary injunctive relief enjoining Defendants Department of Health and Human Services and the U.S. Food and Drug Administration ("FDA") from making effective § 203.50(a) [21 CFR 203.50(a)] (the "Rule"), an FDA regulation promulgated to enforce § 503(e)(1)(A) of the Prescription Drug Marketing Act of 1987 ("PDMA," 21 U.S.C. § 503 et seq.) and which is presently scheduled to become

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 285
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

Page 7

effective on December 1, 2006.

Based upon Plaintiffs' Memorandum of Law in Support of the Motion, the affidavit of Robert Drucker, sworn to on November 21, 2006, with accompanying exhibits, Defendants' Memorandum of Law In Opposition To Plaintiffs' Order to Show Cause For A Preliminary Injunction Staying The Effective Date of a FDA Regulation, Plaintiffs' Reply Memorandum of Law In Further Support Of Their Motion For Preliminary Injunctive Relief, the oral arguments presented at the November 29, 2006 hearing and the applicable law, I am recommending that Plaintiffs' motion for a preliminary injunction against the Department of Health and Human Services and the FDA be granted.

### I. *Factual Background*

Plaintiffs are all engaged in the wholesale distribution of pharmaceutical products. Compl. ¶ 12. They purchase pharmaceutical products for resale almost exclusively from authorized distributors and not directly from manufacturers--primarily because manufacturers typically refuse to sell product directly to Plaintiffs. *Id.* ¶ 14 In order to understand fully the nature of the controversy now before the Court, it is necessary to delve into some of the legislative history of the statute at issue as well as the implementing regulations formulated by the FDA.

On April 22, 1988, Congress enacted the Prescription Drug Manufacturing Act 21 U.S.C. § 331, et seq. (Public Law 100-293). That law was modified by the Prescription Drug Amendments of 1992 ("PDA") on August 26, 1992 (Public Law 102-353, 106 Stat. 941). *Id.* ¶ 16. The PDMA, as modified by the PDA, amended sections 301, 303, 503 and 801 of the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 331, 333, 353, 381 to establish, among other things, requirements for the wholesale distribution of prescription drugs by certain entities, including unauthorized [FN1] wholesaler distributors such as Plaintiffs. *Id.* ¶ 17.

> FN1. It should be noted that "unauthorized" in this context refers only to the fact that these wholesale distributors have not been designated as "authorized distributors" by the manufacturers in this industry. They are so-called "secondary wholesalers" who are not included on a manufacturer's "authorized distributor" list.

The object of the bill introduced into the U.S. House of Representatives and the Senate, which eventually

became the PDMA, was to assure safe and effective distribution of prescription drugs and to minimize risks to consumers from taking counterfeit, adulterated, sub-potent or expired drugs. *See The Prescription Drug Marketing Act Report to Congress June 2001* ("FDA 2001 Report"), annexed as Exhibit 17 to the Affidavit of Robert Drucker; [FN2] Drucker Aff., ¶ 9. The thrust of the bill was to amend § 503 of the FDCA so as to impose a "pedigree" requirement on wholesale distributors of prescription **\*294** drugs. Section 6 of the bill set forth in relevant part the following:

> FN2. All subsequent references to the Affidavit of Robert Drucker are cited as "Drucker Aff., ¶ ___"

Section 503 [of the FDCA] is amended by adding at the end the following:

(e)(1) Each person who is engaged in the wholesale distribution of drugs ... and who is not an authorized distributor of record of such drugs shall provide to each wholesale distributor of such drugs a statement identifying each sale of the drug (including the date of sale) before the sale to such wholesale distributor. Each manufacturer shall maintain at its corporate offices a current list of such authorized distributors.

Drucker Aff., ¶ 9.

In its report of April 30, 1987, the House of Representatives stated that the "pedigree" requirement was "designed to restore accountability to the wholesale sector of the pharmaceutical market ..." and further noted that "[t]he Oversight Committee's investigation found that most of the drugs that were counterfeits, stolen, expired or obtained through fraud were handled by secondary wholesalers, who were not authorized to distribute the manufacturer's product." *See House Report,* annexed to Drucker Aff., as Ex. 1, at p. 17. The House Report concluded, therefore, that "unauthorized distributors will be required to certify in writing to drug wholesalers the source and place **from which they obtained the drugs.**" *Id.* (emphasis supplied) The Senate Report of March 18, 1988 reflected the same language. *See Senate Report,* annexed to Drucker Aff., as Ex. 2, at p. 7. This language remained in both the House and Senate Bills which were ultimately signed into law by President Reagan on April 22, 1988 and came to be known as the PDMA. At that time, based on the foregoing language, the law required unauthorized wholesale distributors to provide pedigree information only so far back as the source from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which they obtained the goods. Drucker Aff., ¶ ¶ 11-13.

On August 1, 1988, the FDA issued a letter that provided guidance on the PDMA for the pharmaceutical industry, pending the issuance of implementing regulations. Compl. ¶ 19. This "Guidance Letter" interpreted the PDMA to require that the pedigree provided by unauthorized wholesale distributors contain the following information, in relevant part:

> 5. *Statement identifying prior sales.* FDA requests that the statement identifying prior sales of prescription drugs by unauthorized distributors be in writing, that it bear the title "Statement identifying Prior Sales of Prescription Drugs by Unauthorized Distributors Required by the Prescription Drug Marketing Act," and that it include all necessary identifying information regarding all sales in the chain of distribution of the product, starting with the manufacturer or authorized distributor of record.

Under the FDA's interpretation of the PDMA at that time, then, an unauthorized wholesale distributor was required to pass along pedigree information relating back to **either** the manufacturer **or** the authorized distributor, depending upon from whom the unauthorized wholesale distributor purchased the drugs (emphasis supplied). Compl. ¶ 20; Drucker Aff., ¶ ¶ 14-15.

The 1992 amendments which came to be known as the PDA modified several sections of the PDMA, including some of the language of § 503(e)(1). The amendments basically expanded the requirement to provide a pedigree with specific items of information and mandated that the pedigrees be provided to retail pharmacy buyers as well as wholesale distributor purchasers. Drucker Aff., ¶ 18. The language outlining the requirement that an unauthorized wholesale distributor had to pass along **\*295** pedigree information relating back to either the manufacturer or the authorized distributor did not change. *Id.* Since 1988, the wholesale pharmaceutical products industry--including both authorized and unauthorized wholesale distributors--has been complying with the PDMA by giving pedigree statements back only to the authorized distributor from whom the product was purchased. *Id.* ¶ 19.

The FDA issued proposed regulations to enforce the provisions of the PDMA on March 14, 1994, at which time it requested public comments on those proposed regulations. *Id.* ¶ 20. Section 203.50(a)(6) of the proposed regulations provided, in relevant part,

as follows:

> 203.50--Requirements for wholesale distribution of prescription drugs.
> (a) Identifying statement for sales by unauthorized distributors. Before the completion of any wholesale distribution by a wholesale distributor of a prescription drug for which the seller is not an authorized distributor of record to another wholesale distributor or retail pharmacy, the seller shall provide to the purchaser a statement identifying each prior sale, purchase, or trade of such drug. This identifying statement shall include:
> (6) the business name and address of all parties to each prior transaction involving the drug, **starting with the manufacturer**....

*Id.* ¶ 20 (emphasis supplied). This proposed rule changed the 1988 Guidance Letter to a regulation which required, for the first time, that unauthorized wholesale distributors provide pedigree information all the way back to the manufacturer, regardless of whether the wholesale distributor purchased the drugs from the manufacturer or from an authorized distributor. *Id.* ¶ 21. This proposed rule placed secondary wholesalers in the position of having to purchase drugs from an authorized distributor who was **not required** to convey any pedigree information whatsoever but nevertheless required the secondary wholesaler to provide pedigree information back to the manufacturer-- information that was not possible to obtain if the authorized distributor refused to provide it. *Id.* ¶ 23 (emphasis supplied).

After a comment period, the FDA published final regulations in part 203 on December 3, 1999. These were to become effective on December 4, 2000. Compl. ¶ 22; Drucker Aff., ¶ 24. Specifically, § 203.50 stated that

> (a) Identifying statement for sale by unauthorized distributors. Before the completion of any wholesale distribution by a wholesale distributor of a prescription drug for which the seller is not an authorized distributor of record to another wholesale distributor or retail pharmacy, the seller shall provide to the purchaser a statement identifying each prior sale, purchase, or trade of such drug. This identifying statement shall include:
> * * *
> (6) The business name and address of all parties to each transaction involving the drug, **starting with the manufacturer.**

*See* Drucker Aff., Ex. 7 (emphasis supplied).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Therefore, before completion of any wholesale distribution of a prescription drug by an unauthorized wholesale distributor, the seller had to provide to the purchaser pedigree statements showing the entire prior sales history of the drug back to the original manufacturer.

After the final rule was published, the FDA received communications from wholesalers, industry trade associations and members of Congress objecting to this most recent provision regarding the pedigree "*296 identifying statement." Compl. ¶ 23. The FDA met with representatives of the wholesale drug industry and industry associations on March 29, 2000 to discuss their concerns regarding the regulations. As a result of that meeting, the FDA delayed the effective date for those provisions until October 1, 2001 and reopened the administrative record to receive additional comments. Drucker Aff., ¶ 27. In the *Federal Register,* the FDA noted that it was delaying enforcement of the Rule "to address numerous concerns about the provisions raised by effected [sic] parties." Drucker Aff., Ex. 8, p. 25639. In connection with the pedigree requirement, the FDA commented that

[t]he meeting participants asserted that manufacturers are unwilling to enter in written authorization agreements with the majority of smaller wholesalers so that these wholesalers cannot become authorized distributors of record to the drugs they sell and, hence, must provide an identifying statement for these drugs. The meeting participants also said that the smaller wholesalers can not obtain an identifying statement showing all prior sales of the drugs they purchase for sale because a large portion of these drugs are purchased from authorized distributors who are not required to provide identifying statement and are unwilling to voluntarily provide them. The meeting participants asserted that authorized distributors will not voluntarily provide identifying statements when they sell drugs to unauthorized distributors because it would require them to change their warehouse and business procedures, which would entail additional effort and expense. The meeting participants asserted that implementation of the final rule will prevent over 4,000 smaller, unauthorized distributors from distributing drugs to their customers and may put them out of business, at least with respect to their prescription drug wholesale business. They also asserted that because many of their customers are smaller retail outlets that are not served by larger distributors, implementation of the final rule may leave certain markets for prescription drugs, and

ultimately consumers for prescription drugs, underserved.

*Id.* On May 16, 2000, the House Committee on Appropriations stated that it supported "recent FDA action to delay the effective date for implementing certain requirements of the Prescription Drug Marketing Act until October 1, 2001, and reopen the administrative record in order to receive additional comments." The Committee further noted that it "believes the agency should thoroughly review the potential impact of the proposed revisions on the secondary wholesale pharmaceutical industry." Compl. ¶ 25.

On September 19, 2000, the FDA announced that it would conduct public hearings on § 203.50. Jane Axelrod, Associate Director for policy in the Center for Drug Evaluation and Research, in describing events leading up to the hearing, stated that

After we published the final rule we received a lot of letters and petitions, and had discussions with industry, industry trade associations and even members of Congress objecting to certain provisions of the regulation. As I said, we really didn't have any inkling from the comments we received on the proposed rule what the implications of this were going to be so really we were not quite prepared for the controversy that began almost as soon as we published the regulations.

Drucker Aff., Ex. 10, p. 9. On March 1, 2001, the FDA again delayed the effective date of the provision to April 1, 2002. In *297 the notice announcing the delay, the FDA stated that part of the reason for the delay was to "allow more time" for the agency "to make recommendations to Congress, for Congress to evaluate those recommendations and, if necessary, time for regulatory or legislative change." Drucker Aff., Ex. 10; Compl. ¶ 26. The notice went on to state that the "FDA acknowledges the concerns of the Pharmaceutical Distributors Association and has decided that, in light of the uncertainty regarding how to resolve the issues involved and the possible adverse consequences that could result from implementation of the relevant provisions of the final rule, it is reasonable and appropriate to delay the effective date" of § 203.50. Drucker Aff., Ex. 16.

On June 7, 2001, the FDA submitted its "Prescription Drug Marketing Act Report" to Congress. The report advised Congress, among other things, of the following:

The PDMA pedigree exemption for authorized distributors not only puts unauthorized distributors at a disadvantage, but also has the effect of wiping the slate clean each time prescription drugs pass

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

through an authorized distributor. Today under the *status quo,* a large volume of prescription drugs move through the system without pedigrees, or with incomplete pedigrees, because they have passed through an authorized distributor at least once before reaching their retail destination.

\* \* \*

The [FDA] believes that, given today's prescription drug distribution system, the PDMA provision that exempts authorized distributors from having to maintain and pass on a pedigree undermines the purpose of the pedigree by allowing for potential gaps in the distribution history.

\* \* \*

FDA does not have the authority to require authorized distributors to maintain and pass on a pedigree. Such a requirement would necessitate a statutory change.

Drucker Aff., Ex. 17, pp. 8-9; Compl. ¶ 27. The FDA's report concluded that by revising the regulations, it would be able to address some, but not all, of the concerns raised by secondary wholesalers. Drucker Aff., ¶ 36 and Ex. 17, p. 7. Ultimately, the report noted that "[b]ecause § 230.50 reflects the language of the statute, the FDA believes that it cannot revise the regulation to make it consistent with the *status quo.* Such a requirement would necessitate a statutory change." *Id.,* Ex. 17, p. 10.

After submitting its report to Congress, the FDA published a notice on February 13, 2002 that it was further delaying the effective date of § 230.50, until April 1, 2003, because "the delay will allow additional time for Congress and FDA to consider whether legislative and regulatory changes are appropriate." Drucker Aff., Ex. 18, p. 6645; Compl. ¶ 28. A similar notice was published by the FDA on January 31, 2003, further delaying the effective date for the same reasons, namely, to give Congress additional time to determine whether legislative action was appropriate and to "give the agency additional time to consider whether regulatory changes are appropriate, and, if so, to initiate such changes." Drucker Aff., Ex. 19, p. 4912.

Subsequently, as part of its Counterfeit Drug Initiative, the FDA sought comment on the most effective ways to achieve the goals of the PDMA. In light of recent and impending advances in technology at the time, the FDA requested comment on the feasibility of using an electronic pedigree in lieu of a paper pedigree. The majority *298 of comments received as reported by the FDA supported the

eventual use of an electronic pedigree for all drug products in the supply chain and indicated that an electronic pedigree should be considered as a long-term solution to fulfilling the PDMA requirements codified at § 230.50. Compl. ¶ 29. On February 23, 2004 (as corrected on March 18, 2004), the FDA published a notice that it was further delaying the effective date of § 230.50--this time until December 1, 2006. Drucker Aff., ¶ 42; Compl. ¶ 30. In that notice, the FDA explained its reasoning:

> To summarize, FDA has concluded that an electronic pedigree should accomplish and surpass the goals of PDMA and is potentially a more effective solution to tracing the movement of pharmaceuticals than a paper pedigree. As stated previously, it appears that industry will migrate toward and implement electronic track and trace capability by 2007. Therefore, in order to allow stakeholders to continue to move toward this goal, FDA has decided to stay the effective date of ... § 230.50 until December 1, 2006. Before the effective date, FDA intends to evaluate the progress toward implementation of the electronic pedigree and its capacity to meet the intent of PDMA, and determine whether to further delay the effective date of the regulations or take other appropriate regulatory action.

Drucker Aff., Ex. 20, p. 12795.

The foregoing "electronic pedigree" capability referenced by the FDA is presently operational in the United States. Drucker Aff., ¶ 42. Several software companies offer electronic pedigree systems that are in compliance with the PDMA. *Id.* ¶ 43. Plaintiff RxUSA Wholesale, Inc, as well as several other Plaintiffs here, has e-pedigree system capability through a subscriber service. However, the problem remains that neither manufacturers nor authorized distributors (with few exceptions) have adopted the system and continue to refuse to provide pedigree statements. *Id.;* Compl. ¶¶ 35-36.

On June 14, 2006, the FDA issued an announcement that it did not intend to further delay the effective date of § 230.50 and that it had published a compliance policy guide entitled "Prescription Drug Marketing Act Pedigree Requirements Under 21 CFR Part 203" for public comment. Drucker Aff., ¶ 48 and Ex. 22, pp. 34249-34250. The FDA issued another announcement on November 14, 2006 that its final Compliance Policy Guide was available. Drucker Aff., ¶ 49. In addition, during the second week of November, 2006, the FDA released a Guidance comprised of questions and answers, entitled "Prescription Drug Marketing Act (PDMA)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

Requirements." *See* Drucker Aff., Ex. 26. Among other things, that document states as follows:
   • Manufacturers are not required under the PDMA to provide any specific information to wholesale customers [p. 5, question 9].
   • Authorized Distributors are not required to provide a pedigree, whether they obtained the drug directly from a manufacturer, from another authorized distributor, or from a non-authorized distributor [p. 6, question 10].

Based upon the FDA's current interpretation of the PDMA, any inventory of the unauthorized wholesale distributors that exists after December 1, 2006 cannot be sold lawfully in the marketplace and further cannot be returned to the manufacturer or authorized distributor from which it was acquired.

## II. *Procedural History*
On September 20, 2006, Plaintiffs filed a Complaint alleging four causes of action:    **\*299** (1) for a Declaratory Judgment that the FDA Rule at 21 CFR 203.50 is partially unenforceable because it constitutes an equal protection violation; (2) for a Declaratory Judgment that the FDA Rule at 21 CFR 203.50 is partially unenforceable because it constitutes a due process violation; (3) for a Declaratory Judgment that 21 U.S.C. § 503(e)(1)(A) of the FDCA is partially unenforceable because it constitutes an equal protection violation; and (4) for a Declaratory Judgment that § 503(e)(1)(A) of the FDCA is partially unenforceable because it constitutes a due process violation. *See Compl.* ¶¶ 39-64. On November 22, 2006, Plaintiffs moved the Court for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure seeking to stay the effective date of the Rule pending final resolution of this matter. On November 22, 2006, Judge Seybert referred the issue of preliminary injunctive relief to me for a Report and Recommendation, pursuant to Fed.R.Civ.P. 72. *See* Order dated Nov. 22, 2006 [DE 5].

The parties appeared by telephone for a scheduling conference on November 27, 2006, at which time I set a briefing schedule. *See, e.g., Drywall Tapers and Pointers of Greater N.Y. v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n,* 954 F.2d 69, 76 (2d Cir.1992); *McKenna v. Wright,* No. 01-CV-6571, 2002 WL 338375, at *13 (S.D.N.Y. Mar.4, 2002).* At the November 27 conference, Plaintiffs and Defendants stated their belief that the motion could be resolved on paper submissions and without the need for live testimony. I advised the parties at that time that I would conduct

the hearing on November 29, 2006 at 11 a.m. The motion was fully submitted immediately prior to the hearing on the preliminary injunction motion on November 29, 2006. At the conclusion of oral argument on November 29, 2006, I closed the hearing and reserved decision. [FN3]

> FN3. Because of the imminent implementation date of December 1, 2006, I agreed to render an expedited Report and Recommendation within one day of the hearing, namely November 30, 2006. The parties further agreed to compressed time period to file their objections.

## III. *The Parties' Contentions*
Plaintiffs argue that the application of the Rule proposed by the FDA to unauthorized wholesale distributors of prescription drugs, and Plaintiffs in particular, deprives them of equal protection of the laws within the meaning of the Fourteenth Amendment. Pltffs. Memorandum at 17. It is Plaintiffs' position that the Rule requires wholesale distributors who are not authorized distributors to provide a pedigree statement "identifying each prior sale, purchase, or trade of such drug" that shall include "the business name and address of all parties to each prior transaction involving the drug, starting with the manufacturer" while at the same time exempting authorized distributors from the pedigree requirement. To the extent that it does so, Plaintiffs maintain, the Rule makes it impossible for the unauthorized wholesale distributors to comply with the regulation as written. That impossibility of compliance, Plaintiffs argue, renders the regulation unconstitutional. *Id.* at 9. Further, Plaintiffs maintain that the Rule as promulgated is inconsistent with the purpose of the PDMA. Plaintiffs also argue that in the event the Rule is found to be a valid interpretation of the PDMA, then certain provisions of the PDMA must be found to be unconstitutional. According to Plaintiffs, when read in conjunction with the Rule promulgated by the FDA, the provision of the PDMA exempting authorized distributors from the pedigree requirement is not rationally related to the purposes **\*300** of the PDMA, and, therefore, this classification results in disparate treatment of authorized and unauthorized wholesale distributors, in violation of the Equal Protection and Due Process Clauses.

On this motion, Plaintiffs seek to stay the effective date of the Rule promulgated by the FDA to allow the Court the opportunity to rule on the merits of the underlying claims. Plaintiffs have taken the position that staying the effective date maintains what the

# APPENDIX OF AUTHORITIES PART 5

467 F.Supp.2d 285
467 F.Supp.2d 285
(Cite as: 467 F.Supp.2d 285)

Page 12

FDA acknowledges has been the *status quo* in the industry for the past ten (10) years. Defendants counter that the application of the FDA pedigree regulation is consistent with the plain meaning of the PDMA, Defts. Memorandum at 13, and that the regulation is consistent with the PDMA's legislative history. *Id.* at 15. The FDA has not identified any prejudice which might result if the Court were to stay the effective date of this Rule.

### IV. *Standard of Review*

The decision whether to grant or deny a preliminary injunction rests within the Court's sound discretion. *Weight Watchers Int'l v. Luigino's, Inc.,* 423 F.3d 137, 141 (2d Cir.2005); *Sierra Club v. United States Army Corps of Engineers,* 732 F.2d 253, 256 (2d Cir.1984). The grant of a preliminary injunction is reviewed for abuse of discretion. *Green Party of New York State v. New York State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir.2004); *Rodriguez v. DeBuono,* 175 F.3d 227, 233 (2d Cir.1999) (per curiam). A district court abuses its discretion in granting a preliminary injunction "if it applies the wrong legal standard, rests its decision on a clearly erroneous finding of fact, or issues an injunction containing an error of form or substance." *Hoblock,* 422 F.3d at 96; *see also Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997) (per curiam).

[5] The requirements for a preliminary injunction in this Circuit are typically met when a plaintiff shows "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Kaplan v. Bd. of Educ. of the City Sch. Dist. of the City of New York,* 759 F.2d 256, 259 (2d Cir.1985); *see also 1-800 Contacts, Inc. v. WhenU.com, Inc.,* 414 F.3d 400, 406 (2d Cir.), *cert. denied,* --- U.S. ----, 126 S.Ct. 749, 163 L.Ed.2d 573 (2005); *Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000). Where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party must show "irreparable injury and a likelihood of success on the merits," *Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir.1996), not just sufficiently serious questions going to the merits of the action. This higher standard "reflects the idea that governmental policies implemented through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States,* 44 F.3d 128, 131 (2d

Cir.1995). As Plaintiffs are seeking to enjoin the implementation of a government program intended to protect the public through the regulation of the distribution of prescription drugs, the application of this higher standard is appropriate here. At oral argument, neither party disputed the application of the higher standard.

A preliminary injunction is a drastic and extraordinary remedy that should not be granted routinely. *See JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990); *301Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986); *CollaGenex v. IVAX Corp.,* 375 F.Supp.2d 120, 123 (E.D.N.Y.2005). Movants seeking preliminary injunctive relief, therefore, have a "heavy burden" to sustain. *See Robert W. Stark, Jr. v. New York Exch., Inc.,* 466 F.2d 743, 744 (2d Cir.1972); *Dopp v. Franklin Nat. Bank,* 461 F.2d 873, 878 (2d Cir.1972); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.,* 937 F.Supp. 204, 207 (S.D.N.Y.1996).

Here, the *status quo* in the industry for the past ten (10) years has been to provide a pedigree back to either (1) the manufacturer **or** (2) the authorized distributor. Staying the effective date of the subject FDA Rule does nothing more than maintain what the FDA has already acknowledged is currently the *status quo.* Since 1988, the wholesale pharmaceutical products industry--including both authorized and unauthorized wholesalers--has been complying with the PDMA by giving pedigree statements back only to the authorized distributor from whom the product was purchased. Drucker Aff., ¶ 19. *See, e.g., Building and Const. Trades Dep't, AFL-CIO v. Donovan,* 543 F.Supp. 1282, 1290 (D.D.C.1982) (granting preliminary injunction restraining the enforcement of certain regulations issued in implementation of the Davis-Bacon Act where the prior regulations had been the industry standard for many years).

### V. *Discussion*
#### A. *Irreparable Harm*

The Second Circuit has repeatedly held that the irreparable harm requirement is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir.1999) (per curiam) (quoting *Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 43 (2d Cir.1983)); *accord Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir.2005); *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 285
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

Page 13

Cir.1990). Thus, unless Plaintiffs can show an injury that "is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages," a motion for a preliminary injunction should be denied. *See Rodriguez, 175 F.3d at 234.*

[6] Irreparable harm may be found where the moving party makes a "strong showing that economic loss would significantly damage its business above and beyond a simple diminution in profits." *See Mylan Pharm., Inc. v. Shalala, 81 F.Supp.2d 30, 42 (D.D.C.2000); Express One Int'l, Inc. v. United States Postal Serv., 814 F.Supp. 87, 91 (D.D.C.1992)* (bidder demonstrated irreparable injury where loss of ten-year $1 billion contract would cause annual loss of $130 million, would impair bidder's relationships with subcontractors and would likely cause capital costs and layoffs).

[7] It is well settled in this Circuit "that the loss of a business" constitutes irreparable harm. *Soap Opera Now, Inc. v. News America Publ'g, Inc., No. 90-CV-2631, 1990 WL 124335 at *4 (S.D.N.Y. Aug.17, 1990); see also The Arbitron Co. v. Phoenix Broad. Corp., No. 97-CV-4355, 1997 WL 452020, at * 4 (S.D.N.Y. Aug.6, 1997).* Thus, where the injunction will prevent damage to the business as a whole, irreparable harm can be established. *See, e.g., GPA Inc. v. Liggett Group, Inc., 862 F.Supp. 1062, 1068 (S.D.N.Y.1994)* ( "[t]he law requires that the injury to a business necessary to support a grant of a preliminary injunction must be damage to the business as a whole (as opposed to a temporary or partial disruption) and that damage must be immediate"); *Jessup v. American Kennel Club, Inc., 862 F.Supp. 1122, 1128 (S.D.N.Y.1994)* (denying motion for preliminary injunction "**\*302** because the evidence ... does not reflect loss of goodwill or destruction of business sufficient to support a finding of likelihood of irreparable injury").

[8] Here, the evidence is unrefuted. In his Affidavit filed in support of the motion for preliminary injunction, Plaintiff RxUSA Wholesale's President, Robert Drucker, states that he has attempted for several years to obtain authorized distributor status for his company from virtually every major manufacturer of pharmaceuticals in the United States, to no avail. [FN4] As evidence, Drucker has supplied refusal letters from major pharmaceutical manufacturers Alcon, Bristol-Myers Squibb, Eisai, GlaxoSmithKline, Inc., Novartis, Pfizer, Schering-Plough, Takeda and Wyeth. Drucker Aff., Ex. 12. The Drucker affidavit goes on to note that "[o]nce the

FDA's rule becomes effective ... neither my company, nor any of the other Plaintiffs will be able to continue in any substantive wholesale distribution business." Drucker Aff., ¶ 66. In addition, Mr. Drucker states that "once our businesses are destroyed and dismantled, it will matter very little whether this Court eventually determines that either the FDA Rule or the underlying statute is unconstitutional." *Id.* ¶ 67. Further, Mr. Drucker points out that the inventory which his company possesses will become worthless since it cannot be returned to the manufacturer or authorized distributor under the new regulations. *Id.* ¶ 68.

> FN4. Plaintiff RxUSA Wholesale, Inc. states in its papers--and reiterated at oral argument--that it is an authorized distributor for approximately 30 smaller manufacturers. However, RxUSA Wholesale has been unable to obtain "authorized distributor" status from any of the major drug manufacturers. Although RxUSA Wholesale has invested monies to become completely electronic pedigree-ready, none of the "big three" authorized distributors who purportedly control approximately 95% of the metropolitan and national markets will agree to provide any pedigree information as far back as the manufacturer from whom they purchased drugs. Drucker Aff., ¶ 28.

At the October 27, 2000 public hearing, the FDA received testimony from several witnesses, including Anthony Young, general counsel to the Pharmaceutical Distributors Association--an association of licensed prescription drug wholesalers that are not authorized distributors of record for the pharmaceuticals they distribute. In his testimony, Mr. Young pointed out that there is no practical way for unauthorized wholesale distributors to obtain pedigree information from authorized distributors since major wholesalers do not voluntarily give pedigree information. Drucker Aff., Ex. 11, p. 37. Young also observed that if the four thousand secondary wholesalers nationwide go out of business as a result of the rule, there will be a serious disruption of drug distribution. *Id.* at pp. 38-39. Citing two economists whose reports were submitted into the record of the hearing, Young stated that the end result of the rule will be higher prices, higher insurance premiums and enhanced ability to charge premium prices. *Id.* at pp. 40-41. Young also referred to a declaration submitted by Steve Simms, former staff person to Congressman Dingell--the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 285
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

Page 14

author of the PDMA--stating that it was not the intention of Congress to create such an anti-competitive result and upset the system so dramatically, *id.* at p. 46, when the industry had been operating for the prior twelve years under an FDA guidance that interpreted the PDMA to require unauthorized wholesale distributors' pedigree history to go back only to the authorized distributor from whom they purchased the drugs, *id.* at p. 38.

Defendants do not substantively respond to the irreparable harm issue. In opposing *303 the motion, the FDA for example does not address Plaintiffs' claims of loss of business or impossibility of performance. Given my review of all the paper submissions as well as the arguments advanced by both sides during the November 29 hearing, I find that the potential destruction of Plaintiffs' businesses constitutes irreparable injury.

**B. *Likelihood of Success on the Merits***

**1. The FDA Rule**

Plaintiffs assert that the application of the Rule proposed by the FDA to unauthorized wholesale distributors of prescription drugs, and Plaintiffs in particular, deprives them of equal protection of the laws within the meaning of the Fourteenth Amendment. Pltffs. Memorandum at 17. It is Plaintiffs' position that to the extent the Rule (1) requires wholesale distributors who are not authorized distributors to provide a pedigree statement "identifying each prior sale, purchase, or trade of such drug" that shall include "the business name and address of all parties to each prior transaction involving the drug, starting with the manufacturer" and (2) at the same time exempts authorized distributors from the pedigree requirement, the Rule makes it impossible for the unauthorized wholesale distributors to comply with the regulation as written. As such, Plaintiffs contend that the regulation is unconstitutional. *Id.* at 9. Defendants counter that the application of the FDA pedigree regulation is consistent with the plain meaning of the PDMA, Def. Memorandum at 13, and that the regulation is consistent with the PDMA's legislative history. *Id.* at 15.

Typically, the FDA's administrative actions are subject to review by the Court under the Administrative Procedure Act ("APA"), and may be disturbed only "if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing the FDA's

interpretation and application of the PDMA, the Court must apply the two-part test set forth by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court first must determine whether Congress has spoken to the question at issue and then determine, if Congress has not addressed the issue, if the agency's regulation is a permissible construction of the statute. *Id.* at 842-43, 104 S.Ct. 2778. However, where an agency is attempting, through new regulation, to overturn a position it had originally taken in an order issued contemporaneously with the legislation and allowed to stand without challenge or contradiction for many years, the Court should not simply defer to the agency's conclusion but should make an independent judgment, examining the agency's conclusion "with more exacting vigilance than would otherwise be employed." *Building and Const. Trades Dep't, AFL-CIO,* 543 F.Supp. at 1290 (granting preliminary injunction restraining the enforcement of certain regulations issued in implementation of the Davis-Bacon Act).

On the record before me, Plaintiffs have not demonstrated that there is a substantial likelihood that they will prevail on their claim that the new Rule, by itself, is inconsistent with the language and intent of the PDMA, since the language of the Rule closely mirrors that of the statute. However, as discussed below, this Rule does not stand in isolation, but rather must be viewed in connection with other provisions of the PDMA as enacted by Congress.

**2. The PDMA**

[9] Plaintiffs' have asserted several challenges to the constitutionality of the *304 PDMA. However, given the time constraints imposed by the filing of this motion roughly a week before the effective date of the statute, I will not rule on all of them since it is unnecessary to do so. For the reasons stated below, I find that Plaintiffs have demonstrated a substantial likelihood of success on the merits on their claim that when read in conjunction with the Rule promulgated by the FDA, the provision of the PDMA exempting authorized distributors from the pedigree requirement is not rationally related to the purposes of the PDMA, and, therefore, there is a substantial likelihood that the classification resulting in the disparate treatment of authorized and unauthorized wholesale distributors may be found unconstitutional.

[10] Traditional equal protection analysis grants great deference to legislative classifications. If "the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 15

distinctions drawn have some basis in practical experience," _South Carolina v. Katzenbach,_ 383 U.S. 301, 331, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), or if "any state of facts reasonably may be conceived to justify" them, _McGowan v. Maryland,_ 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and they are not drawn "on the basis of criteria wholly unrelated to the objective of (the) statute," _Reed v. Reed,_ 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), then the statute will withstand an equal protection challenge. "But the [Supreme] Court also has refined this traditional test and has said that a statutory classification based upon suspect criteria or affecting 'fundamental rights' will encounter equal protection difficulties unless justified by a 'compelling governmental interest'." _Schilb v. Kuebel,_ 404 U.S. 357, 365, 92 S.Ct. 479, 30 L.Ed.2d 502.

The parties agree that this action neither affects fundamental rights nor involves a traditionally suspect classification. Therefore, we need only determine whether the allegedly discriminatory provisions of the PDMA and the FDA regulation promulgated thereunder can be justified by any reasonable statement of facts supported by the broad purposes of the PDMA. Both sides agree that the purpose of the PDMA is to ensure the integrity of the nation's drug distribution system and to prevent the distribution of drugs that are counterfeit, adulterated, misbranded, or otherwise unsafe. Drucker Aff., Ex. 1, at p. 17. Plaintiffs contend that "it is the exemption of so-called authorized distributors from [the pedigree] requirement that is claimed to have no conceivable rational relationship to any legitimate government interest." Pltffs.' Reply Memorandum at 10. Plaintiffs point out that the FDA itself specifically stated, in its June 2001 Report to Congress (Ex. 17, pp. 8-9) that "[t]he PDMA provision that exempts authorized distributors from having to maintain and pass on a pedigree undermines the purpose of the pedigree." It is Plaintiffs' position here that the constitutional violation at issue results from the exemption of certain entities from compliance with pedigree reporting requirements, which exemption makes it impossible for the Plaintiffs to comply with the statute as interpreted by the FDA.

Defendants counter that Congress stated its belief that "most" unsafe drugs pass through the hands of the unauthorized wholesale distributors and therefore the exemption of the authorized distributors from the pedigree requirement has a rational basis and should not be disturbed.

Recognizing that "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices,' " _Heller v. Doe,_ 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993), I nonetheless find that Defendants' argument here falls short. As *305 recognized by the FDA 2001 Report, "the volume of drugs authorized distributors purchase from secondary wholesalers is significant." _See_ Drucker Aff., Ex. 17, pp. 8-9. These drugs are then resold by the authorized distributor without a pedigree. _Id._ Even if only a tiny fraction of the suspect drugs pass through the hands of the authorized distributors, it is not rational for the authorized distributors to be exempt from the requirement of providing a pedigree, particularly since the prescription drugs sold may very well have been purchased on the open market.

Moreover, at the October 27, 2000 public hearing, the FDA heard testimony from Ty Kelley, Director of Government Relations for the Food Marketing Institute. The Food Marketing Institute is comprised of members who operate approximately 8,000 pharmacies within major retail stores (Safeway, Giant, Kroger, Albertson's, Publix, etc.). Mr. Kelley stated, among other things, that while the final rule requires authorized distributors to obtain a pedigree, the "Catch-22 here is that the regulations don't require either the manufacturer or an authorized distributor to provide them." Drucker Aff., Ex. 14, p. 99.

"This Court is obligated to seek out other conceivable reasons for validating" the statute at issue. _Powers v. Harris,_ 379 F.3d 1208, 1217 (10th Cir.2004). Having considered all of the arguments advanced by the parties here and having searched for any conceivable precedent akin to the specific circumstances of this case, I am unable to discern a reason to validate the statute with respect to this particular issue. It is not reasonable or rational to believe that Congress intended to create a situation in which it would be impossible for unauthorized wholesale distributors to comply with the regulations of the PDMA. Rather than engage in the convoluted exercise of defining a secondary market, but then making it impossible for entities in the secondary market to actually sell prescription drugs legally, Congress could have much more simply and directly allowed only authorized distributors to distribute prescription drugs. Based on the chronology of events and exhibits submitted detailing the discussions in both the FDA and Congress, however, it seems clear that Congress did not desire that result.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 285
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

Page 16

At an October 27, 2000 public hearing, the FDA received testimony from several witnesses, including Anthony Young, general counsel to the Pharmaceutical Distributors Association who referred to a declaration submitted by Steve Simms, former staff person to Congressman Dingell--the author of the PDMA--stating that it was not the intention of Congress to create such an anticompetitive result. Drucker Aff., Ex. 11, at pp. 37-38. While it is not for this Court to offer suggested legislation, I simply point out that creating such an unworkable situation could not have been Congress' intent and I see no plausible explanation for the creation of a statute that is, in practice, impossible to comply with. Accordingly, I find that Plaintiffs have demonstrated a substantial likelihood of success on the merits of this individual claim.

## VI. *Laches*

Defendants argue that the doctrine of laches precludes the Court from granting Plaintiffs' motion for a preliminary injunction, staying the December 1, 2006 effective date of the Rule, because Plaintiffs unreasonably delayed in making their application until five business days prior to the effective date. *See* Defts. Memorandum at 32. Defendants reason that Plaintiffs had adequate notice since the pedigree requirements set forth in the regulations are not new, but are rather *306 restatements of those contained in the statute, which has been effective in its present form since 1992. *See id.* at 32-33. Additionally, Defendants argue that Plaintiffs have had six months' notice of the impending December 1, 2006 effective date for implementation of the Rule because the FDA published this information in an announcement on June 14, 2006. *See* 71 Fed.Reg. 34250 (June 14, 2006). *See id.* Defendants contend that Plaintiffs' unreasonable delay in bringing this motion "evinces bad faith and undermines any possible good faith contention of imminent, irreparable harm absent a stay." *See* Defts. Memorandum at 32-33.

In rebuttal, Plaintiffs contend that

the urgent necessity to bring this motion arose because (i) the FDA refused to further delay the effective date of the regulation, notwithstanding that Plaintiffs have challenged the constitutionality of the same more than two months ago, and (ii) the FDA announced, for the first time last week, that no inventory could be returned without pedigree information, even though it was purchased before such information was required, and even though Congress clearly did not intend to include returns within the definition of "sales" for pedigree purposes.

Pltfs. Memorandum at 14.

At the November 29, 2006 oral argument, Plaintiffs' counsel argued that it was unfair for Defendants to raise a defense of laches at this juncture since industry representatives were discussing the Rule with FDA representatives as late as this week. This statement was corroborated by Sarah Hawkins, the representative who appeared on behalf of the FDA at the November 29, 2006 oral argument. The Affidavit of Robert Drucker, President of RxUSA Wholesale, Inc. details extensive negotiations between the parties about the implementation of the effective date. [FN5] In addition, Drucker states that the FDA's requirement, that any inventoried goods to be returned to the originating entity from where they were purchased must be accompanied by a pedigree statement, was "announced for the first time just a week ago." Drucker Aff., ¶ 51. Further, as late as November 20, 2006, counsel for the parties also discussed entering into a possible stipulation consenting to a temporary restraining order. Defendants' counsel ultimately advised Plaintiffs' counsel that "he had no authority to do so." Levine Aff., at ¶ 5.

> FN5. These negotiations are set forth in detail in Section II of this Report and Recommendation.

[11][12][13] The doctrine of laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action. *See Stone v. Williams,* 873 F.2d 620, 623 (2d Cir.1989), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989), *vacated on other grounds,* 891 F.2d 401 (2d Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3215, 110 L.Ed.2d 662 (1990). A party asserting a laches defense must show that "the plaintiff has inexcusably slept on [its] rights so as to make a decree against the defendant unfair." *Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 65 (2d Cir.1983). As an equitable doctrine, laches may not be based on delay alone. *See Tamini v. M/V Jewon,* 808 F.2d 978, 979 (2d Cir.1987); *Henkind v. Brauser,* No. 87-CV-4072, 1989 WL 54109, at * 9 (S.D.N.Y. May 17, 1989). In order to establish a defense of laches and bar the grant of injunctive relief, a defendant must also prove that it has been prejudiced by the plaintiff's unreasonable *307 delay in bringing the action. *See Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.,* 17 F.3d 38, 44 (2d Cir.1994).

[14][15][16] The Second Circuit has found a

467 F.Supp.2d 285
467 F.Supp.2d 285
(Cite as: 467 F.Supp.2d 285)

Page 17

defendant to be prejudiced when the assertion of a claim would be "inequitable" in light of the delay in bringing that claim. *See Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980). Specifically, prejudice ensues when a "defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 192 (2d Cir.1996) (citing *Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 808 n. 7 (8th Cir.1979)). Due to the equitable nature of laches, any resolution must be based on the circumstances peculiar to each case. *See Stone,* 873 F.2d at 623-24. The inquiry is a factual one. *See Conopco, Inc.,* 95 F.3d at 192. The determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court. *Robins Island Preservation Fund, Inc. v. Southold Dev. Corp.,* 959 F.2d 409, 423 (2d Cir.1992).

[17] During the November 29, 2006 oral argument, I asked Defendants' counsel at two different times to identify what prejudice would accrue if Plaintiffs' motion were granted and the Rule was enjoined from taking effect on December 1, 2006. Defendants' counsel stated that the prejudice would be the "message" such a ruling would send to other pharmaceutical companies. I find that even if such a "message" is so perceived in the industry, such outcome does not amount to prejudice warranting the application of the doctrine of laches. Enjoining the effective date of the legislation does nothing more than allow the pharmaceutical distributors to continue to operate in the manner in which the have been for the past ten years. Courts have held that "an additional period of delay while the legality of the regulations is judicially determined with finality cannot significantly harm either the government or others." *Building and Const. Trades Dep't, AFL-CIO,* 543 F.Supp. at 1292 (citing *Metzenbaum v. Edwards,* 510 F.Supp. 609 (D.D.C.1981)). By comparison, there is no evidence of prejudice demonstrated here by Defendants since "there is no comparably urgent need for allowing the regulations to become effective immediately." *Building and Const. Trades Dep't, AFL-CIO,* 543 F.Supp. at 1292.

The preliminary injunction will merely be a temporary reprieve of the Rule taking effect while this litigation is decided on the merits. Therefore, based on the lack of any prejudice established by the Defendants and in light of the already lengthy period of time that this Rule has *not* been in effect, I find that the defense of laches should not bar granting the preliminary injunction. *See Sanofi-Synthelabo, Inc. v.*

*Apotex Inc.,* No. 02-CV-2255, 2006 WL 2516486, at *27 (S.D.N.Y. Aug. 31, 2006) (because active negotiations between the parties is a legitimate excuse to a delay in bringing suit sufficient to bar a laches defense, Sanofi did not unreasonably delay or inexcusably delay its motion for a preliminary injunction); *see also Merrill Lynch Investment Managers v. Optibase, Ltd.,* 337 F.3d 125, 132 (2d Cir.2003) (laches defense rejected where plaintiff presented evidence that prior to bringing its motion for a preliminary injunction, it pursued its objections to the arbitration).

## VII. *Conclusion*
For all of the foregoing reasons, it is my recommendation that Plaintiffs' motion be GRANTED.

Traditionally, any objection to a Report and Recommendation must be filed with the Clerk of the Court within 10 days of *308 service and failure to file objections within this period waives the right to appeal. *See* 28 U.S.C. § 636(b)(1)(C) (West 2006); Fed.R.Civ.P. 72; *Beverly v. Walker,* 118 F.3d 900, 901 (2d Cir.), *cert. denied,* 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir.1996). However, at the November 29, 2006 hearing, I discussed with the parties the fact that the December 1, 2006 effective date of the legislation presented exigent circumstances which seemingly warrant a compression of the 10-day time period provided in 28 U.S.C. 636(b)(1)(C). *See Hispanic Counseling Ctr., Inc. v. Incorporated Vill. of Hempstead,* 237 F.Supp.2d 284, 290 (E.D.N.Y.2002); *see also United States v. Barney,* 568 F.2d 134, 136 (9th Cir.1978). Counsel for Plaintiffs agreed on the record during the hearing to reduce the time to one day. Defendants' counsel asked for a short time to confer with his client and get back to the Court. By letter dated November 29, 2006 [DE 10], counsel for Defendants likewise agreed to compress the time to file objections. Therefore, the parties are directed to file written objections, if any, to this Report and Recommendation via ECF no later than noon on December 1, 2006.

**SO ORDERED.**

Nov. 30, 2006.

467 F.Supp.2d 285

**Motions, Pleadings and Filings (Back to top)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

467 F.Supp.2d 285
467 F.Supp.2d 285
**(Cite as: 467 F.Supp.2d 285)**

Page 18

• 2006 WL 2969603   (Trial Pleading) Complaint (Sep. 20, 2006)Original Image of this Document (PDF)

• 2:06cv05086 (Docket) (Sep. 20, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX OF AUTHORITIES

## PART 5-A

# TAB 5

Westlaw.

44 F.3d 1091                                                    Page 1
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
(Cite as: 44 F.3d 1091)

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
Second Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
LOCAL 1804-1, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO;
John
Barbato; George Barone; John Bowers; George
Bradley; Thomas Buzzanca;
Santo Calabrese; Ronald Capri; Donald J. Carson;
Harry Cashin; James J.
Cashin; Joseph Colozza; Vincent Colucci; James
Coonan; Michael Coppola;
Harold Daggett; Doreen Supply Company, Inc.;
Tino Fiumara; Anthony
Gallagher; Robert Gleason; John Gotti; Leroy
Gwynn; ILA Local 1588; ILA
Local 1588 Executive Board; ILA Local 1804-1;
ILA Local 1804-1 Executive
Board; ILA Local 1809; ILA Local 1809 Executive
Board; ILA Local 1814; ILA
Local 1814 Executive Board; Anthony Anastasio;
ILA Local 1909; Blase
Terraciano; ILA Local 1909 Executive Board; ILA
Local 824; ILA Local 824
Executive Board; Kevin Kelly; Joseph C.F. Kenny;
George Lachnicht; Gregory
Lagana; Frank Lonardo; Venero Mangano; James
McElroy; Metropolitan Marine
Maintenance Contractors; Carlos Mora; New York
Shipping Association; Nodar
Pump Repair, Inc.; Ralph Perello; Louis Pernice;
Anthony
Pimpinella; John Potter; Douglas Rago; Joseph
Randazzo; Thomas Ryan;
Anthony Salerno; Dominick Sanzo; Frank Scollo;
Anthony Scotto; Alfred
Small; Defendants,
New York Shipping Association, Defendant-
Appellee,
Anthony Ciccone, Defendant-Appellant.
No. 556, Docket 94-6152.

Argued Oct. 11, 1994.
Decided Jan. 5, 1995.

United States sought to have former union official held in contempt of consent decree which prohibited him from committing any act or racketeering activity and knowingly and improperly associating with any organized crime family member. The United States District Court for the Southern District of New York, John S. Martin, Jr., J., found former union official in violation of consent decree. Union official appealed from that order and subsequent enforcement order. The Court of Appeals, Calabresi, Circuit Judge, held that: (1) under consent decree prohibiting former union official from improperly associating with any organized crime family member, mere fact of knowing association with persons of prohibited status was not enough; there also had to be grounds for concluding that the contacts helped to perpetuate organized crime's control over union or impinged on integrity and independence of union, and (2) consent decree rendered union official ineligible for window period pension for which he applied.

Affirmed in part, and vacated and remanded in part.

Jon O. Newman, Chief Judge, filed an opinion dissenting in part.

West Headnotes

**[1] Federal Courts** ⚖776
170Bk776 Most Cited Cases
Interpretation of terms of consent decree is subject to de novo review.

**[2] Federal Courts** ⚖850.1
170Bk850.1 Most Cited Cases
District court's factual findings are accepted unless they are shown to be clearly erroneous.

**[3] Contempt** ⚖66(7)
93k66(7) Most Cited Cases
District court's ultimate finding of contempt is reviewed for abuse of discretion.

**[4] Contempt** ⚖66(7)
93k66(7) Most Cited Cases
In reviewing a district court's finding of contempt under abuse of discretion standard, Court of Appeals bears in mind circumstances in which the appeal arises.

**[5] Courts** ⚖26

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 F.3d 1091                                                                          Page 2
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
**(Cite as: 44 F.3d 1091)**

106k26 Most Cited Cases
A court's discretion is not unbounded, and scope of court's discretion varies according to issue before it.

**[6] Federal Civil Procedure** 🔑2011
170Ak2011 Most Cited Cases
As to some matters relating to management of proceedings before court, such as introduction of evidence and regulation of course and scope of examination of witnesses, district court's discretion is broad.

**[7] Contempt** 🔑2
93k2 Most Cited Cases
Unlike general authority to govern course of court proceeding, contempt power may be used to regulate a party's out-of-court behavior.

**[8] Contempt** 🔑20
93k20 Most Cited Cases

**[8] Contempt** 🔑60(3)
93k60(3) Most Cited Cases
In civil contempt proceeding, a contempt holding will fall unless order violated by contemnor is clear and unambiguous, proof of noncompliance is clear and convincing, and contemnor was not reasonably diligent in attempting to comply.

**[9] Contempt** 🔑66(7)
93k66(7) Most Cited Cases
In light of restraints on district court's contempt power, Court of Appeals' review of contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse of discretion review is conducted.

**[10] Federal Civil Procedure** 🔑2397.5
170Ak2397.5 Most Cited Cases
Under consent decree which enjoined union official from knowingly and improperly associating with any member or associate of a crime family or any other criminal group or with any person prohibited from participating in union affairs, mere fact of knowing association with individuals of prohibited status was not enough; absent a showing of explicit impropriety, there also had to be grounds, based on circumstances of particular contacts in question, for concluding that those contacts helped to perpetuate organized crime's control over union or impinged on integrity and independence of union.

**[11] Federal Civil Procedure** 🔑2397.5
170Ak2397.5 Most Cited Cases

In interpreting a particular provision of the consent decree, Court of Appeals is required to read that provision in light of the decree as a whole.

**[12] Federal Civil Procedure** 🔑2397.5
170Ak2397.5 Most Cited Cases
Consent decree, which permitted union official to remain a union member for purpose of obtaining eligibility for benefits but which prohibited him from participating in union affairs, prohibited union official from seeking individualized discretionary waiver from pension fund to obtain a benefit the eligibility requirements of which he plainly did not meet since by doing so, union official did more than maintain his union membership for purpose of obtaining eligibility for benefits but inevitably attempted to influence decision making on union affairs.

\*1093 Kay K. Gardiner, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., New York City, Claude M. Millman, Asst. U.S. Atty., Gabriel W. Gorenstein, Asst. U.S. Atty., on the brief), for plaintiff-appellee U.S.

C. Peter Lambos, New York City (Donato Caruso, Lambos & Giardino, New York City, on the brief), for defendant-appellee New York Shipping Ass'n, Inc.

Richard W. Brewster, New York City (Kaplan & Katzberg, New York City, on the brief), for appellant Ciccone.

Before: NEWMAN, Chief Judge, WALKER and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

In this lengthy postscript to a protracted civil RICO case, defendant Anthony Ciccone appeals from a finding of contempt entered on April 29, 1994, by the United States District Court for the Southern District of New York (John S. Martin, Jr., Judge), and from an enforcement order dated May 24, 1994. The civil contempt finding rested on the District Court's conclusion that Ciccone had violated two provisions of a consent decree entered into by Ciccone and a number of his co-defendants. First, the Court found that Ciccone violated the portion of the decree that prohibited him from knowingly and improperly associating with organized crime figures or with individuals barred from participation in union affairs. Second, the Court determined that Ciccone applied for a pension for which he was ineligible under the terms of the consent decree. Because we interpret

44 F.3d 1091                                                                                                    Page 3
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
(Cite as: 44 F.3d 1091)

the consent decree differently from the District Court, we vacate those portions of the Court's orders that relate to Ciccone's associations with individuals allegedly of prohibited status, and we affirm those portions of the Court's orders that deal with the pension issue on somewhat different grounds.

## BACKGROUND

The consent decree that Ciccone signed arose out of a wide-ranging, multi-defendant civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961 et seq., in which the government sought to eradicate the influence of organized crime in local unions affiliated with the International Longshoremen's Association ("ILA") on the New York/New Jersey Waterfront. Although the government attempted to prove the existence of an overarching RICO enterprise, in practical effect the government's case was broken into relatively discrete units, each targeting a different local union and a different location on the Waterfront. In the portion of the case relevant here, the government tried to prove that Ciccone, an ILA official and a special administrator of Local 1814 in Brooklyn, was affiliated with the Gambino crime family. The government alleged that Ciccone abused his position as special assistant to Local 1814 to embezzle funds from the local, and that Ciccone ran gambling and loansharking rings *1094 from a social club located near Local 1814's offices.

On December 17, 1991, during the course of the trial and after the government presented substantial evidence concerning Ciccone's ties to organized crime and misuse of his union position, Ciccone and a number of his co-defendants agreed to the entry of a consent decree ending their trial. In the consent decree, Ciccone agreed to significant restrictions on his future activities and associations. In particular, under Paragraph 2(a) of the decree, Ciccone agreed to be enjoined

> from committing any act of racketeering activity, as defined in 18 U.S.C. § 1961, and from knowingly and improperly associating with any member or associate of any La Cosa Nostra crime family or any other criminal group, or with any person prohibited from participating in union affairs.

Ciccone further agreed, in Paragraph 9(b) of the decree, to disassociate himself from Local 1814 and the ILA, with limited exceptions relating to job benefits:

> On or before March 30, 1992, Anthony Ciccone shall resign from any and all positions, whether elective or appointive, that he currently holds in

Local 1814, the ILA, or any other ILA-affiliated entity, including any ILA local union, any ILA district, and any pension or other benefit plan or fund affiliated with any ILA entity. Ciccone shall not thereafter seek or accept any such position in any such entity or resume any such membership, and shall be permanently barred from any employment by or other participation in the affairs of any entity doing business on the Waterfront. Nothing in this subparagraph, however, shall preclude Ciccone from remaining a member of Local 1814 solely for the purpose of obtaining eligibility for benefits pursuant to the General Cargo Agreement, subject to the authority of the Monitor herein. Nothing in this provision shall impair Ciccone's entitlement to any welfare or vested pension or severance benefits.

In November 1993, the government moved for an order to show cause why Ciccone should not be held in contempt for violations of the consent decree. The government's motion had two bases. First, the government contended that Ciccone violated Paragraph 2(a) by maintaining regular, systematic contacts both with members of the Gambino crime family and with individuals who had been ordered to refrain from participation in union affairs. In support of its contention, the government submitted an affidavit of a federal agent who had conducted an ongoing surveillance of Ciccone. The affidavit and supporting exhibits detailed numerous contacts between Ciccone and alleged organized crime figures, as well as contacts between Ciccone and individuals barred from participation in union affairs. Many of these contacts occurred at Ciccone's social club and at other social clubs reputed to be gathering points for Gambino family associates; on at least one occasion, Ciccone was observed leaving Local 1814's offices in the company of an alleged Gambino soldier. In response to the government's evidence, Ciccone denied generally that the individuals with whom he had been seen were involved in organized crime; he did not dispute, however, that he met on a number of occasions with individuals barred from involvement in the union. Ciccone's principal contention was that even if he had knowingly associated with organized crime figures and individuals prohibited from taking part in union affairs, there was no evidence that his association with those individuals was improper.

Second, the government contended that Ciccone violated Paragraph 9(b) by seeking a benefit from the union to which he was not entitled. In late March 1992, Ciccone applied to the New York Shipping

44 F.3d 1091
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
(Cite as: 44 F.3d 1091)

Page 4

Association ("NYSA")--ILA pension fund for a "window period pension." The window period pension, an early retirement incentive plan, had been available to active employees over the age of 55, with 25 or more years of experience, who withdrew from the industry between December 1, 1990, and January 31, 1991. Ciccone, who had the requisite experience and was over the age of 55 throughout this period, did not withdraw from the industry during the window period, but rather remained in the industry until he was required to withdraw, pursuant to the consent decree, in March 1992. Although Ciccone's *1095 application therefore was untimely, Ciccone sought a waiver. Ciccone's application was denied by the pension fund trustees and, after a split vote on appeal to the NYSA-ILA Contract Board, was to be submitted to arbitration. The government then obtained an injunction against the arbitration and filed its contempt motion, contending that Paragraph 9(b) clearly established Ciccone's ineligibility for the window period pension, and that his application and appeal constituted improper participation in union affairs. Ciccone responded that Paragraph 9(b) established his eligibility for the pension, or at least that the paragraph was ambiguous.

On review of the government's motion and Ciccone's response, the District Court concluded that Ciccone had violated both Paragraph 2(a) and Paragraph 9(b) of the consent decree. After seeking further input from both the government and Ciccone concerning the appropriate remedy, the Court ordered that Ciccone not associate, knowingly and improperly, with any member or associate of any La Cosa Nostra crime family or other criminal group. The Court specifically identified over 150 individuals as organized crime figures with whom Ciccone was not to associate, knowingly and improperly. The Court also repeated the consent decree's ban on knowing and improper association with individuals barred from involvement in union affairs, and further ordered Ciccone not to associate with any member, officer, or employee of the ILA or any of its affiliates. In addition, the Court ordered Ciccone not to frequent certain locations associated with either the ILA or organized crime. Finally, the Court ordered Ciccone to withdraw his application for the window period pension. The order stated that future violations would "subject Ciccone to escalating fines or imprisonment." From this order, and from the order concluding that Ciccone had violated the consent decree, Ciccone now appeals.

## DISCUSSION

*1. Standard of Review*

[1][2][3] We begin by addressing the standard that we apply in reviewing the District Court's conclusions. This Court has set forth an array of standards that are relevant to different issues relating to consent decrees. The interpretation of the terms of the consent decree is subject to *de novo* review. *United States v. O'Rourke,* 943 F.2d 180, 186 (2d Cir.1991). The District Court's factual findings are accepted unless they are shown to be clearly erroneous. *EEOC v. Local 580, Int'l Ass'n of Bridge Ironworkers, Joint Apprentice-Journeyman Educ. Fund,* 925 F.2d 588, 594 (2d Cir.1991); *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990). The court's ultimate finding of contempt is reviewed for abuse of discretion. *Oral-B Lab. v. Mi-Lor Corp.,* 810 F.2d 20, 23 (2d Cir.1987).

[4][5][6] In reviewing the District Court's finding of contempt under the abuse of discretion standard, we bear in mind the circumstances in which this appeal arises. A court's discretion is not unbounded, and the scope of the court's discretion varies according to the issue before it. As to some matters relating to the management of proceedings before the court, such as the introduction of evidence and the regulation of the course and scope of examination of witnesses, a district court's discretion is broad indeed, *see United States v. Wong,* 40 F.3d 1347, 1378 (2d Cir.1994); *Sage Realty v. Insurance Co. of N. Am.,* 34 F.3d 124, 128 (2d Cir.1994); *United States v. Beverly,* 5 F.3d 633, 638 (2d Cir.1993), and we have suggested that where such issues arise the district court's rulings will be affirmed unless they amount to "manifest error." *Sage Realty,* 34 F.3d at 128.

[7] The contempt power is different. First, unlike the general authority to govern the course of a court proceeding, the contempt power may be used to regulate a party's out-of-court behavior, as it was in the present case. *See generally International Union, United Mine Workers v. Bagwell,* 512 U.S. 821, ----, 114 S.Ct. 2552, 2560, 129 L.Ed.2d 642 (1994) (distinguishing out-of-court contempts from contempts that occur during the course of a judicial proceeding). Second, even when it is applied in in-court behavior, the contempt power is among the most formidable weapons in the court's arsenal, *1096 and one with significant potential for harm if it is wielded imprudently. *Project B.A.S.I.C. v. Kemp,* 947 F.2d 11, 16 (1st Cir.1991).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 F.3d 1091                                                                                         Page 5
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
**(Cite as: 44 F.3d 1091)**

[8][9] In recognition of these factors, the district court's power to hold a party in contempt--whether civil or criminal--is significantly circumscribed. In a civil contempt proceeding, like the present case, a contempt holding will fall unless the order violated by the contemnor is "clear and unambiguous," the proof of non-compliance is "clear and convincing," and the contemnor was not reasonably diligent in attempting to comply. *Local 580, 925 F.2d at 594; New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989), *cert. denied, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990)*. In light of these restraints on the district court's contempt power, this Court's review of a contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted.

Bearing these standards in mind, we proceed to address Ciccone's contentions.

### 2. *Knowing and Improper Association*

[10] The District Court found that Ciccone violated Paragraph 2(a) of the consent decree by knowingly and improperly associating with organized crime figures and individuals barred from participation in union affairs.   On appeal, the government and Ciccone advance widely divergent interpretations of the decree's language.   The government reads the prohibition against knowing and improper associations with persons of prohibited status as equivalent to the language in a consent decree involving the Teamsters, which barred the signatories from "knowingly associating" with individuals of prohibited status.

The meaning of "knowingly associating" in the Teamsters decree has been litigated on several occasions and is now well established.   *See United States v. International Bhd. of Teamsters (DiGirlamo)*, 19 F.3d 816, 822 (2d Cir.), *cert. denied, 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); United States v. International Bhd. of Teamsters (Adelstein)*, 998 F.2d 120, 125 (2d Cir.1993); *United States v. International Bhd. of Teamsters (Cozza)*, 764 F.Supp. 797, 801-02 (S.D.N.Y.1991), *aff'd, 956 F.2d 1161 (2d Cir.1992)*. Under the decisions interpreting the Teamsters consent decree, truly incidental contacts with prohibited individuals, such as encounters at weddings and funerals, are permitted, *Teamsters (Cozza)*, 764 F.Supp. at 813 (decision of independent administrator, affirmed by district court), as are such contacts as are "required in [one's] official capacity."

*Teamsters (Adelstein)*, 998 F.2d at 126.   Where the contacts are the result of "a 'calculated choice' to associate with persons" of prohibited status, however, the consent decree is violated.   *Teamsters (DiGirlamo)*, 19 F.3d at 822.   And this is so even if there is no showing that the associations were for an improper purpose.   *Id.*

The government concedes that although early drafts of the consent decree in this case contained the language from the Teamsters decree, this language was rejected in later drafts and in the final consent decree.   Nevertheless, the government maintains that the inclusion of the word "improperly" in the consent decree did no more than incorporate explicitly the meaning given to "knowingly" by this Court in the Teamsters cases.

Ciccone interprets the decree much more narrowly. In his view, the addition of the word "improperly" to the Teamsters language signified that only those associations with an improper purpose would violate the consent decree.   Ciccone concedes that the requirement of a showing of improper purpose does not require a showing of an intent to commit an illegal act;   it would be sufficient, in his view, if the government showed that Ciccone associated with prohibited individuals for the purpose and with the intent of exerting influence over the union.   Ciccone nevertheless contends that a showing of improper purpose or intent must be made before a violation of the consent decree can be found.

We find both the government's and Ciccone's readings of Paragraph 2(a) unpersuasive.   In light of the government's concession that the Teamsters language was considered and rejected in drafting Paragraph 2(a), it is *1097 difficult to credit the government's contention that the decree does no more than state explicitly what all parties understood the Teamsters language to mean.   We do not accept Ciccone's interpretation, however, nor do we believe that, because the parties offer competing interpretations, the consent decree is necessarily ambiguous.   *See Stroll v. Epstein*, 818 F.Supp. 640, 643 (S.D.N.Y.), *aff'd, 9 F.3d 1537 (2d Cir.1993)*. Instead, we conclude that the consent decree gives clear and independent meaning to the word "improperly" without requiring an explicit showing of improper purpose.

[11] We are required, in interpreting a particular provision of a consent decree, to read that provision in light of the decree as a whole.   *Huertas v. East River Hous. Corp.*, 992 F.2d 1263, 1267 (2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 F.3d 1091                                                                Page 6
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
(Cite as: 44 F.3d 1091)

Cir.1993).   In determining the meaning of "improperly" in Paragraph 2(a), we are drawn in particular to the preamble to the consent decree. There, Ciccone, as a signatory, agreed "that there should be no criminal element or organized crime corruption of any part of the ILA, including Local 1814."   Ciccone also agreed that "one of the purposes of this Consent Decree is to ensure that Local 1814 shall be maintained and run democratically, with integrity, solely for the benefit of its members, and without unlawful outside influence."   These statements of purpose, contained within the four corners of the consent decree, give clear and unambiguous meaning to Paragraph 2(a): any knowing association with individuals of prohibited status that has either the purpose or effect of promoting a continued organized crime influence on union affairs, or that has an intimidating or untoward effect on the operation and integrity of the union, is improper and thus prohibited by the consent decree.

If a signatory to this consent decree associates with organized crime figures or other individuals barred from participation in union affairs for the purpose of perpetuating the influence of organized crime over Local 1814, or for the purpose of planning or committing any illegal acts (even those unconnected to union affairs), that association would clearly violate the consent decree.   But Paragraph 2(a) does not require such a showing of improper purpose in every instance.   For example, were Ciccone, a well-known former leader of Local 1814, to associate openly with organized crime figures in a location commonly frequented by union officials or members, a court could reasonably conclude that such associations had an untoward or intimidating effect on the union even absent a showing that Ciccone intended by those associations to perpetuate the influence of organized crime over the union.

Paragraph 2(a), then, requires the court initially to consider the status of the signatory individual, the status of the persons with whom the signatory associated, and the circumstances of the association. [FN1]   Only where an improper effect on the union's autonomy, operations, or integrity cannot be inferred from these factors must the court consider whether the associations had an improper purpose in order to find a violation of the decree. [FN2]

> FN1. The burden of proving prohibited status, either affiliation with organized crime or a bar from participation in union affairs, of course rests with the government.   *See*

*Badgley v. Santacroce,* 853 F.2d 50, 54 (2d Cir.1988) (burden of proof rests with party moving for contempt); *In re Kitchen,* 706 F.2d 1266, 1273 (2d Cir.1983) (same).

> FN2. It bears mentioning that Ciccone is not the sole signatory defendant to the consent decree.   Not only did other individual defendants sign, but Local 1814 agreed to the consent decree on behalf of its members. As a result, the ban on knowing and improper associations with organized crime figures and individuals barred from participation in union affairs extends not merely to Ciccone and the other individual signatory defendants, but also to "all current and future officers, agents, representatives, employees, and members of Local 1814." Consent Decree ¶ 2.   There may be instances in which it is difficult to conclude that the consent decree has been violated in the absence of a showing of improper purpose.   For example, this may be so when two individuals barred from participation in union affairs knowingly associate in a setting entirely removed from the Waterfront milieu.   When an active union officer, agent, representative, employee, or member knowingly associates with such individuals of prohibited status, however, the danger of improper influence on the union is readily apparent, and the conclusion of impropriety might well be drawn even in the absence of an explicit showing of an improper purpose.

**\*1098** In discussing the purpose of the consent decree, we recognize that the Supreme Court's statement that "the *decree* itself cannot be said to have a purpose;  rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *United States v. Armour & Co.,* 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).   The *Armour* Court emphasized that "the scope of a consent decree must be discerned within its four corners," and not by reference to what one or the other of the parties hoped to achieve in the decree, or in the underlying litigation. *Id.* at 682, 91 S.Ct. at 1757.   Where a statement of purpose is contained in the decree itself, however, as the product of arm's-length negotiations, and that purpose may be discerned without reference to the extrinsic aims of the parties, *Armour* cannot be read to prohibit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX OF AUTHORITIES PART 6

consideration of that purpose. We therefore see no difficulty in interpreting the decree in light of its agreed-upon purpose to protect the integrity and independence of the union.

The District Court did look to the purpose of the consent decree to give meaning to the word "improperly." It appears, however, that the Court concluded that any systematic contacts between Ciccone and alleged organized crime figures would be improper under the consent decree, regardless of the circumstances. We think that such an interpretation exceeds the bounds of the consent decree, and is in effect indistinguishable from the interpretation given to the language of the Teamsters decrees. The mere fact of knowing association with individuals of prohibited status is not enough; in the absence of a showing of explicit impropriety, there must also be grounds, based on the circumstances of the particular contacts in question, for concluding that those contacts help to perpetuate organized crime's control over the union or impinge on the integrity and independence of the union. Accordingly, we vacate the District Court's finding that Ciccone knowingly and improperly associated with individuals of prohibited status. [FN3]

> FN3. Ciccone complains that the District Court accepted, without a hearing, the government's allegations that particular individuals with whom he associated were affiliated with organized crime. It is true that the District Court did not hold a hearing, although we note that Ciccone made no offer of proof to counter the government's evidence--indeed, the only challenge that Ciccone made to the government's evidence was a general statement by counsel during oral argument. Nevertheless, even if the District Court's conclusions regarding the organized crime status of particular individuals could be challenged, at least two of the individuals with whom Ciccone associated were without doubt on the prohibited list, because they were barred from participation in union affairs. Thus, leaving aside the contacts with alleged organized crime figures, a violation of the consent decree could be found if Ciccone's contacts with these individuals, who had been ordered not to take part in union affairs, were knowing and improper under the reading we have given the consent decree.

Because the enforcement order is based on the Court's initial finding that the consent decree was violated, we must also vacate those portions of the enforcement order that depend on the finding of knowing and improper association: Paragraph 1, which lists a large number of individuals with whom Ciccone is not to associate, knowingly and improperly; [FN4] Paragraph 2, which prohibits **\*1099** Ciccone from associating with any member, officer, or employee of the ILA or its affiliates; [FN5] and Paragraph 3, which bars Ciccone from visiting a number of specific locations associated either with organized crime or with the union.

> FN4. Because we vacate Paragraph 1 of the enforcement order, we need not resolve Ciccone's contention that the order improperly infringes his First Amendment associational rights. Ciccone does not appear to contest the principle that an individual may waive constitutional rights in a consent decree, provided that the waiver is voluntary, knowing, and intelligent. *See D.H. Overmyer & Co. v. Frick Co.*, 405 U.S. 174, 187, 92 S.Ct. 775, 783, 31 L.Ed.2d 124 (1972); *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394-95 (9th Cir.), *cert. denied*, 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). Moreover, he seems to concede that his signing of the consent decree was voluntary, knowing, and intelligent. Ciccone's argument appears to be instead that the District Court's enforcement order violates his First Amendment rights by forbidding him to associate with named individuals whose prohibited status has not been proven. But on remand, should the Court find that Ciccone did violate the consent decree, it may well grant him a hearing and allow him to offer evidence that any particular individual identified by the government was not in fact affiliated with organized crime or otherwise of prohibited status. If the Court did so, before reissuing a list of prohibited individuals, the force of Ciccone's First Amendment claims would be significantly reduced, if not negated. Accordingly, we do not today decide whether, in the absence of a hearing, Ciccone's First Amendment objections have merit.

> FN5. We find Paragraph 2 of the enforcement order troubling for another reason: the paragraph imposes a restriction

44 F.3d 1091                                                                                                    Page 8
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
**(Cite as: 44 F.3d 1091)**

on Ciccone that is not contained in the consent decree. It is true that Paragraph 2(a) of the consent decree prohibits members, officers, and employees of the ILA and its affiliates from knowingly and improperly associating with Ciccone, given his status as an individual prohibited by the consent decree from participating in union affairs. To the extent that the government wishes to enforce this provision, however, it must do so by proceeding against individual union members, officers, or employees. Nothing in the Paragraph 2(a) of the consent decree may be interpreted to give the government the right to move for contempt sanctions against Ciccone for merely associating with union members, officers, or employees. Paragraph 9(b) of the consent decree offers some possible support for the prohibition contained in Paragraph 2 of the enforcement order. Paragraph 9(b) bars Ciccone "from any employment or other participation in the affairs of any entity doing business on the Waterfront," which we read to include the ILA and Local 1814. This provision could support an order that prohibited Ciccone from associating or communicating with individuals having discretionary authority over union affairs. The enforcement order, however, goes further: it bars Ciccone from associating with union members generally. In the absence of a District Court finding that particular associations with lower-level union members amounted to Ciccone involving himself in the union's business, this order is too far removed from the goal of ensuring that Ciccone does not participate in union business to be supported by Paragraph 9(b). Were we not already vacating Paragraph 2 of the enforcement order, we would vacate it on the grounds that--without more facts--it oversteps the bounds of the original consent decree.

### 3. *The Window Period Pension*

[12] The District Court concluded, on alternate grounds, that Ciccone was ineligible for the window period pension for which he applied. First, the Court stated that Paragraph 9(b) of the consent decree left Ciccone eligible only for vested pension or severance benefits. Because the window period pension concededly was not a vested benefit, the Court reasoned, Ciccone was ineligible. Second, the Court

noted that the benefit that Ciccone sought required Ciccone to obtain a discretionary waiver from the pension's eligibility requirements, and thus created an opportunity for Ciccone to wield his influence over individuals affiliated with the ILA. This, in the Court's view, was precisely the result that the consent decree was designed to prevent.

Ciccone objects to the Court's statement that Paragraph 9(b) leaves him eligible only for vested pension and severance benefits. He points to the preceding sentence of Paragraph 9(b), which states: "Nothing in this subparagraph ... shall preclude Ciccone from remaining a member of Local 1814 solely for the purpose of obtaining eligibility for benefits pursuant to the General Cargo Agreement...." He further relies on a prior interpretation of Paragraph 9(b) by Judge Sand (to whom this case was assigned at the time). *See United States v. Local 1804-1, Int'l Longshoremen's Ass'n,* 90 Civ. 0963, 1992 WL 77637 (S.D.N.Y. Mar. 24, 1992). In that proceeding, Ciccone had argued that the provision that allowed him to remain a union member for the purpose of obtaining eligibility for benefits permitted him to hold himself out as available for work to the extent that doing so was necessary to obtain benefits. Judge Sand rejected Ciccone's position, noting that the consent decree expressly barred Ciccone from employment by any entity doing business on the Waterfront. Ciccone, Judge Sand concluded, was only "eligible to receive such benefits as are available to a member of Local 1814 by virtue of his *past* membership and employment." *Id.,* slip op. at 4, 1992 WL 77637 at *2. Ciccone argues that the window period pension falls within the category of benefits for which Judge Sand said he was eligible.

The District Court did not cite Judge Sand's opinion, and instead relied solely on the text of Paragraph 9(b) for its conclusion that Ciccone was only permitted to receive vested benefits. We agree with Ciccone that, to this extent, the District Court's interpretation of Paragraph 9(b) is problematic. Paragraph 9(b) does permit Ciccone to remain a union member for the purpose of obtaining eligibility for benefits. Since, by definition, eligibility is immaterial where benefits are **\*1100** vested and nonforfeitable, to read Paragraph 9(b) as permitting Ciccone to receive only vested benefits would effectively render a portion of the paragraph superfluous. It is easy to imagine, moreover, why that part of the paragraph was included. Thus, for example, if Local 1814 made a new medical benefit available to its members, solely by virtue of their membership in the union, Ciccone would appear to be eligible for that benefit under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 F.3d 1091                                                                                          Page 9
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
**(Cite as: 44 F.3d 1091)**

Paragraph 9(b), even though the benefit was not vested.

We need not define the precise types of benefits for which Ciccone might be eligible, however, because whatever benefits Paragraph 9(b) might allow Ciccone to obtain, it does not permit him to seek the window period pension at issue here. As we have previously noted, Paragraph 9(b) bars Ciccone from participating in the affairs of any entity doing business on the Waterfront, including Local 1814. The provision that permits Ciccone to remain a union member *solely* for the purpose of obtaining eligibility for benefits in no way diminishes the prohibition against participation in union affairs. It only allows Ciccone to maintain his union membership in a totally passive way. And it cannot be read to permit Ciccone to attempt to wield his influence within the union to obtain for himself a discretionary benefit that is not available to union members generally.

Under Paragraph 9(b), Ciccone may obtain any benefits available to union members solely by virtue of their union membership and past employment. He may also obtain benefits that have become available through the exercise of a general discretion that does not involve him individually. There may, for example, be instances in which discretion may be exercised by benefit plan trustees in ways that do not involve a special determination of eligibility for one individual, but rather involve general interpretations of a benefit plan document. If, in such circumstances, the plan trustees choose to interpret the document so as to advantage a group of members, including (without a further exercise of discretion) Ciccone, then Ciccone would be eligible to receive the benefit. [FN6] In these circumstances, Ciccone's receipt of benefits is entirely passive. And the mere administrative act of filing an application cannot be considered participation in union affairs, because the opportunity for improper influence over the union does not arise.

> FN6. Paragraph 9(b), however, would obviously still bar Ciccone from seeking in any way to influence the plan trustees to make such an interpretation.

The window period pension does not fall within this class of benefits, however. Rather, in applying for the window period pension, Ciccone sought an individualized discretionary waiver from the pension fund in order to obtain a benefit the eligibility requirements for which he plainly did not meet. By doing so, Ciccone did more than maintain his union

membership for the purpose of obtaining eligibility for benefits; he inevitably attempted to influence the decisionmaking of an entity doing business on the Waterfront. This conduct is prohibited by the consent decree. We therefore agree with the District Court that Ciccone's application for the window period pension violates Paragraph 9(b).

Ciccone further contends that even if the consent decree is interpreted so as to render him ineligible for the window period pension, the District Court erred in imposing contempt sanctions on him for conduct that rested on a plausible interpretation of the consent decree, and for which Ciccone sought the advice of counsel before proceeding. We need not address the merits of this argument, because we conclude that the District Court did not sanction Ciccone for his actions with respect to the pension application. The only portion of the Court's enforcement order that specifically addresses Ciccone's pension application does no more than require him to withdraw the application, forswear any window period pension benefits, and decline to participate in any arbitration involving his application. This portion of the order, in short, only requires Ciccone to adhere to the consent decree as interpreted, properly, by the District Court. The subsequent provision, which says that "[a]ny violation of this Order shall subject Ciccone to escalating fines and/or imprisonment," states the obvious, *1101 as the Court would have the authority to sanction Ciccone for violations of the order even in the absence of such an express warning.

We therefore affirm the part of the Court's April 29 order that deals with Ciccone's pension application, and Paragraphs 4 and 5 of the Court's enforcement order of May 24.

### CONCLUSION

For the foregoing reasons, we vacate the portion of the District Court's order of April 29, 1994, that found that Ciccone had violated the consent decree by knowingly and improperly associating with individuals of prohibited status. We also vacate Paragraphs 1, 2, and 3 of the Court's enforcement order of May 24, 1994. We affirm the finding that Ciccone violated the consent decree by pursuing his application for a window period pension, and affirm Paragraphs 4 and 5 of the enforcement order. We remand the matter for further proceedings consistent with this opinion.

JON O. NEWMAN, Chief Judge, dissenting in part:

Though seamen are the wards of the admiralty court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 F.3d 1091                                                                         Page 10
44 F.3d 1091, 148 L.R.R.M. (BNA) 2217
**(Cite as: 44 F.3d 1091)**

and therefore entitled to sympathetic consideration, it is not surprising that former officials of the International Longshoremen's Association ("ILA"), now under court regulation because of suspected organized crime activities, enjoy no similar solicitude. Nevertheless, even former ILA officials who have settled RICO cases by accepting the terms of a far-reaching consent decree are entitled to have the usual rules applied when they are accused of contempt for violating such a decree.

In this case, I agree that Anthony Ciccone may be validly found in civil contempt for violating the prohibition against "knowingly and improperly associating" with organized crime figures, if, on remand, findings are made that satisfy the majority's careful construction of the term "knowing[ ] and improper[ ] associa[tion]." However, I respectfully dissent from the further ruling that Ciccone was properly found in contempt because, like twelve other ILA members, he applied for a so-called "window" pension benefit after the applicable filing deadline. The decree does not explicitly bar Ciccone from applying for this or any other pension benefit, and we should not stretch either the decree or the law of contempt to say, as the majority does, that Ciccone's attempt, through his counsel, to seek a favorable exercise of the pension authority's discretion to waive the filing deadline and then to challenge the adverse decision in arbitration is punishable as a contempt.

The relevant language of the decree bars Ciccone from ILA membership and from "participation in the affairs" of "any entity doing business on the Waterfront," Decree, ¶ 9(b), and the ILA and its affiliates are such entities. However, the drafters sought to preclude the possibility that broad prohibitions against membership and "participation" could be overzealously applied to the mere act of seeking benefits arising from past or current membership. The decree therefore provides:
> Nothing in this subparagraph, however, shall preclude Ciccone from remaining a member of Local 1814 solely for the purpose of obtaining eligibility for benefits pursuant to the General Cargo Agreement, subject to the authority of the Monitor herein. Nothing in this provision shall impair Ciccone's entitlement to any welfare or vested pension or severance benefits.

The "window" pension benefit for which Ciccone had the temerity to apply is a special enhanced retirement benefit offered by the New York Shipping Association, Inc. to employees over 55 who withdraw

from the industry during either of two time periods, the latest of which ended on January 31, 1991. Ciccone applied for this benefit on April 8, 1992. His lawyer argued to the pension authorities that the lateness of the application should be waived because Ciccone was forced out of the Union by the Government's action in bringing the RICO suit and because he had received a ruling from Judge Sand that, though he was not entitled to work in order to obtain benefits, he was entitled "to receive such benefits as are available to a member of Local 1814 by virtue of his *past* membership and employment." *United States v. Local* **\*1102** *1804-1, Int'l Longshoremen's Ass'n,* 90 Civ. 0963, 1992 WL 77637 (S.D.N.Y. March 24, 1992) (emphasis in original).

In this contempt proceeding, Judge Martin found Ciccone in contempt for seeking the "window" pension benefit because he is not eligible for it. In Judge Martin's view, the decree assures entitlement only to "vested pension or severance benefits," and the "window" pension benefit is not vested. In this Court, the majority declines to adopt Judge Martin's view that Ciccone remains eligible only for vested benefits and instead rules him potentially eligible for other, unspecified benefits. Nevertheless, the majority upholds the contempt citation, based on Ciccone's application for the "window" pension benefit, on the theory that seeking a favorable exercise of discretion with regard to the benefit is within the category of conduct prohibited by the ban on "participation" in ILA affairs.

The issue for us is not whether Ciccone should receive a "window" pension benefit. Nor is it whether he has shown good cause for waiver of the filing deadline. Those are issues appropriate for decision by the pension fund administrators, and by an arbitration panel, in the event that an adverse ruling is challenged. Our task is to determine whether the decree's ban on "participation" in ILA affairs remains that "clear and unambiguous" provision necessary as a predicate for a contempt citation, *see Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.1981), when it is applied to the act of seeking a favorable exercise of discretion to waive the filing deadline for a pension benefit.

Even if Ciccone were the only person who had ever asked for the favorable exercise of discretion in regard to an ILA pension benefit, I could not agree that such a request is a contempt in violation of a general prohibition on "participation" in union affairs. But when the record shows that twelve other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

union members also sought waivers of the cut-off date and two were granted waivers, Record Item 832, it is trifling with the rigor of contempt law to make his application the basis of a contempt. The prohibition on "participation" stands as a guard against any effort by Ciccone to exert influence in the general affairs of the ILA. It does not bar him from hiring a lawyer, applying for discretionary waiver of a filing deadline to obtain a pension benefit, and then seeking to challenge the rejection of his waiver request in arbitration.

I respectfully dissent from the pension aspect of the Court's judgment.

44 F.3d 1091, 148 L.R.R.M. (BNA) 2217

**Briefs and Other Related Documents (Back to top)**

• 1994 WL 16182533 (Appellate Brief) Brief of Defendant-Appellee New York Shipping Association, Inc. (Aug. 17, 1994)Original Image of this Document (PDF)

• 1994 WL 16182532 (Appellate Brief) Brief of Amicus Curiae Special Counsel to the Federal Monitor for ILA Local 1814 in Support of Plaintiff-Appellee United States of America (Aug. 09, 1994)Original Image of this Document (PDF)

• 1994 WL 16182535 (Appellate Brief) Reply Brief of Defendant-Appellant Anthony Ciccone (Aug. 01, 1994)Original Image of this Document (PDF)

• 1994 WL 16182534 (Appellate Brief) Brief for Plaintiff-Appellee (Jul. 27, 1994)Original Image of this Document (PDF)

• 1994 WL 16182531 (Appellate Brief) Brief of Defendant-Appellant Anthony Ciccone (Jun. 27, 1994)Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX OF AUTHORITIES PART 7

# TAB 6

Westlaw.

101 S.Ct. 1830                                                                                    Page 1
451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175, 25 Empl. Prac. Dec. P 31,725, 1 A.D.D. 76
**(Cite as: 451 U.S. 390, 101 S.Ct. 1830)**

▷

**Briefs and Other Related Documents**


Supreme Court of the United States
UNIVERSITY OF TEXAS et al., Petitioners,
v.
Walter CAMENISCH.
**No. 80-317.**

Argued March 31, 1981.
Decided April 29, 1981.


State of Texas appealed from an order of the United States District Court for the Western District of Texas directing the University of Texas, under the Rehabilitation Act, to procure and compensate a qualified interpreter to assist plaintiff, a deaf graduate student. The Court of Appeals, Fifth Circuit, 616 F.2d 127, affirmed the granting of preliminary injunctive relief, rejecting a suggestion that the case had become moot because the student had been graduated. Certiorari was granted to the University, and the Supreme Court, Justice Stewart, held that where plaintiff was required to file bond on the issuing of the temporary injunction and the state appealed, issue before the Court of Appeals was not who should pay for the interpreter but whether district court abused its discretion in granting preliminary relief, and question of who should pay for the interpreter was question for the District Court to decide in first instance after trial on the merits.

Judgment of Court of Appeals vacated and case remanded to District Court for further proceedings.

Chief Justice Burger filed a concurring opinion.

West Headnotes

**[1] Federal Courts ☜757**
170Bk757 Most Cited Cases
Where preliminary injunction was granted to require state university to provide interpreter, but plaintiff was required to file bond, issue as to who should pay for interpreter remained following plaintiff's graduation, and thus case as a whole did not become moot. Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794; Fed.Rules Civ.Proc. Rule 65(a)(2), 28 U.S.C.A.

**[2] Federal Courts ☜815**
170Bk815 Most Cited Cases
Where preliminary injunction was granted to require state university to provide interpreter but plaintiff was required to file bond, and state appealed, issue before Court of Appeals was not who should pay for interpreter but whether district court abused discretion in granting preliminary relief, and question of who should pay was question for district court to decide in first instance after trial on merits. Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794; Fed.Rules Civ.Proc. Rule 65(a)(2), 28 U.S.C.A.

**[3] Injunction ☜132**
212k132 Most Cited Cases

**[3] Injunction ☜147**
212k147 Most Cited Cases

**[3] Injunction ☜158**
212k158 Most Cited Cases
Purpose of preliminary injunction is merely to preserve relative positions of parties until trial on merits can be held, and thus party is not required to prove his case in full at preliminary injunction hearing, and findings of fact and conclusions of law made by court granting preliminary injunction are not binding at trial on the merits. Fed.Rules Civ.Proc. Rule 65(a)(2), 28 U.S.C.A.

**[4] Injunction ☜157**
212k157 Most Cited Cases
It is generally inappropriate for a federal court at preliminary injunction stage to give final judgment on the merits. Fed.Rules Civ.Proc. Rule 65(a)(2), 28 U.S.C.A.

**[5] Injunction ☜157**
212k157 Most Cited Cases
Before court may order trial of action on the merits to be advanced and consolidated with hearing of application for temporary injunction, courts have commonly required that parties receive clear and unambiguous notice of court's intent to consolidate, either before hearing commences or at time which will still afford parties full opportunity to present their respective cases. Fed.Rules Civ.Proc. Rule 65(a)(2), 28 U.S.C.A.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[6] Federal Courts** ☞757
170Bk757 Most Cited Cases
When injunctive aspects of case become moot on
appeal of preliminary injunction, any issue preserved
by injunction bond can generally not be resolved on
appeal but must be resolved in trial on merits, but if,
by contrast, federal district court has granted
permanent injunction, parties will already have had
trial on merits and even if case would otherwise be
moot, determination can be had on appeal of
correctness of trial court's decision on merits, case
having been saved from mootness by injunction
bond.   Fed.Rules  Civ.Proc.  Rule  65(a)(2),  28
U.S.C.A.

**\*\*1831 \*390 Syllabus [FN\*]**

FN\* The syllabus constitutes no part of the
opinion of the Court but has been prepared
by the Reporter of Decisions for the
convenience of the reader.   See United
States v. Detroit Lumber Co., 200 U.S. 321,
337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Respondent, a deaf graduate student at petitioner
University, filed a complaint in Federal District
Court, alleging that the University violated §
504 of the Rehabilitation Act of 1973 by
discriminatorily refusing to pay for a sign-language
interpreter for respondent, and declaratory and
injunctive relief was sought.    Finding a possibility
that respondent would be irreparably harmed in the
absence of an injunction and that he was likely to
prevail on the merits, the District Court, inter alia,
granted a preliminary injunction on the condition that
respondent post a security bond pending the outcome
of the litigation.   The Court of Appeals affirmed the
grant of the injunction.     In the meantime, the
University had obeyed the injunction by paying for
respondent's interpreter and respondent had been
graduated, but the Court of Appeals rejected a
suggestion that the case was moot, noting that the
issue of who should bear the cost of the interpreter
remained to be decided.

Held:   The question whether a preliminary injunction
should have been issued is moot because the terms of
the injunction have been fully and irrevocably carried
out, but, as the Court of Appeals correctly noted, the
question whether the University must pay for the
interpreter remains for trial on the merits. Pp. 1883-
1835.

(a) To suggest that the decisions of the courts below,
to the extent that they considered respondent's
likelihood of success on the merits in granting a
preliminary injunction, were tantamount to decisions
on the \*\*1832 underlying merits and thus that the
preliminary-injunction issue is not truly moot,
improperly equates "likelihood of success" with
"success" and ignores the significant procedural
differences between preliminary and permanent
injunctions.   P. 1833.

(b) Where a federal district court has granted a
preliminary injunction, the parties generally will have
had the benefit neither of a full opportunity to present
their cases nor of a final judicial decision based on
the actual merits of the controversy.   Thus, when the
injunctive aspects of a case become moot on appeal
of a preliminary injunction, any issue preserved by an
injunction bond can generally not be resolved on
appeal, but must be resolved in a trial on the merits.
By contrast, where a federal district court has granted
a permanent injunction, the \*391 parties will already
have had their trial on the merits, and even if the case
would otherwise be moot, a determination can be had
on appeal of the correctness of the trial court's
decision on the merits, since the case has been saved
from mootness by the injunction bond.   Pp. 1834-
1835.

616 F.2d 127 (5th Cir.) vacated and remanded.

Lonny F. Zwiener, Austin, Tex., for petitioners.

Stephen   J.   Pollak,   Washington,   D.   C.,   for
respondent.

Peter Buscemi, Washington, D. C., for United States,
as amicus curiae, by special leave of Court.

Justice STEWART delivered the opinion of the
Court.

On March 1, 1978, Walter Camenisch, a deaf
graduate student at the University of Texas, filed a
complaint alleging \*392 that the University had
violated § 504 of the Rehabilitation Act of 1973, 87
Stat. 394, as amended, 29 U.S.C. § 794 (1976 ed.,
Supp. III), which provides that "[n]o otherwise
qualified handicapped individual in the United States
... shall, solely by reason of his handicap, be
excluded from the participation in, be denied the
benefits of, or be subjected to discrimination under
any program or activity receiving Federal financial
assistance."   The complaint alleged that the
University received federal funds and that the
University had discriminatorily refused to pay for a
sign-language interpreter for Camenisch.   The
complaint asked the United States District Court for
the Western District of Texas to grant declaratory
relief and to "[p]reliminarily and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

101 S.Ct. 1830                                                                                                    Page 3
451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175, 25 Empl. Prac. Dec. P 31,725, 1 A.D.D. 76
**(Cite as: 451 U.S. 390, 101 S.Ct. 1830)**

permanently order defendants to appoint an interpreter for the plaintiff while he is a student in good standing at the defendant University."

The District Court applied the "Fifth Circuit standard for temporary relief to see if the injunction sought is appropriate." That standard, which was enunciated in *Canal Authority of Florida v. Callaway*, 489 F.2d 567 (1974), requires that a federal district court consider four factors when deciding whether to grant a preliminary injunction: whether the plaintiff will be irreparably harmed if the injunction does not issue; whether the defendant will be harmed if the injunction does issue; whether the public interest will be served by the injunction; and whether the plaintiff is likely to prevail on the merits. Finding a possibility that Camenisch would be irreparably harmed in the absence of an injunction, and finding a substantial likelihood that Camenisch would prevail on the merits, the District Court granted a preliminary injunction requiring that the University pay for Camenisch's interpreter, but the court did so on the condition that Camenisch "post a security bond in the amount of *$3,000.00* pending the outcome of this litigation pursuant to Rule 65(c), F. R. C. P." The District Court also ordered that the action be stayed "pending a final administrative determination on the merits, and that as a condition of preliminary injunctive relief, Plaintiff *393 be required to initiate a complaint with HEW requesting the relief sought herein."

The Court of Appeals for the Fifth Circuit likewise applied the *Canal Authority* test, and found that the balance of hardships **1833 weighed in favor of granting an injunction and that Camenisch's claim would be successful on the merits. The Court of Appeals therefore affirmed the grant of the preliminary injunction. 616 F.2d 127. The appellate court ruled, however, that Camenisch was not obligated to pursue any administrative remedy that the Department of Health, Education, and Welfare [FN1] might provide, and therefore vacated that part of the District Court's order staying the litigation pending administrative action.

> FN1. The Department of Health, Education and Welfare has now become the Department of Health and Human Services.

By the time the Court of Appeals had acted, the University had obeyed the injunction by paying for Camenisch's interpreter, and Camenisch had been graduated. The Court of Appeals, however, rejected a suggestion that the case was therefore moot. The court said: "[A] justiciable issue remains: whose responsibility is it to pay for this interpreter?" *Id.*, at 130-131. We granted certiorari, 449 U.S. 950, 101 S.Ct. 352, 66 L.Ed.2d 213, and Camenisch has now raised the mootness issue before this Court.

[1][2] The Court of Appeals correctly held that the case as a whole is not moot, since, as that court noted, it remains to be decided who should ultimately bear the cost of the interpreter. However, the issue before the Court of Appeals was not who should pay for the interpreter, but rather whether the District Court had abused its discretion in issuing a preliminary injunction requiring the University to pay for him. *Brown v. Chote*, 411 U.S. 452, 457, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420; *Alabama v. United States*, 279 U.S. 229, 49 S.Ct. 266, 73 L.Ed. 675. The two issues are significantly different, since whether the preliminary injunction should have issued depended on the balance of factors listed in *Canal Authority*, while whether the University should ultimately bear the cost of the interpreter depends on a final resolution of the merits of Camenisch's case.

*394 This, then, is simply another instance in which one issue in a case has become moot, but the case as a whole remains alive because other issues have not become moot. See, *e. g., Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491. In *Ammond v. McGahn*, 532 F.2d 325 (C.A.3 1976), for instance, the issue of preliminary injunctive relief became moot, but an issue of damages remained. The court said: "Though the entire case is not moot, the question remains whether the issue of the appropriateness of injunctive relief is moot. If the parties lack a legally cognizable interest in the determination whether the preliminary injunction was properly granted, the sole question before us on this appeal, then we must vacate the district court's order and remand the case for consideration of the remaining issues." *Id.*, at 328. Because the only issue presently before us--the correctness of the decision to grant a preliminary injunction--is moot, the judgment of the Court of Appeals must be vacated and the case must be remanded to the District Court for trial on the merits. See *Brown v. Chote, supra.*

Since Camenisch's likelihood of success on the merits was one of the factors the District Court and the Court of Appeals considered in granting Camenisch a preliminary injunction, it might be suggested that their decisions were tantamount to decisions on the underlying merits and thus that the preliminary-injunction issue is not truly moot. It

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

may be that this was the reasoning of the Court of Appeals when it described its conclusion that the case was not moot as "simply another way of stating the traditional rule that issues raised by an expired injunction are not moot if one party was required to post an injunction bond." 616 F.2d, at 131. This reasoning fails, however, because it improperly equates "likelihood of success" with "success," and what is more important, because it ignores the significant procedural differences between preliminary and permanent injunctions.

**\*\*1834 \*395 [3][4]** The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing. _Progress Development Corp. v. Mitchell_, 286 F.2d 222 (C.A.7 1961), and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits, _Industrial Bank of Washington v. Tobriner_, 132 U.S.App.D.C. 51, 54, 405 F.2d 1321, 1324 (1968); _Hamilton Watch Co. v. Benrus Watch Co._, 206 F.2d 738, 742 (C.A.2 1953). In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits. _E. g._, _Brown v. Chote, supra_; _Gellman v. Maryland_, 538 F.2d 603 (C.A.4 1976); _Santiago v. Corporacion de Renovacion Urbana y Vivienda de Puerto Rico_, 453 F.2d 794 (C.A.1 1972).

[5] Should an expedited decision on the merits be appropriate, Rule 65(a)(2) of the Federal Rules of Civil Procedure provides a means of securing one. That Rule permits a court to "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application." Before such an order may issue, however, the courts have commonly required that "the parties should normally receive clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." _Pughsley v. 3750 Lake Shore Drive Cooperative Bldg._, 463 F.2d 1055, 1057 (C.A.7 1972); _Nationwide Amusements, Inc. v. Nattin_, 452 F.2d 651 (C.A.4 1971). This procedure was not followed here.

**\*396 [6]** In short, where a federal district court has granted a preliminary injunction, the parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision based on the actual merits of the controversy. Thus when the injunctive aspects of a case become moot on appeal of a preliminary injunction, any issue preserved by an injunction bond can generally not be resolved on appeal, but must be resolved in a trial on the merits. Where, by contrast, a federal district court has granted a permanent injunction, the parties will already have had their trial on the merits, and, even if the case would otherwise be moot, a determination can be had on appeal of the correctness of the trial court's decision on the merits, since the case has been saved from mootness by the injunction bond.

The principle underlying this basic distinction, although sometimes honored in the breach, [FN2] is reflected in the relevant precedents. For instance, in this Court's decision in _Liner v. Jafco, Inc._, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347, a decision often cited for the proposition that an injunction bond prevents a case from becoming moot, the injunction was permanent, not preliminary. The District Court there had thus reached a final decision on the merits.

> FN2. See, _e. g._, _Bright v. Nunn_, 448 F.2d 245, 247, n.1 (C.A.6 1971); but see 11 C. Wright & A. Miller, Federal Practice and Procedure § 2950, pp. 492-493 (1973).

_American Bible Society v. Blount_, 446 F.2d 588 (C.A.3 1971), illuminates the distinction from a different angle. In that case, the plaintiffs had secured a preliminary injunction and had posted an injunction bond. When the issue of injunctive relief became moot, the Court of Appeals held that the case as a whole was not moot, since the defendant would "in all likelihood institute suit against the sureties at some future time and, in any such action, the court [would] be faced with deciding the same issues that are in contention \*397 here." _Id._, at 594. The appellate court ruled that **\*\*1835** liability on the injunction bond could not arise until there was a final judgment in favor of the defendant: "This rule is consistent with the policy considerations behind the injunction bond. The requirement of security is rooted in the belief that a defendant deserves protection against a court order granted without the full deliberation a trial offers." _Id._, at 595, n. 12. The court therefore remanded the case to the trial court, where such "full deliberation" could take place.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In *Klein v. Califano,* 586 F.2d 250 (C.A.3 1978), the same United States Court of Appeals, sitting en banc, was confronted with a different situation involving a moot injunction which was survived by a possible claim for recoupment on a bond.    The court "recognize[d] that part of the rationale of *American Bible Society* was the policy of the Rule 65 security bond to protect defendants from the consequences of temporary restraining orders granted without opportunity for full deliberation of the merits of a dispute." *Id., at 256.*    Because the District Court in *Klein* had "had such an opportunity to assess the merits of the complaint and [had] granted summary judgment and a permanent injunction," *ibid.,* the Court of Appeals reached the merits of the case. [FN3]

> FN3. The Court of Appeals in the present case mistakenly believed that *Kinnett Dairies v. Farrow,* 580 F.2d 1260 (C.A.5 1978), stands for a contrary principle.    In that case, the question of mootness arose because the defendant's solicitation of bids-- which had been the subject of the District Court's preliminary injunction--had run its course.    The Court of Appeals said: "[T]he history of this controversy reveals the reasonable expectation--indeed, the near certainty--that the act complained of will be repeated.    This case is a paradigm of the situation 'capable of repetition yet evading review.' " *Id., at 1266* (footnote omitted). The court determined that the plaintiff could not win on the merits, and that the issuance of a preliminary injunction had, therefore, been erroneous.    But the court did not say what it would have done had it not concluded that the case was capable of repetition yet avoiding review.

The present case is replete with circumstances indicating the necessity for a full trial on the merits in the *nisi prius* *398 court, where a preliminary injunction has become moot and an injunction bond has been issued.    The proceedings here bear the marks of the haste characteristic of a request for a preliminary injunction:  the parties have relied on a short stipulation of facts, and even the legal theories on which the University has relied have seemed to change from one level of the proceeding to another. The District Court and the Court of Appeals both properly based their decisions not on the ultimate merits of Camenisch's case but rather on the balance of the *Canal Authority* factors.    While it is true that some of the Court of Appeals' language suggests a

conclusion that Camenisch would win on the merits, the court certainly did not hold that the standards for a summary judgment had been met.

In sum, the question whether a preliminary injunction should have been issued here is moot, because the terms of the injunction, as modified by the Court of Appeals, have been fully and irrevocably carried out.    The question whether the University must pay for the interpreter remains for trial on the merits.    Until such a trial has taken place, it would be inappropriate for this Court to intimate any view on the merits of the lawsuit.

The judgment of the Court of Appeals is therefore vacated, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Chief Justice BURGER, concurring.

I join the Court's opinion, but I consider it important to emphasize several aspects of the case, especially as to the regulations.

It is undisputed that the University stood willing to permit respondent to have a sign-language interpreter present in the classroom at respondent's expense, and in fact had allowed that for some time prior to the filing of this lawsuit.    It is also undisputed that the University's refusal to pay for an *399 interpreter was based solely on the fact that respondent did not meet the University's **1836 established income criteria for financial assistance to graduate students. [FN*]

> FN* Respondent and his wife, who have no children, had a combined gross income in excess of $23,000 per year while he was enrolled as a student.    Stipulation of Facts, App. 31.    At oral argument, respondent asserted that even a $100,000 annual income would not affect his right to an interpreter at public expense.
>
> The University advised respondent that its policy was to pay for interpreter services when the services were not available from other agencies such as the Texas Rehabilitation Commission and the Texas Commission for the Deaf, provided that "such assistance will be based on a reasonable interpretation of financial need on an individual basis, using guidelines already in effect for Federal and other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

financial assistance." According to those guidelines, respondent had zero financial need. *Id.*, at 33.

The Court's opinion, of course, is not to be read as intimating that respondent has any likelihood of success on the merits of his claim. The Court holds no more than that, since there has been no trial, respondent has a right to present evidence in support of his claim. The trial court must, among other things, decide whether the federal regulations at issue, which go beyond the carefully worded *nondiscrimination* provision of § 504, exceed the powers of the Secretary under § 504. The Secretary has no authority to rewrite the statutory scheme by means of regulations. *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979); see also *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously").

451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175, 25 Empl. Prac. Dec. P 31,725, 1 A.D.D. 76

**Briefs and Other Related Documents (Back to top)**

• 1981 WL 390379 (Appellate Brief) Brief for the United States as Amicus Curiae (Feb. 01, 1981)

• 1981 WL 390375 (Appellate Brief) Motion for Leave to File and Brief of the American Civil Liberties Union, the Children's Rights Project, the New York Civil Liberties Union, the American Council of the Blind, and the Center for Law and Education, Amici Curiae (Jan. 30, 1981)

• 1981 WL 390378 (Appellate Brief) Motion for Leave to File Brief as Amicus Curiae and Brief of the Legal Action Center of the City of New York, Inc., Amicus Curiae, in Support of Respondent (Jan. 30, 1981)

• 1981 WL 390376 (Appellate Brief) Motion for Leave to File Brief Amici Curiae American Coalition of Citizens with Disabilities; Association on Handicapped Student Service Programs in Post-Secondary Education; Epilepsy Foundation of America; National Association of Protection and Advo cacy Systems; National Education Association; Pennsylvania Society for the Advancement of the Deaf; Texas Protection and Advocacy System: Advocacy, Inc.; United Cerebral Palsy Association

and Brief Amici Curiae in Support of Respondent (Jan. 29, 1981)

• 1981 WL 390374 (Appellate Brief) Brief for Respondent (Jan. 28, 1981)

• 1981 WL 390377 (Appellate Brief) Motion for Leave to File Amici Curiae and Brief of the Deaf Counseling, Advocacy and Referral Agency, Inc., Northern California Center on Deafness, Inc., Greater Los Angeles Council on Deafness, Inc., Deaf Resources and Referral Agency of Marin, Nati onal Gray Panthers Access Task Force, St. Benedict's Center for Deaf and Hard of Hearing, Disability Law Center, Legal Aid Society of Alameda County, Westside Community for Independent Living, Inc., Darrell McDaniel Independent Living Center, Inc., (Jan. 27, 1981)

• 1980 WL 339860 (Appellate Brief) Motion of the American Council on Education and the National Institute of Independent Colleges and Universities for Leave to File Brief Amici Curiae and Brief Amici Curiae in Support of Petitioners (Dec. 18, 1980)

• 1980 WL 339861 (Appellate Brief) Motion for Leave to File Brief and Brief Amicus Curiae for the Equal Employment Advisory Council in Support of the Petitioners (Dec. 18, 1980)

• 1980 WL 339859 (Appellate Brief) Brief for Petitioner (Oct. 01, 1980)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.