Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue, New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

**STORM LLC,**

                            Plaintiff,

                 -against-

**TELENOR MOBILE COMMUNICATIONS AS,**

                        Defendant.

------------------------------------------------------------------------ X    06 CV 13157 (GEL) (DF)

**TELENOR MOBILE COMMUNICATIONS AS,**

                      Counterclaimant,

                - against-

**STORM LLC,**

                      Counterclaim-Defendant,

                - and-

**ALTIMO HOLDINGS & INVESTMENTS LIMITED and**
**ALPREN LIMITED,**

                    Relief Defendants.

------------------------------------------------------------------------ X

**DECLARATION OF**
**PETER S. O'DRISCOLL**

**PETER S. O'DRISCOLL** declares the following to be true:

1.      I am a member of the bar of the State of New York and of the firm of Orrick, Herrington & Sutcliffe LLP, attorneys for Counterclaimant Telenor Mobile Communications AS ("Telenor Mobile").

2.      I make this declaration pursuant to 28 U.S.C. § 1746 in support of Telenor Mobile's motion to have Relief Defendants Altimo Holdings & Investments Limited ("Altimo") and Alpren Limited ("Alpren") and Counterclaim-Defendant Storm LLC ("Storm") held in contempt.

3.      Attached hereto as Exhibit A is a copy of the cover page of the Offering Memorandum for the 12.75% Loan Participation Notes due 2005, issued by, but without recourse to, Dresdner Bank Aktiengesellschaft (the "Lender") for the purpose of funding the Loan Agreement dated November 8, 2004 between the Lender and Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar").

4.      Attached hereto as Exhibit B is a copy of the cover page of the Offering Memorandum for the 10.375% Loan Participation Notes due 2009 (the "2009 Notes"), issued by, but without recourse to, the Lender for the purpose of funding the Loan Agreement dated August 9, 2004 (the "2004 Loan Agreement") between the Lender and Kyivstar, together with copies of the pages from such Offering Memorandum containing the summary of such Offering Memorandum and the terms and conditions of the 2009 Notes.

5.      Attached hereto as Exhibit C is a copy of the cover page of the Offering Memorandum for the 7.75% Loan Participation Notes due 2012 (the "2012 Notes" and, together with the 2009 Notes, collectively, the "Notes") issued by, but without recourse to, the Lender for the purpose of funding the Loan Agreement dated April 19, 2005 (the "2005 Loan Agreement") between the Lender and Kyivstar, together with copies of pages

from such Offering Memorandum containing the summary of such Offering Memorandum and the terms and conditions of the 2012 Notes.

6.      Attached hereto as Exhibit D is a conformed copy of the 2004 Loan Agreement.

7.      Attached hereto as Exhibit E is a conformed copy of the 2005 Loan Agreement.

8.      Attached hereto as Exhibit F is a copy of a letter dated March 19, 2007 from Kyivstar, addressed to the Lender.

9.      Attached hereto as Exhibit G is a copy of a notice dated March 19, 2007 from the Lender, addressed to holders of the Notes.

10.     Attached hereto as Exhibit H is a copy of a press release dated March 21, 2007, issued by Telenor ASA.

11.     Attached hereto as Exhibit I is a screen shot of the Yahoo! Finance page for Telenor ASA's American Depositary Shares (http://finance.yahoo.com/q?s=teln&x=56&y=15) as of 3:45 p.m. on March 21, 2007.

12.     Attached hereto as Exhibit J is a copy of a press release dated March 23, 2007, issued by Standard & Poor's.

13.     Attached hereto as Exhibit K is a copy of a notice dated March 29, 2007, issued by Moody's Investors Service.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of April, 2007 at London, England.

PETER S. O'DRISCOLL

# EXHIBIT A

*OFFERING MEMORANDUM*                    NOT FOR GENERAL CIRCULATION
IN THE UNITED STATES



## ★ KYIVSTAR GSM

**$100,000,000**
**12.75% Loan Participation Notes due 2005**
issued by, but without recourse to, Dresdner Bank Aktiengesellschaft,
for the sole purpose of funding a $100,000,000 loan to
**Closed Joint Stock Company "KYIVSTAR G.S.M."**
**Issue Price: 100%**

#### The Company—

- We are Closed Joint Stock Company "KYIVSTAR G.S.M.", one of the two leading mobile telecommunications operators in Ukraine.

#### The Bank—

- Dresdner Bank Aktiengesellschaft, a commercial bank established under the laws of the Federal Republic of Germany (the "Bank"), is offering an aggregate principal amount of $100,000,000 in the form of 12.75% loan participation notes due 2005 (the "Notes") for the sole purpose of funding a three-year loan (the "Loan") to us under the terms of a loan agreement, dated November 8, 2002 (the "Loan Agreement"). The Bank will charge by way of security to The Law Debenture Trust Corporation p.l.c., as trustee (the "Trustee"), its rights to principal, interest and additional amounts (if any) under the Loan Agreement (other than certain reserved rights), as well as certain sums held in an account of the Bank, and will transfer its rights under the Loan Agreement (save for those rights charged or reserved as described above) to the Trustee upon the closing of the offering of the Notes for the benefit of the holders of the Notes (the "Noteholders").

#### Maturity—

- The Notes will mature on November 21, 2005.

#### Interest—

- The Bank will only be obligated to make payments of principal, interest and additional amounts (if any) to Noteholders to the extent that we make payments to the Bank's account of all principal, interest and additional amounts (if any) under the terms of the Loan Agreement. The Bank will have no other financial obligation under the Notes.

- The Bank will pay interest on the Notes at an annual rate equal to 12.75%.

- The Bank will make interest payments on the Notes semi-annually in arrears on May 21 and November 21 of each year, commencing on May 21, 2003.

- Payments on the Notes will be made free and clear of, and without withholding or deduction for, any taxes imposed by the United States, Germany or Ukraine, to the extent described under "Terms and Conditions of the Notes—Taxation".

#### Ranking—

- The loan will rank equal in right of payment with our other outstanding unsecured and unsubordinated indebtedness.

- Other than as described in this offering memorandum and in a trust deed to be entered into between the Bank and the Trustee on November 21, 2002 (the "Trust Deed"), the Noteholders have no proprietary or other direct interest in the Bank's rights under or in respect of the Loan Agreement or the Loan. Subject to the terms of the Trust Deed, no Noteholder will have any right to enforce any of the provisions in the Loan Agreement or have direct recourse to us except through action by the Trustee.

#### Redemption—

- Except in limited circumstances, the Notes are not redeemable prior to maturity.

#### Change of Control—

- If we experience certain types of mergers, consolidations or other changes in control, you will have the right to require the Bank to redeem all of your Notes at 101% of their principal amount, plus accrued interest.

#### Notice to Investors—

- **You should carefully consider the risk factors beginning on page 10 before investing.**

- The Notes will be offered and sold outside the United States in offshore transactions in reliance on Regulation S under the Securities Act (as defined herein) and in the United States to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) in reliance on Rule 144A (as defined herein).

- The Notes will be held through Citibank, N.A. as DTC Custodian and as common depositary for Euroclear and Clearstream, Luxembourg.

#### Settlement—

- The Notes are expected to be delivered on or about November 21, 2002, through Euroclear, Clearstream, Luxembourg or DTC, as the case may be, against payment therefor in immediately available funds. The closing date of the offering is expected to be November 21, 2002.

#### Listing—

- Application has been made to list the Notes on the Luxembourg Stock Exchange. The Notes represented by Rule 144A Global Notes are expected to be eligible for trading on the PORTAL® Market, a subsidiary of the Nasdaq Stock Market, Inc. There can be no assurance that a trading market for the Notes will develop.

## Dresdner Kleinwort Wasserstein

**OJSC Alfa Bank**                                    **ING Barings**

The date of this offering memorandum is November 12, 2002

*OFFERING MEMORANDUM*

NOT FOR GENERAL CIRCULATION
IN THE UNITED STATES



**$135,000,000**

**10.375% Loan Participation Notes due 2009**
issued by, but without recourse to, Dresdner Bank Aktiengesellschaft
for the purpose of funding a $135,000,000 loan to
**Closed Joint Stock Company "KYIVSTAR G.S.M."**
Issue Price: 100%

#### The Company—

- We are Closed Joint Stock Company "KYIVSTAR G.S.M.", one of the leading mobile telecommunications operators in Ukraine.

#### The Bank—

- Dresdner Bank Aktiengesellschaft, a commercial bank established under the laws of the Federal Republic of Germany (the "Bank"), is issuing the $135,000,000 10.375% loan participation notes due 2009 (together with the aggregate principal amount of such notes, if any, issued in the Concurrent Exchange Offer referred to below, the "New Notes") for the purpose of funding a $135,000,000 loan (together with the aggregate principal amount to be loaned by the Bank in respect of any New Notes issued in the Concurrent Exchange Offer referred to below, the "2004 Loan") from the Bank to us pursuant to a loan agreement dated August 9, 2004 (the "2004 Loan Agreement"). The New Notes are expected to be issued on August 17, 2004 and constituted by a Trust Deed, to be dated August 17, 2004 (the "Trust Deed"), between the Bank and The Law Debenture Trust Corporation p.l.c. (the "Trustee"). The Bank will charge by way of security to the Trustee for the benefit of holders of the New Notes (the "Noteholders") its rights to principal, interest and additional amounts (if any) under the 2004 Loan Agreement (other than certain reserved rights) and certain sums held from time to time in the account of the Bank into which such payments under the 2004 Loan Agreement are made (the "Collection Account") (save for those rights charged or reserved as described above). See "Description of the Transaction and The Security".
- The Bank will only be obligated to make payments of principal, interest and additional amounts (if any) to the Noteholders to the extent that we make payments to the Bank of principal, interest and additional amounts (if any) under the terms of the 2004 Loan Agreement. The Bank will have no other financial obligation under the New Notes.

#### Maturity—

- The New Notes will mature on August 17, 2009.

#### Interest—

- The Bank will pay interest on the New Notes at an annual rate equal to 10.375%.
- The Bank will make interest payments on the New Notes semi-annually in arrears on February 17 and August 17 of each year, commencing on February 17, 2005.
- Payments on the New Notes will be made free and clear of, and without withholding or deduction for, any taxes imposed by the United States, Germany or Ukraine, to the extent described under "Terms and Conditions of the New Notes—Taxation".

#### Ranking—

- The 2004 Loan will rank equal in right of payment with our other outstanding unsecured and unsubordinated indebtedness.
- Other than as described in this offering memorandum and in the Trust Deed, the Noteholders have no proprietary or other direct interest in the Collection Account or the Bank's rights under or in respect of the 2004 Loan Agreement or the 2004 Loan. Subject to the terms of the Trust Deed, no Noteholder will have any right to enforce any of the provisions in the 2004 Loan Agreement or have direct recourse to us except through action by the Trustee.

#### Redemption—

- Except in limited circumstances, the New Notes are not redeemable prior to maturity.

#### Change of Control—

- If we experience certain types of mergers, consolidations or other changes in control, you will have the right to require the Bank to redeem all of your New Notes at 101% of their principal amount, plus accrued interest.

#### The Concurrent Exchange Offer

- Concurrently with the offering of New Notes, we have offered to eligible holders of any and all of the 12.75% loan participation notes due 2005 (the "Existing Notes") issued by the Bank for the sole purpose of funding the $160,000,000 loans to us (pursuant to the loan agreement dated November 8, 2002 (the "2002 Loan Agreement") between us and the Bank, and the loan agreement dated March 11, 2003 (the "2003 Loan Agreement") between us and the Bank) to exchange their Existing Notes for New Notes (the "Concurrent Exchange Offer"). The aggregate principal amount of New Notes issued in the Concurrent Exchange Offer will be no more than $176,000,000. *The offering of the New Notes is in no way conditional on the success of the Concurrent Exchange Offer.*

#### Notice to Investors—

- You should carefully consider the risk factors beginning on page 13 before investing.
- The New Notes will be offered and sold outside the United States in offshore transactions in reliance on Regulation S under the Securities Act (as defined herein). Such New Notes will be represented by the Regulation S Global Note Certificate. The New Notes will also be offered and resold in the United States to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) in reliance on Rule 144A (as defined herein). Such New Notes will be represented by the Rule 144A Global Note Certificate.
- The New Notes will be held through Citibank, N.A., as DTC Custodian and as common depositary for Euroclear and Clearstream, Luxembourg.

#### Settlement—

- The New Notes are expected to be delivered on or about August 17, 2004, through Euroclear, Clearstream, Luxembourg or DTC, as the case may be, against payment therefor in immediately available funds. The closing date of the offering of the New Notes is expected to be August 17, 2004.

#### Listing—

- Application has been made to list the New Notes on the Luxembourg Stock Exchange. The Rule 144A Global Notes are expected to be eligible for trading on the PORTAL Market, a subsidiary of the Nasdaq Stock Market, Inc. There can be no assurance that a trading market for the New Notes will develop.

# Citigroup

# Dresdner Kleinwort Wasserstein

The date of this offering memorandum is August 9, 2004.

# SUMMARY

*This summary contains basic information about us, our industry and the offering. You should read the entire offering memorandum carefully, including the risk factors, our financial statements and the related notes to those statements included in this offering memorandum.*

## Overview

We are one of the leading providers of mobile telecommunications services in Ukraine. We operate a dual-band GSM 900/1800 MHz network, which currently covers more than 1,039 cities and towns, including major urban areas and the main national and regional highways throughout Ukraine. Our network covers territory inhabited by approximately 84% (about 40 million people) of Ukraine's population and representing approximately 66% of Ukraine's land mass.

At June 30, 2004, we had more than 3.6 million subscribers who use our services pursuant to one of our contract or prepaid tariff plans. Our subscriber market share has increased from 17.8% as of December 31, 1999 to 44.5% as of March 31, 2004. Our net revenues have increased from $18.8 million for the financial year ended December 31, 1999 to $373.9 million for the financial year ended December 31, 2003.

We commenced commercial operations in December 1997. At this time, we were a small operator in a market dominated by our principal competitor. We have since obtained additional licenses to enable us to develop the coverage and capacity of our network to accommodate the significant expansion of our subscriber base. We are now one of the leading operators in the Ukrainian cellular market.

In all segments of our business, we benefit significantly from the strengths and expertise of our majority shareholder, Telenor ASA (together with its subsidiaries, "Telenor"), and our other shareholder, Storm LLC ("Storm"). Telenor currently owns 56.5% of our share capital through Telenor Mobile Communications AS ("Telenor Mobile"), and Storm owns 43.5% of our share capital. In June 2002, Alfa Telecom Limited, an affiliate of Alfa Group, one of Russia's largest financial industrial groups, acquired a 50.1% interest in Storm.

Telenor, which is Norway's leading telecommunications company and one of the leading foreign investors in the telecommunications industry of the Commonwealth of Independent States ("CIS"), first became a shareholder of our company in March 1998. Telenor has brought to our company valuable experience in developing and implementing wireless voice and data services as well as sophisticated marketing techniques. We have benefited in particular from the support Telenor has given us in the areas of key personnel, product and technology development and mass market expertise.

We believe that the combination of Telenor's expertise in wireless telecommunications, Storm's local presence and experience in Ukraine, and Alfa Group's extensive knowledge of the CIS, together with their respective capital investments, is the basis for a unique and complementary strategic partnership and a strong platform upon which we can continue to build one of Ukraine's leading mobile telecommunications operators.

## Market Opportunity

The mobile telecommunications market in Ukraine has experienced significant growth in the past few years. Increasing competition between operators has reduced tariffs and has resulted in the introduction of new services. The increased affordability of mobile telecommunications services has allowed larger segments of the population to begin to use such services, creating market opportunities for us. In addition, improvements in Ukraine's economic condition and regulatory and tax reforms have contributed to increased demand and have fuelled our growth. We believe that the low mobile and fixed phone line telecommunication penetration rates in Ukraine of approximately 15% and 24%

1

respectively offer substantial opportunities for mobile telecommunications operators. Ukraine's poor fixed phone line infrastructure and the low fixed line penetration rate have made the use of mobile phones a necessity for many Ukrainians. We expect the penetration rate of the Ukrainian mobile telecommunications market to continue to increase, which, in light of Ukraine's population of approximately 48 million people, will create further growth opportunities for us.

### Competitive Strengths

We believe that we have the following competitive strengths:

- Our relationships with our majority shareholder, Telenor, and with our local partner, Storm, provide us with extensive experience and expertise.

- Our favorable brand image helps us to attract new subscribers and retain existing subscribers.

- Our emphasis on high quality customer service distinguishes us from our competitors.

- Our focus on innovation in our market distinguishes us from our competitors.

- The geographic coverage and quality of our network allow us to attract and retain subscribers.

- Our established mobile telecommunications network and distribution network provide us with a strong position in a growing market.

### Business Strategy

Our strategic objective is to maintain and strengthen our position as one of the leading providers of high quality mobile telecommunications services in Ukraine and to increase revenue, profitability and cash flows. To accomplish these objectives, we intend to focus on the following key elements:

- Increase our subscriber base.

- Retain existing subscribers and reduce churn.

- Continue to selectively expand our technologically advanced network with a focus on quality.

- Increase revenue from value-added services.

- Maintain high brand awareness.

- Continue to increase operating efficiency.

- Continue to draw on expertise from our shareholders.

### Recent Developments

*Citibank Loan Facility*

On July 8, 2004, we entered into a three-year $75,000,000 revolving credit facility agreement (the "Revolving Credit Facility Agreement") arranged by Citibank, N.A. Borrowings under this facility will be used to refinance existing indebtedness and for general corporate purposes. As of the date of this offering memorandum, the facility has not been utilized. See "Description of Existing Indebtedness— Citibank Loan Facility."

*Recent Financial and Operating Data*

On July 23, 2004, our majority shareholder, Telenor ASA ("Telenor"), released its consolidated financial results for the three months ended June 30, 2004 (the "Telenor Release"). Included within these results were certain unaudited and unreviewed financial and operating data as at and for the three months ended June 30, 2004 relating to us. The following financial data and ARPU relating to us

have been extracted from the Telenor Release and stated in U.S. dollars as originally reported by us to Telenor:

|  | As at and for the three months ended June 30, 2004 |
| --- | --- |
|  | (unaudited and unreviewed) |
| **Financial data:** |  |
| Net revenues (in millions) . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 145 |
| EBITDA[1] (in millions) . . . . . . . . . . . . . . . . . . . . . . . . . | $  86 |
| Capital expenditure (in millions) . . . . . . . . . . . . . . . . . . . . . | $  82 |
| **Operating data:** |  |
| Total Kyivstar subscribers (in millions) . . . . . . . . . . . . . . . . . | 3.61 |
| AMPU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74 |
| Kyivstar market share in Ukraine[2] . . . . . . . . . . . . . . . . . . . | 43% |
| Mobile phone penetration rate in Ukraine[3] . . . . . . . . . . . . . | 18% |
| ARPU (per month)[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $14.1 |

[1] EBITDA is defined as income/(loss) before financial and other income/(expenses), provisions for income taxes and depreciation and amortization expense.

[2] Market share is calculated based on the number of subscribers as reported by each operator; the operators use different methods to calculate subscribers.

[3] Mobile phone penetration rate is related to the number of subscribers as reported by each operator.

[4] ARPU is defined as the average monthly service revenue per Kyivstar subscriber.

Net revenues were $145.0 million for the three months ended June 30, 2004, reflecting an increase in the number of our subscribers and ARPU as compared to March 31, 2004. Our EBITDA was $86.2 million for the three months ended June 30, 2004 reflecting principally increased net revenues and increased control of sales and marketing expenses as compared to the three months ended March 31, 2004 as well as the same period in the prior year. ARPU increased from $12 for the three months ended March 31, 2004 to $14.1 for the three months ended June 30, 2004, reflecting the increase in AMPU. Our market share decreased from approximately 45% as at March 31, 2004, to approximately 43% as at June 30, 2004, in part as a result of increased competition, particularly in the prepaid segment of the market.

*Changes in Ukrainian Currency Control Regulation*

Recently, the board of the National Bank of Ukraine (the "NBU") passed a resolution prohibiting Ukrainian companies from making, in connection with prepayments on loans granted by foreign lenders, any payments (other than principal) which, in aggregate, exceed an amount determined by applying the applicable maximum interest rate established by the NBU (the "MIR") to the principal amount prepaid. This resolution will come into force on August 15, 2004.

The NBU has announced that, as of September 3, 2004, the MIR applicable to loans in foreign convertible currencies the maturities of which as set out in the relevant loan agreements are at least three years will be 11% per annum. The NBU has the authority to regularly review and modify such MIR from time to time.

Holders of the New Notes could, if this new regulation (with the announced MIR) were applicable, in connection with any prepayments thereof, receive payment of the full amount of accrued interest in respect of the New Notes (assuming there continues to be no applicable withholding tax) since the coupon on the New Notes is less than the announced MIR. However, if such regulation were applicable, any premium over par, default interest or other charges payable in connection with any prepayment on the New Notes would, after taking account of such accrued interest, be limited by the MIR.

3

On August 5, 2004, we obtained a letter of clarification from the NBU (the "Letter of Clarification") to the effect that the new regulation would not apply to our loan agreements which have been registered with the NBU prior to the effective date of the new regulation (*i.e.*, August 15, 2004). The 2004 Loan Agreement is expected to be registered with the NBU prior to this date and, as a result, it will be covered by the Letter of Clarification. Furthermore, the NBU has discretion to grant *ad hoc* waivers of its regulatory requirements. Although the Letter of Clarification does not have the force of law, the NBU, as the authority regulating currency transactions in Ukraine, normally acts in accordance with such letters. See also "Risk Factors—Risks Relating to the Offering, the New Notes and the Trading Market—Ukrainian currency control regulations could impact our ability to make payments to the Bank or Trustee under the 2004 Loan Agreement."

**The Offering**

*The following summary contains basic information about the New Notes and the structure of the transaction. It does not contain all of the information that may be important to you. For a more complete understanding of the New Notes, please refer to the sections of this offering memorandum entitled "Description of the Transaction and the Security", "Terms and Conditions of the New Notes", "Summary of Provisions of the New Notes While in Global Form" and "Summary of Certain Covenants" and the form of the 2004 Loan Agreement provided in Appendix A of this offering memorandum.*

The Bank will issue the New Notes, which will be without recourse to the Bank, and the Bank will apply an amount equal to the aggregate principal amount of the New Notes sold in this offering to fund an equivalent amount of the 2004 Loan to us (with the remainder of the 2004 Loan, if any, being funded pursuant to the Concurrent Exchange Offer). The New Notes will have the benefit of, and be constituted by, the Trust Deed. As provided in the Trust Deed, the Bank will:

- charge by way of security to the Trustee its rights to principal, interest and other amounts paid and payable under the 2004 Loan Agreement and its right to receive amounts paid and payable under any claim, award or judgment relating to the 2004 Loan Agreement (in each case, other than its right to amounts in respect of Reserved Rights (as defined in the section of this offering memorandum entitled "Terms and Conditions of the New Notes"));

- charge by way of security to the Trustee certain sums held from time to time in the Account (as defined in the 2004 Loan Agreement), together with the debt represented thereby (other than interest from time to time earned thereon and the Reserved Rights), pursuant to the Trust Deed; and

- transfer its rights under the 2004 Loan Agreement (save for those rights charged or reserved as described above) to the Trustee upon the closing of the offering of the New Notes.

The Bank will not have any obligations to the Noteholders, other than the obligation to account to the Noteholders in respect of the payments of principal, interest and additional amounts, if any, under the 2004 Loan if, and only to the extent, received from us and retained, less any Reserved Rights.

The following diagram depicts, in simplified form, the structure of this offering of New Notes.



4

*The Concurrent Exchange Offer*

Concurrently with this offering of New Notes as described in this offering memorandum, we are making an offer to the Existing Noteholders to exchange any and all of the Existing Notes for New Notes. See "Description of the Transaction and the Security—The Concurrent Exchange Offer". At the same time we are making the Concurrent Exchange Offer, the Bank is soliciting proxies to vote in favor of an extraordinary resolution at a meeting (the "Existing Noteholders' Meeting") of holders of the Existing Notes to approve an amendment of a certain financial covenant in the 2002 Loan Agreement and the 2003 Loan Agreement, which covenant would be applicable to any Existing Notes that remain outstanding upon conclusion of the Exchange Offer.

The purpose of the Concurrent Exchange Offer is to lengthen the average maturity of our funding sources, and the purpose of the proposed amendment to the 2002 Loan Agreement and the 2003 Loan Agreement is to conform the covenants relating to any Existing Notes that remain after completion of the Exchange Offer to the covenants relating to the New Notes.

**The offering of New Notes to new investors is not in any way conditional on the success of the exchange offer.**

For information about the impact of the Concurrent Exchange Offer on our future financial condition and results of operations, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Effects of the Concurrent Exchange Offer".

5

**The New Notes**

| | |
|---|---|
| Issuer/Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Dresdner Bank Aktiengesellschaft. |
| Managers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Citigroup Global Markets Limited and Dresdner Bank AG London Branch. |
| Issue Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . | $135,000,000 principal amount offered and sold in this offering. In addition, we are offering further New Notes in the Concurrent Exchange Offer. For information about the principal amount of New Notes and other consideration being offered in the Concurrent Exchange Offer, see "Description of the Transaction and the Security—The Concurrent Exchange Offer". |
| Issue Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100% of the principal amount of the New Notes. |
| Maturity Date . . . . . . . . . . . . . . . . . . . . . . . . . . | August 17, 2009. |
| Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | The Law Debenture Trust Corporation p.l.c. |
| Registrar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Citigroup Global Markets Deutschland AG & Co. KGaA, at its specified office in Frankfurt. |
| Paying Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . | Dexia Banque Internationale à Luxembourg, société anonyme, at its specified office in Luxembourg. |
| Principal Paying Agent . . . . . . . . . . . . . . . . . . . | Citibank, N.A., at its specified office in London. |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | The New Notes will bear interest from August 17, 2004 at an annual rate of 10.375%. Interest on the New Notes will be payable semiannually in arrears on February 17 and August 17 of each year, commencing on February 17, 2005. |
| Status and Use of Proceeds . . . . . . . . . . . . . . . . | The New Notes will constitute the obligations of the Bank to apply an amount equal to the principal amount of the New Notes to fund the 2004 Loan to us under the terms of the 2004 Loan Agreement. The New Notes will be senior obligations of the Bank. However, the Bank's only obligations on the New Notes are to make payments of amounts in aggregate equal to the sums actually received by it from us under the 2004 Loan Agreement, less amounts in respect of certain Reserved Rights. |
| Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | The New Notes will be secured by a charge on:<br><br>• all of the Bank's rights to principal, interest and other amounts paid and payable under the 2004 Loan Agreement and its right to receive amounts paid and payable under any claim, award or judgment relating to the 2004 Loan Agreement (in each case, other than its right to amounts in respect of certain Reserved Rights in relation to the 2004 Loan Agreement); and |

6

|  | • sums held from time to time in the Account (as defined in the Trust Deed) together with the debt represented thereby (other than interest from time to time earned thereon and the Reserved Rights) pursuant to the Trust Deed. |
| Transfer of Rights . . . . . . . . . . . . . . . . . . . . . . | The Bank will transfer its rights under the 2004 Loan Agreement (save for those rights charged or reserved as described above) to the Trustee upon the closing of the offering of the New Notes. |
| Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | The New Notes will be issued in registered form. The New Notes will be in denominations in aggregate principal amount of $100,000 each and integral multiples of $1,000 in excess thereof and will be represented by global note certificates. The global note certificates will be exchangeable for New Notes in individual form in the limited circumstances specified in the global note certificates. |
|  | New Notes offered and sold outside the United States in offshore transactions in reliance on Regulation S under the Securities Act will be represented by the Regulation S Global Note Certificate. |
|  | New Notes offered and resold in the United States to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) in reliance on Rule 144A will be represented by the Rule 144A Global Note Certificate. |
|  | The Global Note Certificates will be exchangeable for New Notes in individual form in the limited circumstances specified in the Global Note Certificates. |
| Optional Redemption by the Bank . . . . . . . . . . . | The New Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, upon giving notice to the Trustee, at the principal amount thereof, together with accrued and unpaid interest and additional amounts, if any, to the date of redemption in the event that it becomes unlawful for the Bank to fund the 2004 Loan or allow the 2004 Loan to remain outstanding under the 2004 Loan Agreement or allow the New Notes to remain outstanding. In such a case, the Bank would require us to repay the 2004 Loan in full. |
| Mandatory Redemption . . . . . . . . . . . . . . . . . . | The Bank is required to redeem in whole, but not in part, the New Notes at 100% of their principal amount plus accrued and unpaid interest and additional amounts, if any, up to the date of redemption if we elect to repay the 2004 Loan in the event we are required to pay certain additional amounts on account of Ukrainian or German |

|  |  |
|---|---|
|  | withholding taxes, or in the event that we are required to pay certain tax indemnity amounts pursuant to the 2004 Loan Agreement. |
| Change of Control . . . . . . . . . . . . . . . . . . . . . | In the event of a Change of Control (as defined in the 2004 Loan Agreement), Noteholders will have the right to require the Bank to repurchase all or any part of the New Notes at 101% of their principal amount, plus accrued and unpaid interest and additional amounts, if any, up to the date of redemption. In such case, we are required to prepay the 2004 Loan in an amount sufficient to provide funds to enable the Bank to repurchase all New Notes validly tendered by Noteholders. |
| Asset Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . | Under certain circumstances and subject to certain limitations, if at the beginning of any month the Excess Proceeds (as defined in the 2004 Loan Agreement) from Asset Sales (as defined in the 2004 Loan Agreement) exceed $3 million, Noteholders will have the right to require the Bank to repurchase their New Notes at 100% of their principal amount, plus accrued and unpaid interest and additional amounts, if any, in an aggregate amount up to the amount of such Excess Proceeds. In such case, we are required to prepay the 2004 Loan in an amount sufficient to provide funds to enable the Bank to repurchase the New Notes. |
| Events of Default and Relevant Events . . . . . . . | In the case of an Event of Default (as defined in the 2004 Loan Agreement) or a Relevant Event (as defined in "Terms and Conditions of the New Notes"), the Trustee may, subject as provided in the Trust Deed, enforce the security created in the Trust Deed in favor of the Noteholders. |
| Rating . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Standard & Poor's Rating Service has assigned its "B" senior unsecured debt rating to the New Notes, and Moody's Investors Service has assigned a P(B2) rating to the New Notes. We have been given a senior implied corporate credit rating of "B (positive outlook)" by Standard & Poor's Rating Service and "B2 (positive outlook)" by Moody's Investors Service, Inc. Credit ratings assigned to the New Notes do not necessarily mean they are a suitable investment for you. A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organization. Similar ratings on different types of securities do not necessarily mean the same thing. The ratings do not address the likelihood that the principal on the New Notes will be prepaid, paid on an expected final payment date or paid on any |

8

|   | particular date before the legal final maturity date of the New Notes. The ratings do not address the marketability of the New Notes or any market price. Any change in the credit ratings of the New Notes or us could adversely affect the price that a subsequent purchaser will be willing to pay for the New Notes. We recommend that you analyze the significance of each rating independently from any other rating. |
|---|---|
| Withholding Tax . . . . . . . . . . . . . . . . . . . . . . . | All payments of principal and interest in respect of the New Notes will be made free and clear of all taxes, duties, fees and other charges of Germany or Ukraine, other than as required by law. If any taxes, duties, fees or other charges are payable in the above jurisdictions (or, subject to certain exceptions, any other jurisdictions in which the Bank or any successor is resident for tax purposes), the sum payable by us will be required (subject to certain exceptions) to be increased to the extent necessary to ensure that the Bank receives a net sum which it would have received free from any liability in respect of any such deduction or withholding had no such deduction or withholding been made or required to be made. The sole obligation of the Bank in this respect will be to pay to the Noteholders sums equivalent to the sum received from us. |
| Listing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Application has been made to list the New Notes on the Luxembourg Stock Exchange. The New Notes issued and sold in reliance on Rule 144A are eligible for trading on the PORTAL® Market, a subsidiary of The Nasdaq Stock Market, Inc. |
| Transfer Restrictions . . . . . . . . . . . . . . . . . . . . | The New Notes have not been, and will not be, registered under the Securities Act and, subject to certain exceptions, may not be offered or sold within the United States. The New Notes may be sold in other jurisdictions only in compliance with applicable laws. See the section of this offering memorandum entitled "Subscription and Sale". |
| ERISA and Other Considerations . . . . . . . . . . . | Each acquiror of a Note or any interest in a Note will be deemed to represent that it either will not be a Benefit Plan or falls within one of certain prohibited transaction class exemptions promulgated by the U.S. Department of Labor applicable to the acquisition and holding of the Notes (or interest therein). See "Certain ERISA and Other Considerations" and "Form of New Notes and Transfer Restrictions." |
| Governing Law . . . . . . . . . . . . . . . . . . . . . . . . | The New Notes will be governed by English law. |

9

## TERMS AND CONDITIONS OF THE NEW NOTES

The following, other than the paragraphs below in italics, is the text of the Terms and Conditions of the Notes which will be endorsed on each Note in definitive form (if issued):

The $ [*an amount equal to US$135,000,000 together with the aggregate principal amount of such Notes, if any, issued in the Concurrent Exchange Offer*] 10.375% Loan Participation Notes due 2009, (the "**Notes**", which expression includes any further notes issued pursuant to Condition 13 (*Further Issues*) and forming a single series therewith) of Dresdner Bank Aktiengesellschaft (the "**Bank**") are constituted by, are subject to and have the benefit of, a trust deed (as amended or supplemented from time to time, the "**Trust Deed**") dated 17 August, 2004 between the Bank and The Law Debenture Trust Corporation p.l.c., as trustee (the "**Trustee**", which expression includes all persons from time to time appointed trustee or trustees under the Trust Deed). The Bank has authorised the creation, issue and sale of the Notes for the sole purpose of financing a loan (the "**Loan**") to Closed Joint Stock Company "KYIVSTAR G.S.M." (the "**Borrower**"). The Bank and the Borrower have recorded the terms of the Loan in an agreement (as amended or supplemented from time to time, the "**Loan Agreement**") dated 9 August, 2004 between the Bank, as lender, and the Borrower.

**In each case where amounts of principal, interest and additional amounts, if any, due pursuant to Condition 7 (*Taxation*) are stated herein or in the Trust Deed to be payable in respect of the Notes, the obligation of the Bank to make any such payment shall constitute an obligation only to pay to the Noteholders (as defined in Condition 2(a)), on each date upon which such amounts of principal, interest and Additional Amounts, if any, are due in respect of the Notes, to the extent of the sums of principal, interest, Additional Amounts (as defined in the Loan Agreement) and Tax Indemnity Amounts (as defined in the Loan Agreement), if any, actually received by or for the account of the Bank pursuant to the Loan Agreement less any amount in respect of the Reserved Rights (as defined below). Noteholders must therefore rely solely and exclusively upon the covenant to pay under the Loan Agreement and the credit and financial standing of the Borrower. Noteholders shall have no recourse (direct or indirect) to any other assets of the Bank.**

The Bank (as lender) has:

(A) charged by way of security to the Trustee all of the Bank's rights, interests and benefits in and to (i) principal, interest and other amounts as at the date of the Trust Deed or thereafter paid and payable by the Borrower to the Bank as lender under the Loan Agreement and (ii) all amounts as at the date of the Trust Deed or thereafter paid or payable by the Borrower to the Bank under or in respect of any claim, award or judgment relating to the Loan Agreement (in each case other than its right to amounts in respect of any rights, interests and benefits of the Bank under the following clauses of the Loan Agreement: Clause 7.6 second sentence thereof (*Costs of Prepayment*); Clause 8.3(a) (*Tax Indemnity*); Clause 10 (*Changes in Circumstances*); Clause 11 (*Representations and Warranties of the Borrower*); Clause 20 (*Fees, Costs and Expenses*) (to the extent that the Bank's claim is in respect of one of the aforementioned clauses of the Loan Agreement); Clause 8.2 (*Payments*) and Clause 18.2 (*Currency Indemnity*) and (to the extent the Bank's rights thereunder relate to sums payable to the Bank under any other provision of the Loan Agreement forming part of the "Reserved Rights") Clause 16 (*Default Interest and Indemnity*) (such rights referred to herein, the "**Reserved Rights**"));

(B) charged by way of security to the Trustee all of the Bank's rights, interest and benefits in and to all sums held on deposit from time to time in the Account with the Principal Paying Agent (as defined below) at its branch in London, England (the "**Account**"), together with the debt represented thereby (other than interest from time to time earned thereon and the Reserved Rights) pursuant to the Trust Deed; and

(C) assigned absolutely to the Trustee all of the Bank's rights, interests and benefits whatsoever, both in existence at the date of the Trust Deed and future, whether proprietary, contractual or

135

otherwise under or arising out of or evidenced by the Loan Agreement (including, without limitation, the right to declare the Loan immediately due and payable and to take proceedings to enforce the obligations of the Borrower thereunder) other than the Charged Property and the Reserved Rights and amounts payable by the Borrower in relation to the Charged Property and the Reserved Rights (the "**Transferred Rights**"),

together, the "**Security Interests**".

In certain circumstances, the Trustee can (subject to it being indemnified and/or secured to its satisfaction) be required by Noteholders holding at least one-quarter of the principal amount of the Notes outstanding or by an Extraordinary Resolution (as defined in the Trust Deed) of the Noteholders to exercise certain of its powers under the Trust Deed (including those arising in connection with the Security Interests).

The Notes are the subject of an agency agreement dated 17 August, 2004 (as amended or supplemented from time to time, the "**Agency Agreement**") among the Bank, Citigroup Global Markets Deutschland AG & Co. KGaA, at its specified office in Frankfurt, as registrar (the "**Registrar**", which expression includes any successor registrar appointed from time to time in connection with the Notes), Citibank N.A., at its specified office in London, as principal paying agent (the "**Principal Paying Agent**", which expression includes any successor principal paying agent appointed from time to time in connection with the Notes), Dexia Banque Internationale à Luxembourg, société anonyme, at its specified office in Luxembourg, and Citibank N.A., at its specified office in London, each as transfer agent (each, a "**Transfer Agent**" and, together, the "**Transfer Agents**", which expression includes any additional or successor transfer agent appointed from time to time in connection with the Notes) and each as paying agent (each, a "**Paying Agent**" and, together, the "**Paying Agents**", which expressions include any additional or successor paying agent appointed from time to time in connection with the Notes) and the Trustee. References herein to the "**Agents**" are to the Registrar, any Transfer Agent, the Principal Paying Agent and any Paying Agent and any reference to an "**Agent**" is to any one of them. Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and are subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the registered office for the time being of the Trustee, being at the date hereof 100 Wood Street, London EC2V 7EX and at the Specified Offices (as defined in the Agency Agreement) of the Registrar, the Principal Paying Agent, any Transfer Agent and any Paying Agent. The initial Specified Offices of the initial Agents are set out below.

1.   **Form, Denomination and Status**

(a)   *Form and denomination:*   The Notes are in registered form in minimum denominations in aggregate principal amount of $100,000 each (subject to Condition 5(d) (*Asset Sale*)) and integral multiples of $1,000 in excess thereof, without coupons attached.

(b)   *Status:*   The sole purpose of the issue of the Notes is to provide the funds for the Bank to finance the Loan. The Notes constitute the obligation of the Bank to apply an amount equal to the gross proceeds from the issue of the Notes solely for financing the Loan and to account to the Noteholders for an amount equivalent to sums of principal, interest, Additional Amounts and Tax Indemnity Amounts, if any, actually received by or for the account of the Bank pursuant to the Loan Agreement (less any amounts in respect of the Reserved Rights), the right to receive which is, inter alia, being charged by way of security to the Trustee by virtue of the Security Interests as security for the Bank's payment obligations under the Trust Deed and in respect of the Notes.

Payments in respect of the Notes to the extent of the sums actually received by or for the account of the Bank by way of principal, interest, Additional Amounts or Tax Indemnity Amounts, if any,

pursuant to the Loan Agreement (less any amounts in respect of the Reserved Rights) will be made pro rata among all Noteholders (subject to Condition 5(c) (*Redemption at the option of the Noteholders upon a Change of Control*), Condition 5(d) (*Asset Sale*) and Condition 7 (*Taxation*)), on the dates on which such payments are due in respect of the Notes subject to the conditions attaching to, and in the currency of, such payments under the Loan Agreement. The Bank shall not be liable to make any payment in respect of the Notes other than as expressly provided herein and in the Trust Deed. The Bank shall be under no obligation to exercise in favour of the Noteholders any rights of set-off or of banker's lien or to combine accounts or counterclaim that may arise out of other transactions between the Bank and the Borrower.

Noteholders are deemed to have accepted that:

(i) neither the Bank nor the Trustee makes any representation or warranty in respect of, and shall at no time have any responsibility for, or (save as otherwise expressly provided in the Trust Deed and paragraph (vi) below) liability, or obligation in respect of the performance and observance by the Borrower of its obligations under the Loan Agreement or the recoverability of any sum of principal, interest, Additional Amounts or Tax Indemnity Amounts or other amounts, if any, due or to become due from the Borrower under the Loan Agreement;

(ii) neither the Bank nor the Trustee shall at any time have any responsibility for, or obligation or liability in respect of, the condition (financial, operational or otherwise), creditworthiness, affairs, status, nature or prospects of the Borrower;

(iii) neither the Bank nor the Trustee shall at any time have any responsibility for, or obligation or liability in respect of, any misrepresentation or breach of warranty or any act, default or omission of the Borrower under or in respect of the Loan Agreement;

(iv) neither the Bank nor the Trustee shall at any time have any responsibility for, or liability or obligation in respect of, the performance and observance by the Registrar, the Principal Paying Agent, any Transfer Agent or any Paying Agent of their respective obligations under the Agency Agreement;

(v) the financial servicing and performance of the terms of the Notes depend solely and exclusively upon performance by the Borrower of its obligations under the Loan Agreement, its covenant to pay under the Loan Agreement and its credit and financial standing. The Borrower has represented and warranted to the Bank in the Loan Agreement that the Loan Agreement constitutes a legal, valid and binding obligation of the Borrower. The representations and warranties given by the Borrower in Clause 11 (*Representations and Warranties of the Borrower*) of the Loan Agreement are given by the Borrower to the Bank for the sole benefit of the Bank and neither the Trustee nor any Noteholder shall have any remedies or rights against the Borrower that the Bank may have with respect to such representations or warranties, other than any right the Trustee may have pursuant to the assignment of the Transferred Rights;

(vi) the Bank (and, pursuant to the assignment of the Transferred Rights, the Trustee) will rely on self-certification by the Borrower and certification by third parties as a means of monitoring whether the Borrower is complying with its obligations under the Loan Agreement and shall not otherwise be responsible for investigating any aspect of the Borrower's performance in relation thereto and, subject as further provided in the Trust Deed, the Trustee will not be liable for any failure to make the usual or any investigations which might be made by a security holder in relation to the property which is the subject of the Security Interests and held by way of security for the Notes, and shall not be bound to enquire into or be liable for any defect or failure in the right or title of the Bank to the secured property represented by the Security Interests whether such defect or failure was known to the Trustee or might have been discovered upon examination or enquiry or whether capable of remedy or not, nor will it

137

have any liability for the enforceability of the security created by the Security Interests whether as a result of any failure, omission or defect in registering or filing or otherwise protecting or perfecting such security and the Trustee will have no responsibility for the value of such security; and

(vii) except to the extent compensated for in interest payments, Additional Amounts or Tax Indemnity Amounts actually received by the Bank under the Loan Agreement in respect of such withholding or deduction, the Bank will not be liable for any withholding or deduction or for any payment on account of Taxes (as defined in the Loan Agreement) (not being a tax imposed on the Bank's net income) required to be made by the Bank on or in relation to any sum received by it under the Loan Agreement which will or may affect payments made or to be made by the Borrower under the Loan Agreement; the Bank shall, furthermore, not be obliged to take any actions or measures as regards such deductions or withholdings other than those set out in Clause 8 (*Taxes*) and Clause 10.4 (*Mitigation*) of the Loan Agreement.

Save as otherwise expressly provided herein and in the Trust Deed, no proprietary or other direct interest in the Bank's rights under or in respect of the Loan Agreement or the Loan exists for the benefit of the Noteholders. Subject to the terms of the Trust Deed, no Noteholder will have any entitlement to enforce any of the provisions in the Loan Agreement or have direct recourse to the Borrower except through action by the Trustee under the Security Interests. Neither the Bank nor the Trustee pursuant to the Transferred Rights shall be required to take proceedings to enforce payment under the Loan Agreement unless it has been indemnified and/or secured by the Noteholders to its satisfaction against all liabilities, proceedings, claims and demands to which it may thereby become liable and all costs, charges and expenses which may be incurred by it in connection therewith.

As provided in the Trust Deed, the obligations of the Bank are solely to make payments of amounts in aggregate equal to each sum actually received by or for the account of the Bank from the Borrower in respect of principal, interest, Additional Amounts, Tax Indemnity Amounts or other amounts, if any, as the case may be, pursuant to the Loan Agreement (less any amount in respect of the Reserved Rights), the right to which is being charged by way of security to the Trustee as aforesaid. Noteholders must therefore rely solely and exclusively upon the covenant to pay under the Loan Agreement and the credit and financial standing of the Borrower.

The obligations of the Bank to make payments as stated in the previous paragraph constitute direct and general obligations of the Bank which will at all times rank *pari passu* among themselves and at least *pari passu* with all other present and future unsecured obligations of the Bank, save for such obligations as may be preferred by provisions of law that are both mandatory and of general application.

Payments made by the Borrower under the Loan Agreement to, or to the order of, the Trustee or (before such time that the Bank has been required by the Trustee, pursuant to the terms of the Trust Deed, to pay to or to the order of the Trustee) the Principal Paying Agent will satisfy *pro tanto* the obligations of the Bank in respect of the Notes.

2.  **Register, Title and Transfers**

    (a) *Register:*   The Registrar will maintain outside the United Kingdom a register (the "**Register**") in respect of the Notes in accordance with the provisions of the Agency Agreement. In these Conditions, the "**Holder**" of a Note means the person in whose name such Note is for the time being registered in the Register (or, in the case of a joint holding, the first named thereof) and "**Noteholder**" shall be construed accordingly. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

138

*The Rule 144A Global Note Certificate will be deposited with a custodian for, and title to the Notes issued in respect of the Rule 144A Global Note Certificate will be registered in the name of, a nominee of DTC. The Regulation S Global Note Certificate will be deposited with a common depositary for Euroclear and Clearstream, Luxembourg and the title to the Notes issued in respect of the Regulation S Global Note Certificate will be registered in the name of a nominee of such common depositary.*

(b) *Title:*  The Holder of each Note shall (except as otherwise required by law) be treated as the absolute owner of such Note for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing on the Note Certificate relating thereto (other than the endorsed form of transfer) or any notice of any previous loss or theft of such Note Certificate) and no person shall be liable for so treating such Holder.

(c) *Transfers:*  Subject to Conditions 2(f) and (g) below, a Note may be transferred upon surrender of the relevant Note Certificate, with the endorsed form of transfer duly completed (including any certificates as to compliance with restrictions on transfer included therein), at the Specified Office of the Registrar or a Transfer Agent, together with such evidence as the Registrar or (as the case may be) such Transfer Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer. Where not all the Notes represented by the surrendered Note Certificate are the subject of the transfer, a new Note Certificate in respect of the balance of the Notes will be issued to the transferor in accordance with Condition 2(d) below.

(d) *Registration and delivery of Note Certificates:*  Within five business days of the surrender of a Note Certificate in accordance with Condition 2(c) above, the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Note(s) transferred to the relevant Holder at the Registrar's Specified Office or (as the case may be) the Specified Office of the Transfer Agent or (at the request and risk of any such relevant Holder) by uninsured first class mail (and airmail if overseas) to the address specified for the purpose by such relevant Holder. In this paragraph, "business day" means a day on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar has its Specified Office. In the case of the transfer of part only of the Notes, a new Note Certificate in respect of the balance of the Notes not transferred will be so delivered or (at the risk and, if mailed at the request of the transferor otherwise than by ordinary uninsured mail, at the expense of the transferor) sent by mail to the transferor.

(e) *No charge:*  The transfer of a Note will be effected without charge by or on behalf of the Bank or the Registrar, but against such indemnity as the Registrar may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(f) *Closed periods:*  Noteholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or interest in respect of the Notes.

(g) *Regulations concerning transfers and registration:*  All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of Notes scheduled to the Agency Agreement. The regulations may be changed by the Bank with the prior written approval of the Trustee, the Registrar and the Borrower. A copy of the current regulations will be mailed (free of charge) by the Registrar and/or any Transfer Agent to any Noteholder who requests in writing a copy of such regulations and will be available at the office of the Registrar in Frankfurt and the Transfer Agent in Luxembourg.

3.  **Bank's Covenants**

(a) *Amendments to Loan Agreement:*   As provided in the Trust Deed, so long as any of the Notes remain outstanding (as defined in the Trust Deed), the Bank will not, without the prior written consent of the Trustee or an Extraordinary Resolution or Written Resolution (as defined in the Trust Deed), agree to any amendments to or any modification or waiver of, or authorise any breach or proposed breach of, the terms of the Loan Agreement and will act at all times in accordance with any instructions of the Trustee from time to time with respect to the Loan Agreement, except as otherwise expressly provided in the Trust Deed and the Loan Agreement. Any such amendment, modification, waiver or authorisation made with the consent of the Trustee shall be binding on the Noteholders and any such amendment or modification shall be notified by the Issuer to the Noteholders in accordance with Condition 14 (*Notices*).

(b) *Provision of Financial Information:*   For so long as any Notes are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Bank will, during any period in which it is neither subject to Section 13 or 15(d) of the U.S. Securities Exchange Act of 1934 nor exempt from reporting pursuant to Rule 12g3-2(b) thereunder, co-operate with the Borrower to provide to any holder or beneficial owner of such restricted securities or to any prospective purchaser of such restricted securities designated by such holder or beneficial owner or to the Trustee for delivery to such holder, beneficial owner or prospective purchaser, in each case upon the request of such holder, beneficial owner, prospective purchaser or the Trustee, the information satisfying the requirements of Rule 144A(d)4 under the Securities Act. This information will also be available free of charge at the office of the paying agent in Luxembourg.

4.  **Interest**

(a) *Accrual of interest:*   The Notes bear interest from 17 August, 2004 (the "**Issue Date**") at the rate of 10.375% per annum (the "**Interest Rate**") payable semi-annually in arrears on 17 February and 17 August of each year (each, other than the Issue Date, an "**Interest Payment Date**"), subject as provided in Condition 6 (*Payments*). Each period from (and including) the Issue Date or any Interest Payment Date to (but excluding) the next (or first) Interest Payment Date is herein called an "**Interest Period**".

Each Note will cease to bear interest from the due date for redemption unless, upon due presentation of the relevant Note Certificate, payment of principal is improperly withheld or refused, in which case interest will continue to accrue (before or after any judgment) from the due date for redemption to, but excluding, the date on which payment in full of the principal is made under the Notes.

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Interest Rate to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half cent being rounded upwards). When interest is required to be calculated in respect of a period other than an Interest Period, it shall be calculated on the basis of a 360 day year consisting of 12 months of 30 days each, and in the case of an incomplete month, the actual number of days elapsed.

(b) *Default Interest under the Loan Agreement:*   In the event that, and to the extent that, the Bank actually receives any amounts in respect of interest on unpaid sums from the Borrower pursuant to Clause 16 (*Default Interest and Indemnity*) of the Loan Agreement (other than amounts so received forming part of the Reserved Rights), the Bank shall account to the Noteholders for an amount equivalent to the amounts in respect of interest on unpaid sums actually so received. Any payments made by the Bank under this Condition 4(b) will be made

on the next following business day (as defined in Condition 6(c)) after the day on which the Bank receives such amounts from the Borrower and, save as provided in this Condition 4(b), subject as provided in Condition 6 (*Payments*).

5. **Redemption and Purchase**

(a) *Final redemption:*   Unless previously prepaid pursuant to Clause 7 (*Prepayment*) of the Loan Agreement or repaid in accordance with Clause 10.3 (*Illegality*) of the Loan Agreement, the Borrower will be required to repay the Loan on its due date as provided in the Loan Agreement and, subject to such repayment, all the Notes will be redeemed at their principal amount on 17 August, 2009, subject as provided in Condition 6 (*Payments*).

(b) *Redemption by the Bank:*   The Notes shall be redeemed by the Bank in whole, but not in part, at any time, on giving not less than 25 days' notice to the Noteholders (which notice shall be irrevocable and shall specify a date for redemption, being the same date as that set forth in the notice of prepayment referred to in Condition 5(b)(i) or (ii) below) in accordance with Condition 14 (*Notices*) at the principal amount thereof, together with interest accrued and unpaid to the date fixed for redemption and any additional amounts in respect thereof pursuant to Condition 7 (*Taxation*), if, immediately before giving such notice, the Bank satisfies the Trustee that:

  (i) the Bank has received a notice of prepayment from the Borrower pursuant to Clause 7.1 (*Prepayment for Tax Reasons*) of the Loan Agreement; or

  (ii) the Bank has delivered a notice to the Borrower, the contents of which require the Borrower to repay the Loan, in accordance with the provisions of Clause 10.3 (*Illegality*) of the Loan Agreement.

The Bank shall deliver to the Trustee a certificate signed by two officers of the Bank stating that the Bank is entitled to effect such redemption in accordance with this Condition 5(b). A copy of the Borrower's notice of prepayment or details of the circumstances contemplated by Clause 10.3 (*Illegality*) of the Loan Agreement and the date fixed for redemption shall be set forth in the notice.

The Trustee shall be entitled to accept any notice or certificate delivered by the Bank in accordance with this Condition 5(b) as sufficient evidence of the satisfaction of the applicable circumstances in which event they shall be conclusive and binding on the Noteholders.

Upon the expiry of any such notice given by the Bank to the Noteholders as is referred to in this Condition 5(b), the Bank shall be bound to redeem the Notes in accordance with this Condition 5, subject as provided in Condition 6 (*Payments*).

(c) *Redemption at the option of the Noteholders upon a Change of Control:*

  (i) Upon the occurrence of a Change of Control (as defined in the Loan Agreement), in accordance with Condition 14 (*Notices*) the Bank will make an offer to purchase all or any part (subject to a minimum of $100,000 in principal amount and integral multiples of $1,000 in excess thereof) of the Notes pursuant to the offer described below (the "**Change of Control Offer**") at a price per Note in cash (the "**Change of Control Payment**") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon to the date of repurchase, plus additional amounts, if any, to such date of repurchase. Pursuant to Clause 7.3 (*Prepayment in the Event of a Change of Control*) of the Loan Agreement, the Borrower is required to give written notice to the Bank (in the form of an Officer's Certificate) (and, following the assignment of the Transferred Rights to the Trustee, to the Trustee) promptly and in any event within 10 calendar days after the date of any Change of Control (the "**Borrower Change of Control Notice**") and thereafter to prepay

141

the Loan to the extent of 101% of the aggregate principal amount of the Notes plus accrued and unpaid interest thereon to the date of prepayment, plus additional amounts, if any, thereon corresponding to the aggregate principal amount plus accrued and unpaid interest and additional amounts, if any, on the Notes to be repurchased in accordance with this Condition 5(c). The Bank, upon receipt of the Borrower Change of Control Notice, shall mail a notice to each Holder postage prepaid (and if and so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such Stock Exchange shall so require, will publish notice in a newspaper having a general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*)), with a copy to the Agents and, following the assignment of the Transferred Rights to the Trustee, the Trustee, with the following information: (i) that a Change of Control Offer is being made pursuant to this Condition 5(c) and all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment; (ii) the purchase price and the purchase date, which will be a business day (when used in this condition, as such term is defined in the Loan Agreement) which is no earlier than 30 days and no later than 60 calendar days from the date of delivery to the Bank of the Borrower Change of Control Notice, except as may be otherwise required by applicable law (the "**Change of Control Payment Date**"); (iii) that any Note not properly tendered or not tendered at all will remain outstanding and continue to accrue interest and additional amounts, if any; (iv) that unless the Bank defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest and additional amounts, if any, on the Change of Control Payment Date; (v) that Holders electing to have any Notes repurchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" set forth as an exhibit to the Agency Agreement completed, to the Paying Agent and at the address specified in the notice by the deadline specified in the notice; (vi) that Holders will be entitled to withdraw their tendered Notes and their election to require the Bank to repurchase such Notes provided that the Paying Agent receives by the deadline specified in the notice, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes tendered for repurchase, and a statement that such Holder is withdrawing his tendered Notes and his election to have such Notes repurchased; and (vii) that Holders whose Notes are being repurchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the principal amount of the Notes surrendered, which unpurchased portion must be in integral multiples of $1,000.

(ii) The Bank will comply with the requirements of Rule 14e-l under the United States Securities Exchange Act of 1934 and any other securities laws and regulations thereunder and will comply with the applicable laws of any non-US jurisdiction in which a Change of Control Offer is made, in each case, to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Loan Agreement or these terms and conditions, the Bank will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations contained in the Loan Agreement or these terms and conditions by virtue thereof.

(iii) On the second business day preceding the Change of Control Payment Date, the Bank will provide a notice (the "**Bank Change of Control Notice**") to the Noteholders (in accordance with Condition 14 (*Notices*)), the Trustee and the Borrower setting forth the Change of Control Payment (including, in the case of the notice to the Trustee and the

Borrower, the computation thereof) required to be made by the Bank for such Notes or portions thereof on the Change of Control Payment Date.

(iv) On the last business day prior to the Change of Control Payment Date, the Borrower is required, pursuant to Clause 7.3 (*Prepayment in the Event of a Change of Control*) of the Loan Agreement, to deposit in the Account with the Principal Paying Agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof properly tendered and not properly withdrawn as set forth in the Bank Change of Control Notice. On the Change of Control Payment Date, the Bank will, to the extent permitted by law, (i) accept for payment all Notes or portions thereof properly tendered and not properly withdrawn pursuant to the Change of Control Offer and (ii) deliver, or cause to be delivered, to the Registrar for cancellation on behalf of the Bank the Notes so accepted together with an Officers' Certificate from the Bank stating that such Notes or portions thereof have been tendered to and purchased by the Bank. In accordance with the instructions of the Holder set forth in the Option of Holder to Elect to Purchase, the Paying Agent will promptly either (x) pay to the Holder or (y) mail to each Holder of Notes postage prepaid, the Change of Control Payment for such Notes, and the Registrar will promptly authenticate and deliver to the Holder of the Notes a new Note Certificate or Certificates, equal in principal amount to any unpurchased portion of the Notes surrendered, if any; provided, however, that each new Note will be in an integral multiple of $1,000. The Bank will notify the Noteholders in accordance with Condition 14 (*Notices*) of the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(d) *Asset Sale:*

(i) If, as of the first day of any calendar month, the aggregate amount of Excess Proceeds (as defined in the Loan Agreement) resulting from Asset Sales (as defined in the Loan Agreement) (the "**Excess Proceeds Offer Amount**") exceeds $3 million, in accordance with Condition 14 (*Notices*), the Bank will make an offer to purchase that part (subject to a minimum of $100,000 in principal amount and integral multiples of $1,000 in excess thereof) of the Notes pursuant to the offer described below (the "**Asset Sale Offer**") at a price per Note in cash (the "**Asset Sale Payment**") equal to 100% of the principal amount thereof plus accrued and unpaid interest thereon to the date of repurchase, plus additional amounts, if any, to such date of repurchase. Pursuant to Clause 7.4 (*Prepayment in the Event of Asset Sales*) of the Loan Agreement, the Borrower is required to give written notice to the Bank in the form of an Officers' Certificate (and, following the assignment of the Transferred Rights to the Trustee, to the Trustee), promptly and in any event within 10 calendar days after the first day of any calendar month in which Excess Proceeds exceed $3 million (the "**Borrower Excess Proceeds Notice**") and thereafter to prepay the Loan to the extent of the aggregate principal amount plus accrued and unpaid interest thereon to the date of prepayment, plus additional amounts, if any, thereon corresponding to the aggregate principal amount plus accrued and unpaid interest and additional amounts, if any, on the Notes to be repurchased in accordance with this Condition 5(d). The aggregate principal amount (less the amount of the Management Fee, if any, received by the Bank) plus accrued and unpaid interest thereon to the date of prepayment, plus additional amounts, if any, thereon corresponding to the aggregate principal amount plus accrued and unpaid interest and additional amounts, if any, on the Notes that are required to be repurchased by the Bank pursuant to this Condition 5(d) may not exceed the Excess Proceeds Offer Amount. The Bank, upon receipt of such Borrower Excess Proceeds Notice, shall mail a notice to each Holder postage prepaid (and if and so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such Stock Exchange shall so require, will publish notice in a

143

newspaper having a general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*)), with a copy to the Agents and, prior to the assignment of the Transferred Rights to the Trustee, the Trustee, with the following information: (i) that an Asset Sale Offer is being made pursuant to this Condition 5(d); (ii) the purchase price, the Excess Proceeds Offer Amount and the purchase date, which will be a business day which is 60 calendar days from the date of delivery to the Bank of the Borrower Excess Proceeds Notice, except as may be otherwise required by applicable law (the "**Asset Sale Payment Date**"); (iii) that any Note not properly tendered or otherwise accepted or not tendered at all will remain outstanding and continue to accrue interest and additional amounts, if any; (iv) that unless the Bank defaults in the payment of the Asset Sale Payment, all Notes accepted for payment pursuant to the Asset Sale Offer will cease to accrue interest and additional amounts, if any, on the Asset Sale Payment Date; (v) that Holders electing to have any Notes repurchased pursuant to an Asset Sale Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" set forth as an exhibit to the Agency Agreement completed, to the Paying Agent and at the address specified in the notice prior to the close of business on the fifth business day preceding the Asset Sale Payment Date; (vi) that Holders will be entitled to withdraw their tendered Notes and their election to require the Bank to repurchase such Notes provided that the Paying Agent receives prior to the close of business on the third business day preceding the Asset Sale Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes tendered for repurchase, and a statement that such Holder is withdrawing his tendered Notes and his election to have such Notes repurchased; (vii) that, if the aggregate principal amount of the Notes (together with any accrued interest thereon and any applicable additional amounts) surrendered by Holders exceeds the Excess Proceeds Offer Amount, the Bank shall determine the Notes to be repurchased on a *pro rata* basis (with such adjustments as may be deemed appropriate by the Bank so that only Notes in denominations of $50,000 and integral multiples of $1,000 in excess thereof shall be purchased); and (viii) that Holders whose Notes are being repurchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the principal amount of the Notes surrendered, which unpurchased portion must be in integral multiples of $1,000.

(ii) The Bank will comply with the requirements of Rule 14e-1 under the United States Securities Exchange Act of 1934 and any other securities laws and regulations thereunder and will comply with the applicable laws of any non-US jurisdiction in which an Asset Sale Offer is made, in each case, to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Loan Agreement or these terms and conditions, the Bank will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations contained in the Loan Agreement or these terms and conditions by virtue thereof.

(iii) On the second business day preceding the Asset Sale Payment Date, the Bank will provide a notice (the "**Bank Asset Sale Notice**") to the Trustee and the Borrower in accordance with Condition 14 (*Notices*) setting forth the aggregate Asset Sale Payment (including the computation thereof) required to be made by the Bank for such Notes or portions thereof on the Asset Sale Payment Date.

(iv) On the last business day prior to the Asset Sale Payment Date, the Borrower is required, pursuant to Clause 7.4 (*Prepayment in the Event of Asset Sales*) of the Loan Agreement, to deposit in the Account with the Principal Paying Agent an amount equal to the Excess Proceeds Offer Amount or portion of the Excess Proceeds Offer Amount, if applicable, in

respect of the Notes or portions thereof properly tendered and not properly withdrawn pursuant to the Asset Sale Offer as set forth in the Bank Asset Sale Notice. On the Asset Sale Payment Date, the Bank will, to the extent permitted by law, (i) accept for payment, on a pro rata basis to the extent necessary, the Notes or portions thereof in the aggregate amount equal to the portion of the Excess Proceeds Offer Amount allocable to the Notes so properly tendered and not properly withdrawn pursuant to the Asset Sale Offer and (ii) deliver, or cause to be delivered, to the Registrar for cancellation on behalf of the Bank the Notes so accepted together with an Officers' Certificate from the Bank stating that such Notes or portions thereof have been tendered to and purchased by the Bank. In accordance with the instructions of the Holder set forth in the Option of Holder to Elect to Purchase, the Paying Agent will promptly either (x) pay to the Holder or (y) mail to each Holder of Notes postage prepaid, the Asset Sale Payment for such Notes, and the Trustee will promptly authenticate and deliver to the Holder of the Notes a new Note Certificate or Certificates, equal in principal amount to any unpurchased portion of the Notes surrendered, if any; provided, however, that each new Note will be in an integral multiple of $1,000. The Bank will notify the Noteholders in accordance with Condition 14 (*Notices*) of the results of the Asset Sale Offer on or as soon as practicable after the Asset Sale Payment Date.

(e) *No other redemption:*   Except where the Loan is accelerated pursuant to Clause 15.2 (*Rights of Lender Upon Occurrence of an Event of Default*) of the Loan Agreement, the Bank shall not be entitled to redeem the Notes prior to that due date otherwise than as provided in Conditions 5(b), (c) and (d) above.

(f) *Purchase:*   The Bank or any of its subsidiaries or the Borrower or any of its subsidiaries may at any time purchase Notes in the open market or otherwise and at any price. Such Notes may be held, reissued, resold or surrendered by the purchaser through the Bank to the Registrar for cancellation.

*Notes held by the Bank and its subsidiaries will continue to carry the right to attend and vote at meetings of Noteholders and will be taken into account in determining how many Notes are outstanding for the purposes of these Conditions and the provisions of the Trust Deed. However, Notes held by the Borrower and its subsidiaries will cease to carry such rights and will not be taken into account, inter alia, for the purposes of Conditions 11 (Meetings of Noteholders; Modification and Waiver; Substitution) and 12 (Enforcement).*

(g) *Cancellation:*   All Notes so redeemed or purchased and surrendered for cancellation by the Bank shall be cancelled and all Notes purchased by the Borrower or any of its subsidiaries and surrendered to the Bank pursuant to Clause 7.8 (*Purchase of Instruments Issued to the Agreed Funding Source*) of the Loan Agreement, together with an authorization addressed to the Registrar by the Borrower or such subsidiaries, shall be cancelled.

6.  **Payments**

(a) *Principal:*   Payments of principal shall be made by dollar cheque drawn on, or, upon application by a Holder of a Note to the Specified Office of the Principal Paying Agent not later than the fifteenth day before the due date for any such payment, by transfer to a dollar account maintained by the payee, upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificate(s) at the Specified Office of the Registrar in Frankfurt and/or the Transfer Agent in Luxembourg.

(b) *Interest:*   Payments of interest shall be made by dollar cheque drawn on, or, upon application by a Holder of a Note to the Specified Office of the Principal Paying Agent not later than the fifteenth day before the due date for any such payment, by transfer to a dollar account maintained by the payee, and (in the case of interest payable on redemption in whole) upon presentation for surrender of the relevant Note Certificate(s) at the Specified Office of the Registrar in Frankfurt and/or the Transfer Agent in Luxembourg.

(c) *Payments on business days:*  Where payment is to be made by transfer to a dollar account, payment instructions (for value the due date for payment, or, if the due date for payment is not a business day, for value the next succeeding business day) will be initiated and, where payment is to be made by dollar cheque, the cheque will be mailed (i) (in the case of payments of principal and interest payable on redemption) on the later of the due date for payment and the day on which the relevant Note Certificate is surrendered (or, in the case of part payment only, endorsed) at the Specified Office of the Registrar in Frankfurt or the Transfer Agent in Luxembourg and (ii) (in the case of payments of interest payable other than on redemption) on the due date for payment. A Holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from (A) the due date for a payment not being a business day or (B) a cheque mailed in accordance with this Condition 6 (*Payments*) arriving after the due date for payment or being lost in the mail. In this paragraph, "business day" means any day (other than a Saturday or Sunday) on which banks generally are open for business in Frankfurt am Main, London and The City of New York and, in the case of surrender (or, in the case of part payment only, endorsement) of a Note Certificate, the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(d) *Partial payments:*  If the Principal Paying Agent makes a partial payment in respect of any Note, the Bank shall procure that the amount and date of such payment are noted on the Register and, in the case of partial payment upon presentation of a Note Certificate, that a statement indicating the amount and the date of such payment is endorsed on the relevant Note Certificate.

(e) *Record date:*  Each payment in respect of a Note will be made to the person shown as the Holder in the Register at the opening of business in the place of the Specified Office of the Registrar on the fifteenth day before the due date for such payment (the "**Record Date**") whether or not a business day. Where payment in respect of a Note is to be made by cheque, the cheque will be mailed to the address shown as the address of the Holder in the Register at the opening of business on the relevant Record Date.

(f) *Payment to the Account:*  Save as the Trustee may otherwise direct at any time after the security created pursuant to the Trust Deed becomes enforceable, the Bank will pursuant to the provisions of Clause 7.1 of the Agency Agreement require the Borrower to make all payments of principal and interest to be made pursuant to the Loan Agreement, less any amounts in respect of the Reserved Rights, to the Account.

(g) *Payment obligations limited:*  Notwithstanding any other provisions to the contrary, the obligations of the Bank to make payments under Conditions 5 and 6 shall constitute an obligation only to account to the Noteholders on such date upon which a payment is due in respect of the Notes, to the extent of sums of principal, interest, Additional Amounts, Tax Indemnity Amounts or other amounts, if any, actually received by or for the account of the Bank pursuant to the Loan Agreement less any amount in respect of the Reserved Rights.

## 7.  Taxation

All payments by the Bank in respect of the Notes shall be made free and clear of and without deduction or withholding for or on account of any present or future taxes, duties, assessments, fees or other governmental charges ("**Taxes**") imposed or levied by or on behalf of the State of New York, Germany, Ukraine, any jurisdiction from or through which a payment is made, or any political subdivision or taxing authority thereof or therein in each of the preceding jurisdictions (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law. In that event, the Bank shall, subject as provided below, pay such additional amounts ("**additional amounts**") as will result in the

146

receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been made or required to be made. The foregoing obligation to pay additional amounts, however, will not apply to any (i) Taxes that would not have been imposed but for the existence of any present or former connection between such Noteholder and any Taxing Jurisdiction other than the mere receipt of such payment or the ownership or holding of such Note; (ii) Taxes that would not have been imposed but for the presentation by the Noteholder for payment on a date more than 30 days after a Relevant Date (as defined below); (iii) Taxes required to be deducted or withheld by any Paying Agent from a payment on a Note, if such payment can be made without deduction or withholding by any other Paying Agent; (iv) Taxes that would not have been imposed but for the failure of the Noteholder to comply with the Bank's written request addressed to the Noteholder at least 60 days prior to the relevant payment to provide information with respect to any reasonable certification, documentation, information or other reporting requirement concerning the nationality, residence, identity or connection with the Taxing Jurisdiction of the holder of such Note; (v) Taxes imposed on a payment to an individual that are required to be made pursuant to any European Union Directive on the taxation of savings implementing the conclusion of the ECOFIN Council meeting of November 26-27, 2000 or any law implementing or complying with, or introduced in order to conform to, the Directive; (vi) estate, inheritance, gift, sale or excise tax; (vii) Taxes withheld by the Bank in its capacity as Disbursing Agent (as defined in "Taxation—German Tax Considerations" of the offering circular dated 9 August 2004 issued in relation to the Notes) or upon interest payments made upon the physical presentation of the Notes; and (viii) Taxes imposed in connection with and on account of a Relevant Event.

**Notwithstanding the foregoing provisions, the Bank shall only make payments of additional amounts to the Noteholders pursuant to this Condition 7 (*Taxation*) to the extent and at such time as it shall have actually received an equivalent amount for such purposes from the Borrower under the Loan Agreement by way of Additional Amounts or Tax Indemnity Amounts or otherwise.**

To the extent that the Bank receives a lesser sum in respect of an additional amount from the Borrower for the account of the Noteholders, the Bank shall account to each Noteholder entitled to receive such additional amount pursuant to this Condition 7 (*Taxation*) for an additional amount equivalent to a *pro rata* portion of such sum (if any) as is actually received by, or for the account of, the Bank pursuant to the provisions of the Loan Agreement on the date of, in the currency of, and subject to any conditions attaching to such payment to the Bank.

In these Conditions, "**Relevant Date**" means whichever is the later of (a) the date on which the payment in question first becomes due and (b) if the full amount payable has not been received in London by the Principal Paying Agent or the Trustee on or prior to such due date, the date on which (the full amount having been so received) notice to that effect has been given to the Noteholders.

Any reference in these Conditions to principal or interest shall be deemed to include, without duplication, any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 7 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 7 (*Taxation*) pursuant to the Trust Deed or the Loan Agreement.

8. **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

9. **Replacement of Note Certificates**

If any Note Certificate is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Registrar, subject to all applicable laws and stock exchange requirements, upon

payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank or Registrar may reasonably require. Mutilated or defaced Note Certificates must be surrendered before replacements will be issued.

### 10. Trustee and Agents

Under separate agreement between the Borrower and the Trustee, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and, under the Trust Deed, to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank, the Borrower and any entity relating to the Bank or the Borrower without accounting for any profit, fees, commissions, interest, discounts or share of brokerage earned arising or resulting from any such contracts or transactions or trusteeships and the Trustee shall also be at liberty to retain the same for its own benefit.

In connection with the exercise by it of any of its trusts, powers, authorities and discretions (including, without limitation, any modification, waiver, authorisation, determination or substitution), the Trustee shall have regard to the general interests of the Noteholders as a class but shall not have regard to any interests arising from circumstances particular to individual Noteholders (whatever their number) and, in particular but without limitation, shall not have regard to the consequences of any such exercise for individual Noteholders (whatever their number) resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or any political sub-division thereof and the Trustee shall not be entitled to require, nor shall any Noteholder be entitled to claim, from the Bank, the Trustee or any other person any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders except to the extent already provided for in Condition 7 (*Taxation*) and/or any undertaking given in addition to, or in substitution for, Condition 7 (*Taxation*) pursuant to the Trust Deed. As provided in the Trust Deed. The power of appointing new trustees is vested in the Bank. Appointments of new trustees shall be notified by the Trustee to the Noteholders and certain others. The Noteholders may remove any trustee, but such a removal shall not become effective unless there remains a trustee after this removal. As provided in the Trust Deed, the Trustee for the time being may retire at any time upon giving a prescribed period of notice to the Bank, without assigning any reason thereof and without being responsible for any cost occasioned by such retirement. The retirement of the trustee shall not, however, become effective unless there remains a trustee in office after such retirement.

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. Under separate agreement between the Borrower and the Agents, the Agents are entitled to be indemnified and relieved from certain responsibilities in certain circumstances.

The initial Agents and their initial Specified Offices are listed below. The Bank reserves the right (with the prior approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor registrar or principal paying agent or additional or successor other paying agents and transfer agents; provided, however, that the Bank shall, if and so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, maintain a transfer and paying agent in Luxembourg and shall at all times maintain a registrar outside the United Kingdom. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14.

If any European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive is introduced, the Bank will ensure that, as soon as

practicable thereafter, it maintains a Paying Agent in a Member State of the European Union that will not be obliged to withhold or deduct tax pursuant to any such Directive or law.

11. **Meetings of Noteholders; Modification and Waiver; Substitution**

    (a) *Meetings of Noteholders:*  The Trust Deed contains provisions for convening meetings of Noteholders to consider matters relating to the Notes, including the modification of any provision of the Loan Agreement or any provision of these Conditions or the Trust Deed. Such a meeting will be convened on no less than 14 days' notice by the Trustee, the Borrower or the Bank or by the Trustee upon the request in writing of Noteholders holding not less than one-tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be one or more persons present in person holding or representing more than half of the aggregate principal amount of the outstanding Notes or, at any adjourned meeting, one or more persons present in person holding or representing whatever the principal amount of the outstanding Notes held or represented, unless the business of such meeting includes consideration of proposals, *inter alia*, (i) to change any date fixed for payment of principal or interest in respect of the Notes, (ii) to reduce the amount of principal or interest payable on any date in respect of the Notes, (iii) to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, (iv) to change the currency of payments under the Notes, (v) to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution, (vi) to alter the governing law of the Conditions, the Trust Deed or the Loan Agreement, (vii) to change any date fixed for payment of principal or interest under the Loan Agreement, (viii) to alter the method of calculating the amount of any payment under the Loan Agreement or (ix) to change the currency of payment or events of default under the Loan Agreement (each, a "**Reserved Matter**"), in which case the necessary quorum will be one or more persons so present holding or representing not less than two-thirds, or at any adjourned meeting not less than one-third, in principal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

    In addition, a resolution in writing signed by or on behalf of Holders of not less than 90% in principal amount of the Notes who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed will take effect as if it were an Extraordinary Resolution. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

    (b) *Modification and waiver:*  The Trustee may, without the consent of the Noteholders and without prejudice to its rights in respect of any subsequent or other breach, condition, event or act, in writing and on such terms and conditions (if any) as shall seem expedient to it, agree to any modification of these Conditions, the Trust Deed or pursuant to the Transferred Rights, the Loan Agreement (other than in respect of a Reserved Matter) which is, in the opinion of the Trustee, proper to make if, in the opinion of the Trustee, such modification will not be materially prejudicial to the interests of Noteholders or which is of a formal, minor or technical nature or is to correct a manifest error.

    In addition, the Trustee may, without the consent of the Noteholders and without prejudice to its rights in respect of any subsequent or other breach, condition, event or act, in writing and on such terms and conditions (if any) as shall seem expedient to it, authorise or waive any breach or proposed breach of the Notes or the Trust Deed by the Bank or, pursuant to the Transferred Rights, the Loan Agreement by the Borrower, or determine that any event which would or might otherwise give rise to a right of acceleration under the Loan Agreement shall not be treated as such (other than a proposed breach or breach relating to a Reserved

149

Matter) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.

Any such authorisation or waiver shall be binding on the Noteholders and, unless the Trustee agrees otherwise, any such authorisation, waiver or modification shall be notified to the Noteholders in accordance with Condition 14 (*Notices*) as soon as practicable thereafter.

(c) *Substitution:*  The Trust Deed contains provisions under which the Bank may, without the consent of the Noteholders, transfer the obligations of the Bank as principal debtor under the Trust Deed and the Notes to a third party provided that certain conditions specified in the Trust Deed are fulfilled. In the event of such a substitution, the Luxembourg Stock Exchange will be notified and a supplemental offering circular will be filed.

## 12.  Enforcement

At any time after an Event of Default (as defined in the Loan Agreement) or Relevant Event (as defined below) shall have occurred and be continuing, the Trustee may, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(a) it has been so requested in writing by the Holders of at least one-quarter in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(b) it has been indemnified and/or provided with security to its satisfaction against all liabilities, proceedings, claims and demands to which it may thereby become liable and all costs, charges and expenses which may be incurred by it in connection therewith.

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

The Trust Deed also provides that, in the case of an Event of Default, or a Relevant Event, the Trustee may, and shall if requested to do so in writing by Noteholders of at least one-quarter in principal amount of the Notes outstanding or if directed to do so by an Extraordinary Resolution and, in either case, subject to it being secured and/or indemnified to its satisfaction, (1) require the Bank to declare all amounts payable under the Loan Agreement by the Borrower to be due and payable (in the case of an Event of Default), or (2) enforce the security created in the Trust Deed in favour of the Noteholders (in the case of a Relevant Event). Upon repayment of the Loan following an Event of Default, the Notes will be redeemed or repaid at the principal amount thereof together with interest accrued to the date fixed for redemption together with any additional amounts due in respect thereof pursuant to Condition 7 (*Taxation*) and thereupon shall cease to be outstanding.

For the purposes of these Conditions, "Relevant Event" means the earlier of (i) the failure by the Bank to make any payment of principal or interest on the Notes when due to the extent it is obligated to do so pursuant to these Conditions; (ii) the filing of an application for the institution for insolvency proceedings over the assets of the Bank in Germany; (iii) the filing of a notice of the Bank with the Federal Authority for Financial Services Supervision (*Bundesanstalt für Finanzdienstleistungsaufsicht*) pursuant to Section 46b of the German Banking Act (*Kreditwesengesetz*); (iv) the issuance of any orders by the Federal Government with respect to the Bank pursuant to Section 47 of the German Banking Act (*Kreditwesengesetz*), including a moratorium; or (v) the taking of any action in furtherance of the dissolution (*Auflösung*) of the Bank.

*For the avoidance of doubt, no additional amounts (other than additional amounts payable in respect of applicable Ukrainian withholding tax at a rate of up to 2%) shall be payable if and to the extent that such withholding or deduction is required following and on account of a Relevant Event.*

### 13. Further Issues

The Bank may from time to time, with the consent of the Borrower and without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest) so as to form a single series with the Notes. In relation to any further issue which is to form a single series with the Notes, the Bank will enter into a loan agreement with the Borrower on the same terms as the Loan Agreement (or on the same terms except for the first payment of interest) subject to any modifications which, in the sole opinion of the Trustee, only relate to the Reserved Rights and would not materially prejudice the interests of the Noteholders. The Bank may from time to time, with the consent of the Borrower and the Trustee, create and issue other series of notes having the benefit of the Trust Deed.

### 14. Notices

Notices to the Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day after the date of mailing. In addition, so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of that Exchange so require, notices to Noteholders will be published on the date of such mailing in a daily newspaper of general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) or, if such publication is not practicable, in a leading English language daily newspaper having general circulation in Europe.

### 15. Governing Law and Jurisdiction

(a) *Governing law:*  The Trust Deed, the Agency Agreement, the Notes and all other agreements entered into in connection therewith are governed by, and shall be construed in accordance with, English law.

(b) *Jurisdiction:*  The Bank has in the Trust Deed (i) submitted irrevocably to the non-exclusive jurisdiction of the courts of England for the purposes of hearing any determination and suit, action or proceedings or settling any disputes arising out of or in connection with the Trust Deed or the Notes; (ii) waived any objection which it might have to such courts being nominated as the forum to hear and determine any such suit, action or proceedings or to settle any such disputes and agreed not to claim that any such court is not a convenient or appropriate forum; (iii) designated a person in England to accept service of any process on its behalf; and (iv) consented to the enforcement of any judgment.

151

*OFFERING MEMORANDUM*

NOT FOR GENERAL CIRCULATION
IN THE UNITED STATES



$175,000,000

7.75% Loan Participation Notes due 2012

issued by, but without recourse to, Dresdner Bank Aktiengesellschaft,

for the purpose of funding a $175,000,000 loan to

**Closed Joint Stock Company "KYIVSTAR G.S.M."**

**Issue Price: 100%**

### The Company—

- We are Closed Joint Stock Company "KYIVSTAR G.S.M.", one of the leading mobile telecommunications operators in Ukraine.

### The Bank—

- Dresdner Bank Aktiengesellschaft, a commercial bank established under the laws of the Federal Republic of Germany (the "Bank"), is issuing the $175,000,000 7.75% loan participation notes due 2012 (the "Notes") for the purpose of funding a $175,000,000 loan (the "Loan") from the Bank to us pursuant to the loan agreement, dated April 19, 2005 (the "Loan Agreement"). The Notes are expected to be issued on April 27, 2005 and constituted by the Trust Deed, to be dated April 27, 2005 (the "Trust Deed"), between the Bank and The Law Debenture Trust Corporation p.l.c. (the "Trustee"). The Bank will charge by way of security to the Trustee its rights to principal, interest and additional amounts (if any) under the Loan Agreement (other than certain reserved rights) and its rights to certain sums held from time to time in the account of the Bank into which such payments under the Loan Agreement are made (the "Account") (other than certain reserved rights). The Bank will transfer its rights under the Loan Agreement (except for those rights charged or reserved as described above) to the Trustee for the benefit of holders of the Notes (the "Noteholders"). See "Description of the Transaction and the Security".

- The Bank will be obligated to make payments of principal, interest and additional amounts (if any) to the Noteholders only to the extent that we make payments to the Bank of principal, interest and additional amounts (if any) under the terms of the Loan Agreement. The Bank will have no other financial obligation under the Notes.

### Maturity—

- The Notes will mature on April 27, 2012.

### Interest—

- The Bank will pay interest on the Notes at an annual rate equal to 7.75%.

- The Bank will make interest payments on the Notes semi-annually in arrears on October 27 and April 27 of each year, commencing on October 27, 2005.

- Payments on the Notes will be made free and clear of, and without withholding or deduction for, any taxes imposed by the United States, Germany or Ukraine, to the extent described under "Terms and Conditions of the Notes—Taxation".

### Ranking—

- The Loan will rank equal in right of payment with our other outstanding unsecured and unsubordinated indebtedness.

- Other than as described in this offering memorandum and in the Trust Deed, the Noteholders have no proprietary or other direct interest in the Account or the Bank's rights under or in respect of the Loan Agreement or the Loan. Subject to the terms of the Trust Deed, no Noteholder will have any right to enforce any of the provisions in the Loan Agreement or have direct recourse to us except through action by the Trustee.

### Redemption—

- Except in limited circumstances, the Notes are not redeemable prior to maturity.

### Change of Control—

- If we experience certain types of mergers, consolidations or other changes in control, you will have the right to require the Bank to redeem all of your Notes at 101% of their principal amount, plus accrued interest.

### Notice to Investors—

- **You should carefully consider the risk factors beginning on page 9 before investing.**

- The Notes will be offered and sold outside the United States in offshore transactions in reliance on Regulation S under the Securities Act (as defined herein). Such Notes will be represented by the Regulation S Global Note Certificate. The Notes will also be offered and resold in the United States to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) in reliance on Rule 144A (as defined herein). Such Notes will be represented by the Rule 144A Global Note Certificate.

- The Notes will be held through Citibank, N.A., as DTC Custodian and as common depositary for Euroclear and Clearstream, Luxembourg.

### Settlement—

- The Notes are expected to be delivered on or about April 27, 2005, through Euroclear, Clearstream, Luxembourg or DTC, as the case may be, against payment therefor in immediately available funds. The closing date of the offering of the Notes is expected to be April 27, 2005.

### Listing—

- Application has been made to list the Notes on the Luxembourg Stock Exchange. The Rule 144A Global Notes are expected to be eligible for trading on the PORTAL Market, a subsidiary of The Nasdaq Stock Market, Inc. There can be no assurance that a trading market for the Notes will develop.

## Citigroup

## Dresdner Kleinwort Wasserstein

The date of this offering memorandum is April 19, 2005.

# SUMMARY

*This summary contains basic information about us, our industry and the offering. You should read the entire offering memorandum carefully, including the risk factors, our financial statements and the related notes to those statements included in this offering memorandum.*

## Overview

We are one of the leading providers of mobile telecommunications services in Ukraine. We operate a dual-band GSM 900/1800 MHz network, which currently covers more than 1,200 cities and towns throughout Ukraine, including major urban areas and the main national and regional highways. Our network covers territory inhabited by approximately 90% (about 43 million people) of Ukraine's population and representing approximately 81% of Ukraine's land mass. At April 1, 2005, we had more than 7.6 million subscribers using our services pursuant to one of our contract or prepaid tariff plans.

Our subscriber market share was 46.3% as of December 31, 2003 and 45.3% as of December 31, 2004. Our net revenues have increased from $374.0 million for the financial year ended December 31, 2003 to $640.7 million for the financial year ended December 31, 2004.

We commenced commercial operations in December 1997. At this time, we were a small operator in a market dominated by our principal competitor. We have since obtained additional licenses to enable us to develop the coverage and capacity of our network to accommodate the significant expansion of our subscriber base. We are now one of the leading operators in the Ukrainian cellular market.

In all segments of our business, we benefit significantly from the strengths and expertise of our majority shareholder, Telenor ASA (together with its subsidiaries, "Telenor"), and our other shareholder, Alfa Group, one of Russia's largest financial industrial groups. Telenor currently owns 56.5% of our share capital through Telenor Mobile Communications AS ("Telenor Mobile"), and Alfa Group owns 43.5% of our share capital indirectly through Storm LLC ("Storm").

Telenor, which is Norway's leading telecommunications company and one of the leading foreign investors in the telecommunications industry of the Commonwealth of Independent States ("CIS"), first became a shareholder of our company in March 1998. Telenor has brought to our company valuable experience in developing and implementing wireless voice and data services as well as sophisticated marketing techniques. We have benefited in particular from the support Telenor has given us in the areas of key personnel, product and technology development and mass market expertise.

We believe that the combination of Telenor's expertise in wireless telecommunications and Alfa Group's extensive knowledge of the CIS, together with their respective capital investments, is the basis for a unique and complementary strategic partnership and a strong platform upon which we can continue to build one of Ukraine's leading mobile telecommunications operators. For a discussion of a recent claim filed by Storm seeking to nullify the Shareholders' Agreement (as defined herein) among Storm, Telenor and us, see "Material Relationships and Related Party Transactions—Shareholders' Agreement".

## Market Opportunity

The mobile telecommunications market in Ukraine has experienced significant growth in the past few years. Increasing competition between operators has reduced tariffs and has resulted in the introduction of new services. The increased affordability of mobile telecommunications services has allowed larger segments of the population to begin to use such services, creating market opportunities for us. In addition, improvements in Ukraine's economic condition and regulatory and tax reforms have contributed to increased demand and have fueled our growth. We believe that the low mobile and fixed phone line telecommunication penetration rates in Ukraine of approximately 29% and 24% respectively offer substantial opportunities for mobile telecommunications operators. Ukraine's poor fixed phone line infrastructure and the low fixed line penetration rate have made the use of mobile phones a necessity for many Ukrainians. We expect the penetration rate of the Ukrainian mobile telecommunications market to continue to increase, which, in light of Ukraine's population of approximately 48 million people, will create further growth opportunities for us.

**Competitive Strengths**

We believe that we have the following competitive strengths:

- Our relationships with our shareholders, Telenor and Alfa Group, provide us with extensive industry and regional experience and expertise.

- Our favorable brand image helps us to attract new subscribers and retain existing subscribers.

- Our emphasis on high quality customer service distinguishes us from our competitors.

- Our focus on innovation in our market distinguishes us from our competitors.

- The geographic coverage and quality of our network allow us to attract and retain subscribers.

- Our established mobile telecommunications network and distribution network provide us with a strong position in a growing market.

**Business Strategy**

Our strategic objective is to maintain and strengthen our position as one of the leading providers of high quality mobile telecommunications services in Ukraine and to increase revenue, profitability and cash flows. To accomplish these objectives, we intend to focus on the following key elements:

- Increase our subscriber base.

- Retain existing subscribers and reduce churn.

- Continue to selectively expand our technologically advanced network with a focus on quality.

- Increase revenue from value-added services.

- Maintain high brand awareness.

- Continue to increase operating efficiency.

- Continue to draw on expertise from our shareholders.

**Recent Developments**

*2004 Ukrainian Presidential Election*

Ukraine experienced significant political instability during the 2004 presidential election, which Mr. Viktor Yuschenko won in the second run-off against his closest rival Mr. Viktor Yanukovich. The results of the first run-off of the election held between Mr. Yuschenko and Mr. Yanukovich on November 21, 2004, which declared Mr. Yanukovich the winner, were disputed on the basis of allegations of massive corruption, voter intimidation and direct electoral fraud, as reported by numerous domestic and foreign observers. The disputed run-off was followed by a series of peaceful protests, including a series of nationwide protests, sit-ins, and planned general strikes by supporters of Mr. Yuschenko. A second run-off election was ordered by Ukraine's Supreme Court and was held on December 26, 2004. Mr Yuschenko was declared the official winner of the second run-off and was inauguarated as President on January 23, 2005. See "Risk Factors—Risks Relating to Ukraine—The volatile political situation in Ukraine could restrict our ability to effectively operate our business."

**The Offering**

*The following summary contains basic information about the Notes and the structure of the transaction. It does not contain all of the information that may be important to you. For a more complete understanding of the Notes, please refer to the sections of this offering memorandum entitled "Description of the Transaction and the Security", "Terms and Conditions of the Notes", "Summary of Provisions of the Notes While in Global Form" and "Summary of Certain Covenants" and the form of the Loan Agreement provided in Appendix A of this offering memorandum.*

The Bank will issue the Notes, which will be without recourse to the Bank, to fund the Loan. The Notes will have the benefit of, and be constituted by, the Trust Deed. As provided in the Trust Deed, the Bank will:

- charge by way of security to the Trustee its rights to principal, interest and other amounts paid and payable under the Loan Agreement and its right to receive amounts paid and payable under any claim, award or judgment relating to the Loan Agreement (other than its right to amounts in respect of Reserved Rights (as defined in the section of this offering memorandum entitled "Terms and Conditions of the Notes") in relation to the Loan Agreement);

- charge by way of security to the Trustee certain sums held from time to time in the Account, together with the debt represented thereby (other than the Reserved Rights in relation to the Loan Agreement), together with the debt represented thereby, pursuant to the Trust Deed; and

- transfer its rights under the Loan Agreement (save for those rights charged or reserved as described above) to the Trustee.

The Bank will not have any obligations to the Noteholders, other than the obligation to make payments of principal, interest and additional amounts (if any) to the Noteholders to the extent that we make payments to the Bank of principal, interest and additional amounts, if any, under the Loan Agreement.

**The Notes**

| | |
|---|---|
| Issuer/Bank . . . . . . . . . . . . . . . . . . . . . . | Dresdner Bank Aktiengesellschaft. |
| Managers . . . . . . . . . . . . . . . . . . . . . . . | Citigroup Global Markets Limited and Dresdner Bank AG London Branch. |
| Issue Amount . . . . . . . . . . . . . . . . . . . . . | $175,000,000. |
| Issue Price . . . . . . . . . . . . . . . . . . . . . . | 100% of the principal amount of the Notes. |
| Maturity Date . . . . . . . . . . . . . . . . . . . . | April 27, 2012. |
| Trustee . . . . . . . . . . . . . . . . . . . . . . . . . | The Law Debenture Trust Corporation p.l.c. |
| Registrar . . . . . . . . . . . . . . . . . . . . . . . | Citigroup Global Markets Deutschland AG & Co. KGaA, at its specified office in Frankfurt. |
| Paying Agent . . . . . . . . . . . . . . . . . . . . | Dexia Banque Internationale à Luxembourg, société anonyme, at its specified office in Luxembourg. |
| Principal Paying Agent . . . . . . . . . . . . . | Citibank, N.A., at its specified office in London. |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . | The Notes will bear interest from April 27, 2005 at an annual rate of 7.75%. Interest on the Notes will be payable semiannually in arrears on October 27 and April 27 of each year, commencing on October 27, 2005. |
| Status and Use of Proceeds . . . . . . . . . . | The Notes will constitute the obligations of the Bank to apply an amount equal to the principal amount of the Notes to fund the Loan to us under the terms of the Loan Agreement. The Notes will be senior obligations of the Bank. However, the Bank will be obligated to make payments of principal, interest and additional amounts (if any) to the Noteholders only to the extent that we make payments to the Bank of principal, interest and additional amounts (if any) under the terms of the Loan Agreement. See "Description of the Transaction and the Security." |
| Security . . . . . . . . . . . . . . . . . . . . . . . . | The Notes will be secured by a charge on: |

- all of the Bank's rights to principal, interest and other amounts paid and payable under the Loan Agreement and its right to receive amounts paid and payable under any claim, award or judgment relating to the Loan Agreement (in each case, other than its right to amounts in respect of certain Reserved Rights); and

- sums held from time to time in the Account, together with the debt represented thereby (other than the Reserved Rights) pursuant to the Trust Deed.

| | |
|---|---|
| Transfer of Rights . . . . . . . . . . . . . . . . . | The Bank will transfer its rights under the Loan Agreement (save for those rights charged or reserved as described above) to the Trustee. |
| Form . . . . . . . . . . . . . . . . . . . . . . . . . . | The Notes will be issued in registered form. The Notes will be in denominations in aggregate principal amount of $100,000 each and integral multiples of $1,000 in excess thereof and will be represented by global note certificates. The global note certificates will be exchangeable for Notes in individual form in the limited circumstances specified in the global note certificates. |
| | Notes offered and sold outside the United States in offshore transactions in reliance on Regulation S under the Securities Act will be represented by the Regulation S Global Note Certificate. |

### TERMS AND CONDITIONS OF THE NOTES

*The following, other than the paragraphs below in italics, is the text of the Terms and Conditions of the Notes which will be endorsed on each Note in definitive form (if issued):*

The $175,000,000 7.75% Loan Participation Notes due 2012, (the "**Notes**", which expression includes any further notes issued pursuant to Condition 13 (*Further Issues*) and forming a single series therewith) of Dresdner Bank Aktiengesellschaft (the "**Bank**") are constituted by, are subject to and have the benefit of, a trust deed (as amended or supplemented from time to time, the "**Trust Deed**") dated 27 April 2005 between the Bank and The Law Debenture Trust Corporation p.l.c., as trustee (the "**Trustee**", which expression includes all persons from time to time appointed trustee or trustees under the Trust Deed). The Bank authorized the creation, issue and sale of the Notes for the sole purpose of financing a loan (the "**Loan**") to Closed Joint Stock Company "KYIVSTAR G.S.M." (the "**Borrower**"). The terms of the Loan are contained in a loan agreement between the Bank, as lender, and the Borrower dated 19 April 2005, as amended and supplemented from time to time (the "**Loan Agreement**").

**In each case where amounts of principal, interest and additional amounts, if any, due pursuant to Condition 7 (*Taxation*) are stated herein or in the Trust Deed to be payable in respect of the Notes, the obligation of the Bank to make any such payment shall constitute an obligation only to pay to the Noteholders (as defined in Condition 2(a)), on each date upon which such amounts of principal, interest and Additional Amounts, if any, are due in respect of the Notes, to the extent of the sums of principal, interest, Additional Amounts (as defined in the Loan Agreement) and Tax Indemnity Amounts (as defined in the Loan Agreement), if any, actually received by or for the account of the Bank pursuant to the Loan Agreement, not including amounts in respect of the Reserved Rights (as defined below). Noteholders must therefore rely solely and exclusively upon the covenant to pay under the Loan Agreement and the credit and financial standing of the Borrower. Noteholders shall have no recourse (direct or indirect) to any other assets of the Bank.**

The Bank (as lender) has:

(A)    charged by way of security to the Trustee all of the Bank's rights, interests and benefits in and to (i) principal, interest and other amounts as at the date of the Trust Deed or thereafter paid and payable by the Borrower to the Bank as lender under the Loan Agreement and (ii) all amounts as at the date of the Trust Deed or thereafter paid or payable by the Borrower to the Bank under or in respect of any claim, award or judgment relating to the Loan Agreement (in each case other than its right to amounts in respect of any rights, interests and benefits of the Bank under the following clauses of the Loan Agreement: Clause 7.6 second sentence thereof (*Costs of Prepayment*); Clause 8.3(a) (*Tax Indemnity*); Clause 10 (*Changes in Circumstances*); Clause 11 (*Representations and Warranties of the Borrower*); Clause 20 (*Fees, Costs and Expenses*) (to the extent that the Bank's claim is in respect of one of the aforementioned clauses of the Loan Agreement); Clause 8.2 (*Payments*) and Clause 18.2 (*Currency Indemnity*) and (to the extent the Bank's rights thereunder relate to sums payable to the Bank under any other provision of the Loan Agreement forming part of the "Reserved Rights") Clause 16 (*Default Interest and Indemnity*) (such rights referred to herein, the "**Reserved Rights**"));

(B)    charged by way of security to the Trustee all of the Bank's rights, interest and benefits in and to all sums held on deposit from time to time in the Account with the Principal Paying Agent (as defined below) at its branch in London, England (the "**Account**"), together with the debt represented thereby (other than interest from time to time earned thereon and the Reserved Rights) pursuant to the Trust Deed; and

(C)    assigned absolutely to the Trustee all of the Bank's rights, interests and benefits whatsoever, both in existence at the date of the Trust Deed and future, whether proprietary, contractual or otherwise under or arising out of or evidenced by the Loan Agreement (including, without limitation, the right to declare the Loan immediately due and payable and to take proceedings to enforce the obligations of the Borrower thereunder) other than the Charged Property and the Reserved Rights and amounts payable by the Borrower in relation to the Charged Property and the Reserved Rights (the "**Transferred Rights**"),

together, the "**Security Interests**".

In certain circumstances, the Trustee can (subject to it being indemnified and/or secured to its satisfaction) be required by Noteholders holding at least one-quarter of the principal amount of the Notes outstanding or by an Extraordinary Resolution (as defined in the Trust Deed) of the Noteholders to exercise certain of its powers under the Trust Deed (including those arising in connection with the Security Interests).

The Notes are the subject of an agency agreement dated 27 April, 2005 (as amended or supplemented from time to time, the "**Agency Agreement**") among the Bank, Citigroup Global Markets Deutschland AG & Co. KGaA, at its specified office in Frankfurt, as registrar (the "**Registrar**", which expression includes any successor registrar appointed from time to time in connection with the Notes), Citibank N.A., at its specified office in London, as principal paying agent (the "**Principal Paying Agent**", which expression includes any successor principal paying agent appointed from time to time in connection with the Notes), Dexia Banque Internationale à Luxembourg, société anonyme, at its specified office in Luxembourg, and Citibank N.A., at its specified office in London, each as transfer agent (each, a "**Transfer Agent**" and, together, the "**Transfer Agents**", which expression includes any additional or successor transfer agent appointed from time to time in connection with the Notes) and each as paying agent (each, a "**Paying Agent**" and, together, the "**Paying Agents**", which expressions include any additional or successor paying agent appointed from time to time in connection with the Notes) and the Trustee. References herein to the "**Agents**" are to the Registrar, any Transfer Agent, the Principal Paying Agent and any Paying Agent and any reference to an "**Agent**" is to any one of them. Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and are subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the registered office for the time being of the Trustee, being at the date hereof 100 Wood Street, London EC2V 7EX and at the Specified Offices (as defined in the Agency Agreement) of the Registrar, the Principal Paying Agent, any Transfer Agent and any Paying Agent. The initial Specified Offices of the initial Agents are set out below.

1.    **Form, Denomination and Status**

(a) *Form and denomination:* The Notes are in registered form in minimum denominations in aggregate principal amount of $100,000 each (subject to Condition 5(d) (*Asset Sale*)) and integral multiples of $1,000 in excess thereof, without coupons attached.

(b) *Status:* The sole purpose of the issue of the Notes is to provide the funds for the Bank to finance the Loan. The Notes constitute the obligation of the Bank to apply an amount equal to the principal amount of the Notes to finance the Loan and to account to the Noteholders for an amount equivalent to principal, interest, Additional Amounts and Tax Indemnity Amounts, if any, actually received by or for the account of the Bank pursuant to the Loan Agreement (less any amounts in respect of the Reserved Rights), the right to which is, inter alia, being charged by way of security to the Trustee by virtue of the Security Interests as security for the Bank's payment obligations under the Trust Deed and in respect of the Notes.

Payments in respect of the Notes to the extent of the sums actually received by or for the account of the Bank by way of principal, interest, Additional Amounts or Tax Indemnity Amounts, if any, pursuant to the Loan Agreement (less any amounts in respect of the Reserved Rights) will be made pro rata among all Noteholders (subject to Condition 5(e) (*Redemption at the option of the Noteholders upon a Change of Control*), Condition 5(d) (*Asset Sale*) and Condition 7 (*Taxation*)), on the dates on which such payments are due in respect of the Notes subject to the conditions attaching to, and in the currency of, such payments under the Loan Agreement. The Bank shall be under no obligation to exercise in favor of the Noteholders any rights of set-off or of banker's lien or to combine accounts or counterclaim that may arise out of other transactions between the Bank and the Borrower.

Noteholders are deemed to have accepted that:

(i)    neither the Bank nor the Trustee makes any representation or warranty in respect of, and shall at no time have any responsibility for, or (save as otherwise expressly provided in the Trust Deed and paragraph (vi) below) liability, or obligation in respect of the performance and observance by the Borrower of its obligations under the Loan Agreement or the recoverability of any sum of principal, interest, Additional Amounts or Tax Indemnity Amounts or other amounts, if any, due or to become due from the Borrower under the Loan Agreement;

(ii)    neither the Bank nor the Trustee shall at any time have any responsibility for, or obligation or liability in respect of, the condition (financial, operational or otherwise), creditworthiness, affairs, status, nature or prospects of the Borrower;

(iii)    neither the Bank nor the Trustee shall at any time have any responsibility for, or obligation or liability in respect of, any misrepresentation or breach of warranty or any act, default or omission of the Borrower under or in respect of the Loan Agreement;

(iv)    neither the Bank nor the Trustee shall at any time have any responsibility for, or liability or obligation in respect of, the performance and observance by the Registrar, the Principal Paying Agent, any Transfer Agent or any Paying Agent of their respective obligations under the Agency Agreement;

(v)    the financial servicing and performance of the terms of the Notes depend solely and exclusively upon performance by the Borrower of its obligations under the Loan Agreement, its covenant to pay under the Loan Agreement and its credit and financial standing. The Borrower has represented and warranted to the Bank in the Loan Agreement that the Loan Agreement constitutes a legal, valid and binding obligation of the Borrower. The representations and warranties given by the Borrower in Clause 11 (*Representations and Warranties of the Borrower*) of the Loan Agreement are given by the Borrower to the Bank for the sole benefit of the Bank and neither the Trustee nor any Noteholder shall have any remedies or rights against the Borrower that the Bank may have with respect to such representations or warranties, other than any right the Trustee may have pursuant to the assignment of the Transferred Rights;

(vi)    the Bank (and, pursuant to the assignment of the Transferred Rights, the Trustee) will rely on self-certification by the Borrower and certification by third parties as a means of monitoring whether the Borrower is complying with its obligations under the Loan Agreement and shall not otherwise be responsible for investigating any aspect of the Borrower's performance in relation thereto and, subject as further provided in the Trust Deed, the Trustee will not be liable for any failure to make the usual or any investigations which might be made by a security holder in relation to the property which is the subject of the Security Interests and held by way of security for the Notes, and shall not be bound to enquire into or be liable for any defect or failure in the right or title of the Bank to the secured property represented by the Security Interests whether such defect or failure was known to the Trustee or might have been discovered upon examination or enquiry or whether capable of remedy or not, nor will it have any liability for the enforceability of the security created by the Security Interests whether as a result of any failure, omission or defect in registering or filing or otherwise protecting or perfecting such security and the Trustee will have no responsibility for the value of such security; and

(vii)    except to the extent compensated for in interest payments, Additional Amounts or Tax Indemnity Amounts actually received by the Bank under the Loan Agreement in respect of such withholding or deduction, the Bank will not be liable for any withholding or deduction or for any payment on account of Taxes (as defined in the Loan Agreement) (not being a tax imposed on the Bank's net income) required to be made by the Bank on or in relation to any sum received by it under the Loan Agreement which will or may affect payments made or to be made by the Borrower under the Loan Agreement; the Bank shall, furthermore, not be obliged to take any actions or measures as regards such deductions or withholdings other than those set out in Clause 8 (*Taxes*) and Clause 10.4 (*Mitigation*) of the Loan Agreement.

Save as otherwise expressly provided herein and in the Trust Deed, no proprietary or other direct interest in the Bank's rights under or in respect of the Loan Agreement or the Loan exists for the benefit of the Noteholders. Subject to the terms of the Trust Deed, no Noteholder will have any entitlement to enforce any of the provisions in the Loan Agreement or have direct recourse to the Borrower except through action by the Trustee under the Security Interests. Neither the Bank nor the Trustee pursuant to the Transferred Rights shall be required to take proceedings to enforce payment under the Loan Agreement unless it has been indemnified and/or secured by the Noteholders to its satisfaction against all liabilities, proceedings, claims and demands to which it may thereby become liable and all costs, charges and expenses which may be incurred by it in connection therewith. As provided in the Trust Deed, the obligations of the Bank are solely to make payments of amounts in aggregate equal to principal, interest, Additional Amounts, Tax Indemnity Amounts or other amounts, if any, actually received by or for the account of the Bank pursuant to the Loan Agreement (less any amount in respect of the Reserved Rights), the right to which is being charged by way of security to the Trustee as aforesaid. Noteholders must therefore rely solely and exclusively upon the covenant to pay under the Loan Agreement and the credit and financial standing of the Borrower.

The obligations of the Bank to make payments as stated in the previous paragraph constitute direct and general obligations of the Bank which will at all times rank *pari passu* among themselves and at least *pari passu* with all other present and future unsecured obligations of the Bank, save for such obligations as may be preferred by provisions of law that are both mandatory and of general application.

Payments made by the Borrower under the Loan Agreement to, or to the order of, the Trustee or (before such time that the Bank has been required by the Trustee, pursuant to the terms of the Trust Deed, to pay to or to the order of the Trustee) the Principal Paying Agent will satisfy *pro tanto* the obligations of the Bank in respect of the Notes.

## 2.     Register, Title and Transfers

(a)     *Register:* The Registrar will maintain outside the United Kingdom a register (the "**Register**") in respect of the Notes in accordance with the provisions of the Agency Agreement. In these Conditions, the "**Holder**" of a Note means the person in whose name such Note is for the time being registered in the Register (or, in the case of a joint holding, the first named thereof) and "**Noteholder**" shall be construed accordingly. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

*The Rule 144A Global Note Certificate will be deposited with a custodian for, and title to the Notes issued in respect of the Rule 144A Global Note Certificate will be registered in the name of, a nominee of DTC. The Regulation S Global Note Certificate will be deposited with a common depositary for Euroclear and Clearstream, Luxembourg and the title to the Notes issued in respect of the Regulation S Global Note Certificate will be registered in the name of a nominee of such common depositary.*

(b)     *Title:* The Holder of each Note shall (except as otherwise required by law) be treated as the absolute owner of such Note for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing on the Note Certificate relating thereto (other than the endorsed form of transfer) or any notice of any previous loss or theft of such Note Certificate) and no person shall be liable for so treating such Holder.

(c)     *Transfers:* Subject to Conditions 2(f) and (g) below, a Note may be transferred upon surrender of the relevant Note Certificate, with the endorsed form of transfer duly completed (including any certificates as to compliance with restrictions on transfer included therein), at the Specified Office of the Registrar or a Transfer Agent, together with such evidence as the Registrar or (as the case may be) such Transfer Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer. Where not all the Notes represented by the surrendered Note Certificate are the subject of the transfer, a new Note Certificate in respect of the balance of the Notes will be issued to the transferor in accordance with Condition 2(d) below.

(d)     *Registration and delivery of Note Certificates:* Within five business days of the surrender of a Note Certificate in accordance with Condition 2(c) above, the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Note(s) transferred to the relevant Holder at the Registrar's Specified Office or (as the case may be) the Specified Office of the Transfer Agent or (at the request and risk of any such relevant Holder) by uninsured first class mail (and airmail if overseas) to the address specified for the purpose by such relevant Holder. In this paragraph, "business day" means a day on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar has its Specified Office. In the case of the transfer of part only of the Notes, a new Note Certificate in respect of the balance of the Notes not transferred will be so delivered or (at the risk and, if mailed at the request of the transferor otherwise than by ordinary uninsured mail, at the expense of the transferor) sent by mail to the transferor.

(e)     *No charge:* The transfer of a Note will be effected without charge by or on behalf of the Bank or the Registrar, but against such indemnity as the Registrar may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(f)     *Closed periods*: Noteholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or interest in respect of the Notes.

(g)     *Regulations concerning transfers and registration:* All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of Notes scheduled to the Agency Agreement. The regulations may be changed by the Bank with the prior written approval of the Trustee, the Registrar and the Borrower. A copy of the current regulations will be mailed (free of charge) by the Registrar and/or any Transfer Agent to any Noteholder who requests in writing a copy of such regulations and will be available at the office of the Registrar in Frankfurt and the Transfer Agent in Luxembourg.

## 3.     Bank's Covenants

(a)     *Amendments to Loan Agreement:* As provided in the Trust Deed, so long as any of the Notes remain outstanding (as defined in the Trust Deed), the Bank will not, without the prior written consent of the Trustee or an Extraordinary Resolution or Written Resolution (as defined in the Trust Deed), agree to any amendments to or

any modification or waiver of, or authorize any breach or proposed breach of, the terms of the Loan Agreement and will act at all times in accordance with any instructions of the Trustee from time to time with respect to the Loan Agreement, except as otherwise expressly provided in the Trust Deed and the Loan Agreement. Any such amendment, modification, waiver or authorization made with the consent of the Trustee shall be binding on the Noteholders and any such amendment or modification shall be notified by the Issuer to the Noteholders in accordance with Condition 14 (*Notices*).

(b)    *Provision of Financial Information:* For so long as any Notes are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Bank will, during any period in which it is neither subject to Section 13 or 15(d) of the U.S. Securities Exchange Act of 1934 nor exempt from reporting pursuant to Rule 12g3-2(b) thereunder, co-operate with the Borrower to provide to any holder or beneficial owner of such restricted securities or to any prospective purchaser of such restricted securities designated by such holder or beneficial owner or to the Trustee for delivery to such holder, beneficial owner or prospective purchaser, in each case upon the request of such holder, beneficial owner, prospective purchaser or the Trustee, the information satisfying the requirements of Rule 144A(d)4 under the Securities Act. This information will also be available free of charge at the office of the paying agent in Luxembourg.

### 4.    Interest

(a)    *Accrual of interest:* The Notes bear interest from 27 April 2005 (the "**Issue Date**") at the rate of 7.75% per annum (the "**Interest Rate**") payable semi-annually in arrears on 27 October and 27 April of each year (each, other than the Issue Date, an "**Interest Payment Date**"), subject as provided in Condition 6 (*Payments*). Each period from (and including) the Issue Date or any Interest Payment Date to (but excluding) the next (or first) Interest Payment Date is herein called an "**Interest Period**".

Each Note will cease to bear interest from the due date for redemption unless, upon due presentation of the relevant Note Certificate, payment of principal is improperly withheld or refused, in which case interest will continue to accrue (before or after any judgment) from the due date for redemption to, but excluding, the date on which payment in full of the principal is made under the Notes.

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Interest Rate to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half cent being rounded upwards). If interest is required to be calculated for any other period, it will be calculated on the basis of the number of days elapsed in the relevant Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-days months unless the last day of a Calculation Period is the 31st of a month but the first day of the succeeding Calculation Period is a day other than the 30th or the 31st of a month, in which case the month that includes that last day shall not be considered to be a 30-day month but be calculated by using the actual number of days of that month). "**Calculation Period**" means any period for which interest is to be calculated, whether or not constituting an Interest Period.

(b)    *Default Interest under the Loan Agreement:* In the event that, and to the extent that, the Bank actually receives any amounts in respect of interest on unpaid sums from the Borrower pursuant to Clause 16 (*Default Interest and Indemnity*) of the Loan Agreement (other than amounts so received forming part of the Reserved Rights), the Bank shall account to the Noteholders for an amount equivalent to the amounts in respect of interest on unpaid sums actually so received. Any payments made by the Bank under this Condition 4(b) will be made on the next following business day (as defined in Condition 6(c)) after the day on which the Bank receives such amounts from the Borrower and, save as provided in this Condition 4(b), subject as provided in Condition 6 (*Payments*).

### 5.    Redemption and Purchase

(a)    *Final redemption:* Unless previously prepaid pursuant to Clause 7 (*Prepayment*) of the Loan Agreement or repaid in accordance with Clause 10.3 (*Illegality*) of the Loan Agreement, the Borrower will be required to repay the Loan on its due date as provided in the Loan Agreement and, subject to such repayment, all the Notes will be redeemed at their principal amount on 27 April 2012, subject as provided in Condition 6 (*Payments*).

(b)    *Redemption by the Bank:* The Notes shall be redeemed by the Bank in whole, but not in part, at any time, on giving not less than 25 days' notice to the Noteholders (which notice shall be irrevocable and shall specify a date for redemption, being the same date as that set forth in the notice of prepayment referred to in Condition 5(b)(i) or (ii) below) in accordance with Condition 14 (*Notices*) at the principal amount thereof, together with interest accrued and unpaid to the date fixed for redemption and any additional amounts in respect thereof pursuant to Condition 7 (*Taxation*), if, immediately before giving such notice, the Bank satisfies the Trustee that:

(i)     the Bank has received a notice of prepayment from the Borrower pursuant to Clause 7.1 (*Prepayment for Tax Reasons*) of the Loan Agreement; or

(ii)    the Bank has delivered a notice to the Borrower, the contents of which require the Borrower to repay the Loan, in accordance with the provisions of Clause 10.3 (*Illegality*) of the Loan Agreement.

The Bank shall deliver to the Trustee a certificate signed by two officers of the Bank stating that the Bank is entitled to effect such redemption in accordance with this Condition 5(b). A copy of the Borrower's notice of prepayment or details of the circumstances contemplated by Clause 10.3 (*Illegality*) of the Loan Agreement and the date fixed for redemption shall be set forth in the notice.

The Trustee shall be entitled to accept any notice or certificate delivered by the Bank in accordance with this Condition 5(b) as sufficient evidence of the satisfaction of the applicable circumstances in which event they shall be conclusive and binding on the Noteholders.

Upon the expiry of any such notice given by the Bank to the Noteholders as is referred to in this Condition 5(b), the Bank shall be bound to redeem the Notes in accordance with this Condition 5, subject as provided in Condition 6 (*Payments*).

(c)     *Redemption at the option of the Noteholders upon a Change of Control:*

(i)     Upon the occurrence of a Change of Control (as defined in the Loan Agreement), in accordance with Condition 14 (*Notices*) the Bank will make an offer to purchase all or any part (subject to a minimum of $100,000 in principal amount and integral multiples of $1,000 in excess thereof) of the Notes pursuant to the offer described below (the "**Change of Control Offer**") at a price per Note in cash (the "**Change of Control Payment**") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon to the date of repurchase, plus additional amounts, if any, to such date of repurchase. Pursuant to Clause 7.3 (*Prepayment in the Event of a Change of Control*) of the Loan Agreement, the Borrower is required to give written notice to the Bank (in the form of an Officer's Certificate) (and, following the assignment of the Transferred Rights to the Trustee, to the Trustee) promptly and in any event within 10 calendar days after the date of any Change of Control (the "**Borrower Change of Control Notice**") and thereafter to prepay the Loan to the extent of 101% of the aggregate principal amount of the Notes plus accrued and unpaid interest thereon to the date of prepayment, plus additional amounts, if any, thereon corresponding to the aggregate principal amount plus accrued and unpaid interest and additional amounts, if any, on the Notes to be repurchased in accordance with this Condition 5(c). The Bank, upon receipt of the Borrower Change of Control Notice, shall mail a notice to each Holder postage prepaid (and if and so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such Stock Exchange shall so require, will publish notice in a newspaper having a general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*)), with a copy to the Agents and, following the assignment of the Transferred Rights to the Trustee, the Trustee, with the following information: (i) that a Change of Control Offer is being made pursuant to this Condition 5(c) and all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment; (ii) the purchase price and the purchase date, which will be a business day (when used in this condition, as such term is defined in the Loan Agreement) which is no earlier than 30 days and no later than 60 calendar days from the date of delivery to the Bank of the Borrower Change of Control Notice, except as may be otherwise required by applicable law (the "**Change of Control Payment Date**"); (iii) that any Note not properly tendered or not tendered at all will remain outstanding and continue to accrue interest and additional amounts, if any; (iv) that unless the Bank defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest and additional amounts, if any, on the Change of Control Payment Date; (v) that Holders electing to have any Notes repurchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" set forth as an exhibit to the Agency Agreement completed, to the Paying Agent and at the address specified in the notice by the deadline specified in the notice; (vi) that Holders will be entitled to withdraw their tendered Notes and their election to require the Bank to repurchase such Notes provided that the Paying Agent receives by the deadline specified in the notice, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes tendered for repurchase, and a statement that such Holder is withdrawing his tendered Notes and his election to have such Notes repurchased; and (vii) that Holders whose Notes are being repurchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the principal amount of the Notes surrendered, which unpurchased portion must be in integral multiples of $1,000.

(ii)    The Bank will comply with the requirements of Rule 14e-1 under the United States Securities Exchange Act of 1934 and any other securities laws and regulations thereunder and will comply with the applicable laws of any non-US jurisdiction in which a Change of Control Offer is made, in each case, to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to a Change of Control Offer.

To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Loan Agreement or these terms and conditions, the Bank will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations contained in the Loan Agreement or these terms and conditions by virtue thereof.

(iii)    On the second business day preceding the Change of Control Payment Date, the Bank will provide a notice (the "**Bank Change of Control Notice**") to the Noteholders (in accordance with Condition 14 (*Notices*)), the Trustee and the Borrower setting forth the Change of Control Payment (including, in the case of the notice to the Trustee and the Borrower, the computation thereof) required to be made by the Bank for such Notes or portions thereof on the Change of Control Payment Date.

(iv)    On the last business day prior to the Change of Control Payment Date, the Borrower is required, pursuant to Clause 7.3 (*Prepayment in the Event of a Change of Control*) of the Loan Agreement, to deposit in the Account with the Principal Paying Agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof properly tendered and not properly withdrawn as set forth in the Bank Change of Control Notice. On the Change of Control Payment Date, the Bank will, to the extent permitted by law, (i) accept for payment all Notes or portions thereof properly tendered and not properly withdrawn pursuant to the Change of Control Offer and (ii) deliver, or cause to be delivered, to the Registrar for cancellation on behalf of the Bank the Notes so accepted together with an Officers' Certificate from the Bank stating that such Notes or portions thereof have been tendered to and purchased by the Bank. In accordance with the instructions of the Holder set forth in the Option of Holder to Elect to Purchase, the Paying Agent will promptly either (x) pay to the Holder or (y) mail to each Holder of Notes postage prepaid, the Change of Control Payment for such Notes, and the Registrar will promptly authenticate and deliver to the Holder of the Notes a new Note Certificate or Certificates, equal in principal amount to any unpurchased portion of the Notes surrendered, if any; provided, however, that each new Note will be in an integral multiple of $1,000. The Bank will notify the Noteholders in accordance with Condition 14 (*Notices*) of the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(d)    *Asset Sale*:

(i)    If, as of the first day of any calendar month, the aggregate amount of Excess Proceeds (as defined in the Loan Agreement) resulting from Asset Sales (as defined in the Loan Agreement) (the "**Excess Proceeds Offer Amount**") exceeds $3 million, in accordance with Condition 14 (*Notices*), the Bank will make an offer to purchase that part (subject to a minimum of $100,000 in principal amount and integral multiples of $1,000 in excess thereof) of the Notes pursuant to the offer described below (the "**Asset Sale Offer**") at a price per Note in cash (the "**Asset Sale Payment**") equal to 100% of the principal amount thereof plus accrued and unpaid interest thereon to the date of repurchase, plus additional amounts, if any, to such date of repurchase. Pursuant to Clause 7.4 (*Prepayment in the Event of Asset Sales*) of the Loan Agreement, the Borrower is required to give written notice to the Bank in the form of an Officers' Certificate (and, following the assignment of the Transferred Rights to the Trustee, to the Trustee), promptly and in any event within 10 calendar days after the first day of any calendar month in which Excess Proceeds exceed $3 million (the "**Borrower Excess Proceeds Notice**") and thereafter to prepay the Loan to the extent of the aggregate principal amount plus accrued and unpaid interest thereon to the date of prepayment, plus additional amounts, if any, thereon corresponding to the aggregate principal amount plus accrued and unpaid interest and additional amounts, if any, on the Notes to be repurchased in accordance with this Condition 5(d). The aggregate principal amount (less the amount of the Management Fee, if any, received by the Bank) plus accrued and unpaid interest thereon to the date of prepayment, plus additional amounts, if any, thereon corresponding to the aggregate principal amount plus accrued and unpaid interest and additional amounts, if any, on the Notes that are required to be repurchased by the Bank pursuant to this Condition 5(d) may not exceed the Excess Proceeds Offer Amount. The Bank, upon receipt of such Borrower Excess Proceeds Notice, shall mail a notice to each Holder postage prepaid (and if and so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of such Stock Exchange shall so require, will publish notice in a newspaper having a general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*)), with a copy to the Agents and, prior to the assignment of the Transferred Rights to the Trustee, the Trustee, with the following information: (i) that an Asset Sale Offer is being made pursuant to this Condition 5(d); (ii) the purchase price, the Excess Proceeds Offer Amount and the purchase date, which will be a business day which is 60 calendar days from the date of delivery to the Bank of the Borrower Excess Proceeds Notice, except as may be otherwise required by applicable law (the "**Asset Sale Payment Date**"); (iii) that any Note not properly tendered or otherwise accepted or not tendered at all will remain outstanding and continue to accrue interest and additional amounts, if any; (iv) that unless the Bank defaults in the payment of the Asset Sale Payment, all Notes accepted for payment pursuant to the Asset Sale Offer will cease to accrue interest and

additional amounts, if any, on the Asset Sale Payment Date; (v) that Holders electing to have any Notes repurchased pursuant to an Asset Sale Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" set forth as an exhibit to the Agency Agreement completed, to the Paying Agent and at the address specified in the notice prior to the close of business on the fifth business day preceding the Asset Sale Payment Date; (vi) that Holders will be entitled to withdraw their tendered Notes and their election to require the Bank to repurchase such Notes provided that the Paying Agent receives prior to the close of business on the third business day preceding the Asset Sale Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes tendered for repurchase, and a statement that such Holder is withdrawing his tendered Notes and his election to have such Notes repurchased; (vii) that, if the aggregate principal amount of the Notes (together with any accrued interest thereon and any applicable additional amounts) surrendered by Holders exceeds the Excess Proceeds Offer Amount, the Bank shall determine the Notes to be repurchased on a *pro rata* basis (with such adjustments as may be deemed appropriate by the Bank so that only Notes in denominations of $100,000 and integral multiples of $1,000 in excess thereof shall be purchased); and (viii) that Holders whose Notes are being repurchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the principal amount of the Notes surrendered, which unpurchased portion must be in integral multiples of $1,000.

(ii)     The Bank will comply with the requirements of Rule 14e-l under the United States Securities Exchange Act of 1934 and any other securities laws and regulations thereunder and will comply with the applicable laws of any non-US jurisdiction in which an Asset Sale Offer is made, in each case, to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Loan Agreement or these terms and conditions, the Bank will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations contained in the Loan Agreement or these terms and conditions by virtue thereof.

(iii)     On the second business day preceding the Asset Sale Payment Date, the Bank will provide a notice (the "**Bank Asset Sale Notice**") to the Trustee and the Borrower in accordance with Condition 14 (*Notices*) setting forth the aggregate Asset Sale Payment (including the computation thereof) required to be made by the Bank for such Notes or portions thereof on the Asset Sale Payment Date.

(iv)     On the last business day prior to the Asset Sale Payment Date, the Borrower is required, pursuant to Clause 7.4 (*Prepayment in the Event of Asset Sales*) of the Loan Agreement, to deposit in the Account with the Principal Paying Agent an amount equal to the Excess Proceeds Offer Amount or portion of the Excess Proceeds Offer Amount, if applicable, in respect of the Notes or portions thereof properly tendered and not properly withdrawn pursuant to the Asset Sale Offer as set forth in the Bank Asset Sale Notice. On the Asset Sale Payment Date, the Bank will, to the extent permitted by law, (i) accept for payment, on a pro rata basis to the extent necessary, the Notes or portions thereof in the aggregate amount equal to the portion of the Excess Proceeds Offer Amount allocable to the Notes so properly tendered and not properly withdrawn pursuant to the Asset Sale Offer and (ii) deliver, or cause to be delivered, to the Registrar for cancellation on behalf of the Bank the Notes so accepted together with an Officers' Certificate from the Bank stating that such Notes or portions thereof have been tendered to and purchased by the Bank. In accordance with the instructions of the Holder set forth in the Option of Holder to Elect to Purchase, the Paying Agent will promptly either (x) pay to the Holder or (y) mail to each Holder of Notes postage prepaid, the Asset Sale Payment for such Notes, and the Trustee will promptly authenticate and deliver to the Holder of the Notes a new Note Certificate or Certificates, equal in principal amount to any unpurchased portion of the Notes surrendered, if any; provided, however, that each new Note will be in an integral multiple of $1,000. The Bank will notify the Noteholders in accordance with Condition 14 (*Notices*) of the results of the Asset Sale Offer on or as soon as practicable after the Asset Sale Payment Date.

(e)     *No other redemption:* Except where the Loan is accelerated pursuant to Clause 15.2 (*Rights of Lender Upon Occurrence of an Event of Default*) of the Loan Agreement, the Bank shall not be entitled to redeem the Notes prior to that due date otherwise than as provided in Conditions 5(b), (c) and (d) above.

(f)     *Purchase:* The Bank or any of its subsidiaries or the Borrower or any of its subsidiaries may at any time purchase Notes in the open market or otherwise and at any price. Such Notes may be held, reissued, resold or surrendered by the purchaser through the Bank to the Registrar for cancellation.

Notes held by the Bank and its subsidiaries will continue to carry the right to attend and vote at meetings of Noteholders and will be taken into account in determining how many Notes are outstanding for the purposes of these Conditions and the provisions of the Trust Deed. However, Notes held by the Borrower and its

subsidiaries will cease to carry such rights and will not be taken into account, inter alia, for the purposes of Conditions 11 (Meetings of Noteholders; Modification and Waiver; Substitution) and 12 (Enforcement).

(g)     *Cancellation:* All Notes so redeemed or purchased and surrendered for cancellation by the Bank shall be cancelled and all Notes purchased by the Borrower or any of its subsidiaries and surrendered to the Bank pursuant to Clause 7.8 (*Purchase of Instruments Issued to the Agreed Funding Source*) of the Loan Agreement, together with an authorization addressed to the Registrar by the Borrower or such subsidiaries, shall be cancelled.

## 6.     Payments

(a)     *Principal:* Payments of principal shall be made by dollar check drawn on, or, upon application by a Holder of a Note to the Specified Office of the Principal Paying Agent not later than the fifteenth day before the due date for any such payment, by transfer to a dollar account maintained by the payee, upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificate(s) at the Specified Office of the Registrar in Frankfurt and/or the Transfer Agent in Luxembourg.

(b)     *Interest:* Payments of interest shall be made by dollar check drawn on, or, upon application by a Holder of a Note to the Specified Office of the Principal Paying Agent not later than the fifteenth day before the due date for any such payment, by transfer to a dollar account maintained by the payee, and (in the case of interest payable on redemption in whole) upon presentation for surrender of the relevant Note Certificate(s) at the Specified Office of the Registrar in Frankfurt and/or the Transfer Agent in Luxembourg.

(c)     *Payments on business days:* Where payment is to be made by transfer to a dollar account, payment instructions (for value the due date for payment, or, if the due date for payment is not a business day, for value the next succeeding business day) will be initiated and, where payment is to be made by dollar check, the check will be mailed (i) (in the case of payments of principal and interest payable on redemption) on the later of the due date for payment and the day on which the relevant Note Certificate is surrendered (or, in the case of part payment only, endorsed) at the Specified Office of the Registrar in Frankfurt or the Transfer Agent in Luxembourg and (ii) (in the case of payments of interest payable other than on redemption) on the due date for payment. A Holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from (A) the due date for a payment not being a business day or (B) a check mailed in accordance with this Condition 6 (*Payments*) arriving after the due date for payment or being lost in the mail. In this paragraph, "business day" means any day (other than a Saturday or Sunday) on which banks generally are open for business in Frankfurt am Main, London and The City of New York and, in the case of surrender (or, in the case of part payment only, endorsement) of a Note Certificate, the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(d)     *Partial payments:* If the Principal Paying Agent makes a partial payment in respect of any Note, the Bank shall procure that the amount and date of such payment are noted on the Register and, in the case of partial payment upon presentation of a Note Certificate, that a statement indicating the amount and the date of such payment is endorsed on the relevant Note Certificate.

(e)     *Record date:* Each payment in respect of a Note will be made to the person shown as the Holder in the Register at the opening of business in the place of the Specified Office of the Registrar on the fifteenth day before the due date for such payment (the "**Record Date**") whether or not a business day. Where payment in respect of a Note is to be made by check, the check will be mailed to the address shown as the address of the Holder in the Register at the opening of business on the relevant Record Date.

(f)     *Payment to the Account:* Save as the Trustee may otherwise direct at any time after the security created pursuant to the Trust Deed becomes enforceable, the Bank will pursuant to the provisions of Clause 7.1 of the Agency Agreement require the Borrower to make all payments of principal and interest to be made pursuant to the Loan Agreement, less any amounts in respect of the Reserved Rights, to the Account.

(g)     *Payment obligations limited:* Notwithstanding any other provisions to the contrary, the obligations of the Bank to make payments under Conditions 5 and 6 shall constitute an obligation only to account to the Noteholders on such date upon which a payment is due in respect of the Notes, to the extent of sums of principal, interest, Additional Amounts, Tax Indemnity Amounts or other amounts, if any, actually received by or for the account of the Bank pursuant to the Loan Agreement, less any amount in respect of the Reserved Rights.

7.    **Taxation**

All payments by the Bank in respect of the Notes shall be made free and clear of and without deduction or withholding for or on account of any present or future taxes, duties, assessments, fees or other governmental charges ("**Taxes**") imposed or levied by or on behalf of the State of New York, Germany, Ukraine, any jurisdiction from or through which a payment is made, or any political subdivision or taxing authority thereof or therein in each of the preceding jurisdictions (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law. In that event, the Bank shall, subject as provided below, pay such additional amounts ("**additional amounts**") as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been made or required to be made. The foregoing obligation to pay additional amounts, however, will not apply to any (i) Taxes that would not have been imposed but for the existence of any present or former connection between such Noteholder and any Taxing Jurisdiction other than the mere receipt of such payment or the ownership or holding of such Note; (ii) Taxes that would not have been imposed but for the presentation by the Noteholder for payment on a date more than 30 days after a Relevant Date (as defined below); (iii) Taxes required to be deducted or withheld by any Paying Agent from a payment on a Note, if such payment can be made without deduction or withholding by any other Paying Agent; (iv) Taxes that would not have been imposed but for the failure of the Noteholder to comply with the Bank's written request addressed to the Noteholder at least 60 days prior to the relevant payment to provide information with respect to any reasonable certification, documentation, information or other reporting requirement concerning the nationality, residence, identity or connection with the Taxing Jurisdiction of the holder of such Note; (v) Taxes imposed on a payment to an individual that are required to be made pursuant to any European Union Directive on the taxation of savings implementing the conclusion of the ECOFIN Council meeting of November 26-27, 2000 or any law implementing or complying with, or introduced in order to conform to, the Directive; (vi) estate, inheritance, gift, sale or excise tax; (vii) Taxes withheld by the Bank in its capacity as Disbursing Agent (as defined in "Taxation—German Tax Considerations" of the offering memorandum dated 19 April, 2005 issued in relation to the Notes) or upon interest payments made upon the physical presentation of the Notes; and (viii) Taxes imposed in connection with and on account of a Relevant Event.

**Notwithstanding the foregoing provisions, the Bank shall only make payments of additional amounts to the Noteholders pursuant to this Condition 7 (*Taxation*) to the extent and at such time as it shall have actually received an equivalent amount for such purposes from the Borrower under the Loan Agreement by way of Additional Amounts or Tax Indemnity Amounts or otherwise.**

To the extent that the Bank receives a lesser sum in respect of an additional amount from the Borrower for the account of the Noteholders, the Bank shall account to each Noteholder entitled to receive such additional amount pursuant to this Condition 7 (*Taxation*) for an additional amount equivalent to a *pro rata* portion of such sum (if any) as is actually received by, or for the account of, the Bank pursuant to the provisions of the Loan Agreement on the date of, in the currency of, and subject to any conditions attaching to such payment to the Bank.

In these Conditions, "**Relevant Date**" means whichever is the later of (a) the date on which the payment in question first becomes due and (b) if the full amount payable has not been received in London by the Principal Paying Agent or the Trustee on or prior to such due date, the date on which (the full amount having been so received) notice to that effect has been given to the Noteholders.

Any reference in these Conditions to principal or interest shall be deemed to include, without duplication, any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 7 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 7 (*Taxation*) pursuant to the Trust Deed or the Loan Agreement.

8.    **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

9.    **Replacement of Note Certificates**

If any Note Certificate is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Registrar, subject to all applicable laws and stock exchange requirements, upon payment by the

claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank or Registrar may reasonably require. Mutilated or defaced Note Certificates must be surrendered before replacements will be issued.

**10.    Trustee and Agents**

Under separate agreement between the Borrower and the Trustee, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and, under the Trust Deed, to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank, the Borrower and any entity relating to the Bank or the Borrower without accounting for any profit, fees, commissions, interest, discounts or share of brokerage earned arising or resulting from any such contracts or transactions or trusteeships and the Trustee shall also be at liberty to retain the same for its own benefit.

In connection with the exercise by it of any of its trusts, powers, authorities and discretions (including, without limitation, any modification, waiver, authorization, determination or substitution), the Trustee shall have regard to the general interests of the Noteholders as a class but shall not have regard to any interests arising from circumstances particular to individual Noteholders (whatever their number) and, in particular but without limitation, shall not have regard to the consequences of any such exercise for individual Noteholders (whatever their number) resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or any political sub-division thereof and the Trustee shall not be entitled to require, nor shall any Noteholder be entitled to claim, from the Bank, the Trustee or any other person any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders except to the extent already provided for in Condition 7 (*Taxation*) and/or any undertaking given in addition to, or in substitution for, Condition 7 (*Taxation*) pursuant to the Trust Deed. As provided in the Trust Deed. The power of appointing new trustees is vested in the Bank. Appointments of new trustees shall be notified by the Trustee to the Noteholders and certain others. The Noteholders may remove any trustee, but such a removal shall not become effective unless there remains a trustee after this removal. As provided in the Trust Deed, the Trustee for the time being may retire at any time upon giving a prescribed period of notice to the Bank, without assigning any reason thereof and without being responsible for any cost occasioned by such retirement. The retirement of the trustee shall not, however, become effective unless there remains a trustee in office after such retirement.

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. Under separate agreement between the Borrower and the Agents, the Agents are entitled to be indemnified and relieved from certain responsibilities in certain circumstances.

The initial Agents and their initial Specified Offices are listed below. The Bank reserves the right (with the prior approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor registrar or principal paying agent or additional or successor other paying agents and transfer agents; provided, however, that the Bank shall, if and so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, maintain a transfer and paying agent in Luxembourg and shall at all times maintain a registrar outside the United Kingdom. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14.

If any European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive is introduced, the Bank will ensure that, as soon as practicable thereafter, it maintains a Paying Agent in a Member State of the European Union that will not be obliged to withhold or deduct tax pursuant to any such Directive or law.

**11.    Meetings of Noteholders; Modification and Waiver; Substitution**

(a)    *Meetings of Noteholders:* The Trust Deed contains provisions for convening meetings of Noteholders to consider matters relating to the Notes, including the modification of any provision of the Loan Agreement or any provision of these Conditions or the Trust Deed. Such a meeting will be convened on no less than 14 days' notice by the Trustee, the Borrower or the Bank or by the Trustee upon the request in writing of Noteholders holding

117

not less than one-tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be one or more persons present in person holding or representing more than half of the aggregate principal amount of the outstanding Notes or, at any adjourned meeting, one or more persons present in person holding or representing whatever the principal amount of the outstanding Notes held or represented, unless the business of such meeting includes consideration of proposals, *inter alia*, (i) to change any date fixed for payment of principal or interest in respect of the Notes, (ii) to reduce the amount of principal or interest payable on any date in respect of the Notes, (iii) to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, (iv) to change the currency of payments under the Notes, (v) to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution, (vi) to alter the governing law of the Conditions, the Trust Deed or the Loan Agreement, (vii) to change any date fixed for payment of principal or interest under the Loan Agreement, (viii) to alter the method of calculating the amount of any payment under the Loan Agreement or (ix) to change the currency of payment or events of default under the Loan Agreement (each, a "**Reserved Matter**"), in which case the necessary quorum will be one or more persons so present holding or representing not less than two-thirds, or at any adjourned meeting not less than one-third, in principal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

In addition, a resolution in writing signed by or on behalf of Holders of not less than 90% in principal amount of the Notes who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed will take effect as if it were an Extraordinary Resolution. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(b)     *Modification and waiver:* The Trustee may, without the consent of the Noteholders and without prejudice to its rights in respect of any subsequent or other breach, condition, event or act, in writing and on such terms and conditions (if any) as shall seem expedient to it, agree to any modification of these Conditions, the Trust Deed or pursuant to the Transferred Rights, the Loan Agreement (other than in respect of a Reserved Matter) which is, in the opinion of the Trustee, proper to make if, in the opinion of the Trustee, such modification will not be materially prejudicial to the interests of Noteholders or which is of a formal, minor or technical nature or is to correct a manifest error.

In addition, the Trustee may, without the consent of the Noteholders and without prejudice to its rights in respect of any subsequent or other breach, condition, event or act, in writing and on such terms and conditions (if any) as shall seem expedient to it, authorize or waive any breach or proposed breach of the Notes or the Trust Deed by the Bank or, pursuant to the Transferred Rights, the Loan Agreement by the Borrower, or determine that any event which would or might otherwise give rise to a right of acceleration under the Loan Agreement shall not be treated as such (other than a proposed breach or breach relating to a Reserved Matter) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.

Any such authorization or waiver shall be binding on the Noteholders and, unless the Trustee agrees otherwise, any such authorization, waiver or modification shall be notified to the Noteholders in accordance with Condition 14 (*Notices*) as soon as practicable thereafter.

(c)     *Substitution:* The Trust Deed contains provisions under which the Bank may, without the consent of the Noteholders, transfer the obligations of the Bank as principal debtor under the Trust Deed and the Notes to a third party provided that certain conditions specified in the Trust Deed are fulfilled. In the event of such a substitution, the Luxembourg Stock Exchange will be notified and a supplemental offering memorandum will be filed.

## 12.     Enforcement

At any time after an Event of Default (as defined in the Loan Agreement) or Relevant Event (as defined below) shall have occurred and be continuing, the Trustee may, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(a)     it has been so requested in writing by the Holders of at least one-quarter in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(b)     it has been indemnified and/or provided with security to its satisfaction against all liabilities, proceedings, claims and demands to which it may thereby become liable and all costs, charges and expenses which may be incurred by it in connection therewith.

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

The Trust Deed also provides that, in the case of an Event of Default, or a Relevant Event, the Trustee may, and shall if requested to do so in writing by Noteholders of at least one-quarter in principal amount of the Notes outstanding or if directed to do so by an Extraordinary Resolution and, in either case, subject to it being secured and/or indemnified to its satisfaction, (1) require the Bank to declare all amounts payable under the Loan Agreement by the Borrower to be due and payable (in the case of an Event of Default), or (2) enforce the security created in the Trust Deed in favor of the Noteholders (in the case of a Relevant Event). Upon repayment of the Loan following an Event of Default, the Notes will be redeemed or repaid at the principal amount thereof together with interest accrued to the date fixed for redemption together with any additional amounts due in respect thereof pursuant to Condition 7 (*Taxation*) and thereupon shall cease to be outstanding.

For the purposes of these Conditions, "Relevant Event" means the earlier of (i) the failure by the Bank to make any payment of principal or interest on the Notes when due to the extent it is obligated to do so pursuant to these Conditions; (ii) the filing of an application for the institution for insolvency proceedings over the assets of the Bank in Germany; (iii) the filing of a notice of the Bank with the Federal Authority for Financial Services Supervision (*Bundesanstalt für Finanzdienstleistungsaufsicht*) pursuant to Section 46b of the German Banking Act (*Kreditwesengesetz*); (iv) the issuance of any orders by the Federal Government with respect to the Bank pursuant to Section 47 of the German Banking Act (*Kreditwesengesetz*), including a moratorium; or (v) the taking of any action in furtherance of the dissolution (*Auflösung*) of the Bank.

*For the avoidance of doubt, no additional amounts (other than additional amounts payable in respect of applicable Ukrainian withholding tax at a rate of up to 2%) shall be payable if and to the extent that such withholding or deduction is required following and on account of a Relevant Event.*

## 13.    Further Issues

The Bank may from time to time, with the consent of the Borrower and without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest) so as to form a single series with the Notes. In relation to any further issue which is to form a single series with the Notes, the Bank will enter into a loan agreement with the Borrower on the same terms as the Loan Agreement (or on the same terms except for the first payment of interest) subject to any modifications which, in the sole opinion of the Trustee, would not materially prejudice the interests of the Noteholders. The Bank may from time to time, with the consent of the Borrower and the Trustee, create and issue other series of notes having the benefit of the Trust Deed.

## 14.    Notices

Notices to the Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day after the date of mailing. In addition, so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of that Exchange so require, notices to Noteholders will be published on the date of such mailing in a daily newspaper of general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) or, if such publication is not practicable, in a leading English language daily newspaper having general circulation in Europe.

## 15.    Governing Law and Jurisdiction

(a)    *Governing law:* The Trust Deed, the Agency Agreement, the Notes and all other agreements entered into in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Jurisdiction:* The Bank has in the Trust Deed (i) submitted irrevocably to the non-exclusive jurisdiction of the courts of England for the purposes of hearing any determination and suit, action or proceedings or settling any disputes arising out of or in connection with the Trust Deed or the Notes; (ii) waived any objection which it might have to such courts being nominated as the forum to hear and determine any such suit, action or proceedings or to settle any such disputes and agreed not to claim that any such court is not a convenient or appropriate forum; (iii) designated a person in England to accept service of any process on its behalf; and (iv) consented to the enforcement of any judgment.

APPENDIX A

2004 LOAN AGREEMENT

*The following is the text of the Loan Agreement which has been entered into between the Bank and our company.*

THIS AGREEMENT is made the 9ᵗʰ day of August 2004

BETWEEN

(1) **CLOSED JOINT STOCK COMPANY "KYIVSTAR G.S.M.",** a closed joint stock company organised under the laws of Ukraine (the "**Borrower**"); and

(2) **DRESDNER BANK AKTIENGESELLSCHAFT**, a bank established under the laws of Germany and whose registered office is Jürgen-Ponto-Platz 1, D-60301 Frankfurt am Main, Germany (the "**Lender**").

**It is agreed as follows:**

1. **DEFINITIONS AND INTERPRETATION**

1.1 **Definitions**

In this Agreement the following terms have the meanings given to them in this sub-Clause 1.1:

"*Acceleration Notice*" has the meaning set forth in sub-Clause 15.2 (*Rights of Lender upon Occurrence of an Event of Default*).

"*Account*" means an account of the Lender with Citibank N.A. in London, England, Account Number 10852244.

"*Acquired Debt*" means any Debt of an entity (i) existing at the time such entity is merged into the Borrower or one of its Subsidiaries or becomes one of the Borrower's Subsidiaries or (ii) assumed in connection with the acquisition of assets by the Borrower or one of its Subsidiaries from such entity, in each case not incurred by such entity in connection with, or in anticipation or contemplation of, such entity becoming a Subsidiary or such merger, consolidation or acquisition.

"*Additional Amounts*" has the meaning set forth in sub-Clause 8.1(b).

"*Advance*" means an advance made or to be made by the Lender under Clause 3 (*Availability of the Facility*);

"*Affiliate*" of any Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person, and, in the case of a natural Person, any immediate family member (including spouse, parents, children, siblings, cousins and in-laws or other relative who has the same principal residence as such Person) of such Person. For purposes of this definition, "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; provided that beneficial ownership of 10% or more of the voting stock of a Person shall be deemed to be control. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" shall have correlative meanings.

"*Agency*" means any agency, authority, central bank, department, committee, government, legislature, minister, ministry, official or public or statutory Person (whether autonomous or not).

"*Agreed Funding Source*" shall mean any Person to whom the Lender owes any Debt (including securities), which Debt was incurred solely and expressly to fund the Loan (including a designated representative of such Person).

A-1

"*Agreed Funding Source Agreements*" means the Trust Deed; the New Notes; the subscription agreement dated 9 August, 2004 in respect of the New Notes between the Lender, the Borrower and Citigroup Global Markets Limited and Dresdner Bank AG London Branch as joint lead managers; the agency agreement dated the date hereof among the Lender, Citibank AG, as registrar, Citibank N.A. as principal paying agent, paying agent and transfer agent, Dexia Banque Internationale à Luxembourg, as Luxembourg paying and transfer agent, and The Law Debenture Trust Corporation p.l.c., as trustee; in each case as amended from time to time; and any other agreements entered into in connection with the Agreed Funding Source.

"*Approved Replacement Shareholder*" means:

(1) a recognised telecommunications operator whose principal business is mobile telephony and who has its principal operations in Western Europe and whose long-term debt is rated BBB- or better from S&P and Baa3 or better from Moody's (and is not in either case on "credit watch" with negative outlook); or

(2) any other person approved by holders of a majority of the principal amount of New Notes outstanding.

"*Asset Sale*" means any sale, transfer or other disposition (including by way of merger, consolidation or Sale and Lease-Back Transaction) in one transaction or a series of related transactions by the Borrower or any of its Subsidiaries to any Person other than the Borrower or any of its wholly-owned Subsidiaries of any or all of the capital stock of any Subsidiary or any other property or assets of the Borrower or any of its Subsidiaries; provided that "Asset Sale" shall not include:

(1) sales, transfers or other dispositions of inventory, receivables and other current assets in the ordinary course of business consistent with past practice;

(2) sales, transfers or other dispositions governed by the provisions applicable to mergers, consolidations and sales of all or substantially all of the Borrower's assets described in sub-Clause 14.11 (*Mergers and Sales of Assets*) or that involve a sale, transfer or other conveyance, whether direct or indirect, of all or substantially all of the Borrower's assets as described in sub-Clause 7.3 (*Prepayment in the Event of a Change of Control*); or

(3) sales, transfers or other dispositions of assets with a Fair Market Value (as certified in an Officers' Certificate) not in excess of $500,000.

"*Asset Sale Payment Date*" means the date specified as such in the notice from the Borrower to the Lender pursuant to sub-Clause 7.4(b).

"*Attributable Debt*" means, in respect of a Sale and Lease-Back Transaction, at the time of determination, the lesser of (x) the Fair Market Value of the property subject to such arrangement and (y) the present value (discounted at the weighted average interest rate of all notes then issued and outstanding in connection with the Agreed Funding Source, compounded semi-annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such arrangement after excluding all amounts required to be paid on account of maintenance and repairs, insurance, taxes and similar charges.

"*Board of Directors*" means, as to any Person, the board of directors of such Person or any duly authorised committee thereof.

"*Borrower*" means the party named as such above until a successor replaces it in accordance with sub-Clause 14.11 (*Mergers and Sales of Assets*) and thereafter means such successor.

"*Budget*" means the annual budget of a Person which shall include (i) revenues, (ii) expenditures, and (iii) a profit and business plan (which shall include all planned current expenditures, investments

A-2

and expenditures for new types of activities), as well as any changes thereto or any expenditures beyond the levels stated therein (taking into account the allowed variances provided for therein).

"*Business Day*" means any day (other than a Saturday or Sunday) on which banks generally are open for business in New York, Frankfurt, London and Kyiv.

"*Cash Offer*" means the offering by the Lender of the New Notes pursuant to the Offering Memorandum dated 9 August 2004.

"*Cash Offer Advance*" means the Advance referred to sub-Clause 3.1(2).

"*Cash Offer Settlement Date*" means 17 August 2004 (being the proposed closing date of the Cash Offer) or such later date as the Lender and the joint lead managers for the Cash Offer may agree.

"*Capital Adequacy Requirement*" means a request or requirement relating to the maintenance of capital, including one which makes any change to, or is based on any alteration in, the interpretation of the International Convergence of Capital Measurement and Capital Standards (a paper prepared by the Basle Committee on Banking Regulations and Supervision, dated July 1988, and amended in November 1991) or which increases the amounts of capital required thereunder, other than a request or requirement made by way of implementation of the International Convergence of Capital Measurement and Capital Standards in the manner in which it is being implemented at the date hereof.

"*Cash Equivalents*" means:

(1) any evidence of Debt with a maturity of one year or less issued or directly and fully guaranteed or insured by the government of an Approved Jurisdiction (as defined below) or any Agency or instrumentality thereof; provided that the full faith and credit of an Approved Jurisdiction (or similar concept under the laws of the relevant Approved Jurisdiction) is pledged in support thereof;

(2) current account balances, deposits, certificates of deposit, promissory notes, acceptances or money market deposits with a maturity of one year or less of (i) any institution having combined consolidated capital and surplus and undivided profits (or any similar capital concept) of not less than $500 million (or the equivalent in another currency) as determined under U.S. GAAP, international accounting standards or the accounting standards of the country in which such institution is incorporated and as set forth in the most recent publicly available financial reports published by such institution or (ii) any Subsidiary duly organized and operating as a banking institution under the laws of Ukraine of any banking or financial institution referred to under (i) above;

(3) current account balances, deposits, certificates of deposit, promissory notes, acceptances or money market deposits with a maturity of one year or less with any banking institution duly organized and operating under the laws of Ukraine having combined capital and surplus and undivided profits (or any similar capital concept) of not less than $100 million (or the equivalent in another currency) as determined under U.S. GAAP, international accounting standards or the accounting standards of the country in which such institution is incorporated and as set forth in the most recent publicly available financial reports published by such institution; provided, however, that the aggregate of such current account balances, deposits, certificates of deposit, promissory notes, acceptances or money market deposits with a maturity of one year or less may not exceed at any one time the aggregate of (x) $25 million (or the equivalent in another currency) with any single such banking institution and (y) $50 million (or the equivalent in another currency) with all such banking institutions;

(4) current account balances with any banking institution duly organized and operating under the laws of Ukraine having combined capital and surplus and undivided profits (or any similar capital concept) of at least $10 million (or the equivalent in another currency) but less than

$100 million (or the equivalent in another currency) as determined under U.S. GAAP, international accounting standards or the accounting standards of the country in which such institution is incorporated and as set forth in the most recent publicly available financial reports published by such institution; provided, however, that the aggregate of such current account balances may not exceed at any one time (x) $15 million (or the equivalent in another currency) with any single such banking institution or (y) $50 million (or the equivalent in another currency) with all such banking institutions; provided, further, that the Borrower shall give (and not withdraw) instructions to any such banking institution with which the Borrower has a current account balance in excess of $1 million (or the equivalent in another currency) to transfer the balance in excess of such amount to a banking institution meeting the qualifications set forth in sub-clause (2) or (3) of this definition no later than 10 Business Days from the date on which such current account balance exceeds $1 million (or the equivalent in another currency);

(5) commercial paper with a maturity of one year or less issued by a corporation (other than an Affiliate of the Borrower) organized under the laws of an Approved Jurisdiction and rated at least "A-1" by S&P or "P-1" by Moody's;

(6) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the government of an Approved Jurisdiction which obligations mature within one year from the date of acquisition; and

(7) interests in any money market funds at least 95% of the assets of which consist of Cash Equivalents of the type discussed in sub-clauses (1) through (6).

For the avoidance of doubt, an Investment in an investment fund or trust which invests substantially all of its assets in Investments described above in this definition or which is itself rated at least "AAA" or "A-1" by S&P or "Aaa" or "P-1" by Moody's constitutes a Cash Equivalent. For the purposes of this definition of "Cash Equivalents", "Approved Jurisdiction" means the United States of America, Switzerland, Ukraine, Norway and any member nation of the European Union as presently constituted.

"*Change of Control*" means such time as:

(1) a plan relating to the Borrower's liquidation or dissolution is adopted;

(2) the Borrower consolidates with or merges with or into any other Person, another Person merges into the Borrower, or the Borrower conveys, transfers, sells, leases or otherwise disposes of all or substantially all of its assets to another Person, in any such event pursuant to a transaction in which the outstanding voting stock of the Borrower is converted into or exchanged for cash, securities or other property, other than any such transaction where (i) the voting stock of the Borrower outstanding immediately prior to such transaction is converted into or exchanged for voting stock (other than Disqualified Stock) of the surviving or transferee Person and (ii) the "beneficial owners" (as such term is used in Rule 13d-3 promulgated pursuant to the Exchange Act) of the voting stock of the Borrower outstanding immediately prior to such transaction own, directly or indirectly, not less than a majority of the voting stock (other than Disqualified Stock) of the surviving or transferee Person immediately after such transaction;

(3) any "Person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act, whether or not applicable), other than an Excluded Person or Excluded Group or Approved Replacement Shareholder, is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 promulgated pursuant to the Exchange Act), directly or indirectly, of more than 35% of the equity of the Borrower then outstanding normally entitled to vote in election of directors; or

(4) during any period of 12 consecutive months after the date hereof, individuals who at the beginning of any such 12-month period constituted the Board of Directors of the Borrower (together with any new directors whose nomination for election by the shareholders of the Borrower was approved by any Excluded Person or Excluded Group or Approved Replacement Shareholder) cease for any reason to constitute one-third of the Board of Directors of the Borrower then in office;

provided that any consolidation or merger, or conveyance, transfer, sale or lease of properties and assets, permitted by sub-Clause 14.11 (*Mergers and Sales of Assets*) shall not be deemed a Change of Control.

"*Change of Control Payment* Date" means the date specified as such in the notice from the Borrower to the Lender pursuant to sub-Clause 7.3(b).

"*Change of Law*" means any of the enactment or introduction of any new law; the variation, amendment or repeal of an existing or new law; any ruling on or interpretation or application by a competent authority of any existing or new law; and the decision or ruling on, the interpretation or application of, or a change in the interpretation or application of, any law by any court of law, tribunal, central bank, monetary authority or agency or any Taxing Authority or fiscal or other competent authority or agency; which, in each case, occurs after the date hereof. For this purpose the word "law" means all or any of the following whether in existence at the date hereof or introduced hereafter and with which it is obligatory or customary for banks or other financial institutions or, as the case may be, companies in the relevant jurisdiction to comply:

(1) any statute, treaty, order, decree, instruction, letter, directive, instrument, regulation, ordinance or similar legislative or executive action by any national or international or local government or authority or by any ministry or department thereof and other agencies of state power and administration (including, but not limited to, taxation departments and authorities); and

(2) any letter, regulation, decree, instruction, request, notice, guideline, directive, statement of policy or practice statement given by, or required of, any central bank or other monetary authority, or by or of any Taxing Authority or fiscal or other authority or agency (whether or not having the force of law).

"*Commission*" means the U.S. Securities and Exchange Commission.

"*Consolidated Cash Flows*" for any period means the Borrower's Consolidated Net Income for such period, excluding any cumulative effect of a change in accounting principles since the beginning of the relevant period, plus the following items (1) through (4), in each case to the extent such items were deducted when calculating the Borrower's Consolidated Net Income for such period:

(1) any non-recurring loss, including any loss realized in connection with any asset sale or disposition of securities;

(2) provision for income taxes;

(3) interest expense; and

(4) depreciation and amortization (including amortization of goodwill and other intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash expenses, including currency exchange and translation losses (excluding bad debt expense and any such non-cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period);

*minus* the following items (5) and (6) in each case to the extent such items increased the Borrower's Consolidated Net Income for such period:

(5) any non-recurring gain, including any gain realized in connection with any asset sale or disposition of securities; and

(6) any non-cash items, including currency exchange and translation gains,

all as determined on a consolidated basis in accordance with U.S. GAAP.

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries for such period, on a consolidated basis, determined in accordance with U.S. GAAP and by applying the protocols set forth below:

(1) the Net Income (but not loss) of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid in cash to the specified Person or a wholly owned Subsidiary thereof;

(2) the Net Income of any Subsidiary shall be excluded to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders;

(3) the Net Income of any Person acquired in a pooling of interests transaction for any period prior to the date of such acquisition shall be excluded;

(4) income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued) shall be excluded;

(5) in the case of a successor to such Person by consolidation or merger or as a transferee of such Person's assets, any earnings of the successor corporation prior to such consolidation, merger, or transfer of assets shall be excluded; and

(6) the cumulative effect of a change in accounting principles shall be excluded.

"*Debt*" means, with respect to any Person, at any date of determination, without duplication:

(i) all obligations of such Person for borrowed money;

(ii) all reimbursement obligations of such Person in respect of letters of credit, banker's acceptances or other similar instruments or credit transactions;

(iii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(iv) all obligations of such Person to the extent that they defer the purchase price of property or services for more than 180 days, except trade accounts payable and other non-interest bearing current liabilities arising in the ordinary course of business;

(v) all obligations of such Person as lessee under leases that would be capitalised on a balance sheet of the lessee prepared in accordance with U.S. GAAP;

(vi) all guarantees and indemnities of such Person in respect of the Debt of any other Person or Persons, without duplication of any Debt otherwise included in this definition; and

A-6

(vii) all Debt of other Persons secured by a Lien on any property, income and assets of such Person whether or not such Debt is assumed by such Person; provided that if such Debt is not assumed by such Person, the amount of such Debt shall be the lesser of (a) the Fair Market Value of such property, income or assets at such date of determination and (b) the amount of such Debt of such other Person;

provided, that any advance payments that the Borrower receives from its subscribers for the provision of telecommunications services by the Borrower shall not be Debt.

"*Default*" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"*Dispute*" has the meaning set forth in sub-Clause 25.7 (*Arbitration*).

"*Disqualified Stock*" means any capital stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the date on which the Loan matures.

"*Drawdown Date*" in relation to an Advance, means the date on which such Advance is made.

"*Environmental Laws*" has the meaning set forth in sub-Clause 11.9 (*Environmental and Labour Laws*).

"*Equity Interest*" means capital stock and all warrants, options or other rights to acquire capital stock (but excluding any debt security that is convertible into, or exchangeable for, capital stock).

"*Event of Default*" has the meaning set forth in sub-Clause 15.1 (*Circumstances which Constitute Events of Default*).

"*Excess Proceeds*" has the meaning set forth in sub-Clause 14.12 (*Asset Sales*).

"*Exchange Act*" means the United States Securities Exchange Act of 1934, as amended.

"*Exchange Offer*" means the exchange offer by the Borrower to holders of the Existing Notes pursuant to the Exchange Offer Memorandum.

"*Exchange Offer Advance*" means the Advance referred to in Clause 3.1(1).

"*Exchange Offer Memorandum*" means the exchange offer memorandum, dated 12 July 2004, prepared by the Borrower and the Lender for the purpose of the Exchange Offer.

"*Exchange Offer Settlement Date*" means the settlement date for delivery of New Notes by the Borrower to holders of Existing Notes validly tendering Existing Notes pursuant to the Exchange Offer.

"*Existing Notes*" means the $160,000,000 Loan Participation Notes due 2005 issued by the Lender for the sole purpose of funding loans to the Borrower.

"*Excluded Group*" means a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) that includes one or more Excluded Persons; provided that the voting power of the capital stock of the Borrower "beneficially owned" (as such term is used in Rule 13d-3 promulgated under the Exchange Act) by such Excluded Persons (without attribution to such Excluded Persons of the ownership by other members of the "group") represents a majority of the voting power of the capital stock "beneficially owned" (as such term is used in Rule 13d-3 promulgated under the Exchange Act) by such group.

A-7

"*Excluded Person*" means (1) Telenor ASA and any of its Affiliates and (2) Storm LLC and any of its Affiliates.

"*Excluded Provisions*" means provisions of the Shareholders' Agreement relating to increases in the share capital of the Borrower, the approval by the Borrower's shareholders and directors of financing transactions to be entered into by the Borrower, the approval by the Borrower's shareholders and directors of the initial public offering of shares of the Borrower, the Borrower's dividend policy, transfer restrictions binding on the shareholders of the Borrower both before and after the initial public offering of the Borrower (including, among others, provisions relating to required sale rights and co-sale rights), limitations on the acquisition of Debt of the Borrower by its shareholders and their respective Affiliates, future amendments to the Borrower's charter to implement the terms of the Shareholders' Agreement, indemnification by the Borrower of its officers and directors and officers and directors of the Borrower's Affiliates who are officers, directors or employees of the Borrower's shareholders and, to the extent the shareholders are enforcing such indemnity obligations, the shareholders, in each case, in an amount equal to the amount of any liabilities, losses, expenses and the like which they incur in their capacity as officers or directors of the Borrower or its Affiliates, and the term and termination of the Shareholders' Agreement, including the ability of a non-breaching shareholder to terminate the Shareholders' Agreement in certain instances.

"*Facility*" means the term loan facility made available by the Lender to the Borrower under this Agreement.

"*Fair Market Value*" means, with respect to any property or assets, the sale price for such property or assets as could be negotiated in a free market transaction for cash conducted at arm's length between a willing seller and a willing and able buyer as determined in good faith by the relevant Person's Board of Directors in cases of property or assets with a Fair Market Value in excess of $5 million, or as determined in good faith by Officers of the relevant Person as set forth in an Officers' Certificate in cases of property or assets with a Fair Market Value of less than $5 million.

"*Germany*" means the Federal Republic of Germany and any political sub-division or agency thereof or therein.

"*incur*" has the meaning set forth in sub-Clause 14.6 (*Incurrence of Debt*).

"*Interest Payment Date*" means 17 February and 17 August of each year in which the Loan remains outstanding, being the last day of the corresponding Interest Period, or if such day is not a Business Day, the next succeeding Business Day, commencing on 17 February 2005, and the last such date being the Repayment Date.

"*Interest Period*" means, except as otherwise provided herein, any of those periods mentioned in sub-Clause 4 (*Interest Periods*).

"*Interest Rate*" means, except as otherwise provided herein, the interest rate specified in sub-Clause 5.2 (*Calculation of Interest*).

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the forms of direct or indirect loans (including guarantees of Debt or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Debt, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with U.S. GAAP. If the Borrower or any of its Subsidiaries sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of the Borrower, the Borrower shall be deemed to have made an Investment on the date of any such sale or disposition equal to the fair market value of the Equity Interests of such Subsidiary

not sold or disposed of in an amount determined as provided in sub-Clause 14.8(c) (*Restricted Payments*).

"*law*" means any statute, treaty, order, decree, instruction, letter, directive, instrument, regulation, ordinance or similar legislative or executive action by any national or international or local government or authority or by any ministry or department thereof and other agencies of state power and administration (including, but not limited to, taxation departments and authorities), whether in existence at the date hereof or introduced hereafter.

"*Lien*" means any mortgage, lien, pledge, charge, security interest or other encumbrance or preferential arrangement, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the U.S. Uniform Commercial Code (or equivalent statutes) of any jurisdiction).

"*Loan*" means the aggregate principal amount advanced by the Lender pursuant to this Agreement and outstanding at such time.

"*Material Adverse Effect*" has the meaning set forth in sub-Clause 11.1 (*Due Organisation*).

"*Net Cash Proceeds*" means:

(1) with respect to any Asset Sale by any Person, the proceeds thereof (without duplication in respect of all Asset Sales) in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of, or stock or other assets when disposed of for, cash or Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Borrower or any of its Subsidiaries) net of:

    (a) brokerage commissions and other reasonable fees and expenses (including fees and expenses of counsel and investment bankers) related to such Asset Sale;

    (b) provisions for all Taxes payable as a result of such Asset Sale;

    (c) payments made to retire Debt where payment of such Debt is secured by the assets of properties that are the subject of such Asset Sale;

    (d) amounts required to be paid to any Person (other than the Borrower or one of its Subsidiaries) owning a beneficial interest in the assets subject to the Asset Sale; and

    (e) appropriate amounts to be provided by the Borrower or any of its Subsidiaries as a reserve, in accordance with U.S. GAAP, against any liabilities associated with such Asset Sale and retained by the Borrower or any of its Subsidiaries, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale; and

(2) with respect to any issuance or sale of Equity Interests of the Borrower or of convertible or exchangeable debt securities of the Borrower that have been converted into or exchanged for such Equity Interests, the proceeds of such issuance or sale in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of, or stock or other assets when disposed of for, cash and Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Borrower or any of its Subsidiaries), net of attorney's fees, accountant's fees and brokerage, consultation, underwriting and other fees (including placement agents' fees, listing fees or other discounts and commissions) and expenses actually incurred in connection with such issuance or sale and net of taxes paid as a result thereof.

"*Net Income*" means, with respect to any Person, the net income or loss of such Person and its Subsidiaries, determined in accordance with U.S. GAAP, excluding, however:

(1) any gain (but not loss), together with any related provision for taxes on such gain (but not loss), realized in connection with: (a) any asset sale or (b) the disposition of any securities by such Person or any of its Subsidiaries or the extinguishment of any Debt of such Person or any of its Subsidiaries; and

(2) any extraordinary gain (but not loss), together with any related provision for taxes on such extraordinary gain (but not loss).

"*New Notes*" means the 10.375% Loan Participation Notes due 2009 proposed to be issued by the Lender for the sole purpose of funding the Loan.

"*Offering Circular*" means the offering circular dated 9 August 2004, relating to the issuance of the New Notes by the Lender to the Agreed Funding Source.

"*Officer*" means, with respect to a Person, the Chairman of the Board of Directors, the General Director, the Chief Executive Officer, the President, the Chief Financial Officer, the Controller, the Treasurer or the General Counsel of such Person.

"*Officers' Certificate*" means a certificate signed by two Officers of the Borrower.

"*Opinion of Counsel*" means a written opinion from legal counsel who is reasonably acceptable to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements). The counsel may be an employee of or counsel to the Borrower or the Lender (or the trustee under the Agreed Funding Source Agreements).

"*Pari Passu Debt*" means any Debt of the Borrower or of any its Subsidiaries that is not expressly subordinated in right of payment to the Loan.

"*permits*" has the meaning set forth in sub-Clause 11.11 (*Permits and Licences*).

"*Permitted Debt*" means:

(1) Debt owed by the Borrower to a wholly-owned Subsidiary, or Debt of any wholly-owned Subsidiary owed to the Borrower or any other wholly-owned Subsidiary; provided, however, that (i) any subsequent issuance or transfer of any capital stock which results in any such wholly-owned Subsidiary ceasing to be a wholly-owned Subsidiary or any subsequent transfer of such Debt (other than to the Borrower or any wholly-owned Subsidiary) shall be deemed, in each case, to constitute the incurrence of such by the Borrower or any wholly-owned Subsidiary that is not permitted by this sub-clause, and (ii) if the Borrower is the obligor on such Debt, such Debt must be expressly subordinated to the prior payment in full in cash of all obligations under the Loan;

(2) Permitted Refinancing Indebtedness;

(3) Debt arising from the honouring by a bank or other financial institution of a cheque, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided such Debt is extinguished within two Business Days of its incurrence; and

(4) Debt representing subordinated loans made by shareholders of the Borrower and/or their respective Affiliates.

"*Permitted Investments*" means Investments made on or after the date of this Agreement consisting of:

(1) any Investment in the Borrower or in a Subsidiary (other than a Significant Subsidiary) of the Borrower;

A-10

(2) any Investment in cash or Cash Equivalents;

(3) any Investment by the Borrower or any of its Subsidiaries in a Person, if as a result of such Investment such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Borrower;

(4) any acquisition of assets solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Borrower;

(5) Investments in joint ventures or similar entities that are primarily engaged in the telecommunications business (or business ancillary to the telecommunications business) not to exceed $5 million in the aggregate outstanding at any one time;

(6) stock, obligations or securities received in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor or in any manner that is involuntary or otherwise received in the ordinary course of business in settlement of debts owing to the Borrower or any of its Subsidiaries as a result of foreclosure or enforcement of liens;

(7) advance payments or deposits made in connection with the purchase or delivery of equipment or services in the ordinary course of business;

(8) hedging obligations entered into in the ordinary course of the Borrower's or its Subsidiaries' business and not for speculative purposes;

(9) other Investments in any Person having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this sub-clause (9) since 21 November 2002, not to exceed $5 million; and

(10) loans and advances to employees and officers of the Borrower or any Subsidiary in the ordinary course of business for *bona fide* business purposes, provided that the amount of such loans and advances may not exceed more than $100,000 in aggregate at any one time outstanding.

"*Permitted Lien*" means:

(i) any Lien existing on the date of this Agreement;

(ii) any Lien on any property or assets of any corporation existing at the time such corporation is merged or consolidated with or into the Borrower or any of its Subsidiaries or becomes a Subsidiary of the Borrower and not created in contemplation of such event, provided that no such Lien shall extend to any other property or assets;

(iii) any Lien existing on any property or assets prior to the acquisition thereof by the Borrower or any of its Subsidiaries and not created in contemplation of such acquisition, provided that no such Lien shall extend to any other property or assets;

(iv) any Lien on any property or assets securing the Borrower's Debt or Debt of any of its Subsidiaries incurred or assumed for the purpose of financing all or part of the cost of acquiring, repairing or refurbishing such property or assets, provided that (a) no such Lien shall extend to any other property or assets, (b) the aggregate principal amount of all Debt secured by Liens under this sub-clause (iv) on such property or assets shall not exceed the lower of (x) the purchase price of such property or assets and (y) the Fair Market Value of such property or assets at the time of acquisition, repair or refurbishing and (c) such Lien attaches to such property or assets concurrently with the repair or refurbishing thereof or within 90 days after the acquisition thereof, as the case may be;

(v) any Lien arising by operation of law, including any Liens (a) arising in the ordinary course of business with respect to amounts not yet delinquent or being contested by the Borrower or a Subsidiary of the Borrower in good faith in appropriate proceedings or (b) for taxes, assessments, government charges or claims, including without limitation those in favour of Ukrainian governmental fiscal authorities, with respect to amounts not yet delinquent or being contested by the Borrower or a Subsidiary of the Borrower in good faith in appropriate proceedings;

(vi) any Lien on the property or assets of any of the Borrower's wholly-owned Subsidiaries securing intercompany Debt of such wholly-owned Subsidiary owing to the Borrower or another of its wholly-owned Subsidiaries;

(vii) easements, rights-of-way, restrictions and any other similar charges or encumbrances incurred in the ordinary course of business and not interfering in any material respect with the Borrower's business or the business of any of its Subsidiaries, including any encumbrance or restriction with respect to an equity interest of any joint venture pursuant to a joint venture agreement;

(viii) any extension, renewal or replacement of any Lien described in sub-clauses (i)–(vii) above, *provided that* (a) such extension, renewal or replacement shall be no more restrictive in any material respect than the original Lien, (b) the amount of Debt secured by such Lien is not increased and (c) if the property or assets securing the Debt subject to such Lien are changed in connection with such refinancing, extension or replacement, the Fair Market Value of the property or assets is not increased; and

(ix) any other Lien securing Debt permitted to be incurred under sub-Clause 14.6 (*Incurrence of Debt*); *provided that*, immediately after giving effect to such Lien, all of the Borrower's and its Subsidiaries' secured Debt and Attributable Debt in the aggregate do not exceed 15% of the Borrower's and its Subsidiaries' total Debt as determined by reference to the Borrower's most recent quarterly or annual consolidated balance sheet on a pro forma basis after giving effect to the incurrence of any Debt and any other changes in the Borrower's and its Subsidiaries' Debt since the date of such balance sheet.

"*Permitted Refinancing Indebtedness*" means any Debt of the Borrower or any of its Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, repay, defease or refund other Debt of the Borrower or any of its Subsidiaries (other than intercompany Debt); *provided that*:

(1) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus accrued interest on, the Debt so extended, refinanced, renewed, replaced, defeased or refunded (plus the amount of any reasonable determined premium necessary to accomplish such refinancing and such reasonable expenses incurred in connection therewith);

(2) such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a weighted average life to maturity equal to or greater than the weighted average life to maturity of, the Debt being extended, refinanced, renewed, replaced, defeased or refunded;

(3) if the Debt being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Loan, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and is subordinated in right of payment to, the Loan on terms at least as favorable to the Lender as those contained in the documentation governing the Debt being extended, refinanced, renewed, replaced, defeased or refunded; and

(4) such Debt is incurred either by the Borrower or by the Subsidiary who is the obligor on the Debt being extended, refinanced, renewed, replaced, defeased or refunded.

"*Person*" means any individual, corporation, partnership, joint venture, trust, unincorporated organization or government or any Agency or political subdivision thereof.

"*Proceedings*" has the meaning set forth in sub-Clause 25.2 (*English Courts*).

"*Qualifying Jurisdiction*" means any jurisdiction which has a double taxation treaty with Ukraine under which the payment of interest by Ukrainian borrowers to lenders in the jurisdiction in which a lender is incorporated is generally able to be made (upon completion of any necessary formalities required in relation thereto) without deduction or withholding of Ukrainian income tax or subject to deduction or withholding of such tax at a rate not exceeding 2%.

"*Rating Agency*" means (i) Standard & Poor's Rating Group (or its successors) ("S&P"); (ii) Moody's Investor Services, Inc. (or its successors) ("Moody's"); and/or (iii) any other internationally recognized securities rating agency which assigns a rating to the Borrower or any securities of the Borrower.

"*Registration Rights Agreement*" means the Registration Rights Agreement dated October 29, 2002 among the Borrower, Telenor Mobile Communications AS and Storm LLC.

"*Repayment Date*" means the fifth anniversary of the date, referred to in Clause 3 (*Availability of the Loan*), on which the Loan is made hereunder, or if such day is not a Business Day, the next succeeding Business Day.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment*" has the meaning set forth in sub-Clause 14.8 (*Restricted Payments*).

"*Revolving Credit Facility*" means any credit facility made available for one year or less pursuant to which amounts may be redrawn and repaid by the Borrower subject to a facility limit.

"*Rules*" has the meaning set forth in sub-Clause 25.7 (*Arbitration*).

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing for a period, including renewals, in excess of 18 months, of any property or asset that has been owned by the Borrower or any of its Subsidiaries for more than 180 days and has been or is to be sold or transferred by the Borrower or such Subsidiary in such transaction.

"*Securities Act*" means the United States Securities Act of 1933, as amended.

"*Shareholders' Agreement*" means the Shareholders' Agreement dated 30 January 2004 between the Borrower, Telenor Mobile Communications AS and Storm LLC.

"*Significant Subsidiary*" means any Subsidiary of the Borrower that satisfies the definition set forth in Article 1, Rule 1-02 of Regulation S-X promulgated under the Securities Act, as such regulation is in effect on the date hereof.

"*Stated Maturity*" means:

(1) with respect to any Debt, the date specified in such Debt as the fixed date on which the final instalment of principal of such Debt is due and payable; and

(2) with respect to any scheduled instalment of principal of or interest on any Debt, the date specified in such Debt as the fixed date on which such instalment is due and payable.

"*Subsidiary*" means, with respect to any Person, (i) any corporation, association or other business entity of which more than 50% of the total voting power of shares of capital stock entitled to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or

indirectly, by such Person or one or more of the other Subsidiaries of such Person (or a combination thereof) and (ii) any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

"*Taxes*" has the meaning set out in sub-Clause 8.1 (*Additional Amounts*).

"*Tax Indemnity Amounts*" has the meaning set out in Clause 8.3 (*Tax Indemnity*).

"*Taxing Authority*" has the meaning set out in sub-Clause 8.1 (*Additional Amounts*).

"*Trust Deed*" means the trust deed dated 17 August 2004 between the Lender and The Law Debenture Trust Corporation p.l.c., as trustee.

"*unpaid sum*" has the meaning set forth in sub-Clause 16.1 (*Default Interest Periods*).

"*U.S. GAAP*" means U.S. generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board ("**FASB**") or, if FASB ceases to exist, any successor thereto.

**Other Definitions**

the "*Lender*" shall be construed so as to include its and any subsequent successors, assignees and chargees in accordance with their respective interests;

the "*equivalent*" on any given date in one currency (the "first currency") of an amount denominated in another currency (the "second currency") is a reference to the amount of the first currency which could be purchased with the amount of the second currency at the spot rate of exchange quoted on the relevant Reuters page or, where the first currency is (i) hryvnia and the second currency is (ii) U.S. dollars or as the case may be euros (or vice versa), as quoted by the National Bank of Ukraine at or about noon (London time or Brussels time (as applicable) or, as the case may be, Kyiv time) on such date for the purchase of the first currency with the second currency;

"*repay*" (or any derivative form thereof) shall, subject to any contrary indication, be construed to include "prepay" (or, as the case may be, the corresponding derivative form thereof); and

"*VAT*" shall be construed as a reference to value added tax including any similar tax which may be imposed in place thereof from time to time.

**1.2 Interpretation**

Unless the context otherwise requires,

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with U.S. GAAP consistently applied;

(c) words in the singular include the plural, and in the plural include the singular;

(d) provisions apply to successive events and transactions;

(e) references to sections of or rules under the Securities Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the Commission from time to time; and

(f) references to "$" or "U.S. dollars" are to United States dollars and references to "hryvnia" are to Ukrainian hryvnia.

### 1.3  Statutes

Any reference in this Agreement to a statute shall be construed as a reference to such statute as the same may have been, or may from time to time be, amended or re-enacted.

### 1.4  Headings

Clause and Schedule headings are for ease of reference only.

### 1.5  Amended Documents

Except where the contrary is indicated, any reference in this Agreement to this Agreement or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented.

## 2.  THE FACILITY

The Lender grants to the Borrower, upon the terms and subject to the conditions hereof, a term loan facility available to be drawn down in up to two disbursements, each being funded by the Agreed Funding Source.

## 3.  AVAILABILITY OF THE FACILITY

### 3.1  Drawdown

Subject to the conditions in Clause 3.2, the Facility will be available by way of up to two advances that will be made by the Lender to the Borrower as follows:

(1) on the Exchange Offer Settlement Date, in an amount equal to the aggregate principal amount of the New Notes required, under the terms of the Exchange Offer, to be delivered by the Borrower to holders of the Existing Notes who have validly tendered the Existing Notes in accordance with the Exchange Offer (being an amount not to exceed $176,000,000), such amount to be credited to the Borrower's account number 89 08 990 01 with Dresdner Bank AG, Frankfurt, Bank Code 500 800 00; and

(2) on the Cash Offer Settlement Date, in an amount equal to $135,000,000 (being an amount equal to the gross proceeds of issue of the New Notes received by the Lender in respect of the Cash Offer), such amount to be credited to the Borrower's account number 26008200106016 with JSCB "Citibank (Ukraine)", Kyiv, Ukraine (SWIFT CITIUAUK; correspondent account 36144321 at Citibank N.A., USA, NY, SWIFT CITIUS33.

### 3.2  Conditions Precedent

The conditions referred to in Clause 3.1 are the following:

(1) Citigroup Global Markets Limited and Dresdner Bank AG London Branch, as joint lead managers, have received the condition precedent documents as listed in the Agreed Funding Source Agreements in form and substance satisfactory to them;

(2) the Lender has received full funding of the relevant Advance from the Agreed Funding Source; and

(3) no event has occurred or circumstance arisen which would, whether or not with the giving of notice and/or the passage of time and/or the fulfilment of any other requirement, constitute an event described under Clause 15 (*Events of Default*) and the representations set out in Clause 11 (*Representations and Warranties of the Borrower*) are true and accurate in all material respects on and as of the proposed date for the making of such Advance.

A-15

### 3.3  New Registration Requirement

Without limitation to the provisions of Clause 3.2, but notwithstanding any other provision of this Agreement, the obligation of the Lender to make any Advance, and the right of the Borrower to require any Advance be made, shall not become effective until this Agreement has been registered with the National Bank of Ukraine.

### 4.  INTEREST PERIODS

The period for which the Loan is outstanding shall be divided into successive semi-annual periods, ending on and excluding 17 August and 17 February, each of which, other than the first (which shall commence on, and shall include, 17 August, 2004) shall start on, and shall include, the last day of the preceding such period (each, an "**Interest Period**").

### 5.  PAYMENT AND CALCULATION OF INTEREST

### 5.1  Payment of Interest

Not later than noon (London time) two Business Days prior to each Interest Payment Date the Borrower shall pay all accrued and unpaid interest calculated to the last day of each Interest Period on the outstanding principal amount of the Loan to the Account. No less than two Business Days prior to the date on which the Lender is required to make payment to the account referred to in Article 7.1 of the Agency Agreement, the Borrower shall procure that the Borrower's paying bank confirms by letter or telex or SWIFT MT 100 message to the Lender the payment instructions relating to such payment. No less than one Business Day prior to such payment, the Borrower shall procure that such payment is remitted to the Account.

### 5.2  Calculation of Interest

The Loan shall bear interest at the rate of 10.375% per annum (the "**Interest Rate**"). The amount of interest payable on each Interest Payment Date shall be calculated by applying the Interest Rate to the amount of the Loan, dividing the product by two, and rounding the resulting figure to the nearest cent, half a cent being rounded upwards, provided, however, that if the Exchange Offer Advance is made prior to the first Interest Payment Date but the Drawdown Date of such Advance falls after the Drawdown Date of the Cash Offer Advance, then, for the purpose only of determining the amount of interest payable on the first Interest Payment Date, the Exchange Offer Advance shall be treated as having been made on the Drawdown Date of the Cash Offer Advance. When interest is required to be calculated for any period other than an Interest Period, it shall be calculated on the basis of a 360 day year consisting of 12 months of 30 days each, and in the case of an incomplete month, the actual number of days elapsed.

### 6.  REPAYMENT

Subject to sub-Clause 15.2 (*Rights of Lender upon Occurrence of an Event of Default*), not later than noon (London time) one Business Day prior to the Repayment Date, the Borrower shall repay in full the Loan and, to the extent not already paid in accordance with sub-Clause 5.1 (*Payment of Interest*), all accrued and unpaid interest, any Additional Amounts and any Tax Indemnity Amounts calculated to the last day of the last Interest Period. No less than two Business Days prior to the date on which the Lender is required to make payment to the account referred to in Clause 7.1 of the Agency Agreement, the Borrower shall procure that the Borrower's paying bank confirms by letter or telex or SWIFT MT 100 message to the Lender the payment instructions relating to such payment. No less than one Business Day prior to such date, the Borrower shall procure that such payment is remitted to the Account.

A-16

## 7.   PREPAYMENT

### 7.1   Prepayment for Tax Reasons

If, as a result of the application of or any amendment to or change (including a change in interpretation or application) in the double taxation treaty between Ukraine and Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) or the laws or regulations of Ukraine or Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) or of any political sub-division thereof or any Agency therein, the Borrower would thereby be required to pay any Additional Amounts in respect of Taxes pursuant to sub-Clause 8.1 (*Additional Amounts*) (other than Additional Amounts payable in respect of applicable Ukrainian withholding tax at a rate of up to 2%) or Tax Indemnity Amounts pursuant to sub-Clause 8.3 (*Tax Indemnity*), then, provided that the Borrower cannot avoid the obligation to pay such Additional Amounts or Tax Indemnity Amounts by taking reasonable measures, the Borrower may (without premium or penalty), upon not less than 30 calendar days' written notice to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) including an Officers' Certificate of the Borrower to the effect that the Borrower would be required to pay such Additional Amounts or Tax Indemnity Amounts, which notice shall be irrevocable, prepay the Loan in whole (but not in part) at any time together with all accrued and unpaid interest, any Additional Amounts and any Tax Indemnity Amounts. No such notice shall be given earlier than 90 calendar days prior to the earliest date on which the Borrower would be obligated to pay such Additional Amounts or Tax Indemnity Amounts, as the case may be.

### 7.2   [Intentionally left blank]

### 7.3   Prepayment in the Event of a Change of Control

(a)  In the event of a Change of Control, the Borrower shall be required to prepay the Loan and any interest accrued and unpaid thereon on the Change of Control Payment Date to the extent and in the amount that the Lender is required to pay the Agreed Funding Source as a result thereof as set forth in a written notice by the Lender to the Borrower, including computation of such amount, given at least two Business Days prior to the Change of Control Payment Date.

(b)  Promptly, and in any event within 10 calendar days after the date of any Change of Control, the Borrower shall deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) a written notice in the form of an Officers' Certificate, which notice shall be irrevocable (but may, in respect of sub-clause (iii), be amended), stating:

(i)   that a Change of Control has occurred;

(ii)  the Change of Control Payment Date, which date shall be a Business Day occurring no earlier than 30 calendar days and no later than 60 calendar days from the date such notice is delivered; and

(iii) the circumstances and relevant facts giving rise to such Change of Control, including, to the extent available, information with respect to pro forma historical income, cash flow and capitalization, each after giving effect to such Change of Control and events causing such Change of Control, and the date upon which such Change of Control is deemed to have occurred.

(c)  On the Business Day prior to the Change of Control Payment Date, the Borrower shall deposit in the Account an amount in cash equal to the amount that the Lender is required to pay to the Agreed Funding Source as a result of such Change of Control as set forth in the notice referred to in sub-Clause 7.3(a) hereof, to be held for payment in accordance with this

Agreement and the agreements entered into in connection with the Agreed Funding Source. To the extent that the amount actually required to be paid on the Change of Control Payment Date is less than the amount so paid by the Borrower, the excess, if any, thereon will be refunded to the Borrower from the Account for or on behalf of the Lender on the Business Day following the Change of Control Payment Date.

(d) The Borrower shall use its best efforts to assist the Lender in connection with any offer to purchase or redeem or any tender offer, as well as the actual purchase or redemption, required in the event of any Change of Control pursuant to the agreements entered into in connection with the Agreed Funding Source.

**7.4  Prepayment in the Event of Asset Sales**

(a) In the event of any Asset Sale that requires the Borrower to apply the Excess Proceeds therefrom in accordance with sub-Clause 14.12(c) hereof, the Borrower shall be required to prepay the Loan on the Asset Sale Payment Date to the extent and in the amount that the Lender is required to pay the Agreed Funding Source as a result thereof as set forth in a written notice by the Lender to the Borrower, including computation of such amount, given at least two Business Days prior to the Asset Sale Payment Date.

(b) Promptly, and in any event within 10 calendar days after the first day of any calendar month in which Excess Proceeds exceed $3 million (or the equivalent in another currency), the Borrower shall deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) a written notice in the form of an Officers' Certificate, which notice shall be irrevocable (but may, in respect of sub-clause (iii), be amended), stating:

   (i) that it is obligated to prepay the Loan to the extent contemplated by sub-Clause 7.4(a) hereof;

   (ii) the Asset Sale Payment Date, which date shall be a Business Day occurring 60 calendar days from the date such notice is delivered, and the Excess Proceeds available for such prepayment (representing the amount available for payments in respect of the asset sale offer to be made by the Lender pursuant to the Agreed Funding Source Agreements);

   (iii) the circumstances and relevant facts giving rise to the obligation to so prepay the Loan; and

   (iv) that the Excess Proceeds from the Asset Sales will be applied pursuant to sub-Clause 14.12(c) hereof.

(c) One Business Day prior to the Asset Sale Payment Date, the Borrower shall deposit in the Account an amount in cash equal to the amount that the Lender is required to pay to the Agreed Funding Source as a result of any Asset Sale that requires the Borrower to apply the Excess Proceeds therefrom in accordance with sub-Clause 14.12(c) hereof as set forth in writing by the Lender to the Borrower (it being understood that, pursuant to the Agreed Funding Source Agreements, the aggregate principal amount of such instruments, together with all accrued and unpaid interest to the Asset Sale Payment Date, Additional Amounts and Tax Indemnity Amounts, if any, may not exceed the Excess Proceeds required to be applied in accordance with sub-Clause 14.12(c) hereof), to be held for payment in accordance with this Agreement and the Agreed Funding Source Agreements. To the extent that the amount actually required to be paid on the Asset Sale Payment Date is less than such Excess Proceeds, the excess, if any, thereon will be refunded to the Borrower from the Account on behalf of the Lender on the Business Day following the Asset Sale Payment Date.

(d) The Borrower shall use its best efforts to assist the Lender in connection with any offer to purchase or redeem or any tender offer, as well as the actual purchase or redemption, required in the event of any Asset Sale pursuant to the agreements entered into in connection with the Agreed Funding Source.

### 7.5 Notice of Prepayment

Without prejudice to any other requirement in this Agreement, any notice of prepayment given by the Borrower pursuant to sub-Clause 7.1 (*Prepayment for Tax Reasons*) hereof shall be irrevocable, shall specify the date upon which such prepayment is to be made and shall oblige the Borrower to make such prepayment one Business Day prior to such date.

### 7.6 Costs of Prepayment

The Borrower shall, on the date of prepayment, pay all accrued and unpaid interest, any Additional Amounts and any Tax Indemnity Amounts (each only with respect to the amount subject to such prepayment), as of such date of prepayment and all other amounts payable to the Lender hereunder in connection with such prepayment. The Borrower shall indemnify the Lender on demand against any administrative and legal costs and expenses reasonably incurred and properly documented by the Lender on account of any prepayment made in accordance with this Clause 7 (*Prepayment*).

### 7.7 No Other Prepayments

The Borrower shall not prepay the whole or any part of the amount of the Loan except at the times and in the manner expressly provided for in this Agreement.

### 7.8 Purchase of Instruments Issued to the Agreed Funding Source

The Borrower and its Subsidiaries may purchase instruments issued to the Agreed Funding Source at any time in the open market or otherwise. If such instruments so purchased by the Borrower are surrendered by it to the Lender, as issuer of such instruments, for cancellation (together with an authorization addressed to the paying agent of the Lender under the Agreed Funding Source Agreements to cancel such instruments), the principal amount of the Loan corresponding to the prepayment of an amount of the Loan equal to the principal amount of such cancelled instruments shall be treated as prepaid by the Borrower by surrender of such instruments to the Lender and accrued and unpaid interest in respect of the principal amount of the Loan shall be treated as paid by the Borrower by surrender of such instruments to the Lender.

## 8. TAXES

### 8.1 Additional Amounts

(a) All payments made by the Borrower in respect of the Loan shall be made free and clear of and without deduction or withholding for or on account of any present or future taxes, duties, assessments, fees or other governmental charges (collectively, "**Taxes**") imposed or levied by or on behalf of Ukraine or Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) or any political subdivision or taxing authority thereof or therein in each of the preceding jurisdictions (each, a "**Taxing Authority**"), unless the Borrower is required to withhold or deduct Taxes by law or by the interpretation or administration thereof. For the avoidance of doubt, this sub-Clause 8.1 shall not apply to any Taxes on income payable by the Lender in Germany (or any Qualifying Jurisdiction).

(b) If at any time the Borrower is required to withhold or deduct any amount for or on account of Taxes imposed or levied by or on behalf of any Taxing Authority within Ukraine or Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) from any payment made under or with respect to the Loan, the Borrower shall, on the due date for such payment, pay such additional amounts ("**Additional Amounts**") as may be necessary so that the net amount received by the Lender (including Additional Amounts) in U.S. dollars after such withholding or deduction will not be less than the amount the Lender would have received if such Taxes had not been withheld or deducted and free from liability in respect of such withholding or deduction; provided, however, that (i) for the avoidance of doubt, such Additional Amounts shall not be payable with respect to any Taxes on income payable by the Lender in Germany (or any Qualifying Jurisdiction) and (ii) such Additional Amounts (other than Additional Amounts payable in respect of applicable Ukrainian withholding tax at a rate of up to 2%) shall not be payable if and to the extent that such withholding or deduction is required following and on account of a Relevant Event (as defined in the New Notes).

(c) The Borrower will also:

  (i) make such withholding or deduction; and

  (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law.

(d) At least 30 calendar days (or, in the event of a Change of Control pursuant to sub-Clause 7.3 (*Prepayment in the Event of a Change of Control*) or an Asset Sale that requires the Borrower to apply the Excess Proceeds therefrom in accordance with sub-Clause 14.12(c) hereof, as soon as reasonably practicable) prior to each date on which any payment under or with respect to the Loan is due and payable, if the Borrower will be obligated to pay Additional Amounts (other than Additional Amounts payable in respect of applicable Ukrainian withholding tax at a rate of up to 2%) with respect to such payment (upon and subject to written notice by the Lender or by the party designated as trustee under the Agreed Funding Source Agreements), the Borrower will deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) an Officers' Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable.

(e) If the Lender pays any amount in respect of such Taxes, the Borrower shall reimburse the Lender in U.S. dollars for such payment on demand.

(f) Whenever this Agreement mentions, in any context, the payment of amounts based upon the principal or premium, if any, interest or of any other amount payable under or with respect to any of the Loan, this includes, without duplication, payment of any Additional Amounts and Tax Indemnity Amounts that may be applicable.

The foregoing provisions shall apply, modified as necessary, to any Taxes imposed or levied by any Taxing Authority in any jurisdiction in which any successor obligor to the Borrower is organized.

**8.2  Payments**

The Borrower shall use all reasonable efforts to assist the Lender in ensuring that all payments made under this Agreement are exempt from deduction or withholding of Tax.

### 8.3  Tax Indemnity

Without prejudice to, and without duplication of, the provisions of sub-Clause 8.1 (*Additional Amounts*),

(a) if at any time the Lender makes or is required to make any payment to a Person (other than to or for the account of the Agreed Funding Source) on account of Tax (other than Taxes on income payable by the Lender in Germany or any Qualifying Jurisdiction) in respect of the Loan or in respect of the Agreed Funding Source Agreements imposed by any Taxing Authority of or in Ukraine, Germany or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes, or any liability in respect of any such payment is asserted, imposed, levied or assessed against the Lender, the Borrower shall, as soon as reasonably practicable following, and in any event within 30 calendar days of, written demand made by the Lender, indemnify the Lender against such payment or liability, together with any interest, penalties, costs and expenses payable or incurred in connection therewith; and

(b) if at any time a Taxing Authority imposes an obligation on the Lender to withhold or deduct any amount on any payment made or to be made by the Lender to or for the account of the Agreed Funding Source and the Lender is required by any Agreed Funding Source Agreements to pay additional amounts to such Agreed Funding Source in connection therewith, the Borrower shall, as soon as reasonably practicable following, and in any event within 30 calendar days of, written demand made by the Lender, pay to the Lender such additional amounts as may be necessary so that the net amount received by the Agreed Funding Source (including such additional amounts) in U.S. dollars after such withholding or deduction will not be less than the amount such Agreed Funding Source would have received if such withholdings or deductions had not been made and free from liability in respect of such withholding or deduction.

Any payments required to be made by the Borrower under this sub-Clause 8.3 are collectively referred to as "**Tax Indemnity Amounts**". For the avoidance of doubt, the provisions of this sub-Clause 8.3 shall not apply to any withholding or deductions of Taxes with respect to the Loan which are subject to payment of Additional Amounts under sub-Clause 8.1 (*Additional Amounts*).

### 8.4  Tax Claims

If the Lender intends to make a claim for any Tax Indemnity Amounts pursuant to sub-Clause 8.3 (*Tax Indemnity*), it shall notify the Borrower thereof; provided that nothing herein shall require the Lender to disclose any confidential information relating to the organization of its affairs.

### 8.5  Tax Credits and Tax Refunds

(a) If any Additional Amounts are paid under sub-Clause 8.1 (*Additional Amounts*) or Tax Indemnity Amounts are paid under sub-Clause 8.3 (*Tax Indemnity*) by the Borrower for the benefit of the Lender and the Lender, in its reasonable opinion, determines that it has received or been granted a credit against, a relief or remission for, or a repayment of, any Tax, then, if and to the extent that the Lender, in its opinion, determines that such credit, relief, remission or repayment is in respect of or calculated with reference to the deduction or withholding giving rise to such Additional Amounts or, in the case of Tax Indemnity Amounts, with reference to the liability, expense or loss to which the payment giving rise to such Tax Indemnity Amounts relates, the Lender shall, to the extent that it can do so without prejudice to the retention of the amount of such credit, relief, remission or repayment, pay to the Borrower such amount as the Lender shall, in its opinion, have concluded to be attributable to such deduction or withholding or, as the case may be, such liability, expense or loss; provided

that the Lender shall not be obliged to make any payment under this sub-Clause 8.5 in respect of such credit, relief, remission or repayment until the Lender is in its opinion satisfied that its tax affairs for its tax year in respect of which such credit, relief, remission or repayment was obtained have been finally settled. Any such payment shall, in the absence of manifest error and subject to the Lender specifying in writing in reasonable detail the calculation of such credit, relief, remission or repayment and of such payment and providing relevant supporting documents evidencing such matters, be conclusive evidence of the amount due to the Borrower hereunder and shall be accepted by the Borrower in full and final settlement of its rights of reimbursement hereunder in respect of such deduction or withholding. Nothing contained in this sub-Clause 8.5 shall interfere with the right of the Lender to arrange its tax affairs generally in whatever manner it thinks fit nor oblige the Lender to disclose any information relating to its tax affairs generally or any computations in respect thereof.

(b) If as a result of a failure to obtain relief from deduction or withholding of any Tax imposed by Ukraine or Germany (or any Qualified Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) (i) such Tax is deducted or withheld by the Borrower and pursuant to sub-Clause 8.1 (*Additional Amounts*) an increased amount is paid by the Borrower to the Lender in respect of such deduction or withholding, and (ii) following the deduction or withholding of Tax as referred to above, (A) the Borrower applies on behalf of the Lender to the relevant Ukrainian Taxing Authorities for a tax refund and such tax refund is credited by the Ukrainian Taxing Authorities to the Lender or (B) if such tax refund is otherwise credited by a relevant Taxing Authority to the Lender, pursuant to a final decision of such Taxing Authority, the Lender shall as soon as reasonably possible notify the Borrower of the receipt of such tax refund and promptly transfer the entire amount of the tax refund to a bank account of the Borrower specified for that purpose by the Borrower.

## 8.6 Representations of the Lender

The Lender represents that (a) it is a bank which at the date hereof is a resident of Germany, is subject to taxation in Germany on the basis of its registration as a legal entity, location of its management body or another similar criterion and it is not subject to taxation in Germany merely on income from sources in Germany or connected with property located in Germany; (b) it will account for the Loan on the date of closing on its balance sheet as an asset under "loans and advances to customers" and any arrangements in connection with the Agreed Funding Source as a liability under "certificated liabilities" and (c) at the date hereof, it does not have a permanent establishment in Ukraine for purposes of applicable Ukrainian tax legislation.

The Lender shall make reasonable and timely efforts to assist the Borrower to obtain relief from withholding of Ukrainian income tax pursuant to the double taxation treaty between Ukraine and the jurisdiction in which the Lender is incorporated, including its obligations under sub-Clause 8.8 (*Delivery of Forms*). The Lender makes no representation as to the application or interpretation of any double taxation treaty between Ukraine and the jurisdiction in which the Lender is incorporated.

## 8.7 Exceptions

The Lender agrees promptly, upon becoming aware of such, to notify the Borrower if it ceases to be resident in Germany or a Qualifying Jurisdiction or if any of the representations set forth in sub-Clause 8.6 (*Representations of the Lender*) are no longer true and correct. If the Lender ceases to be resident in Germany or a Qualifying Jurisdiction, then, except in circumstances where the Lender has ceased to be resident in Germany or a Qualifying Jurisdiction by reason of any Change of Law (including a change in a double taxation treaty or in such law or treaty's application or interpretation), in each case taking effect after the date of this Agreement, the Borrower shall not be liable to pay to the Lender under sub-Clause 8.1 (*Additional Amounts*) or sub-Clause 8.3 (*Tax Indemnity*) any sum in

excess of the sum it would have been obliged to pay if the Lender had not ceased to be resident in Germany or a Qualifying Jurisdiction.

### 8.8 Delivery of Forms

The Lender shall within 30 calendar days of the request of the Borrower, to the extent it is able to do so under applicable law including Ukrainian laws, deliver to the Borrower a certificate issued by the competent state authority in Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) confirming that the Lender is a tax resident in Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) and such other information or forms as may need to be duly completed and delivered by the Lender to enable the Borrower to apply to obtain relief from deduction or withholding of Ukrainian Tax after the date of this Agreement, including under the double taxation treaty, or, as the case may be, to apply to obtain a tax refund if a relief from deduction or withholding of Ukrainian Tax has not been obtained. The Lender shall, within 30 calendar days of the request of the Borrower, to the extent it is able to do so under applicable law including Ukrainian laws, from time to time deliver to the Borrower any additional duly completed application forms as need to be duly completed and delivered by the Lender to enable the Borrower to apply to obtain relief from deduction or withholding of Ukrainian Tax or, as the case may be, to apply to obtain a tax refund if a relief from deduction or withholding of Ukrainian Tax has not been obtained. The certificate and, if required, other forms referred to in this sub-Clause 8.8 shall be duly signed by the Lender, if applicable, and stamped or otherwise approved by the competent state authority in Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) and apostilled or otherwise legalised. If a relief from deduction or withholding of Ukrainian Tax under this sub-Clause 8.8 has not been obtained and further to an application of the Borrower to the relevant Ukrainian Taxing Authorities the latter makes a tax refund to the Borrower, then, if and to the extent that the Borrower has failed to make payment of Additional Amounts in relation to the payments under the Loan from which no such relief as aforesaid was obtained, the Borrower shall promptly transfer to the Lender an amount in U.S. Dollars equivalent to such refund. The Borrower shall pay all costs (including, but not limited to, currency conversion costs) associated with such transfer.

## 9.  TAX RECEIPTS

### 9.1 Notification of Requirement to Deduct Tax

If, at any time, the Borrower is required by law to make any deduction or withholding from any sum payable by it hereunder, or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated, the Borrower shall promptly notify the Lender.

### 9.2 Evidence of Payment of Tax

(a) The Borrower will make all reasonable endeavours to obtain certified copies, and translations into English, of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Taxing Authority imposing such Taxes. The Borrower will furnish to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements), within 60 calendar days after the date the payment of any Taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment by the Borrower or, if such receipts are not obtainable, other evidence of such payments by the Borrower.

(b) The Lender will make all reasonable endeavors to obtain certified copies, and translations into English, of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Taxing Authority imposing such Taxes. The Lender will furnish to the Borrower, within

A-23

60 calendar days after the date the payment of any Taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment by the Lender or, if such receipts are not obtainable, other evidence of such payments by the Lender.

## 10. CHANGES IN CIRCUMSTANCES

### 10.1 Increased Costs

If, by reason of (i) any Change of Law, other than a Change of Law which relates only to the basis or rate of Tax on the net income of the Lender, and/or (ii) compliance with any Capital Adequacy Requirement, reserve or deposit requirement or any other request from or requirement of any central bank or other fiscal, monetary or other authority which has effect in Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes):

(a) the Lender incurs an additional cost as a result of the Lender's entering into or performing its obligations, including its obligation to make the Loan, under this Agreement (excluding Taxes payable by the Lender on its overall net income); or

(b) the Lender becomes liable to make any additional payment on account of Tax or otherwise, not being a Tax imposed on its net income, on or calculated by reference to the amount of the Loan and/or to any sum received or receivable by it hereunder except where compensated under sub-Clause 8.1 (*Additional Amounts*) or under sub-Clause 8.3 (*Tax Indemnity*);

then the Borrower shall, from time to time within 30 calendar days of written demand of the Lender, pay to the Lender amounts sufficient to hold harmless and indemnify it from and against, as the case may be, such properly documented cost or liability; provided that the Lender will not be entitled to indemnification where such increased cost or liability arises as a result of the gross negligence, fraud or wilful default of the Lender; and provided that the amount of such increased cost or liability shall be deemed not to exceed an amount equal to the proportion of any cost or liability which is directly attributable to this Agreement.

### 10.2 Increased Costs Claims

If the Lender intends to make a claim pursuant to sub-Clause 10.1 (*Increased Costs*), it shall notify the Borrower thereof and provide a written description in reasonable detail of the relevant Change of Law or Capital Adequacy Requirement, as the case may be, including a description of the relevant affected jurisdiction or country and the date on which the change in circumstances took effect; provided that nothing herein shall require the Lender to disclose any confidential information relating to the organization of its or any other Person's affairs. The written description shall demonstrate the connection between the change in circumstance and the increased costs and shall be accompanied by relevant supporting documentation evidencing the matters described therein.

### 10.3 Illegality

If, at any time after the date of this Agreement, it is unlawful for the Lender to make, fund or allow to remain outstanding the Loan made or to be made by it hereunder or to maintain the Agreed Funding Source then the Lender shall, after becoming aware of the same, deliver to the Borrower a written notice, setting out in reasonable detail the nature and extent of the relevant circumstances, to that effect and:

(a) if the Loan has not then been made, the Lender shall not thereafter be obliged to make the Loan; and

(b)  if the Loan is then outstanding and the Lender so requests, the Borrower shall, on the latest date permitted by the relevant law or such earlier day as the Borrower elects (as notified to the Lender upon not less than 30 calendar days' written notice prior to the date of repayment), repay the Loan together with accrued and unpaid interest thereon and all other amounts owing to the Lender hereunder.

**10.4  Mitigation**

If circumstances arise which would result in:

(a)  any payment falling due to be made by or to the Lender or for its account pursuant to sub-Clause 10.3 (*Illegality*);

(b)  any payment falling due to be made by the Borrower pursuant to sub-Clause 8.1 (*Additional Amounts*); or

(c)  a claim for indemnification pursuant to sub-Clause 8.3 (*Tax Indemnity*) or sub-Clause 10.1 (*Increased Costs*),

then, without in any way limiting, reducing or otherwise qualifying the rights of the Lender or the Borrower's obligations under any of the above mentioned provisions, the Lender shall, upon becoming aware of the same, notify the Borrower thereof and, in consultation with the Borrower and to the extent it can lawfully do so and without prejudice to its own position, take reasonable steps to remove such circumstances or mitigate the effects of such circumstances including, without limitation, by the change of its lending office or transfer of its rights or obligations under this Agreement to another bank; provided that the Lender shall be under no obligation to take any such action if, in its opinion, to do so might have any adverse effect upon its business, operations or financial condition or might be in breach of any arrangements which it may have made in connection with the Agreed Funding Source.

**11.  REPRESENTATIONS AND WARRANTIES OF THE BORROWER**

The Borrower makes the following representations and warranties and acknowledges that the Lender has entered into this Agreement in reliance on those representations and warranties.

**11.1  Due Organisation**

Each of the Borrower and its Subsidiaries has been duly organized, is validly existing as a legal entity properly organized, registered and existing under the laws of Ukraine; each of the Borrower and its Subsidiaries has the corporate power and authority to own, lease and operate its property and to conduct its business as it is currently being conducted and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification, except where any failure to do so would not have any material adverse effect on the business, financial condition or results of operations of the Borrower and its Subsidiaries taken as a whole ("**Material Adverse Effect**").

**11.2  Authorisation**

The Borrower has full corporate power and authority to enter into this Agreement, and this Agreement has been duly authorised, executed and delivered by the Borrower, and is a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except that the enforcement thereof may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

**11.3  No Conflict**

The execution, delivery and performance of this Agreement by the Borrower, the compliance by the Borrower with all the provisions hereof and the consummation of the transactions contemplated hereby (a) will not require any consent, approval, authorisation or other order of any court, regulatory body, administrative agency or other governmental body except for such consents, approvals, authorisations or other orders as have been obtained and which are in full force and effect or as may only be obtained after the closing of the transactions contemplated hereby or thereby; (b) will not conflict with or constitute a breach of any of the terms or provisions of, or a default under, the foundation agreement and charter of the Borrower or any of its Subsidiaries; (c) will not conflict with or constitute a breach of any agreement, indenture or other instrument to which the Borrower or any of its Subsidiaries is a party or by which the Borrower, any of its Subsidiaries or their respective property or assets is bound, and (d) will not violate or conflict with any laws, administrative regulations or rulings or court decrees applicable to the Borrower, any of its Subsidiaries or their respective property, except in the case of sub-clauses (c) and (d), any conflict, breach or violation which would not have a Material Adverse Effect.

**11.4  Financial Statements**

The audited consolidated financial statements of the Borrower and the related notes thereto, as contained in the Offering Circular, were prepared in accordance with U.S. GAAP consistently applied throughout the periods involved, and present fairly the consolidated financial position of the Borrower as at the dates at which they were prepared and the results of the operations and the cash flows of the Borrower in respect of the periods for which they were prepared. The other financial and statistical information and data set forth in the Offering Circular is, in all material respects, accurately presented and prepared on a basis consistent with such financial statements and the books and records of the Borrower and its Subsidiaries. Since March 31, 2004 financial statements contained in the Offering Circular (a) there has been no material adverse change in the condition (financial or otherwise) or affecting the business, prospects, financial position, or results of operations of the Borrower or the Borrower and its Subsidiaries taken as a whole, whether or not arising from transactions in the ordinary course of business; and (b) neither the Borrower nor any of its Subsidiaries has entered into any transaction or agreement material to the Borrower or to the Borrower and its Subsidiaries taken as a whole, other than in the ordinary course of business.

**11.5  No Other Debt**

The Borrower has no Debt, other than Debt (a) that in the aggregate would not have a Material Adverse Effect, (b) as set forth on the March 31, 2004 consolidated balance sheet of the Borrower or (c) as disclosed in the section entitled "Description of Existing Indebtedness" of the Offering Circular.

**11.6  [Intentionally left blank]**

**11.7  No Material Proceedings**

Except to the extent disclosed in the section entitled "Business—Legal Proceedings" of the Offering Circular, there are no legal or governmental proceedings pending or, to the best knowledge of the Borrower, threatened before any court, tribunal, arbitration panel or Agency to which the Borrower or any of its Subsidiaries is a party or to which any of the properties of the Borrower or any of its Subsidiaries is subject which, singly or in the aggregate, (a) may prohibit the execution and delivery of this Agreement or the Borrower's compliance with its obligations hereunder, (b) may adversely affect the right and power of the Borrower to enter into this Agreement or (c) could have a Material Adverse Effect.

**11.8   No Violations**

Neither the Borrower nor any of its Subsidiaries (i) is in violation of its respective charter documents, articles of association or by-laws or equivalent constitutive documents; (ii) is in default of any obligation, agreement, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which it is a party or by which it is bound or to which any of its properties or assets is subject; or (iii) is in violation of any law, ordinance, governmental rule, regulation or court decree or licence to which it or its properties or assets may be subject, except in the case of sub-clauses (ii) and (iii) above, such defaults or violations which would not have a Material Adverse Effect.

**11.9   Environmental and Labour Laws**

Neither the Borrower nor any of its Subsidiaries has violated any (a) applicable Ukraine or foreign, including in each instance federal, state or local, law or regulation relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("**Environmental Laws**"); (b) any applicable Ukraine or foreign, including in each instance federal, state or local, law or regulation relating to discrimination in the hiring, promotion or pay of employees; nor (c) any applicable Ukraine or foreign, including in each instance, federal, state or local, wages and hours laws or regulations, which in the case of (a), (b) or (c) above might reasonably be expected to have a Material Adverse Effect. For purposes of this sub-Clause 11.9, the term "foreign" shall include only those jurisdictions in which the Borrower conducts its business or owns or leases property.

There are no costs or liabilities associated with Environmental Laws (including, without limitation, any capital or operating expenditures required for clean-up, closure of properties or compliance with Environmental Laws or any permit, licence or approval, any related constraints on operating activities and any potential liabilities to third parties) which would, singly or in the aggregate, have a Material Adverse Effect.

**11.10   Good and Marketable Title**

Except to the extent disclosed in the sections entitled "Description of Existing Indebtedness" and "Business—Property" of the Offering Circular, or such as are not material to the business, prospects, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, each of the Borrower and its Subsidiaries has good and marketable title, free and clear of all Liens, except Liens for Taxes not yet due and payable, to all property and assets described in the Offering Circular as being owned by it. All leases to which the Borrower or any of its Subsidiaries is a party and which are material to the operations of the Borrower and its Subsidiaries, taken as a whole, are valid and binding and no default has occurred or is continuing thereunder, which might result in a Material Adverse Effect, and the Borrower and its Subsidiaries enjoy peaceful and undisturbed possession under all such leases to which any of them is a party as lessee with such exceptions as do not materially interfere with the use made by the Borrower or such Subsidiary.

**11.11   Permits and Licences**

Except to the extent disclosed in the section entitled "Business—Licenses" of the Offering Circular, each of the Borrower and its Subsidiaries has such permits, licences and authorisations of governmental or regulatory authorities ("**permits**"), including, without limitation, licences issued by the State Committee for Communications and Informatisation, as are necessary to own, lease and operate its respective properties and to conduct its business in the regions, which regions are set forth in the section entitled "Business—Licenses" of the Offering Circular except where the failure to have such permits would not have a Material Adverse Effect. Except to the extent disclosed in the sections entitled "Business—Licenses" and "Risk Factors—Failure to fulfill the terms of our licenses could

result in their revocation" of the Offering Circular, each of the Borrower and its Subsidiaries has fulfilled and performed all their material obligations with respect to such permits and no event has occurred which allows, or after notice or lapse of time would allow, revocation or termination thereof or results in any other material impairment of the rights of the holder of any such permit; and, except as disclosed in the sections entitled "Business—Licenses" and "Risk Factors—Failure to fulfill the terms of our licences could result in their revocation" of the Offering Circular, such permits contain no restrictions that have or that the Borrower could reasonably expect to have a Material Adverse Effect.

**11.12    Intellectual Property**

Except to the extent disclosed in the section entitled "Business—Intellectual Property" of the Offering Circular, the Borrower and its Subsidiaries possess the material patents, patent rights, licences, inventions, copyrights, know-how, including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures, trademarks, service marks and trade names employed by them in connection with the business as it is currently being conducted as described in the Offering Circular, and neither the Borrower nor any of its Subsidiaries has received any notice of infringement of or conflict with asserted rights of others with respect to the foregoing which, singly or in the aggregate, if the subject of an unfavourable decision, ruling or finding, could have a Material Adverse Effect.

**11.13    Labour Relations**

No labour strike, dispute, disturbance, lockout, slowdown or stoppage of employees of the Borrower or any of its Subsidiaries currently exists and, to the best knowledge of the Borrower, no such action is threatened or imminent.

**11.14    Adequate Insurance**

The Borrower and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which they are engaged in the jurisdiction where they operate, respectively; the Borrower and each of its Subsidiaries have not been refused any insurance coverage sought or applied for; and the Borrower and each of its Subsidiaries have no reason to believe that they will not be able to renew their existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue their business at a cost that would not have a Material Adverse Effect.

**11.15    Taxes**

To the best knowledge of the Borrower, each of the Borrower and its Subsidiaries has duly filed with the appropriate Taxing Authorities, or has received an extension for filing with respect to, all tax returns, reports and other information required to be filed by it, and each such tax return, report, or other information was, when filed, accurate and complete; and, except as disclosed in the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations— Income Taxes" of the Offering Circular, each of the Borrower and its Subsidiaries has duly paid, or has made adequate reserves for, all Taxes required to be paid by it and any other assessment, fine or penalty levied against it, and to the best of the Borrower's knowledge, no Tax deficiency is currently asserted against the Borrower or any of its Subsidiaries.

**11.16    No Withholding or Similar Tax**

Except for the deduction and withholding of repatriation tax on Ukrainian source income at the reduced rate of 2%, as set forth in the agreement of 3 July 1995 between Germany and Ukraine for the Avoidance of Double Taxation with respect to Taxes on Income and Capital, under current laws

and regulations of Ukraine and Germany and any respective political subdivisions thereof, and based upon the representations of the Lender set forth in sub-Clause 8.6 (*Representations of the Lender*) hereof only to the extent that such representations relate to or otherwise concern the Lender's entitlement under the aforementioned agreement to benefit from such reduced rate of Ukrainian repatriation tax in respect of the payment of interest under this Agreement, all payments of principal and/or interest, Additional Amounts, Tax Indemnity Amounts or any other amounts payable on or in respect of the Loan by the Borrower to the Lender will not be subject to Taxes under laws and regulations of Ukraine, or any political subdivision or Taxing Authority thereof or therein, respectively, and will otherwise be free and clear of any other Tax, duty, withholding or deduction in Germany, Ukraine or any political subdivision or Taxing Authority thereof or therein (provided, however, that the Borrower makes no representation as to any income or similar Tax of Germany (or any Qualifying Jurisdiction) which may be assessed thereon).

### 11.17   Not an Investment Company

Neither the Borrower nor any of its Subsidiaries is and, after giving effect to the Loan and the application of the proceeds thereof will not be, required to register as an "investment company" as defined in the U.S. Investment Company Act of 1940, as amended.

### 11.18   Rating

No Rating Agency (a) has imposed (or has informed the Borrower that it is considering imposing) any condition (financial or otherwise) on the Borrower's retaining any rating assigned to the Borrower or any securities of the Borrower or (b) has indicated to the Borrower that it is considering (i) the downgrading, suspension or withdrawal of, or any review for a possible change that does not indicate the direction of the possible change in, any rating so assigned or (ii) any change in the outlook for any rating of the Borrower, as applicable, or any securities of the Borrower.

### 11.19   No Liquidation or Similar Proceedings

No proceedings have been commenced for the purposes of, and no judgement has been rendered for, the liquidation, bankruptcy or winding-up of the Borrower or any of its Subsidiaries.

### 11.20   Certificates

Each certificate signed by any director or officer of the Borrower and delivered to the Lender or counsel for the Lender on the date of the making of the Loan shall be deemed to be a representation and warranty by the Borrower to the Lender as to the matters covered thereby.

### 11.21   *Pari Passu* Obligations

The obligations of the Borrower under this Agreement will rank at least pari passu in right of payment with all other unsecured and unsubordinated obligations of the Borrower, except as otherwise provided by mandatory provisions of applicable law.

### 11.22   No Stamp Taxes

Under the laws of Ukraine in force at the date hereof, it is not necessary that any stamp, registration (other than a fee payable with respect to the registration of this Agreement with the National Bank of Ukraine) or similar Tax be paid on or in relation to this Agreement.

### 11.23   Money Laundering Laws

To the best knowledge of the Borrower, the operations of the Borrower and its Subsidiaries are and have been conducted at all times in compliance with (i) applicable financial recordkeeping and

reporting requirements of the United States Currency and Foreign Transactions Reporting Act of 1970, as amended, (ii) the money laundering statutes of applicable jurisdictions and the applicable rules and regulations thereunder (collectively, "**Money Laundering Laws**") and (iii) no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower or any of its Subsidiaries with respect to Money Laundering Laws is pending.

**11.24   No Events of Default**

No event has occurred or circumstances arisen which would (whether or not with the giving of notice and/or the passage of time and/or the fulfilment of any other requirement) constitute an event described in Clause 15 (*Events of Default*).

**11.25   Repetition**

Each of the representations and warranties in Clause 11 (*Representations and Warranties of the Borrower*) shall be deemed to be repeated by the Borrower on the date of the making of the Loan.

**12.   REPRESENTATIONS AND WARRANTIES OF THE LENDER**

In addition to the representations and warranties set forth in sub-Clause 8.6 (*Representations of the Lender*), the Lender makes the representations and warranties set out in sub-Clause 12.1 (*Status*) to sub-Clause 12.4 (*No Conflicts*), inclusive, and acknowledges that the Borrower has entered into this Agreement in reliance on those representations and warranties.

**12.1   Status**

The Lender is duly incorporated under the laws of Germany and is resident for German taxation purposes in Germany and has full corporate power and authority to enter into this Agreement and any other agreements relating to the Agreed Funding Source, and to undertake and perform the obligations expressed to be assumed by it herein and therein.

**12.2   Authorisation**

Each of this Agreement and each of the Agreed Funding Source Agreements entered into by the Lender has been duly authorised, executed and delivered by the Lender, and is a legal, valid and binding obligation of the Lender, enforceable against the Lender in accordance with its terms, except that the enforcement thereof may be subject to bankruptcy, insolvency, fraudulent conveyance, reorganisation, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles.

**12.3   Consents and Approvals**

All authorisations, consents and approvals required by the Lender for or in connection with the execution of this Agreement and any other agreements relating to the Agreed Funding Source and the performance by the Lender of the obligations expressed to be undertaken in such agreements have been obtained and are in full force and effect.

**12.4   No Conflicts**

The execution of this Agreement and any Agreed Funding Source Agreements to which the Lender is a party and the undertaking and performance by the Lender of the obligations expressed to be assumed by it herein and therein will not conflict with, or result in a breach of or default under, the laws of Germany.

**12.5  Not an Investment Company**

   (i) The Lender is a banking institution organised under the laws of the Federal Republic of Germany and has its registered office at Jürgen—Ponto—Platz 1, D-60301 Frankfurt am Main, Germany, and is registered in the Commercial Register of Amtsgericht, Frankfurt am Main under number HRB14OOO;

   (ii) The Lender is regulated as a banking institution by the German Financial Supervisory Authority;

   (iii) The Lender is engaged regularly in, and derives a substantial portion of its business from, extending commercial and other types of credit, and accepting demand and other types of deposit, that are customary for commercial banks in the Federal Republic of Germany;

   (iv) The Lender is not operated for the purpose of evading the provisions of the U.S. Investment Company Act of 1940, as amended.

## 13.  FINANCIAL INFORMATION

**13.1  Delivery**

In addition to the Borrower's obligations under sub-Clause 14.13 (*Reports*), the Borrower shall supply or procure to be supplied to the Lender, in sufficient copies as may reasonably be required by the Lender, all such information as it may require in connection with article 18 of the Kreditwesengesetz or as the Luxembourg Stock Exchange (or any other or further stock exchange or stock exchanges or any other relevant authority or authorities on which the instruments issued to the Agreed Funding Source may, from time to time, be listed or admitted to trading) may require in connection with the listing or admittance to trading on such stock exchange or relevant authority of instruments issued to the Agreed Funding Source.

## 14.  COVENANTS

**14.1  Compliance Certificate**

   (a) The Borrower shall deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements), on or before a date not more than 120 calendar days after the end of each fiscal year of the Borrower, and within 14 days of a request from the Lender (or from the trustee under the Agreed Funding Source Agreements), an Officers' Certificate stating that a review of the activities of the Borrower and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Borrower has kept, observed, performed and fulfilled its obligations under, and complied with the covenants and conditions contained in, this Agreement, and further stating, as to the Officers signing such certificate, that to the best of each of their knowledge the Borrower has kept, observed, performed and fulfilled each and every covenant, and complied with the covenants and conditions contained in this Agreement and is not in default in the performance or observance of any of the terms, provisions and conditions hereof (or, if a Default or Event of Default shall have occurred, describing all such Defaults or Events of Default of which he may have knowledge).

(b) One of the Officers signing such Officers' Certificate shall be either the Borrower's Chief Executive Officer, Chief Financial Officer or Controller.

(c) The Borrower shall, so long as the Loan or any other sum owing hereunder remains outstanding, deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements), forthwith upon becoming aware of any Default or Event of Default an Officers' Certificate specifying such Default or Event of Default and the action which the Borrower proposes to take with respect thereto, and, upon receipt of a written request to that effect from the Lender, confirm to the Lender that, save as previously notified to the Lender or as notified in such confirmation, no Default or Event of Default has occurred.

(d) The Borrower shall deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements), on or before a date not more than 120 days after the end of each fiscal year of the Borrower, a certificate prepared by the Borrower's certified independent accountants stating that a review of the financial activities of the Borrower and its Subsidiaries during the preceding fiscal year has been made, that the Borrower and its Subsidiaries are in compliance with their obligations under sub-Clause 14.6 (*Incurrence of Debt*) and sub-Clause 14.8 (*Restricted Payments*), or, if there is a Default, specifying such Default.

## 14.2  Stay, Extension and Usury Laws

The Borrower covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Agreement; and the Borrower (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Lender (or granted to the party designated as trustee under the Agreed Funding Source Agreements by such Agreed Funding Source Agreements), but shall suffer and permit the execution of every such power as though no such law had been enacted.

## 14.3  Corporate Existence

(a) Except as provided under sub-Clause 14.11 (*Merger and Sales of Assets*), the Borrower shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and the corporate, partnership or other existence of each Subsidiary of the Borrower in accordance with the respective organizational documents of each Subsidiary and the rights (charter and statutory), licences (including GSM, communication and frequency licences) and franchises of the Borrower and Subsidiaries.

(b) The Borrower shall as promptly as practicable notify the Lender in writing of any Subsidiary that qualifies as a Significant Subsidiary.

## 14.4  Taxes

The Borrower shall, and shall cause each of its Subsidiaries to, pay prior to delinquency all Taxes, assessments and governmental levies, except as contested in good faith and by appropriate proceedings.

**14.5** [Intentionally left blank]

**14.6 Incurrence of Debt**

    (a) The Borrower shall not create, issue, incur, assume, guarantee or in any manner become directly or indirectly liable with respect to, or otherwise become responsible for (collectively, "incur") any Debt (other than Permitted Debt), including any Acquired Debt, unless the ratio of the Borrower's total outstanding consolidated Debt to annualised Consolidated Cash Flows (as determined by adding the Borrower's Consolidated Cash Flows for the four most recent fiscal quarters) would be no greater than 5.0 to 1.0, determined on a *pro forma* basis after giving *pro forma* effect to such incurrence and the incurrence of any other Debt and any other changes in the Borrower's consolidated Debt since the date of the Borrower's most recently available quarterly or annual consolidated balance sheet and the application of the net proceeds therefrom as if it had occurred on the first date of such quarterly or annual period. The Borrower shall cause its Subsidiaries not to incur any Debt, other than Acquired Debt, provided that, in the case of Acquired Debt, after giving effect to such Acquired Debt and the related acquisition transaction as if the same had occurred at the beginning of the applicable four-quarter period, the Borrower would be permitted to incur at least $1.00 of additional Debt pursuant to the ratio in the previous sentence. Notwithstanding the foregoing, the Borrower and its Subsidiaries may incur Debt of the Borrower or its Subsidiaries outstanding on the date of this Agreement.

    (b) For the purposes of calculating this ratio, any acquisitions that have been made by the Borrower or a Subsidiary of the Borrower, including through mergers or consolidations and including any related financing transactions, during or subsequent to the relevant fiscal quarter or year and on or prior to the date of the calculation of the ratio shall be deemed to have occurred on the first day of the relevant fiscal quarter or year, with the *pro forma* determinations of Consolidated Cash Flows resulting from any such transactions as determined in good faith by the Borrower.

    (c) The accrual of interest, the accretion or amortization of original issue discount and the payment of interest on any Debt in the form of additional Debt with the same terms shall not deemed to be an incurrence of Debt for purposes of this covenant.

**14.7** [Intentionally left blank]

**14.8 Restricted Payments**

    (a) The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

        (1) declare or pay any dividend or make any other payment or distribution on account of the Borrower's or any of its Subsidiaries' Equity Interests or to the direct or indirect holders of the Borrower's or any of its Subsidiaries' Equity Interests in their capacity as such, other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Borrower or payable to the Borrower or one of its wholly-owned Subsidiaries;

        (2) purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Borrower or any of its Subsidiaries (other than any such Equity Interests owned by the Borrower or any or its wholly-owned Subsidiaries);

        (3) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Pari Passu Debt or Debt that is subordinated to the Loan, except a payment of interest or principal at the stated maturity or a scheduled sinking fund or principal installment payment obligation; or

(4) make any Restricted Investment (all such payments and other actions set forth in sub-clauses (1) through this sub-clause (4) being collectively referred to as "Restricted Payments"),

unless, at the time of and after giving effect to such Restricted Payment:

(i) no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof; and

(ii) the Borrower would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Debt pursuant to the test set forth in sub-Clause 14.6(a) (*Incurrence of Debt*) above; and

(iii) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Borrower and its Subsidiaries after the date of this Agreement (excluding Restricted Payments permitted by sub-clauses (b)(i) and (ii) below), is less than the sum, without duplication, of

(A) 75% of the Borrower's Consolidated Net Income for the period (taken as one accounting period) from the beginning of the first fiscal quarter commencing after 21 November 2002 to the end of the Borrower's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit), plus

(B) 100% of the aggregate Net Cash Proceeds received by the Borrower since the date hereof as a contribution to its common equity capital or from the issue or sale of Equity Interests of the Borrower (other than Disqualified Stock) or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Borrower that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to one of the Borrower's Subsidiaries), plus

(C) to the extent that any Restricted Investment that was made after the date of this Agreement is sold for cash or otherwise liquidated or repaid for cash, the lesser of (1) the cash return of capital with respect to such Restricted Investment (less the cost of disposition, if any) and (2) the initial amount of such Restricted Investment.

(b) So long as no Default has occurred and is continuing or would be caused thereby, the preceding provisions shall not prohibit:

(i) the redemption, repurchase, retirement, defeasance or other acquisition of any Pari Passu Debt or subordinated Debt of the Borrower or of any Equity Interests of the Borrower or any or its Subsidiaries in exchange for, or out of the Net Cash Proceeds of the substantially concurrent sale (other than to one of the Borrower's Subsidiaries) of, Equity Interests of the Borrower (other than Disqualified Stock); and upon any such event, the amount of any such Net Cash Proceeds that are utilized for any such redemption, repurchase, retirement, defeasance or other acquisition shall be excluded from sub-clause (iii)(B) of sub-clause (a);

(ii) the defeasance, redemption, repurchase or other acquisition of Pari Passu Debt or subordinated Debt of the Borrower with the Net Cash Proceeds from an incurrence of Permitted Refinancing Indebtedness;

(iii) the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Borrower or any of its Subsidiaries held by any member of the Borrower's (or any of its Subsidiaries') management pursuant to any management equity subscription agreement, employment agreement or stock option agreement, but only to the extent that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests does not exceed $3 million over the term of the Loan; and

(iv) the payment or retirement of up to $160 million of Debt related to the Existing Notes acquired by the Borrower pursuant to the Exchange Offer.

(c) The amount of all Restricted Payments (other than cash) shall be the fair market value, on the date of the Restricted Payment, of the asset(s) or securities proposed to be transferred or issued by the Borrower or such Subsidiary, as the case may be, pursuant to the Restricted Payment. The fair market value of any assets or securities that are required to be valued by this covenant shall be determined by the Borrower's Board of Directors, whose resolution with respect thereto shall be delivered to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements). The Board of Directors' determination must be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of international standing if the fair market value exceeds the equivalent of $1.0 million. Not later than the date of making any Restricted Payment, the Borrower must deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) an Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this "Restricted Payments" covenant were computed, together with a copy of any fairness opinion or appraisal required by this Agreement.

## 14.9  Liens

(a) The Borrower may not create, assume or permit to exist any Lien (other than a Permitted Lien) upon or in respect of any of its property or assets, now owned or hereafter acquired, without effectively providing that this Loan and any other sum owing hereunder shall be directly secured equally and rateably with the obligation or liability secured by such Lien. The Borrower will cause its Subsidiaries not to create, assume or permit to exist any Lien other than Liens of the type described in one of sub-clauses (i) through (viii) of the definition of "Permitted Lien".

(b) This restriction shall not apply to a Lien created to secure Attributable Debt in connection with a Sale and Lease-Back Transaction permitted under sub-Clause 14.10 (*Sale and Lease-Back Transactions*).

## 14.10  Sale and Lease-Back Transactions

(a) The Borrower shall not, and shall cause its Subsidiaries not to, enter into any Sale and Lease-Back Transaction with respect to any of its or their property or assets, now owned or hereafter acquired, unless, after giving effect to the Sale and Lease-Back Transaction, the aggregate amount of all Attributable Debt plus all outstanding secured Debt created, incurred or assumed by the Borrower and its Subsidiaries does not exceed 10% of the book value of the Borrower's total assets, as determined by reference to its most recent quarterly or annual consolidated balance sheet on a *pro forma* basis after giving effect to the incurrence of any Debt and any other changes in its Debt since the date of such balance sheet. For the purposes of this determination, the amount of Debt under any secured credit facility shall be the total amount available to be borrowed under the facility, regardless of the amount at any one time outstanding.

A-35

(b) This restriction shall not apply to transactions between the Borrower and one of its Subsidiaries or between such Subsidiaries.

**14.11  Mergers and Sales of Assets**

(a) The Borrower shall not consolidate with or merge into any other Person or convey, transfer, sell or lease its properties and assets substantially as an entirety to any Person, or permit any Person to consolidate with or merge into the Borrower, unless each of the following requirements is met:

    (i) the successor or transferee, if other than the Borrower, (i) is a corporation organized and existing under the laws of Ukraine, and (ii) assumes, expressly or by operation of law, the due and punctual payment of all the Borrower's obligations and the performance of all of its other covenants under this Agreement and the Agreed Funding Source Agreements to which the Borrower is a party;

    (ii) immediately after giving effect to that transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing;

    (iii) on the date of that transaction, after giving pro forma effect to (A) the transaction; (B) any related financing transactions; and (C) the pro forma Consolidated Cash Flows resulting from such transaction, as determined in good faith by the Borrower, in each case as if they had occurred at the beginning of the relevant quarterly or annual period, the Borrower's ratio of Debt to Consolidated Cash Flows, calculated as provided in sub-Clause 14.6 (*Incurrence of Debt*), would be no greater than the greater of (x) such ratio immediately prior to the date of such transaction and (y) 5.0 to 1.0; provided, however that this sub-clause (iii) shall not apply in the case of a consolidation or merger by one of the Borrower's Subsidiaries with or into the Borrower or another of its Subsidiaries; and

    (iv) the Borrower delivers to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) an Officers' Certificate relating to conditions (i) through (iii) above and an Opinion of Counsel relating to conditions (i) and, with respect to the absence of an Event of Default being caused by such transaction, (ii) above.

(b) Regardless of whether the Borrower is permitted to do so by law, the Borrower shall not transfer, sell or lease any of its GSM 900, GSM 1800, communication or frequency licences, except in a transaction (i) that would be permitted under paragraph (a) above; or (ii) that would not have a material adverse effect on the business, financial condition or results of operations of the Borrower and its Subsidiaries as a whole; or (iii) that consists of the exchange of a licence for another licence with another operator or the cancellation of a licence and its replacement with another licence by the Ukrainian authorities, which other licence is, in each case, in the reasonable judgement of the Borrower's Board of Directors set forth in a resolution, of no less commercial and financial value than the licence for which it was exchanged or which it replaced.

**14.12  Asset Sales**

(a) The Borrower shall not, and shall not permit any of its Subsidiaries to, consummate any Asset Sale, unless:

    (i) the consideration received by the Borrower or the Subsidiary, as the case may be, is at least equal to the Fair Market Value of the assets sold or disposed of; and

A-36

(ii) at least 75% of the consideration received consists of cash or Cash Equivalents.

(b) The Borrower shall or shall cause the relevant Subsidiary to:

(i) within 360 days of the date the Net Cash Proceeds received by the Borrower or any of its Subsidiaries from an Asset Sale are so received:

(A) apply an amount equal to all such Net Cash Proceeds to permanently repay, prepay or purchase any Pari Passu Debt of the Borrower or of any of its Subsidiaries (other than preferred stock or Debt owed to the Borrower or an Affiliate of the Borrower), provided that in connection with any repayment, prepayment or purchase of Pari Passu Debt pursuant to this sub-clause (A), the Borrower or such Subsidiary shall retire such Pari Passu Debt and shall cause the related commitment (if any) to be permanently reduced in an amount equal to the principal amount so repaid, prepaid or purchased; or

(B) invest an equal amount in assets (including capital stock) of a nature or type that are used or usable in the telecommunications business (or business ancillary to the telecommunications business); and

(ii) apply any Net Cash Proceeds not applied or invested pursuant to sub-clauses (i)(A) or (B) above during such 360 day period ("**Excess Proceeds**") as provided in sub-clause (c) below.

(c) If, as of the first day of any calendar month, the aggregate amount of Excess Proceeds totals at least $3 million (or the equivalent in another currency), the Borrower must thereafter prepay the Loan, in whole or in part, to the extent and in the manner required by sub-Clause 7.4 (*Prepayment in the Event of Asset Sales*).

**14.13    Reports**

(a) The Borrower shall also furnish:

(i) within 120 days after the end of each fiscal year, audited year-end financial statements prepared in accordance with U.S. GAAP;

(ii) within 120 days after the end of each fiscal year, the information described in Item 303 of Regulation S-K under the Securities Act (i.e., Management's Discussion and Analysis of Financial Condition and Results of Operations);

(iii) within 60 days after the end of each of the first three fiscal quarters of each fiscal year, unaudited quarterly consolidated financial statements prepared in accordance with U.S. GAAP with respect to such period; and

(iv) within 60 days after the end of each of the first three fiscal quarters of each fiscal year, the information described in Item 303 of Regulation S-K under the Securities Act with respect to such period.

(b) The above reports shall be delivered to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements).

(c) Delivery of such reports, information and documents to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) pursuant to this sub-Clause 14.13 is for informational purposes only and the Lender's receipt (and receipt by the party designated as trustee under the Agreed Funding Source Agreements) of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants

A-37

hereunder (as to which the Lender (and the party designated as trustee under the Agreed Funding Source Agreements) is entitled to rely exclusively on Officers' Certificates).

**14.14  Transactions with Affiliates**

(a) The Borrower shall not, and shall not permit any of its Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of the Borrower's or its Subsidiaries' properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance, guarantee with, or for the benefit of, any Affiliate (each, an "affiliate transaction"), unless:

(i) such affiliate transaction is on terms that are no less favorable to the Borrower or the relevant Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Subsidiary with an unrelated Person; and

(ii) the Borrower delivers to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements):

(A) with respect to any affiliate transaction or series of related affiliate transactions involving aggregate consideration in excess of $1.0 million, a resolution of the Borrower's Board of Directors set forth in an Officers' Certificate certifying that such affiliate transaction complies with this covenant and that such affiliate transaction has been approved by a majority of the members of the Borrower's Board of Directors who are not parties to, or Affiliates of parties to, or who do not otherwise have a direct or indirect legal, monetary or other interest in, such affiliate transaction; and

(B) with respect to any affiliate transaction or series of related affiliate transactions involving aggregate consideration in excess of $5.0 million, or in excess of $1.0 million if there are no disinterested directors, an opinion as to the fairness to the holders of such affiliate transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of international standing;

provided, that the requirements of this sub-clause (ii) shall not be applicable to a contract entered into by the Borrower or any of its Subsidiaries, on the one hand, and any Affiliate, on the other hand, for the provision of international mobile roaming services if the contract is based on the international standard roaming agreement, as recommended by the GSM Association.

(b) The following items shall not be deemed to be affiliate transactions and therefore shall not be subject to the provisions of sub-Clause 14.14(a):

(i) any employment agreement entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and consistent with the Borrower's past practice or the past practice of such Subsidiary;

(ii) transactions between or among the Borrower and/or its wholly-owned Subsidiaries (except if any Affiliate of the Borrower, other than a wholly-owned Subsidiary, is an Affiliate (other than solely as a result of ownership of equity interests of the Borrower) of any wholly-owned Subsidiary that is a party to such transaction);

(iii) payment of reasonable directors fees to Persons who are not otherwise Affiliates of the Borrower;

(iv) sales of Equity Interests (other than Disqualified Stock) to shareholders of the Borrower and their respective Affiliates;

A-38

(v) the performance of the transactions contemplated by the Registration Rights Agreement and the Shareholders' Agreement;

(vi) the amended and restated Management Services Agreement dated 16 December 2003 between the Borrower and Telenor Consult AS and any amendment to, amendment and restatement of, or supplement to, any such agreements from time to time after the date hereof; provided that such amendment, amendment and restatement or supplement (A) relates to an increase in the number of secondees under such agreements (including a corresponding increase in the compensation and bonus paid in connection with such increase in number of secondees) or (B) does not provide for an increase in the financial obligation of the Borrower in excess of $1 million over the financial obligation currently payable by the Borrower under the terms of the relevant Management Services Agreement in its existing form; and

(vii) the entry into any agreement by the Borrower and one or more of its shareholders and/or their respective Affiliates relating to the borrowing of Permitted Debt and the performance of the transactions contemplated thereby.

**14.15 Use of Proceeds of the Loan**

The Borrower shall use the proceeds of the Loan in the manner described in the "Use of Proceeds" section of the Offering Circular.

**14.16 Payment in U.S. Dollars**

All payment obligations of the Borrower under this Agreement shall be paid in U.S. dollars. The Borrower shall obtain all required approval, consents, licences, registrations and permissions to make and shall make such payment only in U.S. dollars.

**15. EVENTS OF DEFAULT**

**15.1 Circumstances which Constitute Events of Default**

Each of the following constitutes an "**Event of Default**" with respect to the Loan:

(a) default in the payment of principal of (or premium, if any, on) the Loan, in the currency and in the manner provided herein, when the same becomes due and payable at maturity, upon acceleration, redemption or otherwise;

(b) default in the payment of interest or Additional Amounts on the Loan, in the currency and in the manner provided herein, when the same becomes due and payable, and such default continues for a period of 15 calendar days;

(c) default in the performance or breach of the provisions of this Agreement applicable to a Change of Control, mergers, consolidations and transfers of all or substantially all of the assets of the Borrower or the failure to prepay the Loan in accordance with sub-Clause 7.3 (*Prepayment in the Event of a Change of Control*) or sub-Clause 14.12 (*Asset Sales*) hereof;

(d) default in the performance of, or breaches of, any covenant or agreement of the Borrower hereunder (other than a breach of a representation or warranty of the Borrower under Clause 11 (*Representations and Warranties of the Borrower*) and other than a default specified in sub-Clause 15.1(a) through 15.1(c) above) and such default or breach continues for a period of 30 consecutive calendar days after written notice by the Lender (or by the party designated as trustee under the Agreed Funding Source Agreements);

A-39

(e) default on any Debt of the Borrower or any of its Subsidiaries with an aggregate principal amount in excess of $5 million (or, to the extent non-U.S. dollar denominated, the U.S. dollar equivalent of such amount as of the date of such default) (i) resulting from the failure to pay principal or interest (in the case of interest default or a default in the payment of principal other than at its Stated Maturity, after the expiration of the originally applicable grace period) in an aggregate amount in excess of $5 million (or, to the extent non-U.S. dollar denominated, the U.S. dollar equivalent of such amount as of the date of such default) when due or (ii) as a result of which the maturity of such Debt has been accelerated prior to its Stated Maturity;

(f) any judgment or order for the payment of money shall be made against the Borrower and/or any of its Subsidiaries, resulting in the aggregate amount of all such judgments or orders which have entered into effect (except those the execution of which has been stayed or suspended, by reason of a pending appeal or otherwise, in accordance with applicable legislation) exceeding $10 million (or, to the extent non-U.S. dollar denominated, the U.S. dollar equivalent of such amount), and such excess shall continue for 60 consecutive calendar days or longer;

(g) the suspension for more than 30 days or loss of any of the Borrower's GSM 900, GSM 1800, communication or frequency licences other than in the event of the Borrower's merger or consolidation or the sale of the Borrower's assets and properties substantially as a whole in a transaction permitted under sub-Clause 14.11(a) (*Mergers and Sales of Assets*), a loss where a new licence is issued within 30 days to the Borrower, the successor or transferee corporation, or any of the Borrower's or such successor's or transferee's Subsidiaries or which would not have a Material Adverse Effect;

(h) the reassignment to other users (other than one of the Borrower's Subsidiaries), cancellation or other loss of any of the Borrower's assigned spectrum allocations, except as would not have a Material Adverse Effect;

(i) the express transfer, sale or lease of any of the Borrower's GSM 900, GSM 1800, communication or frequency licences, regardless of whether such transfer, sale or lease is permitted by law, other than in a merger, consolidation, transfer, sale or lease permitted under sub-Clause 14.11(a) or (b) (*Mergers and Sales of Assets*) or that would not have a Material Adverse Effect;

(j) any regulation, decree, consent, approval, licence or other authority necessary to enable the Borrower to enter into or perform its obligations under this Agreement or for the validity or enforceability thereof shall expire or be withheld, revoked or terminated or otherwise cease to remain in full force and effect or shall be modified in a manner which adversely affects any rights or claims of the Lender (or of the party designated as trustee under the Agreed Funding Source Agreements);

(k) the validity of this Agreement is contested by the Borrower or the Borrower shall deny any of its obligations under this Agreement; or it is, or will become, unlawful for the Borrower to perform or comply with any of its obligations under or in respect of this Agreement or any of such obligations shall become unenforceable or cease to be legal, valid and binding;

(l) a decree, judgment or order by any Agency or a court of competent jurisdiction shall have been entered adjudging the Borrower or any of its Significant Subsidiaries as bankrupt or insolvent, or approving as properly filed a petition seeking reorganisation of the Borrower or any of its Significant Subsidiaries under any bankruptcy or similar law, and such decree or order shall have continued undischarged and unstayed for a period of 60 days; or a decree or order of a court of competent jurisdiction over the appointment of a receiver, liquidator, trustee, or assignee in bankruptcy or insolvency of the Borrower or any of its Significant

A-40

Subsidiaries, or any substantial part of the assets or property of any such Person, or for the winding up or liquidation of the affairs of any such Person, shall have been entered, and such decree, judgment or order shall have remained in force undischarged and unstayed for a period of 60 days; or

(m) the Borrower or any of its Significant Subsidiaries shall institute proceedings to be adjudicated a voluntary bankrupt, or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganisation under any bankruptcy or similar law or similar statute, or shall consent to the filing of any such petition, or shall consent to the appointment of a custodian, receiver, liquidator, trustee or assignee in bankruptcy or insolvency of it or any substantial part of its assets or property, or shall make a general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall, within the meaning of any bankruptcy law, become insolvent, fail generally to pay its debts as they become due, or take any corporate action in furtherance of or to facilitate, conditionally or otherwise, any of the foregoing.

**15.2  Rights of Lender upon Occurrence of an Event of Default**

(a) If an Event of Default occurs under this Agreement and is continuing, the Lender (if it receives instructions from the party designated as trustee of the Agreed Funding Source in accordance with the provisions of the Agreed Funding Source Agreements) and/or the party designated as trustee of the Agreed Funding Source in accordance with the terms of the Agreed Funding Source Agreements may, by written notice (an "**Acceleration Notice**") to the Borrower,

   (i) declare the obligations of the Lender hereunder to be terminated, whereupon such obligations shall terminate, and

   (ii) declare the principal amount of, premium, if any, and accrued and unpaid interest, Additional Amounts and Tax Indemnity Amounts, if any, on the Loan to be immediately due and payable and the same shall become immediately due and payable,

   pursuant to and in accordance with the terms of the Agreed Funding Source Agreements.

(b) If an Event of Default specified in sub-Clause 15.1(l) or (m) occurs with respect to the Borrower, the obligations of the Lender hereunder shall immediately terminate, and the principal amount of, premium, if any, and accrued and unpaid interest, Additional Amounts and Tax Indemnity Amounts, if any, on the Loan then outstanding shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Lender (or on the part of the party designated as trustee under the Agreed Funding Source Agreements), all without diligence, presentment, demand of payment, protest or notice of any kind, which are expressly waived by the Borrower.

**15.3  Other Remedies**

If an Event of Default occurs and is continuing, the Lender (and the party designated as trustee under the Agreed Funding Source Agreements) may pursue any available remedy to collect the payment of principal or interest on the Loan or to enforce the performance of any provision of the Loan or this Agreement. A delay or omission by the Lender (or the party designated as trustee under the Agreed Funding Source Agreements) in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

## 16. DEFAULT INTEREST AND INDEMNITY

### 16.1  Default Interest Periods

If any sum due and payable by the Borrower hereunder is not paid on the due date therefore in accordance with the provisions of Clause 19 (*Payments*) or if any sum due and payable by the Borrower under any judgment of any court in connection herewith is not paid on the date of such judgment, the period beginning on such due date or, as the case may be, the date of such judgment and ending on the date upon which the obligation of the Borrower to pay such sum (the balance thereof for the time being unpaid being herein referred to as an "**unpaid sum**") is discharged shall be divided into successive periods, each of which, other than the first, shall start on the last day of the preceding such period and the duration of each of which shall, except as otherwise provided in this Clause 16 (*Default Interest and Indemnity*), be selected by the Lender, but shall in any event not be longer than one month.

### 16.2  Default Interest

During each such period relating thereto as is mentioned in sub-Clause 16.1 (*Default Interest Periods*) an unpaid sum shall bear interest at a rate per annum equal to the Interest Rate.

### 16.3  Payment of Default Interest

Any interest which shall have accrued under sub-Clause 16.2 (*Default Interest*) in respect of an unpaid sum shall be due and payable and shall be paid by the Borrower at the end of the period by reference to which it is calculated or on such other dates as the Lender may specify by written notice to the Borrower.

### 16.4  Borrower's Indemnity

The Borrower undertakes to indemnify the Lender against any reasonably incurred and properly documented cost, claim, loss, expense (including legal fees) or liability, together with any VAT thereon, which it may sustain or incur as a consequence of the occurrence of any Event of Default or any default by the Borrower in the performance of any of the obligations expressed to be assumed by it in this Agreement.

### 16.5  Unpaid Sums as Advances

Any unpaid sum shall, for the purposes of this Clause 16 (*Default Interest and Indemnity*) and sub-Clause 10.1 (*Increased Costs*), be treated as an advance and accordingly in this Clause 16 (*Default Interest and Indemnity*) and sub-Clause 10.1 (*Increased Costs*) the term "Loan" includes any unpaid sum and the term "Interest Period", in relation to an unpaid sum, includes each such period relating thereto as is mentioned in sub-Clause 16.1 (*Default Interest Periods*).

## 17. AMENDMENTS TO AGREED FUNDING SOURCE AGREEMENTS

Any amendment to, or waivers of any provision of, the Agreed Funding Source Agreements shall be prohibited without the prior express written consent of the Borrower, which consent shall not be unreasonably withheld (other than amendments or waivers that are made pursuant to any legal, regulatory or accounting requirements, with respect to which the Lender shall consult with the Borrower to the extent reasonably practicable).

## 18. CURRENCY OF ACCOUNT AND CURRENCY INDEMNITY

### 18.1  Currency of Account

The U.S. dollar is the currency of account and payment for each and every sum at any time due from the Borrower hereunder.

### 18.2  Currency Indemnity

If any sum due from the Borrower under this Agreement or any order or judgment given or made in relation hereto has to be converted from the currency (the "**first currency**") in which the same is payable hereunder or under such order or judgment into another currency (the "**second currency**") for the purpose of (a) making or filing a claim or proof against the Borrower, (b) obtaining an order or judgment in any court or other tribunal or (c) enforcing any order or judgment given or made in relation hereto, the Borrower shall indemnify and hold harmless the Lender from and against any loss suffered or reasonably incurred as a result of any discrepancy between (i) the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and (ii) the rate or rates of exchange at which the Lender may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.

## 19. PAYMENTS

### 19.1  Payments to the Lender

On each date on which this Agreement requires an amount denominated in U.S. dollars to be paid by the Borrower, the Borrower shall make the same available to the Lender by payment in U.S. dollars and in same day funds on such date, or in such other funds as may for the time being be customary in London for the settlement in London of international banking transactions in U.S. dollars, to the Account. The Borrower shall procure that the bank effecting payment on its behalf confirms to the Lender, or to such Person as the Lender may direct, by tested telex or authenticated SWIFT message three Business Days prior to the date that such payment is required to be made by this Agreement, the payment instructions relating to such payment.

### 19.2  Alternative Payment Arrangements

If, at any time, it shall become impracticable, by reason of any action of any governmental authority or any Change of Law, exchange control regulations or any similar event, for the Borrower to make any payments hereunder in the manner specified in sub-Clause 19.1 (*Payments to the Lender*), then the Borrower may agree with the Lender alternative arrangements for such payments to be made; provided that, in the absence of any such agreement, the Borrower shall be obliged to make all payments due to the Lender in the manner specified herein.

### 19.3  No Set-off

All payments required to be made by the Borrower hereunder shall be calculated without reference to any set-off or counterclaim and shall be made free and clear of and without any deduction for or on account of any set-off or counterclaim.

## 20. FEES, COSTS AND EXPENSES

### 20.1  Costs relating to Preservation of Rights

The Borrower shall, from time to time on demand of the Lender, reimburse the Lender for all costs and expenses (including legal fees) together with any VAT incurred in or in connection with the preservation or the enforcement of any of the rights of the Lender under this Agreement.

### 20.2  Taxes

The Borrower shall pay all stamp, registration and other taxes to which this Agreement or any judgment given in connection with this Agreement is or at any time may be subject and shall, from time to time on demand of the Lender, indemnify the Lender against any liabilities, costs, claims and expenses resulting from any failure to pay or any delay in paying any such tax.

### 20.3  Costs relating to Amendments and Waivers

The Borrower shall, from time to time on demand of the Lender (and without prejudice to the provisions of sub-Clause 20.1 (*Costs relating to Preservation of Rights*)) (and the party designated as trustee under the Agreed Funding Source Agreements) compensate the Lender (and, as the case may be, such trustee) at such daily and/or hourly rates as the Lender (or, as the case may be, such trustee) shall from time to time reasonably determine for all time expended by the Lender (or, as the case may be, such trustee), their respective directors, officers and employees, and for all costs and expenses (including telephone, fax, copying, travel and personnel costs) they may incur, in connection with the Lender (and, as the case may be, such trustee) taking such action as it may consider appropriate in connection with:

    (a)  the granting or proposed granting of any waiver or consent requested under this Agreement by the Borrower;

    (b)  any actual, potential or suspected breach by the Borrower of any of its obligations under this Agreement;

    (c)  the occurrence of any event which is an Event of Default or a potential Event of Default; or

    (d)  any amendment or proposed amendment to this Agreement requested by the Borrower.

### 20.4  Lender's Costs

The Borrower shall, from time to time on demand of the Lender, and without prejudice to the provisions of sub-Clause 20.3 (*Costs Relating to Amendments and Waivers*), compensate the Lender at such daily and/or hourly rates as the Lender shall from time to time reasonably determine for the time and expenditure, all costs and expenses (including telephone, fax, copying, travel and personnel costs) reasonably incurred and properly documented by the Lender in connection with its taking such action as it may deem appropriate or in complying with any request by the Borrower in connection with:

    (a)  the granting or proposed granting of any waiver or consent requested hereunder by the Borrower;

    (b)  any actual breach by the Borrower of its obligations hereunder; or

    (c)  any amendment or proposed amendment hereto requested by the Borrower.

## 21. ASSIGNMENTS AND TRANSFERS

### 21.1  Binding Agreement

This Agreement shall be binding upon and inure to the benefit of each party hereto and its or any subsequent successors and assigns.

### 21.2  No Assignments and Transfers by the Borrower

The Borrower shall not be entitled to assign or transfer all or any of its rights, benefits and obligations hereunder except as permitted under sub-Clause 14.11 (*Mergers and Sales of Assets*).

### 21.3  Assignments by the Lender

(a)  Prior to an Event of Default, the Lender may (i) on or at any time after the date hereof assign all or any of its rights and benefits hereunder or transfer all or any of its rights, benefits and obligations hereunder (save for (x) its rights to principal, interest and other amounts paid and payable under this Agreement and (y) its right to receive amounts paid and payable under any claim, award or judgment relating to this Agreement in favour of the Agreed Funding Source, which rights may, however, be charged in favour of the Agreed Funding Source or any trustee on behalf of the Agreed Funding Source) to or on behalf of (including, for the avoidance of doubt, any trustee on behalf of) the Agreed Funding Source and (ii) subject to the prior written consent of the Borrower (such consent not to be unreasonably withheld or delayed) and except as may be otherwise specifically provided under the Agreed Funding Source Agreements, assign all or any of its rights and benefits hereunder or transfer all or any of its rights, benefits and obligations hereunder to any company which, as a result of any amalgamation, merger or reconstruction or which, as a result of any agreement with the Lender, or any previous substitute, owns beneficially the whole or substantially the whole of the undertaking, property and assets owned by the Lender prior to such amalgamation, merger, reconstruction or agreement coming into force and where, in the case of any company which will own the whole or substantially the whole of the undertaking, property or assets of the Lender, the substitution of that company as principal debtor in relation to the Agreed Funding Source would not be materially prejudicial to the interests of the Agreed Funding Source or the Borrower. Any reference in this agreement to any such assignee or transferee pursuant to sub-clause (ii) of this sub-Clause 21.3(a) shall be construed accordingly and, in particular, references to the rights, benefits and obligations hereunder of the Lender, following such assignment or transfer, shall be references to such rights, benefits or obligations by the assignee or transferee.

(b)  On or following an Event of Default, the Lender may, by notice to the Borrower, assign all or any of its rights and benefits hereunder or transfer all or any of its rights, benefits and obligations hereunder to the Agreed Funding Source, or any assignee or transferee appointed in connection with the Agreed Funding Source. Any reference in this agreement to any such assignee or transferee shall be construed accordingly and, in particular, references to the rights, benefits and obligations hereunder of the Lender, following such assignment or transfer, shall be references to such rights, benefits or obligations by the assignee or transferee appointed in connection with the Agreed Funding Source.

## 22.  CALCULATIONS AND EVIDENCE OF DEBT

### 22.1  Basis of Accrual of Interest

Interest shall accrue from day to day and shall be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each.

**22.2  Evidence of Debt**

The Lender shall maintain, in accordance with its usual practice, accounts evidencing the amounts from time to time lent by and owing to it hereunder; in any legal action or proceeding arising out of or in connection with this Agreement, in the absence of manifest error and subject to the provision by the Lender to the Borrower of written information describing in reasonable detail the calculation or computation of such amounts together with the relevant supporting documents evidencing the matters described therein, the entries made in such accounts shall be conclusive evidence of the existence and amounts of the obligations off the Borrower therein recorded.

**22.3  Change of Circumstance Certificates**

A certificate signed by two authorised signatories of the Lender describing in reasonable detail (a) the amount by which a sum payable to it hereunder is to be increased under sub-Clause 8.1 (*Additional Amounts*) or (b) the amount for the time being required to indemnify it against any such cost, payment or liability as is mentioned in sub-Clause 8.3 (*Tax Indemnity*) or sub-Clause 10.1 (*Increased Costs*) shall, in the absence of manifest error, be prima facie evidence of the existence and amounts of the specified obligations of the Borrower.

**23.  REMEDIES AND WAIVERS, PARTIAL INVALIDITY**

**23.1  Remedies and Waivers**

No failure by the Lender to exercise, nor any delay by the Lender in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

**23.2  Partial Invalidity**

If, at any time, any provision hereof is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

**24.  NOTICES; LANGUAGE**

**24.1  Communications in Writing**

Each communication to be made hereunder shall be made in writing and, unless otherwise stated, shall be made by fax, telex, or letter addressed as follows:

if to the Borrower:

> Closed Joint Stock Company "KYIVSTAR G.S.M."
> 51 Chervonozorianyi Avenue
> Kyiv
> 03110 Ukraine
> Fax number: +380 44 270 3877
> Attention: Chief Financial Officer

with a copy (which shall not constitute notice) to:

> Clifford Chance Limited Liability Partnership
> 10 Upper Bank Street
> London E14 5JJ
> England
> Fax number: +44 20 7600 5555
> Attention: Alan Bannister/Catherine Moroz

if to the Lender:

> Dresdner Bank Aktiengesellschaft
> Jürgen-Ponto-Platz 1
> D-60301 Frankfurt am Main
> Germany
> Fax number: +49 69 713 25001
> Attention: EG Flow Business Debt

with a copy (which shall not constitute notice) to:

> Baker & McKenzie
> 100 New Bridge Street
> London EC4V 6JA
> England
> Fax number: + 44 20 7919 1999
> Attention: Chris Hogan/Carter Brod/Merryn Craske

**24.2  Delivery**

Any communication or document to be made or delivered by one Person to another pursuant to this Agreement shall, unless that other Person has by 15 calendar days' written notice to the same specified another address, be made or delivered to that other Person at the address identified with its signature below and shall be effective upon receipt by the sender of the addressee's answerback at the end of transmission (in the case of a telex) or when left at that address (in the case of a letter) or when received by the addressee (in the case of a fax); provided that any communication or document to be made or delivered by one party to the other party shall be effective only when received by such other party and then only if the same is expressly marked for the attention of the department or officer identified with the such other party's signature below, or such other department or officer as such other party shall from time to time specify for this purpose.

**24.3  Language**

THIS AGREEMENT HAS BEEN SET FORTH AND SIGNED IN BOTH ENGLISH AND UKRAINIAN, PROVIDED, HOWEVER, THAT IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY OR IN CASE OF DOUBT AS TO THE PROPER INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT THE ENGLISH TEXT SHALL BE CONTROLLING. Each communication and document made or delivered by one party to another pursuant to this Agreement shall be in the English language or accompanied by a translation thereof into English certified by an officer of the Person making or delivering the same as being a true and accurate translation thereof.

A-47

## 25. LAW AND JURISDICTION

### 25.1 English Law

This Agreement is governed by, and shall be construed in accordance with, English law.

### 25.2 English Courts

Each of the Lender and the Borrower agrees that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings, and to settle any disputes, which arise out of or in connection with this Agreement ("**Proceedings**") and, for such purposes, irrevocably submits to the jurisdiction of such courts.

### 25.3 Appropriate Forum

Each of the Lender and the Borrower irrevocably waives any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and to settle any Disputes, and agrees not to claim that any such court is not a convenient or appropriate forum.

### 25.4 Service of Process

The Lender and the Borrower agree that the process by which any Proceedings in England are begun may be served on them by being delivered to Dresdner Bank AG at Riverbank House, 2 Swan Lane, London EC4R 3UX and Closed Joint Stock Company "KYIVSTAR G.S.M.", respectively, or their registered offices for the time being. If any such Person mentioned in this sub-Clause is not or ceases to be effectively appointed to accept service of process on the Lender's behalf, the Lender shall immediately appoint a further Person in England to accept service of process on its behalf. If such Person mentioned in this sub-Clause 25.4 is not or ceases to be effectively appointed to accept service of process on the Borrower's behalf, the Borrower shall immediately appoint a further Person in England to accept service of process on its behalf. Nothing in this sub-Clause shall affect the right of either party hereto to serve process in any other manner permitted by law.

### 25.5 Non-exclusivity

The submission to the jurisdiction of the English courts in accordance with sub-Clause 25.2 (*English Courts*) hereof shall not, and shall not be construed so as to, limit the right of any party hereto to take Proceedings in any other court of competent jurisdiction.

### 25.6 Consent to Enforcement, etc.

Each of the Lender and the Borrower consents generally in respect of any Proceedings to the giving of any relief or the issue of any process in connection with such Proceedings including, without limitation, the making, enforcement or execution against any property whatsoever, irrespective of its use or intended use, of any order or judgment which is made or given in such Proceedings.

### 25.7 Arbitration

If any dispute or difference of whatever nature howsoever arises from or in connection with this Agreement, or any supplement, modifications or additions thereto (each a "**Dispute**"), the Lender may elect, by notice to the Borrower, to settle such claim by arbitration in accordance with the following provisions. The Borrower hereby agrees that (regardless of the nature of the Dispute) any Dispute may be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "**Rules**") as at present in force by a panel of three arbitrators appointed in accordance

A-48

with the Rules. The seat of arbitration shall be London, England. The procedural law of arbitration shall be English law. The language of any arbitral proceedings shall be English.

### 25.8  Contracts (Rights of Third Parties) Act 1999

A Person who is not a party to this Agreement has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement, but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

### 25.9  Counterparts

This Agreement may be signed in two or more counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

**AS WITNESS** the hands of the duly authorised representatives of the parties hereto the day and year first before written.

APPENDIX A

LOAN AGREEMENT

THIS AGREEMENT is made the 19th day of April 2005

BETWEEN

(1)     **CLOSED JOINT STOCK COMPANY "KYIVSTAR G.S.M.",** a closed joint stock company organized under the laws of Ukraine (the "**Borrower**"); and

(2)     **DRESDNER BANK AKTIENGESELLSCHAFT,** a bank established under the laws of Germany and whose registered office is Jürgen-Ponto-Platz 1, D-60301 Frankfurt am Main, Germany (the "**Lender**").

**It is agreed as follows:**

**1.      DEFINITIONS AND INTERPRETATION**

**1.1     Definitions**

In this Agreement the following terms have the meanings given to them in this sub-Clause 1.1:

"*Acceleration Notice*" has the meaning set forth in sub-Clause 15.2 (*Rights of Lender upon Occurrence of an Event of Default*).

"*Account*" means an account of the Lender with Citibank N.A. in London, England, Account Number 10863262.

"*Acquired Debt*" means any Debt of an entity (i) existing at the time such entity is merged into the Borrower or one of its Subsidiaries or becomes one of the Borrower's Subsidiaries or (ii) assumed in connection with the acquisition of assets by the Borrower or one of its Subsidiaries from such entity, in each case not incurred by such entity in connection with, or in anticipation or contemplation of, such entity becoming a Subsidiary or such merger, consolidation or acquisition.

"*Additional Amounts*" has the meaning set forth in sub-Clause 8.1(b).

"*Advance*" means an advance made or to be made by the Lender under Clause 3 (*Availability of the Facility*);

"*Affiliate*" of any Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such Person, and, in the case of a natural Person, any immediate family member (including spouse, parents, children, siblings, cousins and in-laws or other relative who has the same principal residence as such Person) of such Person. For purposes of this definition, "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; provided that beneficial ownership of 10% or more of the voting stock of a Person shall be deemed to be control. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" shall have correlative meanings.

"*Agency*" means any agency, authority, central bank, department, committee, government, legislature, minister, ministry, official or public or statutory Person (whether autonomous or not).

"*Agreed Funding Source*" shall mean any Person to whom the Lender owes any Debt (including securities), which Debt was incurred solely and expressly to fund the Loan (including a designated representative of such Person).

"*Agreed Funding Source Agreements*" means the Trust Deed; the Notes; the subscription agreement dated 19 April 2005 in respect of the Notes between the Lender, the Borrower and Citigroup Global Markets Limited and Dresdner Bank AG London Branch as joint lead managers; the agency agreement dated the Drawdown Date among the Lender, Citibank AG, as registrar, Citibank N.A. as principal paying agent, paying agent and transfer agent, Dexia Banque Internationale à Luxembourg, as Luxembourg paying and transfer agent, and The Law Debenture Trust Corporation p.l.c., as trustee, in each case as amended and restated from time to time; and any other agreements entered into in connection with the Agreed Funding Source.

"*Applicable GAAP*" means U.S. GAAP or, if the Borrower exercises its option pursuant to Clause 1.6, IFRS.

"*Approved Replacement Shareholder*" means:

(1) a recognised telecommunications operator whose principal business is mobile telephony and who has its principal operations in Western Europe and whose long-term debt is rated BBB- or better from S&P and Baa3 or better from Moody's (and is not in either case on "credit watch" with negative outlook); or

(2) any other person approved by holders of a majority of the principal amount of Notes outstanding.

"*Asset Sale*" means any sale, transfer or other disposition (including by way of merger, consolidation or Sale and Lease-Back Transaction) in one transaction or a series of related transactions by the Borrower or any of its Subsidiaries to any Person other than the Borrower or any of its wholly-owned Subsidiaries of any or all of the capital stock of any Subsidiary or any other property or assets of the Borrower or any of its Subsidiaries; provided that "Asset Sale" shall not include:

(1) sales, transfers or other dispositions of inventory, receivables and other current assets in the ordinary course of business consistent with past practice;

(2) sales, transfers or other dispositions governed by the provisions applicable to mergers, consolidations and sales of all or substantially all of the Borrower's assets described in sub-Clause 14.11 (*Mergers and Sales of Assets*) or that involve a sale, transfer or other conveyance, whether direct or indirect, of all or substantially all of the Borrower's assets as described in sub-Clause 7.3 (*Prepayment in the Event of a Change of Control*); or

(3) sales, transfers or other dispositions of assets with a Fair Market Value (as certified in an Officers' Certificate) not in excess of $500,000.

"*Asset Sale Payment Date*" means the date specified as such in the notice from the Borrower to the Lender pursuant to sub-Clause 7.4(b).

"*Attributable Debt*" means, in respect of a Sale and Lease-Back Transaction, at the time of determination, the lesser of (x) the Fair Market Value of the property subject to such arrangement and (y) the present value (discounted at the weighted average interest rate of all notes then issued and outstanding in connection with the Agreed Funding Source, compounded semi-annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such arrangement after excluding all amounts required to be paid on account of maintenance and repairs, insurance, taxes and similar charges.

"*Board of Directors*" means, as to any Person, the board of directors of such Person or any duly authorised committee thereof.

"*Borrower*" means the party named as such above until a successor replaces it in accordance with sub-Clause 14.11 (*Mergers and Sales of Assets*) and thereafter means such successor.

"*Borrower's Collection Account*" means an account of the Borrower with JSCB "Citibank (Ukraine)", Kyiv, Ukraine, Account Number 26008200106016 (SWIFT CITIUAUK; correspondent account 36144321 at Citibank N.A., USA, NY, SWIFT CITIUS33).

"*Budget*" means the annual budget of a Person which shall include (i) revenues, (ii) expenditures, and (iii) a profit and business plan (which shall include all planned current expenditures, investments and expenditures for new types of activities), as well as any changes thereto or any expenditures beyond the levels stated therein (taking into account the allowed variances provided for therein).

"*Business Day*" means any day (other than a Saturday or Sunday) on which banks generally are open for business in New York, Frankfurt, London and Kyiv.

"*Capital Adequacy Requirement*" means a request or requirement relating to the maintenance of capital, including one which makes any change to, or is based on any alteration in, the interpretation of the International Convergence of Capital Measurement and Capital Standards (a paper prepared by the Basle Committee on Banking Regulations and Supervision, dated July 1988, and amended in November 1991) or which increases the

amounts of capital required thereunder, other than a request or requirement made by way of implementation of the International Convergence of Capital Measurement and Capital Standards in the manner in which it is being implemented at the date hereof.

"*Cash Equivalents*" means:

(1)     any evidence of Debt with a maturity of one year or less issued or directly and fully guaranteed or insured by the government of an Approved Jurisdiction (as defined below) or any Agency or instrumentality thereof; provided that the full faith and credit of an Approved Jurisdiction (or similar concept under the laws of the relevant Approved Jurisdiction) is pledged in support thereof;

(2)     current account balances, deposits, certificates of deposit, promissory notes, acceptances or money market deposits with a maturity of one year or less of (i) any institution having combined consolidated capital and surplus and undivided profits (or any similar capital concept) of not less than $500 million (or the equivalent in another currency) as determined under Applicable GAAP, international accounting standards or the accounting standards of the country in which such institution is incorporated and as set forth in the most recent publicly available financial reports published by such institution or (ii) any Subsidiary duly organized and operating as a banking institution under the laws of Ukraine of any banking or financial institution referred to under (i) above;

(3)     current account balances, deposits, certificates of deposit, promissory notes, acceptances or money market deposits with a maturity of one year or less with any banking institution duly organized and operating under the laws of Ukraine having combined capital and surplus and undivided profits (or any similar capital concept) of not less than $100 million (or the equivalent in another currency) as determined under Applicable GAAP, international accounting standards or the accounting standards of the country in which such institution is incorporated and as set forth in the most recent publicly available financial reports published by such institution; provided, however, that the aggregate of such current account balances, deposits, certificates of deposit, promissory notes, acceptances or money market deposits with a maturity of one year or less may not exceed at any one time the aggregate of (x) $25 million (or the equivalent in another currency) with any single such banking institution and (y) $50 million (or the equivalent in another currency) with all such banking institutions;

(4)     current account balances with any banking institution duly organized and operating under the laws of Ukraine having combined capital and surplus and undivided profits (or any similar capital concept) of at least $10 million (or the equivalent in another currency) but less than $100 million (or the equivalent in another currency) as determined under Applicable GAAP, international accounting standards or the accounting standards of the country in which such institution is incorporated and as set forth in the most recent publicly available financial reports published by such institution; provided, however, that the aggregate of such current account balances may not exceed at any one time (x) $15 million (or the equivalent in another currency) with any single such banking institution or (y) $50 million (or the equivalent in another currency) with all such banking institutions; provided, further, that the Borrower shall give (and not withdraw) instructions to any such banking institution with which the Borrower has a current account balance in excess of $1 million (or the equivalent in another currency) to transfer the balance in excess of such amount to a banking institution meeting the qualifications set forth in sub-clause (2) or (3) of this definition no later than 10 Business Days from the date on which such current account balance exceeds $1 million (or the equivalent in another currency);

(5)     commercial paper with a maturity of one year or less issued by a corporation (other than an Affiliate of the Borrower) organized under the laws of an Approved Jurisdiction and rated at least "A-1" by S&P or "P-1" by Moody's:

(6)     repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the government of an Approved Jurisdiction which obligations mature within one year from the date of acquisition; and

(7)     interests in any money market funds at least 95% of the assets of which consist of Cash Equivalents of the type discussed in sub-clauses (1) through (6).

For the avoidance of doubt, an Investment in an investment fund or trust which invests substantially all of its assets in Investments described above in this definition or which is itself rated at least "AAA" or "A-1" by S&P or "Aaa" or "P-1" by Moody's constitutes a Cash Equivalent. For the purposes of this definition of "Cash Equivalents", "Approved Jurisdiction" means the United States of America, Switzerland, Ukraine, Norway and any member nation of the European Union as presently constituted.

"*Change of Control*" means such time as:

(1)    a plan relating to the Borrower's liquidation or dissolution is adopted;

(2)    the Borrower consolidates with or merges with or into any other Person, another Person merges into the Borrower, or the Borrower conveys, transfers, sells, leases or otherwise disposes of all or substantially all of its assets to another Person, in any such event pursuant to a transaction in which the outstanding voting stock of the Borrower is converted into or exchanged for cash, securities or other property, other than any such transaction where (i) the voting stock of the Borrower outstanding immediately prior to such transaction is converted into or exchanged for voting stock (other than Disqualified Stock) of the surviving or transferee Person and (ii) the "beneficial owners" (as such term is used in Rule 13d-3 promulgated pursuant to the Exchange Act) of the voting stock of the Borrower outstanding immediately prior to such transaction own, directly or indirectly, not less than a majority of the voting stock (other than Disqualified Stock) of the surviving or transferee Person immediately after such transaction;

(3)    any "Person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act, whether or not applicable), other than an Excluded Person or Excluded Group or Approved Replacement Shareholder, is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 promulgated pursuant to the Exchange Act), directly or indirectly, of more than 35% of the equity of the Borrower then outstanding normally entitled to vote in election of directors; or

(4)    during any period of 12 consecutive months after the date hereof, individuals who at the beginning of any such 12-month period constituted the Board of Directors of the Borrower (together with any new directors whose nomination for election by the shareholders of the Borrower was approved by any Excluded Person or Excluded Group or Approved Replacement Shareholder) cease for any reason to constitute one-third of the Board of Directors of the Borrower then in office;

provided that any consolidation or merger, or conveyance, transfer, sale or lease of properties and assets, permitted by sub-Clause 14.11 (*Mergers and Sales of Assets*) shall not be deemed a Change of Control.

"*Change of Control Payment Date*" means the date specified as such in the notice from the Borrower to the Lender pursuant to sub-Clause 7.3(b).

"*Change of Law*" means any of the enactment or introduction of any new law; the variation, amendment or repeal of an existing or new law; any ruling on or interpretation or application by a competent authority of any existing or new law; and the decision or ruling on, the interpretation or application of, or a change in the interpretation or application of, any law by any court of law, tribunal, central bank, monetary authority or agency or any Taxing Authority or fiscal or other competent authority or agency; which, in each case, occurs after the date hereof. For this purpose the word "law" means all or any of the following whether in existence at the date hereof or introduced hereafter and with which it is obligatory or customary for banks or other financial institutions or, as the case may be, companies in the relevant jurisdiction to comply:

(1)    any statute, treaty, order, decree, instruction, letter, directive, instrument, regulation, ordinance or similar legislative or executive action by any national or international or local government or authority or by any ministry or department thereof and other agencies of state power and administration (including, but not limited to, taxation departments and authorities); and

(2)    any letter, regulation, decree, instruction, request, notice, guideline, directive, statement of policy or practice statement given by, or required of, any central bank or other monetary authority, or by or of any Taxing Authority or fiscal or other authority or agency (whether or not having the force of law).

"*Commission*" means the U.S. Securities and Exchange Commission.

"*Consolidated Cash Flows*" for any period means the Borrower's Consolidated Net Income for such period, excluding any cumulative effect of a change in accounting principles since the beginning of the relevant

period, plus the following items (1) through (4), in each case to the extent such items were deducted when calculating the Borrower's Consolidated Net Income for such period:

(1)  any non-recurring loss, including any loss realized in connection with any asset sale or disposition of securities;

(2)  provision for income taxes;

(3)  interest expense; and

(4)  depreciation and amortization (including amortization of goodwill and other intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash expenses, including currency exchange and translation losses (excluding bad debt expense and any such non-cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period);

*minus* the following items (5) and (6) in each case to the extent such items increased the Borrower's Consolidated Net Income for such period:

(5)  any non-recurring gain, including any gain realized in connection with any asset sale or disposition of securities; and

(6)  any non-cash items, including currency exchange and translation gains,

all as determined on a consolidated basis in accordance with Applicable GAAP.

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries for such period, on a consolidated basis, determined in accordance with Applicable GAAP and by applying the protocols set forth below:

(1)  the Net Income (but not loss) of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid in cash to the specified Person or a wholly owned Subsidiary thereof;

(2)  the Net Income of any Subsidiary shall be excluded to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders;

(3)  the Net Income of any Person acquired in a pooling of interests transaction for any period prior to the date of such acquisition shall be excluded;

(4)  income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued) shall be excluded;

(5)  in the case of a successor to such Person by consolidation or merger or as a transferee of such Person's assets, any earnings of the successor corporation prior to such consolidation, merger, or transfer of assets shall be excluded; and

(6)  the cumulative effect of a change in accounting principles shall be excluded.

"*Debt*" means, with respect to any Person, at any date of determination, without duplication:

(i)  all obligations of such Person for borrowed money;

(ii)  all reimbursement obligations of such Person in respect of letters of credit, banker's acceptances or other similar instruments or credit transactions;

(iii)  all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(iv)   all obligations of such Person to the extent that they defer the purchase price of property or services for more than 180 days, except trade accounts payable and other non-interest bearing current liabilities arising in the ordinary course of business;

(v)    all obligations of such Person as lessee under leases that would be capitalised on a balance sheet of the lessee prepared in accordance with Applicable GAAP;

(vi)   all guarantees and indemnities of such Person in respect of the Debt of any other Person or Persons, without duplication of any Debt otherwise included in this definition; and

(vii)  all Debt of other Persons secured by a Lien on any property, income and assets of such Person whether or not such Debt is assumed by such Person; provided that if such Debt is not assumed by such Person, the amount of such Debt shall be the lesser of (a) the Fair Market Value of such property, income or assets at such date of determination and (b) the amount of such Debt of such other Person;

provided, that any advance payments that the Borrower receives from its subscribers for the provision of telecommunications services by the Borrower shall not be Debt.

"*Default*" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"*Dispute*" has the meaning set forth in sub-Clause 25.7 (*Arbitration*).

"*Disqualified Stock*" means any capital stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the date on which the Loan matures.

"*Drawdown Date*" means 27 April 2005 (being the proposed closing date of the offering of the Notes) or such later date as may be agreed by the parties to this Agreement in respect of the Loan.

"*Environmental Laws*" has the meaning set forth in sub-Clause 11.9 (*Environmental and Labour Laws*).

"*Equity Interest*" means capital stock and all warrants, options or other rights to acquire capital stock (but excluding any debt security that is convertible into, or exchangeable for, capital stock).

"*Event of Default*" has the meaning set forth in sub-Clause 15.1 (*Circumstances which Constitute Events of Default*).

"*Excess Proceeds*" has the meaning set forth in sub-Clause 14.12 (*Asset Sales*).

"*Exchange Act*" means the United States Securities Exchange Act of 1934, as amended.

"*Excluded Group*" means a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) that includes one or more Excluded Persons; provided that the voting power of the capital stock of the Borrower "beneficially owned" (as such term is used in Rule 13d-3 promulgated under the Exchange Act) by such Excluded Persons (without attribution to such Excluded Persons of the ownership by other members of the "group") represents a majority of the voting power of the capital stock "beneficially owned" (as such term is used in Rule 13d-3 promulgated under the Exchange Act) by such group.

"*Excluded Person*" means (1) Telenor ASA and any of its Affiliates and (2) Storm LLC and any of its Affiliates.

"*Excluded Provisions*" means provisions of the Shareholders' Agreement relating to increases in the share capital of the Borrower, the approval by the Borrower's shareholders and directors of financing transactions to be entered into by the Borrower, the approval by the Borrower's shareholders and directors of the initial public offering of shares of the Borrower, the Borrower's dividend policy, transfer restrictions binding on the shareholders of the Borrower both before and after the initial public offering of the Borrower (including, among

others, provisions relating to required sale rights and co-sale rights), limitations on the acquisition of Debt of the Borrower by its shareholders and their respective Affiliates, future amendments to the Borrower's charter to implement the terms of the Shareholders' Agreement, indemnification by the Borrower of its officers and directors and officers and directors of the Borrower's Affiliates who are officers, directors or employees of the Borrower's shareholders and, to the extent the shareholders are enforcing such indemnity obligations, the shareholders, in each case, in an amount equal to the amount of any liabilities, losses, expenses and the like which they incur in their capacity as officers or directors of the Borrower or its Affiliates, and the term and termination of the Shareholders' Agreement, including the ability of a non-breaching shareholder to terminate the Shareholders' Agreement in certain instances.

"*Facility*" means the term loan facility made available by the Lender to the Borrower under this Agreement.

"*Fair Market Value*" means, with respect to any property or assets, the sale price for such property or assets as could be negotiated in a free market transaction for cash conducted at arm's length between a willing seller and a willing and able buyer as determined in good faith by the relevant Person's Board of Directors in cases of property or assets with a Fair Market Value in excess of $5 million, or as determined in good faith by Officers of the relevant Person as set forth in an Officers' Certificate in cases of property or assets with a Fair Market Value of less than $5 million.

"*Germany*" means the Federal Republic of Germany and any political sub-division or agency thereof or therein.

"*IFRS*" means International Financial Reporting Standards.

"*incur*" has the meaning set forth in sub-Clause 14.6 (*Incurrence of Debt*).

"*Interest Payment Date*" means 27 April and 27 October of each year in which the Loan remains outstanding, being the last day of the corresponding Interest Period, or if such day is not a Business Day, the next succeeding Business Day, commencing on 27 October 2005, and the last such date being the Repayment Date.

"*Interest Period*" means, except as otherwise provided herein, any of those periods mentioned in sub-Clause 4 (*Interest Periods*).

"*Interest Rate*" means, except as otherwise provided herein, the interest rate specified in sub-Clause 5.2 (*Calculation of Interest*).

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the forms of direct or indirect loans (including guarantees of Debt or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Debt, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with Applicable GAAP. If the Borrower or any of its Subsidiaries sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of the Borrower, the Borrower shall be deemed to have made an Investment on the date of any such sale or disposition equal to the fair market value of the Equity Interests of such Subsidiary not sold or disposed of in an amount determined as provided in sub-Clause 14.8(c) (*Restricted Payments*).

"*law*" means any statute, treaty, order, decree, instruction, letter, directive, instrument, regulation, ordinance or similar legislative or executive action by any national or international or local government or authority or by any ministry or department thereof and other agencies of state power and administration (including, but not limited to, taxation departments and authorities), whether in existence at the date hereof or introduced hereafter.

"*Lien*" means any mortgage, lien, pledge, charge, security interest or other encumbrance or preferential arrangement, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the U.S. Uniform Commercial Code (or equivalent statutes) of any jurisdiction).

"*Loan*" has the meaning set forth in Clause 2 (*The Loan*).

"*Material Adverse Effect*" has the meaning set forth in sub-Clause 11.1 (*Due Organisation*).

"*Net Cash Proceeds*" means:

(1)    with respect to any Asset Sale by any Person, the proceeds thereof (without duplication in respect of all Asset Sales) in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of, or stock or other assets when disposed of for, cash or Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Borrower or any of its Subsidiaries) net of:

(a)    brokerage commissions and other reasonable fees and expenses (including fees and expenses of counsel and investment bankers) related to such Asset Sale;

(b)    provisions for all Taxes payable as a result of such Asset Sale;

(c)    payments made to retire Debt where payment of such Debt is secured by the assets of properties that are the subject of such Asset Sale;

(d)    amounts required to be paid to any Person (other than the Borrower or one of its Subsidiaries) owning a beneficial interest in the assets subject to the Asset Sale; and

(e)    appropriate amounts to be provided by the Borrower or any of its Subsidiaries as a reserve, in accordance with Applicable GAAP, against any liabilities associated with such Asset Sale and retained by the Borrower or any of its Subsidiaries, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale; and

(2)    with respect to any issuance or sale of Equity Interests of the Borrower or of convertible or exchangeable debt securities of the Borrower that have been converted into or exchanged for such Equity Interests, the proceeds of such issuance or sale in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of, or stock or other assets when disposed of for, cash and Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Borrower or any of its Subsidiaries) net of attorney's fees, accountant's fees and brokerage, consultation, underwriting and other fees (including placement agents' fees, listing fees or other discounts and commissions) and expenses actually incurred in connection with such issuance or sale and net of taxes paid as a result thereof.

"*Net Income*" means, with respect to any Person, the net income or loss of such Person and its Subsidiaries, determined in accordance with Applicable GAAP, excluding, however:

(1)    any gain (but not loss), together with any related provision for taxes on such gain (but not loss), realized in connection with: (a) any asset sale or (b) the disposition of any securities by such Person or any of its Subsidiaries or the extinguishment of any Debt of such Person or any of its Subsidiaries; and

(2)    any extraordinary gain (but not loss), together with any related provision for taxes on such extraordinary gain (but not loss).

"*Notes*" means the $175,000,000 7.75% Loan Participation Notes due 2012 proposed to be issued by the Lender for the sole purpose of funding the Loan.

"*Offering Circular*" means the offering memorandum dated 19 April 2005 relating to the issuance of the Notes by the Lender to the Agreed Funding Source.

"*Officer*" means, with respect to a Person, the Chairman of the Board of Directors, the General Director, the Chief Executive Officer, the President, the Chief Financial Officer, the Controller, the Treasurer or the General Counsel of such Person.

"*Officers' Certificate*" means a certificate signed by two Officers of the Borrower.

"*Opinion of Counsel*" means a written opinion from legal counsel who is reasonably acceptable to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements). The counsel may be an employee of or counsel to the Borrower or the Lender (or the trustee under the Agreed Funding Source Agreements).

"*Pari Passu Debt*" means any Debt of the Borrower or of any its Subsidiaries that is not expressly subordinated in right of payment to the Loan.

"*permits*" has the meaning set forth in sub-Clause 11.11 (*Permits and Licences*).

"*Permitted Debt*" means:

(1)   Debt owed by the Borrower to a wholly-owned Subsidiary, or Debt of any wholly-owned Subsidiary owed to the Borrower or any other wholly-owned Subsidiary; provided, however, that (i) any subsequent issuance or transfer of any capital stock which results in any such wholly-owned Subsidiary ceasing to be a wholly-owned Subsidiary or any subsequent transfer of such Debt (other than to the Borrower or any wholly-owned Subsidiary) shall be deemed, in each case, to constitute the incurrence of such by the Borrower or any wholly-owned Subsidiary that is not permitted by this sub-clause, and (ii) if the Borrower is the obligor on such Debt, such Debt must be expressly subordinated to the prior payment in full in cash of all obligations under the Loan;

(2)   Permitted Refinancing Indebtedness;

(3)   Debt arising from the honouring by a bank or other financial institution of a cheque, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided such Debt is extinguished within two Business Days of its incurrence; and

(4)   Debt representing subordinated loans made by shareholders of the Borrower and/or their respective Affiliates.

"*Permitted Investments*" means Investments made on or after 9 August 2004 consisting of:

(1)   any Investment in the Borrower or in a Subsidiary (other than a Significant Subsidiary) of the Borrower;

(2)   any Investment in cash or Cash Equivalents;

(3)   any Investment by the Borrower or any of its Subsidiaries in a Person, if as a result of such Investment such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Borrower;

(4)   any acquisition of assets solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Borrower;

(5)   Investments in joint ventures or similar entities that are primarily engaged in the telecommunications business (or business ancillary to the telecommunications business) not to exceed S5 million in the aggregate outstanding at any one time;

(6)   stock, obligations or securities received in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor or in any manner that is involuntary or otherwise received in the ordinary course of business in settlement of debts owing to the Borrower or any of its Subsidiaries as a result of foreclosure or enforcement of liens;

(7)   advance payments or deposits made in connection with the purchase or delivery of equipment or services in the ordinary course of business;

(8)   hedging obligations entered into in the ordinary course of the Borrower's or its Subsidiaries' business and not for speculative purposes;

A-9

(9) other Investments in any Person having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this sub-clause (9) since 21 November 2002, not to exceed $5 million: and

(10) loans and advances to employees and officers of the Borrower or any Subsidiary in the ordinary course of business for *bona fide* business purposes. provided that the amount of such loans and advances may not exceed more than $100,000 in aggregate at any one time outstanding.

*"Permitted Lien"* means:

(i) any Lien existing on 9 August 2004;

(ii) any Lien on any property or assets of any corporation existing at the time such corporation is merged or consolidated with or into the Borrower or any of its Subsidiaries or becomes a Subsidiary of the Borrower and not created in contemplation of such event. provided that no such Lien shall extend to any other property or assets;

(iii) any Lien existing on any property or assets prior to the acquisition thereof by the Borrower or any of its Subsidiaries and not created in contemplation of such acquisition, provided that no such Lien shall extend to any other property or assets;

(iv) any Lien on any property or assets securing the Borrower's Debt or Debt of any of its Subsidiaries incurred or assumed for the purpose of financing all or part of the cost of acquiring. repairing or refurbishing such property or assets, provided that (a) no such Lien shall extend to any other property or assets. (b) the aggregate principal amount of all Debt secured by Liens under this sub-clause (iv) on such property or assets shall not exceed the lower of (x) the purchase price of such property or assets and (y) the Fair Market Value of such property or assets at the time of acquisition. repair or refurbishing and (c) such Lien attaches to such property or assets concurrently with the repair or refurbishing thereof or within 90 days after the acquisition thereof. as the case may be;

(v) any Lien arising by operation of law. including any Liens (a) arising in the ordinary course of business with respect to amounts not yet delinquent or being contested by the Borrower or a Subsidiary of the Borrower in good faith in appropriate proceedings or (b) for taxes, assessments. government charges or claims, including without limitation those in favour of Ukrainian governmental fiscal authorities, with respect to amounts not yet delinquent or being contested by the Borrower or a Subsidiary of the Borrower in good faith in appropriate proceedings;

(vi) any Lien on the property or assets of any of the Borrower's wholly-owned Subsidiaries securing intercompany Debt of such wholly-owned Subsidiary owing to the Borrower or another of its wholly-owned Subsidiaries;

(vii) easements, rights-of-way. restrictions and any other similar charges or encumbrances incurred in the ordinary course of business and not interfering in any material respect with the Borrower's business or the business of any of its Subsidiaries, including any encumbrance or restriction with respect to an equity interest of any joint venture pursuant to a joint venture agreement;

(viii) any extension, renewal or replacement of any Lien described in sub-clauses (i)-(vii) above. *provided that* (a) such extension, renewal or replacement shall be no more restrictive in any material respect than the original Lien. (b) the amount of Debt secured by such Lien is not increased and (c) if the property or assets securing the Debt subject to such Lien are changed in connection with such refinancing. extension or replacement, the Fair Market Value of the property or assets is not increased; and

(ix) any other Lien securing Debt permitted to be incurred under sub-Clause 14.6 (*Incurrence of Debt*): *provided that*, immediately after giving effect to such Lien, all of the Borrower's and its Subsidiaries' secured Debt and Attributable Debt in the aggregate do not exceed 15% of the Borrower's and its Subsidiaries' total Debt as determined by reference to the Borrower's most

recent quarterly or annual consolidated balance sheet on a pro forma basis after giving effect to the incurrence of any Debt and any other changes in the Borrower's and its Subsidiaries' Debt since the date of such balance sheet.

"*Permitted Refinancing Indebtedness*" means any Debt of the Borrower or any of its Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, repay, defease or refund other Debt of the Borrower or any of its Subsidiaries (other than intercompany Debt); *provided* that:

(1)     the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus accrued interest on, the Debt so extended, refinanced, renewed, replaced, defeased or refunded (plus the amount of any reasonable determined premium necessary to accomplish such refinancing and such reasonable expenses incurred in connection therewith);

(2)     such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a weighted average life to maturity equal to or greater than the weighted average life to maturity of, the Debt being extended, refinanced, renewed, replaced, defeased or refunded;

(3)     if the Debt being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Loan, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and is subordinated in right of payment to, the Loan on terms at least as favorable to the Lender as those contained in the documentation governing the Debt being extended, refinanced, renewed, replaced, defeased or refunded; and

(4)     such Debt is incurred either by the Borrower or by the Subsidiary who is the obligor on the Debt being extended, refinanced, renewed, replaced, defeased or refunded.

"*Person*" means any individual, corporation, partnership, joint venture, trust, unincorporated organization or government or any Agency or political subdivision thereof.

"*Proceedings*" has the meaning set forth in sub-Clause 25.2 (*English Courts*).

"*Qualifying Jurisdiction*" means any jurisdiction which has a double taxation treaty with Ukraine under which the payment of interest by Ukrainian borrowers to lenders in the jurisdiction in which a lender is incorporated is generally able to be made (upon completion of any necessary formalities required in relation thereto) without deduction or withholding of Ukrainian income tax or subject to deduction or withholding of such tax at a rate not exceeding 2%.

"*Rating Agency*" means (i) Standard & Poor's Rating Group (or its successors) ("S&P"); (ii) Moody's Investor Services, Inc. (or its successors) ("Moody's"); and/or (iii) any other internationally recognized securities rating agency which assigns a rating to the Borrower or any securities of the Borrower.

"*Registration Rights Agreement*" means the Registration Rights Agreement dated October 29, 2002 among the Borrower, Telenor Mobile Communications AS and Storm LLC.

"*Repayment Date*" means the seventh anniversary of the date, referred to in Clause 3 (*Availability of the Loan*), on which the Loan is made hereunder, or if such day is not a Business Day, the next succeeding Business Day.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment*" has the meaning set forth in sub-Clause 14.8 (*Restricted Payments*).

"*Revolving Credit Facility*" means any credit facility made available for one year or less pursuant to which amounts may be redrawn and repaid by the Borrower subject to a facility limit.

"*Rules*" has the meaning set forth in sub-Clause 25.7 (*Arbitration*).

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing for a period, including renewals, in excess of 18 months, of any property or asset that has been owned by the Borrower or any of its Subsidiaries for more than 180 days and has been or is to be sold or transferred by the Borrower or such Subsidiary in such transaction.

A-11

"*Securities Act*" means the United States Securities Act of 1933, as amended.

"*Shareholders' Agreement*" means the Shareholders' Agreement dated 30 January 2004 between the Borrower, Telenor Mobile Communications AS and Storm LLC.

"*Significant Subsidiary*" means any Subsidiary of the Borrower that satisfies the definition set forth in Article 1, Rule 1-02 of Regulation S-X promulgated under the Securities Act, as such regulation is in effect on the date hereof.

"*Stated Maturity*" means:

(1)    with respect to any Debt, the date specified in such Debt as the fixed date on which the final instalment of principal of such Debt is due and payable; and

(2)    with respect to any scheduled instalment of principal of or interest on any Debt, the date specified in such Debt as the fixed date on which such instalment is due and payable.

"*Subsidiary*" means, with respect to any Person, (i) any corporation, association or other business entity of which more than 50% of the total voting power of shares of capital stock entitled to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person (or a combination thereof) and (ii) any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

"*Taxes*" has the meaning set out in sub-Clause 8.1 (*Additional Amounts*).

"*Tax Indemnity Amounts*" has the meaning set out in Clause 8.3 (*Tax Indemnity*).

"*Taxing Authority*" has the meaning set out in sub-Clause 8.1 (*Additional Amounts*).

"*Trust Deed*" means the trust deed to be dated the Drawdown Date, as amended and restated from time to time, between the Lender and The Law Debenture Trust Corporation p.l.c., as trustee.

"*unpaid sum*" has the meaning set forth in sub-Clause 16.1 (*Default Interest Periods*).

"*U.S. GAAP*" means U.S. generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board ("FASB") or, if FASB ceases to exist, any successor thereto.

**Other Definitions**

The "*Lender*" shall be construed so as to include its and any subsequent successors, assignees and chargees in accordance with their respective interests;

the "*equivalent*" on any given date in one currency (the "first currency") of an amount denominated in another currency (the "second currency") is a reference to the amount of the first currency which could be purchased with the amount of the second currency at the spot rate of exchange quoted on the relevant Reuters page or, where the first currency is (i) hryvnia and the second currency is (ii) U.S. dollars or as the case may be euros (or vice versa), as quoted by the National Bank of Ukraine at or about noon (London time or Brussels time (as applicable) or, as the case may be, Kyiv time) on such date for the purchase of the first currency with the second currency;

"*repay*" (or any derivative form thereof) shall, subject to any contrary indication, be construed to include "prepay" (or, as the case may be, the corresponding derivative form thereof); and

"*VAT*" shall be construed as a reference to value added tax including any similar tax which may be imposed in place thereof from time to time.

1.2    **Interpretation**

Unless the context otherwise requires,

(a)    a term has the meaning assigned to it;

(b)    an accounting term not otherwise defined has the meaning assigned to it in accordance with Applicable GAAP consistently applied;

(c)    words in the singular include the plural, and in the plural include the singular;

(d)    provisions apply to successive events and transactions;

(e)    references to sections of or rules under the Securities Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the Commission from time to time; and

(f)    references to "$" or "U.S. dollars" are to United States dollars and references to "hryvnia" are to Ukrainian hryvnia.

1.3    **Statutes**

Any reference in this Agreement to a statute shall be construed as a reference to such statute as the same may have been, or may from time to time be, amended or re-enacted.

1.4    **Headings**

Clause and Schedule headings are for ease of reference only.

1.5    **Amended Documents**

Except where the contrary is indicated, any reference in this Agreement to this Agreement or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented.

1.6    **Applicable GAAP**

The Borrower may, at its option at any time, elect to convert Applicable GAAP from U.S. GAAP to IFRS, provided that prior to the effectiveness of such conversion the Borrower delivers to the Lender and the party designated as trustee under the Agreed Funding Source Agreements a notice of such election accompanied by a report, containing the information required under Clause 14.13 with respect to financial statements prepared in accordance with IFRS for the most recently completed fiscal year or fiscal quarter, as the case may be, together with financial statements for the prior year or corresponding quarter in the prior year, as the case may be.

2.    **THE FACILITY**

The Lender grants to the Borrower, upon the terms and subject to the conditions hereof, a term loan facility in the amount of $175,000,000 (the "**Loan**"), funded by the Agreed Funding Source.

3.    **AVAILABILITY OF THE FACILITY**

3.1    **Drawdown**

Subject to the conditions in Clause 3. 2, the Facility will be available by way of a single advance that will be made by the Lender to the Borrower's Collection Account, and the Borrower will draw down the Loan, on the Drawdown Date.

3.2    **Conditions Precedent**

The conditions referred to in Clause 3.1 are the following:

(1)    Citigroup Global Markets Limited and Dresdner Bank AG London Branch, as joint lead managers, have received the condition precedent documents as listed in the Agreed Funding Source Agreements in form and substance satisfactory to them;

(2)    the Lender has received full funding of the relevant Advance from the Agreed Funding Source; and

(3)    no event has occurred or circumstance arisen which would, whether or not with the giving of notice and/or the passage of time and/or the fulfilment of any other requirement, constitute an event

A-13

described under Clause 15 (*Events of Default*) and the representations set out in Clause 11 (*Representations and Warranties of the Borrower*) are true and accurate in all material respects on and as of the proposed date for the making of such Advance.

### 3.3    National Bank of Ukraine Registration Requirement

Without limitation to the provisions of Clause 3.2, but notwithstanding any other provision of this Agreement, this Agreement shall not become effective until it has been registered with the National Bank of Ukraine.

### 4.    INTEREST PERIODS

The period for which the Loan is outstanding shall be divided into successive semi-annual periods, ending on and excluding 27 October and 27 April, each of which, other than the first (which shall commence on, and shall include, 27 April 2005) shall start on, and shall include, the last day of the preceding period (each an "**Interest Period**").

### 5.    PAYMENT AND CALCULATION OF INTEREST

### 5.1    Payment of Interest

Not later than noon (London time) two Business Days prior to each Interest Payment Date the Borrower shall pay all accrued and unpaid interest calculated to the last day of each Interest Period on the outstanding principal amount of the Loan to the Account. No less than two Business Days prior to the date on which the Lender is required to make payment to the account referred to in Article 7.1 of the Agency Agreement, the Borrower shall procure that the Borrower's paying bank confirms by letter or telex or SWIFT MT 100 message to the Lender the payment instructions relating to such payment. No less than one Business Day prior to such payment, the Borrower shall procure that such payment is remitted to the Account.

### 5.2    Calculation of Interest

The Loan shall bear interest at the rate of 7.75% per annum (the "**Interest Rate**"). The amount of interest payable on each Interest Payment Date shall be calculated by applying the Interest Rate to the amount of the Loan, dividing the product by two, and rounding the resulting figure to the nearest cent, half a cent being rounded upwards. If interest is required to be calculated for any other period, it will be calculated on the basis of the number of days elapsed in the relevant Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-days months unless the last day of a Calculation Period is the 31st of a month but the first day of the succeeding Calculation Period is a day other than the 30th or the 31st of a month, in which case the month that includes that last day shall not be considered to be a 30-day month but be calculated by using the actual number of days of that month). "**Calculation Period**" means any period for which interest is to be calculated, whether or not constituting an Interest Period.

### 6.    REPAYMENT

Subject to sub-Clause 15.2 (*Rights of Lender upon Occurrence of an Event of Default*), not later than noon (London time) one Business Day prior to the Repayment Date, the Borrower shall repay in full the Loan and, to the extent not already paid in accordance with sub-Clause 5.1 (*Payment of Interest*), all accrued and unpaid interest, any Additional Amounts and any Tax Indemnity Amounts calculated to the last day of the last Interest Period. No less than two Business Days prior to the date on which the Lender is required to make payment to the account referred to in Clause 7.1 of the Agency Agreement, the Borrower shall procure that the Borrower's paying bank confirms by letter or telex or SWIFT MT 100 message to the Lender the payment instructions relating to such payment. No less than one Business Day prior to such date, the Borrower shall procure that such payment is remitted to the Account.

### 7.    PREPAYMENT

### 7.1    Prepayment for Tax Reasons

If, as a result of the application of or any amendment to or change (including a change in interpretation or application) in the double taxation treaty between Ukraine and Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) or the laws or regulations of Ukraine or

Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) or of any political sub-division thereof or any Agency therein, the Borrower would thereby be required to pay any Additional Amounts in respect of Taxes pursuant to sub-Clause 8.1 (*Additional Amounts*) (other than Additional Amounts payable in respect of applicable Ukrainian withholding tax at a rate of up to 2%) or Tax Indemnity Amounts pursuant to sub-Clause 8.3 (*Tax Indemnity*), then, provided that the Borrower cannot avoid the obligation to pay such Additional Amounts or Tax Indemnity Amounts by taking reasonable measures, the Borrower may (without premium or penalty), upon not less than 30 calendar days' written notice to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) including an Officers' Certificate of the Borrower to the effect that the Borrower would be required to pay such Additional Amounts or Tax Indemnity Amounts, which notice shall be irrevocable, prepay the Loan in whole (but not in part) at any time together with all accrued and unpaid interest, any Additional Amounts and any Tax Indemnity Amounts. No such notice shall be given earlier than 90 calendar days prior to the earliest date on which the Borrower would be obligated to pay such Additional Amounts or Tax Indemnity Amounts, as the case may be.

7.2    [Intentionally left blank]

7.3    **Prepayment in the Event of a Change of Control**

    (a)    In the event of a Change of Control, the Borrower shall be required to prepay the Loan and any interest accrued and unpaid thereon on the Change of Control Payment Date to the extent and in the amount that the Lender is required to pay the Agreed Funding Source as a result thereof as set forth in a written notice by the Lender to the Borrower, including computation of such amount, given at least two Business Days prior to the Change of Control Payment Date.

    (b)    Promptly, and in any event within 10 calendar days after the date of any Change of Control, the Borrower shall deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) a written notice in the form of an Officers' Certificate, which notice shall be irrevocable (but may, in respect of sub-clause (iii), be amended), stating:

        (i)    that a Change of Control has occurred;

        (ii)    the Change of Control Payment Date, which date shall be a Business Day occurring no earlier than 30 calendar days and no later than 60 calendar days from the date such notice is delivered; and

        (iii)    the circumstances and relevant facts giving rise to such Change of Control, including, to the extent available, information with respect to pro forma historical income, cash flow and capitalization, each after giving effect to such Change of Control and events causing such Change of Control, and the date upon which such Change of Control is deemed to have occurred.

    (c)    On the Business Day prior to the Change of Control Payment Date, the Borrower shall deposit in the Account an amount in cash equal to the amount that the Lender is required to pay to the Agreed Funding Source as a result of such Change of Control as set forth in the notice referred to in sub-Clause 7.3(a) hereof, to be held for payment in accordance with this Agreement and the agreements entered into in connection with the Agreed Funding Source. To the extent that the amount actually required to be paid by the Lender on the Change of Control Payment Date is less than the amount so paid by the Borrower, the excess, if any, thereon will be refunded to the Borrower from the Account for or on behalf of the Lender on the Business Day following the Change of Control Payment Date.

    (d)    The Borrower shall use its best efforts to assist the Lender in connection with any offer to purchase or redeem or any tender offer, as well as the actual purchase or redemption, required in the event of any Change of Control pursuant to the agreements entered into in connection with the Agreed Funding Source.

7.4    **Prepayment in the Event of Asset Sales**

    (a)    In the event of any Asset Sale that requires the Borrower to apply the Excess Proceeds therefrom in accordance with sub-Clause 14.12(c) hereof, the Borrower shall be required to prepay the Loan on the Asset Sale Payment Date to the extent and in the amount that the Lender is required to pay the

Agreed Funding Source as a result thereof as set forth in a written notice by the Lender to the Borrower, including computation of such amount, given at least two Business Days prior to the Asset Sale Payment Date.

(b) Promptly, and in any event within 10 calendar days after the first day of any calendar month in which Excess Proceeds exceed $3 million (or the equivalent in another currency), the Borrower shall deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) a written notice in the form of an Officers' Certificate, which notice shall be irrevocable (but may, in respect of sub-clause (iii), be amended), stating:

(i) that it is obligated to prepay the Loan to the extent contemplated by sub-Clause 7.4(a) hereof;

(ii) the Asset Sale Payment Date, which date shall be a Business Day occurring 60 calendar days from the date such notice is delivered, and the Excess Proceeds available for such prepayment (representing the amount available for payments in respect of the asset sale offer to be made by the Lender pursuant to the Agreed Funding Source Agreements);

(iii) the circumstances and relevant facts giving rise to the obligation to so prepay the Loan; and

(iv) that the Excess Proceeds from the Asset Sales will be applied pursuant to sub-Clause 14.12(c) hereof.

(c) One Business Day prior to the Asset Sale Payment Date, the Borrower shall deposit in the Account an amount in cash equal to the amount that the Lender is required to pay to the Agreed Funding Source as a result of any Asset Sale that requires the Borrower to apply the Excess Proceeds therefrom in accordance with sub-Clause 14.12(c) hereof as set forth in writing by the Lender to the Borrower (it being understood that, pursuant to the Agreed Funding Source Agreements, the aggregate principal amount of such instruments, together with all accrued and unpaid interest to the Asset Sale Payment Date, Additional Amounts and Tax Indemnity Amounts, if any, may not exceed the Excess Proceeds required to be applied in accordance with sub-Clause 14.12(c) hereof), to be held for payment in accordance with this Agreement and the Agreed Funding Source Agreements. To the extent that the amount actually required to be paid on the Asset Sale Payment Date is less than such Excess Proceeds, the excess, if any, thereon will be refunded to the Borrower from the Account on behalf of the Lender on the Business Day following the Asset Sale Payment Date.

(d) The Borrower shall use its best efforts to assist the Lender in connection with any offer to purchase or redeem or any tender offer, as well as the actual purchase or redemption, required in the event of any Asset Sale pursuant to the agreements entered into in connection with the Agreed Funding Source.

## 7.5    Notice of Prepayment

Without prejudice to any other requirement in this Agreement, any notice of prepayment given by the Borrower pursuant to sub-Clause 7.1 (*Prepayment for Tax Reasons*) hereof shall be irrevocable, shall specify the date upon which such prepayment is to be made and shall oblige the Borrower to make such prepayment one Business Day prior to such date.

## 7.6    Costs of Prepayment

The Borrower shall, on the date of prepayment, pay all accrued and unpaid interest, any Additional Amounts and any Tax Indemnity Amounts (each only with respect to the amount subject to such prepayment), as of such date of prepayment and all other amounts payable to the Lender hereunder in connection with such prepayment. The Borrower shall indemnify the Lender on demand against any administrative and legal costs and expenses reasonably incurred and properly documented by the Lender on account of any prepayment made in accordance with this Clause 7 (*Prepayment*).

## 7.7    No Other Prepayments

The Borrower shall not prepay the whole or any part of the amount of the Loan except at the times and in the manner expressly provided for in this Agreement.

7.8     **Purchase of Instruments Issued to the Agreed Funding Source**

The Borrower and its Subsidiaries may purchase instruments issued to the Agreed Funding Source at any time in the open market or otherwise. If such instruments so purchased are surrendered by the Borrower to the Lender, as issuer of such instruments, for cancellation (together with an authorization addressed to the paying agent of the Lender under the Agreed Funding Source Agreements to cancel such instruments), the principal amount of the Loan corresponding to the prepayment of an amount of the Loan equal to the principal amount of such cancelled instruments shall be treated as prepaid by the Borrower by surrender of such instruments to the Lender and accrued and unpaid interest in respect of the principal amount of the Loan shall be treated as paid by the Borrower by surrender of such instruments to the Lender.

8.     **TAXES**

8.1     **Additional Amounts**

(a)     All payments made by the Borrower in respect of the Loan shall be made free and clear of and without deduction or withholding for or on account of any present or future taxes, duties, assessments, fees or other governmental charges (collectively, "**Taxes**") imposed or levied by or on behalf of Ukraine or Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) or any political subdivision or taxing authority thereof or therein in each of the preceding jurisdictions (each, a "**Taxing Authority**"), unless the Borrower is required to withhold or deduct Taxes by law or by the interpretation or administration thereof. For the avoidance of doubt, this sub-Clause 8.1 shall not apply to any Taxes on income payable by the Lender in Germany (or any Qualifying Jurisdiction).

(b)     If at any time the Borrower is required to withhold or deduct any amount for or on account of Taxes imposed or levied by or on behalf of any Taxing Authority within Ukraine or Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) from any payment made under or with respect to the Loan, the Borrower shall, on the due date for such payment, pay such additional amounts ("**Additional Amounts**") as may be necessary so that the net amount received by the Lender (including Additional Amounts) in U.S. dollars after such withholding or deduction will not be less than the amount the Lender would have received if such Taxes had not been withheld or deducted and free from liability in respect of such withholding or deduction; provided, however, that (i) for the avoidance of doubt, such Additional Amounts shall not be payable with respect to any Taxes on income payable by the Lender in Germany (or any Qualifying Jurisdiction) and (ii) such Additional Amounts (other than Additional Amounts payable in respect of applicable Ukrainian withholding tax at a rate of up to 2%) shall not be payable if and to the extent that such withholding or deduction is required following and on account of a Relevant Event (as defined in the Notes).

(c)     The Borrower will also:

(i)     make such withholding or deduction; and

(ii)     remit the full amount deducted or withheld to the relevant authority in accordance with applicable law.

(d)     At least 30 calendar days (or, in the event of a Change of Control pursuant to sub-Clause 7.3 (*Prepayment in the Event of a Change of Control*) or an Asset Sale that requires the Borrower to apply the Excess Proceeds therefrom in accordance with sub-Clause 14.12(c) hereof, as soon as reasonably practicable) prior to each date on which any payment under or with respect to the Loan is due and payable, if the Borrower will be obligated to pay Additional Amounts (other than Additional Amounts payable in respect of applicable Ukrainian withholding tax at a rate of up to 2%) with respect to such payment (upon and subject to written notice by the Lender or by the party designated as trustee under the Agreed Funding Source Agreements), the Borrower will deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) an Officers' Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable.

(e)     If the Lender pays any amount in respect of such Taxes, the Borrower shall reimburse the Lender in U.S. dollars for such payment on demand.

(f)    Whenever this Agreement mentions, in any context, the payment of amounts based upon the principal or premium, if any, interest or of any other amount payable under or with respect to any of the Loan, this includes, without duplication, payment of any Additional Amounts and Tax Indemnity Amounts that may be applicable.

The foregoing provisions shall apply, modified as necessary, to any Taxes imposed or levied by any Taxing Authority in any jurisdiction in which any successor obligor to the Borrower is organized.

## 8.2    Payments

The Borrower shall use all reasonable efforts to assist the Lender in ensuring that all payments made under this Agreement are exempt from deduction or withholding of Tax.

## 8.3    Tax Indemnity

Without prejudice to, and without duplication of, the provisions of sub-Clause 8.1 (*Additional Amounts*),

(a)    if at any time the Lender makes or is required to make any payment to a Person (other than to or for the account of the Agreed Funding Source) on account of Tax (other than Taxes on income payable by the Lender in Germany or any Qualifying Jurisdiction) in respect of the Loan or in respect of the Agreed Funding Source Agreements imposed by any Taxing Authority of or in Ukraine, Germany or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes, or any liability in respect of any such payment is asserted, imposed, levied or assessed against the Lender, the Borrower shall, as soon as reasonably practicable following, and in any event within 30 calendar days of, written demand made by the Lender, indemnify the Lender against such payment or liability, together with any interest, penalties, costs and expenses payable or incurred in connection therewith; and

(b)    if at any time a Taxing Authority imposes an obligation on the Lender to withhold or deduct any amount on any payment made or to be made by the Lender to or for the account of the Agreed Funding Source and the Lender is required by any Agreed Funding Source Agreements to pay additional amounts to such Agreed Funding Source in connection therewith, the Borrower shall, as soon as reasonably practicable following, and in any event within 30 calendar days of, written demand made by the Lender, pay to the Lender such additional amounts as may be necessary so that the net amount received by the Agreed Funding Source (including such additional amounts) in U.S. dollars after such withholding or deduction will not be less than the amount such Agreed Funding Source would have received if such withholdings or deductions had not been made and free from liability in respect of such withholding or deduction.

Any payments required to be made by the Borrower under this sub-Clause 8.3 are collectively referred to as "**Tax Indemnity Amounts**". For the avoidance of doubt, the provisions of this sub-Clause 8.3 shall not apply to any withholding or deductions of Taxes with respect to the Loan which are subject to payment of Additional Amounts under sub-Clause 8.1 (*Additional Amounts*).

## 8.4    Tax Claims

If the Lender intends to make a claim for any Tax Indemnity Amounts pursuant to sub-Clause 8.3 (*Tax Indemnity*), it shall notify the Borrower thereof; provided that nothing herein shall require the Lender to disclose any confidential information relating to the organization of its affairs.

## 8.5    Tax Credits and Tax Refunds

(a)    If any Additional Amounts are paid under sub-Clause 8.1 (*Additional Amounts*) or Tax Indemnity Amounts are paid under sub-Clause 8.3 (*Tax Indemnity*) by the Borrower for the benefit of the Lender and the Lender, in its reasonable opinion, determines that it has received or been granted a credit against, a relief or remission for, or a repayment of, any Tax, then, if and to the extent that the Lender, in its opinion, determines that such credit, relief, remission or repayment is in respect of or calculated with reference to the deduction or withholding giving rise to such Additional Amounts or, in the case of Tax Indemnity Amounts, with reference to the liability, expense or loss to which the payment giving rise to such Tax Indemnity Amounts relates, the Lender shall, to the

extent that it can do so without prejudice to the retention of the amount of such credit, relief, remission or repayment, pay to the Borrower such amount as the Lender shall, in its opinion, have concluded to be attributable to such deduction or withholding or, as the case may be, such liability, expense or loss; provided that the Lender shall not be obliged to make any payment under this sub-Clause 8.5 in respect of such credit, relief, remission or repayment until the Lender is in its opinion satisfied that its tax affairs for its tax year in respect of which such credit, relief, remission or repayment was obtained have been finally settled. Any such payment shall, in the absence of manifest error and subject to the Lender specifying in writing in reasonable detail the calculation of such credit, relief, remission or repayment and of such payment and providing relevant supporting documents evidencing such matters, be conclusive evidence of the amount due to the Borrower hereunder and shall be accepted by the Borrower in full and final settlement of its rights of reimbursement hereunder in respect of such deduction or withholding. Nothing contained in this sub-Clause 8.5 shall interfere with the right of the Lender to arrange its tax affairs generally in whatever manner it thinks fit nor oblige the Lender to disclose any information relating to its tax affairs generally or any computations in respect thereof.

(b)     If as a result of a failure to obtain relief from deduction or withholding of any Tax imposed by Ukraine or Germany (or any Qualified Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) (i) such Tax is deducted or withheld by the Borrower and pursuant to sub-Clause 8.1 (*Additional Amounts*) an increased amount is paid by the Borrower to the Lender in respect of such deduction or withholding, and (ii) following the deduction or withholding of Tax as referred to above, (A) the Borrower applies on behalf of the Lender to the relevant Ukrainian Taxing Authorities for a tax refund and such tax refund is credited by the Ukrainian Taxing Authorities to the Lender or (B) if such tax refund is otherwise credited by a relevant Taxing Authority to the Lender, pursuant to a final decision of such Taxing Authority, the Lender shall as soon as reasonably possible notify the Borrower of the receipt of such tax refund and promptly transfer the entire amount of the tax refund to a bank account of the Borrower specified for that purpose by the Borrower.

**8.6     Representations of the Lender**

The Lender represents that (a) it is a bank which at the date hereof is a resident of Germany, is subject to taxation in Germany on the basis of its registration as a legal entity, location of its management body or another similar criterion and it is not subject to taxation in Germany merely on income from sources in Germany or connected with property located in Germany; (b) it will account for the Loan on the date of closing on its balance sheet as an asset under "loans and advances to customers" and any arrangements in connection with the Agreed Funding Source as a liability under "certificated liabilities" and (c) at the date hereof, it does not have a permanent establishment in Ukraine for purposes of applicable Ukrainian tax legislation.

The Lender shall make reasonable and timely efforts to assist the Borrower to obtain relief from withholding of Ukrainian income tax pursuant to the double taxation treaty between Ukraine and the jurisdiction in which the Lender is incorporated, including its obligations under sub-Clause 8.8 (*Delivery of Forms*). The Lender makes no representation as to the application or interpretation of any double taxation treaty between Ukraine and the jurisdiction in which the Lender is incorporated.

**8.7     Exceptions**

The Lender agrees promptly, upon becoming aware of such, to notify the Borrower if it ceases to be resident in Germany or a Qualifying Jurisdiction or if any of the representations set forth in sub-Clause 8.6 (*Representations of the Lender*) are no longer true and correct. If the Lender ceases to be resident in Germany or a Qualifying Jurisdiction, then, except in circumstances where the Lender has ceased to be resident in Germany or a Qualifying Jurisdiction by reason of any Change of Law (including a change in a double taxation treaty or in such law or treaty's application or interpretation), in each case taking effect after the date of this Agreement, the Borrower shall not be liable to pay to the Lender under sub-Clause 8.1 (*Additional Amounts*) or sub-Clause 8.3 (*Tax Indemnity*) any sum in excess of the sum it would have been obliged to pay if the Lender had not ceased to be resident in Germany or a Qualifying Jurisdiction.

**8.8     Delivery of Forms**

The Lender shall within 30 calendar days of the request of the Borrower, to the extent it is able to do so under applicable law including Ukrainian laws, deliver to the Borrower a certificate issued by the competent state

authority in Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) confirming that the Lender is a tax resident in Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) and such other information or forms as may need to be duly completed and delivered by the Lender to enable the Borrower to apply to obtain relief from deduction or withholding of Ukrainian Tax after the date of this Agreement, including under the double taxation treaty, or, as the case may be, to apply to obtain a tax refund if a relief from deduction or withholding of Ukrainian Tax has not been obtained. The Lender shall, within 30 calendar days of the request of the Borrower, to the extent it is able to do so under applicable law including Ukrainian laws, from time to time deliver to the Borrower any additional duly completed application forms as need to be duly completed and delivered by the Lender to enable the Borrower to apply to obtain relief from deduction or withholding of Ukrainian Tax or, as the case may be, to apply to obtain a tax refund if a relief from deduction or withholding of Ukrainian Tax has not been obtained. The certificate and, if required, other forms referred to in this sub-Clause 8.8 shall be duly signed by the Lender, if applicable, and stamped or otherwise approved by the competent state authority in Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes) and apostilled or otherwise legalised. If a relief from deduction or withholding of Ukrainian Tax under this sub-Clause 8.8 has not been obtained and further to an application of the Borrower to the relevant Ukrainian Taxing Authorities the latter makes a tax refund to the Borrower, then, if and to the extent that the Borrower has failed to make payment of Additional Amounts in relation to the payments under the Loan from which no such relief as aforesaid was obtained, the Borrower shall promptly transfer to the Lender an amount in U.S. Dollars equivalent to such refund. The Borrower shall pay all costs (including, but not limited to, currency conversion costs) associated with such transfer.

9.    TAX RECEIPTS

9.1    Notification of Requirement to Deduct Tax

If, at any time, the Borrower is required by law to make any deduction or withholding from any sum payable by it hereunder, or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated, the Borrower shall promptly notify the Lender.

9.2    Evidence of Payment of Tax

(a)    The Borrower will make all reasonable endeavours to obtain certified copies, and translations into English, of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Taxing Authority imposing such Taxes. The Borrower will furnish to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements), within 60 calendar days after the date the payment of any Taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment by the Borrower or, if such receipts are not obtainable, other evidence of such payments by the Borrower.

(b)    The Lender will make all reasonable endeavors to obtain certified copies, and translations into English, of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Taxing Authority imposing such Taxes. The Lender will furnish to the Borrower, within 60 calendar days after the date the payment of any Taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment by the Lender or, if such receipts are not obtainable, other evidence of such payments by the Lender.

10.    CHANGES IN CIRCUMSTANCES

10.1    Increased Costs

If, by reason of (i) any Change of Law, other than a Change of Law which relates only to the basis or rate of Tax on the net income of the Lender, and/or (ii) compliance with any Capital Adequacy Requirement, reserve or deposit requirement or any other request from or requirement of any central bank or other fiscal, monetary or other authority which has effect in Germany (or any Qualifying Jurisdiction in which the Lender or any successor thereto is resident for tax purposes):

(a)    the Lender incurs an additional cost as a result of the Lender's entering into or performing its obligations, including its obligation to make the Loan, under this Agreement (excluding Taxes payable by the Lender on its overall net income); or

(b)    the Lender becomes liable to make any additional payment on account of Tax or otherwise, not being a Tax imposed on its net income, on or calculated by reference to the amount of the Loan and/or to any sum received or receivable by it hereunder except where compensated under sub-Clause 8.1 (*Additional Amounts*) or under sub-Clause 8.3 (*Tax Indemnity*);

then the Borrower shall, from time to time within 30 calendar days of written demand of the Lender, pay to the Lender amounts sufficient to hold harmless and indemnify it from and against, as the case may be, such properly documented cost or liability; provided that the Lender will not be entitled to indemnification where such increased cost or liability arises as a result of the gross negligence, fraud or wilful default of the Lender; and provided that the amount of such increased cost or liability shall be deemed not to exceed an amount equal to the proportion of any cost or liability which is directly attributable to this Agreement.

## 10.2    Increased Costs Claims

If the Lender intends to make a claim pursuant to sub-Clause 10.1 (*Increased Costs*), it shall notify the Borrower thereof and provide a written description in reasonable detail of the relevant Change of Law or Capital Adequacy Requirement, as the case may be, including a description of the relevant affected jurisdiction or country and the date on which the change in circumstances took effect; provided that nothing herein shall require the Lender to disclose any confidential information relating to the organization of its or any other Person's affairs. The written description shall demonstrate the connection between the change in circumstance and the increased costs and shall be accompanied by relevant supporting documentation evidencing the matters described therein.

## 10.3    Illegality

If, at any time after the date of this Agreement, it is unlawful for the Lender to make, fund or allow to remain outstanding the Loan made or to be made by it hereunder or to maintain the Agreed Funding Source then the Lender shall, after becoming aware of the same, deliver to the Borrower a written notice, setting out in reasonable detail the nature and extent of the relevant circumstances, to that effect and:

(a)    if the Loan has not then been made, the Lender shall not thereafter be obliged to make the Loan; and

(b)    if the Loan is then outstanding and the Lender so requests, the Borrower shall, on the latest date permitted by the relevant law or such earlier day as the Borrower elects (as notified to the Lender upon not less than 30 calendar days' written notice prior to the date of repayment), repay the Loan together with accrued and unpaid interest thereon and all other amounts owing to the Lender hereunder.

## 10.4    Mitigation

If circumstances arise which would result in:

(a)    any payment falling due to be made by or to the Lender or for its account pursuant to sub-Clause 10.3 (*Illegality*);

(b)    any payment falling due to be made by the Borrower pursuant to sub-Clause 8.1 (*Additional Amounts*); or

(c)    a claim for indemnification pursuant to sub-Clause 8.3 (*Tax Indemnity*) or sub-Clause 10.1 (*Increased Costs*),

then, without in any way limiting, reducing or otherwise qualifying the rights of the Lender or the Borrower's obligations under any of the above mentioned provisions, the Lender shall, upon becoming aware of the same, notify the Borrower thereof and, in consultation with the Borrower and to the extent it can lawfully do so and without prejudice to its own position, take reasonable steps to remove such circumstances or mitigate the effects of such circumstances including, without limitation, by the change of its lending office or transfer of its rights or obligations under this Agreement to another bank; provided that the Lender shall be under no obligation to take any such action if, in its opinion, to do so might have any adverse effect upon its business, operations or financial condition or might be in breach of any arrangements which it may have made in connection with the Agreed Funding Source.

## 11.    REPRESENTATIONS AND WARRANTIES OF THE BORROWER

The Borrower makes the following representations and warranties and acknowledges that the Lender has entered into this Agreement in reliance on those representations and warranties.

### 11.1    Due Organisation

Each of the Borrower and its Subsidiaries has been duly organized, is validly existing as a legal entity properly organized, registered and existing under the laws of Ukraine; each of the Borrower and its Subsidiaries has the corporate power and authority to own, lease and operate its property and to conduct its business as it is currently being conducted and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification, except where any failure to do so would not have any material adverse effect on the business, financial condition or results of operations of the Borrower and its Subsidiaries taken as a whole ("**Material Adverse Effect**").

### 11.2    Authorization

The Borrower has full corporate power and authority to enter into this Agreement, and this Agreement has been duly authorised, executed and delivered by the Borrower, and is a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except that the enforcement thereof may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

### 11.3    No Conflict

The execution, delivery and performance of this Agreement by the Borrower, the compliance by the Borrower with all the provisions hereof and the consummation of the transactions contemplated hereby (a) will not require any consent, approval, authorisation or other order of any court, regulatory body, administrative agency or other governmental body except for such consents, approvals, authorisations or other orders as have been obtained and which are in full force and effect or as may only be obtained after the closing of the transactions contemplated hereby or thereby; (b) will not conflict with or constitute a breach of any of the terms or provisions of, or a default under, the foundation agreement and charter of the Borrower or any of its Subsidiaries; (c) will not conflict with or constitute a breach of any agreement, indenture or other instrument to which the Borrower or any of its Subsidiaries is a party or by which the Borrower, any of its Subsidiaries or their respective property or assets is bound, and (d) will not violate or conflict with any laws, administrative regulations or rulings or court decrees applicable to the Borrower, any of its Subsidiaries or their respective property, except in the case of sub-clauses (c) and (d), any conflict, breach or violation which would not have a Material Adverse Effect.

### 11.4    Financial Statements

The audited consolidated financial statements of the Borrower and the related notes thereto, as contained in the Offering Circular, were prepared in accordance with U.S. GAAP consistently applied throughout the periods involved, and present fairly the consolidated financial position of the Borrower as at the dates at which they were prepared and the results of the operations and the cash flows of the Borrower in respect of the periods for which they were prepared. The other financial and statistical information and data set forth in the Offering Circular is, in all material respects, accurately presented and prepared on a basis consistent with such financial statements and the books and records of the Borrower and its Subsidiaries. Since the December 31, 2004 financial statements contained in the Offering Circular (a) there has been no material adverse change in the condition (financial or otherwise) or affecting the business, prospects, financial position, or results of operations of the Borrower or the Borrower and its Subsidiaries taken as a whole, whether or not arising from transactions in the ordinary course of business; and (b) neither the Borrower nor any of its Subsidiaries has entered into any transaction or agreement material to the Borrower or to the Borrower and its Subsidiaries taken as a whole, other than in the ordinary course of business.

### 11.5    No Other Debt

The Borrower has no Debt, other than Debt (a) that in the aggregate would not have a Material Adverse Effect, (b) as set forth on the December 31, 2004 consolidated balance sheet of the Borrower or (c) as disclosed in the section entitled "Description of Existing Indebtedness" of the Offering Circular.

A-22

**11.6    [Intentionally left blank]**

**11.7    No Material Proceedings**

Except to the extent disclosed in the section entitled "Business—Legal Proceedings" of the Offering Circular, there are no legal or governmental proceedings pending or, to the best knowledge of the Borrower, threatened before any court, tribunal, arbitration panel or Agency to which the Borrower or any of its Subsidiaries is a party or to which any of the properties of the Borrower or any of its Subsidiaries is subject which, singly or in the aggregate, (a) may prohibit the execution and delivery of this Agreement or the Borrower's compliance with its obligations hereunder, (b) may adversely affect the right and power of the Borrower to enter into this Agreement or (c) could have a Material Adverse Effect.

**11.8    No Violations**

Neither the Borrower nor any of its Subsidiaries (i) is in violation of its respective charter documents, articles of association or by-laws or equivalent constitutive documents; (ii) is in default of any obligation, agreement, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which it is a party or by which it is bound or to which any of its properties or assets is subject; or (iii) is in violation of any law, ordinance, governmental rule, regulation or court decree or licence to which it or its properties or assets may be subject, except in the case of sub-clauses (ii) and (iii) above, such defaults or violations which would not have a Material Adverse Effect.

**11.9    Environmental and Labour Laws**

Neither the Borrower nor any of its Subsidiaries has violated any (a) applicable Ukraine or foreign, including in each instance federal, state or local, law or regulation relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("**Environmental Laws**"); (b) any applicable Ukraine or foreign, including in each instance federal, state or local, law or regulation relating to discrimination in the hiring, promotion or pay of employees; nor (c) any applicable Ukraine or foreign, including in each instance, federal, state or local, wages and hours laws or regulations, which in the case of (a), (b) or (c) above might reasonably be expected to have a Material Adverse Effect. For purposes of this sub-Clause 11.9, the term "foreign" shall include only those jurisdictions in which the Borrower conducts its business or owns or leases property.

There are no costs or liabilities associated with Environmental Laws (including, without limitation, any capital or operating expenditures required for clean-up, closure of properties or compliance with Environmental Laws or any permit, licence or approval, any related constraints on operating activities and any potential liabilities to third parties) which would, singly or in the aggregate, have a Material Adverse Effect.

**11.10    Good and Marketable Title**

Except to the extent disclosed in the sections entitled "Description of Existing Indebtedness" and "Business—Property" of the Offering Circular, or such as are not material to the business, prospects, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, each of the Borrower and its Subsidiaries has good and marketable title, free and clear of all Liens, except Liens for Taxes not yet due and payable, to all property and assets described in the Offering Circular as being owned by it. All leases to which the Borrower or any of its Subsidiaries is a party and which are material to the operations of the Borrower and its Subsidiaries, taken as a whole, are valid and binding and no default has occurred or is continuing thereunder, which might result in a Material Adverse Effect, and the Borrower and its Subsidiaries enjoy peaceful and undisturbed possession under all such leases to which any of them is a party as lessee with such exceptions as do not materially interfere with the use made by the Borrower or such Subsidiary.

**11.11    Permits and Licences**

Except to the extent disclosed in the section entitled "Business—Licenses" of the Offering Circular, each of the Borrower and its Subsidiaries has such permits, licences and authorisations of governmental or regulatory authorities ("**permits**"), including, without limitation, licences issued by the State Committee for Communications and Informatisation, as necessary to own, lease and operate its respective properties and to conduct its business in the regions, which regions are set forth in the section entitled "Business—Licenses" of the Offering Circular except where the failure to have such permits would not have a Material Adverse Effect. Except to the extent disclosed in the sections entitled "Business—Licenses" and "Risk Factors—Failure to fulfill

the terms of our licenses could result in their revocation" of the Offering Circular, each of the Borrower and its Subsidiaries has fulfilled and performed all their material obligations with respect to such permits and no event has occurred which allows, or after notice or lapse of time would allow, revocation or termination thereof or results in any other material impairment of the rights of the holder of any such permit; and, except as disclosed in the sections entitled "Business—Licenses" and "Risk Factors—Failure to fulfill the terms of our licences could result in their revocation" of the Offering Circular, such permits contain no restrictions that have or that the Borrower could reasonably expect to have a Material Adverse Effect.

**11.12  Intellectual Property**

Except to the extent disclosed in the section entitled "Business—Intellectual Property" of the Offering Circular, the Borrower and its Subsidiaries possess the material patents, patent rights, licences, inventions, copyrights, know-how, including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures, trademarks, service marks and trade names employed by them in connection with the business as it is currently being conducted as described in the Offering Circular, and neither the Borrower nor any of its Subsidiaries has received any notice of infringement of or conflict with asserted rights of others with respect to the foregoing which, singly or in the aggregate, if the subject of an unfavourable decision, ruling or finding, could have a Material Adverse Effect.

**11.13  Labour Relations**

No labour strike, dispute, disturbance, lockout, slowdown or stoppage of employees of the Borrower or any of its Subsidiaries currently exists and, to the best knowledge of the Borrower, no such action is threatened or imminent.

**11.14  Adequate Insurance**

The Borrower and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which they are engaged in the jurisdiction where they operate, respectively; the Borrower and each of its Subsidiaries have not been refused any insurance coverage sought or applied for; and the Borrower and each of its Subsidiaries have no reason to believe that they will not be able to renew their existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue their business at a cost that would not have a Material Adverse Effect.

**11.15  Taxes**

To the best knowledge of the Borrower, each of the Borrower and its Subsidiaries has duly filed with the appropriate Taxing Authorities, or has received an extension for filing with respect to, all tax returns, reports and other information required to be filed by it, and each such tax return, report, or other information was, when filed, accurate and complete; and, except as disclosed in the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Income Taxes" of the Offering Circular, each of the Borrower and its Subsidiaries has duly paid, or has made adequate reserves for, all Taxes required to be paid by it and any other assessment, fine or penalty levied against it, and to the best of the Borrower's knowledge, no Tax deficiency is currently asserted against the Borrower or any of its Subsidiaries.

**11.16  No Withholding or Similar Tax**

Except for the deduction and withholding of repatriation tax on Ukrainian source income at the reduced rate of 2%, as set forth in the agreement of 3 July 1995 between Germany and Ukraine for the Avoidance of Double Taxation with respect to Taxes on Income and Capital, under current laws and regulations of Ukraine and Germany and any respective political subdivisions thereof, and based upon the representations of the Lender set forth in sub-Clause 8.6 (*Representations of the Lender*) hereof only to the extent that such representations relate to or otherwise concern the Lender's entitlement under the aforementioned agreement to benefit from such reduced rate of Ukrainian repatriation tax in respect of the payment of interest under this Agreement, all payments of principal and/or interest, Additional Amounts, Tax Indemnity Amounts or any other amounts payable on or in respect of the Loan by the Borrower to the Lender will not be subject to Taxes under laws and regulations of Ukraine, or any political subdivision or Taxing Authority thereof or therein, respectively, and will otherwise be free and clear of any other Tax, duty, withholding or deduction in Germany, Ukraine or any political subdivision or Taxing Authority thereof or therein (provided, however, that the Borrower makes no representation as to any income or similar Tax of Germany (or any Qualifying Jurisdiction) which may be assessed thereon).

**11.17  Not an Investment Company**

Neither the Borrower nor any of its Subsidiaries is and, after giving effect to the Loan and the application of the proceeds thereof will not be, required to register as an "investment company" as defined in the U.S. Investment Company Act of 1940, as amended.

**11.18  Rating**

No Rating Agency (a) has imposed (or has informed the Borrower that it is considering imposing) any condition (financial or otherwise) on the Borrower's retaining any rating assigned to the Borrower or any securities of the Borrower or (b) has indicated to the Borrower that it is considering (i) the downgrading, suspension or withdrawal of, or any review for a possible change that does not indicate the direction of the possible change in, any rating so assigned or (ii) any change in the outlook for any rating of the Borrower, as applicable, or any securities of the Borrower.

**11.19  No Liquidation or Similar Proceedings**

No proceedings have been commenced for the purposes of, and no judgment has been rendered for, the liquidation, bankruptcy or winding-up of the Borrower or any of its Subsidiaries.

**11.20  Certificates**

Each certificate signed by any director or officer of the Borrower and delivered to the Lender or counsel for the Lender on the date of the making of the Loan shall be deemed to be a representation and warranty by the Borrower to the Lender as to the matters covered thereby.

**11.21  *Pari Passu* Obligations**

The obligations of the Borrower under this Agreement will rank at least pari passu in right of payment with all other unsecured and unsubordinated obligations of the Borrower, except as otherwise provided by mandatory provisions of applicable law.

**11.22  No Stamp Taxes**

Under the laws of Ukraine in force at the date hereof, it is not necessary that any stamp, registration (other than a fee payable with respect to the registration of this Agreement with the National Bank of Ukraine) or similar Tax be paid on or in relation to this Agreement.

**11.23  Money Laundering Laws**

To the best knowledge of the Borrower, the operations of the Borrower and its Subsidiaries are and have been conducted at all times in compliance with (i) applicable financial recordkeeping and reporting requirements of the United States Currency and Foreign Transactions Reporting Act of 1970, as amended, (ii) the money laundering statutes of applicable jurisdictions and the applicable rules and regulations thereunder (collectively, "**Money Laundering Laws**") and (iii) no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower or any of its Subsidiaries with respect to Money Laundering Laws is pending.

**11.24  No Events of Default**

No event has occurred or circumstances arisen which would (whether or not with the giving of notice and/or the passage of time and/or the fulfilment of any other requirement) constitute an event described in Clause 15 (*Events of Default*).

**11.25  Repetition**

Each of the representations and warranties in Clause 11 (*Representations and Warranties of the Borrower*) shall be deemed to be repeated by the Borrower on the date of the making of the Loan.

## 12.    REPRESENTATIONS AND WARRANTIES OF THE LENDER

In addition to the representations and warranties set forth in sub-Clause 8.6 (*Representations of the Lender*), the Lender makes the representations and warranties set out in sub-Clause 12.1 (*Status*) to sub-Clause 12.4 (*No Conflicts*), inclusive, and acknowledges that the Borrower has entered into this Agreement in reliance on those representations and warranties.

### 12.1    Status

The Lender is duly incorporated under the laws of Germany and is resident for German taxation purposes in Germany and has full corporate power and authority to enter into this Agreement and any other agreements relating to the Agreed Funding Source, and to undertake and perform the obligations expressed to be assumed by it herein and therein.

### 12.2    Authorisation

Each of this Agreement and each of the Agreed Funding Source Agreements entered into by the Lender has been duly authorised, executed and delivered by the Lender, and is a legal, valid and binding obligation of the Lender, enforceable against the Lender in accordance with its terms, except that the enforcement thereof may be subject to bankruptcy, insolvency, fraudulent conveyance, reorganisation, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles.

### 12.3    Consents and Approvals

All authorisations, consents and approvals required by the Lender for or in connection with the execution of this Agreement and any other agreements relating to the Agreed Funding Source and the performance by the Lender of the obligations expressed to be undertaken in such agreements have been obtained and are in full force and effect.

### 12.4    No Conflicts

The execution of this Agreement and any Agreed Funding Source Agreements to which the Lender is a party and the undertaking and performance by the Lender of the obligations expressed to be assumed by it herein and therein will not conflict with, or result in a breach of or default under, the laws of Germany.

### 12.5    Not an Investment Company

(i)     The Lender is a banking institution organised under the laws of the Federal Republic of Germany and has its registered office at Jürgen-Ponto-Platz 1, D-60301 Frankfurt am Main, Germany, and is registered in the Commercial Register of Amtsgericht, Frankfurt am Main under number HRB14000;

(ii)    The Lender is regulated as a banking institution by the German Financial Supervisory Authority;

(iii)   The Lender is engaged regularly in, and derives a substantial portion of its business from, extending commercial and other types of credit, and accepting demand and other types of deposit, that are customary for commercial banks in the Federal Republic of Germany;

(iv)    The Lender is not operated for the purpose of evading the provisions of the U.S. Investment Company Act of 1940, as amended.

## 13.    FINANCIAL INFORMATION

### 13.1    Delivery

In addition to the Borrower's obligations under sub-Clause 14.13 (*Reports*), the Borrower shall supply or procure to be supplied to the Lender, in sufficient copies as may reasonably be required by the Lender, all such information as it may require in connection with article 18 of the Kreditwesengesetz or as the Luxembourg Stock Exchange (or any other or further stock exchange or stock exchanges or any other relevant authority or authorities on which the instruments issued to the Agreed Funding Source may, from time to time, be listed or admitted to trading) may require in connection with the listing or admittance to trading on such stock exchange or relevant authority of instruments issued to the Agreed Funding Source.

A-26

## 14.    COVENANTS

### 14.1    Compliance Certificate

(a)    The Borrower shall deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements), on or before a date not more than 120 calendar days after the end of each fiscal year of the Borrower, and within 14 days of a request from the Lender (or from the trustee under the Agreed Funding Source Agreements), an Officers' Certificate stating that a review of the activities of the Borrower and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Borrower has kept, observed, performed and fulfilled its obligations under, and complied with the covenants and conditions contained in, this Agreement, and further stating, as to the Officers signing such certificate, that to the best of each of their knowledge the Borrower has kept, observed, performed and fulfilled each and every covenant, and complied with the covenants and conditions contained in this Agreement and is not in default in the performance or observance of any of the terms, provisions and conditions hereof (or, if a Default or Event of Default shall have occurred, describing all such Defaults or Events of Default of which he may have knowledge).

(b)    One of the Officers signing such Officers' Certificate shall be either the Borrower's Chief Executive Officer, Chief Financial Officer or Controller.

(c)    The Borrower shall, so long as the Loan or any other sum owing hereunder remains outstanding, deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements), forthwith upon becoming aware of any Default or Event of Default an Officers' Certificate specifying such Default or Event of Default and the action which the Borrower proposes to take with respect thereto, and, upon receipt of a written request to that effect from the Lender, confirm to the Lender that, save as previously notified to the Lender or as notified in such confirmation, no Default or Event of Default has occurred.

(d)    The Borrower shall deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements), on or before a date not more than 120 days after the end of each fiscal year of the Borrower, a certificate prepared by the Borrower's certified independent accountants stating that a review of the financial activities of the Borrower and its Subsidiaries during the preceding fiscal year has been made, that the Borrower and its Subsidiaries are in compliance with their obligations under sub-Clause 14.6 (*Incurrence of Debt*) and sub-Clause 14.8 (*Restricted Payments*), or, if there is a Default, specifying such Default.

### 14.2    Stay, Extension and Usury Laws

The Borrower covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Agreement; and the Borrower (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Lender (or granted to the party designated as trustee under the Agreed Funding Source Agreements by such Agreed Funding Source Agreements), but shall suffer and permit the execution of every such power as though no such law had been enacted.

### 14.3    Corporate Existence

(a)    Except as provided under sub-Clause 14.11 (*Merger and Sales of Assets*), the Borrower shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and the corporate, partnership or other existence of each Subsidiary of the Borrower in accordance with the respective organisational documents of each Subsidiary and the rights (charter and statutory), licences (including GSM, communication and frequency licences) and franchises of the Borrower and Subsidiaries.

(b)    The Borrower shall as promptly as practicable notify the Lender in writing of any Subsidiary that qualifies as a Significant Subsidiary.

A-27

14.4    Taxes

  The Borrower shall, and shall cause each of its Subsidiaries to, pay prior to delinquency all Taxes, assessments and governmental levies, except as contested in good faith and by appropriate proceedings.

14.5    [Intentionally left blank]

14.6    Incurrence of Debt

  (a) The Borrower shall not create, issue, incur, assume, guarantee or in any manner become directly or indirectly liable with respect to, or otherwise become responsible for (collectively, "incur") any Debt (other than Permitted Debt), including any Acquired Debt, unless the ratio of the Borrower's total outstanding consolidated Debt to annualised Consolidated Cash Flows (as determined by adding the Borrower's Consolidated Cash Flows for the four most recent fiscal quarters) would be no greater than 5.0 to 1.0, determined on a *pro forma* basis after giving *pro forma* effect to such incurrence and the incurrence of any other Debt and any other changes in the Borrower's consolidated Debt since the date of the Borrower's most recently available quarterly or annual consolidated balance sheet and the application of the net proceeds therefrom as if it had occurred on the first date of such quarterly or annual period. The Borrower shall cause its Subsidiaries not to incur any Debt, other than Acquired Debt, provided that, in the case of Acquired Debt, after giving effect to such Acquired Debt and the related acquisition transaction as if the same had occurred at the beginning of the applicable four-quarter period, the Borrower would be permitted to incur at least $1.00 of additional Debt pursuant to the ratio in the previous sentence. Notwithstanding the foregoing, the Borrower and its Subsidiaries may incur Debt of the Borrower or its Subsidiaries outstanding on the date of this Agreement.

  (b) For the purposes of calculating this ratio, any acquisitions that have been made by the Borrower or a Subsidiary of the Borrower, including through mergers or consolidations and including any related financing transactions, during or subsequent to the relevant fiscal quarter or year and on or prior to the date of the calculation of the ratio shall be deemed to have occurred on the first day of the relevant fiscal quarter or year, with the *pro forma* determinations of Consolidated Cash Flows resulting from any such transactions as determined in good faith by the Borrower.

  (c) The accrual of interest, the accretion or amortization of original issue discount and the payment of interest on any Debt in the form of additional Debt with the same terms shall not deemed to be an incurrence of Debt for purposes of this covenant.

14.7    [Intentionally left blank]

14.8    Restricted Payments

  (a) The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

    (1) declare or pay any dividend or make any other payment or distribution on account of the Borrower's or any of its Subsidiaries' Equity Interests or to the direct or indirect holders of the Borrower's or any of its Subsidiaries' Equity Interests in their capacity as such, other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Borrower or payable to the Borrower or one of its wholly-owned Subsidiaries;

    (2) purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Borrower or any of its Subsidiaries (other than any such Equity Interests owned by the Borrower or any or its wholly-owned Subsidiaries);

    (3) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Pari Passu Debt or Debt that is subordinated to the Loan, except a payment of interest or principal at the stated maturity or a scheduled sinking fund or principal installment payment obligation; or

    (4) make any Restricted Investment (all such payments and other actions set forth in sub-clauses (1) through this sub-clause (4) being collectively referred to as "Restricted Payments"),

unless, at the time of and after giving effect to such Restricted Payment:

(i)   no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof; and

(ii)   the Borrower would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Debt pursuant to the test set forth in sub-Clause 14.6(a) (*Incurrence of Debt*) above; and

(iii)   such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Borrower and its Subsidiaries after the date of this Agreement (excluding Restricted Payments permitted by sub-clauses (b)(i) and (ii) below), is less than the sum, without duplication, of

(A)   75% of the Borrower's Consolidated Net Income for the period (taken as one accounting period) from the beginning of the first fiscal quarter commencing after 21 November 2002 to the end of the Borrower's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit), plus

(B)   100% of the aggregate Net Cash Proceeds received by the Borrower since the date hereof as a contribution to its common equity capital or from the issue or sale of Equity Interests of the Borrower (other than Disqualified Stock) or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Borrower that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to one of the Borrower's Subsidiaries), plus

(C)   to the extent that any Restricted Investment that was made after the date of this Agreement is sold for cash or otherwise liquidated or repaid for cash, the lesser of (1) the cash return of capital with respect to such Restricted Investment (less the cost of disposition, if any) and (2) the initial amount of such Restricted Investment.

(b)   So long as no Default has occurred and is continuing or would be caused thereby, the preceding provisions shall not prohibit:

(i)   the redemption, repurchase, retirement, defeasance or other acquisition of any Pari Passu Debt or subordinated Debt of the Borrower or of any Equity Interests of the Borrower or any or its Subsidiaries in exchange for, or out of the Net Cash Proceeds of the substantially concurrent sale (other than to one of the Borrower's Subsidiaries) of, Equity Interests of the Borrower (other than Disqualified Stock); and upon any such event, the amount of any such Net Cash Proceeds that are utilized for any such redemption, repurchase, retirement, defeasance or other acquisition shall be excluded from sub-clause (iii)(B) of sub-clause (a);

(ii)   the defeasance, redemption, repurchase or other acquisition of Pari Passu Debt or subordinated Debt of the Borrower with the Net Cash Proceeds from an incurrence of Permitted Refinancing Indebtedness; and

(iii)   the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Borrower or any of its Subsidiaries (or any of its Subsidiaries') management pursuant to any management equity subscription agreement, employment agreement or stock option agreement, but only to the extent that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests does not exceed S3 million over the term of the Loan.

(c)   The amount of all Restricted Payments (other than cash) shall be the fair market value, on the date of the Restricted Payment, of the asset(s) or securities proposed to be transferred or issued by the Borrower or such Subsidiary, as the case may be, pursuant to the Restricted Payment. The fair

market value of any assets or securities that are required to be valued by this covenant shall be determined by the Borrower's Board of Directors, whose resolution with respect thereto shall be delivered to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements). The Board of Directors' determination must be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of international standing if the fair market value exceeds the equivalent of $1.0 million. Not later than the date of making any Restricted Payment, the Borrower must deliver to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) an Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this "Restricted Payments" covenant were computed, together with a copy of any fairness opinion or appraisal required by this Agreement.

## 14.9 Liens

(a) The Borrower may not create, assume or permit to exist any Lien (other than a Permitted Lien) upon or in respect of any of its property or assets, now owned or hereafter acquired, without effectively providing that this Loan and any other sum owing hereunder shall be directly secured equally and rateably with the obligation or liability secured by such Lien. The Borrower will cause its Subsidiaries not to create, assume or permit to exist any Lien other than Liens of the type described in one of sub-clauses (i) through (viii) of the definition of "Permitted Lien".

(b) This restriction shall not apply to a Lien created to secure Attributable Debt in connection with a Sale and Lease-Back Transaction permitted under sub-Clause 14.10 (*Sale and Lease-Back Transactions*).

## 14.10 Sale and Lease-Back Transactions

(a) The Borrower shall not, and shall cause its Subsidiaries not to, enter into any Sale and Lease-Back Transaction with respect to any of its or their property or assets, now owned or hereafter acquired, unless, after giving effect to the Sale and Lease-Back Transaction, the aggregate amount of all Attributable Debt plus all outstanding secured Debt created, incurred or assumed by the Borrower and its Subsidiaries does not exceed 10% of the book value of the Borrower's total assets, as determined by reference to its most recent quarterly or annual consolidated balance sheet on a *pro forma* basis after giving effect to the incurrence of any Debt and any other changes in its Debt since the date of such balance sheet. For the purposes of this determination, the amount of Debt under any secured credit facility shall be the total amount available to be borrowed under the facility, regardless of the amount at any one time outstanding.

(b) This restriction shall not apply to transactions between the Borrower and one of its Subsidiaries or between such Subsidiaries.

## 14.11 Mergers and Sales of Assets

(a) The Borrower shall not consolidate with or merge into any other Person or convey, transfer, sell or lease its properties and assets substantially as an entirety to any Person, or permit any Person to consolidate with or merge into the Borrower, unless each of the following requirements is met:

(i) the successor or transferee, if other than the Borrower, (i) is a corporation organized and existing under the laws of Ukraine, and (ii) assumes, expressly or by operation of law, the due and punctual payment of all the Borrower's obligations and the performance of all of its other covenants under this Agreement and the Agreed Funding Source Agreements to which the Borrower is a party;

(ii) immediately after giving effect to that transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing;

(iii) on the date of that transaction, after giving pro forma effect to (A) the transaction; (B) any related financing transactions; and (C) the pro forma Consolidated Cash Flows resulting from such transaction, as determined in good faith by the Borrower, in each case as if they had

A-30

occurred at the beginning of the relevant quarterly or annual period, the Borrower's ratio of Debt to Consolidated Cash Flows, calculated as provided in sub-Clause 14.6 (*Incurrence of Debt*), would be no greater than the greater of (x) such ratio immediately prior to the date of such transaction and (y) 5.0 to 1.0; provided, however that this sub-clause (iii) shall not apply in the case of a consolidation or merger by one of the Borrower's Subsidiaries with or into the Borrower or another of its Subsidiaries; and

(iv) the Borrower delivers to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) an Officers' Certificate relating to conditions (i) through (iii) above and an Opinion of Counsel relating to conditions (i) and, with respect to the absence of an Event of Default being caused by such transaction, (ii) above.

(b) Regardless of whether the Borrower is permitted to do so by law, the Borrower shall not transfer, sell or lease any of its GSM 900, GSM 1800, communication or frequency licences, except in a transaction (i) that would be permitted under paragraph (a) above; or (ii) that would not have a material adverse effect on the business, financial condition or results of operations of the Borrower and its Subsidiaries as a whole; or (iii) that consists of the exchange of a licence for another licence with another operator or the cancellation of a licence and its replacement with another licence by the Ukrainian authorities, which other licence is, in each case, in the reasonable judgement of the Borrower's Board of Directors set forth in a resolution, of no less commercial and financial value than the licence for which it was exchanged or which it replaced.

**14.12  Asset Sales**

(a) The Borrower shall not, and shall not permit any of its Subsidiaries to, consummate any Asset Sale, unless:

(i) the consideration received by the Borrower or the Subsidiary, as the case may be, is at least equal to the Fair Market Value of the assets sold or disposed of; and

(ii) at least 75% of the consideration received consists of cash or Cash Equivalents.

(b) The Borrower shall or shall cause the relevant Subsidiary to:

(i) within 360 days of the date the Net Cash Proceeds received by the Borrower or any of its Subsidiaries from an Asset Sale are so received:

(A) apply an amount equal to all such Net Cash Proceeds to permanently repay, prepay or purchase any Pari Passu Debt of the Borrower or of any of its Subsidiaries (other than preferred stock or Debt owed to the Borrower or an Affiliate of the Borrower), provided that in connection with any repayment, prepayment or purchase of Pari Passu Debt pursuant to this sub-clause (A), the Borrower or such Subsidiary shall retire such Pari Passu Debt and shall cause the related commitment (if any) to be permanently reduced in an amount equal to the principal amount so repaid, prepaid or purchased; or

(B) invest an equal amount in assets (including capital stock) of a nature or type that are used or usable in the telecommunications business (or business ancillary to the telecommunications business); and

(ii) apply any Net Cash Proceeds not applied or invested pursuant to sub-clauses (i)(A) or (B) above during such 360 day period ("**Excess Proceeds**") as provided in sub-clause (c) below.

(c) If, as of the first day of any calendar month, the aggregate amount of Excess Proceeds totals at least $3 million (or the equivalent in another currency), the Borrower must thereafter prepay the Loan, in whole or in part, to the extent and in the manner required by sub-Clause 7.4 (*Prepayment in the Event of Asset Sales*).

**14.13  Reports**

(a) The Borrower shall also furnish:

(i) within 120 days after the end of each fiscal year, audited consolidated year-end financial statements prepared in accordance with Applicable GAAP;

A-31

(ii)   within 120 days after the end of each fiscal year, the information described in Item 303 of Regulation S-K under the Securities Act (i.e., Management's Discussion and Analysis of Financial Condition and Results of Operations) with respect to the financial statements described in (i);

(iii)  within 60 days after the end of each of the first three fiscal quarters of each fiscal year, unaudited quarterly consolidated financial statements with respect to such fiscal quarter prepared in accordance with Applicable GAAP; and

(iv)   within 60 days after the end of each of the first three fiscal quarters of each fiscal year, the information described in Item 303 of Regulation S-K under the Securities Act with respect to the financial statements described in (iii).

(b)   The above reports shall be delivered to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements).

(c)   Delivery of such reports, information and documents to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements) pursuant to this sub-Clause 14.13 is for informational purposes only and the Lender's receipt (and receipt by the party designated as trustee under the Agreed Funding Source Agreements) of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder (as to which the Lender (and the party designated as trustee under the Agreed Funding Source Agreements) is entitled to rely exclusively on Officers' Certificates).

**14.14  Transactions with Affiliates**

(a)   The Borrower shall not, and shall not permit any of its Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of the Borrower's or its Subsidiaries' properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance, guarantee with, or for the benefit of, any Affiliate (each, an "affiliate transaction"), unless:

(i)   such affiliate transaction is on terms that are no less favorable to the Borrower or the relevant Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Subsidiary with an unrelated Person; and

(ii)  the Borrower delivers to the Lender (and to the party designated as trustee under the Agreed Funding Source Agreements):

(A)   with respect to any affiliate transaction or series of related affiliate transactions involving aggregate consideration in excess of $1.0 million, a resolution of the Borrower's Board of Directors set forth in an Officers' Certificate certifying that such affiliate transaction complies with this covenant and that such affiliate transaction has been approved by a majority of the members of the Borrower's Board of Directors who are not parties to, or Affiliates of parties to, or who do not otherwise have a direct or indirect legal, monetary or other interest in, such affiliate transaction; and

(B)   with respect to any affiliate transaction or series of related affiliate transactions involving aggregate consideration in excess of $5.0 million, or in excess of $1.0 million if there are no disinterested directors, an opinion as to the fairness to the holders of such affiliate transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of international standing;

provided, that the requirements of this sub-clause (ii) shall not be applicable to a contract entered into by the Borrower or any of its Subsidiaries, on the one hand, and any Affiliate, on the other hand, for the provision of international mobile roaming services if the contract is based on the international standard roaming agreement, as recommended by the GSM Association.

(b)    The following items shall not be deemed to be affiliate transactions and therefore shall not be subject to the provisions of sub-Clause 14.14(a):

    (i)    any employment agreement entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and consistent with the Borrower's past practice or the past practice of such Subsidiary;

    (ii)    transactions between or among the Borrower and/or its wholly-owned Subsidiaries (except if any Affiliate of the Borrower, other than a wholly-owned Subsidiary, is an Affiliate (other than solely as a result of ownership of equity interests of the Borrower) of any wholly-owned Subsidiary that is a party to such transaction);

    (iii)    payment of reasonable directors fees to Persons who are not otherwise Affiliates of the Borrower;

    (iv)    sales of Equity Interests (other than Disqualified Stock) to shareholders of the Borrower and their respective Affiliates;

    (v)    the performance of the transactions contemplated by the Registration Rights Agreement and the Shareholders' Agreement;

    (vi)    the amended and restated Management Services Agreement dated 16 December 2003 between the Borrower and Telenor Consult AS and any amendment to, amendment and restatement of, or supplement to, any such agreements from time to time after the date hereof; provided that such amendment, amendment and restatement or supplement (A) relates to an increase in the number of secondees under such agreements (including a corresponding increase in the compensation and bonus paid in connection with such increase in number of secondees) or (B) does not provide for an increase in the financial obligation of the Borrower in excess of $1 million over the financial obligation currently payable by the Borrower under the terms of the relevant Management Services Agreement in its existing form; and

    (vii)    the entry into any agreement by the Borrower and one or more of its shareholders and/or their respective Affiliates relating to the borrowing of Permitted Debt and the performance of the transactions contemplated thereby.

**14.15  Use of Proceeds of the Loan**

The Borrower shall use the proceeds of the Loan for refinancing indebtedness, capital expenditures on network expansion and general corporate purposes.

**14.16  Payment in U.S. Dollars**

All payment obligations of the Borrower under this Agreement shall be paid in U.S. dollars. The Borrower shall obtain all required approval, consents, licences, registrations and permissions to make and shall make such payment only in U.S. dollars.

**15.    EVENTS OF DEFAULT**

**15.1  Circumstances which Constitute Events of Default**

Each of the following constitutes an "**Event of Default**" with respect to the Loan:

(a)    default in the payment of principal of (or premium, if any, on) the Loan, in the currency and in the manner provided herein, when the same becomes due and payable at maturity, upon acceleration, redemption or otherwise;

(b)    default in the payment of interest or Additional Amounts on the Loan, in the currency and in the manner provided herein, when the same becomes due and payable, and such default continues for a period of 15 calendar days;

(c)  default in the performance or breach of the provisions of this Agreement applicable to a Change of Control, mergers, consolidations and transfers of all or substantially all of the assets of the Borrower or the failure to prepay the Loan in accordance with sub-Clause 7.3 (*Prepayment in the Event of a Change of Control*) or sub-Clause 14.12 (*Asset Sales*) hereof;

(d)  default in the performance of, or breaches of, any covenant or agreement of the Borrower hereunder (other than a breach of a representation or warranty of the Borrower under Clause 11 (*Representations and Warranties of the Borrower*) and other than a default specified in sub-Clause 15.1(a) through 15.1(c) above) and such default or breach continues for a period of 30 consecutive calendar days after written notice by the Lender (or by the party designated as trustee under the Agreed Funding Source Agreements);

(e)  default on any Debt of the Borrower or any of its Subsidiaries with an aggregate principal amount in excess of S5 million (or, to the extent non-U.S. dollar denominated, the U.S. dollar equivalent of such amount as of the date of such default) (i) resulting from the failure to pay principal or interest (in the case of interest default or a default in the payment of principal other than at its Stated Maturity, after the expiration of the originally applicable grace period) in an aggregate amount in excess of S5 million (or, to the extent non-U.S. dollar denominated, the U.S. dollar equivalent of such amount as of the date of such default) when due or (ii) as a result of which the maturity of such Debt has been accelerated prior to its Stated Maturity;

(f)  any judgment or order for the payment of money shall be made against the Borrower and/or any of its Subsidiaries, resulting in the aggregate amount of all such judgments or orders which have entered into effect (except those the execution of which has been stayed or suspended, by reason of a pending appeal or otherwise, in accordance with applicable legislation) exceeding S10 million (or, to the extent non-U.S. dollar denominated, the U.S. dollar equivalent of such amount), and such excess shall continue for 60 consecutive calendar days or longer;

(g)  the suspension for more than 30 days or loss of any of the Borrower's GSM 900, GSM 1800, communication or frequency licences other than in the event of the Borrower's merger or consolidation or the sale of the Borrower's assets and properties substantially as a whole in a transaction permitted under sub-Clause 14.11(a) (*Mergers and Sales of Assets*), a loss where a new licence is issued within 30 days to the Borrower, the successor or transferee corporation, or any of the Borrower's or such successor's or transferee's Subsidiaries or which would not have a Material Adverse Effect;

(h)  the reassignment to other users (other than one of the Borrower's Subsidiaries), cancellation or other loss of any of the Borrower's assigned spectrum allocations, except as would not have a Material Adverse Effect;

(i)  the express transfer, sale or lease of any of the Borrower's GSM 900, GSM 1800, communication or frequency licences, regardless of whether such transfer, sale or lease is permitted by law, other than in a merger, consolidation, transfer, sale or lease permitted under sub-Clause 14.11(a) or (b) (*Mergers and Sales of Assets*) or that would not have a Material Adverse Effect;

(j)  any regulation, decree, consent, approval, licence or other authority necessary to enable the Borrower to enter into or perform its obligations under this Agreement or for the validity or enforceability thereof shall expire or be withheld, revoked or terminated or otherwise cease to remain in full force and effect or shall be modified in a manner which adversely affects any rights or claims of the Lender (or of the party designated as trustee under the Agreed Funding Source Agreements);

(k)  the validity of this Agreement is contested by the Borrower or the Borrower shall deny any of its obligations under this Agreement; or it is, or will become, unlawful for the Borrower to perform or comply with any of its obligations under or in respect of this Agreement or any of such obligations shall become unenforceable or cease to be legal, valid and binding;

(l)  a decree, judgment or order by any Agency or a court of competent jurisdiction shall have been entered adjudging the Borrower or any of its Significant Subsidiaries as bankrupt or insolvent, or approving as properly filed a petition seeking reorganisation of the Borrower or any of its

Significant Subsidiaries under any bankruptcy or similar law, and such decree or order shall have continued undischarged and unstayed for a period of 60 days; or a decree or order of a court of competent jurisdiction over the appointment of a receiver, liquidator, trustee, or assignee in bankruptcy or insolvency of the Borrower or any of its Significant Subsidiaries, or any substantial part of the assets or property of any such Person, or for the winding up or liquidation of the affairs of any such Person, shall have been entered, and such decree, judgment or order shall have remained in force undischarged and unstayed for a period of 60 days; or

(m)     the Borrower or any of its Significant Subsidiaries shall institute proceedings to be adjudicated a voluntary bankrupt, or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganisation under any bankruptcy or similar law or similar statute, or shall consent to the filing of any such petition, or shall consent to the appointment of a custodian, receiver, liquidator, trustee or assignee in bankruptcy or insolvency of it or any substantial part of its assets or property, or shall make a general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall, within the meaning of any bankruptcy law, become insolvent, fail generally to pay its debts as they become due, or take any corporate action in furtherance of or to facilitate, conditionally or otherwise, any of the foregoing.

**15.2    Rights of Lender upon Occurrence of an Event of Default**

(a)     If an Event of Default occurs under this Agreement and is continuing, the Lender (if it receives instructions from the party designated as trustee of the Agreed Funding Source in accordance with the provisions of the Agreed Funding Source Agreements) and/or the party designated as trustee of the Agreed Funding Source in accordance with the terms of the Agreed Funding Source Agreements may, by written notice (an "**Acceleration Notice**") to the Borrower,

(i)     declare the obligations of the Lender hereunder to be terminated, whereupon such obligations shall terminate, and

(ii)    declare the principal amount of, premium, if any, and accrued and unpaid interest, Additional Amounts and Tax Indemnity Amounts, if any, on the Loan to be immediately due and payable and the same shall become immediately due and payable,

pursuant to and in accordance with the terms of the Agreed Funding Source Agreements.

(b)     If an Event of Default specified in sub-Clause 15.1(l) or (m) occurs with respect to the Borrower, the obligations of the Lender hereunder shall immediately terminate, and the principal amount of, premium, if any, and accrued and unpaid interest, Additional Amounts and Tax Indemnity Amounts, if any, on the Loan then outstanding shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Lender (or on the part of the party designated as trustee under the Agreed Funding Source Agreements), all without diligence, presentment, demand of payment, protest or notice of any kind, which are expressly waived by the Borrower.

**15.3    Other Remedies**

If an Event of Default occurs and is continuing, the Lender (and the party designated as trustee under the Agreed Funding Source Agreements) may pursue any available remedy to collect the payment of principal or interest on the Loan or to enforce the performance of any provision of the Loan or this Agreement. A delay or omission by the Lender (or the party designated as trustee under the Agreed Funding Source Agreements) in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

**16.     DEFAULT INTEREST AND INDEMNITY**

**16.1    Default Interest Periods**

If any sum due and payable by the Borrower hereunder is not paid on the due date therefore in accordance with the provisions of Clause 19 (*Payments*) or if any sum due and payable by the Borrower under any judgment of any court in connection herewith is not paid on the date of such judgment, the period beginning on such due date or, as the case may be, the date of such judgment and ending on the date upon which the obligation of the

Borrower to pay such sum (the balance thereof for the time being unpaid being herein referred to as an "**unpaid sum**") is discharged shall be divided into successive periods, each of which, other than the first, shall start on the last day of the preceding such period and the duration of each of which shall, except as otherwise provided in this Clause 16 (*Default Interest and Indemnity*), be selected by the Lender, but shall in any event not be longer than one month.

**16.2    Default Interest**

During each such period relating thereto as is mentioned in sub-Clause 16.1 (*Default Interest Periods*) an unpaid sum shall bear interest at a rate per annum equal to the Interest Rate.

**16.3    Payment of Default Interest**

Any interest which shall have accrued under sub-Clause 16.2 (*Default Interest*) in respect of an unpaid sum shall be due and payable and shall be paid by the Borrower at the end of the period by reference to which it is calculated or on such other dates as the Lender may specify by written notice to the Borrower.

**16.4    Borrower's Indemnity**

The Borrower undertakes to indemnify the Lender against any reasonably incurred and properly documented cost, claim, loss, expense (including legal fees) or liability, together with any VAT thereon, which it may sustain or incur as a consequence of the occurrence of any Event of Default or any default by the Borrower in the performance of any of the obligations expressed to be assumed by it in this Agreement.

**16.5    Unpaid Sums as Advances**

Any unpaid sum shall, for the purposes of this Clause 16 (*Default Interest and Indemnity*) and sub-Clause 10.1 (*Increased Costs*), be treated as an advance and accordingly in this Clause 16 (*Default Interest and Indemnity*) and sub-Clause 10.1 (*Increased Costs*) the term "Loan" includes any unpaid sum and the term "Interest Period", in relation to an unpaid sum, includes each such period relating thereto as is mentioned in sub-Clause 16.1 (*Default Interest Periods*).

**17.    AMENDMENTS TO AGREED FUNDING SOURCE AGREEMENTS**

Any amendment to, or waivers of any provision of, the Agreed Funding Source Agreements shall be prohibited without the prior express written consent of the Borrower, which consent shall not be unreasonably withheld (other than amendments or waivers that are made pursuant to any legal, regulatory or accounting requirements, with respect to which the Lender shall consult with the Borrower to the extent reasonably practicable).

**18.    CURRENCY OF ACCOUNT AND CURRENCY INDEMNITY**

**18.1    Currency of Account**

The U.S. dollar is the currency of account and payment for each and every sum at any time due from the Borrower hereunder.

**18.2    Currency Indemnity**

If any sum due from the Borrower under this Agreement or any order or judgment given or made in relation hereto has to be converted from the currency (the "**first currency**") in which the same is payable hereunder or under such order or judgment into another currency (the "**second currency**") for the purpose of (a) making or filing a claim or proof against the Borrower, (b) obtaining an order or judgment in any court or other tribunal or (c) enforcing any order or judgment given or made in relation hereto, the Borrower shall indemnify and hold harmless the Lender from and against any loss suffered or reasonably incurred as a result of any discrepancy between (i) the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and (ii) the rate or rates of exchange at which the Lender may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.

19.    PAYMENTS

19.1    Payments to the Lender

On each date on which this Agreement requires an amount denominated in U.S. dollars to be paid by the Borrower, the Borrower shall make the same available to the Lender by payment in U.S. dollars and in same day funds on such date, or in such other funds as may for the time being be customary in London for the settlement in London of international banking transactions in U.S. dollars, to the Account. The Borrower shall procure that the bank effecting payment on its behalf confirms to the Lender, or to such Person as the Lender may direct, by tested telex or authenticated SWIFT message three Business Days prior to the date that such payment is required to be made by this Agreement, the payment instructions relating to such payment.

19.2    Alternative Payment Arrangements

If, at any time, it shall become impracticable, by reason of any action of any governmental authority or any Change of Law, exchange control regulations or any similar event, for the Borrower to make any payments hereunder in the manner specified in sub-Clause 19.1 (*Payments to the Lender*). then the Borrower may agree with the Lender alternative arrangements for such payments to be made; provided that, in the absence of any such agreement, the Borrower shall be obliged to make all payments due to the Lender in the manner specified herein.

19.3    No Set-off

All payments required to be made by the Borrower hereunder shall be calculated without reference to any set-off or counterclaim and shall be made free and clear of and without any deduction for or on account of any set-off or counterclaim.

20.    FEES, COSTS AND EXPENSES

20.1    Costs relating to Preservation of Rights

The Borrower shall, from time to time on demand of the Lender, reimburse the Lender for all costs and expenses (including legal fees) together with any VAT incurred in or in connection with the preservation or the enforcement of any of the rights of the Lender under this Agreement.

20.2    Taxes

The Borrower shall pay all stamp, registration and other taxes to which this Agreement or any judgment given in connection with this Agreement is or at any time may be subject and shall, from time to time on demand of the Lender, indemnify the Lender against any liabilities, costs, claims and expenses resulting from any failure to pay or any delay in paying any such tax.

20.3    Costs relating to Amendments and Waivers

The Borrower shall, from time to time on demand of the Lender (and without prejudice to the provisions of sub-Clause 20.1 (*Costs relating to Preservation of Rights*)) (and the party designated as trustee under the Agreed Funding Source Agreements) compensate the Lender (and, as the case may be, such trustee) at such daily and/or hourly rates as the Lender (or, as the case may be, such trustee) shall from time to time reasonably determine for all time expended by the Lender (or, as the case may be, such trustee), their respective directors, officers and employees, and for all costs and expenses (including telephone, fax, copying, travel and personnel costs) they may incur, in connection with the Lender (and, as the case may be, such trustee) taking such action as it may consider appropriate in connection with:

(a)    the granting or proposed granting of any waiver or consent requested under this Agreement by the Borrower;

(b)    any actual, potential or suspected breach by the Borrower of any of its obligations under this Agreement;

(c)    the occurrence of any event which is an Event of Default or a potential Event of Default; or

(d)    any amendment or proposed amendment to this Agreement requested by the Borrower.

**20.4    Lender's Costs**

The Borrower shall, from time to time on demand of the Lender, and without prejudice to the provisions of sub-Clause 20.3 (*Costs Relating to Amendments and Waivers*), compensate the Lender at such daily and/or hourly rates as the Lender shall from time to time reasonably determine for the time and expenditure, all costs and expenses (including telephone, fax, copying, travel and personnel costs) reasonably incurred and properly documented by the Lender in connection with its taking such action as it may deem appropriate or in complying with any request by the Borrower in connection with:

(a)    the granting or proposed granting of any waiver or consent requested hereunder by the Borrower;

(b)    any actual breach by the Borrower of its obligations hereunder; or

(c)    any amendment or proposed amendment hereto requested by the Borrower.

**21.    ASSIGNMENTS AND TRANSFERS**

**21.1    Binding Agreement**

This Agreement shall be binding upon and inure to the benefit of each party hereto and its or any subsequent successors and assigns.

**21.2    No Assignments and Transfers by the Borrower**

The Borrower shall not be entitled to assign or transfer all or any of its rights, benefits and obligations hereunder except as permitted under sub-Clause 14.11 (*Mergers and Sales of Assets*).

**21.3    Assignments by the Lender**

(a)    Prior to an Event of Default, the Lender may (i) on or at any time after the date hereof assign all or any of its rights and benefits hereunder or transfer all or any of its rights, benefits and obligations hereunder (save for (x) its rights to principal, interest and other amounts paid and payable under this Agreement and (y) its right to receive amounts paid and payable under any claim, award or judgment relating to this Agreement in favour of the Agreed Funding Source, which rights may, however, be charged in favour of the Agreed Funding Source or any trustee on behalf of the Agreed Funding Source) to or on behalf of (including, for the avoidance of doubt, any trustee on behalf of) the Agreed Funding Source and (ii) subject to the prior written consent of the Borrower (such consent not to be unreasonably withheld or delayed) and except as may be otherwise specifically provided under the Agreed Funding Source Agreements, assign all or any of its rights and benefits hereunder or transfer all or any of its rights, benefits and obligations hereunder to any company which, as a result of any amalgamation, merger or reconstruction or which, as a result of any agreement with the Lender, or any previous substitute, owns beneficially the whole or substantially the whole of the undertaking, property and assets owned by the Lender prior to such amalgamation, merger, reconstruction or agreement coming into force and where, in the case of any company which will own the whole or substantially the whole of the undertaking, property or assets of the Lender, the substitution of that company as principal debtor in relation to the Agreed Funding Source would not be materially prejudicial to the interests of the Agreed Funding Source or the Borrower. Any reference in this agreement to any such assignee or transferee pursuant to sub-clause (ii) of this sub-Clause 21.3(a) shall be construed accordingly and, in particular, references to the rights, benefits and obligations hereunder of the Lender, following such assignment or transfer, shall be references to such rights, benefits or obligations by the assignee or transferee.

(b)    On or following an Event of Default, the Lender may, by notice to the Borrower, assign all or any of its rights and benefits hereunder or transfer all or any of its rights, benefits and obligations hereunder to the Agreed Funding Source, or any assignee or transferee appointed in connection with the Agreed Funding Source. Any reference in this agreement to any such assignee or transferee shall be construed accordingly and, in particular, references to the rights, benefits and obligations hereunder of the Lender, following such assignment or transfer, shall be references to such rights, benefits or obligations by the assignee or transferee appointed in connection with the Agreed Funding Source.

## 22.    CALCULATIONS AND EVIDENCE OF DEBT

### 22.1    Basis of Accrual of Interest

Interest shall accrue from day to day and shall be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each.

### 22.2    Evidence of Debt

The Lender shall maintain, in accordance with its usual practice, accounts evidencing the amounts from time to time lent by and owing to it hereunder; in any legal action or proceeding arising out of or in connection with this Agreement, in the absence of manifest error and subject to the provision by the Lender to the Borrower of written information describing in reasonable detail the calculation or computation of such amounts together with the relevant supporting documents evidencing the matters described therein, the entries made in such accounts shall be conclusive evidence of the existence and amounts of the obligations off the Borrower therein recorded.

### 22.3    Change of Circumstance Certificates

A certificate signed by two authorised signatories of the Lender describing in reasonable detail (a) the amount by which a sum payable to it hereunder is to be increased under sub-Clause 8.1 (*Additional Amounts*) or (b) the amount for the time being required to indemnify it against any such cost, payment or liability as is mentioned in sub-Clause 8.3 (*Tax Indemnity*) or sub-Clause 10.1 (*Increased Costs*) shall, in the absence of manifest error, be prima facie evidence of the existence and amounts of the specified obligations of the Borrower.

## 23.    REMEDIES AND WAIVERS, PARTIAL INVALIDITY

### 23.1    Remedies and Waivers

No failure by the Lender to exercise, nor any delay by the Lender in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

### 23.2    Partial Invalidity

If, at any time, any provision hereof is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

## 24.    NOTICES; LANGUAGE

### 24.1    Communications in Writing

Each communication to be made hereunder shall be made in writing and, unless otherwise stated, shall be made by fax, telex, or letter addressed as follows:

if to the Borrower:

> Closed Joint Stock Company "KYIVSTAR G.S.M."
> 51 Chervonozorianyi Avenue
> Kyiv
> 03110 Ukraine
> Fax number: +380 44 270 3877
> Attention: Chief Financial Officer

with a copy (which shall not constitute notice) to:

> Gibson Dunn & Crutcher LLP
> Telephone House, 2-4 Temple Avenue
> London EC4Y 0HB
> England
> Fax number: +44 20 7071 4244
> Attention: J. Alan Bannister/Benjamin C. Adams

if to the Lender:

> Dresdner Bank Aktiengesellschaft
> Jürgen-Ponto-Platz 1
> D-60301 Frankfurt am Main
> Germany
> Fax number: +49 69 713 25001
> Attention: EG Flow Business Debt

with a copy (which shall not constitute notice) to:

> Baker & McKenzie
> 100 New Bridge Street
> London EC4V 6JA
> England
> Fax number: + 44 20 7919 1999
> Attention: Chris Hogan/Carter Brod

**24.2    Delivery**

Any communication or document to be made or delivered by one Person to another pursuant to this Agreement shall, unless that other Person has by 15 calendar days' written notice to the same specified another address, be made or delivered to that other Person at the address identified with its signature below and shall be effective upon receipt by the sender of the addressee's answerback at the end of transmission (in the case of a telex) or when left at that address (in the case of a letter) or when received by the addressee (in the case of a fax); provided that any communication or document to be made or delivered by one party to the other party shall be effective only when received by such other party and then only if the same is expressly marked for the attention of the department or officer identified with the such other party's signature below, or such other department or officer as such other party shall from time to time specify for this purpose.

**24.3    Language**

THIS AGREEMENT HAS BEEN SET FORTH AND SIGNED IN BOTH ENGLISH AND UKRAINIAN, PROVIDED, HOWEVER, THAT IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY OR IN CASE OF DOUBT AS TO THE PROPER INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT THE ENGLISH TEXT SHALL BE CONTROLLING. Each communication and document made or delivered by one party to another pursuant to this Agreement shall be in the English language or accompanied by a translation thereof into English certified by an officer of the Person making or delivering the same as being a true and accurate translation thereof.

**25.    LAW AND JURISDICTION**

**25.1    English Law**

This Agreement is governed by, and shall be construed in accordance with, English law.

**25.2    English Courts**

Each of the Lender and the Borrower agrees that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings, and to settle any disputes, which arise out of or in connection with this Agreement ("**Proceedings**") and, for such purposes, irrevocably submits to the jurisdiction of such courts.

A-40

**25.3    Appropriate Forum**

Each of the Lender and the Borrower irrevocably waives any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and to settle any Disputes, and agrees not to claim that any such court is not a convenient or appropriate forum.

**25.4    Service of Process**

The Lender and the Borrower agree that the process by which any Proceedings in England are begun may be served on them by being delivered to Dresdner Bank AG at Riverbank House, 2 Swan Lane, London EC4R 3UX and Closed Joint Stock Company "KYIVSTAR G.S.M.", respectively, or their registered offices for the time being. If any such Person mentioned in this sub-Clause is not or ceases to be effectively appointed to accept service of process on the Lender's behalf, the Lender shall immediately appoint a further Person in England to accept service of process on its behalf. If such Person mentioned in this sub-Clause 25.4 is not or ceases to be effectively appointed to accept service of process on the Borrower's behalf, the Borrower shall immediately appoint a further Person in England to accept service of process on its behalf. Nothing in this sub-Clause shall affect the right of either party hereto to serve process in any other manner permitted by law.

**25.5    Non-exclusivity**

The submission to the jurisdiction of the English courts in accordance with sub-Clause 25.2 (*English Courts*) hereof shall not, and shall not be construed so as to, limit the right of any party hereto to take Proceedings in any other court of competent jurisdiction.

**25.6    Consent to Enforcement, etc.**

Each of the Lender and the Borrower consents generally in respect of any Proceedings to the giving of any relief or the issue of any process in connection with such Proceedings including, without limitation, the making, enforcement or execution against any property whatsoever, irrespective of its use or intended use, of any order or judgment which is made or given in such Proceedings.

**25.7    Arbitration**

If any dispute or difference of whatever nature howsoever arises from or in connection with this Agreement, or any supplement, modifications or additions thereto (each a "**Dispute**"), the Lender may elect, by notice to the Borrower, to settle such claim by arbitration in accordance with the following provisions. The Borrower hereby agrees that (regardless of the nature of the Dispute) any Dispute may be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "**Rules**") as at present in force by a panel of three arbitrators appointed in accordance with the Rules. The seat of arbitration shall be London, England. The procedural law of arbitration shall be English law. The language of any arbitral proceedings shall be English.

**25.8    Contracts (Rights of Third Parties) Act 1999**

A Person who is not a party to this Agreement has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement, but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

**25.9    Counterparts**

This Agreement may be signed in two or more counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

**AS WITNESS** the hands of the duly authorized representatives of the parties hereto the day and year first before written.



Dresdner Bank Aktiengesellschaft
Theodor-Heuss-Allee 44-46
D-60486 Frankfurt am Main
Germany

Attention: EG Debt Transaction

Fax: 0049 69 713 25002

19 March 2007

**DRESDNER BANK AKTIENGESELLSCHAFT**
**7.75% Loan Participation Notes due 2012 (the "2012 Notes") and 10.375 % Notes due 2009 (the "2009 Notes" and, together with the 2012 Notes, the "Notes") issued for the purpose of funding loans to**
**CLOSED JOINT STOCK COMPANY KYIVSTAR GSM ("Kyivstar")**

Dear Sirs,

Reference is made to the respective loan agreements related to the respective Notes referred to above. We hereby notify you, and request that you notify holders of the Notes, that Kyivstar has been served with an injunction issued by the Kyiv City Commercial Court upon the application of a subsidiary of the Alfa Group, one of the two principal shareholder groups of Kyivstar. Subsidiaries of Telenor S.A. comprise the other principal shareholder group of Kyivstar. Pursuant to the court order, Kyivstar has been enjoined from making available, to any third party in any way whatsoever, any financial or other reports or any information relating to the financial or business activities of Kyivstar. This injunction, which may remain effective until the dispute is resolved, follows another recent injunction obtained by the Alfa Group subsidiary to prevent Kyivstar from entering into any audit services agreements and from re-appointing its independent auditor on the grounds that the Kyivstar Board of Directors had not approved the re-appointment. In order to convene a Board meeting, the attendance by representatives of both shareholder groups is required, and recently, the Alfa Group representatives have not attended Board meetings at which such appointment could be approved.

As a result of these injunctions, Kyivstar currently believes that it may not be able to comply with the covenants relating to the outstanding Notes under which it is obligated to deliver certain annual and quarterly financial information.

Kyivstar is currently undertaking all reasonable measures to resolve the situation

Respectfully,

CLOSED JOINT STOCK COMPANY "KYIVSTAR" G.S.M.

By: _____

Name:  Igor LytovchenkoTitle:
President and Chief Executive Officer

Legal address:
51, Chervonozoryanyi Av., Kyiv, 03110
tel.: +380 44 209 00 70
fax: +380 44 232 21 84
www.kyivstar.net
wap.starport.com.

Correspondence address:
53, Degtyarivska St., Kyiv, 03113
tel.: +380 44 209 00 70
fax: +380 44 232 21 84
www.kyivstar.net ua
wap.starport.com.ua

Customer care:
24, Sichnevoro Povstannya St.,
Kyiv, 01010
tel.: + 380 44 466 0 466
www.kyivstar.net
wap.starport.com.ua

**Dresdner Bank Aktiengesellschaft**
Frankfurt am Main

**U.S.$266,420,000**
**10.375 per cent Loan Participation Notes due 2009**
**issued by, but without recourse to, Dresdner Bank Aktiengesellschaft**
**for the purpose of funding an U.S.$266,420,000 loan to**
**Closed Joint Stock Company "KYIVSTAR G.S.M."**

**CUSIP for the Rule 144A Notes: 50154MAB6**
**ISIN for the Rule 144A Notes: US50154MAB63**
**ISIN for the Regulation S Notes: XS0198267320**

**(the "2009 Notes")**

**U.S.$175,000,000**
**7.75 per cent Loan Participation Notes due 2012**
**issued by, but without recourse to, Dresdner Bank Aktiengesellschaft**
**for the purpose of funding an U.S.$175,000,000 loan to**
**Closed Joint Stock Company "KYIVSTAR G.S.M."**

**CUSIP for the Rule 144A Notes: 261561AC8**
**ISIN for the Rule 144A Notes: US261561AC88**
**ISIN for the Regulation S Notes: XS0217919462**

**(the "2012 Notes" and together with the 2009 Notes, the "Notes")**

Notice is hereby given to the holders of the Notes that Closed Joint Stock Company "KYIVSTAR G.S.M." ("Kiyvstar") as Borrower under the respective loan agreements relating to the loans funded by the 2009 Notes and the 2012 Notes has notified Dresdner Bank Aktiengesellschaft in its capacity as Lender by way of a letter dated 19 March 2007 as follows:

"Kyivstar has been served with an injunction issued by the Kyiv City Commercial Court upon the application of a subsidiary of the Alfa Group, one of the two principal shareholder groups of Kyivstar. Subsidiaries of Telenor S.A. comprise the other principal shareholder group of Kyivstar. Pursuant to the court order, Kyivstar has been enjoined from making available, to any third party in any way whatsoever, any financial or other reports or any information relating to the financial or business activities of Kyivstar. This injunction, which may remain effective until the dispute is resolved, follows another recent injunction obtained by the Alfa Group subsidiary to prevent Kyivstar from entering into any audit services agreements and from re-appointing its independent auditor on the grounds that the Kyivstar Board of Directors had not approved the re-appointment. In order to convene a Board meeting, the

attendance by representatives of both shareholder groups is required, and recently, the Alfa Group representatives have not attended Board meetings at which such appointment could be approved.

As a result of these injunctions, Kyivstar currently believes that it may not be able to comply with the covenants relating to the outstanding Notes under which it is obligated to deliver certain annual and quarterly financial information.

Kyivstar is currently undertaking all reasonable measures to resolve this situation."

The listing agent and Luxembourg paying and transfer agent of the above Notes is Dexia Banque Internationale à Luxembourg, société anonyme, 69 route dÈsch, L1470 Luxembourg.

*This notice has been issued by Dresdner Bank Aktiengesellschaft at the request of Closed Joint Stock Company "KYIVSTAR G.S.M." However, Dresdner Bank Aktiengesellschaft has not itself verified the accuracy and completeness of the above information provided to it by Closed Joint Stock Company "KYIVSTAR G.S.M." Accordingly, no representation or warranty, express or implied, is made by Dresdner Bank Aktiengesellschaft or any of its affiliates or any person acting on their behalf as to the accuracy or completeness of this information.*

Frankfurt am Main, 19 March 2007

Dresdner Bank Aktiengesellschaft
Jürgen-Ponto-Platz 1
60301 Frankfurt am Main

Germany



telenor

| About Telenor | Press centre | Investor Relations | Corporate responsibility | Career centre |

**Press releases**

Subscribe

Archive

Press and media contacts

Image gallery

Telektronikk

## Press releases

*Telenor, 21 march, 2007*

### Accounting treatment of Kyivstar in the 2006 Annual Report

(Fornebu/Norway, 21 March 2007) Telenor's Board of Directors today decided to deconsolidate Kyivstar and to present Telenor's interests in the company in one line, as an investment in the 2006 Annual Report. Telenor owns 56.5 per cent of Kyivstar. The Board will next week consider Telenor's 2006 Annual Report in its entirety.

The Alfa Group affiliate Storm LLC, owning 43.5 per cent of Kyivstar, has persistently boycotted Kyivstar's shareholder and Board meetings for the past two years. As a result, there has not been a valid quorum at either shareholder meetings or Board meetings in Kyivstar for the whole of 2006. Telenor has nevertheless remained in control of the operations in Kyivstar throughout the period up to 29 December 2006.

Alfa Group affiliates, Storm and Alpren, commenced legal actions in Ukrainian courts in late December 2006 and in January and February 2007 disputing Kyivstar's authority to appoint auditors. These actions have led to injunctions purporting to prohibit Kyivstar's management from providing financial information to Kyivstar's international auditors and shareholders, including Telenor. The injunctions also purport to prohibit the use of financial information already provided by Kyivstar, and to prohibit Kyivstar and Telenor's auditors from carrying out any audit work in relation to Kyivstar's year-end IFRS financial statements. A third injunction purports to prohibit Kyivstar from disseminating any financial information that has not been approved by Kyivstar's board or shareholders, and to prohibit anyone from using any such financial information in their consolidated accounts.

Telenor is contesting these actions in the context of its ongoing arbitration proceedings in New York, as well as, to the extent permitted by the Kyivstar shareholders agreement, by seeking alternative legal redress.

Although Telenor is attempting to remedy the situation, the injunctions at present prevent Telenor from controlling or exercising significant influence over Kyivstar. Accordingly, Telenor's Board of Directors has decided to temporarily deconsolidate Kyivstar in Telenor's accounts with effect from 29 December 2006, and present the majority stake in one line as an investment. Kyivstar has been consolidated in the income statement up to 29 December 2006. Telenor's auditor has informed Telenor that, since they have been prevented from

carrying out audit work in relation to Kyivstar's year-end financial information, their audit report for the Telenor Group will contain a scope limitation in respect to Kyivstar's financial information. The entire Annual Report for 2006 will be considered by the Board of Directors next week.

**Adjustment of outlook 2007:**

Assuming that Kyivstar is reported as a deconsolidated operation throughout 2007, we expect reported revenue growth of 0-5 per cent, a reported EBITDA margin before other income and expenses of around 32 per cent and CAPEX/Sales at around 20 per cent.

The reason for lowering the revenue and EBITDA expectations is that Kyivstar is included in the 2006 numbers but not included in the outlook for 2007. For 2006, Kyivstar reported revenues of NOK 10 956 million and an EBITDA margin of 59.5 per cent.

When adjusting for Kyivstar numbers in 2006, the revenue growth is expected to be 15-20%.

For further details related to the outlook for 2007, see Telenor's Q4 report.

**Conference call**
There will be a conference call today, Wednesday 21 March at 18:00 CET . The call will be conducted in English. Participants will be given the opportunity to ask questions after a short introduction by CFO Trond Westlie.

To participate in the conference call, please register well in advance by calling (+47) 800 80 119 (from Norway) or (+47) 23 00 04 00 (from Norway or abroad).

**Contact:**

Media:
Dag Melgaard, Vice President, Corporate Communications, tel +47 901 92 000
Email: dag.melgaard@telenor.com

TELN Summary for TELENOR ASA ADS - Yahoo! Finance

Case 1:06-cv-13157-GEL-AS Document 61-12 Filed 04/16/2007 Page 1 of 1

Page 1 of 2

Yahoo!  ·  My Yahoo!  ·  Mail  ·  More    New Make Y! your home page! Sign In · Help



**YAHOO! FINANCE**    Web Search

Dow ⬆ 1.27%  Nasdaq ⬆ 1.68%              Wednesday, March 21, 2007, 3:45PM ET - U.S. Mark

---

Enter Symbol(s)    [ GET QUOTES ]    Symbol Lookup    Finance Search

# Telenor ASA (TELN)

At 3:29PM ET: **54.34**






Streaming Quotes:  ?

**TELENOR ASA ADS** (NasdaqGS:TELN) Delayed quote data                    [Edit]

| | | | |
|---|---|---|---|
| Last Trade: | **54.34** | Day's Range: | 51.58 - 57.47 |
| Trade Time: | 3:29PM ET | 52wk Range: | 32.26 - 65.75 |
| Change: | ⬇ 3.41 (5.90%) | Volume: | 325,153 |
| Prev Close: | 57.75 | Avg Vol (3m): | 107,575 |
| Open: | 57.30 | Market Cap: | 30.44B |
| Bid: | 54.35 x 300 | P/E (ttm): | 11.79 |
| Ask: | 54.41 x 200 | EPS (ttm): | 4.61 |
| 1y Target Est: | 67.25 | Div & Yield: | N/A (N/A) |

New! Try our new Charts in Beta
TELN 21-Mar 3:24pm (C)Yahoo!

1d 5d 3m 6m 1y 2y 5y max

Market Updates Hourly from Fox
Business Now. Watch.

NEW Add Quotes to Your Web Site    ✉ Add TELN to Portfolio  ⚲ Set Alert  ⬇ Download Data

We can no longer offer real-time ECN data due to pricing changes by the exchanges. For real-time quotes (including real-time pre/post market data), sign up for a free trial of Real-time Quotes.

**HEADLINES**    Change Display [ hide $$  edit ]

- UPDATE - Telenor cuts 2007 outlook due to Kyivstar row
  **at Reuters** (Wed 2:54pm)
- Kyivstar may not meet eurobond convenants - Telenor
  **at Reuters** (Wed 2:00pm)
- Telenor says Kyivstar operations unhurt by row
  **at Reuters** (Wed 1:38pm)
- [SS] Malaysia Telecom Licensing Shuns Big Firms
  **at The Wall Street Journal Online** (Sun, Mar 18)
- [SS] Nordic Telecoms Place Bets On Broadband TV Service
  **at The Wall Street Journal Online** (Tue, Mar 13)
- [SS] Telenor Says Russian Foe Has Run Smear Campaign
  **at The Wall Street Journal Online** (Tue, Mar 13)
- Consortium Wins Montenegro License Bid
  **AP** (Tue, Mar 13)
- Telenor Satellite Services Agrees to Extend Iridium Quality of Service Offer
  **Business Wire** (Tue, Mar 13)
- UPDATE - Alfa raises Vimpelcom stake to almost 40 pct

**(Advertisement)**

HSBC
Online Saver
5.75% AER

Open your
account today >>

HSBC ⬥
The world's local bank

**KEY STATISTICS**

| | |
|---|---|
| Forward P/E (1 yr): | 11.44 |
| P/S (ttm): | 2.18 |
| Dividend Date: | 15-Jun-06 |
| Ex-Dividend Date: | 04-May-04 |

More Key Statistics...



# PRESS RELEASE

## Ratings On Kyivstar Remain Unchanged Despite Ongoing Possibility Of Covenant Breach

**Primary Credit Analysts**:
Michael O'Brien
London
(44) 20-7176-3561
michael_obrien@
standardandpoors.com

**Secondary Credit Analyst**:
Lorenzo Sliusarev
Moscow
(7) 495-783-41-32
lorenzo_sliusarev@
standardandpoors.com

Additional Contact: Industrial
Ratings Europe
CorporateFinanceEurope@
standardandpoors.com

**RatingsDirect
Publication Date**
March 23, 2007

LONDON (Standard & Poor's) March 23, 2007—Standard & Poor's Ratings Services said today that its ratings and outlook on Ukraine-based mobile telecommunications operator CJSC Kyivstar GSM (BB-/Stable/—) remain unchanged despite the ongoing possibility that the company might breach an information covenant of its Eurobonds.

The covenant requires the company to provide full audited results for the previous fiscal year no later than April 30. Kyivstar might be prevented from doing so by a recent court injunction that has been issued by the Kyiv City Commercial Court upon the application of a subsidiary of the Alfa Group, one of the two principal shareholder groups of Kyivstar. The court injunction seeks to prevent Kyivstar from providing further financial information.

A breach of the covenant is defined as an event of default, which would allow bondholders to seek repayment of the bonds and interest following a remedy period of 30 consecutive calendar days. If the covenant was breached, Standard & Poor's considers that investors may not have a strong incentive to force repayment of the bonds, given the level at which the bonds are trading. If the repayment of all or a substantial part of Kyistar's outstanding debt was accelerated by investors, however, we believe Kyivstar's liquidity to be largely sufficient to fund back the debt given on-balance-sheet cash and cash equivalents of $473 million at Sept. 30, 2006, and the company's ongoing free cash flow generation and market performance. The company's management has also indicated its willingness and ability to continue making interest payments. The company had total unadjusted debt of $510 million at Sept. 30, 2006.

We are concerned, however, that the quality of information we receive from Kyivstar will rapidly

decline due to the court injunction. As a result we will suspend our ratings on Kyivstar if the company cannot provide adequate financial and operating information. This suspension will likely occur by the end of the remedy period.

Published by Standard & Poor's, a Division of The McGraw-Hill Companies, Inc. Executive offices: 1221 Avenue of the Americas, New York, NY 10020. Editorial offices: 55 Water Street, New York, NY 10041. Subscriber services: (1) 212-438-7280. Copyright 2007 by The McGraw-Hill Companies, Inc. Reproduction in whole or in part prohibited except by permission. All rights reserved. Information has been obtained by Standard & Poor's from sources believed to be reliable. However, because of the possibility of human or mechanical error by our sources, Standard & Poor's or others, Standard & Poor's does not guarantee the accuracy, adequacy, or completeness of any information and is not responsible for any errors or omissions or the result obtained from the use of such information. Ratings are statements of opinion, not statements of fact or recommendations to buy, hold, or sell any securities.

Standard & Poor's uses billing and contact data collected from subscribers for billing and order fulfillment purposes, and occasionally to inform subscribers about products or services from Standard & Poor's, our parent, The McGraw-Hill Companies, and reputable third parties that may be of interest to them. All subscriber billing and contact data collected is stored in a secure database in the U.S. and access is limited to authorized persons. If you would prefer not to have your information used as outlined in this notice, if you wish to review your information for accuracy, or for more information on our privacy practices, please call us at (1) 212-438-7280 or write us at: privacy@standardandpoors.com. For more information about The McGraw-Hill Companies Privacy Policy please visit www.mcgraw-hill.com/privacy.html.

Analytic services provided by Standard & Poor's Ratings Services ("Ratings Services") are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. Credit ratings issued by Ratings Services are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of credit ratings issued by Ratings Services should not rely on any such ratings or other opinion issued by Ratings Services in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or by the underwriters participating in the distribution thereof. The fees generally vary from US$2,000 to over US$1,500,000. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications.

Permissions: To reprint, translate, or quote Standard & Poor's publications, contact: Client Services, 55 Water Street, New York, NY 10041; (1) 212-438-7280; or by e-mail to: research_request@standardandpoors.com.

The McGraw-Hill Companies