Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

STORM LLC,

            Plaintiff,

-against-

TELENOR MOBILE COMMUNICATIONS AS,

            Defendant.

------------------------------------------------------------------ X  06 CV 13157(GEL) (DF)

TELENOR MOBILE COMMUNICATIONS AS,

            Counterclaimant,

- against-

STORM LLC,

            Counterclaim-Defendant,

- and-

ALTIMO HOLDINGS & INVESTMENTS LIMITED and
ALPREN LIMITED,

            Relief Defendants.

------------------------------------------------------------------ X

**REPLY MEMORANDUM IN FURTHER SUPPORT OF COUNTERCLAIMANT'S MOTION TO HOLD COUNTERCLAIM-DEFENDANT AND RELIEF DEFENDANTS IN CONTEMPT**

Counterclaimant Telenor Mobile Communications AS ("Telenor Mobile") respectfully submits this reply memorandum in further support of its motion to hold Relief Defendants Altimo Holdings & Investments ("Altimo") and Alpren Limited ("Alpren") and Counterclaim-Defendant Storm LLC ("Storm") (collectively, "Defendants") held in contempt of this Court's December 18, 2006 preliminary injunction (the "Preliminary Injunction").

## INTRODUCTION

The Preliminary Injunction is absolutely clear. It bars Defendants from either "commencing, prosecuting, enforcing, causing the enforcement, attempting to enforce or cause the enforcement; or (b) allowing, or failing to take steps to prevent, any other person, official or entity from enforcing or attempting to enforce" any Ukrainian order "that would disrupt, delay or hinder in any manner whatsoever, the arbitration proceedings between Telenor Mobile and Storm." As the Court explained in its December 15, 2006 Order, absent an injunction, Telenor Mobile would face "imminent and irreparable harm" because (a) to the extent the Ukrainian litigation interfered with the arbitration "Storm would be able to prolong its boycott of Kyivstar meetings, thereby making it impossible for that company – in which Telenor has a majority stake – to function"; and (b) "[m]ore importantly, the Ukrainian proceedings place Telenor under threat of criminal sanctions if it proceeds with the arbitration." Opinion and Order, dated December 15, 2006, at 23.

In the face of that order, to date, Defendants have prosecuted, or allowed the prosecution of, <u>five</u> proceedings that have the effect of disrupting, delaying or hindering the arbitration proceedings. Two of those proceedings concern an enforcement order and a fine that may lead to criminal sanctions, including the arrest of Telenor Mobile personnel. The other three are duplicative lawsuits that arise out of the inability of Closed Joint Stock Company "Kyivstar

G.S.M." ("Kyivstar") to function because of the board boycott that is one of the principal issues in the arbitration.

I. **THE ALTIMO ENTITIES FAILED TO TAKE STEPS TO PREVENT ENFORCEMENT OF THE DECEMBER 1 ORDER**

Defendants assert that, absent any action by Defendants, the December 1 injunction would have been enforced against Telenor Mobile, and claim that they did not to take any steps after December 4 even to contact Ukrainian authorities. See Memorandum of Altimo Holdings & Investments Limited and Alpren Limited in Opposition to Telenor Mobile's Motion for an Order of Contempt ("Altimo Mem.") at 4. Accordingly, by their own admission, Defendants knowingly violated the Preliminary Injunction by failing to take steps to prevent Ukrainian officials from "enforcing or attempting to enforce" the December 1 Order.[1]

Defendants' only excuse for ignoring the plain command of this Court's order is that, in light of their reading of the context in which the order was issued, Defendants were not required to "intervene actively to stop the enforcement of the December 1 injunction." Altimo Mem. at 5. While context may be significant in the interpretation of an ambiguous order, the language of the Preliminary Injunction could not have been clearer.[2] Indeed, on their appeal to the Second

---

[1] Defendants mistakenly claim that Telenor Mobile has not directly asserted that Altimo's actions are contumacious. Altimo Mem. at 1 n.1. As set forth below, Altimo's failure to take steps to stop the enforcement of the orders or the litigation described herein clearly violated the Preliminary Injunction. Moreover, Defendants are incorrect when they assert that Cypriot law, and not federal common law, determines whether or not to pierce the corporate veil for a contumacious act. See United States Public Interest Group v. Atlantic Salmon of Maine, 261 F. Supp.2d 17, 23-24 (D. Me. 2003) (finding federal common law applied to pierce corporate veil of contemnor, observing that "questions of the enforceability of a federal court order seeking to enforce a federal statutory mandate is the immediate precipitating cause of the controversy"). At the hearing on the Preliminary Injunction, Telenor Mobile produced, more than sufficient evidence, under either standard, to pierce the corporate veil. See Telenor Mobile's Memorandum in Opposition to Motion of Relief Defendants Altimo Holdings & Investments Limited and Alpren Limited to Dismiss for Lack of Personal Jurisdiction and accompanying affidavits, dated Dec. 14, 2006. Indeed, Defendants' own documents make it clear that they regarded Storm and Altimo (then known as Alfa Telecommunications) as a single business entity. See, e.g., Reply Declaration of Robert L. Sills ("Sills Declaration") dated April 16, 2007 at Exh. A (email from David Wack, Esq., to Mary St. John-Butler, Esq., dated Sept. 4, 2002. ("In any event, since Alfa acquired Storm back in July, Storm means Alfa.")).

[2] Rule 65(d) does not allow a party to look beyond the four corners of a preliminary injunction to avoid its plain meaning. The reason for that rule is to ensure that a party subject to such an order is able to ascertain from the

Circuit, Alpren and Altimo argued that the Preliminary Injunction is overbroad, stating as follows:

> By these terms, the injunction imposes upon Storm, Altimo and Alpren an obligation not only to refrain from legal activities in Ukraine that hinder the arbitration, <u>but also to take affirmative measures to prevent all others from interfering with the arbitration by using the Ukraine courts</u>. Such language, in effect, places on Altimo and Alpren the heavy burden of serving as guardian of the arbitration throughout the Ukraine legal system—<u>or else face a contempt citation in the United States.</u>

Brief of Relief Defendants, dated February 14, 2006 (emphasis added).[3] If Defendants believed, as they now argue, that the December 18 order was inconsistent with the scope of the Court's December 15 decision or the relief sought by Telenor Mobile, their remedy was to seek to modify or vacate the decree. Alpren and Altimo defendants attempted to do so on December 18, 2006, when they took precisely the same position in opposing Telenor Mobile's proposed order and in support of their proposed counter-order as they do on this motion. Having failed in their effort to narrow the scope of the Preliminary Injunction, Defendants do not have the option to ignore this Court's order and raise their rejected claim of overbreadth as a defense to a contempt motion. See Celotex Corp. v. Edwards, 514 U.S. 300, 306 (1995) ("[P]ersons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order."); Milltex Indus. Corp. v. Jacquard Lace Co., Ltd., 55 F.3d 34, 41 n. 14 (2d Cir. 1995) ("The fact that a court order

---

document itself exactly what conduct is proscribed." Charles A. Wright and Arthur R. Miller, Fed. Prac. & Proc. § 2955 (2ed 1995) at p. 309; Drywall Tapers and Pointers of Greater New York, Local 1974 of I.B.P.A.T. AFL-CIO v. Local 530 of Operative Plasterers and Cement Masons Intern. Ass'n, 889 F.2d 389, 395-96 (2d Cir. 1989); Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63, 76-77 (1st Cir. 2002).

[3] Defendants go on to say that the injunction "likewise seems to oblige Storm, a Ukraine company, to litigate against the Ukraine government if the Ukraine government takes action in that country's courts that might interfere with the arbitration." Id. If Defendants, in their view, could be required to litigate with the Ukrainian government, it is implausible how Defendants contend that they are not required merely to contact Ukrainian officials to prevent Telenor Mobile from being subjected to enforcement actions in Ukraine, which they are plainly allowed to do under Ukrainian law. See Didkovskiy Reply Declaration at ¶ 4.

might be unlawful does not, of course, give a lawyer or client license to violate it; to the contrary, the proper course is to adhere to the order until– and unless– it is vacated."); see In re Bucurescu, 282 B.R. 124, 131 n.29 (S.D.N.Y. 2002) ("An order issued by a court must be obeyed, even if it is later shown to be erroneous. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal."), citing McDonald v. Head Criminal Court Supervisor Officer, 850 F.2d 121, 124 (2d Cir. 1988) (internal quotation marks omitted).

Second, to the extent context does matter, it lends no support to Defendants. At the hearing of December 7, 2006, when Telenor Mobile sought a temporary restraining order, Telenor Mobile explained that unlike Storm and Vadim Klymenko, Telenor Mobile had not been served with any enforcement orders, and that the purpose of the injunction "was to stop [such an order] from being issued." 12/7/2006 Tr. at 23; see also 12/7/2006 Tr. at 6-7 (stating that the purpose of the application was to eliminate the "specter of criminal prosecutions against Telenor or its executives."). Avoiding such harm was a consistent theme advanced by Telenor Mobile at each subsequent hearing. Given the myriad ways in which Defendants have conducted their assault on the arbitration through the Ukrainian legal system, an order imposing affirmative as well as negative obligations on them – particularly given the ease with which they could have halted any enforcement proceeding – was entirely appropriate.[4]

Third, Defendants' claim that they took no "affirmative steps" to enforce the December 1 Order after December 18 rings entirely hollow. Defendants state that Alpren's only action was to enforce the December 1 order on December 4, 2006 and that Alpren took "no further steps" after this Court issued its injunction on December 7, 2006. Defendants cannot credibly claim to

---

[4] It is striking that Defendants never argued, in any of the three hearings leading up to the Preliminary Injunction, that enforcement proceedings had already begun and could not be stopped.

4

have applied for an enforcement order against Telenor Mobile on December 4, the date that Alpren made its applications against Storm and Klymenko. Under Ukrainian law and practice, the Ukrainian State Enforcement Service will not act to serve and enforce an injunction – which is a necessary predicate for imposing sanctions – absent a request by a party.[5] Although Defendants deny having made such a request after being restrained, the evidence, albeit circumstantial, strongly supports a finding that they did so. The enforcement file contains two applications by Alpren, one directed specifically to Storm and one to Klymenko. Those applications are entirely inconsistent with Defendants' alternative claims that the December 1 order was self-executing, or that the one or the other of the December 4 applications – each of which, on its face, relates to a single party – implicitly applied to Telenor Mobile. Moreover, the February 17 Enforcement Order refers, on its face, to "the application"; there is no copy of that application in the Ukrainian file, from which the index is also missing, and none has been produced by Defendants. The only logical explanation is that an application for enforcement was made by Alpren sometime after December 7, and that an effort has been made to conceal the evidence of that application from Telenor Mobile and from this Court.[6]

## II. THE E & Y LITIGATION UNLAWFULLY INTERFERES WITH THE ONGOING ARBITRATION

Defendants argue that the E&Y litigation was permissible under the Preliminary Injunction because it allegedly falls outside the scope of the arbitration. See Altimo Mem. at 8. As set forth below, the E & Y litigation is plainly a subject of the arbitration and could serve no

---

[5] See Didkovskiy Reply Dec. ¶ 8. Defendants also do not explain how the Ukrainian authorities, became aware that Telenor Mobile had continued with the arbitration so as to issue a fine against Telenor Mobile on February 9, 2007, other than from Defendants.

[6] Moreover, the extraordinary delay between the claimed application date of December 4 and service of the enforcement order on February 17 further undercuts Defendants' position, because such orders are generally delivered in one business day. See Reply Declaration of Oleksiy Didkovskiy, dated April 16, 2007 at ¶ 12.

legitimate business purpose other than to pressure Telenor Mobile and to destroy the rights that Telenor Mobile seeks to vindicate in arbitration under the Shareholders Agreement dated January 30, 2004 between and among Telenor Mobile, Storm and Kyivstar (the "Shareholders Agreement").[7]

### A. The E & Y Litigation Arises Directly Out of Storm's Bad Faith Refusal to Attend Board and Shareholder Meetings

The E & Y litigation directly involves the claims at the heart of Telenor Mobile's case—to restore Kyivstar's board of directors (the "Board") and convene shareholders meetings in compliance with both the terms of the Shareholders Agreement and the December 22, 2005 Order of the Higher Commercial Court of Ukraine (the "December 22, 2005 Order"). Storm's ongoing boycott of those meetings, which has paralyzed the Board, was one of the express reasons this Court gave for finding that Telenor Mobile would face imminent and irreparable injury if its motion for an anti-suit injunction were not granted. Telenor Mobile first requested that the arbitrators enjoin the Ukrainian E&Y litigation on January 16, 2007, and Storm responded on January 19, 2007. That issue was addressed in Telenor Mobile's proposed findings of fact and conclusions of law, submitted to the arbitrators on January 2007, and remains pending before the arbitration panel, so that Defendants E&Y litigation directly interferes with

---

[7] The arbitrators, in the first instance, have jurisdiction to decide whether Telenor Mobile's claims are arbitrable because the Shareholders Agreement expressly incorporates the UNCITRAL arbitration rules, which in turn, provide that the Panel has authority to determine the scope of its own jurisdiction. See Shaw Group, Inc. v. Triplefine Intern. Corp., 322 F.3d 115, 123 (2d Cir. 2003) (arbitrability question delegated to arbitrators when agreement incorporated ICC rules of international arbitration (citing Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 46-47 (1997)). However, Telenor Mobile notes that, in light of the broad arbitration clause in the Shareholders Agreement, the clause is "presumptively applicable to disputes involving matters going beyond the 'interpret[ation] or enforce[ment] of particular provisions' of the contract which contains the arbitration clause." JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 172 (2d Cir. 2004). So long as the "allegations underlying the claims 'touch matters' covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." Id. at at 167 n.6. As set forth below, Telenor Mobile's claim that Storm has violated its duty of good faith by commencing the E & Y litigation easily satisfies that standard.

the arbitration, in violation of the Preliminary Injunction.

Defendants erroneously argue that the E & Y litigation "derives from the December 22, 2005 Order." Rather, the December 22, 2005 Order holds that, under Ukrainian law, only shareholders could be board members of a closed joint stock company like Kyivstar.[8] The December 22, 2005 Order did not address any issue under the Shareholders Agreement, nor did it address, in any way, Kyivstar's contracts with its outside auditors or its power to release financial information.

In the arbitration, one of Telenor Mobile's principal claims is that Storm's refusal to attend Board (as well as shareholders) meetings or to amend the Charter so as to reconstitute the Board violates its obligation of good faith under the Shareholders Agreement.[9] The Shareholders Agreement expressly requires Telenor Mobile and Storm to maintain a quorum in Board meetings for, among other things, the express purpose of approving Kyivstar's external auditors. See Shareholders Agreement § 2.05(c) & (d)(x). The Shareholders Agreement also provides that, in the event that the parties cannot convene a Board meeting, a shareholders meeting should be held to approve the issues that would otherwise have been considered by the Board. See Shareholders Agreement § 2.05(c). Storm's defense is that it was not required to attend Board meetings because the December 22, 2005 Order invalidated those provisions of the Charter

---

[8] Because there were, at the time, only two shareholders in Kyivstar, the December 22, 2005 Order struck the nine-member provision from the Charter. Because corporations can serve as directors under Ukrainian law, Telenor Mobile has since transferred shares to each of four subsidiaries of Telenor Mobile for the express purpose of complying with that order. See Am. St. of Cl. at ¶¶ 48-49. Storm's bad faith refusal to respond to Telenor Mobile's proposal to amend the Charter is itself a subject of the arbitration.

[9] Following the December 22, 2005 Order, in February 2006, Telenor Mobile commenced the arbitration in an effort to, inter alia, (a) cause the Charter to be amended consistent with the terms of the December 22, 2005 Order of the Higher Commercial Court (the "December 22, 2005 Order") and the Shareholders Agreement, (b) require Storm and its nominees to attend Kyivstar's shareholders and Board meetings, as Storm promised to do under the Shareholders Agreement, and (c) enjoin any further litigation by Storm in the Ukraine arising out of or relating to the Shareholders Agreement. See Telenor Mobile's Statement of Claim, dated February 7, 2006, p. 18-19; Am. St. of Cl., p. 21 and Telenor Mobile's Amended Statement of Claim, dated April 25, 2006 ("Am. St. of Cl.").

regarding the Board. While Telenor Mobile disputes that assertion,[10] those issues are at the heart of the arbitration.[11] Indeed, it is Storm's nearly two-year long refusal to attend such meetings that provided it with the basis for the E & Y litigation. Such claims clearly fall within the scope of a broad arbitration clause. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 622 n.9 (1984).

### B. Defendants Incorrectly Assert That the E & Y Litigations are Not Currently Before the Panel

After Telenor Mobile learned of the first E & Y action filed by Storm, Telenor Mobile expressly included the E & Y litigation as part of its request for an anti-suit injunction from the arbitrators on January 16, 2007. Telenor Mobile had already sought a broadly worded anti-suit injunction in its original and amended statement of claim.[12] Telenor Mobile's motion seeks a declaration that the litigation was commenced, like Storm's prior vexatious litigation, in violation of Storm's duty of good faith under the Shareholders Agreement to maintain the board and attend meetings, as well as to ensure Kyivstar's continued ability to access international capital markets.[13] While that motion was pending, Alpren commenced two additional actions

---

[10] Under Section 2.01(b), Storm agreed to "take all action necessary . . . to (1) ensure the election of candidates and (2) maintain the membership of the Board" as specified in the Shareholders Agreement. Id. (emphasis added). See also Am. Statement of Cl. at pp. 5-6. Storm has not only failed to maintain the membership of the Board, but has engaged in ongoing litigation to destroy the structure of the Board as contemplated by the Shareholders Agreement and obstructed attempts to reconstitute the Board since the December 22, 2005 Order was issued.

[11] Storm does not, and could not, argue that the December 22, 2005 Order prevented Storm from attending shareholders meetings, where the parties could have freely amended the Charter and approved Storm's external auditors. Storm's failure to attend shareholders meetings is another subject of the arbitration.

[12] Although Defendants argue to the contrary, that claim, and the evidence in support of that claim, was made on January 16, 2007.

[13] It is well-settled "that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself." See A.H.A. Gen. Constr., Inc. v. N.Y. City Housing Auth., 92 N.Y.2d 20, 677 N.Y.S.2d 9, 699 N.E.2d 368, 374 (1998) (Kaye, C.J.); accord Spanos v. Skouras Theatres Corp., 364 F.2d 161, 169 (2d Cir.1966) (en banc) ("One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from

based on what Storm concedes are the precisely same grounds.[14] Those actions plainly frustrate Telenor Mobile's application for injunctive and declaratory relief.

### C. The E & Y Litigation Also Disrupts the Arbitration by Threatening to Destroy Telenor Mobile's Rights Under the Shareholders Agreement and to Moot the Relief it Seeks in Arbitration

The E & Y litigation also threatens to moot Telenor Mobile's rights in Kyivstar that Telenor Mobile seeks to vindicate in arbitration.

First, the E & Y litigation directly compromises Kyivstar's ability to access the international capital markets by preventing the audit of Kyivstar's financial statements and preventing Kyivstar from providing financial information to its auditors, its shareholders or any other third party. The ability to access the international capital markets was a central reason for the parties' entering into the Shareholders Agreement. See Affidavit of Egil Hansen dated August 9, 2006 at ¶ 8. For that reason, as noted above, in Section 2.05(b) of the Shareholders Agreement, Storm also promised:

> (iii) not to take, or permit any of its Affiliates to take, any action permitted by Ukrainian law which would allow Storm to prevent the approval by the Board or the GMS, as applicable, of any action which is specified in Section 2.03(b) as an action for which Storm is required to vote its Voting Securities and cause the Directors nominated by it to vote in favor of approving.

Critically, one of the actions specified in Section 2.03(b)(ii) that Storm and its nominees on the Board are required to vote for is "any Eurobond issue undertaken by the Company in accordance with the Company's annual budget and/or financing plan." As of January 30, 2004, when the parties entered into the Shareholders Agreement, Kyivstar had issued $160,000,000 of 12.75% Loan Participation Notes due 2005 (the "2005 Notes"), and in view of those bonds'

---

liability for not rendering his promised performance by preventing the happening of the condition on which it was promised." (quoting 3A Corbin on Contracts, § 767, at 540 (1960)).

[14] See Storm's Letter dated January. 26, 2007.

9

impending maturity, intended to issue further debt securities in the international capital markets.[15] In August 2004, Kyivstar issued $266,420,000 of 10.375% Loan Participation Notes due 2009 (the "2009 Notes"), and undertook an exchange offer in which holders of the 2005 Notes were given the opportunity to exchange their 2005 Notes for 2009 Notes. In April 2004, Kyivstar issued $175,000,000 of 7.75% Loan Participation Notes due 2012 (the "2012 Notes" and, together with the 2009 Notes, collectively, the "Notes"). See Declaration of Peter O'Driscoll dated April 16, 2007 ("O'Driscoll Decl.") ¶¶ 4 to 5. The proceeds of the Notes are used to fund loans made to Kyivstar by Dresdner Bank AG (the "Lender") O'Driscoll Decl. ¶¶ 6-7. The terms and conditions of the relevant loan agreements require Kyivstar to deliver to the Lender an auditor's compliance certificate and audited year-end financial statements within 120 days after the end of each fiscal year.[16] Kyivstar's fiscal year ends on December 31. Accordingly, its auditor's compliance certificate and audited year-end financial statements must be delivered to the Lender by April 30, 2007. Kyivstar's failure to deliver such auditor's compliance certificate and financial statements by such date will constitute an event of default

---

[15] The need to access capital markets was so important that the Shareholders Agreement contains a further provision stating:

> [N]o Shareholder shall take any action or engage in any conduct, or permit any of its Affiliates or any of its or their respective directors, officers, employees, agents, subcontractors or consultants to take any action or engage in any conduct, the direct or indirect consequence of which would be to prevent the Company from having access to the United States or other international capital markets. . . .

See Shareholders Agreement § 8.07.

[16] Audited financial statements are, of course, a requirement for virtually any company in the world to issue debt or equity securities. In addition, audited financial statements are required in order for an issuer such as Kyivstar to obtain a credit rating for its debt securities from rating agencies.

under the relevant loan agreements, which will, in turn, constitute an event of default under the Notes.[17]

At the time of their issuance on March 26, 2007, Standard & Poor's ("S&P") issued a notice stating that it may suspend its BB- credit rating for Kyivstar if Kyivstar does not provide financial statements to its creditors and shareholders. O'Driscoll Decl. ¶ 12 and Exhibit J. On March 29, 2007, Moody's Investors Service issued a notice stating that it had put Kyivstar on review for a possible downgrade from its Ba3 credit rating due to Kyivstar's inability to provide financial and other information to third parties as a result of the injunction in the third E&Y case. O'Driscoll Decl. ¶13 and Exhibit K.[18]

Second, the Shareholders Agreement also expressly provides each party with the right to audit Kyivstar's books and records. See Shareholders Agreement § 9.02. As a result of the injunction issued in the third E & Y case, Kyivstar cannot even provide financial information to its majority owner, Telenor Mobile, or publish its financial results. The result of that third action is, therefore, a separate violation of an additional express term of the Shareholders Agreement.

---

[17] Section 15.1(d) of the relevant loan agreements provides that Kyivstar's failure to perform any covenant or agreement under such loan agreements is an Event of Default if such default continues after the Lender's written notice thereof. O'Driscoll Decl. ¶¶ 6-7. On March 19, 2007, Kyivstar notified the Lender of the injunction issued by the Kyiv City Commercial Court in the third E&Y case and stated that "As a result of these injunctions, Kyivstar currently believes it may not be able to comply with the covenants relating to the outstanding Notes under which it is obligated to deliver certain annual and quarterly financial information." O'Driscoll Decl. ¶ F. The Lender issued a notice dated March 19, 2007 to holders of the Notes informing them of the notice it had received from Kyivstar. O'Driscoll Decl., Exhibit G.

[18] On March 21, 2007, Telenor Mobile's parent corporation, Telenor ASA, announced that its board of directors had, as a direct consequence of Telenor ASA's inability to obtain financial information from Kyivstar arising from the E & Y litigation, decided to deconsolidate Kyivstar's financial results from Telenor ASA's financial results. O'Driscoll Decl. ¶ 10 and Exhibit H. This announcement resulted in an immediate drop in Telenor ASA's share price. O'Driscoll Decl. ¶ 4 and Exhibit I.

11

III.   **THIS COURT HAS BOTH ORIGINAL AND REMOVAL JURISDICTION**

Alpren and Altimo now argue that this Court lacks subject matter jurisdiction because the New York Convention only governs the enforcement and recognition of awards rendered pursuant to international arbitration agreements, and does not apply to applications to vacate such awards. As set forth below, Defendants' overly literal reading of § 202 of the FAA is incorrect. In any event, the plain language of § 205, which is wholly ignored by Defendants, clearly gives removal jurisdiction to this Court.

   A.   **Original Subject Matter Jurisdiction Exists Under the Plain Language of §§ 202 and 203 of the Act.**

Chapter 2 of the Act defines the scope of subject matter jurisdiction for actions arising under the New York Convention. See 9 U.S.C. §§ 201-208. Section 203 of the Act provides that a federal court has original jurisdiction over any "action or proceeding falling under the Convention." 9 U.S.C. § 203. Section 202, in turn, "describes which actions fall under the Convention." Sarhank Grp v. Oracle Corp., 404 F.3d 657, 660 (2d Cir. 2005) (internal quotation omitted). That section provides as follows:

> An arbitration agreement or arbitral award . . . which is considered as commercial, including a transaction, contract, or agreement described in Section 2 of this title, <u>falls under the Convention</u>. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

9 U.S.C. § 202 (emphasis added).

Reading §§ 202 and 203 together, there is original jurisdiction over any action involving an arbitral award or arbitration agreement falling under the Convention. See Sarhank Group, 404 F.3d at 659-60. There is no dispute that this action, which involves an arbitration between two non-American companies regarding their respective interests in a Ukrainian company, comes squarely within the scope of § 202. See Bergesen v. Joseph Muller Corp., 710 F.2d 928, 932 (2d Cir. 1983). As a result, had Storm filed its petition directly with the District Court, the District Court would have had original jurisdiction to hear the dispute.

As Defendants acknowledge, the Sixth and the Eleventh Circuits have held that there is original jurisdiction in actions to vacate arbitral awards falling under the New York Convention. See Jacada (Europe), Ltd. v. Int'l Mktg Strategies, Inc., 401 F.3d 701, 704 (6th Cir. 2005), and Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434, 1441 (11th Cir. 1998). Indeed, in Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 102-03; 103 n.1 (2d Cir. 2006), an action to vacate an arbitration award, the Second Circuit held that "[t]he Convention on the Recognition and Enforcement of Foreign Arbitral Awards . . . governs this dispute and provides federal subject matter jurisdiction." See also Sarhank Group, 404 F.3d at 659-60 (reading §§ 202 and 203 in pari materia).

Defendants, however, argue that actions falling under the New York Convention pursuant to § 203 do not include all disputes arising out of the "agreements or awards" falling under the Convention pursuant to § 202. Defendants narrowly read the phrase "actions or proceedings falling under the Convention" in § 203 to include only those remedies specifically set out in the language of the treaty, and which are in turn incorporated by § 201 of the Act.

The Second Circuit and the other Courts of Appeals have not taken such a hairsplitting approach to Chapter 2 of the Federal Arbitration Act. Indeed, the Second Circuit has upheld

13

jurisdiction over a variety of actions involving arbitral awards arising out of the New York Convention, even though the remedy sought was not expressly included in the text of the New York Convention.[19]

Section 208 of the Act expressly provides that all remedies available under Chapter 1 of the Act are available in actions under Chapter 2 to the extent they do not conflict with the Convention. See 9 U.S.C. § 208.[20] Those include motions to modify or vacate a domestic award, remedies not included in the Convention. Toys "R" Us, Inc., 126 F.3d at 20 (jurisdiction over petition to vacate pursuant to § 208).[21] Defendants' reading of the scope of § 203 would defeat the purpose of Chapter 2, which was specifically designed to create a federal forum to uniformly deal with international arbitral awards in the federal courts.[22] See Suter v. Munich Reinsurance Co., 223 F.3d 150, 159 (3d Cir. 2000).

---

[19]See Borden, Inc v. Meiji Milk Prods. Co., 919 F.2d 822, 825-26 (2d Cir. 1990), cert. denied 500 U.S. 953 (1991) (subject matter jurisdiction in a proceeding for an injunction in aid of arbitration); Productos Mercantiles e Industriales, S.A. v. Faberge USA, Inc., 23 F.3d 41, 44-45 (2d Cir. 1994) (original jurisdiction over a petition to modify an award arising under the Convention); Yusuf Ahmed Alghanim & Sons, W.L.L v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997), cert. denied, 522 U.S. 1111 (1998) (rejecting a literal reading of the scope of the Convention, and finding that "the district court properly found that it had the authority under the Convention to apply the FAA's implied grounds for setting aside the award.") (emphasis added).

[20] This is consistent with the legislative history of enabling statute. See Senate Report on Foreign Arbitral Awards, S38, p. 8 (Feb. 13, 1970) (noting that the "original Arbitration Act applies to all matters arising under the legislation implementing the convention"); G. Aksen, American Arbitration Accession Arrives in the Age of Aquarius: United States Implements United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 3 Sw. U. L. Rev. 1, 22 (1970) ("Since Chapter I is made applicable to all actions and proceedings commenced under Chapter II (so long as they are not inconsistent with Chapter II), the same remedies apply to agreements falling under the Convention.").

[21]Defendants cite Toys "R" Us for the proposition that "the Convention does not provide a basis for federal jurisdiction over an action seeking to vacate an arbitral award." To the contrary, Toys "R" Us held that in addition to motions to vacate under Article V, where a non-domestic arbitration award was made in the United States, federal courts, in their capacity as "competent authorities" under the New York Convention, could act on the bases developed under Chapter 1 of the FAA that allow a court to vacate an award. Id. at 22. See also Solé Resort, 450 F.3d at 103 n.1 (citing Toys "R" Us for the proposition that the Convention applies to a petition to vacate because of the "overlapping jurisdiction" of the FAA and the Convention).

[22] Defendants cite several commentators for the uncontroversial proposition that the Convention left rules, procedures or grounds for vacatur for arbitral awards issued in the host country to the domestic law of that country. See Altimo Mem. at 14-15 n.6. The domestic law referred to those materials are the courts of the signatory nations; nothing in the Convention, nor the commentary cited by Defendants, addresses the division of responsibility

14

### B.    Even If there Were Not Original Jurisdiction, Removal Jurisdiction Exists Under the Plain Language of § 205 of the Act.

Storm originally filed its petition to vacate in state court. Accordingly, even if Defendants were correct that Storm could not have brought its petition in federal court, Telenor Mobile's removal of the action would remain proper under § 205, which provides that any action that "relates to an arbitration agreement or award" falling under the Convention may be removed. See 9 U.S.C. § 205. Because there could be no doubt that Storm's Petition to Vacate "relates to" just such an arbitration award falling under the Convention, removal was proper. See Beiser v. Weyler, 284 F.3d 665, 669 (5th Cir. 2002); Banco de Santander Central Hispano, S.A. v. Consalvi Int'l, Inc., 425 F. Supp.2d 421, 427 (S.D.N.Y. 2006); Republic of Ecuador v. ChevronTexaco Corp., 376 F. Supp.2d 334, 349 (S.D.N.Y. 2005).

Section 205 provides as follows:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the [New York] Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. . . .

9 U.S.C. § 205 (emphasis added). While the words of § 203 are broad enough to encompass Storm's initial petition to vacate had it been brought originally in federal court, the wording of § 205 is substantially broader. See York Hannover Holding A.G. v. Am. Arbitration Ass'n, 794 F. Supp. 118, 122-23 (S.D.N.Y. 1992).[23] If Congress had intended to limit removal to compel

---

between state and federal courts. Rather, the Convention and the policy choices that support it "establish a strong and clear preference for a federal forum." Suter, 223 F.3d at 158.

[23] Defendants cite Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier (RAKTA), 508 F.2d 969, 971 (2d Cir. 1974) for the proposition that "[r]emoval under the Convention, pursuant to Section 205, is proper only if Section 203 would have provided original jurisdiction over Storm's petition to vacate." Altimo Mem. at 15. The Court made no such finding and relied on no such rule in that case, and nowhere discussed the language of § 205.

15

arbitration or confirm an award, "it could easily have said so." Id. at 122. As a result, the phrase "relates to" in § 205 has been broadly construed by every Court of Appeals and virtually every District Court interpreting § 205. See, e.g., Suter, 223 F.3d at 158 ("regardless of the amount in controversy or the questions raised in the case") (emphasis added); Beiser, 284 F.3d at 674 at 669 ("relates to" includes "just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense."); Jacada, 401 F.3d at 704 n.2.

Indeed, even the handful of District Court opinions that accept Defendant's narrow view of original jurisdiction have routinely found that there is removal jurisdiction over petitions to vacate or to stay arbitration under § 205. See Banco de Santander Central Hispano, S.A., 425 F. Supp. 2d at 433-34 (petition to vacate); Republic of Ecuador, 376 F. Supp.2d at 348-49 (S.D.N.Y. 2005) (petition to vacate); JSC Surgutneftegaz v. President and Fellows of Harvard College, 2005 WL 1863676 at *2, n.3 (S.D.N.Y. Aug. 3, 2005) (petition to stay).[24] For example, in Republic of Educador, Judge Sand upheld removal jurisdiction over a petition to vacate under § 205, observing:

> In this case, however, the parties who initially sought the exercise of federal jurisdiction were Defendants, under the removal provision applicable to the Convention. That provision . . . allows removal where the subject matter of an action or proceeding pending in state court relates to an arbitration agreement or award falling under the Convention, whether or not this relationship appears on the face of the complaint.

---

[24] The most recent and comprehensive of those decision is Banco de Santander. In a footnote, Defendants dismiss Banco de Santander's holding on removal jurisdiction as "inconsistent with the majority of cases," but that is, as set forth above, simply not the case. Altimo Mem., p. 15-16 n.9. Defendants go on to describe Banco de Santander as "wrongly decided" because the Court supposedly ignored the "narrow design" of the Convention. Altimo Mem. at 14-15 n.6. Putting to one side the fact that the Convention is not "narrowly designed", the District Court's decision there was based on the broad language of § 205, which Defendants wholly ignore. Moreover, while that opinion's discussion of original jurisdiction which was decided before the Second Circuit's decision in Solé Resort, is set out in a footnote that states that "[t]he Second Circuit has indicated that district courts do not have original jurisdiction over such actions," id., 425 F. Supp. at 425 n.2, the exhaustive discussion of removal jurisdiction in that case speaks for itself.

16

Republic of Ecuador, 376 F. Supp. 2d at 349 (citation omitted). The Court reasoned that removal jurisdiction was consistent with the purpose of the Convention – to provide parties with a federal forum that ensures arbitration agreements under the Convention are given proper effect. Id., citing Borden, 919 F.2d at 826.

This reasoning is consistent with the structure of § 205, which permits removal on the basis of a federal defense, and expressly abrogates the "well-pleaded" complaint rule that normally prevents such defenses from providing the basis for subject matter jurisdiction. See Beiser, 284 F.3d at 670-71. Accordingly, Congress expressly granted removal jurisdiction to a class of actions filed in state court—like vacatur actions—so long as the award "relates to" the Convention.[25] See Banco de Santander, 425 F. Supp.2d at 429.[26]

Defendants' argument on removal jurisdiction assumes that § 205 functions precisely like 28 U.S.C. § 1441, and allows removal only if there is original jurisdiction. The wording of § 205 is far broader than that of § 1441, and clearly allows removal of any action "relating to" an arbitration agreement or award "falling under the Convention," even assuming that Defendants' narrow construction of § 203's grant of original jurisdiction were correct. See Banco de Santander, 425 F. Supp. 2d at 427 (noting "significant differences between § 205 and § 1441"). Defendants' contentions regarding removal jurisdiction ignore the plain language of the statute, and should be rejected.

---

[25] Other statutory schemes provide broader grounds for removal jurisdiction than original jurisdiction. See Westmoreland Capital Corp. v. Findlay, 100 F.3d 263, 268-69 (2d Cir. 1996) (discussing statutory basis for removal of the abrogation of the well pleaded complaint rule for federal officers and international banks in specific actions, as well as awards under the New York Convention). See 14C Wright & Miller, Fed. Prac. & Proc. § 3729 (3d ed. 2006) (discussing statutes).

[26] While Defendants point to several District Court cases for the proposition that federal courts lack original jurisdiction to hear petitions to vacate, Defendants only point to one district court case that even suggest that a state-court action to vacate an arbitral award cannot be removed, and that case found that subject matter jurisdiction existed on a separate ground. See HSMV Corp. v. ADI Ltd., 72 F. Supp. 2d 1122 (C.D. Cal. 1999). That Court never examined the text of §§ 203 or 205, or the independent reasons why removal jurisdiction was made available for parties attempting to avoid the vacation of an award arising under the Convention. Id. at 1127 n.8.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that Counterclaimant Telenor Mobile's motion to declare Storm, Altimo and Alpren in civil contempt be granted in its entirety, that Counterclaim-Defendant and Relief Defendants be held in civil contempt of court and that the appropriate sanctions be assessed, including Counterclaimant's reasonable attorneys' fees.

Dated: New York, New York
April 16, 2007

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By /s/ Robert L. Sills

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
666 Fifth Avenue
New York, New York 101013
Telephone: 212 506 5000
Facsimile: 212 506 5151

-and-

Peter O'Driscoll
ORRICK, HERRINGTON & SUTCLIFFE LLP
25 Old Broad Street
London EC2N 1HQ
United Kingdom
Telephone: 011-44 20 7562 5000
Facsimile: 011-44 20 7628 0078

Attorneys for Counterclaimant-Defendant